1  Tracy Thompson (SBN 88173)
     tt@millerlawgroup.com
2  Jennifer A. Shy (SBN 131074)
     jas@millerlawgroup.com
3  MILLER LAW GROUP
   A Professional Corporation
4  111 Sutter Street, Suite 700
   San Francisco, CA 94104
5  Tel. (415) 464-4300
   Fax (415) 464-4336
6
7
   Attorneys for Defendant
8  RADIOSHACK CORPORATION

9

10                    UNITED STATES DISTRICT COURT

11                  NORTHERN DISTRICT OF CALIFORNIA

12                      SAN FRANCISCO DIVISION

13

14  FRANK ALLEN,                          | Case No.:   CV 11 3110 WHA
                                          | ECF No.:    3:11-cv-03110-WHA
15                                        | Judge:      Hon. William H. Alsup
16              Plaintiff,
                                          | DEFENDANT RADIOSHACK
17  v.                                    | CORPORATION'S NOTICE OF MOTION
                                          | AND MOTION FOR SUMMARY JUDGMENT
18                                        | OR, IN THE ALTERNATIVE, PARTIAL
    RADIO SHACK CORPORATION, et al.,      | SUMMARY JUDGMENT; MEMORANDUM
19                                        | OF POINTS AND AUTHORITIES IN
                                          | SUPPORT THEREOF
20              Defendants.
                                          | Date:       December 20, 2012
21                                        | Time:       8:00 a.m.
22                                        | Dept:       Courtroom 8, 19th Floor
23
24                                        | Complaint Filed:  May 20, 2011
                                          | Trial Date:       February 19, 2013
25

26  ///

27  ///

28  ///

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
CALIFORNIA

**TABLE OF CONTENTS**

I.    NOTICE OF MOTION AND MOTION...............................................................1

II.   MEMORANDUM OF POINTS AND AUTHORITIES.......................................1

    A.    INTRODUCTION ...............................................................................1

    B.    STATEMENT OF ISSUES TO BE DECIDED ...................................3

    C.    STATEMENT OF FACTS .................................................................3

        1.    RadioShack Maintained Policies and Procedures Applicable to its Employees and Store Operations. .........................................................3

        2.    Plaintiff's Employment with RadioShack and Documented Company Policy Violations.....................................................................................4

        3.    Acting Area Vice President Greg Pattakos is Displeased by the Appearance of Plaintiff's Store During his December 2009 Visit. ..........6

        4.    Alzaghari Holds District Meeting to Discuss Preparation for Pattakos's Return Visit, and upon his Return Pattakos Finds that Allen's Store Looks "Great".....................................................................7

        5.    Newly Appointed DM Ocampo Discusses Staffing Issues at Store 3830 with Plaintiff....................................................................................7

        6.    The Events Leading to Allen's April 27, 2010 Termination.....................8

    D.    LEGAL ARGUMENT .......................................................................10

        1.    Plaintiff's First Claim for Disparate Treatment Discrimination Based on Race and Third Claim for Age Discrimination Fail as a Matter of Law Because Plaintiff Cannot Make Out a *Prima Facie* Case of Race or Age Discrimination..............................................................................10

        2.    Plaintiff's Claims for Race and Age Discrimination Fail Because RadioShack had a Legitimate, Nondiscriminatory Reason for Terminating Plaintiff. ...........................................................................11

        3.    Plaintiff's Second Claim for Retaliation Fails as a Matter of Law. ..........16

        4.    Plaintiff's Fourth Claim for Hostile Work Environment Harassment Fails as a Matter of Law.........................................................................18

        5.    Plaintiff's Wrongful Termination Claim Fails as a Matter of Law. ..........21

        6.    Plaintiff's Claim for Intentional Infliction of Emotional Distress Fails Because He Has No Evidence of Extreme and Outrageous Conduct. ..21

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
CALIFORNIA

i

7.   Plaintiff Cannot Make Out a Claim for Punitive Damages........................22

E.   CONCLUSION...................................................................................................25

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
CALIFORNIA

**DEFENDANT'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT; MEMO OF P&A'S IN SUPPORT THEREOF -** Case No.: CV 11 3110 WHA

1

## TABLE OF AUTHORITIES

2

3 **Cases**

4 *Ackerman v. Western Elec. Co.*
    (N.D. Cal. 1986) 643 F.Supp. 836 ................................................................................23

5

6 *Aguilar v. Avis Rent A Car System, Inc.*
    (1999) 21 Cal. 4th 121 ........................................................................................................20

7 *Barber v. CSX Distrib. Servs.*
    (3rd Cir.1995) 68 F.3d 694 .................................................................................................16

8

9 *Barton v. Alexander Hamilton Life. Ins. Co. of America*
    (2003) 110 Cal.App.4th 1640 .............................................................................................23

10 *Basich v. Allstate Insurance Co.*
    (2001) 87 Cal.App.4th 1112 ...............................................................................................22

11

12 *Beaubrun v. Thomas Jefferson Univ.*
    (E.D. Pa. 2008) 578 F. Supp. 2d 777 ................................................................................20

13

14 *Bodett v. Coxcom, Inc.*
    (9th Cir. 2004) 366 F.3d 736 ..............................................................................................12

15

16 *Brooks v. City of San Mateo*
    (9th Cir. 2000) 229 F.3d 917 ..............................................................................................16

17 *Cervantes v. J.C. Penney Co., Inc.*
    (1979) 24 Cal. 3d 579.........................................................................................................21

18

19 *Chen v. County of Orange*
    (2002) 96 Cal.App.4th 926 .................................................................................................16

20

21 *College Hosp., Inc. v. Superior Court*
    (1994) 8 Cal. 4th 704.....................................................................................................22, 23

22 *Cruz v. Homebase*
    (2000) 83 Cal.App.4th 160 .................................................................................................25

23

24 *Etter v. Veriflo Corp.*
    (1998) 67 Cal.App.4th 457 .................................................................................................18

25

26 *Everroad v. Scott Truck Sys.*
    (7th Cir. 2010) 604 F.3d 471 ..............................................................................................11

27 *Fisher v. San Pedro Peninsula Hosp.*
    (1989) 214 Cal.App.3d 590 ...........................................................................................20, 22

28

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
CALIFORNIA

iii

*Godwin v. Hunt Wesson, Inc.*
(9th Cir. 1998) 150 F. 3d 1217 ................................................................... 11

*Granillo v. Exide Technologies, Inc.*
(C.D. Cal. 2011) 2011 WL 2535112 ............................................................ 15

*Guthrey v. State of California*
(1998) 63 Cal.App.4th 1108 ....................................................................... 18

*Guz v. Bechtel Nat'l, Inc.*
(2000) 24 Cal. 4th 317............................................................... 11, 12, 15

*Hampe v. Dept. of Corrections*
(E. D. Cal. 2000) 2000 U.S. Dist. LEXIS 15435............................................ 20

*Hanson v. Lucky Stores, Inc.*
(1999) 74 Cal.App.4th 215 ......................................................................... 21

*Hersant v. California Dep't of Social Servs.*
(1997) 57 Cal.App.4th 997 ......................................................................... 11

*Hoffman v. Capital Cities/ABC, Inc.*
(9th Cir. 2001) 255 F.3d 1180 .................................................................... 23

*Hughes v. Pair*
(2009) 46 Cal. 4th 1035............................................................................. 18, 21

*In re Angelia P.*
(1981) 28 Cal.3d 908.................................................................................. 23

*Janken v. GM Hughes Elec.*
(1996) 46 Cal.App.4th 55............................................................................ 20, 21

*Johnson v. United Cerebral Palsy/Spastic Children's Found. of Los Angeles*
(2009) 173 Cal.App.4th 740 ....................................................................... 10, 12

*Jones v. Dept. of Corrections and Rehabilitation*
(2007) 152 Cal. App. 4th 1367 .................................................................. 22

*Jurado v. Eleven-Fifty Corp.*
(9th Cir. 1987) 813 F.2d 1406 .................................................................... 16

*Kariotis v. Navistar Intern. Transp. Corp.*
(7th Cir. 1997) 131 F.3d. 672 ..................................................................... 15

*Kelly-Zurian v. Wohl Shoe Co., Inc.*
(1994) 22 Cal.App.4th 397 ......................................................................... 24

*King v. United Parcel Service*
(2007) 152 Cal.App.4th 426 ....................................................................... 15

Miller Law Group
A Professional Corporation
California

iv

*Lyle v. Warner Brothers Television Productions*
(2006) 38 Cal. 4th 264................................................................................................18

*Mayfield v. Sara Lee Corp.*
(N.D. Cal. Jan. 13, 2005) 2005 WL 88965 ...............................................................16

*McDonnell Douglas Corp. v. Green*
(1973) 411 U.S. 792 ..................................................................................................11

*Myers v. Trendwest Resorts, Inc.*
(2007) 148 Cal.App.4th 1403 ....................................................................................24

*Nidds v. Schindler Elevator Corp.*
(9th Cir. 1996) 113 F.3d 912 ....................................................................................14

*Patrick v. Maryland Cas. Co.*
(1990) 217 Cal.App.3d 1566 .....................................................................................23

*Peterson v. Hewlett-Packard Co.*
(9th Cir. 2004) 358 F.3d 599 ....................................................................................10

*Reno v. Baird*
(1998) 19 Cal. 4th 640...............................................................................................20

*Roby v. McKesson Corp.*
(2009) 47 Cal. 4th 686...............................................................................................24

*Shoemaker v. Myers*
(1990) 52 Cal. 3d 1....................................................................................................21

*Sirridge v. Bar-S Food Co.*
(9th Cir. 1996) 138 Fed. Appx. 948 ..........................................................................14

*Tennison v. Circus Circus Enterprises, Inc.*
(9th Cir. 2001) 244 F.3d 684 ....................................................................................21

*Unt v. Aerospace Corp.*
(9th Cir 1985) 765 F.2d 1440 ...................................................................................17

*Villiarimo v. Aloha Island Air, Inc.*
(9th Cir. 2002) 281 F.3d 1054 ..................................................................................15

*White v. Ultramar Inc.*
(1999) 21 Cal. 4th 563...............................................................................................24

*Yanowitz v. L'Oreal USA, Inc.*
(2005) 36 Cal. 4th 1028.............................................................................................16

**Statutes**

California  Civil Code § 3294................................................................................22, 23, 24

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
CALIFORNIA

## I.  NOTICE OF MOTION AND MOTION

NOTICE IS HEREBY GIVEN that on December 20, 2012, at 8:00 a.m., in Courtroom 8, located on the 19th floor of the above-mentioned Court, at 450 Golden Gate Avenue, San Francisco, California, Defendant RADIOSHACK CORPORATION will and hereby does move, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for an order granting summary judgment or, in the alternative, partial summary judgment, on the Complaint filed by Plaintiff FRANK ALLEN, and removed to federal court on June 23, 2011. This Motion is made on the grounds that there are no triable issues as to any material fact and that Defendant is entitled to judgment as a matter of law.

This Motion is based upon this Notice, the accompanying Memorandum of Points and Authorities, the supporting Declarations of Tracy Thompson[1] ("Thompson Dec."), Hani Alzaghari ("Alzaghari Dec."), Donna Ocampo ("Ocampo Dec."), James Peterson ("Peterson Dec."), and Todd Schrader ("Schrader Dec."), with exhibits, the pleadings and papers filed in this action, and upon such other evidence or argument as may be presented to the Court at or before the hearing on this Motion.

## II.  MEMORANDUM OF POINTS AND AUTHORITIES

### A.    INTRODUCTION

Frank Allen, a Store Manager employed by RadioShack, was terminated on April 27, 2010, for his failure to protect company assets.  The incident that precipitated his termination occurred on April 20, 2010. That evening, Allen's manager, Donna Ocampo, made a visit to Allen's Tenderloin-area store with Regional Sales Director Basem Aybef.  Upon arrival at the store, Ocampo and Aybef found stacks of bills and rolls of coins in the manager's desk

---

[1] Excerpts from the deposition transcripts of Plaintiff Frank Allen ("Allen Dep."), Donna Ocampo ("Ocampo Dep."), Amy Tam ("Tam Dep."), Hani Alzaghari ("Alzaghari Dep."), Rosetta Holmes ("Holmes Dep."), Gregory Pattakos ("Pattakos Dep."), David Gonsolin ("Gonsolin Dep."),  Nabor Baca ("Baca Dep."), Shaan Smith ("Smith Dep."), Thomas Nabozny ("Nabozny Dep."), and Carlos Venegas ("Venegas Dep.") are attached as Exhibits 2, 3, 4, 5, 6, 7, 8, 9, 10, 11 and 12, respectively, to the Thompson Dec.

drawer, rather than in the cash register where company policy required cash to be kept.  In addition, they observed a store associate, Rosetta Holmes, walking through the store with a large wad of cash in her pocket; when questioned about it, Holmes acknowledged that the cash amounted to about $1000.  In a discussion with Allen the next day, April 21, Allen took the position with Ocampo that he should not be held responsible for what had occurred in his store, as he was not there at the time of the visit.  Less than one month earlier, Ocampo had issued a written warning to Allen for his failure to comply with various company loss prevention policies and procedures.  The warning clearly put Allen on notice that any further violations would result in further disciplinary action, up to and including immediate termination. After review and consultation with Aybef and Loss Prevention, Ocampo made the decision to terminate Allen's employment.

In this lawsuit, Plaintiff claims disparate treatment based on race and national origin[2]; retaliation; discrimination based on age; hostile work environment (harassment) based on race and age; wrongful termination in violation of public policy; and intentional infliction of emotional distress.  Each claim fails as a matter of law.

- Plaintiff's age and race discrimination claims fail because Plaintiff has no evidence that the decision to terminate his employment was made because of his age or his race.

- Plaintiff's claims of hostile environment based on his age and race fail because, among other reasons, the alleged acts of harassment were nothing more than routine personnel management actions, were neither severe nor pervasive, and were unconnected to any protected classification.

- Plaintiff's retaliation claim fails because Plaintiff never engaged in any protected activity and, even if he had, there is no evidence of a causal connection between that activity and his termination.

- Plaintiff's wrongful termination claim fails because he cannot show that he was terminated because of his age or race, or because he engaged in protected activity.

- Plaintiff's claim for intentional infliction of emotional distress fails because he has no evidence that RadioShack engaged in any extreme and outrageous conduct.

---

[2] Although styled as a claim based on both race and national origin, Plaintiff has not produced evidence of any claim based on his national origin.  Accordingly, for purposes of this motion, RadioShack will treat this claim as one for race discrimination only.

Because there is no evidentiary support for any of Plaintiff's claims, RadioShack respectfully requests that this Court grant RadioShack's motion and enter summary judgment in its favor.

**B.    STATEMENT OF ISSUES TO BE DECIDED**

(1)    Whether RadioShack is entitled to summary judgment on all of Plaintiff's claims for relief;

(2)    Whether RadioShack is entitled to partial summary judgment on any of the following claims for relief:

(a)    First – Disparate Treatment Based on Race/National Origin in violation of California Fair Employment and Housing Act ("FEHA");

(b)    Second -- Retaliation in Violation of the FEHA;

(c)    Third – Discrimination Based on Age in Violation of the FEHA;

(d)    Fourth -- Hostile Work Environment (Harassment) in Violation of the FEHA;

(e)    Fifth -- Wrongful Termination in Violation of Public Policy;

(f)    Sixth -- Intentional Infliction of Emotional Distress ("IIED");

(3)    Whether RadioShack is entitled to partial summary judgment on Plaintiff's claim for punitive damages.

**C.    STATEMENT OF FACTS**

**1.    RadioShack Maintained Policies and Procedures Applicable to its Employees and Store Operations.**

RadioShack is a consumer electronics specialty retailer with its corporate headquarters in Fort Worth, Texas.  In 2010, RadioShack operated over 4,400 stores throughout the United States, with approximately 30,000 employees.  Schrader Dec. ¶ 2.  RadioShack maintains policies reflecting its commitment to providing a workplace that is free from discrimination, harassment and retaliation, and its policies reflect its equal employment opportunity philosophy.  Ocampo Dec. ¶¶ 33-34, Exhs. 11-12.  Employees are routinely informed of

RadioShack's policies, which are also available through RadioShack's "Answers Online" intranet. *Id.*; Allen Dep. 404:16-405:4.

Loss prevention and asset protection are an important part of a RadioShack store manager's job, and compliance with the Company's policies and procedures regarding loss prevention was stressed by RadioShack.  Peterson Dec. ¶¶ 2-3; Ocampo Dec. ¶ 9.  Each store manager is responsible for ensuring that store employees are familiar and comply fully with all applicable Company policies and procedures, and is held accountable for that compliance.  *Id.*  Allen Dep. 155:20-156:6, 158:21-159:12, 404:16-405:4.  Among other duties, store managers (including Allen, an experienced store manager) were required to follow established cash handling procedures, to complete a weekly physical "cage count" of all high-end merchandise kept locked in the "Security Cage" in the back stockroom, to properly authorize and document refunds, to report and monitor cash shortages, and to confirm that all appropriate merchandise security devices were functional and being used. Allen Dep. 153:9-18, 153:25-154:10, 155:20-156:6, 165:12-20; Exhs. 1, 5; Nabozny Dep. 64:10-14, 78:11-25, 82:17-83:13, 91:8-15, 97:18-98:4, 103:23-104:8, 111:25-112:19, 123:8-25, 138:1-139:7; Ocampo Dec. ¶ 9.

In addition, RadioShack emphasized store appearance through the use of established uniform standards for its stores known as "Non-Negotiable Standards," which were intended to ensure consistency in physical appearance, merchandising, and cleanliness, among other items, in all stores.  Schrader Dec. ¶ 5; Alzaghari Dec. ¶ 15, Exhs. 12-16; Ocampo Dec. ¶ 24. All store managers were expected to adhere to and be held accountable for compliance with the Non-Negotiable Standards, which were the focus of regular store visits conducted by District Managers (DMs), and occasionally by their Regional Sales Directors (RSDs), in order to assess their stores' ongoing compliance.  *Id.*

> **2.   Plaintiff's Employment with RadioShack and Documented Company Policy Violations.**

Allen's store, Store 3830, was part of RadioShack's District 538, which included about 22 stores in San Francisco.  Allen Dep. 29:17-30:1; Alzaghari Dec. ¶¶ 1-2.  Allen became a

1  store manager in 1998, and had many years of experience.  Allen Dep. 155:15-18; Nabozny

2  Dep. 123:15-25.  Throughout much of his employment, Allen reported to Hani Alzaghari, who

3  was the DM for District 538 from 2003 until February 2010.[3]  Alzaghari Dec. ¶ 2.  Among

4  other duties, a DM is responsible for the oversight of sales team recruitment and

5  development, store appearance or "image," and the professional appearance and conduct of

6  the store manager and team members.   Schrader Dec. ¶¶ 5, 7; Alzaghari Dec. ¶ 15,

7  Exhs. 12-16.  As DM for Store 3830, Alzaghari raised these issues with Plaintiff.  *Id.*

8       Allen had a well-documented history of violations of various company policies and

9  procedures relating to asset protection and loss prevention, among other issues.   These

10 issues were observed and documented not only by Alzaghari, but also by the Loss Prevention

11 Managers ("LPMs") responsible for District 538.  Alzaghari Dec. ¶¶ 3-17, 19-20, Exhs. 1-19;

12 Ocampo Dec. ¶¶ 11-19, Exhs. 2-7.  For example, on February 21, 2003, Alzaghari issued,

13 and Allen signed, a "written reprimand" citing Allen's "poor operational controls, failure to

14 follow daily report procedure and policy violation for cash procedures."  Alzaghari noted that

15 LPM Tom Nabozny, who had visited the store the previous day, had "found a box in the

16 manager's desk, which contained $300.  Money was used for change to avoid running to the

17 bank daily to get change."  Alzaghari was unequivocal:  "Mr. Allen:  I need you to follow

18 company policy for all cash procedures.   Cash must be kept in the cash drawer and

19 monitored by you at all times.   This must be done immediately and I'm holding you

20 accountable to follow all company policies at all time."  Alzaghari Dec. ¶¶ 4-6, Exhs. 1-3;

21 Allen Dep. 175:19-178:10, 180:20-181:13, 198:4-23, 199:20-202:22, 203:15-25, Exh. 2.

22      On April 16, 2007, Loss Prevention wrote Allen up for "failure to follow Company

23 compliance operational procedures" and, in a memorandum subsequently signed by Plaintiff

24 and his staff – advised Plaintiff that he "needs to understand that by just ignoring these

25 operational procedures, he is showing that he is not being responsible for maintaining the

26

---

27 [3] From the fall of 2009 until around February 2010, Alzaghari reported to Donna Ocampo,
   who – for a few months – was the acting RSD and Ocampo, in turn, reported to acting Area

28 Vice President Greg Pattakos.  Alzaghari Dec. ¶ 2; Ocampo Dec. ¶ 3.

DEFENDANT'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL
SUMMARY JUDGMENT; MEMO OF P&A'S IN SUPPORT THEREOF - Case No.: CV 11 3110 WHA

security of company assets.  The kind of negligent attitude that is displayed in this area reflects poorly on Allen's managerial skills."  Alzaghari Dec. ¶¶ 12-13, Exhs. 9-10.

Over the years, Alzaghari and Loss Prevention documented repeated violations of company policy and procedures, including missing signatures on refund tickets, an open back room door and unlocked security cage, inventory losses and failure to follow inventory action plans, among other issues.  Alzaghari Dec. ¶¶ 7-14, 16, Exhs. 4-11, 17.  Store 3830 was located in an area where crime and shoplifting were not uncommon, making it particularly important for Allen to adhere to RadioShack's loss prevention policies and procedures.  Allen Dep. 140:4-13, 189:9-18.

### 3. Acting Area Vice President Greg Pattakos is Displeased by the Appearance of Plaintiff's Store During his December 2009 Visit.

In December 2009, during a pre-Christmas tour of Bay Area stores by senior RadioShack management, Pattakos, Ocampo, the Area Loss Prevention Director, and the Area Human Resources Director visited Store 3830 for about 20 minutes.  Ocampo Dec. ¶ 4; Allen Dep. 37:23-38:12, 38:25-40:21, 41:1-42:3, 42:6-22, 50:9-51:18, 63:14-17, 72:15-18.  Alzaghari had warned all the store managers in his district about senior management's impending store inspections.  Allen Dep. 47:15-48:11, 48:20-49:22.  Allen, who had never met Pattakos, was "on alert" and had cleaned up his store.  *Id.* at 50:9-51:18, 54:17-55:14.

According to Allen, Pattakos came into Allen's store, introduced himself, looked Allen "up and down", and asked in a "very hostile" tone "how long have you been with RadioShack?"  When Allen answered, Pattakos responded:  "You may have a year with RadioShack."  Allen Dep. 51:19-52:5, 58:9-59:9.  Pattakos then inquired whether Allen was "running the store" to which Allen responded "[n]o, my district manager tell (sic) me what I need to do . . . ."  *Id.* at 59:10-60:21.  Pattakos expressed his concern about whether Allen's DM was doing his job, including "coaching" and "helping [Allen] to run the store.  *Id.* at 60:2-21.

After spending "no more than a minute" on the sales floor, Pattakos "went straight to the back room" with Allen and the LPM, where they talked about rearranging the store, the

disorganization and messiness of the store and back room, and security improvements. *Id. at* 62:4-64:17. Pattakos told Allen he would return to reinspect the store. Allen Dep. 97:6-10. Nothing was said by Pattakos during the visit about Allen's race or age. *Id.* at 58:9-64:17, 89:14-16. The next day, Pattakos shared his observations from the tour with Alzaghari, including his unhappiness with the appearance of Plaintiff's store. Alzaghari Dec. ¶ 17.

**4. Alzaghari Holds District Meeting to Discuss Preparation for Pattakos's Return Visit, and upon his Return Pattakos Finds that Allen's Store Looks "Great".**

Shortly after Pattakos's store visits, Alzaghari met with his store managers to discuss the results of those visits and to prepare for Pattakos'ss impending follow-up inspection. Ocampo was also present at the meeting. At that meeting, Allen shared with the assembled store managers his experience with Pattakos. Alzaghari Dec. ¶ 18; Ocampo Dec. ¶ 5; Allen Dep. 69:8-76:7, 77:20-78:5, 79:17-23, 81:14-24, 82:12-83:21, 84:2-85:10. Allen made no mention of his race or age, and neither Ocampo nor Alzaghari understood him to be complaining about unlawful discrimination or harassment by Pattakos. *Id.*

As promised, Pattakos returned to Store 3830 a few weeks later with his replacement, David Charles, and Ocampo. Allen Dep. 96:4-98:9, 99:11-100:11, 103:7-108:9; Ocampo Dec. ¶¶ 6-7; Alzaghari Dec. ¶ 21. Pattakos was pleasant, polite, professional and friendly, and complimented Allen that Store 3830 "looked great." Allen Dep. 103:13-104:22. Plaintiff never saw or interacted with Pattakos again, as Pattakos returned to his position in Fort Worth, and no longer had any responsibility for District 538 or Allen's store. Ocampo ¶ 7; Allen Dep. 108:10-15, 110:17-21.

**5. Newly Appointed DM Ocampo Discusses Staffing Issues at Store 3830 with Plaintiff.**

In late February 2010, Donna Ocampo took over as the new DM of District 538, and Allen began reporting directly to Ocampo. Ocampo Dec. ¶ 2. While she was DM, Allen saw Ocampo three or four times for store visits. Allen Dep. 113:10-25. As DM, Ocampo – like Alzaghari before her – was responsible for the oversight of the appearance or "image" of

1   Allen's store, as well as the professional conduct of Allen and his team members.  Ocampo

2   Dec. ¶¶ 24, 29-21, Exh. 10.

3        Allen asserts that during a March 2010 store visit, Ocampo observed his sales

4   associates at work, and told Allen that she was not pleased with the store appearance.

5   According to Allen, Ocampo told him that "the store was not in good shape, it was not

6   according to planogram," that he had the "wrong people," that the store had the "wrong

7   image," that "we need to upgrade the employees," and that "you need some better employees

8   in this store".  Plaintiff never asked Ocampo what she meant by the term "wrong people" or by

9   her direction to find "better employees".    Allen Dep. 224:5-7, 226:4-9.   Ocampo also

10  commented on the store's displays and merchandising.   Allen Dep. 222:3-226:9, 227:8-

11  229:22.   Allen claims that Ocampo talked "mostly" about two female African-American

12  employees, that she had questioned "their ability on the floor", and that she had asked Allen

13  "[c]an you find some better people?"  *Id.*

14       Finally, Allen claims that a week later Ocampo told him "if you don't get rid of … your

15  employees, then I will get rid of you," and "the only thing I care about is making sure that my

16  son is taken care of."   *Id.*  at 229:23-233:13, 234:6-17.   Allen never asked Ocampo which

17  employees she was talking about or what she meant by the reference to her son.   *Id.*

18  According to Allen, following that conversation, all further discussions with Ocampo

19  concerned "sales performance, sales and stuff like that".   Ocampo made no other comments

20  to Allen about the store employees.  Allen Dep.  235:5-16.

21       **6.    The Events Leading to Allen's April 27, 2010 Termination.**

22       On March 9, 2010, LPM David Gonsolin visited Store 3830 and documented Allen's

23  failure to meet RadioShack's Non-Negotiables.  Ocampo Dec. ¶¶ 11-16, Exhs. 2-5; Gonsolin

24  Dep. 62:5-71:13, 73:6-76:21.   Gonsolin noted "numerous cash shortages in the last several

25  months" which Allen "had not reported … and had no explanation as to why they are

26  happening," a missed mid-February "cage count", and merchandise not secured properly in

27  the cage or on the sales floor, among other issues.  *Id.*  Gonsolin shared his findings with

28  Ocampo, and on March 23, 2010, Ocampo gave Allen a Corrective Action Record ("CAR")

8

**DEFENDANT'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL
SUMMARY JUDGMENT; MEMO OF P&A'S IN SUPPORT THEREOF -** Case No.: CV 11 3110 WHA

based on these violations.  Ocampo Dec. ¶¶ 13-15, 17, and Exhs. 2-4, 6.  Allen signed the CAR without written comment although the form afforded him an opportunity to do so. Ocampo Dec. ¶ 17, Exh. 6.

Early in the evening on April 20, 2010, Ocampo and RSD Aybef[4] visited Store 3830. By the time they arrived, Allen had already left for the day.  Ocampo Dec. ¶ 18.  Ocampo and Aybef went into the back room and discovered stacks of bills and rolls of coins lying in an unzippered pouch in one of the drawers of the manager's desk, which was also unlocked.  *Id.* This was a clear violation of company policy, which required that all cash be kept in the cash register drawer.  *Id.;* Gonsolin Dep. 143:13-144:11, 145:147:7.  Ocampo and Aybef also spoke with store employee Rosetta Holmes.  While speaking with Holmes, Ocampo noticed a large wad of bills in Holmes's pocket.  Holmes showed her the cash, which amounted to approximately $1000.  Ocampo Dec. ¶ 19; Holmes Dep. 110:18-113:3.  Holmes stated that she had had several large cash transactions and was going to put the cash in the back room. Ocampo immediately instructed Holmes to prepare and make a back deposit.  *Id.*

Ocampo expected that Allen, as the store manager, would comply with RadioShack's asset protection policies "whether he's in the store or whether he's out of the store."  Ocampo Dep. 45:11-19, 46:4-15; 59:24-60:4; Ocampo Dec. ¶ 18.  Ocampo was particularly concerned about the unsecured cash, given the numerous unexplained cash shortages Loss Prevention had found at Allen's store over the preceding several months, which had been noted in the recent CAR.  Ocampo Dec. ¶ 16, Exh. 5; Ocampo Dep. 66:7-67:11.  Having heard from Holmes that Ocampo had been in the store the prior evening, Allen called Ocampo the next day.  During the call, Allen informed Ocampo that he always kept cash in the desk drawer, that the drawer was locked when he left the store that night, and that he had no responsibility

---

[4] For the first month or so as DM, Ocampo reported to Regional Sales Director ("RSD") Todd Schrader.  Schrader was new to the Region, and in early April 2010, RadioShack transferred Basem Aybef, then an RSD in Minneapolis, to assist Schrader on a temporary basis in the management of his Region.  Aybef assumed responsibility for several of Schrader's districts, including District 538, for about six weeks.  Schrader Dec. ¶ 3; Ocampo Dec. ¶ 8.  Upon Aybef's arrival, Ocampo reported to him until about May 21, 2010, when Aybef left and relocated to Texas.  *Id.*

for what his staff did in his absence.  Allen Dep. 192:1-16, 194:11-195:7, 195:19-23, 441:14-442:7; Ocampo Dec. ¶ 21; Ocampo Dep. 60:9-61:1.

Ocampo made the decision to terminate Allen's employment based on her observations at the store on April 20, 2010, and the recent CAR.  Ocampo Dec. ¶¶ 20-22.  She discussed the situation with Aybef and Gonsolin, and both supported her decision.  Ocampo Dec. ¶ 20, 22, 25; Gonsolin Dep. 172:23-173:2, 175:8-12.

On April 27, 2010, Ocampo and Gonsolin went to Store 3830, and Ocampo informed Allen that he was being terminated for failing to protect RadioShack's assets.  Ocampo Dec. ¶ 22, and Exh. 8; Allen Dep. 442:21-443:6.  Before leaving the store, Allen made a comment to the effect of "Thank you for freeing a slave."  Allen Dep. 444:23-445:21; Ocampo Dec. ¶¶ 23.  Ocampo had no idea what Allen meant by this remark, did not interpret the comment to be a complaint of race discrimination, and was "appalled" because Plaintiff's race had nothing to do with "holding him responsible for not protecting company assets."  *Id.*; Ocampo Dep. 106:23-107:7, 108:5-23.   Ocampo was particularly sensitive to issues of racism toward African-Americans as her long-time partner and the father of her child is African-American, and her young son is half African-American.  Ocampo Dec. ¶ 25; Ocampo Dep. 113:10-114:5.

## D.   LEGAL ARGUMENT

### 1.   Plaintiff's First Claim for Disparate Treatment Discrimination Based on Race and Third Claim for Age Discrimination Fail as a Matter of Law Because Plaintiff Cannot Make Out a *Prima Facie* Case of Race or Age Discrimination.

To establish a *prima facie* case of discrimination under the FEHA, a plaintiff must show that:  (1) he is a member of a protected class; (2) he was qualified for the position; (3) he experienced an adverse employment action; and (4) similarly situated individuals outside his protected class were treated more favorably, or there are other circumstances surrounding the adverse employment action that give rise to an inference of discrimination.  *Peterson v. Hewlett-Packard Co.* (9th Cir. 2004) 358 F.3d 599, 603; *Johnson v. United Cerebral Palsy/Spastic Children's Found. of Los Angeles* (2009) 173 Cal.App.4th 740, 754.  Plaintiff admitted that he knows of no other employee who kept cash in the manager's desk drawer

instead of the cash register.  Allen Dep. 400:20-401:2.  Lacking any evidence that Plaintiff was treated less favorably than similarly situated younger or non-African-American employees, Plaintiff cannot satisfy even this threshold showing.

Even if Plaintiff could make this showing, his claims still must be dismissed as a matter of law because:  (1) Plaintiff's failure to comply with RadioShack's asset protection policies and procedures undeniably constitutes a legitimate, nondiscriminatory reason for RadioShack's decision to terminate Plaintiff's employment; and (2) Plaintiff lacks "specific, substantial" evidence to show that RadioShack's reasons were a pretext for either race or age discrimination.  *See Godwin v. Hunt Wesson, Inc.* (9th Cir. 1998) 150 F. 3d 1217, 1221 (once an employer articulates a legitimate, non-discriminatory reason for an adverse employment action, the employee must produce "*specific, substantial* evidence of pretext" for a more invidious motive) (italics added).

### 2. Plaintiff's Claims for Race and Age Discrimination Fail Because RadioShack had a Legitimate, Nondiscriminatory Reason for Terminating Plaintiff.

RadioShack must meet a slight burden of *articulation* rather than persuasion – RadioShack's stated reasons are presumptively valid.  *See McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792, 805.  RadioShack is not required to prove that it made a wise decision, the best decision, or even a fair decision; to meet its burden, RadioShack need only show that the decision to terminate Plaintiff was based on factors other than Plaintiff's race or age.  *Guz v. Bechtel Nat'l, Inc.* (2000) 24 Cal. 4th 317, 358 (summary judgment proper where employee offered no evidence that the real reason for the employer's decisions was discriminatory *animus*); *Hersant v. California Dep't of Social Servs.* (1997) 57 Cal.App.4th 997, 1005 (plaintiff brought an action for "discrimination," not "general unfairness").  The relevant inquiry is not whether the decision was objectively correct or incorrect; it is whether RadioShack believed, when it made decision to terminate Plaintiff's employment, that Plaintiff had engaged in the misconduct at issue.  *Everroad v. Scott Truck Sys.* (7th Cir. 2010) 604 F.3d 471, 478 n.2.  Here, the undisputed evidence demonstrates that:

**DEFENDANT'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT; MEMO OF P&A'S IN SUPPORT THEREOF -** Case No.: CV 11 3110 WHA

- RadioShack's Store Managers – like Plaintiff – are responsible for loss prevention and asset protection in their stores, and are expected to train and supervise their staff with respect to compliance with company policies and procedures [Ocampo Dec. ¶ 9; Alzaghari Dec. ¶ 3; Allen Dep. 412:18-22, Exh. 5];

- Plaintiff's District Managers and RadioShack's Loss Prevention personnel documented Plaintiff's repeated non-compliance with various loss prevention and operational policies and procedures [Alzaghari Dec. ¶¶ 3-16,19, 20; Ocampo Dec. ¶¶ 11-19];

- DM Alzaghari gave Plaintiff a written reprimand on February 21, 2003, admonishing Plaintiff to "follow company policy" and keep cash in the "cash [register] drawer" [Alzaghari Dec. ¶¶ 4-6];

- Plaintiff was issued a Corrective Action Record ("CAR") on March 23, 2010, noting unexplained cash shortages, unsecured merchandise, and a missing cage count that had been documented during a March 9, 2010, store visit by Loss Prevention Manager Gonsolin.  The CAR warns that "[f]ailure to achieve the required improvement will lead to additional disciplinary action up to and including termination" [Ocampo Dec. ¶ 17]; and

- On April 20, 2010, less than a month after the CAR had been issued, DM Ocampo and RSD Aybef discovered cash in Plaintiff's desk drawer and also observed a sales associate removing a large sum of additional cash from her pocket [Ocampo Dec. ¶¶ 18,19].

Because RadioShack's reason for its termination decision is compelling on its face, Plaintiff can survive summary judgment on his discrimination claims only by producing specific, substantial evidence that the articulated reason was a pretext for unlawful discrimination.  *Guz*, 24 Cal. 4th at 361 ("the pertinent statutes do not prohibit lying, they prohibit discrimination"); *see also Bodett v. Coxcom, Inc.* (9th Cir. 2004) 366 F.3d 736, 745 (affirming summary judgment to employer when plaintiff failed to show pretext by coming forward with evidence that discrimination most likely motivated her termination).  To satisfy this standard, Allen "must do more than raise an issue whether the employer's action was unfair, unsound, wrong or mistaken, because the overriding issue is whether discriminatory animus motivated the employer." *Johnson*, 173 Cal.App.4th at 755.  Absent such evidence, RadioShack is entitled to judgment as a matter of law.  Mere speculation and conjecture cannot be regarded as "substantial responsive evidence" to overcome a legitimate business reason. *Id.*  Here, even if Allen could establish a *prima facie* case, summary judgment is

warranted because Allen lacks specific, substantial evidence of pretext or discriminatory animus.

Despite being written up by Alzaghari, Nabozny and Gonsolin for various policy violations and performance deficiencies, Allen does not believe that any of them harbored any bias against him due to his race or age; Allen asserts that only Ocampo and Pattakos were biased.[5]   Allen Dep. 110:22-111:11, 239:3-8, 266:24-267:6.

As to Ocampo, Plaintiff asserts that on two occasions while visiting his store, Ocampo made comments regarding the "image" of his store employees and their "abilities on the floor", and told Plaintiff he had the "wrong people" and needed to "upgrade" his employees.[6] Plaintiff – who never asked Ocampo to explain what she meant – points to these comments as evidence of Ocampo's bias.   However, on their face, Ocampo's observations – which RadioShack does not dispute for purposes of this motion – appear consistent with her legitimate management responsibility for ensuring that her stores were properly staffed with competent employees, and that the store's appearance, and that of the employees, was professional and in keeping with RadioShack standards.  Ocampo Dec. ¶¶ 24, 30.

Indeed, Allen's former DM, Alzaghari, had addressed these same "image" and staffing issues with Allen – advising Allen regarding his "store image" and the need to "develop a better staff" – over the years that Allen reported to him.  Alzaghari Dec.  ¶ 15.  These management concerns had nothing to do with Allen's race or age or that of his employees.  Rather, it was common at RadioShack to assess both store "image" and whether employees presented a professional "image."   *Id.*   Although Alzaghari used these same terms in

---

[5] Allen has never met, or even heard of, RSD Aybef.  Nor does Allen believe that former area HR manager Shaan Smith (who is African-American) was biased against him.  *Id.* at 116:20-117:5, 117:13-20, 119:8-12, 467:2-10.   Allen admits that he does not think Ocampo was biased against him because he is African-American, that he has never heard Ocampo say anything derogatory about anybody's age, and does not know if she is biased against him because of his age.  Allen Dep. 236:9-12, 248:20-24, 249:5-14.

[6] Other than these alleged comments by Ocampo, Allen admitted that he heard no derogatory comments about his age or race while employed at RadioShack.  Allen Dep.  35:21-36:16, 36:22-37:10;  89:14-16, 207:12-21, 236:9-12, 238:22-239:8, 248:25-249:14, 266:24-267:16, 467:2-10.

discussing staffing and store appearance, Allen did not believe that Alzaghari bore him any discriminatory animus, while coming from Ocampo, Plaintiff construed those terms as discriminatory.  Allen Dep. 30:24-31:10, 34:17-35:8, 112:8-10, 112:16-19.  Given the context, no reasonable inference can be drawn that Ocampo's reference to "image" had anything to do with age or race.

Allen also points to a *single comment* made by former acting Area Vice President Pattakos in the course of a store visit that left Pattakos clearly unhappy with the store's appearance: "You may have a year with RadioShack."  Allen Dep. 59:10-60:25, 63:9-11, 64:1-17.  There is no evidence that Pattakos's comment – assuming he even said it – refers to Plaintiff's *age or race*.  Rather, it reflects Pattakos's severe frustration and displeasure with regard to the store's appearance, and could have been made to any store manager of any age or race – especially one who asserted (as Allen did when he met Pattakos) that he was not responsible for the appearance of his store, and instead blamed his DM.  Moreover, any attempt to ascribe discriminatory intent to Pattakos is undermined by his follow-up visit to Plaintiff's store several weeks later when, according to Plaintiff, Pattakos told Plaintiff the store looked "great."

Even if Pattakos's alleged comment rises to the level of a "stray remark," however, the Ninth Circuit has made clear that a single stray comment, particularly one untethered to the decision constituting the adverse action, is insufficient to create a triable issue of fact with respect to a claim of discrimination.[7]   *Nidds v. Schindler Elevator Corp.* (9th Cir. 1996) 113 F.3d 912, 918-19; s*ee also, Sirridge v. Bar-S Food Co.* (9th Cir. 1996) 138 Fed. Appx. 948, 949 (evidence of comments by COO that he wanted plaintiff to retire and that plaintiff was "long in the tooth" could not overcome evidence of insubordination).

Nor can Plaintiff raise a triable issue by arguing that Ocampo was mistaken or acting inappropriately in holding him accountable for events that occurred in his store when he was

---

[7]  Pattakos's comment was made some five months before Allen's termination, and it is undisputed that Pattakos played no role in that decision; he was neither consulted nor informed.  Ocampo Dec. ¶¶ 25.

**DEFENDANT'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT; MEMO OF P&A'S IN SUPPORT THEREOF -** Case No.: CV 11 3110 WHA

not there, or that she was in error in believing that his keeping cash in the back drawer was a violation of policy.  It is not the role of the Court to conduct an independent assessment of the reasons for Plaintiff's termination, or to decide whether RadioShack's perception of the relevant events was objectively correct.  *See e.g.*, *Kariotis v. Navistar Intern. Transp. Corp.* (7th Cir. 1997) 131 F.3d. 672, 678 (cited with approval in *Guz*, 24 Cal. 4th at 358) (holding that the plaintiff could not establish pretext by picking apart the employer's investigation, noting that "[t]his is probably the classic case where a court must observe its limitations and 'not sit as a super-personnel department that reexamines an entity's business decision.  No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken a firm's managers, the laws barring discrimination do not interfere.")

Nor does RadioShack have to show that Allen actually engaged in the conduct that led to his termination; only that "it had a good faith belief that [Allen] violated [RadioShack's] policies".  *Granillo v. Exide Technologies, Inc.* (C.D. Cal. 2011) 2011 WL 2535112, *15-16. Courts "only require that an employer honestly believed its reasons for its actions, even if its reason is foolish or trivial or even baseless."  *Villiarimo v. Aloha Island Air, Inc.* (9th Cir. 2002) 281 F.3d 1054, 1063; *Guz*, 24 Cal. 4th at 358; *see also King v. United Parcel Service* (2007) 152 Cal.App.4th 426, 436 ("[i]t is the employer's honest belief in the stated reasons for firing an employee and not the objective truth or falsity of the underlying facts that is at issue in a discrimination case").  Allen's evidence simply does not satisfy the "specific and substantial" requirement, and therefore Allen cannot proceed to trial on his claims for race and age discrimination.[8]

---

[8] Allen may also claim that two African-American employees and two Hispanic employees were also terminated in the weeks following his termination.  However, the evidence shows that one of the African-American employees voluntarily transferred to another store and did not leave the company; the other was terminated for failing to report for a mandatory inventory; and the Hispanic employees were terminated for attendance issues and admitted retail theft.  Tam Dep. 82:11-24, 93:17-94:5; Holmes Dep. 94:7-96:12, 98:19-99:23; Baca Dep. 29:20-32:18, 35:10-22.  Two of the terminated employees – one African-American and one Hispanic – each testified that he/she did not believe that RadioShack had discriminated against them.  [Holmes Dep. 102:9-11; Baca Dep. 42:8-12.]

### 3.     Plaintiff's Second Claim for Retaliation Fails as a Matter of Law.

To establish of retaliation under the FEHA, a plaintiff must show that: (1) he engaged in a protected activity; (2) he was thereafter subjected to an adverse employment action by his employer; and (3) there is a causal link between the protected activity and the adverse employment action. *Brooks v. City of San Mateo* (9th Cir. 2000) 229 F.3d 917, 928; *Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal. 4th 1028, 1042.  Here, Plaintiff cannot show either that he engaged in protected activity or, even if he did, that there was a causal connection between that activity and Plaintiff's termination. *Chen v. County of Orange* (2002) 96 Cal.App.4th 926, 948-49.   The *McDonnell-Douglas* burden-shifting analysis applies to this claim.   *Brooks*, 229 F.3d at 928.

Allen asserts that he "complained" about Pattakos to Alzaghari and Ocampo at the manager meeting called by Alzaghari to discuss preparation for Pattakos's return visit to reinspect the stores.  There is no evidence that Plaintiff reported any belief that Pattakos's conduct, while perhaps rude and overbearing, constituted unlawful harassment or discrimination.   Allen Dep. 69:8-72:20, 73:25-74:12, 76:1-7, 84:16-20; Alzaghari Dec. ¶ 18; Ocampo Dec. ¶ 5.  For this reason, Allen's alleged "complaint" does not, as a matter of law, rise to the level of protected activity necessary for a claim of retaliation.  *See Mayfield v. Sara Lee Corp.* (N.D. Cal. Jan. 13, 2005) 2005 WL 88965, *8 (no protected activity where employee never communicated to employer that he believed unfair treatment was racially motivated); *Jurado v. Eleven-Fifty Corp.* (9th Cir. 1987) 813 F.2d 1406, 1412 (finding employee complaint regarding scheduling change did not constitute protected activity where plaintiff never communicated any belief that the change was discriminatory); *Barber v. CSX Distrib. Servs.* (3rd Cir.1995) 68 F.3d 694, 701-702 (finding employee complaint regarding unfair treatment did not constitute protected activity where employee never reported a belief that age was the motivating reason).

Allen also points to Ocampo's alleged statements that Allen needed to "get rid of" store employees because they "did not fit the image" RadioShack wanted, and that if he did not do so, Allen would be terminated.   Allen concedes that Ocampo made no reference to any

employee's age or race during those discussions [Allen Dep. 222:3-226:9, 226:13-233:13], and the context in which the statements were allegedly made does not, as a matter of law, support a reasonable inference that Ocampo was alluding to either age or race. Allen's conclusion that Ocampo was targeting African-American and/or Hispanic employees is, in short, nothing other than rank speculation, and his "pushing back" against Ocampo's supposed instruction does not constitute protected activity.

Finally, Allen's parting comment following his termination thanking Ocampo "for freeing a slave" cannot support a retaliation claim for at least two reasons. First, and most fundamentally, the comment was made only <u>after</u> Allen had been informed of his termination. Second, even Allen himself concedes that his comment had nothing to do with perceived racial discrimination, but rather reflected his feeling that he had devoted a great deal of his time, energy and focus to RadioShack, and had made it a "top priority," and perhaps had sacrificed other parts of his life in doing so. [Allen Dep. 444:23-445:21.]

Under the burden shifting analysis, even assuming that Allen can make out a *prima facie* case of retaliation based on Ocampo's statements, RadioShack had a legitimate nonretaliatory reason for Allen's termination: his documented and repeated failure to protect company assets. *Unt v. Aerospace Corp.* (9th Cir 1985) 765 F.2d 1440, 1447 (employer presented "well documented performance deficiencies"). The evidence supporting the decision to terminate includes the following:

- LPM Gonsolin documented Plaintiff's failure to comply with company policies during a visit to Plaintiff's store on March 9, 2010 [Ocampo Dec. ¶¶ 13-15];

- The "Settlement Over/Short Report" dated March 9, 2010 for Plaintiff's store showed a shortage of $141.05 for the one-month period starting on February 9, 2010 [Ocampo Dec. ¶ 16];

- Plaintiff was issued a Corrective Action Record ("CAR") on March 23, 2010, noting unexplained cash shortages, unsecured merchandise, and a missing cage count previously documented by Gonsolin during the March 9, 2010, visit. The CAR warns Plaintiff that "[f]ailure to achieve the required improvement will lead to additional disciplinary action up to and including termination" [Ocampo Dec. ¶ 17]; and

- A few weeks later, on April 20, 2010, Ocampo and RSD Aybef discovered cash in Plaintiff's desk drawer and observed a sales associate removing about $1000 in cash from her pocket [Ocampo Dec. ¶¶ 18, 19].

In the face of this compelling and undisputed evidence, Plaintiff has not come forward with even a shred of evidence, much less specific and substantial evidence, to suggest that the reason articulated by RadioShack for the termination decision was a pretext for unlawful retaliation. Accordingly, Allen's claim of retaliation must fail.

### 4.   Plaintiff's Fourth Claim for Hostile Work Environment Harassment Fails as a Matter of Law.

To establish hostile work environment harassment, Allen must show that he was subjected to conduct that was *both objectively and subjectively so severe or pervasive* that it altered the conditions of his employment and created a work environment that was abusive, and that this conduct was based on Allen's race or age. *Lyle v. Warner Brothers Television Productions* (2006) 38 Cal. 4th 264, 284; *Etter v. Veriflo Corp.* (1998) 67 Cal.App.4th 457, 465-67. In order to satisfy the threshold standard of severity or pervasiveness, Allen must produce evidence of something more than "occasional, isolated, sporadic, or trivial" acts. *Lyle,* 38 Cal. 4th at 283. Even a plaintiff who "subjectively perceives the workplace as hostile or abusive will not prevail … if a reasonable person…, considering all the circumstances, would not share the same perception." *Hughes v. Pair* (2009) 46 Cal. 4th 1035, 1044 (citations omitted). Moreover, "petty differences" and "festering disputes" that are unrelated to one's protected class are not, as a matter of law, sufficient to warrant trial. *Guthrey v. State of California* (1998) 63 Cal.App.4th 1108, 1110.

Here, the inadequacy of Allen's harassment allegations is readily apparent. Regardless of what Allen *subjectively* perceives, *no reasonable juror* could find the conduct alleged against Pattakos and Ocampo (taken in the context of the undisputed facts, below) to be *objectively severe or pervasive*, *or tied to Allen's age or race*. Indeed:

- Allen alleges harassment based on a *single* ambiguous comment made by Pattakos during his first store visit, which was followed a few weeks later by a second store visit during which Pattakos told Allen that his store "looked great" – the last time Plaintiff ever heard from Pattakos;

18

- Allen admits that Pattakos never made any reference to his race [Allen Dep. 89:14-16];

- Allen accuses Ocampo of harassment for using routine management terms like "image" when discussing staffing issues on two occasions – terms that his former DM Alzaghari also used [Alzaghari Dec. ¶ 15].   Allen does not believe that Alzaghari was biased again him [Allen Dep. 207:18-21];

- Allen did not ask Ocampo what she meant when, in the course of observing Plaintiff's sales staff at work in the appropriate discharge of her management duties, she allegedly told him that he had the "wrong people" in the store, that "it's the wrong image", and "questioned their ability on the floor", and all discussions with Ocampo after she made these comments concerned "sales performance, sales and stuff like that", and Ocampo made no further comments to Allen about the employees in his store [Allen Dep. 223:5-224:7, 225:17-21, 226:4-9, 235:5-10];

- Allen admits that he would be "guessing" if he tried to interpret Ocampo's alleged comment that "the only thing I care about is making sure that my son is taken care of" [Allen Dep. 230:19-231:7, 232:6-233:13];

- Regarding Ocampo's scrutiny of his store operations, Allen testified that almost all of the approximately 22 store managers in Ocampo's district complained among themselves about her oversight as DM, and shared Allen's opinion that Ocampo was looking for things that were "wrong" [Allen Dep. 249:15-253:10, 254:1-255:20];

- Ocampo has a long-time partner who is African-American, and a child who is half African-American [Ocampo Dec. ¶ 25];

- Allen admits that he does not think Ocampo is biased against him because of race, and that while employed at RadioShack he heard no derogatory comments about his race or African-Americans, apart from the "image" comments attributed to Ocampo [Allen Dep.  35:21-36:16, 36:22-37:10, 236:9-12];

- Allen admits that he does not know if Ocampo harbored any age bias against him [Allen Dep. 249:5-14];

- Allen admits that he never heard anyone at RadioShack make derogatory comments about age; [Allen Dep. 239:3-8] and

- There is no evidence of a culture of bias at RadioShack.  Not a single witness who was deposed ever heard anyone at RadioShack make any derogatory comments or jokes about African-Americans or older workers.  [Allen Dep. 36:11-16, 37:7-10, 239:3-8; Baca Dep. 44:23-45:5; Gonsolin Dep. 166:7-168:25; Holmes Dep. 28:12-29:24; Venegas Dep. 65:9-12, 66:14-23; 67:9-14, 72:1-4, 72:13-15.

Regarding Pattakos's alleged harassment, Plaintiff's evidence of his single ambiguous comment cannot satisfy the "severe or pervasive" standard.  *Aguilar v. Avis Rent A Car*

*System, Inc.* (1999) 21 Cal. 4th 121, 130-31 ("occasional, isolated, sporadic, or trivial" acts are usually not enough to create a hostile environment; rather a plaintiff must show a concerted pattern of harassment of a repeated, routine or a generalized nature.") (*citing Fisher v. San Pedro Peninsula Hosp.* (1989) 214 Cal.App.3d 590, 610)

As to Ocampo, any speculation by Allen that the facially neutral terms he claims Ocampo used in the course of two conversations concerning store appearance and store employees were actually "code words" reflecting unlawful bias based on race and/or age is insufficient as a matter of law to defeat summary judgment. Courts recognize that there is a high potential for abuse with respect to claims based on "code words" that are allegedly biased but are facially neutral. *See e.g., Beaubrun v. Thomas Jefferson Univ.* (E.D. Pa. 2008) 578 F. Supp. 2d 777, 784 (to defeat summary judgment where a plaintiff relies on code words, some overt connection to a protected classification is required; mere speculation about a connection is insufficient). Plaintiff has not shown the requisite overt connection to either his age or race.

Finally, Ocampo's two discussions relating to staffing, her inspection of and visits to Allen's store, and her decision to terminate Allen's employment for his violation of RadioShack's asset protection policies, constitute routine personnel management actions and cannot, as a matter of law, constitute harassment. *Janken v. GM Hughes Elec.* (1996) 46 Cal.App.4th 55, 64-65, 79 ("commonly necessary personnel management actions such as hiring and firing, promotion or demotion, [and] performance evaluations *. . . do not come within the meaning of harassment*") (italics added) (cited with approval in *Reno v. Baird* (1998) 19 Cal. 4th 640, 643.) *See also Hampe v. Dept. of Corrections* (E. D. Cal. 2000) 2000 U.S. Dist. LEXIS 15435, *16-17 (the plaintiff's claims of harassment failed where they were based on such incidents as her locker area having been ransacked, increased scrutiny of her work, exclusion from staff meetings, removal from an assignment, being shoved by her supervisor in the hallway, being indirectly accused of a workplace violation, and being continuously followed and reported on by a "surrogate" of her supervisor). Allen's evidence of "harassment" is similarly defective and judgment on this claim is therefore warranted.

5.    **Plaintiff's Wrongful Termination Claim Fails as a Matter of Law.**

Allen's wrongful termination claim is entirely derivative of his discrimination and retaliation claims under the FEHA, and fails for the same reasons those claims fail.  *See Hanson v. Lucky Stores, Inc.* (1999) 74 Cal.App.4th 215, 229 (affirming summary judgment; because plaintiff's FEHA claim failed, his claim for wrongful termination in violation of public policy failed as well).

6.    **Plaintiff's Claim for Intentional Infliction of Emotional Distress Fails Because He Has No Evidence of Extreme and Outrageous Conduct.**

The elements of a claim for intentional infliction of emotional distress are (1) extreme and outrageous conduct (2) intended to cause or done in reckless disregard of causing (3) severe emotional distress, and (4) actual and proximate causation of emotional distress. *Cervantes v. J.C. Penney Co., Inc.* (1979) 24 Cal. 3d 579, 593.  RadioShack's conduct must be so extreme as to "exceed all bounds of that usually tolerated in a civilized community."  *Id. See also Hughes*, 46 Cal. 4th at 1051 (defendant's conduct is outrageous when it is so extreme as to "exceed all bounds of that usually tolerated in a civilized community").

Allen has alleged no conduct on the part of RadioShack that could reasonably be construed as extreme and outrageous.  It is well settled that personnel management activities such as hiring, firing, discipline, and criticism that are a normal part of the employment relationship do not constitute outrageous conduct, even if intentional or malicious. *Shoemaker v. Myers* (1990) 52 Cal. 3d 1, 25; *Janken,* 46 Cal.App.4th at 55 (a simple pleading of personnel management activity is insufficient to support a claim for intentional infliction of emotional distress, even if improper motivation is alleged).

Plaintiff's evidence of harassment is also insufficient to establish extreme or outrageous conduct. *Hughes*, *supra*, 66 Cal. 4th at 1051 (threatening comments, such as  "I'll get you on your knees eventually. I'm going to fuck you one way or another" "fall far short of" the standard for establishing outrageous conduct). Moreover, because Plaintiff's harassment and discrimination claims fail as a matter of law, they are necessarily insufficient to support an IIED claim.  See *Tennison v. Circus Circus Enterprises, Inc.* (9th Cir. 2001) 244 F.3d 684, 691

(finding that a jury's rejection of a sexual harassment claim made any error in failing to instruct on intentional infliction of emotional distress harmless); *Jones v. Dept. of Corrections and Rehabilitation* (2007) 152 Cal. App. 4th 1367, 1382 ("Because we conclude Jones did not establish discrimination her causes of action for emotional distress fail to the extent they are tethered to the discrimination claim.")  Clearly, the conduct alleged by Allen comes nowhere close to meeting the requisite standard, and summary judgment in RadioShack's favor must be granted on this claim.

### 7.  Plaintiff Cannot Make Out a Claim for Punitive Damages.

As a threshold matter, a plaintiff seeking punitive damages must prove by clear and convincing evidence that defendant acted with malice, oppression, or fraud.  This is an extremely high standard, which Allen cannot meet.  Even if he could, for a corporate employer such as RadioShack to be held liable for punitive damages, Allen must be able to show either: (1) that an officer, director, or managing agent is "personally guilty of oppression, fraud, or malice"; or (2) that an officer, director, or managing agent authorized or ratified fraudulent, malicious, or oppressive conduct or acted with a conscious disregard for plaintiff's rights or safety.  Cal.  Civ. Code § 3294 (b).  *College Hosp., Inc. v. Superior Court* (1994) 8 Cal. 4th 704, 724 n.11 ("[P]unitive damages are not assessed against employers on a pure *respondeat superior* basis.  Some evidence of fault by the employer itself is also required."); *Fisher, supra,* 214 Cal.App.3d at 621 n.13 (punitive damages required ratification through an officer, director, or managing agent).

A corporate defendant is entitled to prevail on a motion to summarily adjudicate a claim for punitive damages unless the plaintiff comes forward with **clear and convincing evidence** supporting both the threshold issue, and every element of at least one of the two theories in order to establish corporate responsibility.  *Basich v. Allstate Insurance Co.* (2001) 87 Cal.App.4th 1112, 1121.  All findings made under Civil Code § 3294(b), including, for example, whether an employee is a managing agent and whether a corporate employer

ratified any wrongful conduct, must be made by "clear and convincing" evidence.[9]  *Barton v. Alexander Hamilton Life. Ins. Co. of America* (2003) 110 Cal.App.4th 1640, 1644.

Allen's claim for punitive damages against RadioShack fails because (1) he cannot prove malice, oppression, or fraud; (2) none of the individuals involved in Allen's termination were officers, directors, or managing agents of RadioShack; and (3) Allen cannot produce clear and convincing evidence to establish that any officer, director, or managing agent of RadioShack consciously disregarded his rights, or ratified any allegedly wrongful conduct.

### a.   Allen Cannot Show Any Action That Meets the High Standard of Malice or Oppression.

Allen cannot meet his initial burden of showing by clear and convincing evidence that any RadioShack employee acted with malice or oppression toward him.[10]  The only wrongful conduct he alleges is his termination by Ocampo, as well as several ambiguous comments allegedly made by Pattakos and Ocampo.  The comments in question – "you may have a year left at RadioShack" and Ocampo's references to Allen's employees – are on their face insufficient as a matter of law to support a claim of punitive damages.  Therefore, Allen must prove by clear and convincing evidence that Ocampo's decision to terminate him was done with malice or oppression.  This he cannot do.  A finding of malice or oppression under Civil Code § 3294 requires "despicable" conduct.  "'[D]espicable' is a powerful term that refers to circumstances that are 'base,' 'vile,' or 'contemptible.'"  *College Hosp.,* 8 Cal. 4th at 725.  Mere tortious conduct, even discrimination, is not malice or oppression.  *Patrick v. Maryland Cas. Co.* (1990) 217 Cal.App.3d 1566, 1575; *Ackerman v. Western Elec. Co.* (N.D. Cal. 1986) 643 F.Supp. 836, 857, *aff'd,* (9th Cir. 1988) 860 F.2d 1514, 1521 ("unfounded, misguided and

---

[9] To be clear and convincing, the evidence must be "sufficiently strong to command the unhesitating assent of every reasonable mind."  *In re Angelia P.* (1981) 28 Cal.3d 908, 919 (internal quotation marks omitted).  This requirement presents "a heavy burden, far in excess of the preponderance sufficient for most civil litigation."  *Hoffman v. Capital Cities/ABC, Inc.* (9th Cir. 2001) 255 F.3d 1180, 1186-87.

[10] Plaintiff does not allege that RadioShack acted fraudulently.  See Complaint.

extremely ill-advised" discriminatory conduct was insufficient).   Plaintiff has no evidence to meet this extremely high burden.

### b.   Allen Cannot Show that Any Officer, Director, or Managing Agent Engaged in Malice or Oppression.

Allen cannot show that any officer, director, or managing agent of RadioShack is "personally guilty" of wrongful conduct towards him.   Cal. Civil Code § 3294(b).   It is undisputed that Pattakos had returned to Texas, was no longer in Allen's chain of command, had no involvement in Allen's termination, and was not even informed about it.   Ocampo Dec. ¶ 25.   Allen makes no claim of any kind against Aybef – indeed, he has never even heard of him.   However, Aybef did participate in that decision to terminate.   Nevertheless, the undisputed evidence confirms that none of the three individuals involved in that decision – Ocampo, Gonsolin and Aybef – was an officer, director or managing agent of RadioShack.   Ocampo Dec. ¶¶ 30-32 Exh. 10; *see also* Schrader Dec. ¶¶ 7-9, Exh. 1; Peterson Dec. ¶¶ 2, 3, Exh. 1.

Supervisory employees are not managing agents under § 3294 (b) "unless they in fact exercise *substantial discretion* in their decision making capability."   *White v. Ultramar Inc.* (1999) 21 Cal. 4th 563, 573 (emphasis added).   The California Supreme Court clarified that this means substantial discretion over "formal policies that affect a substantial portion of the company and that are the type likely to come to the attention of corporate leadership."   *Roby v. McKesson Corp.* (2009) 47 Cal. 4th 686, 715.   Furthermore, "supervisors who have no discretionary authority over decisions that ultimately determine corporate policy would not be considered managing agents even though they may have the ability to hire or fire other employees."   *White*, 21 Cal. 4th at 577; *see also Kelly-Zurian v. Wohl Shoe Co., Inc.* (1994) 22 Cal.App.4th 397, 421-22.   *Myers v. Trendwest Resorts, Inc.* (2007) 148 Cal.App.4th 1403, 1436-37.   It is undisputed that neither Ocampo, Gonsolin nor Aybef had any discretionary

authority over decisions that ultimately determined RadioShack corporate policy.[11] Accordingly, they were not managing agents of the company as a matter of law.  *Roby*, 47 Cal. 4th at 715.

### c. Allen Cannot Show Ratification, Authorization, or Disregard of His Rights or Safety by Any Officer, Director, or Managing Agent.

Finally, Allen cannot show that any officer, director or managing agent ratified or authorized his termination, or allowed Ocampo to terminate him with conscious disregard for his rights or safety.  Even if Ocampo's motivations were discriminatory or retaliatory, there is simply no evidence that anyone higher than RSD Aybef authorized or ratified the termination. Indeed, there is no evidence that anyone higher than Aybef even knew about it.  *See Cruz v. Homebase* (2000) 83 Cal.App.4th 160, 168 (reversing punitive damages where no evidence that managing agent had actual knowledge that employee had acted maliciously).   The undisputed facts establish that RadioShack RSDS's are not officers, directors, or managing agents.  Schrader Dec. ¶ 7-9.  Summary adjudication of Plaintiff's claim for punitive damages is thus appropriate.

## E. CONCLUSION

For all the foregoing reasons, RadioShack respectfully requests that the Court grant this motion and enter judgment in its favor.


Dated:  November 15, 2012                          MILLER LAW GROUP
                                                   A Professional Corporation


                                                   By:  _____/s/ Tracy Thompson_____
                                                        Tracy Thompson
                                                        Attorneys for Defendant
                                                        RADIOSHACK CORPORATION

4829-0227-3553, v.  1

---

[11] RadioShack's corporate policies regarding loss prevention, human resources, sales goals and strategies, salary and compensation rates were established at the company's headquarters in Fort Worth, Texas.  Schrader Dec. ¶¶ 13, 16; Ocampo Dec. ¶¶ 18, 22; Peterson Dec. ¶ 3.

**DEFENDANT'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT; MEMO OF P&A'S IN SUPPORT THEREOF -** Case No.: CV 11 3110 WHA