1   informed and believes that the defendant and its management acted deliberately

2   for the purposes of injuring her.

3

4   88.   Defendant, by and through its managing agents and employees, further acted

5   intentionally and unreasonably because they knew and/or should have known

6   that their conduct was likely to result in additional, severe mental distress.

7   Plaintiff therefore seeks damages for such emotional distress in an amount to be

8   proven at time of trial.

9

10   89.   Plaintiff is informed and believes and thereon allege that this cause of action is

11   not preempted by the California Workers' Compensation Act on the grounds that

12   employment discrimination is not a risk or condition of her employment.

13

14   90.   Because of the wrongful acts of Defendant as herein above alleged, Plaintiff has

15   been and/ or will in the future be required to employ physicians and mental

16   health care professionals to examine, treat and care for her and will incur

17   additional medical expenses in an amount to be proven at the time of trial.

18

19   91.   In doing the acts set forth above, Defendant and its managing agents acted as

20   herein alleged with a conscious disregard of Plaintiff's right to be free from

21   discrimination based on age.  Defendant acted, as alleged, with the malicious

22   intention of depriving Plaintiff of employment opportunities and benefits that

23   must be accorded to all employees regardless of their age.  Defendant has retained,

24   promoted and coddled employees and managers known by it to be vicious in that

25   they are prejudiced against older employees.  This conduct by Defendant was, and

26

27

28

17

**Dec. of Thompson - Exhibit 1**

1   is, despicable, cruel and oppressive.  The Plaintiff is therefore entitled to an award

2   of punitive damages in an amount to be proven at trial.

3   92.    In bringing this action, Plaintiff has been required to retain the services of

4

5   counsel. Pursuant to **California Government Code § 12965(b)**, she is entitled to

6   and hereby requests an award of attorney fees and costs of suit.

7   **WHEREFORE,** Plaintiff prays for judgment as more fully set forth herein below.

8                            **FOURTH CAUSE OF ACTION**

9                    **Harassment In Violation of FEHA**
                          **(Hostile Work Environment)**
10                   Cal. Govt. Code Sections 12900 et. seq.
                              **(As to all Defendants )**
11

12  93. Plaintiff  realleges and incorporate paragraphs 1 through 49 with the same force

13      and effect as if  fully pleaded at length herein

14  94. Jurisdiction in this court is invoked pursuant to the **FAIR EMPLOYMENT AND**

15      **HOUSING ACT ["FEHA "]**, i.e.,**Gov.Code § § 12900, 12921, 12926, 12940  and**

16      **12965**, specifically **Section 12940 (j).**

17  95. Defendants are comprised of entities and/or individuals with an obligation under

18      the law to assure an environment in which its employees can work freely without

19      fear of harassment.

20  96. Defendants have allowed, condoned, enabled and refused to prevent the

21      harassment of Plaintiff, by themselves, agents, managerial, and other employees.

22      Said harassment included, but is not limited to, the following:

23              (A)      Making false accusations against the plaintiff:

24              (B)      Falsely accusing plaintiff of criminal acts

25              (C)      Threatening Plaintiff with termination when he would not engage

26                       in racial discrimination;

27              (D)      Verbally threatening Plaintiff with threat of termination;

28

                                            18

1    (E)    Ongoing excessive and disproportionate scrutiny of Plaintiff

2           conduct;

3    (F)    Defendants at all times creating and condoning a hostile work

4           environment for Plaintiff;

5    (G)    Defendants at all times creating and condoning an intolerable

6           work environment for Plaintiff;

7    (H)    Public humiliation of  Plaintiffs  by Defendants;

8    (I)    Racially motivated disrespect toward Plaintiff; and

9    (J)    Wrongfully Terminating Plaintiff and replacing plaintiff with 23

10          year old non-African American.

11   97. The harassment described in the preceding  paragraphs and otherwise described

12       in detail herein was and is so severe and pervasive that the working conditions of

13       the Plaintiff was altered into a hostile and unsafe work environment.

14

15   98. The harassment described in the preceding  paragraph and otherwise described in

16       detail herein was and is so severe and pervasive that the working conditions of the

17       Plaintiff constituted  "harassment" of the Plaintiff pursuant to **Cal. Govt. Code**

18       **Section Section 12940 (j).**

19

20   99. Repeatedly and persistently at all times relevant herein, the Plaintiff herein

21       complained to management of the harassment described herein, but such

22       harassment  never and has never ceased.

23

24   100.   As a result of the aforesaid acts of Defendants, Plaintiff has, and continues to

25       suffer, monetary damages in an amount which is currently unascertained.

26       Plaintiffs will therefore request leave of the court to amend this Complaint to state

27

28

19

the amount of all such damages when they have been ascertained, or upon proof at the time of trial.

101.   As a result of the aforesaid racial harassment, the Plaintiff has been held up to great derision and embarrassment with his fellow workers, customers, friends, members of the community and families, and has suffered emotional distress because Defendants demonstrated to him that they would not recognize nor accept him as an employee solely because of their race and religion and in retaliation for plaintiff's complaints. Plaintiff is informed and believes that the Defendants and their management acted deliberately for the purposes of injuring him as alleged above. Defendants, by and through their managing agents and employees, further acted intentionally and unreasonably because they knew and/or should have known that their conduct was likely to result in severe mental distress. Plaintiff therefore seeks damages for such emotional distress in an amount to be proven at time of trial.

102.   Plaintiff is informed and believes and thereon alleges that this cause of action is not preempted by the California Workers' Compensation Act on the grounds that harassment is not a risk or condition of Plaintiffs' employment.

103.   Because of the wrongful acts of Defendants as herein above alleged, Plaintiff has been and will in the future be required to employ physicians and surgeons to examine, treat and care for him and will incur additional medical expenses in an amount to be proven at the time of trial.

20

**Dec. of Thompson - Exhibit 1**

104.    In doing the acts set forth above, Defendants acted as herein alleged with a conscious disregard of Plaintiff's rights to a non discriminatory work place. Defendants have acted in utter disregard of their obligations under the law. The managing agents of Defendants have made conscious decisions to establish and to allow the existence of a hostile work place.  In addition, said managing agents have knowingly retained and promoted vicious employees, including managers, known by Defendants to be prejudiced against African American employees and employees over the age of 40. This conduct by Defendants was, and is, despicable, cruel and oppressive. The Plaintiff is therefore entitled to an award of punitive damages in an amount to be proven at trial.

105.    In bringing this action, Plaintiff has been required to retain the services of counsel. Pursuant to **Government Code § 12965(b),** they are entitled to an award of attorney fees.

**WHEREFORE,** Plaintiff prays for judgment as more fully set forth herein below

### FIFTH CAUSE OF ACTION

**Wrongful Termination in Violation of Public Policy**

**(AS TO Defendants Radio Shack)**

106.    The facts alleged in paragraphs 1 through 49 are hereby incorporated by reference with the same force and effect as if fully pleaded at length herein.

107.    Jurisdiction is invoked in this court pursuant to the California Supreme Court case of Tameny v. Atlantic Richfield Company (1980) 27 Cal. 3d 167.

108.    There is a fundamental and well established public policy of this state against discrimination in employment on the basis of race, age, sex and national origin.

21

**Dec. of Thompson - Exhibit 1**

1   Said public policy is embodied inter alia in Article I, Section 8 of the California

2   Constitution.

3   109.    There is also a fundamental and well established public policy of this state

4   against discrimination on the basis of age and race. That public policy is also

5   embodied inter alia in the California Fair Employment and Housing Act.

6   110.    Defendants have a long standing policy and practice of making personnel

7   decisions on the basis of factors prohibited by the public policies of this state.

8   111.    The policy and practice described in paragraphs -- was applied specifically to

9   the Plaintiff in this case as follows:

11      (A).    Termination of the employment of Plaintiff Frank Allen based upon

12              race;

13      (B).    Termination of the employment of Plaintiff Frank Allen for race

14              discrimination in defense of others; and

15      (C).    Termination of the employment of Plaintiff Frank Allen based upon

16              Age;

17   112.    As a result of the aforesaid acts of Defendants, Plaintiff has suffered, and is

18   continuing to suffer, a loss of wages/salary, benefits, and other forms of

19   compensation in an amount which is currently unascertained.  As a result of

20   the discriminatory and retaliatory acts of Defendants the Plaintiff herein faces

21   substantial diminution of their future earning capacity in an amount which is

22   currently unascertained. Plaintiff will therefore request leave of the court to

23   amend this Complaint to state the amount of all such damages when they have

24   been ascertained or upon proof at the time of trial.

25   113.    As a result of the aforesaid acts of discrimination and retaliation in

26   employment, the Plaintiff has been held up to great derision and

27   embarrassment with their fellow workers, customers, friends, members of the

28   community and families, and has suffered emotional distress because

22

Defendants have demonstrated to them that it will not recognize nor accept them as employees solely on their merits but rejects them based upon prohibited classifications described above.

114. Plaintiff is informed and believes that the Defendant and its management acted deliberately for the purposes of injuring them as alleged above.

115. Defendants, by and through their managing agents and employees, further acted intentionally and unreasonably because it knew and/or should have known that its conduct was likely to result in severe mental distress. Plaintiff therefore seeks damages for such emotional distress in an amount to be proven at time of trial.

116. Because of the wrongful acts of Defendants as herein above alleged, Plaintiff has been and will in the future be required to employ physicians and surgeons to examine, treat and care for them and will incur additional medical expenses in an amount to be proven at the time of trial.

117. In doing the acts set forth above, Defendants acted as alleged intentionally and with a conscious disregard of the Plaintiff's right to equal employment opportunities and to be free from discrimination on the basis of prohibited factors. Defendants have acted and continue to act in utter disregard of its obligations under the public policy of this state. Defendants have made conscious decisions to discriminate against its employees for reasons prohibited by law, specifically the Plaintiff herein, by treating him adversely in the manner described above.

118. In addition, said managing agents have retained, protected, promoted and coddled vicious employees known by it to discriminate against its employees. This conduct by Defendants was, and is, despicable, cruel and oppressive. The Plaintiff is therefore entitled to an award of punitive damages in an amount to be proven at trial.

23

**Dec. of Thompson - Exhibit 1**

1

2 ### SIXTH CAUSE OF ACTION
Intentional Infliction of Emotional Distress - Common Law
3 (As to All Defendants)

4 126.Plaintiff realleges and incorporates paragraphs 1 through 49 with the same force

5 and effect as if full pleaded at length herein.

6 127 .This is an action for damages pursuant to the common law of the State of

7 California as mandated by the California Supreme Court in the decision of **Rojo v.**

8 **Kliger,** (1990) 52 Cal. 3d 65.

9

10 128.The acts of Defendants and agents, including managers of Defendant, as

11 described above, were extreme and outrageous. **This includes, but is not limited to,**

12 **the following:**

13

14 (A)**Wrongful termination based on Age and Race;**

15 (B) **Falsely accusing plaintiff of criminal acts;**

16 (C)Plaintiff was threatened and told to terminate his African American and

17 Hispanic employees because they "did not fit the image' defendants

18 wanted. Plaintiff was told he needed to "upgrade" his staff. Plaintiff was

19 threatened that if he did not do this, he would be terminated. Plaintiff, as

20 the Store Manager felt he had a superb and competent staff, which was

21 reflected by his store's success. Plaintiff, rightfully and loyally defended

22 his staff. Soon after , plaintiff was retaliated against and terminated;

23

24 (D)Hostile work environment,

25 WHEREFORE, Plaintiff prays for judgment as more fully set forth herein below.

26

27

28

24

**DEMAND FOR JURY TRIAL**

Plaintiff Frank Allen hereby demands trial of this matter by jury.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Frank Allen prays for relief as follows:

129.    For compensatory damages;

130.    For monetary damages to compensate for the emotional distress suffered by Plaintiff;

131.    For punitive damages in an amount appropriate to punish Defendants for their wrongful and malicious conduct and to set an example for others;

132.    For prejudgment and post-judgment interest accrued to date;

133.    For costs of suit incurred herein;

134.    For attorneys fees and costs pursuant to **California Government Code § 12965(b)** and other provisions of law; and

135.    For such other relief that this Court may deem just and proper.

Dated:

LAW OFFICES OF MAYOR JOSEPH L. ALIOTO & ANGELA ALIOTO

By: _____

ANGELA ALIOTO

Attorney for Plaintiff Frank Allen

25

EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION


FRANK ALLEN,

        Plaintiff,

   vs.                           CASE NO.
                                  CV 11 3110 WHA

RADIO SHACK CORPORATION, et al.,

        Defendants.
_____/


DEPOSITION OF FRANK ALLEN, JR.

February 15, 2012


Reported by:
WENDY C. BROWN
C.S.R. NO. 5697


PATRICIA CALLAHAN REPORTING
Certified Shorthand Reporters
(510) 885-2371    (415) 788-3993
Facsimile (510) 247-9775

Dec. of Thompson - Exhibit 2

4

1           BE IT REMEMBERED THAT, pursuant to Notice of

2    Taking Deposition, and on Wednesday, February 15, 2012,

3    commencing at the hour of 9:51 o'clock a.m. of the said

4    day, at the law offices of MILLER LAW GROUP, 111 Sutter

5    Street, Suite 700, San Francisco, California, before me,

6    WENDY C. BROWN, a certified shorthand reporter, State of

7    California, personally appeared FRANK ALLEN, JR., a

8    plaintiff in the above-entitled court and cause,

9    produced on behalf of the defendant, who, being by me

10   first duly sworn, was then and there examined and

11   interrogated by Attorney Tracy Thompson, representing

12   the law offices of MILLER LAW GROUP, 111 Sutter Street,

13   Suite 700, San Francisco, California, counsel for the

14   defendant.

15

16                  APPEARANCES OF COUNSEL

17

18   FOR THE PLAINTIFF:

19

20         LAW OFFICES OF MAYOR JOSEPH L. ALIOTO &

21         ANGELA ALIOTO

22         BY:  ANGELA MIA VERONESE, ESQ.

23         700 Montgomery Street

24         San Francisco, California  94111

25

**Dec. of Thompson - Exhibit 2**

27

1    you ever had any conversation with Bill Hamilton about

2    either your claims or his claims?

3    A.      No.

4    Q.      Have you ever had any conversations with

5    Basem Saba about your claims?

6    A.      No.

7    Q.      Do you know why Carlos left Radio Shack?

8    A.      No, I don't.

9    Q.      Did he ever tell you that he had been terminated

10   unfairly or words to that effect?

11   A.      No.

12   Q.      Do you know whether he resigned voluntarily?

13   A.      No.

14   Q.      You just don't know anything about the

15   circumstances surrounding his leaving?

16   A.      No.

17   Q.      Okay.

18          All right.  So you started working for Radio

19   Shack in 1997; is that right?

20   A.      Yes.

21   Q.      And what was your first position?

22   A.      Salesperson.

23   Q.      And who was your store manager?

24   A.      Whew.  I have no idea.

25   Q.      Okay.  It was a while ago, so ....

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 2**

29

1   A.      Yes.

2   Q.      Okay.  And what was your position at that time?

3   A.      Store manager.

4   Q.      And what was the store number there?  You don't

5   remember that?

6   A.      No.

7   Q.      Okay.  And how long did you stay at that

8   location?

9   A.      Oh, about seven -- seven months.

10  Q.      Who were you reporting to at that time?

11  A.      Gary Martinez.

12  Q.      He was your district manager?

13  A.      Yes.

14  Q.      And do you know who the regional manager was at

15  that time?

16  A.      I don't remember his name.

17  Q.      Okay.  So after seven months, where did you go?

18  A.      To 938 Market Street.

19  Q.      I'm sorry what was the number?

20  A.      938 Market Street.

21  Q.      938 Market Street.  And what was the store

22  number there?

23  A.      3830.

24  Q.      Okay.  And did you stay at 938 Market Street,

25  Store 3830, until April of 2010?

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 2**

30

1    A.      Yes.

2    Q.      Who was your district manager when you started

3    working at Store No. 3830?

4    A.      Gary Martinez.

5    Q.      Do you know how long, approximately,

6    Gary Martinez stayed as your district manager?

7    A.      Oh, about five years, I believe, approximately.

8    Q.      I understand you're doing your best to estimate,

9    right?

10   A.      Yes.

11   Q.      Okay.  And who became your district manager

12   after Gary Martinez?

13   A.      Hani.

14   Q.      Is that Hani Alzaghari?

15   A.      Yes.

16   Q.      And do you remember when that was,

17   approximately, what year?

18   A.      No, I do not.

19   Q.      And do you know who Hani reported to, in terms

20   of the regional director?

21   A.      Uh, Tom.

22   Q.      Is that Tom Schultz?

23   A.      Yes.

24   Q.      How would you characterize your working

25   relationship with Hani Alzaghari?

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 2**

31

1   A.      I think it was a good one.

2   Q.      I take it that you enjoyed working with Hani?

3   A.      I did.

4   Q.      You liked him, personally?

5   A.      Yes.

6   Q.      Do you believe that he treated you fairly?

7   A.      Yes.

8   Q.      Did you have any difficulties at all in working

9   with Hani?

10  A.      No.

11  Q.      Did Hani ever provide any written form of

12  discipline to you during the time you reported to him?

13  A.      No.

14  Q.      Did you ever get any kind of corrective action

15  record from Hani at all?

16  A.      Correction --

17  Q.      A corrective action record or report.

18  A.      I don't understand the question.

19  Q.      Okay.  Have you ever heard the term "corrective

20  action record" or "corrective action report" at Radio

21  Shack?

22  A.      No.

23  Q.      Okay.  Have you ever -- go ahead, I'm sorry.

24  A.      The monthly review.

25  Q.      I'm sorry, monthly review?

**Dec. of Thompson - Exhibit 2**

32

1   A.       A monthly review or review.

2   Q.       Okay.  So when you say "a monthly review," what

3   do you mean by that?

4   A.       Meaning that when the district manager comes in

5   to the store, he writes a review of what he sees need to

6   be done in the store.

7   Q.       And when did that practice start, to your

8   knowledge?

9   A.       It has always been.

10  Q.       Okay.

11  A.       Whenever he comes in, he will write a review.

12  Q.       Okay.  Is that something like a store visit

13  report?

14  A.       Yes.

15  Q.       Okay.  And how frequently during the time you

16  reported to Hani did he visit you at the store,

17  approximately, or on average?

18  A.       Four times a year.

19  Q.       And your recollection is that his practice was

20  on each of those four occasions that he would give -- he

21  would prepare some form of store visit report following

22  the visit?

23  A.       Yes.

24  Q.       And the store visit report would note things

25  that you were doing well and things where you needed

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 2**

33

1    improvement?

2    A.      Yes.

3    Q.      And do you believe that Hani was fair in his

4    assessment when he completed those store visit reports?

5    A.      I questioned him.

6    Q.      I'm sorry?

7    A.      I questioned him on some of them.

8    Q.      When you say you questioned him, did he respond

9    to your questions?

10   A.      Uh, yes.

11   Q.      And after he responded to your questions and

12   explained, were you satisfied with his explanations?

13   A.      No.

14   Q.      Okay, so you're saying that sometimes you

15   disagreed with him?

16   A.      Yes.

17   Q.      Okay.  And when you disagreed with Hani on his

18   store visit reports, did you put that in writing?

19   A.      No.

20   Q.      But you would have oral discussions with him?

21   A.      Yes.

22   Q.      And how did he respond when you told him that

23   you -- in general, how would he respond when you told

24   him you disagreed with him?

25   A.      Um, I responded by saying that, "This is my job,

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 2**

34

1   so I'll get it done, even though I disagree" -- "I'll

2   get it done; I'll take care of it."

3   Q.      Okay.

4   A.      "I'll make sure it's done."

5   Q.      And was he polite in his dealings with you when

6   you told him you disagreed with him?

7   A.      Yes.

8   Q.      So you would say -- if Hani criticized you in

9   some way in a store visit report, you might say to him,

10  "I disagree with it, but I'll make sure the issue gets

11  taken care of," or words to that effect?

12  A.      Yes.

13  Q.      Were there ever any times where Hani gave you

14  some negative feedback where you agreed that he was

15  right?

16  A.      Yes.

17  Q.      And I take it from what you said earlier -- but

18  correct me if I'm wrong -- but overall, you thought that

19  Hani treated you fairly?

20  A.      Yes.

21  Q.      Did Hani ever give you any indication at all

22  that he bore you any kind of animus because you're

23  African-American?

24  A.      No.

25  Q.      Did you ever hear Hani make any kind of

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 2**

35

1   derogatory comments based on your race?

2   A.      No.

3   Q.      Did you ever hear Hani make any jokes about

4   race, your race?

5   A.      No.

6   Q.      Did anyone ever tell you that they had heard

7   Hani make any derogatory comments or jokes about race?

8   A.      No.

9   Q.      Throughout the time of your employment at Radio

10  Shack, did you ever hear any employee make any

11  derogatory comments to you about race?

12  A.      When you say "employee," I don't understand what

13  you mean, an employee.

14  Q.      Anybody working at Radio Shack.

15  A.      Regardless of their position?

16  Q.      Yes.

17  A.      About race?

18  Q.      Yes.

19  A.      The word "race" wasn't used.

20  Q.      Let me clarify the question, okay?

21          Again, during your employment at Radio Shack,

22  did you ever hear any employee make any derogatory

23  comment about your race or about African-Americans?  Do

24  you understand that question?

25  A.      Yes.

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 2**

36

1   Q.      Okay.

2   A.      No more than the wrong image, or not the right

3   image of people.

4   Q.      Why don't you tell me who made the comments, and

5   then I'll follow up with you.

6   A.      Donna made the comment that we were -- we had

7   the wrong image of people in the store, and we need to

8   change the image of the store.

9   Q.      And when you say "Donna," that's Donna Ocampo?

10  A.      Yes.

11  Q.      Other than Donna Ocampo -- and we'll come back

12  to this.  I would just right now like you to give me a

13  list of anyone, at any time during your employment, who

14  you felt made a derogatory comment about your race or

15  about African-Americans?

16  A.      No.

17          MS. VERONESE:  And just to clarify, that's what

18  he has heard?

19          MS. THOMPSON:  Correct.  Fair enough.

20  Q.      Okay.  So let me -- I'll ask the question again,

21  just to make sure, and I'll follow up on that.

22          So my question was, have you personally, at any

23  time during your employment, heard any Radio Shack

24  employee make any comment or joke about your race or

25  about African-Americans.

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 2**

37

1         Can you read that back?  I want to make sure I

2 got it.

3         (Record read.)

4         MS. THOMPSON:  Q.  So just so we're clear, I'm

5 asking you about comments you've personally heard.

6 A.     No.

7 Q.     Have people told you that they heard someone, an

8 employee at Radio Shack, make a derogatory comment about

9 your race or about African-Americans?

10 A.    No.

11 Q.    All right.  Did you continue reporting to

12 Hani Alzaghari until -- well, who was your next district

13 manager after Hani?  Let's start there.

14 A.    Donna.

15 Q.    That's Donna Ocampo?

16 A.    Yes.

17 Q.    Do you remember when, approximately, she became

18 your district manager?

19 A.    I believe she officially took over the

20 responsibility in February.

21 Q.    February of 2010?

22 A.    Yes.

23 Q.    When was the first time you met Donna Ocampo?

24 A.    The first time I met her was when Greg and her

25 came into the store.

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 2**

38

1   Q.      When you say Greg, do you know Greg's last name?

2   A.      Pat -- uh ....

3   Q.      Was it Greg Patakas?

4   A.      Greg Patapas.

5   Q.      Patakas.

6   A.      Patakas.

7   Q.      Okay.  And had you ever met Greg Patakas before

8   the time he and Donna came into your store?

9   A.      No.

10  Q.      How many times have you ever actually met

11  Greg Patakas?

12  A.      Twice.

13  Q.      So let me make sure I understand something,

14  though.  Had you ever met Donna Ocampo at any time

15  before 2010?

16  A.      I have seen her.

17  Q.      Did you see her at company meetings or events?

18  A.      Yes.

19  Q.      Because she was a store manager and you were a

20  store manager?

21  A.      Yes.  She was district manager.

22  Q.      Okay.  But before sometime in early 2010, you'd

23  never actually been introduced to her?

24  A.      No.

25  Q.      So the first time that you met both Greg Patakas

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 2**

39

1   and Donna Ocampo was when they came into your store in

2   early 2010?

3   A.      Yes.

4   Q.      And do you remember what month that was?

5   A.      First part of December, I believe it was.

6   Q.      I'm sorry?

7   A.      First part of December.

8   Q.      First part of December of what year?

9   A.      2009.  It was a year before -- it was beginning

10  of the year, 'cause I believe --

11  Q.      I'm a little confused now.

12  A.      Okay.

13  Q.      I thought you said that you -- well, maybe I

14  misunderstood.  So, you're saying that you met

15  Greg Patakas and Donna Ocampo sometime in December of

16  2009?

17  A.      Yes.

18  Q.      Okay.  And what was your understanding of what

19  Donna's -- Ms. Ocampo's position was at that time?

20  A.      I think she was the area vice president.  I

21  believe.  I'm not for sure.

22  Q.      Okay.  And was Greg Patakas with her?

23  A.      Yes.

24  Q.      And do you know what Mr. Patakas' position was

25  at this time?

**Dec. of Thompson - Exhibit 2**

40

1  A.      I believe he was the regional president,

2  regional vice president.

3  Q.      Well, was it your understanding that he was

4  above Donna in the hierarchy or below her?

5  A.      Above.

6  Q.      Okay.  But you thought Donna was the area vice

7  president?

8  A.      Yes.

9  Q.      And was Hani Alzaghari your district manager at

10  the time of this visit in 2009?

11  A.      Yes.

12  Q.      Was anybody with Greg -- I'll just call it Greg

13  and Donna -- at the time of this visit in 2009?

14  A.      Yes.

15  Q.      Who else?

16  A.      Uh, loss prevention manager.

17  Q.      And who was that?

18  A.      I'm not for sure of his name.

19  Q.      Was it David Gonsolin, or don't you know?

20          MS. VERONESE:  Don't guess.

21          THE WITNESS:  Don't know.

22          MS. THOMPSON:  Q.  Yeah, your lawyer has made a

23  good point here.  I don't want you to guess if you

24  really don't know, but if you have some recollection or

25  some idea of who it was, then I'd like you to tell me,

**Dec. of Thompson - Exhibit 2**

1   okay.  So, as you sit here now, you have no idea of the

2   name of the loss prevention manager?

3   A.      No.

4   Q.      Okay.  Was it a man?

5   A.      Yes.

6   Q.      Okay.  Other than the loss prevention manager,

7   Greg and Donna, was there anybody else that was part of

8   this visit in 2009?

9   A.      Yes.

10  Q.      Who else?

11  A.      Human resource.

12  Q.      Who was that?

13  A.      I don't know her name.

14  Q.      Okay.  It was a woman?

15  A.      Yes.

16  Q.      By the way, the loss prevention manager, what

17  race was he?

18  A.      She --

19  Q.      The loss prevention manager.

20  A.      Uh, white.

21  Q.      A white male.  Do you have any idea how old,

22  approximately?

23  A.      40.  In his 40's.

24  Q.      Okay, and you said the HR manager was a female,

25  right?

42

1   A.      Yes.

2   Q.      And what was her race?

3   A.      African-American.

4   Q.      Was it Shaan Smith?

5   A.      The name sounds familiar, but I'm not for sure.

6   Q.      Okay.  And how old was this female human

7   resources manager, approximately?

8   A.      In her 40's.

9   Q.      Had you ever met the loss prevention manager

10  before this visit in 2009?

11  A.      No.

12  Q.      Have you ever met the human resources manager

13  before this visit in 2009?

14  A.      No.

15  Q.      Had you ever spoken to the loss prevention

16  manager on the telephone, to your knowledge, before this

17  visit?

18  A.      No, not to my knowledge.

19  Q.      Have you ever had any kind of interaction at all

20  with the loss prevention manager before this visit in

21  2009?

22  A.      No.

23  Q.      Okay.  How about the human resources manager;

24  had you ever had any kind of interaction with her,

25  either on the telephone, e-mail, in person, before the

**Dec. of Thompson - Exhibit 2**

46

1    A.      Yes.

2    Q.      Right?

3    A.      Yes.

4    Q.      So do you remember which employees specifically

5    were present?

6    A.      Bruce, Rosetta.

7    Q.      Okay.  What's Bruce's last name?

8    A.      I don't know.

9    Q.      Okay.  Did you know at one time and have just

10   forgotten?

11   A.      I did know at one time.

12   Q.      Okay.  What's Bruce's race?

13   A.      Uh, he's white.

14   Q.      His approximate age, as far as you could

15   observe?

16   A.      About 46.

17   Q.      Okay.  Rosetta, is that Rosetta Holmes?

18   A.      Yes.

19   Q.      And what race is she?

20   A.      Black.

21   Q.      Do you know what her approximate age was?

22   A.      About 26.

23   Q.      Okay.  Anyone other than Bruce and Rosetta?

24   A.      Victoria.

25   Q.      Do you know Victoria's last name?

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 2**

47

1  A.      No.

2  Q.      And what race is Victoria?

3  A.      Hispanic.

4  Q.      And her approximate age, to the best of your

5  observation?

6  A.      About twenty.

7  Q.      Twenty years old?

8  A.      Yes.

9  Q.      Anyone else, employees?

10  A.      No.

11  Q.      But as you sit here now, you have a specific

12  recollection of those three individuals being present at

13  the time of this visit in 2009?

14  A.      Yes.

15  Q.      Okay.  Now, did you know that you were going to

16  be visited by Donna, Greg, loss prevention, human

17  resources, before the visit actually occurred?  In other

18  words, did anyone tell you, "We're coming to your store

19  on this date"?

20  A.      Everyone was on alert.

21  Q.      What do you mean by that?

22  A.      Uh, there was a possibility that they may be

23  coming.  It wasn't for sure.

24  Q.      Who told you that there was a possibility that

25  these individuals might be visiting your store?

**Dec. of Thompson - Exhibit 2**

48

1    A.      District manager.

2    Q.      And that would have been Hani?

3    A.      Yes.

4    Q.      So tell me what Hani told you about that,

5    please.

6    A.      "We have some people that's in the area.  Make

7    sure your store is clean, neat, organized, because we

8    don't know if they're coming or not.  So be ready."

9    Q.      And was that conversation you had with Hani on

10   the telephone?

11   A.      Yes.

12   Q.      Was that a district -- was that a call where all

13   the store managers were on the line with Hani -- I mean,

14   all the store managers in Hani's district, or was this a

15   personal call between you and Hani?

16   A.      It was a personal call between me ....

17   Q.      Did you discuss any other subjects on that call,

18   other than what you've testified to?

19   A.      No.

20   Q.      Okay.  Did Hani initiate that call or did you

21   call him?

22   A.      He called.

23   Q.      Okay.  And so what you recall is that Hani

24   called you, and your understanding was that his specific

25   purpose in calling you was to let you know that there

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 2**

49

1    are some people in management that were in the area and

2    that they might come to your store?

3    A.      Yes.   He called all the stores.

4    Q.      Okay.   So Hani called all the stores in his

5    district to alert them?

6    A.      Yes.

7    Q.      And how do you know he called all the stores?

8    A.      Because once we got the call, we, as managers,

9    began to call each other to see --

10   Q.      Okay.

11   A.      -- where -- where are they.

12   Q.      Okay.   Trying to keep track of them, right?

13   A.      Yes.

14   Q.      Okay.   Fair enough.   So after Hani called you,

15   you had conversations with the other store managers in

16   the district to find out, you know, if they had any news

17   about where these people were or whose stores they were

18   coming to, that kind of thing?

19   A.      Yes.

20   Q.      So as far as you understood it, everyone got the

21   same call from Hani?

22   A.      Yes.

23   Q.      Okay.   How far in advance of the visit was this

24   phone call from Hani?

25   A.      Actually, Hani just called and let us know he

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 2**

50

1   was coming, because he didn't know where they were.  So

2   there was not a time.

3   Q.      No, I understand that he couldn't tell you when

4   they were coming, but what I want to know is how much

5   time went by between the time he called you to put you

6   on alert and the time that the people actually showed

7   up.  Was it the same day, was it a week, was it hours?

8   A.      Hmm ... I'm not for sure.

9   Q.      Okay.  Did you do anything in response to the

10  phone call from Hani in terms of your store?

11  A.      Yes.

12  Q.      Okay.  Can you tell me what you did?

13  A.      Um, cleaned it up, organized it, um, got it

14  ready for them.

15  Q.      So other than cleaning the store and organizing

16  it, did you do anything else to get ready?

17  A.      No more than the washing, the organizing the

18  displays and ....

19  Q.      Okay.  And were you satisfied with the condition

20  of the store after you got it cleaned and organized?

21  A.      Yes.

22  Q.      All right.  So, did anyone tell you what the

23  purpose of the visit was?  In other words, when Hani

24  alerted you that this group of people were in the area,

25  did he tell you what the purpose of the visit would be?

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 2**

51

1   A.      No.

2   Q.      Did you ask him?

3   A.      No.

4   Q.      Did you have any understanding of what the

5   purpose was for this group of people to be visiting?

6   A.      Well, it was Christmastime, so ... normally

7   people -- they said that people were going to come out

8   and visit the stores during Christmastime, to check to

9   see how it's supposed to look, are they ready for

10  Christmas.

11  Q.      Okay.  So that was a normal practice every year?

12  A.      Yes.

13  Q.      Okay.  People from the corporate office or

14  higher management would visit the stores in early

15  December, roughly --

16  A.      Yes.

17  Q.      -- to see how the stores looked?

18  A.      Yes.

19  Q.      Okay.  So, did this group of people, that

20  is, Donna, Greg, the loss prevention manager and

21  Shaan Smith, did they all arrive at the same time?

22  A.      No.

23  Q.      Who got there first?

24  A.      Donna, loss prevention and human resources.

25  They came in first.

**Dec. of Thompson - Exhibit 2**

52

1  Q.     They all came in together?

2  A.     Yes.

3  Q.     And how much after they had arrived did Greg

4  Patakas arrive?

5  A.     About three or four minutes after.

6  Q.     Okay.  So when the first group walked in, what

7  were you doing; where were you?

8  A.     Walking -- walking in the store.

9  Q.     When they came into the store, did they say

10  anything to you?

11  A.     Yes.

12  Q.     Did they introduce themselves?

13  A.     Yes, they did.

14  Q.     And did you introduce yourself?

15  A.     Yes, I did.

16  Q.     Did you introduce your employees?

17  A.     No, I didn't.

18  Q.     Were the employees -- where did the

19  introductions take place, on the sales floor?

20  A.     On the sales floor.

21  Q.     And where were the employees?

22  A.     Up front.  We have two sections in the store.

23  Q.     So when you say the employees were up front,

24  what does that mean?

25  A.     Mean that there's two sections in the store.

**Dec. of Thompson - Exhibit 2**

53

1   Q.      Okay.

2   A.      And you have to walk through a doorway to get to

3   one part of the store, and they was all up front -- in

4   the front of the store, and I was in the back of the

5   store.

6   Q.      Okay.  So you said that there were three

7   employees present, and all three of them were at the

8   front of the store?

9   A.      Yes.

10  Q.      And you were in the back of the store?

11  A.      I was in the back of the store.

12  Q.      So the group of people had to walk by the

13  employees to go to the back of the store where you were?

14  A.      Yes.

15  Q.      Okay.  So apart from the introductions, what

16  happened next?

17  A.      Um, they walked in, and they warned me.

18  Q.      Wait.  When you say, "They warned me," what do

19  you mean?

20  A.      Not to say anything.  Just listen, because he

21  had just left Oakland, and he had just fired a manager

22  over there for talking back to him.

23  Q.      Okay.  Let me back up here.

24          Who gave you this warning, as you've described

25  it?

**Dec. of Thompson - Exhibit 2**

54

1  A.      Donna and the loss prevention manager.

2  Q.      Did this comment come right after the

3  introductions had been made?

4  A.      Yes.

5  Q.      And who was speaking, Donna or the loss

6  prevention manager?

7  A.      Both of them was speaking.

8  Q.      Do you remember who said what?

9  A.      I believe Donna said that -- "Just listen to

10  what he have to say."

11  Q.      Now, when she said, "Just listen to what he has

12  to say," did she say who the "he" was she was referring

13  to?

14  A.      Greg.

15  Q.      Okay.  Did she mention his name?

16  A.      No.

17  Q.      You had never met Greg before?

18  A.      Never had.

19  Q.      Did you have some understanding that someone

20  name Greg Patakas was coming to your store?

21  A.      Yes.

22  Q.      And is that because Hani told you?

23  A.      Yes.

24  Q.      So did Hani tell you exactly who was coming in

25  the phone call where he --

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 2**

55

```
 1   A.      He didn't know exactly who was coming, but he
 2   knew Greg was coming.
 3   Q.      And did he tell you who Greg was?
 4   A.      Yes.
 5   Q.      And what did he say about Greg?
 6   A.      "The new regional president is coming."
 7   Q.      "The new regional president is coming"?
 8   A.      Region -- yes.
 9   Q.      And he said, "His name is Greg Patakas"?
10   A.      Yes.
11   Q.      Did he say anything else about how --
12   A.      He said he never met him before.
13   Q.      Did he say he knew anything about him at all?
14   A.      No.
15   Q.      Okay.
16           So after the introductions, going back to the
17   actual store visit, Donna Ocampo made the comment to
18   you, "Just listen to what Greg Patakas has to say," or
19   words to that effect?
20   A.      Yes.
21   Q.      Did she say anything else?
22   A.      No.
23   Q.      Now, who made the comment that someone had just
24   been fired in Oakland?
25   A.      The human resource manager.
```

**Dec. of Thompson - Exhibit 2**

57

1          MS. VERONESE:  At that moment?

2          MS. THOMPSON:  Right.

3          THE WITNESS:  No.

4          MS. THOMPSON:  Q.  Okay.  Did anyone else say

5   anything, other than what you've testified to, before

6   Greg Patakas walked into the store?

7   A.      The human resource manager, I heard her say that

8   what he was doing was not right.

9   Q.      Is that a comment that she made to you?

10  A.      Um, she made a comment -- she was talking to

11  Donna, and I heard her say it.

12  Q.      Okay.  Did you hear her say anything other than

13  what Greg Patakas was doing was not right, or words to

14  that effect?

15  A.      No.

16  Q.      Did you ask you her what she meant by that?

17  A.      No.

18  Q.      Is there any reason why you didn't?

19  A.      Um, because it wasn't part of my conversation.

20  Q.      Okay.

21  A.      So I didn't ask her.

22  Q.      Okay.  So this is a conversation between the HR

23  manager and Donna Ocampo that you happened to

24  overhear --

25  A.      Yes.

**Dec. of Thompson - Exhibit 2**

58

1   Q.      -- in the store?

2   A.      Yes.

3   Q.      Before Greg Patakas arrived?

4   A.      Yes.

5   Q.      Okay.  Was there any other conversation or

6   statements made by anyone that you could hear before

7   Greg Patakas entered the store?

8   A.      No.

9   Q.      Okay.  So when Greg Patakas did walk into the

10  store, did he introduce himself to you?

11  A.      Yes.

12  Q.      Did you introduce yourself to him?

13  A.      Yes.

14  Q.      What did he say, if anything?

15  A.      He introduced his self, and then he began to ask

16  me, "How long have you been with Radio Shack?"

17  Q.      And was he polite when he asked that?

18  A.      No.

19  Q.      How would you characterize him when he asked

20  that question?

21  A.      Very hostile.

22  Q.      What makes you think he was hostile?

23  A.      Tone of voice.

24  Q.      Okay.  So in a hostile tone of voice, he asked

25  you, "How long have you been with Radio Shack?"

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 2**

59

1    A.      Yes.

2    Q.      And did you respond to him?

3    A.      Yes.

4    Q.      And what did you tell him?

5    A.      Uh, thirteen years.

6    Q.      And what, if anything, was said after that?

7    A.      Um, and he looked at me, looked around the

8    store, and he said, "You may have a year with Radio

9    Shack."

10   Q.      Okay.  Did he say anything else?

11   A.      Um, he asked me was I running the store, was I

12   in charge of running the store, and I said, "No, my

13   district manager tell me what I need to do in the

14   store."

15   Q.      All right.  Let me back up here a little bit.

16           When he made the comment, "You may have a year

17   with Radio Shack," or words to that effect, did you say

18   anything in response?

19   A.      No.

20   Q.      Okay.  And then his next question to you was,

21   "Are you in charge of running the store," or words to

22   that effect?

23   A.      Yes.

24   Q.      And your response was, "No, my district manager

25   tells me what I need to do," or words to that effect?

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 2**

60

1   A.      Yes.

2   Q.      And what, if anything, did Greg Patakas say in

3   response?

4   A.      He kept asking me questions, trying to insinuate

5   that my district manager was not doing his job and was

6   not helping me to run the store.

7   Q.      When you say that he was insinuating that, do

8   you remember what -- what words he said to --

9   A.      "Are you running the store, yourself?  You don't

10  have" -- "your district manager's not coaching you."

11  Q.      Did he say anything else, other than what you've

12  already told me?

13  A.      Uh, he repeated, "How long have you been here?

14  How many years have you been with Radio Shack?"

15  Q.      Okay.  Did you say anything at all after -- When

16  he made the comment, "You're running the store yourself;

17  your DM is not coaching you," or words to that effect,

18  did you say anything at all?

19  A.      I said that my district manager comes down and

20  give me idea on how to operate the store.  He calls me

21  up and talk to me about what I need to do to the store.

22  Q.      And what else did Greg Patakas say, if

23  anything -- again, other than what you've already told

24  me?

25  A.      And he talked about the back room.

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 2**

61

1  Q.      So, who was present when this was actually

2  happening?  Was Donna Ocampo actually part of this

3  conversation?

4  A.      No.

5  Q.      Was Shaan Smith part of the conversation?

6  A.      He was from the beginning --

7          MS. VERONESE:  Clarify.  Shaan is a female.

8          MS. THOMPSON:  Yes.

9  Q.      Right?  Shaan Smith is a female?

10 A.      Right.  She was -- she was up front; she was not

11 around.  Only the loss prevention manager was there.

12 Q.      Okay.  So when you were having this conversation

13 with Greg Patakas, it was just you Greg and the loss

14 prevention manager?

15 A.      Yes.

16 Q.      And where was Donna Ocampo?

17 A.      She was up front.

18 Q.      Okay.  And Shaan Smith was also up front?

19 A.      Yes.

20 Q.      When you say "up front," do you mean the front

21 part of the store?

22 A.      There's a stockroom.  We was in the stockroom.

23 Q.      Okay.

24 A.      She was on the sales floor.

25 Q.      All right.  So I thought you said -- correct me

**Dec. of Thompson - Exhibit 2**

62

1 if I'm wrong -- that you were on the sales floor, the

2 back of the sales floor, when the group came in?

3 A.      Right.

4 Q.      At some point, did you move into the stockroom?

5 A.      We moved into the stockroom.

6 Q.      So who moved into the stockroom?

7 A.      Greg, myself and loss prevention president.

8 Q.      How soon after Greg Patakas walked into the

9 store did you move into the stockroom for the

10 conversation?

11 A.      No more than a minute.  It was a short period of

12 time.  We went straight to the back room.

13 Q.      And who led the group to the back room; was

14 that -- why did you wind up in the back room?

15 A.      Greg took us there.

16 Q.      Okay.

17         So Greg took you and the loss prevention manager

18 to the back room, and then Donna and Shaan Smith were at

19 the front of the store with the employees?

20 A.      Yes.

21 Q.      Okay.  So Donna and Shaan, to the best of your

22 knowledge and belief, could not hear any of the

23 conversation between you and Greg and the loss

24 prevention manager?

25 A.      No.

**Dec. of Thompson - Exhibit 2**

63

1   Q.      Did the loss prevention manager say anything

2   during this discussion in the back room?

3   A.      Yes.

4   Q.      What did he say?

5   A.      He talked about, um, changing things around in

6   the back room.  Making things more secure.

7   Q.      Did he say anything else that you can remember?

8   A.      No.

9   Q.      Did Greg Patakas say anything else, other than

10  what you've already testified to?

11  A.      He talked about rearranging the store.

12  Q.      Anything else?

13  A.      Uh, no, not that I ....

14  Q.      How long was Greg Patakas actually in the store,

15  to the best of your recollection, on this occasion in

16  December of 2009?

17  A.      Twenty minutes, tops.

18  Q.      How long was the rest of the -- well, was

19  Donna Ocampo -- let me withdraw that.

20          Did all of them leave at the same time?

21  A.      Yes.

22  Q.      Okay.  And after about twenty minutes, Greg,

23  Donna, the loss prevention manager and Shaan Smith all

24  walked out of the store?

25  A.      Yes.

**Dec. of Thompson - Exhibit 2**

64

1  Q.      Okay.  Other than what you've already testified,

2  did Greg say anything else?

3  A.      Yes.

4  Q.      What else did he say?

5  A.      Um, we had -- he had just -- we had -- during

6  the time he came in, we had just received 120 cases of

7  merchandise.  We had put away a hundred cases of

8  merchandise.  And I had 20 cases of merchandise in the

9  back room.  And he said that the store was unorganized.

10 And I explained to him that we had just gotten 120 cases

11 in, and he said the store still should have been neater.

12 But it was the back room that was in a mess.  The front

13 part of the store was fine.

14 Q.      Have you told me everything now that you can

15 recall that Greg Patakas said during this store visit in

16 December of 2009?

17 A.      Yes.

18         MS. THOMPSON:  Let's take a ten-minute break,

19 okay?  Is that all right?

20         MS. VERONESE:  Yeah, that's fine.

21         THE VIDEOGRAPHER:  Okay.  We're off the record

22 at 11:03.

23         (Recess taken.)

24         THE VIDEOGRAPHER:  Okay.  We're back on the

25 record at 11:11.

**Dec. of Thompson - Exhibit 2**

69

1   Q.      What did you think he would be a witness -- what

2   facts did you believe Basem Saba knew that you thought

3   related to your claims in the lawsuit?

4   A.      Well, he was at the meeting.  They had a special

5   meeting, um, a couple days after Greg had left, and they

6   asked me to explain how and what was said, and how he

7   treated me, at the meeting.

8   Q.      All right.  When you say there was a special

9   meeting after Greg had left, when was this special

10  meeting?

11  A.      The meeting was on a Thursday.

12  Q.      When, though, what year?

13  A.      Um, 2009.

14  Q.      So was it before Christmas of 2009?

15  A.      Before Christmas.

16  Q.      And who called this meeting, to your knowledge?

17  A.      Hani.

18  Q.      Was this a face-to-face meeting?

19  A.      Yes.

20  Q.      Okay.  And where did it take place?

21  A.      2141 Geary -- not Geary.  Was it Geary?  Yes.

22  Q.      2141 Geary Boulevard?

23  A.      No, no, no, no, not Geary.  It was not Geary.

24  But it was in the district office.

25  Q.      Was that on 19th Avenue?

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 2**

70

1   A.      19th -- thank you.

2   Q.      Okay.  So, how soon after Greg Patakas had been

3   in your store did this special meeting, as you've

4   described it, take place?

5   A.      It was approximately two or three days.

6   Q.      Okay.

7   A.      It was an emergency meeting.

8   Q.      And it was your understanding that Hani called

9   the meeting?

10  A.      Yes.

11  Q.      Did Hani tell you why he was calling the

12  meeting?

13  A.      To talk about the visit.

14  Q.      To talk about the visit to your store or to all

15  of your stores, as far as you knew?

16  A.      As far as my store, or --

17  Q.      I'm sorry?

18  A.      -- all of the stores.  I'm not for sure what the

19  meeting was about.

20  Q.      Okay.  Well, did Hani -- how did you learn about

21  the meeting?

22  A.      He called up and said, "We're having a special

23  meeting, and we want all the managers to be there."

24  Q.      Was this a group conference call where he said

25  this, or one on one with you?

**Dec. of Thompson - Exhibit 2**

71

1  A.      One on one.

2  Q.      So in his telephone call with you, he's saying,

3  "I'm calling a special meeting for all the managers,"

4  and did he say why he was calling the meeting in that

5  conversation with you?

6  A.      No.

7  Q.      Did you ask him, "What's the purpose of this

8  meeting" --

9  A.      No.

10  Q.      -- or words to that effect?

11  A.      No.

12  Q.      Okay.  So what time of day was the meeting?

13  A.      Morning.

14  Q.      Do you know what time it started?

15  A.      About 10:00 o'clock.

16  Q.      And how long did it last, approximately?

17  A.      About five hours.

18  Q.      So the meeting went from 10:00 till about 3:00

19  p.m.?

20  A.      Yes.

21  Q.      And can you remember who was present?

22  A.      All the managers was there.  Donna was there.

23  Um, a couple other district managers was there.  The

24  district manager for Oakland was there.

25  Q.      Who was that?

**Dec. of Thompson - Exhibit 2**

72

1   A.      I forgot his name.

2   Q.      Okay.  All right.  So, what store managers do

3   you remember being present?

4   A.      All 22 store managers was there in the district.

5   The whole district was there.

6   Q.      So how many people total were at this meeting,

7   approximately?

8   A.      25, 30 people.

9   Q.      Between 25 and 30 people?

10  A.      Yes.

11  Q.      Do you have any idea of why Donna Ocampo was

12  there?

13  A.      Uh, she was the area president, and she was with

14  him during the visit.

15  Q.      To your knowledge, had Greg visited other stores

16  on that same day or in that same time frame besides

17  yours?

18  A.      Yes.

19  Q.      Okay.  Who led the meeting?

20  A.      Hani.

21  Q.      Tell me what Hani said when he opened up the

22  meeting.

23  A.      I don't remember what was said at the meeting --

24  I mean, how he opened up the meeting.

25  Q.      All right.

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 2**

73

1    A.       But he asked me -- he asked me -- Alex

2    Basheri --

3    Q.       Wait, Alex Basheri?

4    A.       Basheri.

5    Q.       Is he another store manager?

6    A.       Yes.

7    Q.       Okay.  So --

8    A.       Greg -- Greg walked in his store.  What he said,

9    that his nerves were still upset behind the conversation

10   that he had had with Greg.

11   Q.       Okay.

12   A.       And he didn't want to remember.

13   Q.       So -- okay.  So Alex Basheri spoke at the

14   meeting and said --

15   A.       No, he -- yes, go ahead.

16   Q.       I'm sorry, I didn't mean to -- did I interrupt

17   you?

18   A.       No, I interrupted you.  I'm sorry.

19   Q.       Well, I -- I apologize, but I just want to make

20   sure I understand what you just said.  So Alex Basheri

21   was at the meeting, and he spoke about how his nerves

22   were still upset from the visit that Greg had made made

23   to his store?

24   A.       Yes.

25   Q.       And did you speak at this meeting?

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 2**

74

1  A.      Yes.

2  Q.      Do you remember what you said at the meeting?

3  A.      Um, I told them how Greg came into the store and

4  what he had said to me.  How he walked in the store and

5  looked at me and said, "How long have you been with

6  Radio Shack," and looked me up and down and said, "You

7  may have another year with Radio Shack."  Then I told

8  him he repeated that a couple times, and, um, his

9  attitude that he had while he was talking to me.  I

10  talked to them and I explained that all to them.

11  Q.      You told the whole group?

12  A.      I told the whole group.

13  Q.      And did other people present tell you they had

14  similarly had other unpleasant experiences with Greg?

15  A.      He only saw two stores.

16  Q.      How do you know that?

17  A.      Um, because they mentioned it at the meeting.

18  Q.      So the only two stores that he saw was yours and

19  Alex Basheri's?

20  A.      Yes.

21  Q.      As far as you knew?

22  A.      Yes.  In the Bay Area, in this district.

23  Q.      Was anyone from human resources present at this

24  meeting, to your knowledge?

25  A.      I don't remember.

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 2**

75

1   Q.      Was Shaan Smith there?

2   A.      I don't remember.

3   Q.      So am I correct in understanding -- did

4   Alex Basheri speak before you?

5   A.      Yes.

6   Q.      And he got -- he got up in front of the group

7   and said -- I'm sorry.  Did you want to say something?

8   A.      No, go ahead.

9   Q.      Okay.  Did Alex Basheri stand up and talk about

10  what had happened when Greg had visited his store?

11  A.      No, he did not stand up.

12  Q.      Okay.  So he sat down?

13  A.      He sat down.

14  Q.      Were you all sitting around a table?

15  A.      Yes.

16  Q.      And did you stand up when you were speaking?

17  A.      Yes.

18  Q.      Okay.  Is there some reason you stood up?

19  A.      I was asked to come up front.

20  Q.      Okay.  Who asked you to come up front?

21  A.      Hani.

22  Q.      So you came -- when Hani asked you to come up

23  front, you got up from your seat and walked to the front

24  of the room and stood in front of the group?

25  A.      Yes.

**Dec. of Thompson - Exhibit 2**

76

1   Q.      And then you told the whole group what had

2   happened when Greg Patakas had visited your store?

3   A.      Yes.

4   Q.      And did you pretty much tell them everything you

5   told me in this deposition, in terms -- did you tell the

6   group the same thing basically you've told me?

7   A.      Yes.

8   Q.      After you had given your -- after you had spoken

9   about that experience, did anyone in the group say

10  anything?

11  A.      Uh, a lot of them was upset about what was said

12  and how he was questioning the length -- the time that I

13  have with Radio Shack and how long I've been with Radio

14  Shack and, um ....

15  Q.      Okay.  I'm sorry, I may have asked you this, and

16  I apologize, but did Alex speak first about his

17  experience, or did you speak first?

18  A.      Alex never spoke about his experience.  He said

19  that he could not speak about his experience.

20  Q.      Okay.  I'm sorry.  So Alex told the group --

21  A.      That he was --

22  Q.      -- that he couldn't talk about what happened

23  because he was so upset, or words to that effect?

24  A.      Yes.

25  Q.      Have you ever spoken to Alex about what his

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 2**

77

1   experience was like with Greg Patakas?

2   A.      Briefly, yes.

3   Q.      Did Alex tell you about what had happened when

4   Greg had visited his store?

5   A.      Yes.

6   Q.      What did he tell you about that?

7   A.      That he had never in his entire life had anybody

8   come to him and talk to him the way that this man had

9   talked to him.  He had never in his life had anyone to

10  approach him and to get in his face and point his finger

11  in his face the way that this man did.  That's what Alex

12  told me.

13  Q.      Did he say anything else that you can remember?

14  A.      From that point, he said, "I don't want to talk

15  anymore about it," and left it -- left it alone, but he

16  said he has never been treated that way before.

17  Q.      Is Alex still working for Radio Shack, do you

18  know?

19  A.      Yes, he is.

20  Q.      So after you spoke to the group, did Donna

21  Ocampo say anything?

22  A.      No.

23  Q.      Did Hani say anything?

24  A.      They was quiet, looked at each other, and

25  gradually changed the conversation.

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 2**

78

1   Q.      So what do you mean, they gradually changed the

2   conversation?

3   A.      After I got up and explained what was said to me

4   and how he treated me, they looked at each other and

5   went on to talk about other things about the store.

6   Q.      But after you had spoken, I thought you said --

7   and correct me if I'm wrong -- that other people made

8   comments after you gave your -- after you told them what

9   happened to you?

10  A.      (Nods head.)

11  Q.      Other people in the group started talking about

12  what you had said?

13  A.      The store managers.

14  Q.      Okay.  Do you remember any of them specifically?

15  A.      Um, Nina, she spoke out.

16  Q.      What did Nina say?

17  A.      That that was not right what they was doing;

18  they was wrong.  That the employees should not conduct

19  themselves like that with their employees.  It was not

20  professional.  And that was sort of the overall

21  conversation at the time in the meeting.

22  Q.      Do you remember anybody other than Nina speaking

23  out --

24  A.      Uh --

25  Q.      -- of the store managers?

**Dec. of Thompson - Exhibit 2**

79

1    A.      No.

2    Q.      Are you saying other people did speak out and

3    you just can't remember who they were or --

4    A.      That's --

5    Q.      -- what they said?

6    A.      That's what I'm saying, yes.

7    Q.      Okay.  Even if you can't remember who, can you

8    remember anything that was said specifically at the

9    meeting by the store managers, other than what you've

10   testified to?

11   A.      I heard a lot of -- that "They should not have

12   treated you that way; that that was wrong, what they

13   did."  Um --

14   Q.      Anything else?  I'm sorry?  No?

15   A.      No.

16   Q.      Sorry.

17           Did Donna say anything else about Greg Patakas

18   in this discussion?

19   A.      She said that, "He's gone now," and now that

20   he's gone, she said that she would be there, and he

21   would be mostly dealing with her, so we would have her

22   to deal with and not him, because he will be going back

23   to Texas.

24   Q.      And did you have any reaction to that, when she

25   made that comment?

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 2**

80

1   A.      My comment was -- I didn't say anything.  I

2   didn't say anything.

3   Q.      So when Donna made the comment that, "He's gone

4   now; he's gone back to Texas.  You won't have to deal

5   with him anymore," did you say anything in response?

6   A.      No, I didn't say anything, but I thought

7   something.

8   Q.      What did you think?

9   A.      Things rolled downhill.  If her boss say, "Do

10  this," then she's going to have to have that attitude

11  that her boss want her to have, and if that's the

12  attitude he has, then she have to have the same attitude

13  in order to keep her job.

14  Q.      So that was your concern?

15  A.      That was my concern.

16  Q.      And did you voice that concern to anyone at that

17  time?

18  A.      Um, I talked to some managers about it.

19  Q.      Okay.  Who did you talk to about that?

20  A.      Um, I talked to um, Mayunk, Alex Basheri.

21  Q.      I'm sorry, what was the first one?  Maya?

22  A.      Mayunk.  Mike.

23  Q.      Oh, okay.  I'm sorry, Mike goes by Maya?

24  A.      Yes.

25  Q.      Do you know how to spell that?

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 2**

81

1    A.      M-a, M-a -- no, I don't.

2    Q.      So Mike and Mayunk were the same person?

3    A.      Yes.

4    Q.      So you spoke to Mike, Alex Basheri?

5    A.      And Darlene.

6    Q.      Darlene or Darling?

7    A.      Darlene.

8    Q.      Is Darlene and Darling the same person?

9    A.      Yes.

10   Q.      Okay.  That's a store manager?

11   A.      Yes.

12   Q.      Former store manager?

13   A.      Former store manager.

14   Q.      Okay.  Did Hani say anything in the discussion,

15   this meeting, about Greg Patakas?

16   A.      He said that Greg was coming back in two weeks.

17   Q.      I'm a little confused, because I thought -- I

18   thought you said that Donna told the group that he's

19   gone back to Texas and you wouldn't have to deal with

20   him anymore, or words to that effect?

21   A.      She did.

22   Q.      And then Hani said, "He's coming back in two

23   weeks"?

24   A.      Yes.

25           MS. VERONESE:  Well, I think we need to clarify.

**Dec. of Thompson - Exhibit 2**

82

1    I don't think you meant gone, like terminated.  I think

2    he went back home.  He's --

3           THE WITNESS:  Right.  In other words, she's

4    saying that -- is it my turn?

5           MS. VERONESE:  Go ahead.

6           THE WITNESS:  She's saying that after he's

7    finished his business, then she would be in charge.

8    After he finished his visits.

9           MS. THOMPSON:  Q.  Okay.

10   A.     So after he come back, then we would be actually

11   dealing with Donna.

12   Q.     Okay.  So let me just make sure I understand

13   something.  When Donna was saying that Greg was gone and

14   he went back to Texas, you understood that to mean that

15   he was only gone temporarily, and that he would

16   ultimately be coming back?

17   A.     Yes.

18   Q.     Okay.  And then Hani says that he's coming back

19   in two weeks?

20   A.     Yes.

21   Q.     Did Hani say anything else, other than that Greg

22   would be coming back in two weeks?

23   A.     He said he's coming back and looking at the

24   stores again.

25   Q.     Did he have any suggestions or recommendations

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 2**

83

1   or directions, based upon the fact that Greg would be

2   coming back to look at the stores in two weeks?

3   A.      Um, Greg give him some instructions on what to

4   do.

5   Q.      I'm not -- but what I'm trying to find out is

6   whether Hani told the store managers -- gave them any

7   instructions.

8   A.      Yes.

9   Q.      Okay.  What did Hani say about that?

10  A.      To go to the store and pull up the planograms,

11  to make sure that all the planograms are exactly the way

12  that they were designed to be; make sure that everyone

13  is aware of their performance.

14  Q.      Did Hani say anything else?

15  A.      He said quite a bit, but I'm -- I don't remember

16  it all.

17  Q.      Okay.  So, have you now told me everything that

18  you can recall about what Hani said at this district --

19  I'm sorry, this manager meeting that took place in late

20  2009?

21  A.      Yes.

22  Q.      So was this a regularly scheduled district

23  meeting, as you understood it?

24  A.      No, it was not a regular.  It was a special.  It

25  was very unusual, because normally we do not have

**Dec. of Thompson - Exhibit 2**

84

1  meetings in November.  Or December.

2  Q.      Okay.  Did Hani say anything to indicate that he

3  was concerned about how he would be viewed by Greg if

4  the stores were not in good condition?

5  A.      Yes.

6  Q.      What did he say about that?

7  A.      He was very nervous.

8  Q.      Did he say that he was nervous?

9  A.      Uh, no, he was -- he said that his job is in

10  jeopardy.

11  Q.      That's what he told the whole group?

12  A.      Yes.

13  Q.      Did he say why he thought his job was in

14  jeopardy?

15  A.      No.

16  Q.      Did you ever make any complaint to human

17  resources about the way you felt that Greg had treated

18  you in the store visit in December of 2009?

19  A.      I complained to -- at the meeting, I made the

20  complaint.

21  Q.      Okay.  So at the meeting, did you ask either

22  Hani or Donna to take any action in response to the

23  complaint you were making at the meeting?

24  A.      I didn't ask them to take some action.  I

25  presented it to them and thought maybe that they would

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 2**

85

1  automatically do it, since I was presenting it to them,

2  but they didn't.

3  Q.       What did you want -- did you tell them what you

4  wanted them to do?

5  A.       No, I said, "What can I do?"

6  Q.       You said, "What can I do," meaning what?

7  A.       Meaning, "What can I do" -- "once I presented it

8  to you, what do I do next?"

9  Q.       Okay.  Did anyone respond to that?

10  A.       No one responded to that.

11  Q.       Okay.  Did you ever talk to Shaan Smith about

12  the way you felt you'd been treated by Greg Patakas in

13  December of 2009?

14  A.       No.

15  Q.       Is there any reason why you didn't go to

16  Shaan Smith and talk about the way you felt you'd been

17  treated?

18  A.       No.  Not, not ....

19  Q.       Let me make sure I understand something.  Did

20  Donna Ocampo -- well, was Donna Ocampo any part at all

21  of the conversation in the back room with you and

22  Greg Patakas and the loss prevention manager?

23  A.       I didn't see her back there at all.

24  Q.       Okay.  And was Shaan Smith at any time part

25  of the discussion in the back room among you and

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 2**

86

1    Greg Patakas and the loss prevention manager?

2    A.      No.

3    Q.      To your knowledge, were either Donna Ocampo or

4    Shaan Smith in a position to overhear anything that

5    Greg Patakas said to you?

6    A.      In the front of the store, when we first had the

7    conversation, yes, and then from there, we went in the

8    back room, and the only one that I saw was the loss

9    prevention president.

10   Q.      Okay.

11   A.      And he wasn't there all the time.

12   Q.      So part of the time it was just you and

13   Greg Patakas alone in the back room?

14   A.      Yes.

15   Q.      So, how long were you and Greg with Shaan Smith

16   and Donna Ocampo before you went to the back room?

17   A.      About a minute.  Not that long.

18   Q.      And during that first minute of conversation,

19   was that when you were basically introducing yourselves

20   to each other?

21   A.      Yes.

22   Q.      Did Greg Patakas say anything other than

23   introducing himself during the part of the time that you

24   were with Donna Ocampo and Shaan Smith, before you went

25   into the back room?

Dec. of Thompson - Exhibit 2

87

1          MS. VERONESE:  I'm sorry, could you ask that

2   question one more time?

3          MS. THOMPSON:  Sure.  Can you read it back?

4          (Record read by the reporter:

5          "Question:  Did Greg Patakas say anything

6          other than introducing himself during the

7          part of the time that you were with Donna

8          Ocampo and Shaan Smith, before you went into

9          the back room?")

10         MS. VERONESE:  Okay.

11         THE WITNESS:  How long had I been with Radio

12   Shack.

13         MS. THOMPSON:  Q.  Okay.  Anything else?

14   A.     Give me the -- the overlook, looked me from head

15   to toe and said, "You may have a year with Radio Shack."

16   And then we went back in the back room.

17   Q.     Okay.

18   A.     He sat down at my desk.

19   Q.     I'm sorry, he sat at your desk?

20   A.     He sat at my desk.

21   Q.     And were you standing or sitting?

22   A.     I was sitting.

23   Q.     And where was the loss prevention manager?

24   A.     Uh, he was walking up and down the stockroom.

25   Q.     How big is the back room, roughly?

**Dec. of Thompson - Exhibit 2**

88

1   A.      About the size of this space here.

2   Q.      Can you give me a number of --

3   A.      Twenty feet by twenty feet.

4   Q.      Twenty by twenty?

5   A.      Yeah.

6   Q.      Is that right?

7   A.      (Nods head.)

8           MS. VERONESE:  About.

9           MS. THOMPSON:  Q.  No, approximately, right?

10  A.      Approximately, approximately.

11  Q.      Okay.  So was the loss prevention manager in a

12  position to hear what you and Greg Patakas were saying

13  to one another?

14  A.      Um, I'm not for sure.  It's possible, but I'm

15  not for sure.  Because there was another room that we

16  were in.  We were not in the stockroom.  He was in the

17  stockroom.

18  Q.      I see.

19  A.      And we was in the office room.

20  Q.      Okay.  So you couldn't even see him; is that a

21  fair statement?

22  A.      I saw him passing by.

23  Q.      Okay.  You saw him walking back and forth into

24  the stockroom?

25  A.      Yes.

**Dec. of Thompson - Exhibit 2**

89

1   Q.      From the stockroom onto the sales floor?

2   A.      Yes.

3   Q.      Okay.  But once he was -- went into the

4   stockroom, you do not know where he was?

5   A.      No.

6   Q.      Okay.  Now, when you say that -- and correct me

7   if I misstate anything -- you said that Mr. Patakas

8   looked you up and down.  Can you tell me what you mean

9   by that?

10  A.      Meaning that he was looking at my hair, looking

11  at my mustache, looking at my appearance, looking at how

12  I was dressed, um, and he looked at me and he made a

13  evaluation and said that, "You may have a year with us."

14  Q.      Okay.  Did Mr. Patakas at any time make any

15  express reference to your race?

16  A.      Not to my recall.

17  Q.      When you said that he was looking you up and

18  down, can you give me an estimate, how long did that

19  take, a second, two seconds, five seconds?  What's your

20  best recollection?

21  A.      Oh, about three to five seconds.

22  Q.      Did he raise his voice to you?

23  A.      Oh, yes.

24  Q.      He did?

25  A.      Yes.

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 2**

90

1   Q.      So was he shouting?

2   A.      Not really a shout, but a very firm, stern

3   discipline attitude.

4   Q.      So was he yelling, do you think, or just

5   speaking in a loud voice?

6   A.      Speaking in a loud voice.  Harsh loud voice.

7   Q.      Did he swear at you or use any profanity?

8   A.      No, not ....

9   Q.      So, again, have you told me everything that you

10  can remember about that store visit with Greg Patakas in

11  December of 2009?

12  A.      Yes.  That I remember.

13  Q.      Now, when you were in the back room with

14  Greg Patakas on this occasion, was the door open or

15  closed?

16  A.      Open.

17  Q.      Okay.  And how far away were the employees from

18  where you were in the back room, best estimate?

19  A.      There's the office, stockroom.  20, 25 feet.

20  Q.      Okay.

21  A.      Two, three separate different -- separate rooms.

22  Q.      Okay.  Did any of your employees ever -- did you

23  ever discuss this incident with any of your employees?

24  A.      Yes.

25  Q.      Okay.  When did you first discuss the incident

**Dec. of Thompson - Exhibit 2**

91

1   of the December 2009 store visit with Greg Patakas with

2   any of your employees?

3   A.      Almost right after he left.

4   Q.      Was this one-on-one conversation with one of the

5   employees, or was it you and all three of the employees?

6   A.      It was a group.

7   Q.      Okay.  So right after Greg Patakas and

8   Donna Ocampo and Shaan Smith and the loss prevention

9   manager left the store, you had a group conversation

10  with your employees?

11  A.      Yes.

12  Q.      Did any of the employees tell you that they had

13  heard anything?

14  A.      No.

15  Q.      Did you ask them whether they had heard anything

16  that had been said to you?

17  A.      I did not ask them.

18  Q.      As you sit here now, do you know one way or the

19  other whether any of your employees heard anything that

20  was said between you and Mr. Patakas?

21  A.      I'm not for sure.

22  Q.      Okay.  Tell me what you remember about the group

23  conversation with your employees right after Mr. Patakas

24  left?

25  A.      We talked about how and what he had said to me,

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 2**

92

1  how he had treated me, and the conversation, and then

2  from there we began to talk about the appearance of the

3  store.

4  Q.     So you told your employees what Mr. Patakas had

5  said to you?

6  A.     Yes.

7  Q.     And you told them how he had treated you?

8  A.     Yes.

9  Q.     Did any of them say anything in response to

10 that?

11 A.     They were somewhat upset.

12 Q.     How do you know they were upset?

13 A.     Uh, they voiced their opinion.

14 Q.     What did they say?

15 A.     That I should have said something -- I should

16 have expressed myself to him more and been a little bit

17 more verbal with him.

18 Q.     And what did you say when they told you that?

19 A.     I said it wasn't the time to do that.  That's

20 what I believe I said to them.

21 Q.     Okay.  Did Donna Ocampo say or do anything on

22 that store visit that you thought was inappropriate in

23 any way?

24 A.     No.

25 Q.     How about Shaan Smith, did Shaan Smith say or do

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 2**

93

1  anything that you thought was not appropriate in any

2  way?

3  A.      No.

4  Q.      What about the loss prevention manager, did he

5  say or do anything that you thought was not appropriate?

6  A.      No.

7  Q.      Okay.

8  A.      Most of them was --

9           MS. VERONESE:  Is there a question?

10          THE WITNESS:  Sorry.

11          MS. THOMPSON:  Q.  Is there anything you want to

12  clarify or --

13          MS. VERONESE:  Go ahead.

14          MS. THOMPSON:  Q.  If you're trying to clarify

15  something you said, you're allowed to do that.

16  A.      Okay.

17  Q.      Wait.  I'm sorry.  Did you want to add anything?

18          MS. VERONESE:  You started to say something, and

19  there wasn't a question pending, so --

20          THE WITNESS:  Okay.  I'm sorry, no.

21          MS. THOMPSON:  Q.  All right.  That's fine.

22          All right.  Well, we got off on this because we

23  were talking about the meeting at the district office,

24  but we talked about conversations that you'd had about

25  your claims with Basem Saba.  Have you told me all the

**Dec. of Thompson - Exhibit 2**

95

1   say anything else to one another about either your

2   claims or his claims?

3   A.      No.

4   Q.      Okay.  Then you said you talked to Bill a couple

5   of times.  When was the next time you spoke with Bill

6   about that?

7   A.      That was -- that was prior to when Bill was

8   fired, he was talking about how -- what had happened to

9   him, and I was talking about what happened to me, and

10  that was it.

11  Q.      Okay.  So you're saying this is the second

12  conversation with Bill Hamilton?

13  A.      Yes.

14  Q.      And so during that second conversation, you and

15  Bill spoke to one another about what had happened to

16  each of you?

17  A.      Yes.

18  Q.      Do you remember what Bill said about that during

19  that discussion?

20  A.      No, I don't.

21  Q.      Do you remember what you said to Bill in that

22  conversation?

23  A.      No more than what had already been said about

24  what was being said to me and how he treated me.

25  Q.      All right.  After that December 2009 store visit

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 2**

96

1    that you've already told me about, did you ever see

2    Mr. Patakas again?

3    A.      Yes.

4    Q.      When was the next time you saw Greg Patakas?

5    A.      Oh, I believe it was in January.

6    Q.      January of 2010?

7    A.      Yes.

8    Q.      Okay.  And where did that take place?

9    A.      3830.

10   Q.      At your store?

11   A.      Yes.

12   Q.      Was Mr. Patakas alone or was he with anybody?

13   A.      He was with someone else.

14   Q.      Who was he with?

15   A.      Uh, Dave Charles.

16   Q.      I'm sorry?

17   A.      Dave.  Dave was taking his place.

18   Q.      Okay.  So, wait.  So Dave's last name is

19   Charles?

20   A.      I believe it is, Charles.

21   Q.      Had you ever met Dave Charles before this

22   meeting or this store visit in January of 2010?

23   A.      No.

24   Q.      Was there anybody else present from outside the

25   store other than Greg Patakas and Dave Charles?

**Dec. of Thompson - Exhibit 2**

97

1  A.      Um, Donna was there, and I don't remember anyone

2  else.

3  Q.      Did the three of them, that is, Greg, Donna and

4  Dave, all come to your store at the same time?

5  A.      Yes.

6  Q.      Had you been given any advanced notice that

7  those individuals would be visiting your store on that

8  day?

9  A.      Well, he had said that he was coming back, but I

10  didn't know when he was coming back.

11  Q.      Okay, fair enough.  But did you receive any

12  advanced notice around the time that they showed up at

13  the store that he would be coming in Jan -- at that day?

14  A.      Yes.

15  Q.      Okay.  Who told you that?

16  A.      Hani.

17  Q.      Okay.  And what did Hani say to you?

18  A.      That, "He's coming back to your store on today."

19  Q.      So the day of the store visit, Hani called you

20  and said, "Greg Patakas is back in town, and he's coming

21  to your store today"?

22  A.      Yes.

23  Q.      Okay.  So how much time went by -- between that

24  phone call from Hani and Greg Patakas actually showing

25  up at your store?

**Dec. of Thompson - Exhibit 2**

98

1  A.      Hours, couple hours.

2  Q.      Did Hani, during the phone conversation, say

3  anything else to you about -- other than, "Greg Patakas

4  is coming to your store today"?

5  A.      "Are you ready?  How your store look?"

6  Q.      Okay.  And what did you say in response?

7  A.      "Great."

8  Q.      You thought your store looked great?

9  A.      I thought it looked great.

10  Q.      Okay.

11          So I think we need to change the tape.

12          THE VIDEOGRAPHER:  Okay.  This is the end of

13  tape one.  We're going off the record at 11:55.

14          (A lunch recess was taken from 11:55 to 12:35

15  o'clock p.m.)

16          THE VIDEOGRAPHER:  This is the beginning of tape

17  two.  We're on the record at 12:35.

18          MS. THOMPSON:  Q.  Okay.  Mr. Allen, this is the

19  continuation, obviously, of your deposition, and you're

20  still under oath.  You understand that, right?

21  A.      Yes.

22  Q.      Okay.  So right before the break, we were

23  talking about the store visit in January of 2010 to your

24  store by Greg Patakas, Dave Charles and Donna Ocampo,

25  okay?  So, what time of day did the --

**Dec. of Thompson - Exhibit 2**

99

1          MS. VERONESE:  I'm sorry.  Dave Charles?

2          MS. THOMPSON:  I thought that was the name that

3    you gave me.

4          THE WITNESS:  It was.

5          MS. VERONESE:  It was.  Okay.  I'm sorry.  I

6    didn't --

7          MS. THOMPSON:  That's all right.

8          THE WITNESS:  I believe that's his name.  I'm

9    not for sure.

10         MS. THOMPSON:  Q.  Okay.  No, I understand that.

11   But you know his first name was Dave?

12   A.      Yes.

13   Q.      And you believe his last name was Charles?

14   A.      Yes.

15   Q.      And your understanding, I think you testified

16   earlier, was that he was the replacement for

17   Greg Patakas?

18   A.      Yes.

19   Q.      Okay.

20         MS. VERONESE:  Okay.  Sorry.

21         MS. THOMPSON:  Q.  And you had never met him

22   before then?

23   A.      No.

24   Q.      Had you heard anything about Dave Charles?

25   A.      No.

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 2**

100

1   Q.      By the way, did you ever see Greg Patakas

2   interact with any other store manager?

3   A.      No.

4   Q.      Okay.  So what time of day did they come to your

5   store?  This is January 2010.

6   A.      Oh, about noontime.  Approximately about

7   noontime, somewhere in that area.

8   Q.      Okay.  I understand it's approximate, right?

9   A.      (Nods head.)

10  Q.      Yes?

11  A.      Yes.

12  Q.      Okay.  Sorry.

13          Did you have employees in the store that day?

14  A.      Yes.

15  Q.      Do you remember who they were?

16  A.      No, I don't, but -- no, I don't.  But probably

17  the -- probably the same ones that was there, because

18  they -- the evening shift.

19  Q.      Okay.  Well, how many -- in the 2009, 2010 time

20  frame, how many employees did you have in your store,

21  reporting to you?

22  A.      Five.  Five.  We was five.  I believe it was

23  five or six.

24  Q.      Five to six --

25  A.      Yes.

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 2**

101

1    Q.       -- employees?  Did you have an assistant

2    manager?

3    A.       No.

4    Q.       So the five or six employees were all sales

5    associates?

6    A.       Yes.

7    Q.       Now, you mentioned three of them before.  You

8    said there was Bruce, Rosetta and --

9    A.       And I totally forgot Nabor.

10   Q.       I'm sorry?

11   A.       Nabor.

12   Q.       You said there was Bruce, Rosetta and Victoria,

13   right?

14   A.       Yes.

15   Q.       Do you remember the names of any others?

16   A.       I have one other that I forgot about.  His name

17   is Nabor.

18   Q.       Can you spell his first name?

19   A.       N-a-b-v -- no, I don't.

20   Q.       Wait.  "N" -- you think it begins with an "N"?

21   A.       Nabor, yes.

22   Q.       N-a-b-o-r?

23   A.       Yes.

24   Q.       And that's a male employee?

25   A.       Yes.

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 2**

102

1   Q.      And what's his racial background, do you know?

2   A.      Hispanic.

3   Q.      Okay.  So we've got Bruce, Rosetta, Victoria and

4   Nabor.  Was there anybody else?

5   A.      That was there, no.

6   Q.      That --

7   A.      I have other employees.

8   Q.      Who were your other employees?

9   A.      Rosetta -- not Rosetta.  Erica Beard.

10  Q.      Erica Bird?

11  A.      Beard.

12  Q.      Beard.  Okay.  And what was her background,

13  racial background?

14  A.      Black.

15  Q.      Okay.  Anyone else?

16  A.      No.

17  Q.      Okay.  So you had a total of five employees

18  reporting to you during the 2009, 2010 time frame,

19  right?

20  A.      Yes.

21  Q.      And they're Bruce, Rosetta, Victoria, Nabor and

22  Erica, right?

23  A.      Yes.

24  Q.      Now, focusing on the January 10th, 2010, store

25  visit, who was there?

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 2**

103

1  A.      I only remember the three.

2  Q.      Which three?

3  A.      Um, Greg, Dave and Donna.

4  Q.      Oh.  What I'm trying to find out is which of

5  your employees were present, if any.

6  A.      I'm not for sure.

7  Q.      Okay.  All right.  Did Greg, Donna and Dave all

8  walk into the store at the same time?

9  A.      Yes.

10 Q.      And where were you when they walked in?

11 A.      I -- I don't remember where I was at.  But I was

12 on the sales floor.

13 Q.      Okay.  So what was the first thing that either

14 you said to any of them or any of them said to you when

15 they walked into the store?

16 A.      Greg said, "I told you I was coming back, so I

17 had to keep my word to say that I was coming back.  So

18 I'm here."

19 Q.      So Greg said words to the effect that, "I said I

20 was coming back and I had to keep my word, so I'm back,"

21 or words --

22 A.      Yeah, something like --

23 Q.      -- to that effect?

24 A.      To that effect.

25 Q.      Okay.  And what was his tone of voice when he

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 2**

104

1  said that?

2  A.      He was a different guy.

3  Q.      What was he like?

4  A.      Um, he was pleasant at the time.

5  Q.      Okay.  So he was polite?

6  A.      Yes.

7  Q.      Professional?

8  A.      Yes.

9  Q.      Friendly?

10  A.      I would say.

11  Q.      Okay.  What else did Greg say during that store

12  visit, other than what you've just testified to?

13  A.      Uh, the store looked great.

14  Q.      Did he say anything else?

15  A.      No.

16  Q.      Did Greg, on the occasion of the January 2010

17  store visit, say or do anything that you thought was

18  inappropriate in any way?

19  A.      No.  Not that I remember.

20  Q.      Okay.  And he told you he thought the store

21  looked great?

22  A.      Yes.

23  Q.      Did Donna say anything to you during this store

24  visit in January of 2010?

25  A.      No.

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 2**

105

1    Q.      Did Donna say or do anything that you thought
2    was inappropriate in that store visit?
3    A.      Donna didn't say too much during the store
4    visit.  Greg did most of the talking.
5    Q.      Okay.  What else did Greg say besides what
6    you've already testified to, if you remember?
7    A.      I don't remember anything else.
8    Q.      How long were they in the store?
9    A.      It was a short visit.  It -- I don't know.
10   Q.      Best estimate?
11   A.      Fifteen -- fifteen, twenty minutes.  I'm not for
12   sure.  It wasn't that long.
13   Q.      Okay.  Your best estimate, it was fifteen to
14   twenty minutes?
15   A.      Yes.
16   Q.      And Greg was polite and professional and
17   pleasant throughout that fifteen-to-twenty-minute visit?
18   A.      Yes.
19   Q.      And Donna said nothing?
20   A.      I didn't hear her say anything.
21   Q.      Understanding that she said nothing, did she do
22   anything that you thought was inappropriate or
23   unprofessional?
24   A.      I wasn't around her.
25   Q.      Okay.

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 2**

106

1   A.      I was with Greg and Dave.

2   Q.      Okay.  So did you have any interaction at all

3   with Donna at the January 2010 store visit?

4   A.      No.  No, not to my memory.

5   Q.      And what about Dave?  Did Dave -- did you and

6   Dave say anything to one another?

7   A.      Uh, I don't remember what was said, but we did

8   talk with each other.

9   Q.      And this was your very first meeting with him,

10  right?

11  A.      Yes.

12  Q.      And was he polite to you?

13  A.      Yes.

14  Q.      Professional?

15  A.      Very, yes.

16  Q.      Did Dave say or do anything that you thought was

17  inappropriate or offensive in any way?

18  A.      No.  Not then.  Not that I remember.

19  Q.      Did anything occur during the store visit in

20  January of 2010 that you found offensive or

21  inappropriate?

22  A.      No, not then.

23  Q.      Would you characterize it as a good store visit?

24  A.      I thought it was.

25  Q.      And Greg Patakas told you he thought it was,

**Dec. of Thompson - Exhibit 2**

107

1    too, right?

2    A.      Yes.

3    Q.      Did anyone criticize your store at all during

4    that fifteen-to-twenty-minute store visit?

5    A.      No.

6    Q.      How did the visit end?

7    A.      Um, Dave said that he was leaving and now it's

8    Steve responsibility now, and he's moving on, and that

9    was (inaudible) much the end of the conversation.

10   Q.      Wait, I'm sorry --

11           THE REPORTER:  I couldn't -- "that was" --

12   something -- "the end of the conversation."

13           THE WITNESS:  Greg said that he was leaving, and

14   it was Steve's responsibility now, and he was turning it

15   over to Steve.

16           MS. THOMPSON:  Q.  You mean Steve or Dave?

17           MS. VERONESE:  Dave.

18           THE WITNESS:  Dave.  Dave, I'm sorry.

19           MS. THOMPSON:  Q.  Yeah, we're getting kind of

20   confused here.

21   A.      I'm sorry.

22   Q.      So, just so the record is clear, at the end of

23   the store visit, Greg said words to the effect that he

24   was leaving, and that he was turning his job duties over

25   to Dave?

**Dec. of Thompson - Exhibit 2**

108

1    A.      Yes.

2    Q.      Did he say anything else about that before he

3    left?

4    A.      No.

5    Q.      Did Dave say anything about that before he left?

6    A.      No.  Not that I remember.

7    Q.      So as far as you were concerned, the store visit

8    ended on friendly, positive terms?

9    A.      Yes.

10   Q.      Did you ever see Greg Patakas again after that

11   January 2010 visit?

12   A.      No.

13   Q.      Did you ever have any interaction with him, with

14   Greg Patakas, after the January 2010 store visit?

15   A.      No.

16   Q.      Did you talk to any store managers who -- in the

17   district or otherwise -- who had been visited by

18   Greg Patakas -- again, other than what we've already

19   talked about?

20   A.      No.

21   Q.      Did any of the other store managers tell you

22   that they had been visited by Greg and Steve -- I'm

23   sorry, you got me doing it -- Greg and Dave in that same

24   January 2010 time frame?

25   A.      Alex -- he only visited two stores that I know

**Dec. of Thompson - Exhibit 2**

109

1  of.

2  Q.      Okay.  So you heard from Alex Basheri that Greg

3  and Dave also visited Alex's store in January 2010?

4  A.      Yes.

5  Q.      And what did Alex say about that store visit?

6  A.      He didn't have anything to say about the store

7  visit.

8  Q.      One way or the other?

9  A.      No more than he was glad that Greg is gone.

10  Q.     Okay.  Did he say that the store visit in

11  January was better than what had happened in December of

12  2009?

13  A.     He wouldn't comment on it.

14  Q.     Okay.  So Alex Basheri didn't give you any

15  information about what transpired during the store visit

16  by Greg Patakas and Dave in January 2010; is that right?

17  A.     Right.

18  Q.     Okay.  Have you heard from any source how that

19  visit went at Alex Basheri's store?

20  A.     No, I have not.

21  Q.     But at some point Alex made the comment to you

22  that he was glad that Greg Patakas was gone?

23  A.     Yes.

24  Q.     Was it your understanding that Greg Patakas was

25  leaving the company?

**Dec. of Thompson - Exhibit 2**

110

1   A.      No, not leaving the company.

2   Q.      Okay.  What was your understanding about what

3   Greg Patakas was doing?

4   A.      Uh, getting a promotion.

5   Q.      And who told you that?

6   A.      That was the managers talk throughout the

7   district.

8   Q.      Okay.  So you heard from other store managers in

9   the district that Greg Patakas was getting promoted in

10  the January 2010 time frame?

11  A.      Yes.

12  Q.      Okay.  But you don't remember who specifically

13  said that --

14  A.      No.

15  Q.      -- to you?

16  A.      No, I don't.

17  Q.      And you never saw or spoke to Greg Patakas

18  again --

19  A.      No.

20  Q.      -- after January?

21  A.      No.

22  Q.      Has anyone at Radio Shack in a supervisory or

23  management position ever treated you in a way that you

24  thought was offensive or inappropriate, other than what

25  you've already told me about Greg Patakas?

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 2**

111

1   A.      Um, other than Donna?

2   Q.      Okay.  Other than Donna.

3   A.      Yes.

4   Q.      Anyone else?

5   A.      No.

6   Q.      So I just want to make sure we're clear, then.

7   The only two people at Radio Shack throughout your

8   employment that you thought treated you in a way that

9   you thought was either offensive or inappropriate were

10  Greg Patakas and Donna Ocampo?

11  A.      Yes.

12  Q.      Okay.  Did Donna Ocampo at some point become

13  your district manager?

14  A.      Yes.

15  Q.      And I think you said earlier that was sometime

16  in about late February of 2010?

17  A.      About that time.

18  Q.      Other than seeing Donna during the store visit

19  in December of '09 and January 2010, had you had any

20  interactions with Donna before she became your district

21  manager in late February of 2010?

22  A.      I have -- no, I don't remember having any --

23  being -- I don't remember her being around me at all

24  during that time.

25  Q.      Okay.  At some point someone told you that Donna

**Dec. of Thompson - Exhibit 2**

112

1    is now your district manager, and you would be reporting

2    directly to her, right?

3    A.      Right.

4    Q.      Do you have some understanding as to what

5    happened to Hani Alzaghari?

6    A.      From my understanding, that he got transferred,

7    and once he got transferred, then he got fired.

8    Q.      Did you ever speak with Hani after he got

9    transferred?

10   A.      No.

11   Q.      So when was the last time you actually spoke

12   with Hani?

13   A.      I don't remember.

14          MS. VERONESE:  Speak up.

15          THE WITNESS:  I don't remember.

16          MS. THOMPSON:  Q.  Have you had any

17   communication with Hani at any time from the time he got

18   transferred up to the present?

19   A.      No.

20   Q.      Did you ever speak with Hani about why he got

21   transferred?

22   A.      No.

23   Q.      Have you ever had any conversations with Hani

24   about why he -- Where did you learn he'd been fired; who

25   told you that?

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 2**

113

1   A.      Other managers.

2   Q.      Anybody in particular?

3   A.      No, no.  It was just a conversation piece that

4   went through the district, went on through the district.

5   Q.      Okay.  Did anyone tell you why he'd been fired?

6   A.      No.

7   Q.      So how many times did you actually interact with

8   Donna once she became your district manager -- actually,

9   let me rephrase that.

10          How many times did you actually see Donna Ocampo

11  from the point at which she became your district manager

12  until your termination?

13  A.      I saw Donna about, oh, probably about three,

14  four times.  Not that many.

15  Q.      So three or four times from about February 2010

16  until your employment ended?

17  A.      Yes.

18  Q.      And were those all store visits?

19  A.      Yes.

20  Q.      Or did you see her other places or times?

21  A.      Store visit.

22  Q.      So during that time period, that is, from

23  February to April 2010, Donna Ocampo made three to four

24  store visits to your store?

25  A.      Yes.

**Dec. of Thompson - Exhibit 2**

116

1    Q.      Right.

2    A.      But she was in charge of the whole area at the

3    time, also.

4    Q.      Let me make sure I understand something.  You

5    say Donna was the district manager, right?

6    A.      Right.

7    Q.      And she reported to a regional sales director?

8    A.      Yes.

9    Q.      And that person reported to an area vice

10   president?

11   A.      Yes.

12   Q.      Okay.  So you said Donna was the district

13   manager.  You're saying Dave Charles was the regional

14   sales director?

15   A.      Yes.

16   Q.      You don't mean Todd Schrader, do you?

17   A.      Todd Schrader?

18   Q.      Right.

19   A.      He's still in the position now.

20   Q.      Have you ever heard the name Todd Schrader?

21   A.      I have not --

22   Q.      Okay.

23   A.      -- heard.

24   Q.      Okay.  And I take it -- so you've never heard

25   the name Todd Schrader, and you've never met anyone

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 2**

117

1   named Todd Schrader?

2   A.       I never met a Todd Schrader.

3   Q.       And that name is completely unfamiliar to you?

4   A.       Todd Schrader.  Todd.  Oh, okay.  Now.  I didn't

5   know his name.

6   Q.       Well, I'm not trying to give you any ideas or

7   tell you what to say.  I'm just trying to figure out if

8   you know --

9   A.       There was -- there was a new guy that came in.

10  He was there for about a month, not even a month,

11  almost, that she was reporting to -- I'm not -- I never

12  knew his name.

13  Q.       Who was the regional sales director, if you

14  know, at the time that your employment was terminated?

15  A.       I don't know.

16  Q.       Okay.

17  A.       I don't know.

18  Q.       Okay.  Well, have you ever heard the name

19  Basem Abef?

20  A.       No.

21  Q.       Have you ever --

22           MS. VERONESE:  Can I just ask a question?

23  There's Basem Abef and then there's another Basem?

24           MS. THOMPSON:  Basem Saba.

25  Q.       Right?  Basem Saba was a store manager, correct?

**Dec. of Thompson - Exhibit 2**

119

1    Basem, and you don't know his last name?

2    A.      Yes.

3    Q.      Okay.  So I'm not talking about him.

4    A.      No.

5    Q.      I'm trying to figure out whether you ever met

6    any other Radio Shack manager whose name was Basem?

7    A.      No.  I never met him.

8    Q.      Did you ever meet any Radio Shack manager whose

9    last name was Abef?

10   A.      No.

11   Q.      So the name Basem Abef is new to you?

12   A.      It's new to me.  I --

13   Q.      Okay.  And Todd Schrader is also a name you've

14   never heard before?

15   A.      Todd.

16   Q.      Todd Schrader?

17   A.      I'm not for sure.  I don't remember the name.

18   Q.      Okay.  All right.

19          During the conversation you were having with

20   Donna Ocampo when she was telling you that your store

21   would be visited by the new regional vice president and

22   the area vice presidents in order to remodel the store,

23   was she saying that was being done to punish you in some

24   way?

25   A.      No, I don't think it was to punish me.

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 2**

140

1    there's three of you, right, according to what you just

2    said?

3    A.        Three.

4    Q.        You, Dave Charles and the manager of loss

5    prevention, right?

6    A.        Yes.

7    Q.        Okay.  So can you tell me what you each said to

8    one another during that conversation?

9    A.        I talked to him about securing the merchandise

10   in the store.

11   Q.        What did you say about that subject?

12   A.        We was in the Tenderloin, and I told him we had

13   a lot of shoplifting.  And they was taking all the

14   merchandise from the back room, putting it on the floor.

15   And I said it was hard to secure the merchandise.  And

16   they took all the lock and pegs off the merchandise that

17   secured the merchandise.

18   Q.        Okay.  So at some point you observed that --

19   that because they were putting all the merchandise on

20   the floor, and they were taking the locks off the pegs

21   so the merchandise, once it was on the floor, would no

22   longer be secured?

23   A.        Yes.

24   Q.        And your concern was that that would be easy for

25   someone to steal?

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 2**

152

1   A.      Would you repeat that, please?

2   Q.      Yeah.  You said that Donna, on her way out the

3   door, told you that it was not a good store visit, or

4   words to that effect.  So my question is, after that

5   day, did you have any conversations with Donna about her

6   opinion that that was not a good store visit?

7   A.      That was the first time that I had heard that I

8   have the wrong people in the store.  And I need to

9   upgrade my people, because I have the wrong people in

10  the store.  And -- because she was working mostly with

11  the people, and she said that I need to upgrade the

12  people in the store.

13  Q.      Okay.  Let me make sure of something.  So this

14  was a conversation you had after the remodeling store

15  visit?

16  A.      After the remodeling visit.

17  Q.      Okay.  So was that a face-to-face conversation?

18  A.      That was a face-to-face conversation.

19  Q.      Okay.  And where did that take place?

20  A.      Inside the store.

21  Q.      How long after the remodeling visit did this

22  face-to-face conversation with Donna take --

23  A.      Um --

24  Q.      -- take place?

25  A.      Week.  I'm not for sure, about a week, two

**Dec. of Thompson - Exhibit 2**

153

1  weeks.

2  Q.      A week or two later?

3  A.      Yes.

4  Q.      In that week or two that passed between the

5  remodeling store visit and this conversation with

6  Donna Ocampo, had you had any conversations with her

7  about the store visit, the remodeling store visit?

8  A.      No.

9  Q.      Okay.  So what were your duties and

10  responsibilities as a store manager?

11  A.      To train the employees, to inform them of

12  promotions, sales, the events that's going on, reviews,

13  evaluation, inventory, sales, sales performance for each

14  employee, um, merchandising.

15  Q.      Okay.  Is it fair to say that you, as a store

16  manager, were responsible for knowing, being familiar

17  with company policies and procedures?

18  A.      Some of them, yes.

19  Q.      When you say, "some of them," what do you mean

20  by that?

21  A.      Um, there was so many, that we had four or five

22  books, and from that they went on line to -- I don't

23  think anybody was able to remember all the dos and

24  don'ts of Radio Shack.

25  Q.      Okay, fair enough, but I'm not saying that you

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 2**

154

1  had to commit them to memory, but you were responsible

2  for making sure that you, as the store manager, complied

3  with company policy and procedure, right?

4  A.      Yes.

5  Q.      Okay.  And if you had a question about the

6  company policy or procedure, as you just indicated, you

7  could go on line and find the policies?

8  A.      Yes, if you could find them.  If you can -- if

9  you can maneuver your way through the policy book to

10  find what you're looking for.

11  Q.      Okay.  And that was part of your job as a

12  manager, though, right, to know how to -- to know what

13  the company policies and procedures were?

14  A.      I wouldn't say it was my job to know that,

15  because there was so many.  And I don't even think --

16  Q.      Again, I'm not --

17  A.      -- any manager knew, "This policy says this

18  here; this policy says that."  I don't think any of

19  them --

20  Q.      Okay.  Maybe my question's unclear.  Again, I'm

21  not suggesting that you had to memorize anything, but

22  you've indicated that there were -- at one time there

23  were books that set forth the policies and procedures?

24  A.      Yes.

25  Q.      Okay.  And if you had a question about a

**Dec. of Thompson - Exhibit 2**

155

1  particular policy or procedure, you could go look in the

2  book and find out what they were?

3  A.      Sometime.

4  Q.      Why do you say sometimes?

5  A.      Because they very seldom was updated.

6  Q.      Whether it's updated or not, could you go to the

7  book and look to see what policies and procedures were

8  at least in the book?

9  A.      If you could find it, yes.

10  Q.      If you could find what?

11  A.      The information that you're looking for.  It's

12  not as easy going through there and saying, "I'm looking

13  for this policy here, and there it is right there."  It

14  was -- it was not that easy to do.

15  Q.      All right.  Leaving all that aside, I'm just

16  trying to figure out -- you were the store manager

17  for -- since 1998 --

18  A.      Yes.

19  Q.      -- roughly?  Okay.

20          You would agree with me that it was your job, as

21  a manager, to make sure that you complied with

22  applicable policies and procedures?

23  A.      Yes.

24  Q.      Okay.  And weren't you also responsible for

25  making sure your employees complied with company

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 2**

156

1    policies and procedures?

2    A.      Yes.

3    Q.      And if they didn't comply with company policies

4    and procedures, it was your job to educate them about

5    those policies and procedures, right?

6    A.      Yes.

7    Q.      And I take it you also were responsible for

8    hiring employees?

9    A.      No.

10   Q.      You had no responsibility for that?

11   A.      No.

12   Q.      Did you have any responsibility for recruiting

13   employees?

14   A.      Um, we can recruit, but actually hiring, they

15   had to go through some hiring managers to be able to do

16   that.

17   Q.      Okay.  But is it fair to say you were

18   responsible for recruiting employees for your store?

19   A.      Yes.

20   Q.      And if you recruited somebody that you thought

21   would be a good employee, what steps would you take to

22   having that person get hired?

23   A.      Call up one of the hiring managers and see if

24   they can set up for me to interview that person.

25   Q.      Okay.  And then did you have any input at all

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 2**

157

1  into the decision in terms of whether a candidate was

2  hired or not?

3  A.      Not after he going to the interviewing manager,

4  no.

5  Q.      So your only role would be to recommend a

6  candidate to the recruiting manager?

7  A.      Yes.

8  Q.      And once you did that, you had no further input

9  or role in determining whether somebody was hired or

10  not?

11  A.      No.

12  Q.      Did you ever interview candidates?

13  A.      Yes.

14  Q.      Okay.  So when -- at what point in the process

15  did you interview them?

16  A.      From the beginning.

17  Q.      Okay.  So, again, if there was a candidate you

18  thought might qualify or be eligible for hiring, you

19  would interview that person?

20  A.      Yes.

21  Q.      And if you liked that person and thought they

22  might be a good employee, you would refer them to the

23  hiring manager?

24  A.      Yes.

25  Q.      And then it's your testimony that the hiring

**Dec. of Thompson - Exhibit 2**

158

1   manager would then make the decision?

2   A.      Yes.

3   Q.      But wasn't it part of your job to be actively

4   looking for possible candidates for employment?

5   A.      Yes.

6   Q.      Did you have any role at all in hiring any of

7   the employees in your store?

8   A.      No.

9   Q.      Were those people all in the store at the time

10  you arrived?

11  A.      They was all hired by someone else and then

12  transferred to my store.

13  Q.      Okay.  So -- all right.  Fair enough.

14          So they had already been -- they were already

15  Radio Shack employees at the time they were assigned to

16  your store?

17  A.      Yes.

18  Q.      So the five employees you talked about before

19  all had been hired by somebody other than you?

20  A.      Yes.

21  Q.      All right.  But it was your job to train them?

22  A.      Yes.

23  Q.      And to coach them in the performance of their

24  jobs?

25  A.      Yes.

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 2**

159

1    Q.      And to discipline them, if appropriate?

2    A.      Yes.

3    Q.      And that would include writing them up, if

4    necessary?

5    A.      Yes.

6    Q.      Were you able to terminate employees?

7    A.      No.

8    Q.      Who had authority to terminate, if you know?

9    A.      District manager.

10   Q.      Were you able to recommend to the district

11   manager if you thought an employee should be terminated?

12   A.      Yes.

13   Q.      Have you ever, in your career at Radio Shack,

14   recommended that an employee be terminated?

15   A.      Yes.

16   Q.      On how many occasions?

17   A.      About three times.  Not that many.

18   Q.      Okay.  And why did you recommend that -- on

19   those three occasions, why did you recommend that the

20   employee be terminated?

21   A.      Um, conduct towards customers.

22   Q.      Was that for one of them or all three of them?

23   A.      For one of them.

24   Q.      What about the other two?

25   A.      They were not coming to work on time.

**Dec. of Thompson - Exhibit 2**

161

1    transferred.  Bruce is still there.  I'm sorry.

2  Q.       Okay.  Now I'm confused.  So you recommend that

3  Bruce be terminated?

4  A.       Yes.

5  Q.       And why were you recommending that Bruce be

6  terminated?

7  A.       Um, his attitude towards the customers.

8  Q.       I'm sorry, what race was Bruce?

9  A.       White.

10  Q.       Okay.  And you made that recommendation to Hani?

11  A.       Yes.

12  Q.       And what did Hani tell you?

13  A.       Concerning Bruce?

14  Q.       Yeah.

15  A.       He said that there's no one else wanted to work

16  with Bruce, so Bruce had to stay there with me, and he

17  told me to work with Bruce.

18  Q.       I'm sorry, so Hani -- I thought you were

19  recommending that he be terminated.

20  A.       I did.

21  Q.       So why did Hani -- did Hani tell you one way or

22  the other whether he made the decision to terminate

23  Bruce?

24  A.       No.  He told me that I had to work with him,

25  because Bruce was a -- one of the top salesmen in the

**Dec. of Thompson - Exhibit 2**

162

1    store -- in the district.

2    Q.      Okay.  So you made the recommendation to Hani

3    that Bruce be terminated because you thought he had a

4    poor attitude toward customers, and Hani said to you,

5    "You need to work with him, because he's one" -- or

6    words to that effect --

7    A.      Yes.

8    Q.      -- "because he's one of the top producing

9    salespeople in the" --

10   A.      District.

11   Q.      -- "in the district."  Okay.  And what did you

12   say?

13   A.      I -- I didn't say anything.  I just left it

14   alone.

15   Q.      Okay.  So had you actually written Bruce up for

16   his poor attitude towards customers?

17   A.      Yes.

18   Q.      On how many occasions?

19   A.      Quite a few times.

20   Q.      What do you mean by that?

21   A.      Three, four times.

22   Q.      So you're saying in Bruce's personnel file,

23   there would be three or four write-ups by you?

24   A.      There should be.

25   Q.      I guess I'm a little bit confused.  Can you

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 2**

164

1   A.      Yes.

2   Q.      Were there any other ways in which he had a bad

3   attitude toward customers?

4   A.      No.

5   Q.      All right.  So Hani basically said, "I'm not

6   going to accept your recommendation.  Bruce is one of

7   our top salespeople, and I think you need to work with

8   him," or words to that effect?

9   A.      Yes.

10  Q.      So now, these other two that you said were not

11  coming to work on time, what were their names?

12  A.      I don't know their names.  It was ....

13  Q.      Okay.  And you're saying that when you made the

14  recommendation of termination, Hani's reaction was to

15  transfer them to some other store?

16  A.      Yes.

17  Q.      Did Hani tell you why he wasn't accepting your

18  recommendation to terminate those people for their

19  tardiness?

20  A.      No, but he did explain to me about sometime

21  people just don't get along with certain people, and

22  they may work better with someone else than they did

23  with you -- with me.

24  Q.      Do you know whether those employees were

25  complaining about working with you?

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 2**

165

1    A.      No, I don't know.  I never heard anything about

2    that.

3    Q.      Okay.  But Hani's explanation to you was that,

4    "Sometimes people might work better under different

5    managers"?

6    A.      Yes.

7    Q.      "So I'm going to give them a chance and transfer

8    them to another store"?

9    A.      Yes.

10   Q.      Okay.  And did you disagree with that approach?

11   A.      No.

12   Q.      Was one of your duties and responsibilities

13   protection of the company's assets?

14   A.      Yes.

15   Q.      And the company's assets would include

16   merchandise, right?

17   A.      Yes.

18   Q.      It would also include any cash that was

19   received?

20   A.      Yes.

21   Q.      Anything else?

22   A.      My responsibility?

23   Q.      I'm sorry, no.  What other assets were you

24   responsible for protecting that belonged to the company?

25   Besides cash and merchandise, was there anything else?

**Dec. of Thompson - Exhibit 2**

166

1   A.      The records.

2   Q.      And were you responsible -- did Radio Shack have

3   written policies with regard to the protection of

4   company assets?

5   A.      They probably did.

6   Q.      Did you ever see any such policies?

7   A.      I never saw any.

8   Q.      You never saw a single written policy dealing

9   with protection of assets?

10  A.      I don't remember seeing it.

11  Q.      You are aware that the company had policies with

12  respect to handling cash, right?

13  A.      Once again, I have never seen that.

14  Q.      Regardless of whether you've seen any policies

15  dealing with handling cash, what was your understanding

16  of what were the practices that you were supposed to

17  follow with respect to handling cash at your store?

18  A.      Um, make sure that the money's deposited into

19  the bank.  Make sure that there's a proper amount of

20  money to open up and operate the business with.

21  Q.      So did you have cash registers in your store?

22  A.      Yes.

23  Q.      And did the register -- was there a drawer that

24  was part of the cash register?

25  A.      Yes.

**Dec. of Thompson - Exhibit 2**

169

1  don't want to have a whole lot of ones inside the

2  drawer, when you open up and people look inside and see

3  how much money is in the drawer.  And you want to keep

4  it to a minimum so the drawer would look empty, because

5  people come in and buy something and look in your drawer

6  to see how much money is in there.

7  Q.     All right.  Let me make sure I understand

8  something.  I thought -- so you're now -- I thought that

9  the money was supposed to be underneath the register.

10  A.     20s, 50s and 100s.

11  Q.     Okay.

12  A.     Ones was on the --

13  Q.     All right.  So you're saying all of the money

14  except for the singles, all of the singles -- how many

15  singles would you put in the back office in the locked

16  drawer?

17  A.     I had three registers.  Tried to keep maybe at

18  least a hundred dollars in singles.

19  Q.     Where?

20  A.     In the back in the desk, in the locked drawer.

21  Q.     Okay, so about a hundred dollars in singles, and

22  $50 in coins?

23  A.     Something like that, yes.

24  Q.     Okay.  But your testimony, then, is that all

25  bills over one dollar -- that would be 5, 10s, 20s --

**Dec. of Thompson - Exhibit 2**

170

1  would all be kept in the register?

2  A.      Yes.

3  Q.      Okay.  And that was your policy and practice?

4  A.      Right.

5  Q.      And you told all of your employees that?

6  A.      Yes.

7  Q.      You told them that they needed to keep all

8  money, except for rolls of coins and hundred dollars in

9  singles -- all needed to be maintained in the register,

10 right?

11 A.      Right.

12 Q.      And you had to make a bank deposit every day,

13 right?

14 A.      Actually, we made bank deposits twice a day.

15 Q.      Okay.

16 A.      And that was because you wanted to not have a

17 whole lot of cash lying around, right?

18 A.      Yes.

19 Q.      At what point would you make a bank deposit; how

20 much cash did you have to have on hand before you had to

21 make a bank deposit?

22 A.      We try to -- well, 800 to a thousand.  It

23 depends on the time of day, business come in, and

24 it's -- it would be random.  Depends on how busy we'd

25 get during the day.  Then we'd look and see what we

**Dec. of Thompson - Exhibit 2**

173

1      MS. THOMPSON:  Q.  There was not enough room in

2  the three registers for the change; is that your

3  testimony?

4  A.      Yes.

5      MS. THOMPSON:  Let's take a break, okay?  We've

6  been going for a while.

7      THE VIDEOGRAPHER:  Okay.  I'll end this tape.

8  This is the end of tape two.  We're off the record at

9  2:01.

10      (Recess taken.)

11      THE VIDEOGRAPHER:  Just a moment, please.  This

12  is the beginning of tape three.  We're on the record at

13  2:09.

14      MS. THOMPSON:  Okay.  Can we mark this document

15  as Exhibit 1?

16      (DEFENDANT'S EXHIBIT NO. 1

17       WAS MARKED FOR IDENTIFICATION.)

18      MS. THOMPSON:  For the record, I have marked as

19  Exhibit 1 a document that's Bates numbered RS/Allen -268

20  and has the heading, "Job Title:  Store Manager."

21  Q.      Mr. Allen, please take as much time as you need

22  to review Exhibit 1.      addie

23      (Pause.)

24      Have you had a chance to review Exhibit 1?

25  A.      Yes.

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 2**

174

1    Q.      Have you ever seen Exhibit 1 before today?

2    A.      No, I haven't.

3    Q.      Okay's.  Regardless of whether you've seen it or

4    not, does Exhibit 1 accurately describe your duties and

5    responsibilities as store manager during your employment

6    at Radio Shack?

7    A.      Yes.

8    Q.      So you understood that one of your purposes as a

9    store manager during your employment was to protect the

10   company's assets, correct?

11   A.      Yes.

12   Q.      Were you ever written up by Hani Alzaghari for

13   anything having to do with failing to protect company

14   assets?

15   A.      Never.

16   Q.      Were you ever written up by Hani Alzaghari for

17   poor operational controls?

18   A.      No.

19   Q.      Were you ever written up by any district manager

20   for poor operational controls?

21   A.      No.

22   Q.      Do you have some understanding of what the term

23   "operational controls" means?

24   A.      The access of the -- no, I don't.  Would you

25   explain it to me?

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 2**

175

1   Q.      Fair enough.  Have you ever heard that term

2   before used at Radio Shack?

3   A.      No.

4   Q.      Have you ever seen any document that made

5   reference to operational controls?

6   A.      No, not that I remember, no, I don't.

7   Q.      Have you ever been written up for failure to

8   follow daily report procedures?

9   A.      Daily report procedures?

10  Q.      Right.

11  A.      I don't remember getting written up, no, not at

12  all.

13  Q.      Were you ever written up at all -- well, who was

14  your district manager in 2003, was that Hani?

15  A.      2003?

16  Q.      Right.

17  A.      It could have been -- might have been Hani.  Or

18  Gary Martinez.

19  Q.      Were you ever told in writing by Mr. Alzaghari

20  that cash must be kept in the cash drawer and monitored

21  by you at all times?

22  A.      No.

23  Q.      Had Mr. Alzaghari ever told you that he was

24  holding you accountable to follow all company policies

25  at all times?

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 2**

176

1  A.      No.

2  Q.      Did you ever keep money in the manager's desk to

3  use for change so you would avoid running to the bank to

4  get change?

5  A.      Yes.

6  Q.      And you were told that was a violation of

7  company policy, right?

8  A.      No, I wasn't.

9          MS. THOMPSON:  Okay.  Let's mark the next

10 document as Exhibit 2.

11         (DEFENDANT'S EXHIBIT NO. 2

12          WAS MARKED FOR IDENTIFICATION.)

13         MS. THOMPSON:  For the record, I've marked

14 as Exhibit 2 a one-page document with Bates No.

15 RS/Allen -94, and has the date February 21, 2003.

16 Q.      So please take as much time as you need to read

17 Exhibit 2.

18         Okay.  Have you had a chance to review

19 Exhibit 2?

20 A.      Yes.

21 Q.      Okay.  And you've seen Exhibit 2 before today,

22 right?

23 A.      Uh, yes, I have.

24 Q.      And that's your signature over the signature

25 line that says "Store Manager's Signature"?

**Dec. of Thompson - Exhibit 2**

177

1  A.      Yes, it is.

2  Q.      And you signed this document on February 21,

3  2003?

4  A.      Yes.

5  Q.      And where it says, "District Manager's

6  Signature," do you recognize that signature?

7  A.      Yes.

8  Q.      And is that Hani's signature?

9  A.      Yes.

10 Q.      So is it fair to say that Mr. Alzaghari

11 presented you with Exhibit 2 on February 21, 2003?

12 A.      Yes.

13 Q.      And he asked you to read it?

14 A.      Yes.

15 Q.      And then he asked you to sign the document,

16 acknowledging receipt?

17 A.      Yes.

18 Q.      Did you review Exhibit 2 with Mr. Alzaghari on

19 February 21, 2003?

20 A.      Uh, yes, I did.

21 Q.      And Exhibit 2 states in part, "Mr. Allen:  I

22 need you to follow company policy for all cash

23 procedures.  Cash must be kept in the cash drawer and

24 monitored by you at all times.  This must be done

25 immediately, and I'm holding you accountable to follow

**Dec. of Thompson - Exhibit 2**

178

1   all company policies at all times."

2          At the time you read this in February of 2003,

3   did you understand that?

4   A.      Yes, and the situation, too.

5   Q.      I'm sorry?

6   A.      Yes.

7   Q.      And you understood that Mr. Alzaghari was going

8   to hold you accountable to follow all company policies

9   at all times, right?

10  A.      Yes.

11  Q.      And he told you the cash must be kept in the

12  cash drawer and monitored by you at all times, right?

13  A.      In that store.

14  Q.      I'm sorry?

15  A.      In that store.

16  Q.      What store is that?

17  A.      That's the store -- we moved across the street,

18  and this is when this happened.  But when we remodeled

19  the store and came into the new store where we didn't

20  have anyplace to keep the change at, Hani said that that

21  was okay to do that, because we didn't have any place to

22  keep the change.

23  Q.      Hold on a second.  So what store are you saying

24  you were in in February of 2003?

25  A.      We was at 989 Market Street, I believe it was.

**Dec. of Thompson - Exhibit 2**

180

1  thereafter, Store 3830 was moved to a different

2  location?

3  A.      Yes.

4  Q.      And what location was that?

5  A.      938 Market.

6  Q.      All right.  So is there anywhere on Exhibit 2

7  that says to you that these rules only apply to 989

8  Market Street?

9  A.      Uh, I talked to Hani about that, and I let him

10  know that the new registers did not have room for the

11  change, and I didn't have anywhere to put it.  And since

12  it was back in the back room, and you had to go through

13  two -- one, two, another room to get to the desk, and it

14  was locked, he said I would be able to put it in there.

15  Q.      Did he say that in writing to you anywhere?

16  A.      We -- we didn't do too much writing.  It was

17  mostly verbal conversation.

18  Q.      Okay.  But let's just hold on for a second,

19  because I want to make sure I understand a few things.

20  You understood that you were being given a written

21  reprimand on February 21, 2003, right?

22  A.      Then.  I had forgot about this.

23  Q.      I'm not asking you whether you forgot about it.

24  I'm talking about at the time you got this, you

25  understood you were being written up for not following

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 2**

181

1    company policies, right?

2    A.      Yes.

3    Q.      And you understood from reading this that the

4    loss prevention manager had visited your store on

5    February 20th, 2003, right?

6    A.      Yes.

7    Q.      And that as a result of that visit, he found a

8    number of violations of company policies, right?

9    A.      Yes.

10   Q.      So not only the cash-handling policies but

11   various other policies were also violated, right,

12   according to Exhibit 2?

13   A.      Yes.

14   Q.      All right.  So when did you move from 989 Market

15   to 938 Market?

16   A.      Oh, I believe it was -- we was there for about

17   three years, four years, so ... I'm not for sure.

18   Q.      Best estimate?

19   A.      February 2003.  This -- I'm not for sure.  I'm

20   not for sure of the actual time.

21   Q.      I understand you're not sure.  Can you give me

22   your best estimate or best recollection?

23   A.      And where we was located when this was written?

24   Q.      Well, I thought -- you've testified that

25   Exhibit 2 was given to you while you were at 989 Market.

**Dec. of Thompson - Exhibit 2**

182

1    A.      Right.  I believe that's when it was given to

2    me.

3    Q.      Okay.  And so my question was, how long were you

4    at 989 Market before you moved to 938 Market?

5    A.      We was there for about four years.

6    Q.      Okay.  So what year, approximately, did your

7    store move to 938 Market?

8    A.      Uh, about 2007, somewhere along in there.

9    Q.      Okay.  And from that point forward, 2007 to the

10   time of your termination, you remained at 938 Market,

11   right?

12   A.      Yes.

13   Q.      Okay.  So, now you're saying when you moved into

14   938 Market, there was no room in the cash register

15   drawers?

16   A.      No.

17   Q.      Is that your testimony?

18   A.      Yes.

19   Q.      So were your cash registers different than the

20   cash registers in any other store?

21   A.      Yes.

22   Q.      What makes you say that?

23   A.      Because the cash registers in the new stores,

24   they was electronic, and normally with the old drawers,

25   they had a slot in the back that you can keep extra

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 2**

183

1   change or one dollar bills, whatever you want to put

2   back there in it.

3   Q.      Okay.  And you're saying that when -- you're

4   calling 989 an old store; is that right?

5   A.      Right.

6   Q.      989 Market.  Okay.  And you're saying at 989

7   Market, the cash register had drawers with a slot in the

8   back?

9   A.      Yes.

10  Q.      Okay.  So -- but when you moved to 938 Market,

11  other stores at Radio Shack had the same cash registers,

12  didn't they?

13  A.      No.

14  Q.      Okay.  So let's be very clear about this, then.

15  Is it your testimony that your store at 938 Market

16  Street was the only store in the entire Radio Shack

17  company that had your brand of cash register; is that

18  what you're saying?

19  A.      No, that's not what I'm saying.

20  Q.      Okay.  So other stores had the same cash

21  registers you had at 938 Market, didn't they?

22  A.      Um, there was about three stores that had the

23  same registers that I had.

24  Q.      Three stores that had the same registers that

25  you had at the remodeled store at 938 Market?

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 2**

184

1    A.      Yes.

2    Q.      Okay.  And what are those three other stores, or

3    three stores?

4    A.      One was on Mission, Serramonte and Castro.

5    Q.      All right.  Which Mission -- which store on

6    Mission Street, Mission and what?

7    A.      Mission and 23rd.

8    Q.      And who is the store manager there?

9    A.      Mike.

10   Q.      And who is the store manager at Serramonte?

11          MS. VERONESE:  I'm going to object.  Vague as to

12   time.  When are we talking about?

13          MS. THOMPSON:  We're talking about -- he's

14   testified --

15   Q.      And correct me if I'm wrong -- that in 2007,

16   approximately, you moved into a remodeled store which

17   was located at 938 Market Street.  And I was asking

18   you -- and you said you had a different kind of cash

19   register at 938 Market than you'd had 989 Market.  Did I

20   understand that correctly?

21   A.      Yes.

22   Q.      Okay.

23          MS. VERONESE:  I'm --

24          MS. THOMPSON:  Q.  So I'm trying to find out

25   what other stores had the same kind of cash register

**Dec. of Thompson - Exhibit 2**

189

1    A.      Yes.

2    Q.      And was anybody else there?

3    A.      No.

4    Q.      Okay.  So you've testified that the store was in

5    what you've called a high-crime area.  Didn't that make

6    it all the more important for you to make sure you took

7    precautions to protect company merchandise and assets?

8    A.      I don't understand what you mean by that.

9    Q.      Well, you knew you were in a high-crime area,

10   correct?

11   A.      Correct.

12   Q.      So didn't that make it even more important for

13   you to make sure that you took all appropriate measures

14   to protect company assets, because you knew there was a

15   risk, right?

16   A.      Yes.

17   Q.      Is that a fair statement?

18   A.      Yes.

19   Q.      Now, you said you talked to Hani about keeping

20   money in the back room, right?

21   A.      Yes.

22   Q.      And so was there any -- the dollar amount was

23   what?  Was there any limit on the dollar amount that you

24   could keep in the back room?

25   A.      Yes.

**Dec. of Thompson - Exhibit 2**

1  Q.      But it was still your responsibility to make

2  sure that Rosetta and Bruce followed company policies,

3  right?

4  A.      As long as I was there to make sure it was done,

5  yes.

6  Q.      So if you weren't there, you felt that you had

7  no responsibility for what they were doing?

8  A.      If I was not there, I felt that they should have

9  followed the policy that was presented to them.  Whether

10 or not they followed it, I wouldn't know until the next

11 day or till someone came and presented it to me.

12 Q.      But you had overall responsibility for the

13 store, right --

14 A.      Right.

15 Q.      -- as the store manager?

16 A.      Yes.

17 Q.      Both of them were just sales associates, right?

18 A.      Right.

19 Q.      And so just because you weren't there, are you

20 saying that if you weren't in the store, you had no

21 responsibility for what was happening in your absence?

22 A.      I'm saying that I have no control over what

23 they're doing.  I'm not saying that I'm not accountable

24 for what they do or what goes on.  If somebody breaks

25 into the store, robs the store, someone breaks the

**Dec. of Thompson - Exhibit 2**

193

1  window in a store, um --

2  Q.      I understand that you can't -- I'm not talking

3  about other people or third parties.  I'm just talking

4  about the employees.  I understand that you can't --

5  when you're not there, I understand you cannot

6  physically control them, but you just said -- and you

7  would agree -- that regardless of whether you were there

8  or not, you were accountable for their actions while

9  they were working, correct?

10  A.      I did make a mistake and say that.

11  Q.      You were accountable, though, weren't you?

12  A.      For their action?

13  Q.      During their -- while they were working, yes.

14  A.      And I'm not there?

15  Q.      Right.

16  A.      I don't see how I could be responsible for their

17  action.

18  Q.      I'm not asking whether you're responsible.  I'm

19  saying whether you were accountable as the store manager

20  for what your employees did while they were working?

21  A.      I never agree -- I don't agree -- I don't agree

22  to that.

23  Q.      So you have no accountability -- if you're not

24  in the store, you have no accountability whatsoever for

25  what your employees are doing; are you saying that?

**Dec. of Thompson - Exhibit 2**

194

1    A.       I'm saying that I don't know what my employees

2    doing when I'm not there.

3    Q.       I'm not asking whether you know about them or

4    not.  I'm trying to figure out how you perceived your

5    responsibility to the company.

6    A.       I think that --

7               MS. VERONESE:  Let her --

8               MS. THOMPSON:  Q.  Yeah.  So my question, again,

9    is --

10              MS. VERONESE:  Answer the question.

11              MS. THOMPSON:  Q.  -- is it your testimony, as

12   you sit here now, that while you were the store manager,

13   as long as you were not in the store, you had no

14   responsibility whatsoever for what happened in your

15   store by your employees?  Is that your testimony?

16              MS. VERONESE:  I'm going to object as to vague.

17   It depends on what these employees were doing.

18              MS. THOMPSON:  That's fine.  That's fine.

19   Q.       Can you answer that question?

20   A.       No, I don't feel that I'm responsible for what

21   they do when I'm not there, because they are responsible

22   for the store when I'm not there.

23   Q.       So the minute you walk out the store, you have

24   no responsibility for what happens in your absence?

25   A.       I can't, because I'm not there.

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 2**

195

1   Q.      Okay.  That's fine.  I'm just trying to

2   understand your position on this.  So as soon as you

3   walk out the door, you wash your hands and just say,

4   "Whatever happens now is not my problem or my

5   responsibility"?  Is that your view?

6   A.      If I'm not there, I can't be responsible for

7   something that -- if I'm not there.

8   Q.      Okay.  So again, as soon as you walk out the

9   door and say goodbye to your employees, your feeling is

10  that you're completely absolved of all responsibility

11  for what happens in that store while you're not there?

12  A.      When I have told my employees that, "You're

13  responsible now, of the store; make sure you take care

14  of it."

15  Q.      I understand you're telling them they're

16  responsible --

17  A.      Right.

18  Q.      -- but I'm trying to find out what your view of

19  your own responsibility was.  Do you feel you're

20  completely absolved of any responsibility for your store

21  once you walk out the door and leave it in the hands of

22  Rosetta or Bruce?  And that's a "yes" or a "no."

23  A.      Yes.

24  Q.      Did you know who Tom Nabozny was?

25  A.      Yes.

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 2**

196

1  Q.      He was the loss prevention manager?

2  A.      Yes.

3  Q.      Okay.  When we talked earlier about visits by

4  the loss prevention manager, you talked about December

5  of 2009 and January of 2010, are you talking about

6  Tom Nabozny?

7  A.      No.

8  Q.      What other loss prevention managers did you know

9  besides Tom Nabozny?

10  A.      Tom Nabozny was my loss prevention manager

11  for -- until he got fired.

12  Q.      And when was he fired?

13  A.      2007, somewhere along in there.

14  Q.      Who told him he was fired?

15  A.      Excuse me.

16  Q.      I'm sorry.  Who told you he was fired?

17  A.      Um, we had had a conversation in our back room

18  once, where he was telling me that Radio Shack is

19  getting ready to get rid of all their senior managers in

20  Radio Shack, and they have started with, uh -- with him.

21  He was -- his job was in jeopardy because of age, and he

22  said that, um, he were getting ready to -- they were

23  getting ready to eliminate him because of his age.  And

24  he had a younger man that was coming in to take his

25  place.

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 2**

197

1    Q.      All right.  Let me make sure I understand a few

2    things.  So this is a conversation you and Tom Nabozny

3    were having in 2007?

4    A.      Yes.  Around then.

5    Q.      Who else was present?

6    A.      We was in the back room.  He had did one of

7    these reviews here.

8    Q.      He had a store visit?

9    A.      Yes.

10   Q.      Did you like Tom Nabozny?

11   A.      I got along with almost everybody.

12   Q.      Okay.  Did you feel he treated you fairly?

13   A.      Yes.

14   Q.      So even when he gave you a negative store visit,

15   did you think that he was treating you fairly?

16   A.      Um, with this visit here, um, once we did the

17   visit, and I explained to him how these things happen,

18   and the reason why we was having these problems, he went

19   back and talked to Hani about them, and then from there,

20   we worked those things out and got it taken care of.

21   Q.      Okay.  So after you received the written

22   reprimand on February 21, 2003, you're saying that you

23   and Tom Nabozny worked out your differences?

24   A.      We didn't have -- there was no differences to

25   work out.

**Dec. of Thompson - Exhibit 2**

198

1  Q.      Okay.  So -- all right.  So you had no problems

2  at all working with Tom Nabozny, then?

3  A.      No.

4  Q.      Okay.  Fair enough.  So when he wrote you --

5  again, looking at Exhibit 2, where it says, "Tom Nabozny

6  (Loss Prevention Manager) visited store on February 20,

7  2003 and the store visit report revealed the following,"

8  and he talks, "Refunds - 0 out of 29 refunds either had

9  SM or issuer's signature as per company policy."

10  Was that true?

11  A.      Yes.

12  Q.      That was a violation of company policy, right?

13  A.      Yes.

14  Q.      You had to have the store manager sign the

15  refund?

16  A.      Yes.

17  Q.      And out of 29 refunds, none had been signed by

18  you, right?

19  A.      Yes.  Is that what this says?

20  Q.      That's what it says.  It also says, "Voids - 0

21  out of 2 voids were signed by the [store manager] as per

22  company policy."  Is that a true statement?

23  A.      Yes.

24  Q.      And you understood voids needed to be signed by

25  the store manager by company policy?

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 2**

199

1   A.      At that time, when Tom did this here, that was a

2   change in the policy, and Tom was coming along saying

3   that these were things that need to be taken care of.

4   And I was one of the stores that he came to.

5           And then from that point there, everybody

6   understood -- in the district understood what they was

7   looking for, during that time.

8   Q.      Okay.  But that's on the -- on the voids, you're

9   saying that policy changed.  But it hadn't changed on

10  refunds --

11  A.      But the whole --

12  Q.      -- had it?

13  A.      But the whole thing was -- the whole policy --

14  all the policy had been changed when he made this visit.

15  Q.      Well, are you saying that before -- are you

16  saying that in 2000, for example, a store manager did

17  not have to sign refunds?

18  A.      No, I'm not saying that, but it was not an

19  issue.

20  Q.      Right.  You knew that store managers -- it was

21  always company policy that a store manager would have to

22  sign refunds, right?

23  A.      Yes.

24  Q.      That was the policy the day you became the store

25  manager, and that was the policy the day you left as

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 2**

200

1   store manager, right?

2   A.      Right.

3   Q.      Okay.  The same thing were voids, right?  The

4   voids were supposed to be signed by the store manager,

5   right?

6   A.      Right.

7   Q.      "Payroll - Time cards need to be filled out by

8   employees every day worked."  That's company policy,

9   right?

10  A.      Yes.

11  Q.      And you were responsible for making sure that

12  happened, right?

13  A.      Right.

14  Q.      "The [store manager] must review and sign each

15  employee's time card for accuracy prior to closing

16  payroll."  That was company policy, right?

17  A.      Right.

18  Q.      And that was your responsibility as a store

19  manager?

20  A.      Right.

21  Q.      And Tom Nabozny was pointing out to you that

22  that wasn't being done correctly, right?

23  A.      Right.

24  Q.      And you didn't disagree with him, did you?

25  A.      No.

**Dec. of Thompson - Exhibit 2**

201

1   Q.      Now, what does "RSAP" stand for?  Take a look at

2   Exhibit 2.

3   A.      Radio Shack service plans.

4   Q.      Well, it's AP.  Do you know what that stands

5   for?

6   A.      Radio Shack applications, credit card

7   applications.

8   Q.      I'm just asking you what -- when there's a

9   reference to "0 out of 7 RSAP applications did not have

10  the hard copy of RSAP contracts signed and attached to

11  the document.  2 out of 4" -- oh, sorry.  "Document,"

12  period.  Never mind.

13          So in that context, what does "RSAP application"

14  mean?

15  A.      Radio Shack credit card.

16  Q.      That's your understanding?

17  A.      Yes.

18  Q.      Okay.  So was it true that zero out of seven

19  RSAP applications did not have the hard copy of the RSAP

20  contract signed and attached to the document?

21  A.      Yes.

22  Q.      Was that your responsibility, to make sure that

23  was done correctly?

24  A.      Yes.

25  Q.      And you didn't disagree with Mr. Nabozny when he

**Dec. of Thompson - Exhibit 2**

202

1  pointed out that that had not been done, did you?

2  A.      No.

3  Q.      Okay.  Where it says, "2 out of 4 Verizon

4  applications did not have the wireless phone purchase

5  summary filled out and attached to the document," was

6  that true?

7  A.      Yes.

8  Q.      And that, again, was part of your responsibility

9  to make sure that happened?

10  A.      Yes.

11  Q.      And was it true that there was a box in the

12  manager's desk which contained $300?

13  A.      There was some money in the box, yes.

14  Q.      Was it $300?

15  A.      No, it -- no.

16  Q.      You don't know?

17  A.      No, it wasn't no $300.

18  Q.      So you're saying that's a -- Mr. Nabozny is

19  making that up?

20  A.      I'm saying there wasn't no $300 in the drawer.

21  Q.      How much was in there --

22  A.      I don't know.

23  Q.      -- according to you?

24  A.      I don't know, because there's $300 is the petty

25  cash, and the petty cash was in the drawers.  There was

**Dec. of Thompson - Exhibit 2**

203

1  $300 --

2  Q.     Wait, wait, wait.  I'm sorry.  You really do

3  have to speak more slowly.  I'm sorry.  I know it's

4  hard.  Can you start again?  'Cause what I'm asking you

5  is how do you -- how much money was in the manager's

6  desk if it --

7          MS. VERONESE:  In 2003?

8          MS. THOMPSON:  Q.  -- wasn't $300?

9          MS. VERONESE:  Back in 2003?

10         MS. THOMPSON:  Correct, at the time of this

11  reprimand.

12         THE WITNESS:  We kept loose coins, one dollar

13  bills in the drawer in the box -- in the box at that

14  time.

15         MS. THOMPSON:  Q.  All I'm asking you is, you

16  said that -- you just stated under oath that there was

17  not -- you disagreed with the statement that there was

18  $300 in the manager's desk, right?

19  A.     Right.

20  Q.     Okay.  So I'm asking you, as you sit here now,

21  do you know exactly how much money you had in the

22  manager's box as of February 2003?

23  A.     No, I don't.

24  Q.     So it could have been $300, right?

25  A.     It could have been.

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 2**

204

1   Q.      Okay.  All right.  So let's go back to your

2   conversation with Tom Nabozny, where you said that --

3   correct me if I'm wrong -- that you were having some

4   kind of store visit with him, and you and he were in the

5   back room, and he -- he told you that he was getting

6   fired?

7   A.      They told me that they are getting ready to

8   change the -- they was getting ready to change the

9   employees around, employees; that he said that he was --

10  they was getting ready to get rid of him.

11  Q.      Okay.  I just want to make sure I understand.

12  This is something that Tom Nabozny was saying now?

13  A.      Yes.

14  Q.      Was somebody else there?

15  A.      No, we was in the back room.

16  Q.      So Tom Nabozny was telling you -- was he telling

17  you that he had been fired?

18  A.      No, he had not been fired yet.

19  Q.      Okay.  So he was telling you that he thought he

20  was going to be fired?

21  A.      Yes.

22  Q.      Okay.  And did he tell you why he thought he was

23  going to be fired?

24  A.      Yes.

25  Q.      And what did he tell you?

**Dec. of Thompson - Exhibit 2**

207

1   Q.      I'm not talking about a store visit report.

2   I'm talking about a write-up for failure to follow

3   company policy.  Did you ever get such a write-up from

4   Tom Nabozny at any time?

5          MS. VERONESE:  And just to clarify "write-up,"

6   meaning a reprimand?

7          MS. THOMPSON:  Right.

8          THE WITNESS:  From Tom Nabozny?

9          MS. THOMPSON:  Q.  Yes.

10  A.      Not that I recall, no, I don't.  I don't

11  remember one.

12  Q.      Did Tom Nabozny ever say or do anything to you

13  that suggested that he was biased against you because of

14  your race?

15  A.      Tom Nabozny?

16  Q.      Right.

17  A.      No.

18  Q.      And Hani Alzaghari never did anything to you

19  that would suggest that he was biased against you

20  because of your race, did he?

21  A.      No.

22          MS. THOMPSON:  Let's mark the next document as

23  Exhibit 3, please.

24          (DEFENDANT'S EXHIBIT NO. 3

25           WAS MARKED FOR IDENTIFICATION.)

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 2**

208

1          MS. THOMPSON:  For the record, I've marked as

2    Exhibit 3 a one-page document, Bates numbered RS/Allen

3    -91, with the date April 16th, 2007.

4    Q.     Please take as much time as you need to read

5    Exhibit 3.

6          (Pause.)

7          Have you had an opportunity to review Exhibit 3?

8    A.     Yes.

9    Q.     And you've seen Exhibit 3 before today, right?

10   A.     Uh, yes.

11   Q.     And is that your signature on the bottom third

12   of Exhibit 3 next to the number 1.?

13   A.     Yes.

14   Q.     And did you read Exhibit 3 on or about

15   April 16th, 2007?

16   A.     Yes.

17   Q.     And did you sign Exhibit 3 on or about

18   April 16th, 2007?

19   A.     Yes.

20   Q.     And who are the other signatures, if you know?

21   Do you know whose signature is next to item 2.?

22   A.     Uh, Bruce Gillon.

23   Q.     I'm sorry.  What's the last name?

24   A.     Bruce Gillon.

25   Q.     How do you spell that?

**Dec. of Thompson - Exhibit 2**

209

1   A.      G-i-l-l -- I don't know.

2   Q.      You don't know?

3   A.      I don't know.

4   Q.      I'm sorry?

5   A.      I don't know how to spell his last name.

6   Q.      Do you know whose signatures or initials are

7   next to the number 3.?

8   A.      Hmm, no, I don't.

9   Q.      How about next to number 4.?

10  A.      Erica Beard.

11  Q.      Okay.  Number 5., is that Rosetta Holmes?

12  A.      Yes.

13  Q.      And do you know who's next to number 6.?

14  A.      No, I don't.

15  Q.      So you understood that you were being written up

16  on April 16th, 2007, for failure to follow company

17  compliance, operational procedures?

18  A.      Yes.  The reason why we have all the other

19  signatures on there was to make them accountable,

20  because they were the ones that was doing these sales

21  and not completing the forms.

22          So we had them to sign also, to let them know

23  that was their responsibility, once they sell a phone,

24  to make sure it was complete and have all the documents

25  with it.

**Dec. of Thompson - Exhibit 2**

210

1   Q.      And it was also your responsibility as store

2   manager, right?

3   A.      Right.

4   Q.      And whose idea was it to make the employees

5   sign; was that your idea?

6   A.      Yes.

7   Q.      Tom Nabozny didn't tell you to have your

8   employees sign, did he?

9   A.      No.

10  Q.      In fact, the memorandum, Exhibit 3, is

11  directed -- well, let me withdraw that.

12          Did anyone tell you that you should have your

13  employees sign Exhibit 3?

14  A.      Um, I talked with Hani about it, and he said it

15  would be a good idea to have them accountable.

16  Q.      Okay.  So was it true that -- would you agree

17  that you were not in compliance with operational

18  procedures during the store visit that was conducted --

19  or at the time of the store visit that was conducted on

20  April 16th, 2007?

21  A.      I disagreed with him because the forms that he

22  found were done, and over the weekend, there were some

23  forms that was not signed.  And since they were not

24  signed over the weekend while I was not there, or when

25  I'm not there, um, it -- I had to come back and get them

**Dec. of Thompson - Exhibit 2**

212

1    I was not there during the time the refund was there.

2    Q.      So if there was a refund or a void on a day when

3    you were not there, who was responsible for approving

4    that?

5    A.      Um, Rosetta and Bruce.

6    Q.      So you're --

7    A.      And they didn't sign it because it was --

8    Q.      You're saying that your sales associates were

9    responsible for signing refunds and voids?

10   A.      They were responsible for signing their names on

11   the refunds and voids during that day.

12   Q.      You were also, as the store manager, supposed to

13   be reviewing the refunds and voids, weren't you?

14   A.      Right.

15   Q.      And signing off on them?

16   A.      Reviewing.

17   Q.      You had no responsibility for signing off on

18   refunds and voids?

19   A.      I didn't sign off on them if I wasn't there.  If

20   I was there during that day, then I signed them, but if

21   I was not there, then I didn't sign it.

22   Q.      Okay.  So you're saying if you were not there,

23   you had no responsibilities for refunds or voids that

24   were handled on that particular day?

25   A.      Uh, my responsibility were to come in and I

**Dec. of Thompson - Exhibit 2**

213

1   would randomly check refunds to see if the merchandise

2   were returned or put back on the shelf.  I would do that

3   on some of the receipts.  I wouldn't do it with all the

4   receipts.  But certain amounts of refunds, dollar

5   amount, I would go and check the refund and check to see

6   whether it was done, but I did not sign it.

7   Q.      Right.  But you had overall responsibility for

8   making sure that all refunds and voids were handled

9   properly, right?

10  A.      Yes.

11  Q.      Okay.  And it states, "Several of the refunds

12  either did not have the issuers or the customer

13  signatures as per policy," end quote.  Is that a true

14  statement?

15  A.      Yes.

16  Q.      And your position is that you have no

17  responsibility for that?

18  A.      No, my position is that in the area that we was

19  in, we had quite a few refunds.  We was known for an

20  awful a lot of refunds, and Tom Nabozny and Hani was

21  aware of that.  And we get people coming in that says,

22  "I'm not going to sign this.  I want my money, and

23  that's it."  And they would get sometime, uh, hostile.

24  So they wouldn't sign it.  And they would walk out and

25  get their money, and we would let them go.

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 2**

214

1   Q.      Who is the issuer; what does that mean?

2   A.      Issuer, who issues the money to the person.

3   Q.      Who is that?

4   A.      Whatever salesman it is.

5   Q.      So the statement is, "Several of the refunds

6   either did not have the issuers or the customer

7   signatures as per policy."

8   A.      Exactly.

9   Q.      So it was your responsibility to at least make

10  sure the issuers signed off, right?

11  A.      Right.

12  Q.      That was company policy, right?

13  A.      Right.

14  Q.      So the statement is made, "19 out of 24 refunds

15  reviewed did not have the customers name, address or

16  phone number on the refund."  That's your responsibility

17  to make sure that happened, right?

18  A.      No.

19  Q.      You had no responsibility for that as the store

20  manager?

21  A.      To make sure that people name, and telephone

22  number is put on there?

23  Q.      Right, on the --

24  A.      No.

25  Q.      -- refunds.

**Dec. of Thompson - Exhibit 2**

215

1   A.      No.  Because --

2   Q.      You had no responsibility for that.

3   A.      No, I did not.

4   Q.      And that was company policy, though, right, to

5   require that refunds have the customer's name, address,

6   phone number on the refund?

7   A.      Yes.

8   Q.      But you're saying that wasn't your

9   responsibility as a store manager to make sure that

10  happened?

11  A.      I'm saying that if I asked a customer to give me

12  they name, address and telephone number, and they say to

13  me, no, they're not going to give it to me, then I can't

14  make them give it to me.

15  Q.      And you also don't have to give a refund then,

16  do you?

17  A.      Um ....

18  Q.      Isn't that the condition of the refund?

19  A.      It is.

20  Q.      Right.

21  A.      But I have done that, and I have gotten broken

22  windows; I have gotten broken doors.

23  Q.      So let me just be very clear here.  The company

24  policy says you don't give a refund unless you get the

25  customer's name, address or phone number, correct?

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 2**

216

1   A.      Right.

2   Q.      And you, as store manager, were required to

3   follow that policy, correct?

4   A.      Yes.

5   Q.      Okay.

6   A.      And I --

7   Q.      And you were being reprimanded on April 16th,

8   2007, because 19 out of 24 refunds reviewed did not have

9   the required information, right?

10  A.      Right.  And I also talked to Tom and Hani about

11  the situation that I have dealing with the customers

12  down there.  And I explained to them what was going on

13  and the attitude of the people that I was dealing with

14  in that area.

15  Q.      It also states -- Exhibit 3 also says, "I also

16  reviewed all Sprint contracts from the month of April

17  and found that none of them had the customer profile

18  sheet attached to the contract."  Was that true?

19  A.      This is what this says.

20  Q.      Do you have any reason to believe it's not true?

21  A.      No, I don't.

22  Q.      He also says, quote, "I also found that one of

23  the contracts did not have the sales ticket attached."

24  Q.      Was that a true statement?

25  A.      I don't remember the facts of this.

**Dec. of Thompson - Exhibit 2**

217

1  Q.      Do you have any reason to believe it's not true

2  as you sit here now?

3  A.      No, I don't.

4  Q.      It then states, quote, "This then lead me to

5  review the manager's Redbook and found that Allen has

6  not filed the wireless transaction checklist for the

7  last 18 days," end quote.

8          Is that a true statement?  And actually, is it

9  true that as of April 16th, 2007, you had not filed the

10  wireless transaction checklist for the previous eighteen

11  days?

12  A.      I don't -- I have no idea about that.

13  Q.      As you sit here now, do you have any reason to

14  believe that was not a true statement at the time that

15  Mr. Nabozny wrote it on Exhibit 3?

16  A.      That could be a mistake.

17  Q.      You don't know one way or the other, though, do

18  you?

19  A.      No, I don't.

20  Q.      And you didn't file any kind of written rebuttal

21  to Exhibit 3, did you?

22  A.      No, I didn't.  No more than talk to Hani about

23  it.

24  Q.      Instead, you actually signed off on Exhibit 3,

25  right?

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 2**

218

1   A.      Right.  Because there were some things on here

2   that we needed to bring to attention to everyone in the

3   store.

4   Q.      So what's the manager's Redbook?

5   A.      The manager's Redbook is a monthly log in of

6   sales, I believe it is, sales, cell phones, daily sales.

7   Q.      Wait.  Is Redbook -- the manager's Redbook

8   something that you were required to maintain?

9   A.      Yes.

10  Q.      And that was part of your job as a store

11  manager?

12  A.      Yes.

13  Q.      And was this something that you did manually?

14  A.      Yes.

15  Q.      So it wasn't on the computer?

16  A.      No.

17  Q.      Was it an actual physical book?

18  A.      Yes.

19  Q.      Was it red?

20  A.      Yes.

21  Q.      Okay.  And what items were you supposed to

22  record in the Redbook?

23  A.      Daily sales.

24  Q.      Daily sales?

25  A.      Daily sales, I believe that was daily sales,

**Dec. of Thompson - Exhibit 2**

219

1  cell phones.

2  Q.      I want to make sure I understand you.  Daily

3  sales --

4  A.      Yes.

5  Q.      -- was one thing you would record?

6  A.      Yes.

7  Q.      So when you say you would record daily sales,

8  are you talking about dollar figures?

9  A.      Yes.

10  Q.      Okay.  And then you said cell phones.  What were

11  you supposed to do with regard to recording information

12  about cell phones?

13  A.      Keeping a quota of how many cell phones was

14  sold.

15  Q.      Okay.  And this was something you were supposed

16  to do every day, right?

17  A.      Yes.

18  Q.      And what was your understanding of the purpose

19  of keeping the Redbook on a daily basis?

20  A.      To find out where you were as far as sales are

21  concerned and how close are you to the goal.

22  Q.      What was your point in recording how many cell

23  phones you were selling?  As you understood it, why was

24  that required?

25  A.      To see how many we have sold to keep up with our

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 2**

220

1    goal that was set forth.

2    Q.      So it's your testimony that the only reason to

3    fill out the Redbook on a daily basis was to keep track

4    of how you were -- your sales as measured against your

5    goals?

6    A.      Yes.

7    Q.      Was there any other reason for keeping the

8    Redbook?

9    A.      I can't think of anything right now.

10   Q.      All right.  Then Exhibit 3 states, "Allen needs

11   to understand that just by ignoring these operational

12   procedures, he is showing that he is not being

13   responsible for maintaining the security of company

14   assets.  The kind of negligent attitude that is

15   displayed in this area reflects poorly on Allen's

16   managerial skills."

17           I take it you read that on April 16th, 2007,

18   right?

19   A.      Hmm.

20   Q.      Did you read that paragraph on April 16th, 2007,

21   when you were given Exhibit 3?

22   A.      I probably did.

23   Q.      And you understood that Tom Nabozny was

24   informing you that your negligent attitude reflected

25   poorly on your managerial skills, right?

**Dec. of Thompson - Exhibit 2**

221

1  A.      I didn't at the time, but now I do.

2  Q.      Well, didn't you understand it when you read

3  Exhibit 3 back on April 16th, 2007?

4  A.      Uh, no, because my main focus was on the refund

5  slips, the cell phone -- the cell phone receipts.

6  That's the reason we got everybody to sign, because that

7  was what my main focus was on.

8  Q.      So are you saying now that you didn't bother to

9  read that paragraph when you were given Exhibit 3?

10 A.      I did not bother to read that paragraph.

11 Q.      Okay.  But as you look at it now, you understand

12 that what he's saying is a pretty serious commentary on

13 his opinion of your managerial skills, right?

14 A.      Right.

15 Q.      Let's go back to Donna Ocampo.  And what I'd

16 like to talk about was the next -- you'd spoken to

17 Donna Ocampo as she was leaving the store at the time of

18 the group remodel that we've already gone over, and she

19 told you she didn't think it was a good store visit.

20 Did you ever have any follow-up discussion with

21 Donna Ocampo in terms of why she thought it was not a

22 good store visit?

23 A.      We talked about -- yeah, I did talk to her about

24 that.

25 Q.      Okay.  And did she tell you why -- did you ask

PATRICIA CALLAHAN REPORTING

Dec. of Thompson - Exhibit 2

222

1   her why she thought it was not a good store visit?

2   A.      Yes.

3   Q.      Okay.  Tell me, if you can -- first of all, when

4   did this conversation take place?

5   A.      Uh, a couple weeks after the initial remodel.

6   Q.      Okay.  And was this -- I apologize if I asked

7   you this before.  Was this in person or on the phone?

8   A.      In person.

9   Q.      And this was at your store?

10  A.      Yes.

11  Q.      And where was this conversation taking place?

12  A.      In the front part of the store.

13  Q.      Was anyone else present?

14  A.      Uh, the employees was there, but I'm not sure if

15  they heard the conversation.

16  Q.      Do you remember which employees were there?

17  A.      No, I don't.

18  Q.      Okay.  Can you tell me -- was Donna -- was

19  anybody else with Donna in terms of making the store

20  visit, or was she by herself?

21  A.      She was by herself.

22  Q.      And did you know that she was coming that day?

23  A.      No, I didn't.  She called and said -- wait a

24  minute.  No, I didn't know she was coming.

25  Q.      Okay.  So she surprised you?

**Dec. of Thompson - Exhibit 2**

223

1   A.      She surprised us.

2   Q.      Okay.  And when she walked into the store, you

3   were on the sales floor?

4   A.      Yes.

5   Q.      And what did you and she say to one another once

6   she walked in?

7   A.      She said that -- that the store was not in good

8   shape, it was not according to planogram, and I -- I

9   mentioned to her, it is still not according to

10  planogram.

11  Q.      Did you and she say anything else to one another

12  on that occasion?

13  A.      Um, she began to watch my employees.

14  Q.      When you say she began to watch your employees,

15  what do you mean?

16  A.      Meaning that she would be doing certain tasks,

17  and while she's doing certain tasks, she would look

18  around to see what they're doing or how they're reacting

19  in the store.

20  Q.      And did you think there was something wrong with

21  her doing that?

22  A.      No.

23  Q.      Okay.  So she began to look at the employees.

24  Did she say anything more during that store visit?

25  A.      Uh, one of the main things that she kept

224

1  reminding me of, that I had the wrong people in the

2  store.

3  Q.     Were those her exact words?

4  A.     Yes.

5  Q.     Okay.  When she said you have the wrong people

6  in the store, did you ask her what she meant by that?

7  A.     No, I didn't.

8  Q.     Did you ask her what she wanted you to do about

9  that?

10  A.     Yes.

11  Q.     Tell me what you said to her.

12  A.     I actually said -- she said that I have the

13  wrong people.  And I said, "Donna, we have the three top

14  salesmen in thirteen states working in this store.  We

15  have the best inventory in the district in this store,

16  in the worst area of the district."  I said, "And these

17  are the top salesmen in your district."  And she said,

18  "Even so, it's the wrong image that we want."  And I

19  said, "Okay."

20        And then she would change the conversation, and

21  we would start talking about displays, talk about

22  merchandising.

23  Q.     Okay.  So who were the three top salespeople?

24  A.     Bruce, Rosetta and Victoria.

25  Q.     So you would -- she would say, "We've got the

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 2**

225

1   wrong people in the store."  You would say, "Well, wait

2   a second.  We've got the three top salespeople in the

3   district?"  They were the top three in the district?

4   A.      Yes.

5   Q.      "And we have the best inventory in the

6   district"?

7   A.      Yes.

8   Q.      And then she would say what?

9   A.      She would change the conversation.

10  Q.      All right.  I think you testified that the three

11  top salespeople -- Bruce is Caucasian?

12  A.      Yes.

13  Q.      Rosetta is African-American?

14  A.      Yes.

15  Q.      And Victoria is Latina?

16  A.      Yes.

17  Q.      So when she said the wrong people in the store,

18  did she identify anybody by name?

19  A.      She talked about Rosetta and Erica mostly.

20  Q.      Oh.  So what did she say about Rosetta?

21  A.      Um, she questioned their ability on the floor.

22  Q.      I'm just talking about Rosetta right now.  What

23  did Donna Ocampo say about Rosetta?

24  A.      She asked me could I find someone that's better

25  than Rosetta, a better employee.  She didn't like her

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 2**

226

1   image.

2   Q.      All right.  So I want to be really clear here.

3   A.      Okay.

4   Q.      So Donna Ocampo said to you, "We need to find a

5   better employee than Rosetta because I don't like her

6   image"?

7   A.      Yes.

8   Q.      And did you say, "What do you mean by that?"

9   A.      No, I did not.

10  Q.      Did Donna Ocampo ever tell you that you needed

11  to terminate Rosetta?

12  A.      Yes, she did.

13  Q.      When did she tell you that?

14  A.      Actually, she said, "If you don't get rid of

15  those employees, I'll get rid of you."

16  Q.      All right.  When did she say, "If you don't

17  rid of those employees, I'll get rid of you"?

18  A.      Uh, that was not during that time.  That was

19  about, oh, maybe a week later, she came down to the

20  store to pick up some lock and pegs.  She went

21  downstairs to bring up the lock and pegs, brought them

22  back upstairs.  She took me back in my back room back

23  there, in the office.  She sit down in the chair, and

24  she said, "You need to upgrade your people, and if you

25  don't get rid of these people, then I'll get rid of

**Dec. of Thompson - Exhibit 2**

227

1   you."

2   Q.      All right.  So when did this happen, what month?

3   A.      That was March, somewhere along in March,

4   sometime in March.  I'm not for sure.  But it was right

5   after the -- right after the official visit where they

6   remodeled the store, because all the lock and pegs was

7   downstairs then.

8   Q.      All right.  I don't want to get too far ahead of

9   ourselves here.  Let's stay focused on the first store

10  visit after the remodel.  So I want to go back to -- did

11  Donna, during that conversation where you said she said

12  that you have the wrong people in the store and the

13  wrong image -- did she mention -- again, I'm talking

14  about that conversation, not the later conversation.

15  Did Donna mention anyone by name in that conversation?

16  A.      She mentioned -- she mentioned Rosetta's name.

17  Q.      Okay.  So this was in the first conversation

18  with Donna Ocampo following the remodel; is that right?

19  A.      Yes.

20  Q.      Okay.  What exactly did she say about Rosetta?

21  A.      She was questioning her image.

22  Q.      What did she say?  What were the exact words

23  that she used?

24  A.      Those were her exact words, she was questioning

25  her image.

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 2**

228

1   Q.      What did she say?

2   A.      "Can you find some better people?"

3   Q.      "All right.  You've already testified she said,

4   "Can you find better people?  You have the wrong people

5   in the store.  You have the wrong image."  I want to

6   know what else, specifically, if anything, she said, her

7   words.

8   A.      And from that, we moved on to another

9   conversation.  She started talking about merchandising

10  of the store.  It wasn't that we had a long conversation

11  about this; it was just --

12  Q.      How long was the conversation about the

13  employees on that occasion?  And I'm talking about the

14  first store visit after the remodel.

15  A.      It wasn't a long conversation.  It was not more

16  than a conversation saying, "We need to upgrade the

17  employees.  We need to make some changes with the

18  employees."

19  Q.      Okay.  Again, I really want to be careful.  I

20  really want to know what the exact words were, if you

21  know.

22          MS. VERONESE:  If you remember the exact words.

23          THE WITNESS:  I don't know the exact words.

24          MS. THOMPSON:  Q.  Okay.  Do you remember any of

25  Donna's exact words about this subject?

**Dec. of Thompson - Exhibit 2**

229

1   A.      Donna's exact words were that, "We need to

2   upgrade your employees.  You need some better employees

3   in this store."

4   Q.      Okay.  And it's your testimony that those were

5   Donna's exact words?

6   A.      Those was Donna exact words.

7   Q.      Other than those exact words, do you remember

8   any other exact words that Donna said on that occasion

9   of that store visit following the remodel?

10  A.      No, we talked about the merchandise of the

11  store.

12  Q.      Okay.  I don't want to go on to that yet.  I

13  just want to make sure you've told me all of the exact

14  words that you can recall that Donna said to you about

15  the employees on that first store visit following the

16  remodel.  And so far you've said her exact words, "We

17  need to upgrade the employees" -- well, let me withdraw

18  that.  I'm not going to characterize what you said.

19      Have you told me all of the exact words that you

20  can recall Donna saying on the occasion of that first

21  store visit following the remodel?

22  A.      Yes.

23  Q.      Okay.  So let's talk about the next time.  Did

24  you have another store visit with Donna following that

25  store visit?

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 2**

230

1  A.      Yes.

2  Q.      Okay.  And how soon after that store visit

3  following the remodel did the next store visit take

4  place?

5  A.      It was a couple weeks.

6  Q.      Okay.  Was Donna by herself or with anyone else?

7  A.      She was by herself.

8  Q.      Did she give you advance notice that she was

9  coming?

10  A.      Uh, yes, she called me up and said she was on

11  her way.

12  Q.      Okay.  And is this the time when she brought the

13  lock and pegs with her?

14  A.      No, she came to pick up the lock and pegs.

15  Q.      I apologize; you did say that.  So this was the

16  occasion when Donna came to pick up the lock and pegs

17  from your stores?

18  A.      Yes.

19  Q.      So on that occasion, what exact words did Donna

20  use, if you remember?  Well, first of all, let me start

21  there.  Do you remember any exact words Donna used about

22  the employees during that second store visit?

23  A.      The second store visit was that she came into

24  the store, walked in the back room, sat down in my

25  chair.  I was standing in the door.  And she says, "If

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 2**

231

1    you don't get rid of those employees" -- "your

2    employees, then I will get rid of you."  And then she

3    said -- she said, "The only thing I care about is making

4    sure that my son is taken care of."

5    Q.     Okay.  Let me just make sure I'm -- so -- are

6    you testifying that these were Donna's exact words?

7    A.     These were Donna's exact words.

8    Q.     So the first comment was, "If you don't get rid

9    of those employees, I will get rid of you"?

10   A.     Yes.

11   Q.     And the second comment was what about her son?

12   A.     She said, "The only thing I care about is making

13   sure that my son is taken care of."

14   Q.     Do you remember any other exact words that

15   Donna Ocampo used on this second visit?

16   A.     That was -- that was it.

17          MS. VERONESE:  Those are the words that you

18   remember exactly?

19          THE WITNESS:  The words that I remember exactly.

20          MS. THOMPSON:  Q.  Okay.  Do you remember

21   anything else that Donna said in that second

22   conversation that had anything to do with the employees?

23   A.     Not that I remember.

24   Q.     Now, when she said, quote, "If you don't get rid

25   of those employees, I will get rid of you," end quote,

**Dec. of Thompson - Exhibit 2**

232

1  what, if anything, did you say in response?

2  A.      I didn't say anything in response.

3  Q.      Did you ask her which employees she was talking

4  about?

5  A.      No.

6  Q.      Had Donna ever spoken to you about her son

7  before this comment about "The only thing I care about

8  is taking care of my son or ....?

9  A.      No.

10 Q.      Had you ever seen Donna's son?

11 A.      I never -- never even knew she had a son.

12 Q.      Did you ask her what she meant by that comment?

13 A.      No, I thought it was pretty obvious.  "Whatever

14 I need to do to keep my job, that's what I'm going to

15 do, is to make sure my son is taken care of."  That's

16 the way I took it.

17 Q.      Okay.  So let's just make sure I understand

18 this, then.  So the comment is, "The only thing I care

19 about is my son," or words to that effect?

20 A.      Yes.

21 Q.      She didn't say anything else, right --

22 A.      No.

23 Q.      -- about that, her son?

24 A.      No.

25 Q.      And you -- so you took it -- you drew the

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 2**

233

1  inference from that comment that what she was referring

2  to is that she would do anything to keep her job?

3  A.      That's what I took it as.

4  Q.      Why did you take it that way?

5  A.      Why did I take it that way?  Because she's

6  saying to me -- it was saying, "This is what I was told

7  to do, and that's what" -- I'm assuming.  I should keep

8  my mouth shut, then.

9  Q.      Right.  Well, I mean, if you're making an

10  assumption or guessing --

11         MS. VERONESE:  Don't guess.

12         MS. THOMPSON:  Q.  Is that what you're doing?

13  A.      Yes.

14  Q.      Okay.  'Cause I don't want you to assume or

15  guess, but if you have some basis for having an opinion,

16  I do want you to tell me what that is, okay?

17         So my question is, do you have any basis for

18  your opinion that what she meant was that she would do

19  anything to save her job?  I'm not asking you to guess

20  or speculate.

21  A.      Are you -- I don't understand the question.

22  Q.      Fair enough.

23         Why don't we take a break, okay, and come back

24  in ten minutes.

25         THE VIDEOGRAPHER:  Okay.  I'll end this tape.

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 2**

234

1    This is the end of tape three.  We're off the record at

2    3:34.

3          (Recess taken.)

4          THE VIDEOGRAPHER:  Okay.  This is the beginning

5    of tape four.  We're on the record at 3:44.

6          MS. THOMPSON:  Q.  Okay.  Let's go back again to

7    the comment that Donna Ocampo allegedly made about her

8    son.  Can you tell me what the words were again that she

9    used?

10   A.     That the only thing that she was worried about

11   is "taking care of my son."

12   Q.     Okay.  And you never asked her what she meant by

13   that, right?

14   A.     No.

15   Q.     And she never told you what she meant by that,

16   did she?

17   A.     No.

18   Q.     Other than what you've -- did you have any

19   further conversations with Donna Ocampo about the

20   employees in your store, other than what you've already

21   told me?

22         MS. VERONESE:  On that day or --

23         MS. THOMPSON:  Q.  All right.  Well, let's --

24         MS. VERONESE:  Even after that day?

25         MS. THOMPSON:  Let's start with that day.

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 2**

235

1       THE WITNESS:  Uh --

2       MS. THOMPSON:  Q.  Other than what you've

3   already said.

4   A.      No.

5   Q.      Okay.  Following that store visit that we've

6   just been talking about, did you have any further

7   conversations with Donna Ocampo about the employees in

8   your store?

9   A.      We talked about sales performance, sales and

10  stuff like that.

11  Q.      Okay.  Other than talking about the sales

12  performance of the employees in your store, did

13  Donna Ocampo make any other comments about the employees

14  in your store?  Again, other than what you've testified

15  to.

16  A.      No.

17  Q.      As you sit here now, do you believe that

18  Donna Ocampo is biased against you because of your race?

19  A.      I think Donna was doing exactly what Radio Shack

20  had told her to do, from the previous managers or

21  manager or people that was working for Radio Shack had

22  been fired because of age and discrimination because of

23  race.  They was eliminated.  And I think that she was

24  doing exactly what she was told to do.

25  Q.      I'll get to that in a minute.  I'm just trying

**Dec. of Thompson - Exhibit 2**

236

1   to find out if you have any -- first of all, if you

2   believe Donna Ocampo has a bias against you because

3   you're African-American?

4           MS. VERONESE:  I think he answered that.

5           MS. THOMPSON:  I don't think he did.  I think

6   that's a "yes" or "no."

7           THE WITNESS:  Do I think she's biased because

8   I'm a --

9           MS. THOMPSON:  Q.  Yeah.  Do you think

10  Donna Ocampo is biased against you because you're

11  African-American?

12  A.      No.

13  Q.      All right.  Now, you mentioned that it's your

14  opinion or belief that Donna is doing what she's been

15  told to do?

16  A.      Yes.

17  Q.      Okay.  So who is telling Donna what -- who, in

18  your mind, is telling Donna what to do?

19  A.      Her boss, her --

20  Q.      And who is her boss that you think is telling

21  her what to do?

22  A.      Radio Shack itself was making changes, a new

23  image, and the new image was that they wanted a lot of

24  the older managers, senior managers that had been

25  around, most of them were being eliminated or forced

**Dec. of Thompson - Exhibit 2**

238

1   employees based upon their age.  Do you understand that

2   question?

3   A.      Have I heard any supervisors at Radio Shack

4   saying that they're going to eliminate ....

5   Q.      Okay.

6          MS. VERONESE:  No.

7          MS. THOMPSON:  Q.  No, my question is a little

8   bit broader than that, okay?  And I apologize if it's

9   not clear, and I know it's late in the day.

10         What I'm trying to find out is whether you have

11  personally heard with your two own ears any -- let's say

12  supervisor or manager or further up the chain make any

13  comment about any employee that you viewed as derogatory

14  based upon that employee's age.  Do you understand that?

15  A.      I have heard -- the only someone I heard say

16  anything was Tom Nabozny.  And he said that Radio Shack

17  is getting ready to eliminate all the --

18         MS. VERONESE:  Okay.  I think you're still not

19  understanding the question.

20         MS. THOMPSON:  Yeah, I do think there's still a

21  lack of -- I think there is some confusion.

22  Q.      Okay.  What I'm trying to find out is whether

23  you've heard any Radio Shack supervisor or manager make

24  what you thought was a negative or offensive comment

25  about a Radio Shack employee because of that employee's

Dec. of Thompson - Exhibit 2

239

1   age.

2   A.        Not directly, but indirectly, yes.

3   Q.        Okay.  Let's start with, I just -- whether

4   directly or indirectly, have you heard with your own two

5   ears any derogatory comment by a supervisor or manager

6   at Radio Shack based on an employee's age?  So that's

7   yes or no.

8   A.        I have not heard.

9   Q.        Have you ever heard any Radio Shack supervisor

10  or manager make any jokes that were based on age that

11  you found offensive in some way?  Again, I'm talking

12  about with your own two ears.

13  A.        I talked to one manager that took over the

14  store.  She called me up and said that Radio Shack needs

15  some new ideas in 3830.  The old ideas are no longer

16  effective, or we need some -- some younger ideas.

17  Q.        All right.  I'm sorry, this was after you were

18  terminated?

19  A.        No, that was during the time I was working

20  there, before I was terminated.

21  Q.        Okay.  So while you're working at Radio Shack.

22  Who was this person who made the comment?

23  A.        Amy.

24  Q.        Who is Amy?

25  A.        The one that took over my old store.

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 2**

240

1   Q.      Is that Amy Tan?

2   A.      Yes.

3   Q.      Okay.  And what was Amy's position when she was

4   making this comment?

5   A.      She was working as store manager on -- what was

6   it?  On Clement.

7   Q.      Okay.  So at the time Amy Tan made this comment

8   to you, she was the store manager on Clement Street?

9   A.      Yes.

10  Q.      And you were the store manager at 3830?

11  A.      Yes.

12  Q.      Okay.  And was this a face-to-face conversation

13  or a telephone conversation?

14  A.      Telephone conversation.

15  Q.      And who initiated the conversation, you or Amy?

16  A.      She called me up.

17  Q.      Did she tell you why she was calling you?

18  A.      She called me up, told me that she can run my

19  store better than I can run my store.

20  Q.      So, did she tell you why she was calling you?

21  A.      Because she can run my store better than I

22  could.

23  Q.      So it's your testimony that Amy Tan picks up the

24  phone for the purpose of telling you that she could run

25  your store better than you could?

**Dec. of Thompson - Exhibit 2**

241

1  A.     Yes.

2  Q.     Those were her words?

3  A.     Yes.

4  Q.     Did you ask her why she was calling you to tell

5  you that?

6  A.     No, I didn't ask her that.

7  Q.     When did this conversation take place in

8  relation to the date of your termination?

9  A.     Oh, almost, oh, about a week.  Yeah, about a

10 week, two, a week and a half.

11 Q.     A week and a half before your termination?

12 A.     Yes.

13 Q.     Okay.  And Amy Tan calls you up and says she

14 thinks she can run your store better than you can.  What

15 else did she say?  Well, what did you say in response to

16 that?

17 A.     "Come on down."

18 Q.     And what did she say?

19 A.     She said, "Oh, I was just kidding with you,

20 Frank.  I was just kidding with you."  But I took it as

21 she already knew she was on her way down.

22 Q.     So your response was, "Come on down"?

23 A.     "Come on down."

24 Q.     And then she says, "I'm just kidding with you"?

25 A.     Yes.

Dec. of Thompson - Exhibit 2

242

1  Q.     Did she say anything else during this

2  conversation?

3  A.     Then the con -- we changed the conversation

4  again.

5  Q.     Okay.  I thought you said earlier that she made

6  some comment about Radio Shack needing new ideas?

7  A.     Yes.

8  Q.     Was that in this same phone conversation?

9  A.     Same phone conversation.

10  Q.     So tell me what her exact words were about that

11  subject in this telephone conversation.

12  A.     She said that she can come down and run 3830

13  better than I can, and she said Radio Shack 3830 need

14  some new ideas, and the old ideas are not effective

15  anymore.  And I said, "Well, we just got" -- "we just

16  hit $1.4 million, starting from a store that was doing

17  $650,000."  And I said, "So I think the ideas are pretty

18  good."  And from there, she said, "Yeah, yeah.  Okay.  I

19  was just kidding," and then we went on to talk about

20  something else.

21  Q.     Were you friends with Amy Tan?

22  A.     Not friends.

23  Q.     Did you have -- you were working colleagues?

24  A.     Yes.

25  Q.     Did you have what you considered a positive

**Dec. of Thompson - Exhibit 2**

243

1   relationship with her?

2   A.      No.

3   Q.      Did you like her?

4   A.      I didn't have anything against her, but she

5   couldn't be trusted.

6   Q.      Did you have any further conversations with

7   Amy Tan about anything having to do with you or your

8   store, other than what you've testified to?

9   A.      No.

10  Q.      Okay.  Other than Amy Tan and what you've

11  already testified to, did you ever hear with your own

12  ears any supervisor or manager make any other comments,

13  jokes, that you thought were derogatory to an employee

14  based upon age?

15  A.      No.

16  Q.      All right.  Now, I gather -- you gave me this

17  list earlier.  And so I'm going to go back over the

18  names and ask you to tell me what, if anything, they

19  said about anything having to do with age.  The first

20  one was Alex Basheri.  Did Alex tell you that he had

21  heard anything -- any derogatory comments or jokes based

22  on an employee's age?

23  A.      They all had said that Radio Shack was in the

24  process of getting rid of all the senior managers.

25  Q.      Okay.  So let me ask you this:  Have you heard

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 2**

244

1  from any source, either current or former employee of

2  Radio Shack, that that person has heard someone, a

3  manager at Radio Shack, make a derogatory comment or a

4  joke based on age?

5  A.      They didn't give any specific names, no.

6  Q.      But has someone told you that they have heard

7  jokes or comments based on age?

8  A.      Comments.

9  Q.      Okay.  Who's told you that they have heard

10 comments that were based on age?

11 A.      Everyone on that list.

12 Q.      Okay.  So let's start with Alex Basheri, then.

13 First of all, do you know how old Alex is?

14 A.      About 52.

15 Q.      And do you know how long he's worked for Radio

16 Shack, approximately?

17 A.      25 years.

18 Q.      And he's still employed?

19 A.      Yes.

20 Q.      So what did Alex tell you, in terms of what he

21 heard about having -- anything relating to older

22 employees at Radio Shack?

23 A.      That Alex told me that they were getting ready

24 to have a new image, and what they was doing is -- was

25 eliminating a lot of the older managers that was with

**Dec. of Thompson - Exhibit 2**

245

1   Radio Shack.

2   Q.      Did Alex tell you where he was getting this

3   information from?

4   A.      No.

5   Q.      So did you understand that Alex was basically

6   expressing his opinion that that's what was happening?

7   A.      Yes.

8   Q.      Did he point to any specific examples of where

9   he thought that Radio Shack was eliminating older

10  employees?

11  A.      Um, no more than some of the ones that had --

12  that he knew in other districts had gotten fired.

13  Q.      Did he give you any names?

14  A.      No.

15  Q.      What about in your district, did he mention

16  anyone in your district that he thought was being fired

17  or eliminated because of age?

18  A.      Um, yes.

19  Q.      Who did he mention?

20  A.      Um, he mentioned actually everybody that was

21  over 45, 50.  He was mentioning that -- there wasn't

22  anybody specific, but he was saying that this is the

23  movements that they're doing, is to eliminate people

24  that was 50 and over.

25  Q.      And again, did he tell you where he'd heard

**Dec. of Thompson - Exhibit 2**

246

1   that?

2   A.      No, he didn't.  Now, the same conversation came

3   with all of those guys.  The same conversation is with

4   all those managers that I give you the names of.

5   Q.      Okay.  Let me --

6   A.      They're all saying the same thing.

7   Q.      Okay.  So Tom Nabozny, you talked about the

8   conversation you had with him in 2007.  Right?

9   A.      Right.

10  Q.      Okay.  Since 2007, you've had no conversation

11  with Tom Nabozny --

12  A.      No.

13  Q.      -- right?  Okay.  And you told me everything

14  about your conversation in 2007 that had to do with

15  employees being terminated because of their age?

16  A.      Yes.

17  Q.      Okay.  And did Tom Nabozny tell you where he was

18  getting his information?

19  A.      No.

20  Q.      Then you mentioned Basem.  You mean Basem Saba,

21  right?

22  A.      Yes.

23  Q.      And do you know how old Basem Saba is?

24  A.      54, 55 -- from 50 to 55.

25  Q.      You mentioned Nina.  How old is Nina?

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 2**

247

1  A.      Nina's about 45 to 50, somewhere along there.

2  Q.      I'm sorry, is Nina still there or not?

3  A.      Yeah, she's till there.

4  Q.      Okay.  Mert?

5  A.      Mert is about 50, 52, 50 to 55.

6  Q.      And he's still there?

7  A.      Yes.

8  Q.      And what about Carlos?

9  A.      Carlos is no longer there.

10 Q.      And how old is Carlo?

11 A.      Carlos is about 35, 40.

12 Q.      And did Carlos, to your knowledge, resign

13 voluntarily or was he terminated?

14 A.      He resigned -- I believe he resigned

15 voluntarily.

16 Q.      Is it your testimony, though, that -- well,

17 we've talked about Alex and Tom, but Basem Saba, Nina,

18 Mert and Carlos expressed the opinion to you that Radio

19 Shack wanted to get rid of older employees?

20 A.      Yes.  And they -- they even mentioned it at the

21 meeting that we had.  I forgot that they said it, but

22 they did say it at the meeting.

23 Q.      What meeting was that?

24 A.      The meeting on Thursday with Hani, Donna.

25 Q.      Okay.  The meeting that you testified about --

Dec. of Thompson - Exhibit 2

248

1   the district manager meeting that -- I'm sorry, the

2   district meeting that took place in about December of

3   2009?

4   A.      Yes.

5   Q.      Okay.  So at that meeting, who expressed that

6   opinion?

7   A.      Um, Nina, Basem, um, Alex.

8   Q.      Anyone else?

9   A.      That's all I remember.

10  Q.      Okay.  So at that store manager meeting of your

11  district in about December 2009, Nina, Basem Saba and

12  Alex Basheri all voiced the opinion that Radio Shack was

13  trying to get rid of older workers?

14  A.      Yes.

15  Q.      And was there any response to that comment by

16  anybody?

17  A.      No, the room got silent.

18  Q.      Did anyone say anything else?

19  A.      No.

20  Q.      So I take it that you never heard Donna Ocampo

21  say anything derogatory about anybody's age, did she?

22  A.      Not with the visit that we were ....

23  Q.      At any time.

24  A.      No.

25  Q.      As you sit here now, do you believe Donna Ocampo

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 2**

249

1   has a bias against you because of your age?

2   A.      I think Donna was doing exactly what she was

3   told to do.  As far as her being biased, I think she was

4   doing her job.

5   Q.      Okay.  But that wasn't my question, and I'll

6   give you a chance to tell me about your thinking on

7   that, but I really want to know if you, as you sit here

8   now, believe that Donna Ocampo, herself, has a bias

9   against you because of your age.

10  A.      I don't know.

11  Q.      Do you have any reason to think that she does?

12  A.      I don't have an idea, because it's such a short

13  time there, I don't -- I'm not for sure how she felt

14  about it.

15  Q.      Was Donna polite to you in her dealings with

16  you?

17  A.      Polite?

18  Q.      Yes.

19  A.      No, she was pretty much standoffish.

20  Q.      Was she rude?

21  A.      There was some times when I thought she was

22  rude.

23  Q.      When you say you thought there were times when

24  she was rude, what did she do or say that made you think

25  she was being rude?

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 2**

250

1   A.      The attitude towards a question, the

2   aggressiveness of the question that's being presented.

3   Q.      So, do you have a specific example in mind?

4   A.      It would almost be -- it was almost as if she

5   would make up a reason to -- make up a question or a

6   situation and then point it out and say, "This is

7   wrong," or "This is broken."

8   Q.      Okay.  Can you tell me when that happened, give

9   me an example of what you're talking about?

10  A.      She would come in and look at the displays on

11  the wall, and she would look at it and say, "This is

12  wrong.  This is not right," or, "Why is it this way?"

13  Or, "Your people don't know how to do planograms."  And

14  that's what she would do.

15  Q.      Okay.  And you thought that was rude?

16  A.      Yes, I did.

17  Q.      Okay.  But was she basically commenting upon the

18  appearance of the store?

19  A.      She was making an opinion of the store, but even

20  though she made an opinion of the store, the store

21  planogram was done properly, but she still say that it

22  was not done properly.  It was not ....

23  Q.      Okay, so let me just make sure I understand what

24  you're saying.  Donna Ocampo would point out something

25  that she felt was in violation of the planogram, and you

**Dec. of Thompson - Exhibit 2**

251

1  felt that it was consistent with the planogram?

2  A.      Yes.

3  Q.      I'm not trying to put words in your mouth.  I'm

4  just trying to understand what you're saying.

5  A.      What I'm saying is she would come in, and she

6  would deliberately find something, look for something

7  that was wrong so that she would be able to come back

8  and voice her opinion or find fault about it.

9  Q.      Okay.  But she was your boss, right?

10 A.      Right.

11 Q.      And it was part of her job to point out areas

12 where she thought you weren't doing things correctly,

13 right?

14 A.      Yes.

15 Q.      So I'm just trying to understand why -- what

16 was -- why were you bothered when she would do that?

17 A.      Not that she was my boss -- and I understand

18 that every time your boss walked -- my boss walked into

19 the store, regardless of how perfect the store is, when

20 they walk in, their whole purpose is to come through and

21 find other things or to change things around in the

22 store.

23        But with her, it was completely different, the

24 way that she would do it.  It wasn't that I was pointed

25 out that this was wrong, but if it was -- it was just a

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 2**

252

1  nagging factor that she would do, to bring out a

2  situation that the problem -- something wrong with the

3  problem.

4  Q.     So you thought that she -- well, did you

5  understand that she was expressing her opinion?

6  A.     Yes.

7  Q.     And did you think there was something wrong with

8  her expressing her opinion?

9  A.     How she was expressing it.

10  Q.     Okay.  That's what I'm trying to understand.  So

11  how was she expressing her opinion that you had a

12  problem with?

13  A.     As if I'm looking for something to crucify you

14  with, something that I can get you with.  That's the way

15  her attitude was in the store.  "I'm looking for

16  something, anything I can find, to get you.  That's what

17  I'm looking for."

18  Q.     But what makes you say that?  I understand you

19  hold that opinion, but what makes you say that, that she

20  was looking for something to get you with?

21  A.     That was her personality.  That's what she was

22  good at doing.  That's what she was known for doing.

23  Q.     Okay.  That was her reputation throughout the

24  district?

25  A.     Yes.

**Dec. of Thompson - Exhibit 2**

253

1   Q.      Did the other store managers share -- did you

2   and the other store managers talk about that amongst

3   yourselves?

4   A.      Yes.

5   Q.      And was there agreement among all the --

6   A.      100 percent.

7   Q.      A hundred percent of the store managers, that

8   that was the way -- that was her -- the way she

9   operated?

10  A.      Yes.

11  Q.      So all the store managers under Donna were

12  basically complaining about her and felt that she was

13  looking to find fault with them; is that a fair

14  statement?

15          MS. VERONESE:  I think that misstates testimony.

16  He didn't say all.

17          THE WITNESS:  No, Amy -- Amy loved her.  Amy

18  loved her, and I don't think -- I don't think there's

19  too many more.  I don't know -- not all, but there was

20  no more than a couple more that -- none of them trusted

21  her.

22          MS. THOMPSON:  Q.  That's what I'm trying to

23  understand.  Okay.  So other than Amy -- I thought you

24  said a hundred percent before.

25  A.      I did.  I made a mistake.

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 2**

1  Q.      All right.  So now you're saying a hundred

2  percent minus Amy?

3  A.      And a couple others.

4  Q.      And who were the others?

5  A.      Um, very few of them.

6  Q.      I understand that, but who are they?

7  A.      I don't know names, but very few.  There was --

8  Q.      Okay.  So other than Amy, every other store

9  manager in Donna Ocampo's district was complaining about

10  the way that she was doing her job?

11  A.      Yes.

12  Q.      And all of them felt that she was looking for

13  things that were wrong in their stores, right?

14  A.      Entrapment.

15  Q.      Well, I'll get to that in a second, but you have

16  to answer my question first.  So as far as the opinions

17  that were being expressed to you, the other store

18  managers other than Amy, they were all complaining that

19  every time Donna came into their store, she was looking

20  to find fault, right?

21  A.      Yes.

22  Q.      So you weren't the only one who held that

23  opinion?

24  A.      No.

25  Q.      And then you just mentioned -- you said the word

**Dec. of Thompson - Exhibit 2**

255

1    "entrapment," and I'm not sure what you meant by that.

2    Can you explain --

3    A.      Meaning that whatever she can find to -- to

4    eliminate you, or to get you, as far as a write-up or

5    whatever it be.  She was looking -- Donna had a thing

6    about taking pictures, and going into stores and finding

7    something going on and take a picture of it.  And she

8    would send it to all the other district managers and

9    say, "Look what I found.  Look what I've got."  And she

10   was known for doing that.

11   Q.      Okay.  So is it fair to say that you and the

12   other store managers in the district, with the possible

13   exception of Amy, all complained to one another that you

14   felt that Donna was trying to entrap you in some way?

15   A.      Yes.

16   Q.      That was the commonly held opinion?

17   A.      Yes.

18   Q.      It was your opinion, and other people shared

19   that same opinion with you?

20   A.      Yes.

21   Q.      Okay.

22           All right.  Let's mark the next document as

23   Exhibit 4.

24           (DEFENDANT'S EXHIBIT NO. 4

25            WAS MARKED FOR IDENTIFICATION.)

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 2**

256

1        MS. THOMPSON:  For the record, I've marked as

2   Exhibit 4 a one-page document Bates numbered RS/Allen

3   -192.

4   Q.      And please take as much time as you need to read

5   this.

6        (Pause.)

7        All right.  Have you seen Exhibit 4 before

8   today?

9   A.      Yes.

10  Q.      Is Exhibit 4 a true and correct copy of a

11  corrective action record that you received on or about

12  March 23rd, 2010?

13  A.      Uh, it was more to it than what's put on here.

14  Q.      Well, I'll get to that in a minute, but --

15  A.      Okay.

16  Q.      -- you've seen Exhibit 4 before today?

17  A.      Right.

18  A.      Yes.

19  Q.      And Exhibit 4 is a corrective action record that

20  was given to you on March 23rd, 2010, right?

21  A.      Right.

22  Q.      Okay.  And that's your signature on the bottom,

23  about two-thirds of the way down on the left?

24  A.      Yes.

25  Q.      And is that Donna Ocampo's signature next to

Dec. of Thompson - Exhibit 2

257

1   your signature?

2   A.      I don't know.

3   Q.      Okay.  You don't recognize that signature?

4   A.      No.

5   Q.      Okay.  Did Donna Ocampo present you with

6   Exhibit 4 in person?

7   A.      No.

8   Q.      How did you receive Exhibit 4?

9   A.      The loss prevention manager wrote this up.

10  Q.      I'm sorry?

11  A.      The loss prevention manager wrote -- written

12  this up.

13  Q.      Okay.  Did the loss prevention manager give this

14  to you?

15  A.      Yes.

16  Q.      And was that David Gonsolin?

17  A.      Yes.

18  Q.      Okay.  When you say there was more to Exhibit 4,

19  what do you mean by that?

20  A.      Laptops on display not secured.  They was --

21  they was all secure.  Cage counts was all up to date.

22  Laptops was in the back room.  They were secured in the

23  cage.  Um --

24  Q.      Hang on one second.  I thought you said there

25  was more to Exhibit 4.  Did you mean that there was

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 2**

258

1   missing pages to the document?

2   A.      No, meaning that what was put down here was just

3   partially what was down here.

4   Q.      I'm sorry.  I'm not understanding that.  Did you

5   receive this document, Exhibit 4, from David Gonsolin?

6   A.      Yes.

7   Q.      Okay.  Did you discuss it with him?

8   A.      Yes.

9   Q.      Okay.  And in the corrective action record, you

10  were told that the issue to correct was failure to

11  protect company assets from internal and external theft,

12  correct?

13  A.      Yes.

14  Q.      Okay.  And it notes, "5 laptops on display, not

15  secured, only screamers."  First of all, what's a

16  screamer, do you know?

17  A.      Of course I do.

18  Q.      Okay.  'Cause I don't, so sorry.

19  A.      A screamer is what we had to secure the laptops

20  with.  The laptops -- a screamer is that -- a sticker

21  that you lock onto the laptop onto a counter, and if you

22  pull the screamer off, it start making a very loud

23  noise.

24  Q.      Okay.  So is it true that the five laptops that

25  were on display were only secured by screamers?

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 2**

259

1    A.      Yes.

2    Q.      Okay.  And that's what this says, "5 laptops on

3    display, not secured, only screamers," right?

4    A.      That's all we had.  And I told him that that's

5    all we had.

6    Q.      So you had no means of securing the laptops

7    other than screamers; is that what you're saying?

8    A.      Other than screamers, that's all we had, and I

9    told him that.

10   Q.      And what did he say?

11   A.      He ordered me some.  He ordered me some things

12   that he wanted me to use to secure.  He ordered them.

13   Q.      Well, is there some reason why you had not

14   ordered them, yourself?

15   A.      I didn't have the authority to order them.

16   Q.      Well, had you ever asked anyone to order them

17   for you so you could secure the laptops?

18   A.      Yes.

19   Q.      Who else?

20   A.      My district manager.

21   Q.      Who was that?

22   A.      My district manager, Hani.

23   Q.      Okay.

24   A.      And we had screamers on the laptops.  The

25   laptops were secure.

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 2**

260

1  Q.      So -- let me make sure I understand something.

2  A screamer would only make a loud noise; it would not

3  prevent somebody from grabbing the laptop and running,

4  right?

5  A.      Even the ones that he give me was not enough to

6  keep people from grabbing it and running.

7  Q.      Well, I'll get to that in a minute.  I just want

8  to make sure I understand the concept of screamers.  The

9  whole point of a screamer was that it wasn't securing

10  the item; it would just make a noise, right?

11  A.      Right.

12  Q.      Okay.  And so when you said "he," meaning

13  David Gonsolin, ordered you something, what ultimately

14  were you given to secure the laptops?

15  A.      Locks.

16  Q.      Locks.  What do you mean, what kind of locks?

17  A.      A lock that you would stick in this hole here

18  (indicating).

19  Q.      You'd stick into the computer?

20  A.      Yeah, and it was a combination lock.

21  Q.      And what would it be attached to?

22  A.      It would be attached to the shelf.

23  Q.      Okay.  So that was a physical restraint on the

24  computer, right?

25  A.      Yes.

**Dec. of Thompson - Exhibit 2**

264

1  Q.      Who is that?

2  A.      Hani put them back there.  He put them back

3  there.

4  Q.      We're not talking about -- Hani's gone in March

5  of 2010, right?

6  A.      Right.

7  Q.      So we're talking about in March of 2010, the

8  laptops were -- it says, "were not secured in the back

9  room."  And you're saying they were secured in the back

10 room?

11 A.      They were secured.

12 Q.      How were they secured in the back room?

13 A.      In the manager's office.

14 Q.      So you're saying the mere fact that they were in

15 the manager's office meant they were secured?

16 A.      With the locked door, because that's the only

17 place I had to put them.

18 Q.      Well --

19 A.      That's where my previous district manager had

20 told me to put them, so that's where they were at when

21 they came in.

22 Q.      All right.  "David Gonsolin RLPM and I made room

23 in the cage to protect the laptops."  Is there some

24 reason you could not have made room in the cage to

25 protect the laptops?

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 2**

265

1    A.      That could have been done.

2    Q.      Okay.  So you were being criticized because

3    David Gonsolin, the regional loss protection manager,

4    felt the laptops were not secured in the back room,

5    right?

6    A.      Right.

7            MS. VERONESE:  And Donna Ocampo, she wrote this

8    document.

9            MS. THOMPSON:  That's unclear.

10           MS. VERONESE:  Well, it says "and I."

11           MS. THOMPSON:  Well, we don't know.  He says he

12   doesn't recognize the signature.  So, I'm afraid --

13   that's what I thought as well, but the witness is --

14           THE WITNESS:  I don't know whose signature that

15   is.

16           MS. THOMPSON:  Q.  Right, so --

17           MS. VERONESE:  Okay.  But it wasn't David who

18   wrote the document.

19           MS. THOMPSON:  I'm not arguing with anybody.

20   I'm trying to find out from the witness what he knows

21   about it.

22   Q.      Do you know who wrote the document, Exhibit 4?

23   A.      "Supervisor, Donna Ocampo."  I don't know who

24   wrote it.  I never seen Donna's signature before.

25   Q.      That's fair enough.  So your testimony is you

                PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 2**

266

1    don't know who wrote Exhibit 4, right?

2    A.        Right.

3    Q.        Okay.  And I asked you if you discussed it with

4    Donna Ocampo, and I thought you said no.

5    A.        I talked to Dave about this.

6    Q.        We're not talking about Dave.  That's what I

7    thought you said.  My question to you is, did you ever

8    discuss Exhibit 4 with Donna Ocampo?

9    A.        I don't remember talking to Donna about this.

10   Q.        Okay.  You spoke to David Gonsolin about it,

11   right?

12   A.        Yes.

13   Q.        Okay.  Had you ever met David Gonsolin before

14   March 23rd, 2010?

15   A.        Yes.

16   Q.        When had you first met him?

17   A.        Oh, about two, three years prior to this.

18   Q.        Okay.  So when you talked about the store

19   visit with Greg Patakas in December of 2009, was it

20   David Gonsolin that --

21   A.        He was not around.

22   Q.        So he was -- he was not on that store visit?

23   A.        No.

24   Q.        Okay.  Do you have any reason to believe that

25   David Gonsolin is biased against you because of your

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 2**

267

1   race?

2   A.      Personally, no.

3   Q.      Do you have any reason to believe that

4   David Gonsolin is biased against you because of your

5   age?

6   A.      Personally, no.

7   Q.      What do you mean by "personally"?

8   A.      "Personally" meaning that I don't think him

9   personally.  I think that, once again, that he had a job

10  to do.

11  Q.      Okay.  All right.  I understand what you're

12  saying now.  So in terms of David Gonsolin, himself, you

13  do not think that he bore you any -- had any bias

14  against you because you're African-American; is that

15  true?

16  A.      Yes.

17  Q.      And you also don't think David Gonsolin

18  personally had a bias against you because of your age,

19  right?

20  A.      Yes.

21  Q.      But it's your opinion that David Gonsolin was

22  operating under instructions from somebody else?

23  A.      Yes.

24  Q.      And who would that somebody else be that --

25  A.      It could have been Greg, because Greg was the

**Dec. of Thompson - Exhibit 2**

269

1    Q.      What's your source of information?

2    A.      Tom Nabozny.

3    Q.      Okay, your conversation with Tom Nabozny in

4    2007?

5    A.      Right.

6    Q.      And did he tell you why he was making those

7    statements in 2007?

8    A.      Because evidently he was in a meeting with them,

9    and that was the plan.

10   Q.      Did Tom Nabozny tell you that he was in a

11   meeting?

12   A.      Yes, he did.

13   Q.      And did he tell you who was present in this

14   meeting?

15   A.      No, he did not.

16   Q.      Okay.  So your testimony is that in 2007,

17   Tom Nabozny told you he was in a meeting with some

18   unidentified persons, and what was discussed?

19   A.      Um, changing the image of Radio Shack.

20   Eliminating the elders that was in Radio Shack, the

21   senior managers in Radio Shack, and changing the image

22   around.

23   Q.      Okay.  All right.  So I understand you had that

24   conversation with Tom Nabozny in 2007.  Now we're in

25   2010, and we're talking to David Gonsolin.  Did

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 2**

270

1   David Gonsolin say anything to you that suggested to you

2   that he was operating under orders from somebody, in

3   issuing or discussing Exhibit 4 with you?

4   A.      Did he?  No, he did not.

5   Q.      The next bullet point on Exhibit 4 says,

6   "Several months of numerous cash shortages were found."

7   Is that a true statement?

8   A.      Yes.

9   Q.      The next sentence reads, "You failed to report

10  the shortages and did not have an explanation as to why

11  they are happening."  Is that a true statement?

12  A.      No, it's not.

13  Q.      Okay.  So how many cash shortages did you have

14  in that period?

15  A.      I'm not for sure how many we had, but we had

16  quite a few.

17  Q.      And what was the dollar amount of the cash

18  shortages, do you know?

19  A.      No, I don't.

20  Q.      What was your explanation for the cash

21  shortages?

22  A.      We have a prepaid phone that is named Boost

23  Mobile.

24  Q.      I'm sorry, what?

25  A.      Boost.

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 2**

277

1  A.      That's what he's talking about.

2  Q.      Well, okay.  I'm asking you about the "several

3  months of numerous cash shortages" referenced in

4  Exhibit 4.  What was your estimate of the dollar value

5  of those cash shortages?

6  A.      I don't -- about -- once again, about 6- to

7  $800.

8  Q.      I'm sorry, I thought you said that was over the

9  course of a year.

10 A.      That's what they're talking about.  That's what

11 this is saying here.  That's what this was about, about

12 a year.

13 Q.      Well, the words are, "several months of numerous

14 cash shortages were found."

15 A.      Hmm.

16 Q.      Right?

17 A.      Right.

18 Q.      Okay.

19 A.      He went a year back.

20 Q.      Where are you getting that idea, that he went a

21 year back?

22 A.      I was there.  He showed me.

23 Q.      I'm sorry, so did David Gonsolin do a store

24 visit with you on March 23rd, 2010?

25 A.      David pulled this report up.  David did the

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 2**

278

1  report -- David did the cage count.

2  Q.      When did he do that?

3  A.      On this date (indicating).

4  Q.      On March 23rd, 2010?

5  A.      Yes.

6  Q.      Okay.  Was Donna Ocampo in the store?

7  A.      She was in the store.

8  Q.      Okay.  So this Exhibit 4 was written up on the

9  same day that the store visit occurred with

10 David Gonsolin and Donna Ocampo?

11 A.      Yes.

12 Q.      You sure about that?

13 A.      Positive, because Dave sit down on a box in the

14 middle of the back room floor while Donna and I was

15 walking around in the store.  He used his laptop to pull

16 up all the information, because he didn't go into the

17 office.

18 Q.      He pulled up what information?

19 A.      He -- this information.

20 Q.      You have to be more specific.  What information

21 did he pull up?

22 A.      The several months of numerous shortages.

23 Q.      Okay.

24 A.      He pulled that up on the laptop.

25 Q.      Right while you were there?

Dec. of Thompson - Exhibit 2

279

1  A.      Yes.

2  Q.      Okay.  And so he showed those to you?

3  A.      Yes.

4  Q.      And he told you that you failed to report the

5  shortages --

6  A.      Yes.

7  Q.      -- and did not have an explanation?

8  A.      Yes.  This didn't happen while he was there or

9  Donna was there.  They wasn't even around at the time

10 when this happened.

11 Q.      Who wasn't around?

12 A.      Donna and Dave.  They were not in charge of the

13 store during the time that that happened.

14 Q.      Oh.  What was the time period that it happened?

15 A.      That was the year prior to that.  She was ....

16 Q.      You're totally losing me now.  I have no idea

17 what you're saying.  I'm sorry, maybe it's my fault,

18 but --

19 A.      The shortages on here.

20 Q.      Yes.

21 A.      I would not have the shortages when they came

22 into the store.

23 Q.      All right.  So let's just be very clear here,

24 then.  When it states, "several months of numerous cash

25 shortages were found," end quote, that's a true

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 2**

280

1  statement, right?

2  A.      Yes.

3  Q.      And for what time period did you have?

4  A.      It was about a year ago.

5  Q.      All right.  You're saying that even though this

6  document is dated March 23rd, 2010, the months --

7  "several months of numerous cash shortages" was

8  referring to a year before?

9  A.      Yes.

10  Q.      So sometime in 2009?

11  A.      Yes.

12  Q.      And what makes you say that?

13  A.      I mentioned it to Dave.  I showed Dave.  David

14  showed me on the computer what he was doing, where he

15  got it from.  I said, "You guys wasn't even around

16  during this time."

17  Q.      Regardless of whether they were around or not,

18  there were numerous cash shortages, right?

19  A.      Right.

20  Q.      And they were telling you failed to report them,

21  right?

22  A.      Right.

23  Q.      And you said, "That's not true."

24  A.      "That's not true."

25  Q.      And were you able to show them where you had

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 2**

281

1   made the reports?

2   A.      Made the reports?

3   Q.      Right.

4   A.      No, because it was sent in on the computer.   It

5   was typed in in the computer.

6   Q.      Okay.  Were you able to show him that you had,

7   in fact, reported those cash shortages?

8   A.      No.

9   Q.      All right, now, did you provide any written

10  rebuttal at all to Exhibit 4 after it was given to you?

11  A.      No.

12  Q.      You've testified that you disagreed with at

13  least some of the comments on Exhibit 4, correct?

14  A.      Yes.

15  Q.      Is there some reason why you didn't write a

16  written response, setting forth your disagreement?

17  A.      Comments.  No.

18  Q.      And you see on the form, itself, you see --

19  A.      I see.

20  Q.      -- there's space for "Employee Comments," right?

21  A.      Yes.

22  Q.      And there's nothing in there?

23  A.      Yes.

24  Q.      As you sit here now, do you have any reason why

25  you didn't put in Exhibit 4 why you disagreed with

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 2**

282

1    Exhibit 4?

2    A.      I verbally said something to him, but I didn't

3    write it down.

4    Q.      Okay.  That's what I'm asking you.  Was there

5    some reason why you didn't put it in writing on the

6    document in the space designated for "Employee Comments"

7    if you, in fact, disagreed with the document?

8    A.      No.

9    Q.      And you understood that, quote, "Failure to

10   achieve the required improvement will lead to additional

11   disciplinary action, including and up to termination"?

12   A.      Yes.

13   Q.      And you understood that as of March 23rd, 2010,

14   right?

15   A.      Right.

16          MS. THOMPSON:  Okay.  Why don't we adjourn for

17   the day?  I'm sorry.  It's been a long day.

18          THE VIDEOGRAPHER:  Okay.  This ends tape four,

19   Volume I.  We're going off the record at 4:45.

20          (The deposition was adjourned at 4:45 o'clock

21   p.m.)

22

23                        _____

24                         Signature of Witness

25

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 2**

283

CERTIFICATE

    I, the undersigned, a Certified Shorthand Reporter, hereby certify that the witness in the foregoing deposition was first duly sworn to testify to the truth, the whole truth, and nothing but the truth in the within-entitled cause; that said deposition was taken at the time and place therein stated; that the testimony of said witness was reported by me, a disinterested person, and was thereafter transcribed under my direction into typewriting; that the foregoing is a full, complete and true record of said testimony; and that the witness was given an opportunity to read and, if necessary, correct said deposition and to subscribe to the same.

    I further certify that I am not of counsel or attorney for either or any of the parties in the foregoing deposition and caption named, nor in any way interested in the outcome of the cause named in said caption.  Executed this 26th day of February, 2012.


_____
CERTIFIED SHORTHAND REPORTER
NO. 5697

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 2**

Page 284

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION


FRANK ALLEN,

       Plaintiff,

   vs.                     No. CV 11 3110 WHA

RADIO SHACK CORPORATION, et al.,

       Defendants.
_____/


DEPOSITION OF FRANK ALLEN, JR.

VOLUME II

October 2, 2012


Reported by:
LaRelle M. Fagundes
CSR No. 9762


PATRICIA CALLAHAN REPORTING
Certified Shorthand Reporters
510-885-2371   415-788-3993
Facsimile 510-247-9775

PATRICIA CALLAHAN REPORTING

42d841a2-be4b-43bd-bccd-bc38e989c56d

**Dec. of Thompson - Exhibit 2**

Page 287

1          BE IT REMEMBERED THAT, pursuant to Notice of

2     Taking Deposition, and on Tuesday, October 2, 2012,

3     commencing at the hour of 9:57 o'clock a.m. of the said

4     day, at the law offices of MILLER LAW GROUP, 111 Sutter

5     Street, Suite 700, San Francisco, California, before me,

6     LARELLE M. FAGUNDES, a Certified Shorthand Reporter,

7     personally appeared FRANK ALLEN, the plaintiff in the

8     above-entitled court and cause, produced on behalf of

9     the defendants therein, who being by me first duly

10    sworn, was then and there examined and interrogated by

11    Attorney TRACY THOMPSON, representing the law firm of

12    MILLER LAW GROUP, 111 Sutter Street, Suite 700,

13    San Francisco, California, counsel for the defendants.

14

15                     APPEARANCES OF COUNSEL

16

17    FOR PLAINTIFF:

18          LAW OFFICES OF MAYOR JOSEPH L. ALIOTO &

19          ANGELA ALIOTO

20          BY:  ANGELA MIA VERONESE, ESQ.

21          700 Montgomery Street

22          San Francisco, California  94111

23          (415) 434-8700

24

25    //

42d841a2-be4b-43bd-bccd-bc38e989c56d

**Dec. of Thompson - Exhibit 2**

Page 389

1          Everything I talked to him about -- everything I

2     did, I talked to him about.

3          MS. THOMPSON:  Q.  Okay.  That's fine.  That was

4     a slightly different question.  I think you've already

5     testified about that.

6          I want to know what your reasons were for

7     keeping the cash in the back.

8     A.     The reason why we kept the cash in the back --

9     Q.     Right.

10    A.     -- is because the cash register that we had in

11    the store was big enough to put the bills in the front,

12    but there was no place to put the rolls of coins in the

13    back of the drawer.  So we kept the rolls of coins and

14    some ones and fives in the back.

15    Q.     And the reason you did that was because there

16    was no room in the cash register drawer?

17    A.     There was no room in the cash register drawer

18    for the change.

19    Q.     But was there room in the cash register drawer

20    for the bills?

21    A.     There was room for the cash -- for the bills,

22    but if we put all of those bills in there, in that area,

23    there was a lot of people getting robbed in that area,

24    and I didn't want to have the cash in the drawer so

25    people can walk in and look into it, because the way the

42d841a2-be4b-43bd-bccd-bc38e989c56d

Dec. of Thompson - Exhibit 2

Page 390

1   store was designed, people can walk right beside you and

2   look into the drawer and see what's in there.

3   Q.      Okay.  So I just want to make sure, because I'm

4   hearing two different things, and correct me if I'm

5   misunderstanding what you're saying, that the reason you

6   kept the coins in the back was because there wasn't room

7   in the cash register drawer for coins, right?

8   A.      Yes.

9   Q.      Okay.  And the reason you kept any bills in the

10  back was because you were concerned about theft?

11  A.      Yes, robbery.

12  Q.      Okay.  Any other reasons for keeping any of the

13  cash in the back -- the manager's desk in the back

14  office other than what you've already told me?

15  A.      No.

16  Q.      Okay.  So last time I think you said that there

17  were three cash registers in your store.

18          Is that accurate, or is there -- I mean, how

19  many cash registers did you have in 938 Market Street?

20  A.      In 938 Market Street?

21  Q.      That's the new -- the remodeled store, right?

22  A.      Mm-hmm.

23  Q.      Is that "yes"?

24  A.      Yes.

25  Q.      Okay.  So I just want to make sure that I

42d841a2-be4b-43bd-bccd-bc38e989c56d

**Dec. of Thompson - Exhibit 2**

Page 391

1   understand your testimony about that, because last time

2   you said there were three, and I want to make sure that

3   your -- that's still your testimony.

4   A.      Yes, there's still -- there were three.

5   Q.      And there were three cash registers the entire

6   time you were at 938 Market?

7   A.      Yes.

8   Q.      And there were three cash registers when you

9   left 938 Market?

10  A.      Yes.

11  Q.      As you sit here now, do you know of any other

12  store manager that kept any cash in the manager's desk

13  in the back office other than you?

14  A.      I know -- I know one manager said to me, "I need

15  to take my cash from my desk, then."

16  Q.      Okay.  That's not my question.

17          My question is, do you know of any store

18  manager, other than you, who kept any cash in the

19  manager's desk in the back office instead of in the cash

20  register drawer in the cash registers?

21  A.      Tim, the manager of Serramonte.

22  Q.      I'm sorry?

23          MS. VERONESE:  Slow down.

24          THE WITNESS:  Tim, the manager at Serramonte,

25  said he needed to take his money out the desk and put it

42d841a2-be4b-43bd-bccd-bc38e989c56d

**Dec. of Thompson - Exhibit 2**

1    conversation with Tim, the manager of the RadioShack

2    Serramonte store, that you just testified about?

3    A.      Um, we were -- I'm not for sure where we was at

4    when we had it, but when we had the conversation when we

5    was in a store.  I'm not for sure which store we was in.

6    Q.      Okay.  Was anybody else present besides you and

7    Tim?

8    A.      One of his salespeople.  Well, we was in

9    Serramonte.  I was in Serramonte at his store, and

10   that's when he told me that.

11   Q.      What were you doing at Tim's store in Serramonte

12   on this occasion?

13   A.      Shopping.

14   Q.      You went to Tim's store to go shopping in

15   Serramonte rather than your own store?

16   A.      No.  No.  I was just shopping.  I -- when I was

17   working for RadioShack, I would go to -- I would go to

18   all of the RadioShack stores just to go in there to see

19   what they're doing, see how their store looks, to see

20   how their merchandise is displayed, see how the

21   salespeople are approaching you.

22   Q.      Oh, okay.  So you weren't shopping.  You were

23   going to check out the other store?

24   A.      That's what I always do.  I would go to the --

25   always go to the store and do that, RadioShack store,

42d841a2-be4b-43bd-bccd-bc38e989c56d

**Dec. of Thompson - Exhibit 2**

1    regardless where I'm at.

2    Q.      Okay.  So when was this -- when were you at

3    Tim's store in Serramonte when you had this

4    conversation?  When was that?

5    A.      That was after I was fired.

6    Q.      Okay.  So how soon after you were fired were you

7    in the -- at Tim's store in Serramonte?

8    A.      Within a week, two weeks.  I'm not for sure, but

9    it was a short period of time.

10   Q.      Okay.  And so what was your purpose in being

11   there after you'd been terminated?

12   A.      I wasn't allowed to go to RadioShack stores

13   after being terminated?

14   Q.      That wasn't my question.

15           MS. VERONESE:  Just answer her question.

16           MS. THOMPSON:  Q.  Yeah.  I'm not trying to

17   argue with you.  I just want to know, because before you

18   said you were going to see how other managers were doing

19   things, but now you told me it's after you were

20   terminated.

21           So what was your reason for being there after

22   you were terminated?

23   A.      Love of the store.  Just going -- like, I love

24   going to RadioShack.  I love going to Home Depot.

25   Q.      So it was more of a social visit, then?

PATRICIA CALLAHAN REPORTING

42d841a2-be4b-43bd-bced-bc98e985c56d

**Dec. of Thompson - Exhibit 2**

Page 395

1    A.      Yes.

2    Q.      Okay.  And so tell me what exactly you and Tim

3    said to one another on this -- during this visit.

4    A.      I don't remember the conversation, but we was

5    just randomly talking.

6    Q.      What do you remember about the conversation, if

7    anything?

8    A.      I don't remember.  I don't remember too much

9    about the conversation.

10   Q.      Well, do you remember anything at all about the

11   conversation?

12   A.      I don't remember.

13   Q.      Well, I thought you said you remembered Tim

14   making some comment to you.

15   A.      He did.

16   Q.      Okay.  So what were the exact words that he

17   used?

18   A.      Um, that he needed to take the money that he

19   have in his desk and move it and put it somewhere else.

20   Q.      Okay.  So did you tell Mr. Tin -- Tim that you

21   had been fired for leaving money in your manager's desk?

22   A.      Not only did Tim know about it, the whole

23   district knew about it.

24   Q.      Okay.  That wasn't my question, though.

25           Did you tell Tim that you had been terminated

PATRICIA CALLAHAN REPORTING

42d841a2-be4b-43bd-bccd-bc38e989c96d

**Dec. of Thompson - Exhibit 2**

Page 396

1   for leaving money in the manager's desk?

2   A.      I don't remember telling him that, no.

3   Q.      Did that come up in the conversation at all?

4   A.      Um, I don't remember.

5   Q.      Drawing a complete blank?

6   A.      Um, yes, I am.

7   Q.      Okay.  And the only thing that you remember

8   about this conversation is that Tim said to you that he

9   needed to take -- he needed to take money out of the

10  manager's desk?

11  A.      Yes.

12  Q.      Did he say anything else?

13  A.      Um, we probably did, but that's what stuck in my

14  mind.  That registered in my mind --

15  Q.      Why is that?

16  A.      -- why would he say something like that, "I need

17  to take the money out of my desk to put it somewhere

18  else."

19  Q.      He said, "I need to take the money out of the

20  desk and put it somewhere else"?  Is that what he said?

21  A.      He said that he needed to take his money and put

22  it somewhere else.

23  Q.      Okay.  And, to the best of your recollection,

24  those were his exact words?

25  A.      Yes.

42d841a2-be4b-43bd-bccd-bc38e989c56d

**Dec. of Thompson - Exhibit 2**

Page 397

1   Q.      Did you ask him what he meant by that?

2   A.      No.

3   Q.      Did he say anything more about that?

4   A.      No.

5   Q.      Okay.  How long did this conversation last?

6   A.      Not that long at all.

7   Q.      Five minutes, two minutes?

8   A.      If that long.

9   Q.      So some -- between two and five minutes?

10  A.      Somewhere along in there.

11  Q.      Okay.  And was any -- was it just you and Tim

12  having this conversation?

13  A.      Yes.

14  Q.      Was anybody else within earshot, as far as you

15  knew?

16  A.      There was a salesman that was there.

17  Q.      And who was that?

18  A.      I don't know his name.

19  Q.      Okay.  Was he part of the conversation or

20  just --

21  A.      No.

22  Q.      Okay.  So the salesman was off working in the

23  store?

24  A.      Yes.

25  Q.      And was Tim working as well?

PATRICIA CALLAHAN REPORTING

42d841a2-be4b-43bd-bccd-bc38e989e56d

**Dec. of Thompson - Exhibit 2**

Page 398

1    A.      Yes.

2    Q.      Okay.  And was this on the sales floor?

3    A.      Yes.

4    Q.      Okay.  And the only thing that you remember

5    either of you saying, during this conversation, was

6    that -- of Tim saying something like, "I needed to take

7    my money" -- "the money out of the manager's desk and

8    put it somewhere else," right?

9    A.      Or take the money from where he has it and put

10   it somewhere.  I'm not for sure if he used the desk.

11   Q.      Okay.

12   A.      But he said he had to take it and put it

13   somewhere else --

14   Q.      Okay.

15   A.      -- the extra change.

16   Q.      So tell me what you -- I'm sorry.  I don't mean

17   to confuse things, but I really want to make sure the

18   record is clear.

19          Tell me what were the words that he used that

20   you're remembering now.

21   A.      I remember him saying that he needed to take his

22   money and put it somewhere else now.

23   Q.      Okay.  And to the best of your recollection,

24   were those the exact words that he used?

25   A.      Yes.

PATRICIA CALLAHAN REPORTING

42d841a2-be4b-43bd-bccd-bc38e989c56d

**Dec. of Thompson - Exhibit 2**

Page 399

1   Q.      Okay.  And in terms of that conversation, those

2   are the -- that's all that you remember about that

3   conversation?

4   A.      Yes.

5   Q.      Okay.  Did you talk about that conversation with

6   anyone else at any time?

7   A.      I don't understand the question.

8   Q.      Did you ever tell anyone else about this

9   conversation other than today telling me?

10  A.      I believe I did, yes.

11  Q.      Who else did you tell?

12  A.      Hmm, I think I talked to --

13  Q.      Other than your lawyer.

14  A.      No.

15  Q.      Okay.  So other than telling me right now and

16  telling your lawyer, you didn't tell anyone else about

17  that conversation between you and Tim; is that right?

18  A.      No.

19  Q.      That's not right?

20          Can I have the question read back, please.

21          (Record read by the reporter as follows:

22          "Q.  So other than telling me right now and

23               telling your lawyer, you didn't tell anyone

24               else about that conversation between you

25               and Tim; is that right?")

PATRICIA CALLAHAN REPORTING

42d841a2-be4b-43bd-bccd-bc38e989c56d

Dec. of Thompson - Exhibit 2

1      MS. THOMPSON:  Q.  Okay.  So my question, again,

2  was, are you aware of any other store manager who kept

3  cash in the manager's desk drawer other than you?

4  A.      I never asked anyone.  I'm not for sure.

5  Q.      Okay.  So as you sit here now, can you name

6  one -- any one other manager who kept cash in the back

7  drawer?

8  A.      I'm not for sure.

9  Q.      Well, can you name anyone that you know of?  All

10  I'm asking you about is what you know of.  As you sit

11  here now, do you know of any other manager, besides

12  yourself, who kept cash in the manager's desk drawer?

13      MS. VERONESE:  I think he answered that.  Asked

14  and answered.

15      THE WITNESS:  Excuse me?

16      MS. VERONESE:  Answer it again.

17      MS. THOMPSON:  Can you read the question back.

18      THE WITNESS:  I'm not for sure.

19      (Record read by the reporter as follows:

20      "Q.  Well, can you name anyone that you know of?

21          All I'm asking you about is what you know

22          of.  As you sit here now, do you know of

23          any other manager, besides yourself, who

24          kept cash in the manager's desk drawer?")

25      MS. THOMPSON:  Q.  So that's a yes or a no,

PATRICIA CALLAHAN REPORTING

42d841a2-be4b-43bd-bccd-bc38e989c56d

**Dec. of Thompson - Exhibit 2**

Page 401

1  because I'm just asking you do you know of anyone.

2  A.      No, I don't know of anyone.

3  Q.      Okay.  Are you familiar with something called

4  non-negotiable standards?

5  A.      Yes.

6  Q.      Have you heard that term before today?

7  A.      Yes.

8  Q.      Okay.  And you heard that term while you were

9  working at RadioShack, right?

10  A.      Yes.

11  Q.      Okay.  And what was your understanding of what

12  the non-negotiable standards were?

13  A.      Standards of operation.

14  Q.      Were these -- were they standards of operation,

15  to your understanding, that were company-wide?

16  A.      Yes.

17  Q.      And were all store managers expected to adhere

18  to those non-negotiable standards?

19  A.      Yes.

20  Q.      Did you receive training on the non-negotiable

21  standards?

22  A.      It was ongoing training.

23  Q.      Do you know when the non-negotiable standards

24  were adopted by the company?

25  A.      No.

PATRICIA CALLAHAN REPORTING

42d841a2-be4b-43bd-bccd-bc38e989c56d

**Dec. of Thompson - Exhibit 2**

1    Q.     Were you given any materials to read about the

2    non-negotiable standards?

3            MS. VERONESE:  At any time during the 13 years?

4            THE WITNESS:  Yes.

5            MS. THOMPSON:  Yes, at any time.

6            THE WITNESS:  Yes.

7            MS. THOMPSON:  Q.  What kinds of things were you

8    given to read about the non-negotiable standards?

9    A.      Letters.  Actually, the non-negotiable was

10   pretty much the basic operation of RadioShack that was

11   put into a booklet.

12   Q.      And that was a booklet that the store managers

13   could have, use as a reference point?

14   A.      Yes.

15   Q.      Were they also available online?

16   A.      I'm not for sure if it was online.

17   Q.      Okay.  But you recall seeing a hard copy?

18   A.      Yes.

19   Q.      Okay.  And what was the name of the document

20   that you remember seeing?

21   A.      Non-negotiable.

22           MS. VERONESE:  If you remember.

23           MS. THOMPSON:  Q.  You remember that in the

24   title?

25   A.      Yes.

**Dec. of Thompson - Exhibit 2**

Page 403

1  Q.     All right.  And were you responsible for making

2  are sure all your sales associates complied with the

3  non-negotiable standards?

4  A.     Yes.

5  Q.     Okay.  All right.  Let's mark the next document

6  as 5.

7         (DEFENDANTS' EXHIBIT NO. 5 WAS MARKED FOR

8         IDENTIFICATION.)

9         MS. THOMPSON:  Q.  So, for the record, I've

10 marked as Exhibit 5 a multipage booklet called "The

11 Store Manager's Non-Negotiable Standards Reference," and

12 it's Bates number RadioShack/Allen 744 to 786.

13         So what I'd like you to do is take a couple of

14 minutes and see if this document looks familiar to you.

15         Have you had a chance to look at Exhibit 5?

16         MS. VERONESE:  Look at all of the pages.  Just

17 look at it.

18         MS. THOMPSON:  Q.  Yeah, please take as much

19 time as you need, and let me know when you've had a

20 chance to do that.

21         Yeah, for the record, I'll also note that

22 Exhibit 5 has, in the lower left-hand corner, the date

23 3-9 -- 3-09-10.

24         Okay.  Have you had a chance now look at Exhibit

25 5?

PATRICIA CALLAHAN REPORTING

42d841a2-be4b-43bd-bccd-bc38e989c56d

Dec. of Thompson - Exhibit 2

1  A.      Yes.

2  Q.      Have you seen Exhibit 5 before today?

3  A.      I never remember seeing this before.

4  Q.      Okay.  Well, you talked about getting a booklet

5  before about non-negotiable standards.

6  A.      Right.

7  Q.      Does this -- does Exhibit 5 look like the

8  booklet that you were describing?

9  A.      No.

10  Q.      What's different about it?

11  A.      It's completely different.  This book here --

12  this here -- um, the book that I'm talking about has

13  months, dates.  It has what the weather is like, what's

14  going on today, what business was like.  It has a chart

15  inside of it.  I never seen this before.

16  Q.      Okay.  So you're familiar with answers online,

17  right, RadioShack's answers online?

18  A.      Yes.

19  Q.      Okay.  What is RadioShack's answers online?

20  A.      Um, RadioShack answers online is supposedly be

21  able to give you answers to questions that you may want

22  from RadioShack.

23  Q.      Right.  And isn't it true that on answers

24  online, you could access RadioShack company policies and

25  procedures?

PATRICIA CALLAHAN REPORTING

42d841a2-be4b-43bd-bccd-bc38e989c56d

**Dec. of Thompson - Exhibit 2**

Page 405

1    A.       You may be able to do it if you know how to find

2    it.

3    Q.       Well, you could go on to answers online, right?

4    A.       Right.

5    Q.       How hard was that to log on to answers online?

6    A.       And finding certain documents or certain parts

7    that you want, very difficult.

8    Q.       So you had a problem, I take it, from what

9    you're saying?

10   A.       A lot of people do.

11   Q.       Okay.  I'm not talking about a lot of people.

12   I'm talking about you.

13           Is it your testimony that you had problems

14   finding documents online at RadioShack?

15   A.       Yes.

16   Q.       Okay.  Was there something called a store

17   operations manual?

18   A.       Store operation manager?

19   Q.       Manual.

20           MS. VERONESE:  Manual.

21           THE WITNESS:  Manual.  There was something

22   called that, yes.

23           MS. THOMPSON:  Q.  Okay.  So just look at the

24   bottom of Exhibit 5 where it says, "answers online,"

25   then the word "operations," then "store ops manual."

PATRICIA CALLAHAN REPORTING

42d841a2-be4b-43bd-bccd-bc38e989c56d

**Dec. of Thompson - Exhibit 2**

1    A.      Yes.

2    Q.      Did you ever access the store ops manual online?

3    A.      I tried.

4    Q.      What do you mean you tried?

5    A.      We had these store operation manual books in the

6    store, and it was five books that was about four-inches

7    thick, and you had to go through and find out what

8    information that you want to go through.  But you had to

9    do some research to be able to find out where you wanted

10   to find that information at.  So it was you had to

11   actually spend some time to be able to do some research,

12   or you call someone up and talk to them about it, and

13   then they would be able to help you with it.

14   Q.      Okay.  So if you wanted to find out what the

15   company's non-negotiable standards were, how would you

16   go about doing that?

17   A.      If I couldn't find it, then I would call a

18   couple of other managers up and talk to them about it

19   and see how they tried to find it and see what the

20   results would be from there if I wasn't able to find it.

21   Q.      Well, did you ever look online for "The Store

22   Manager's Reference" -- I'm sorry -- "The Non-Negotiable

23   Standards Reference"?

24   A.      No, I didn't.

25   Q.      Okay.  Is there some reason why you never looked

PATRICIA CALLAHAN REPORTING

42d841a2-be4b-43bd-bccd-bc38e989c56d

**Dec. of Thompson - Exhibit 2**

1  at "The Store Manager's Non-Negotiable Standards

2  Reference"?

3  A.      Because my district manager was always talking

4  to me about the red book, which was figures, numbers,

5  sales, tasks that would need to be taken care of.

6  Q.      Well, you testified, I thought, correct me if

7  I'm wrong, that you were aware that RadioShack had

8  non-negotiable standards, which you described as

9  standards of operation, right?

10  A.      Right.

11  Q.      So if you wanted to find out what those

12  standards were, what would you do?

13          MS. VERONESE:  He testified about the books that

14  he would go to.

15          MS. THOMPSON:  Q.  So you're testifying that you

16  had -- went to your hard copy books.

17  A.      If that's what I -- I would go to the hard

18  copies, or I would go to the hard copy --- if I couldn't

19  find it on the Internet, then I would go to some senior

20  managers and ask them how would I find this information.

21  Q.      Well, as you sit here now, did you, at any

22  occasion during your last few years of your employment,

23  to reference what the store -- what the non-negotiable

24  standards were?

25  A.      I never had time to do that.

PATRICIA CALLAHAN REPORTING

42d841a2-be4b-43bd-bccd-bc38e989c56d

**Dec. of Thompson - Exhibit 2**

1    Q.     So you never had time to find out what the

2    non-negotiable standards were?

3    A.     When my district manager would come to the

4    store, he would bring in -- he would talk to me about

5    the book, the red book.  He never talked to me about the

6    rules, the guidelines, the dos or the don'ts in

7    RadioShack.

8    Q.     But wait.  I don't mean to be arguing with you,

9    but you testified that you had ongoing training about

10   non-negotiable standards.

11          Is that true or not?

12   A.     In the red book.

13   Q.     I'm not -- I didn't ask you about the red book.

14   I asked you -- hang on.  Because I -- I asked you about

15   whether you had any training with regard to the

16   company's non-negotiable standards, and you answered

17   yes.

18          So are you changing that testimony now?

19   A.     No.

20   Q.     Okay.  So what training did you have on

21   non-negotiable standards?

22   A.     In the red book.

23   Q.     What's the red book?

24   A.     That's the non-negotiable.  That's what

25   RadioShack know -- that's what store managers know as

PATRICIA CALLAHAN REPORTING

42d841a2-be4b-43bd-bccd-bc38e989c56d

**Dec. of Thompson - Exhibit 2**

1    non-negotiable.  They don't know anything about this.

2    Q.      Well, I'm not asking about them.  I'm asking

3    about you.

4            So you're saying you don't know anything about

5    Exhibit 5.  Is that your testimony?

6    A.      Yes.

7    Q.      Okay.  All right.  Let's look -- even if you've

8    never seen this document before, let's look at page 746

9    of Exhibit 5.  And so this deals with recruiting.

10           Are you with me?

11   A.      Yes.

12   Q.      Okay.  So where it says, "Store Manager

13   Responsibilities," on page 746 --

14   A.      Yes.

15   Q.      -- it says, "Store Managers are responsible for

16   proactively recruiting inside and outside the store."

17           Is that a true statement?

18   A.      Yes.

19   Q.      Okay.  And the next statement reads, "Regular

20   utilization of R Recruits will assist a manager in

21   finding qualified individuals from an available pool of

22   applicants."

23           Do you know what R Recruits is?

24   A.      Yes.

25   Q.      What is R Recruits?

PATRICIA CALLAHAN REPORTING

42d841a2-be4b-43bd-bccd-bc38e989c56d

**Dec. of Thompson - Exhibit 2**

Page 410

1    A.       RadioShack recruiting online.

2    Q.       And so you understood that as part of your

3    responsibility to regularly utilize R Recruits to assist

4    you in finding qualified individuals?

5    A.       Yes.

6    Q.       And it was your responsibility to make sure all

7    of your store employees were trained; is that right?

8    A.       Yes.

9    Q.       And was it your responsibility for enforcing

10   RadioShack's -- ensuring that all team members were in

11   compliance with the RadioShack dress code guidelines?

12   A.       Yes.

13            MS. VERONESE:  For your store.

14            MS. THOMPSON:  I'm sorry?

15            MS. VERONESE:  Go ahead

16            MS. THOMPSON:  Q.  Okay.  Let's turn to

17   RadioShack 761, please, and the heading, at the top,

18   says, "Asset Protection."  Please take as much as time

19   as you need to review page 761 and 762.  Let me know

20   when you're finished, please.

21   A.       Okay.

22   Q.       Do pages 761 and 762 of Exhibit 5 accurately

23   describe your duties and responsibilities as a store

24   manager with respect to asset protection?

25            MS. VERONESE:  Read the next page.

PATRICIA CALLAHAN REPORTING

42d841a2-be4b-43bd-bccd-bc38e989c56d

**Dec. of Thompson - Exhibit 2**

Page 411

1      MS. THOMPSON:  Can I have the question read

2  back.

3  Q.      Have you had a chance to read it?

4      THE WITNESS:  Yes.

5      MS. THOMPSON:  Okay.  Could I have the question

6  read back.

7      (Record read by the reporter as follows:

8      "Q.  Do pages 761 and 762 of Exhibit 5

9          accurately describe your duties and

10         responsibilities as a store manager with

11         respect to asset protection?")

12     THE WITNESS:  Yes.

13     MS. VERONESE:  And just to be clear, at this

14  time, in March of 2010?

15     MS. THOMPSON:  No, that wasn't my question.

16     MS. VERONESE:  Well, it says revised March 2010.

17  We don't know what the prior one said.

18     MS. THOMPSON:  I know.  That wasn't my question.

19     MS. VERONESE:  Okay.

20     MS. THOMPSON:  I can certainly follow up on

21  that.

22     Let's ask my question again, and I just want an

23  answer so the record is clear, and then I'll ask a

24  follow-up.

25     (Record read by the reporter as follows:

42d841a2-be4b-43bd-bccd-bc38e989c56d

**Dec. of Thompson - Exhibit 2**

1        "Q.  Do pages 761 and 762 of Exhibit 5

2             accurately describe your duties and

3             responsibilities as a store manager with

4             respect to asset protection?")

5      MS. VERONESE:  Okay.  Vague as to time.

6      MS. THOMPSON:  At any time.

7      MS. VERONESE:  Well, if this document was

8  revised in March of 2010, we don't know what the

9  document before it said.  And if he's testifying to

10  these two pages --

11      MS. THOMPSON:  He can tell me.  He can tell me.

12  I think -- I don't think your objections are

13  appropriate.  Make the objection, but we can't have

14  speaking objections.

15      MS. VERONESE:  Okay.  Fine.

16      MS. THOMPSON:  So I'll start -- I'll back up, if

17  that will make things easier.

18  Q.     Do Exhibits 761 and 762 accurately describe --

19  of Exhibit 5 accurately describe your duties and

20  responsibilities as a store manager with respect to

21  asset protection as of March 9th, 2010?

22  A.     Yes.

23  Q.     Okay.  Did your duties and responsibilities with

24  respect to asset protection, were they different than

25  what's set forth in 761 and 762 before March 9th of

**Dec. of Thompson - Exhibit 2**

Page 413

1    2010?   Let me withdraw that.

2           Did your duties and responsibilities as a store

3    manager, with respect to asset protection, change, in

4    any way, let's say, over the last five years of your

5    employment?

6    A.      Um, no.

7           MS. THOMPSON:  Okay.  Let's mark the next

8    document as Exhibit 6.

9           (DEFENDANTS' EXHIBIT NO. 6 WAS MARKED FOR

10          IDENTIFICATION.)

11          MS. VERONESE:  What?

12          THE WITNESS:  This and this, I started them

13   doing that.

14          MS. THOMPSON:  Wait.  I don't like this

15   whispering, because it's on the thing.

16          MS. VERONESE:  Okay.  Just say it.

17   Q.      Do you have something you want --

18   A.      Yes.

19   Q.      Wait.  You need to wait.

20          Do you have something you want to add to or

21   change about your testimony?

22   A.      Yes.

23   Q.      Okay.  Please do so.

24   A.      Um, the cage count and the security merchandise

25   count, I started that.

42d841a2-be4b-43bd-bccd-bc38e989c56d

**Dec. of Thompson - Exhibit 2**

1    Q.      What do you mean you started that?

2    A.      I started the company doing this.

3    Q.      Okay.  And when was that?

4    A.      I have always done it.  I have always counted my

5    cage.  I have always counted merchandise in the store

6    because of the area that I worked in.  And the company

7    started doing it after they found out that I was doing

8    it.

9    Q.      Okay.  Well, when was that?

10   A.      '98, '99.

11   Q.      Okay.  So just -- I want to make sure I

12   understand your testimony.

13           In 1999, you started conducting cage counts; is

14   that right?

15   A.      Yes.

16   Q.      And what was the other practice you were

17   referring to?

18   A.      Random merchandise counts.

19   Q.      And random merchandise counts.

20           You started that practice in 1999?

21   A.      Yes.

22   Q.      Okay.  And then that wasn't -- it was your --

23   it's your testimony that there was no company policy or

24   practice with respect to cage counts or random

25   merchandise counts before then?

PATRICIA CALLAHAN REPORTING

42d841a2-be4b-43bd-bccd-bc38e989c56d

**Dec. of Thompson - Exhibit 2**

1  about the testimony you -- or add to about the testimony

2  you've given?

3  A.     No.

4  Q.     All right.  So just so we're clear, the

5  testimony about the policies of the cage counts, is

6  that -- are you referring to page 762 of Exhibit 5?

7  A.     762?  Yes.

8  Q.     Okay.  Where it says, "Secured Merchandise

9  Counts"?

10  A.     Yes.

11  Q.     And the first sentence reads, "Store managers

12  are required to perform at least one complete count of

13  all secured merchandise each week," end quote.

14       Are you saying that's the policy that you

15  started in 1999?

16       MS. VERONESE:  Right here.

17       THE WITNESS:  Yes.  They was doing it once a

18  month.

19       MS. THOMPSON:  Q.  I'm sorry?

20  A.     RadioShack said you could do it once a month.

21  They wanted you to do it once a month.

22  Q.     All right.  So your testimony is that before

23  when was it once a month?

24  A.     Um, '90 -- 1999 to 2005, you only had to count

25  it once.  Actually --

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 2**

Page 418

1   Q.      All right.  I thought you said 2003 to 2004.

2           Are you changing that now to 2005?

3   A.      It was -- from that time, from 2003 to 2005,

4   they began counting once a week, because too many people

5   were losing too much merchandise.

6   Q.      All right.  So you're saying sometime between

7   2003 and 2005, the company adopted a requirement of

8   counting secured merchandise once a week.

9   A.      Yes.

10  Q.      And before that, it -- you're saying that the

11  RadioShack policy was secured merchandise only needed to

12  be counted once a month.

13  A.      Yes.

14  Q.      But you -- starting in 1999, you did secured

15  merchandise counts once every week, right?

16  A.      Yes.

17          MS. VERONESE:  Let her finish the question.

18          MS. THOMPSON:  Q.  And did you do that once

19  every week from 1999 until the time that you left your

20  employment?

21  A.      Yes.

22  Q.      Now, you also mentioned something about random

23  merchandise counts.

24          Did I understand that correctly?

25  A.      Yes.

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 2**

1  Q.      Go ahead?

2  A.      There's a cage count that you have to count.

3  Q.      All right.  So you're saying there are two

4  counts.  One is cage count, right?

5  A.      Yes.

6  Q.      And the cage count is a count of all of the

7  merchandise that's locked in the cage?

8  A.      Yes.

9  Q.      Okay.  And then there's also something you're

10 calling, what, a secured merchandise count?

11 A.      Yes.

12 Q.      And that's a count of what?

13 A.      Um, different types of merchandise that are in

14 the store that's not in the cage.

15 Q.      So what was part of the count?  What was

16 considered -- anything not --

17 A.      Security --

18         MS. VERONESE:  Wait.

19         MS. THOMPSON:  Q.  So it's not -- the secured

20 merchandise count, in your terminology, is merchandise

21 that's outside the cage; is that right?

22 A.      Repeat that, please.

23         MS. THOMPSON:  Can you read it back, please.

24         (Record read by the reporter as follows:

25         "Q.  The secured merchandise count, in your

PATRICIA CALLAHAN REPORTING

42d841a2-be4b-43bd-bccd-bc38e989c56d

**Dec. of Thompson - Exhibit 2**

Page 423

1           terminology, is merchandise that's outside

2           the cage; is that right?")

3      THE WITNESS:  Yes.

4      MS. THOMPSON:  Q.  Okay.  But it's high-value

5  merchandise?

6  A.      Yes.

7  Q.      Okay.  So it was your policy and your practice

8  to do a cage count every week, right?

9  A.      Yes.

10  Q.      Using your definition of cage count.

11         And that you also did a secured merchandise

12  count, again, using your definition?  You did that every

13  week too, right?

14  A.      Yes.

15  Q.      Okay.  All right.  Let's go to Exhibit 6.

16         Exhibit 6, for the record, is a copy of the

17  complaint in this action.

18         What I'd like you to do is take a few minutes

19  and familiarize yourself with Exhibit 6.

20         In particular -- well, first of all, have you

21  seen Exhibit 6 before today?

22  A.      Um, I don't remember.

23  Q.      Okay.  Well, I will represent to you, and I'm

24  sure your lawyer will confirm, that Exhibit 6 is a

25  document prepared by your lawyers that sets forth the

PATRICIA CALLAHAN REPORTING

42d841a2-be4b-43bd-bccd-bc38e989c56d

Dec. of Thompson - Exhibit 2

1   Q.      Okay.  And what were the store's hours in April

2   of 2010?

3   A.      From 9:00 to 7:30, 9:00 to 8:00, one of them.

4   Q.      9:00 to either 7:30 or 8:00 p.m.?

5   A.      Yes.

6   Q.      And you would typically leave around 6:00, so

7   the store was still open when you would leave.  Is that

8   a fair statement?

9   A.      Yes.

10  Q.      Okay.  And who would be in charge when you left?

11  A.      Um, Bruce or Rosetta.

12  Q.      Because Bruce or Rosetta -- and Rosetta both

13  were key carriers?

14  A.      Yes.

15  Q.      So if you weren't there, either Bruce or Rosetta

16  would be there and would be in charge?

17  A.      Yes.

18  Q.      Okay.  All right.  So let's talk about the

19  evening of April 13th, 2010.

20          This states, "On the evening April 13th, 2010,

21  Plaintiff had left the store to make a bank deposit, and

22  then went home as he did daily."

23          That was your normal routine.  Is that a true

24  statement?

25  A.      Yes.

42d841a2-be4b-43bd-bccd-bc38e989c56d

**Dec. of Thompson - Exhibit 2**

1    Q.      You would leave the store, make a bank deposit,

2    and then go home?

3    A.      Yes.

4    Q.      And that was your regular practice each day?

5    A.      Yes.

6    Q.      Okay.  Then it states, quote, "Plaintiff had

7    left $120 in his desk drawer as per custom and practice

8    should a customer need change," end quote.

9            Is that a true statement?

10   A.      Yes.

11   Q.      So what do you mean by should a customer need

12   change?  What does that mean in the context of the

13   statement I just read?

14   A.      Meaning that once we make the bank deposit, from

15   6:00 o'clock to 7:30, they can make anything from 1,000

16   to $2,000 in cash.  And if we don't have change for them

17   to make that change, to make the sale, then they would

18   no way -- they wouldn't be able to operate the business,

19   because they have no change to do the business.

20   Q.      Okay.  I understand you're saying you needed to

21   have change.  I understand that.  Right?

22           Okay.  But you're saying, on this particular

23   night, you left $120 in the desk drawer.

24           Is that a true statement?

25   A.      Yes.

42d841a2-be4b-43bd-bccd-bc38e989c56d

**Dec. of Thompson - Exhibit 2**

1    MS. THOMPSON:   Q.   I thought you just testified

2  that you left $120 in your desk drawer, as set forth in

3  paragraph 32 of Exhibit 6.

4  A.      I misunderstood the question when you said $300

5  in the drawer, cash -- in the cash register.   I

6  misunderstand that.   I was thinking about $300 towards

7  the whole store, not $300 in the cash register.

8  Q.      Okay.   So let's start all over again, then.

9        On the evening of April 13th, 2010, when you

10  left to make the bank deposit, how much money,

11  approximately, did you leave in the cash register

12  drawer?

13  A.      I'm not for sure.

14  Q.      What's your best -- what was your custom and

15  practice?

16  A.      To leave $300 for petty cash in the store.

17  Q.      Okay.   Do you have any reason to believe you

18  didn't follow your custom and practice on April 13th,

19  2010?

20  A.      No.

21  Q.      Okay.   So you've testified that you left $120

22  out of the $300 in your manager's desk drawer, correct?

23  A.      Yes.

24  Q.      Okay.   So how much, then, did you leave in the

25  cash register drawer, $180?

PATRICIA CALLAHAN REPORTING

42d841a2-be4b-43bd-bccd-bc38e989c56d

**Dec. of Thompson - Exhibit 2**

1        MS. VERONESE:  He testified he didn't know.

2        MS. THOMPSON:  Q.  Well, what's the difference

3   between 120 and $300?  If you left $300 in petty cash in

4   the store, and $120 is in the back, what's in the front?

5   A.      The difference.

6   Q.      Well, you're the guy in charge.  Was that right,

7   that you would -- the difference would be $180, right?

8   A.      Right.

9   Q.      Okay.  So you have $120 in petty cash in the

10  back manager's desk drawer, right?

11  A.      Right.

12  Q.      And then you have $180 in the cash register

13  drawers in the front, right?

14  A.      Right.

15  Q.      And the reason you kept $120 in the back, in the

16  manager's desk drawer, was because you were concerned

17  with theft?

18  A.      And wanted to make sure I had change in the

19  store for customers when they come into the store.

20  Q.      Okay.  But you also had change in the cash

21  register drawer.  You had $180 in cash register drawer,

22  right?

23  A.      Right.

24  Q.      Okay.  So I thought you testified, and correct

25  me if I'm wrong, that you kept $120 in the back, because

42d841a2-be4b-43bd-bccd-bc38e989c56d

**Dec. of Thompson - Exhibit 2**

Page 435

1    you wanted to protect that money from theft.  Is that

2    true?

3    A.        Or -- yes.  Yes.

4    Q.        Okay.  Now, the next sentence, in paragraph 32,

5    says, quote, "When plaintiff left the store that

6    evening, the drawer was locked," end quote.

7             Is that a true statement?

8    A.        Yes.

9    Q.        And who locked the desk drawer?

10   A.        I did.

11   Q.        Okay.  Who else had a key to the desk drawer

12   besides you?

13   A.        Rosetta and Bruce.

14   Q.        Okay.  And you knew they both had keys, right?

15   A.        Yes.

16   Q.        And you intended them to have keys so they could

17   have access to the cash that was left in the manager's

18   desk drawer, right?

19   A.        Yes.

20   Q.        And what makes you so sure the drawer was locked

21   when you left?

22   A.        I have a habit of pulling the drawers, to make

23   sure that they're locked, before I leave.

24   Q.        Okay.  And do you have a specific memory of --

25   on the night of April 13th, 2010, making sure the desk

PATRICIA CALLAHAN REPORTING

42d841a2-be4b-43bd-bccd-bc38e989c56d

**Dec. of Thompson - Exhibit 2**

1   drawers were locked before you left, or are you just

2   assuming you did it?

3   A.      I'm made sure that it was locked.

4   Q.      I'm sorry?

5   A.      I made sure that it was locked.

6   Q.      Okay.  So your testimony is that when you left

7   the store, on the night of April 13th, 2010, the desk

8   drawer was locked, right?

9   A.      Yes.

10   Q.      Okay.  The next statement in paragraph 32 says,

11   "After plaintiff left, Defendant O'Campo returned to the

12   store."

13          Now, you were already gone, right?

14   A.      Yes.

15   Q.      So who told you that Defendant O'Campo returned

16   to the store?

17   A.      Rosetta.

18   Q.      Okay.  When did Rosetta tell you that?

19   A.      Oh, she called me up about 7:15, 7:20 that

20   evening and said that Donna was in the store.

21   Q.      Okay.

22   A.      And, um, she said that she had just made, um --

23   sold four laptops, and it was cash, and she said she's

24   got a lot of money in the drawer.  I told her, "Take the

25   money, take it to the bank.  Take it back in the back

15d57a3f24ee93ef

**Dec. of Thompson - Exhibit 2**

1    and count it, and take it to the bank.

2            All right.  So --

3    A.      I told her to.

4    Q.      All right.  Let me just make sure I understand

5    something.

6            Was Rosetta call -- did Rosetta, when she called

7    you, say, "Donna is in the store right now"?

8    A.      Yes.

9    Q.      Okay.  And this was around 7:00 p.m.?

10   A.      Around there.

11   Q.      Okay.  And this is Rosetta was calling you at

12   home?

13   A.      Yes.

14   Q.      Okay.  And Rosetta calls you and says, "Donna

15   O'Campo is in the store.  I sold four laptops.  I've got

16   a lot of money in the drawer."

17           Did she tell you which drawer she meant?

18   A.      Cash drawer up front.

19   Q.      The cash register drawer?

20   A.      Cash register.  I'm sorry.

21   Q.      So when -- did Rosetta tell you if anybody else

22   was in the store with Ms. O'Campo?

23   A.      She said somebody else was with her.

24   Q.      Did she say who it was?

25   A.      No, she didn't tell me who it was.

42d841a2-be4b-43bd-bccd-bc38e989c56d

**Dec. of Thompson - Exhibit 2**

Page 438

1    Q.      Did she describe the person for you?

2    A.      No.

3    Q.      Okay.  So when Ms. -- after Rosetta told you

4    that there was a lot of money in the cash register

5    drawer, what did you say?

6    A.      "Take it out.  Take it back in the back and

7    count it, and take it to the bank."

8    Q.      And what did Rosetta say?

9    A.      She did it.  She was taking the money back to

10   the back to count it.

11   Q.      So I'm sorry.  You're on the phone with Rosetta,

12   right?  She's calling you?

13   A.      Yes.

14   Q.      Okay.  She tells you there's a lot of cash in

15   the drawer because she sold four laptop computers for

16   cash, right?

17   A.      Yes.

18   Q.      And your instructions were, "Take it to the

19   bank"?

20   A.      To the bank.

21   Q.      Okay.

22   A.      Make a bank deposit.

23   Q.      Okay.  Did you say anything else to her?

24   A.      No.

25   Q.      Did Rosetta say anything else in that

42d841a2-be4b-43bd-bccd-bc38e989c56d

**Dec. of Thompson - Exhibit 2**

Page 439

1  conversation?

2  A.      Um, I believe she -- she said that "She's going

3  through your drawer back there," and, um, that was it.

4  Q.      Okay.  Let's look again at paragraph 32.  So

5  it's line seven.  "Rosetta, an employee of Defendant

6  RadioShack, who had a key to the drawer, had just sold

7  some computers and had opened the cash drawer to make

8  some change," end quote.

9         Now, with -- the reference to the cash drawer is

10  what, the cash register drawer?  I'm looking at

11  paragraph 32, line 9.

12  A.      I'm not -- I believe it was the cash drawer,

13  because she was up front.  Rosetta was up front when

14  Donna was in the back.

15  Q.      Okay.  So I'm just asking you your understanding

16  of what is meant by the statement in paragraph 32.

17         This all comes -- all this information comes

18  from Rosetta because you were not there.  Is that a fair

19  statement?

20  A.      Yes.

21  Q.      So you're relying on Rosetta in terms of making

22  these allegations in paragraph 32 after you left, right?

23  A.      Right.

24  Q.      Okay.  Look at paragraph 33.  "Defendant O'Campo

25  began going through plaintiff's desk and became angry

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 2**

Page 440

1    that the cash drawer was not locked.  Rosetta, who was

2    very distressed, called her boss, the Plaintiff, and

3    informed him that Defendant O'Campo was going through

4    his desk."

5              Okay.  So is all of the information that's set

6    forth in Exhibit 33, is Rosetta the source of your

7    information?

8    A.        Yes.

9    Q.        Again, because you were not there yourself,

10   right?

11   A.        No.

12   Q.        Okay.  So Rosetta tells you that Ms. O'Campo

13   started going through the desk in the back office,

14   right?

15   A.        Right.

16   Q.        And the desk is RadioShack property?

17   A.        Yes.

18   Q.        Okay.  And Defendant -- I mean, Donna O'Campo

19   was your boss at the time, right?

20   A.        Yes.

21   Q.        And did she have the right to go through your

22   desk drawer?

23   A.        Yes.

24   Q.        Okay.  So Ms. -- so Rosetta told you that Donna

25   became angry that the cash drawer was not locked.

42d841a2-be4b-43bd-bccd-bc38e989c56d

**Dec. of Thompson - Exhibit 2**

1        Now, when you're referring to cash drawer, in

2   paragraph 33, are you talking about the manager's desk

3   drawer or the register drawer?

4   A.       The desk drawer.

5   Q.       Okay.  So Ms. -- Rosetta told you that the

6   manager's desk drawer in the back office was not locked

7   when Ms. O'Campo came to the store; is that right?

8   A.       Yes.

9   Q.       And Ms. Holmes, Rosetta Holmes, when she called

10  you, told you that Ms. O'Campo was going through your

11  desk, right?

12  A.       Yes.

13  Q.       Okay.  Read paragraph 34, please.

14        Quote, "The next day Plaintiff called Defendant

15  O'Campo.  Defendant O'Campo accused Plaintiff of leaving

16  the cash drawer open.  Rosetta had told O'Campo that she

17  had unlocked the drawer because she had just opened the

18  drawer to make change for a purchase."

19        Okay.  So did you call Ms. O'Campo the next day?

20  Is that a true statement?

21  A.       I did call her.

22  Q.       Okay.  What was your purpose in calling Donna

23  O'Campo the next day after this incident?

24  A.       Well, she came to the store while I was not

25  there.  So she came to the store.  I wanted to find out

PATRICIA CALLAHAN REPORTING

42d841a2-be4b-43bd-bccd-bc38e989c56d

Dec. of Thompson - Exhibit 2

Page 442

1   what were her response or outcome on what happened in

2   the store so she can inform me what went on.

3   Q.      Okay.  Because, as you sit here now, you have no

4   personal knowledge about what actually happened in the

5   store on the night of this visit by Ms. O'Campo and this

6   other unidentified person, right?

7   A.      Right.

8   Q.      Okay.  Let's look at paragraph 37, please.

9        "Two weeks later, on April 27th, 2010, Defendant

10  O'Campo returned to the store with the manager of lost

11  prevention."

12        Were you present at the store when this

13  happened?

14  A.      Yes.

15  Q.      And who was the manager of loss prevention that

16  you're referring to?  Is that David Gonsolin?

17  A.      Yes.

18  Q.      So Ms. O'Campo and Mr. Gonsolin came to your

19  store together on April 27th, 2010?

20  A.      Yes.

21  Q.      Okay.  The next statement is, "Defendant O'Campo

22  stated to Plaintiff `give me your keys.  We are going to

23  let you go for not taking care of Radio Shack

24  merchandise,'" end quote.

25        Is that a true statement?

Dec. of Thompson - Exhibit 2

Page 443

1   A.      Yes.

2   Q.      Okay.  So when Ms. O'Campo and Mr. Gonsolin came

3   to your store, is that what Ms. O'Campo said to you,

4   "Give me your keys.  We're going to let you go for not

5   taking care of RadioShack merchandise"?

6   A.      Yes.

7   Q.      Then the paragraph 38 reads, "Plaintiff Allen

8   was stunned.  He replied, `I have the best inventory in

9   the district.  What is really going on here?  It's not

10  about the merchandise?  Why are you really firing me?'"

11          Is that what you said?

12  A.      Yes.

13  Q.      And according to the complaint, it says, quote,

14  "Defendant O'Campo stated, `sue me.'"

15  A.      Yes.

16  Q.      Were those Ms. O'Campo's exact words?

17  A.      Yes.

18  Q.      And did Ms. O'Campo ask you to leave the store

19  at that point?

20  A.      Right after that, yes.

21  Q.      Did Mr. Gonsolin say anything during this

22  discussion?

23  A.      He tried to say something.

24  Q.      What did Mr. Gonsolin say?

25  A.      I didn't really pay it any attention what he was

PATRICIA CALLAHAN REPORTING

45d57a3f24ee93ef-bc4b-43bd-bccd-bc90e909c56d

**Dec. of Thompson - Exhibit 2**

1  saying.

2  Q.      Was he saying something?

3  A.      He said something.  I don't remember what it

4  was.

5  Q.      Okay.  Drawing a complete blank on anything said

6  by David Gonsolin?

7  A.      There was a blank there.  I was talking with

8  Donna, because Donna had her mind focused on getting me

9  out of there.

10  Q.      All right.  So as you sit here now, you don't

11  remember anything that David Gonsolin said?

12  A.      No.

13  Q.      But he was present during the entire time,

14  right?

15  A.      Yes.

16  Q.      Okay.  What else did Ms. O'Campo say -- what, if

17  anything, else did Ms. O'Campo say to you that day, at

18  that time, after she said, "I'm letting you go for not

19  taking care of Radio Shack merchandise"?  Did she saying

20  anything else other than what you've -- what is set

21  forth in Exhibit 6, the complaint?

22  A.      I don't remember.  I don't recall.

23  Q.      Do you remember anything else said by either you

24  or Ms. O'Campo on the day of April 27th, 2010, when you

25  were being terminated?

PATRICIA CALLAHAN REPORTING

4z0841a2-be4b-43bd-bcc0-bc38e989c56d

**Dec. of Thompson - Exhibit 2**

Page 445

1   A.      Um, I believe I said, um, "Are you setting a

2   slave free?" something like that.

3   Q.      What made you make that statement, "Are you

4   setting a" -- well, let me back up.

5           What did you mean by that, "Are you setting a

6   slave free?"

7   A.      Um, as a RadioShack store manager, that is your

8   life.  That is your -- that Radio Shack is everything.

9   Everything you do is RadioShack.  That's like the number

10  one priority almost in your life until Radio Shack came

11  along and said, "Here's what we want all the managers to

12  do.  We want all you managers to train someone so that

13  RadioShack will not be the top priority in your life.

14  Your family will be the top priority in your life.  So

15  once you get someone trained, we want you to start

16  trying to take off as much time as you can so that you

17  would not be so wrapped up in RadioShack," so....

18  Q.      Did you -- can you remember saying anything else

19  during the conversation on April 27th, 2010, other than

20  what you've testified to?

21  A.      No.

22  Q.      Can you remember anything else at all about that

23  discussion with -- between you and Ms. O'Campo and

24  Mr. Gonsolin other than what you've already told me?

25  A.      Not that I can recall, no.

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 2**

Page 446

1    Q.      How long did you stay in the store after the

2    conversation with Ms. O'Campo and Mr. Gonsolin?

3    A.      I left.

4    Q.      How long did the conversation take place?

5    A.      I have no idea.

6    Q.      Approximately ten minutes?

7    A.      I have no idea.  What I know, after she said get

8    my keys and get out, I did that.  Then I walked in --

9    Q.      Okay.  So you left when she asked you to leave,

10   is that --

11   A.      Yes.

12   Q.      And then what did you do after you left?

13   A.      Walked out the front of the store and thought

14   about where am I going, what am I -- who should I call,

15   or should I call my wife and talk to my wife about it,

16   or should I catch the bus and go down to where any wife

17   is at.  I was pondering how I was going to get home,

18   so....  And that's what I standing there trying to

19   decide, waiting on the bus to come, which direction so

20   that I can run and catch the bus to go to where my wife

21   worked at to get my car to go home.  And I stood there

22   in front of the store pondering that idea.

23   Q.      Did you have any further discussions with anyone

24   at that point?

25   A.      In the store?

PATRICIA CALLAHAN REPORTING

42d841a2-be4b-43bd-bccd-bc38e989c56d

**Dec. of Thompson - Exhibit 2**

1  e-mail.  When we take a break, I'll come back to the

2  e-mail, then.

3  Q.     All right.  Did you actually speak with anyone

4  in human resources?

5  A.     I did talk to one lady in human resources.

6  Q.     Who did you speak to, do you know?

7  A.     Um, she was new.  I could -- it's all on the

8  e-mail that I e-mailed back to her.

9         MS. THOMPSON:  Okay.  All right.  Well,

10  actually, why don't we take a break now.  I'll try to

11  find the e-mail, and then hopefully we can wrap up.

12  Okay?

13        VIDEO OPERATOR:  Okay.  We're off the record at

14  2:07.

15        (Recess taken.)

16        VIDEO OPERATOR:  This is the beginning of tape

17  three.  We're on the record at 2:14.

18        MS. THOMPSON:  Q.  Okay.  Um, right before we

19  took a break, Mr. Allen mentioned an e-mail that he had

20  sent to human resources at RadioShack, and I went and

21  checked the productions.

22        And I'd like to mark the next document as

23  Exhibit 8.

24        (DEFENDANTS' EXHIBIT NO. 8 WAS MARKED FOR

25        IDENTIFICATION.)

PATRICIA CALLAHAN REPORTING

42d841a2-be4b-43bd-bccd-bc38e989c56d

**Dec. of Thompson - Exhibit 2**

1          MS. THOMPSON:  And, for the record, I've marked

2     as Exhibit 8 a one-page document Bates numbered Allen

3     versus RadioShack 000177 and appears to be an e-mail

4     from Frank Allen to Shaan Smith, dated Wednesday, May

5     5th, 2010.

6     Q.     So please take as much as time as you need to

7     review Exhibit 8, Mr. Allen.

8          Okay.  Have you looked at Exhibit 8?

9     A.     Yes.

10    Q.     Have you seen Exhibit 8 before today?

11    A.     Yes.

12    Q.     Is Exhibit 8 the e-mail that you were talking

13    about in your testimony before the break?

14    A.     Yes.

15    Q.     Okay.  So what was your purpose in sending

16    Exhibit 8 to Shaan Smith?

17    A.     We had talked earlier, and she said she was

18    going to get back with me.  I never did get a response,

19    so I e-mailed her the letter.

20    Q.     So did you actually speak with Shaan Smith on

21    April 28th, 2010?

22    A.     I'm not for sure about the date, but I did speak

23    to her.

24    Q.     Well, the reason I'm asking you is because this

25    e-mail says, quote, "I spoke with you on April 28th,

PATRICIA CALLAHAN REPORTING

15d57a3f24ee93ef

**Dec. of Thompson - Exhibit 2**

Page 454

1   2010."

2   A.      Yes.

3   Q.      Okay.  So does that refresh your recollection

4   that around on or about April 28th, 2010, you had an

5   actual conversation with Shaan Smith?

6   A.      Yes.

7   Q.      Was that over the telephone or face-to-face?

8   A.      Telephone.

9   Q.      Okay.  And you called Ms. Smith; is that right?

10  A.      Yes.

11  Q.      How did you get her name and number?

12  A.      I called Texas.  Texas given me a number.  That

13  was the number that I wasn't able to get in contact with

14  anybody with.  I called a couple of people up, and they

15  got me her number.

16  Q.      Who gave you her number?

17  A.      Um, it was through networking.  I'm not for sure

18  who give it to me, but I went through some people, and

19  they got me her number.

20  Q.      Well, some of your friends at RadioShack?

21  A.      Yes.

22  Q.      Okay.  And who actually gave you the number?

23  A.      That's what I'm not for sure, who did give me

24  the number.

25  Q.      Well, who did -- do you remember who you asked

42d841a2-be4b-43bd-bccd-bc38e989c56d

Dec. of Thompson - Exhibit 2

1    associate?

2    A.       Um, she was transferred to another store.

3    Q.       And did you think that was an appropriate

4    resolution?

5    A.       Yes, I did.

6    Q.       Okay.  So other than talking with Shaan Smith

7    about that complaint between the two employees in your

8    store, had you had any other occasion to speak with or

9    see Shaan Smith between the December 2009 store visit

10   with Mr. Patakas and your conversation with Shaan on or

11   about April 28th, 2010, regarding your termination?

12   A.       I missed -- I'm sorry.  Would you repeat that.

13   Q.       Sure, it was a long, convoluted question.

14            Can you read it back, please.

15            (Record read by the reporter as follows:

16            "Q.  Okay.  So other than talking with Shaan

17                 Smith about that complaint between the two

18                 employees in your store, had you had any

19                 other occasion to speak with or see Shaan

20                 Smith between the December 2009 store visit

21                 with Mr. Patakas and your conversation with

22                 Shaan on or about April 28th, 2010,

23                 regarding your termination?")

24            MS. THOMPSON:  Q.  I just want to make sure

25   there was nothing in there that I'm missing.

PATRICIA CALLAHAN REPORTING

42d841a2-be4b-43bd-bccd-bc38e989c56d

**Dec. of Thompson - Exhibit 2**

Page 462

1        Any other conversations --

2   A.      No.

3   Q.      -- with Ms. Shaan Smith?

4   A.      No.

5   Q.      I'm sorry?

6   A.      No.

7   Q.      Okay.  So when you spoke with Ms. Smith, on

8   April 28th, 2010, on or about April 28th, 2010, can you

9   tell me everything that you recall saying to Ms. Smith

10  and what she said to you that day?

11  A.      All I remember is explaining to her what

12  happened.

13  Q.      What did you tell her?  What were the words that

14  you used to tell her what happened?

15  A.      Um, I had left the store.  Um, Donna came into

16  the store.  Um, Donna went back in the back and found

17  some change that we keep back in the back in a drawer, a

18  locked drawer.  And she came back and fired me for not

19  securing company policy -- company funds when I was not

20  even there to make sure the drawer was locked, even

21  though my district manager and area manager and everyone

22  knew that I kept the change in the drawer at all times,

23  and, um, she came in and fired me.

24  Q.      This is everything that you're telling to

25  Ms. Smith?

PATRICIA CALLAHAN REPORTING

42d841a2-be4b-43bd-bccd-bc38e989c56d

**Dec. of Thompson - Exhibit 2**

1   Q.    So after you related this to Ms. Smith, what, if

2  anything, did she say back to you?

3   A.    She said that she was going to look into it and

4  get back with me.

5   Q.    Did she ask you questions, any questions?

6   A.    Um, I think she was just listening to me and

7  said that she would get back with me.

8   Q.    Do you remember saying anything else to

9  Ms. Smith other than what you've testified to?

10   A.    Not that I remember, but we had a nice

11  conversation.

12   Q.    Was she pleasant and polite to you?

13   A.    Yes.

14   Q.    Um, and -- so you don't remember her really

15  saying anything to you other than just listening to you

16  and saying that she would get back to you?

17   A.    Yes.

18   Q.    How long did this conversation take?

19   A.    Thirty minutes.

20   Q.    It took 30 minutes, to your best recollection?

21   A.    About 30 minutes.

22   Q.    Okay.  And, at the end of the conversation,

23  Ms. Smith said words to the effect of "I'll look into

24  this and get back to you," right?

25   A.    Yes.

PATRICIA CALLAHAN REPORTING

42d841a2-be4b-43bd-bccd-bc38e989c56d

**Dec. of Thompson - Exhibit 2**

Page 465

1  Q.      Okay.  And then did you ever hear from her

2  again?

3  A.      No.

4  Q.      Okay.  So I know that you wrote Exhibit 8 on,

5  looks like, May 5th, about seven -- about a week later,

6  right, after the conversation?

7  A.      Right.

8  Q.      After writing Exhibit 8, did you ever make any

9  further efforts to get in touch with Ms. Smith?

10  A.      I tried calling quite a few times.

11  Q.      And when you called, was there an answering

12  machine?

13  A.      No.  There was a lady at the desk, and she kept

14  saying that she was busy or she wasn't there.

15  Q.      Did you leave messages?

16  A.      Yes.

17  Q.      Did you ever leave any voice mail messages for

18  Ms. Smith?

19  A.      No.

20  Q.      Did you have her direct dial line to Ms. Smith?

21  A.      To her office, to her desk.

22  Q.      Her office?

23  A.      To her office.

24  Q.      Yes.

25  A.      Where her secretary was.

PATRICIA CALLAHAN REPORTING

42d841a2-be4b-43bd-bccd-bc38e989c56d

Dec. of Thompson - Exhibit 2

1    Q.      Okay.  So what -- I guess what I'm trying to

2    figure out is, did -- was there a direct phone line --

3    were you aware of any direct phone line that went right

4    to Ms. Smith as opposed to some secretary?

5    A.      No, I wasn't aware of that.

6    Q.      Okay.  So you tried calling a couple of times,

7    and somebody you understood to be a secretary would

8    answer and say "Ms. Smith is too busy, but I'll give her

9    the message" or words to that effect?

10   A.      It was more than a couple.  I even tried almost

11   like every other hour trying to get in contact with her

12   at one point.

13   Q.      But you never actually left a voice mail message

14   for her.  It was all through the secretary?

15   A.      All through the secretary.

16   Q.      Did you ever send her any other e-mails other

17   than Exhibit 8?

18   A.      No.

19   Q.      Did you ever send her any letters, not through

20   e-mail but through regular mail?  Did you ever attempt

21   to contact Ms. Smith through regular mail?

22   A.      No.

23   Q.      Did you attempt to contact anyone else at

24   RadioShack when you did not hear back from Ms. Smith?

25   A.      I tried to talk to people in Fort Worth, but

PATRICIA CALLAHAN REPORTING

42d841a2-be4b-43bd-bccd-bc38e989c56d

**Dec. of Thompson - Exhibit 2**

1    they channeled me back to her.

2    Q.      Did you have any reason to believe that

3    Ms. Smith was biased against you because of your race?

4    A.      No.

5    Q.      Any reason -- did Ms. Smith ever say or do

6    anything to you that suggested she was biased against

7    you because of your age?

8    A.      Ms. Smith?

9    Q.      Yes.

10   A.      No.

11           MS. THOMPSON:  Sorry.  Can we just go off the

12   record for five minutes.

13           VIDEO OPERATOR:  Off the record at 2:31.

14           (Off the record.)

15           VIDEO OPERATOR:  Okay.  Back on the record at

16   2:32.

17           MS. THOMPSON:  Okay.  Actually, let me withdraw

18   that.  Sorry.  Let me withdraw that.  I might have one

19   more question.  I really apologize.

20           Okay.  I have no further questions.

21           VIDEO OPERATOR:  Okay.  This is the end of

22   today's deposition.  We're going off the record at 2:33.

23           (Deposition concluded at 2:33 p.m.)

24                     _____

25                     Signature of witness

PATRICIA CALLAHAN REPORTING

42d841a2-be4b-43bd-bccd-bc38e989c56d

**Dec. of Thompson - Exhibit 2**

468

## CERTIFICATE

1

I, the undersigned, a Certified Shorthand

Reporter, State of California, hereby certify that the

witness in the foregoing deposition was by me first duly

sworn to testify to the truth, the whole truth, and

nothing but the truth in the within-entitled cause; that

said deposition was taken at the time and place therein

stated; that the testimony of said witness was reported

by me, a disinterested person, and was there after

transcribed under my direction into typewriting; that

the foregoing is a full, complete and true record of

said testimony; and that the witness was given an

opportunity to read and, if necessary, correct said

deposition and to subscribe the same.

I further certify that I am not of counsel or

attorney for either or any of the parties in the

foregoing deposition and caption named, nor in any way

interested in the outcome of the cause named in said

caption.

Executed this 8th day of October, 2012.

LARELLE M. FAGUNDES, CSR 9762

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 2**



**Job Title:** _**Store Manager**_

**Job Code: MD, ME, MN, MO LD, LE, LN, LO**

**Reports To: District Manager**

_Purpose:_ To maximize sales and profit, through employee training and supervision, directing sales, personal selling, control of expenses, and protecting the company's assets.

_Essential Functions:_ Responsible for all operations of the assigned store. Takes direction from the District Manager to perform total store management responsibilities including promoting and maximizing sales, marketing, expense control, loss prevention and customer experience. Works with District Manager to hire, and personally schedules, trains, coaches, and develops the store team.

Performs daily store activities including, but not limited to those described in the Store Manager Success Model. Serves as primary management contact for both employees and customers of the store.

Tasks and Responsibilities:
Refer to the Store Manager Success Model

Knowledge and Skill Requirements: High school diploma or GED required for candidates over the age of 18. Strong desire to excel and be compensated on self performance. Demonstrated leadership characteristics including aptitude to lead a sales team and manage a store. Excellent interpersonal and communication skills. Must be reliable and have high personal integrity. Must be able to input necessary POS information into computer and tender the proper change in a cash transaction.

_Working Conditions:_ Retail store environment. Normally scheduled to work 5 to 6 days, 48 to 54 hours per week including some evenings, weekends and holidays. Extended hours may be required at particular times, i.e. during holiday seasons, remodeling, inventory, cleaning, security breaks, etc. Duties of selling and stocking require continuous standing and walking throughout the workday. Duties also require frequent bending, reaching, pushing, pulling, and lifting of up to 15 lbs. May occasionally climb, kneel, crawl and lift up to 50 lbs. or more and/or assist others in lifting heavier objects. May occasionally have to travel to district office for training or work in other nearby stores.

_This job description does not state or imply that the above are the only duties and responsibilities assigned to this position. Employees holding this position will be required to perform any other job-related duties as requested by management. All requirements are subject to possible modification to reasonably accommodate individuals with a disability._

_Revised 3/15/06 CCD_

RS/ALLEN000268

**Dec. of Thompson - Exhibit 2**





**RadioShack**
A Division of Tandy Corporation

Regional Sales Office 01-0340
3000 Crow Canyon Place, Suite 140
San Ramon, CA 94583
Phone: (925) 866-1126
Fax: (925) 866-119

February 21, 2003

Dear Frank Allen:

This written reprimand is being given to you as a result of poor operational
control, failure to follow daily report procedure and policy violation for cash
procedures.
Tom Nabozny (Loss Prevention Manager) visited store on February 20,
2003 and the store visit report revealed the following:

**Refunds-** 0 out of 29 refunds either had SM or issuers signature as per
company policy.
**Voids-** 0 out of 2 voids were signed by the SM as per company policy.
**Payroll-** Time cards need to be filled out by employees every day worked.
SM must review and sign each employee's time card for accuracy prior to
closing payroll.
**Applications on File-** 0 out of 7 RSAP applications did not have the hard
copy of RSAP contract signed and attached to the document. 2 out of 4
Verizon applications did not have the wireless phone purchase summary
filled out and attached to the document.

Found a box in the manager's desk, which contained $300. Money was used
for change to avoid running to the bank daily to get change.

Mr. Allen:
I need you to follow company policy for all cash procedures. Cash must be
kept in the cash drawer and monitored by you at all times. This must be done
immediately and I'm holding you accountable to follow all company
policies at all time.

I hereby acknowledge receipt of this written reprimand.

_____          2/21/03
Store Manager Signature                        Date

_____          2/21/03
District Manager Signature                      Date

**Dec. of Thompson - Exhibit 2**



EXHIBIT
3
Allen
2/15/12

Apr 25 07 12:46p                                                                P.1




**RadioShack.**
C O R P O R A T I O N

POOR QUALITY

925-866-0208
Fax: 925-866-1128

Loss Prevention Services          2000 Crow canyon Pl. #140, San Ramon Ca.

431 08 6588

**Tom Nabozny**
Loss Prevention Manager

April 16, 2007                    **MEMORANDUM**

TO:        Hani Alzaghari DM 01-0538
cc:        Tom Schultz RSM / Steve Hodgkins, Director, Loss Prevention

FROM:      Tom Nabozny LPM

SUBJECT:   **Policy Violation (Store #01-3830) (Failure follow company compliance
Operational procedures)**

The following details are provided to you for your information and action deemed appropriate.  If
you have any questions concerning this matter do not hesitate to contact me.

On Monday April 16, 2007 I conducted an SVR for store 01-3830 San Francisco Ca and found
that store manager FRANK ALLEN was not in compliance for operational procedures.

During my visit I found that ALLEN was not reviewing or signing refunds and voids on a daily
basis.  Several of the refunds either did not have  the Issuers or the customer signatures as per
policy.

19 out of 24 refunds reviewed did not have the customers name, address, or phone number on
the refund.

I also reviewed all Sprint contracts from the month of April and found that none of them had the
customer profile sheet attached to the contract.  I also found that one of the contracts did not
have the sales ticket attached.  This then lead me to review the manager's Redbook and found
that ALLEN has not filed the wireless transaction checklist for the last 18 days

ALLEN needs to understand that by just ignoring these operational procedures, he is showing
that he is not being responsible for maintaining the security of company assets.  The kind of
negligent attitude that is displayed in this area reflects poorly on ALLEN's managerial skills.

To better control this area, ALLEN needs to address his operational issues in a timely and
thorough manner.

Please review this violation with the associate and return it to me signed within ten days.

1.
2.
3.
4.
5.

6.

Received Time Apr.25. 11:43AM

RS/ALLEN000091

**Dec. of Thompson - Exhibit 2**





# Corrective Action Record

| Employee Name: | Frank Allen | District | 538 |
|---|---|---|---|
| Job Title: | Store Manager | Date: | 3/23/2010 |
| Supervisor: | Donna Ocampo | Area: | West |

|  | *Identify behavior, performance, special issues, or events requiring corrective action:* |
|---|---|
| **Issue to Correct** | Failure to protect company assets from internal and external theft. <br><br> • 5 laptops on display, not secured (only screamers) <br> • Missing Cage Counts for Mid February <br> • Laptops were not secured in the backroom. David Gonsolin RLPM and I made room in the cage to protect the laptops. <br> • Several months of numerous cash shortages were found. You failed to report the shortages and did not have an explanation as to why they are happening. |

|  | *List date(s) and summarize all previous counseling's both verbal and written:* |
|---|---|
| **Previous Actions (Specific)** | Store Visits from David Gonsolin RLPM 2/04/2009 documenting similar issues with asset protection. <br><br> Previous DM communication through Store Visits, District Meeting and One on One conversations. |

|  | *What disciplinary action may occur due to failure to improve?* |
|---|---|
| **Consequences Of Failure To Improve** | Failure to achieve the required improvement will lead to additional disciplinary action including and up to termination. |

| **Employee Comments** | |
|---|---|
|  | |

I have received a copy of this Corrective Action Record and understand RadioShack has an Open Door Policy. I may discuss this issue or any other employee relations issue with my Area Human Resources Director, _____, the Employee Relations Department or any member of Management in my chain of command.

_____    3/23/10          _____    3/23/10
Employee                   Date             Supervisor                Date

RS/ALLEN000192

**Dec. of Thompson - Exhibit 2**



# The Store Manager's
# Non-Negotiable Standards Reference

**NonNegotiable**

PERFORMANCE

PEOPLE · PRODUCT · PROPERTY

PERFORMANCE

**Standards**

EXHIBIT
5
Allen 10-2-12

| People | | Product | | Property | |
|---|---|---|---|---|---|
| Scheduling | 2 | All Products on Display | 15 | Store Exterior | 20 |
| Recruiting | 3 | Everything Priced | 16 – 17 | Customer Environment | 21 – 22 |
| Training | 4 – 5 | Asset Protection | 18 – 19 | Working Environment | 23 – 24 |
| Dress Code | 6 | | | Store Safety | 25 |
| Goal Setting | 7 | | | | |
| Performance Review | 8 – 9 | | | | |
| Employee Awareness | 10 – 11 | | | | |
| Customer Service | 12 | | | | |
| Handling Returns | 13 – 14 | | | | |

RS/ALLEN000744

**Dec. of Thompson - Exhibit 2**

## Scheduling



How you allocate payroll within your store is crucial to driving increased customer satisfaction and increased sales and profitability for RadioShack as a whole. This procedure addresses the basics of creating and executing a quality weekly store schedule.

**Store Manager Responsibilities:**
- Verify all present employees are currently on the clock
- Ensure all time punches are paired  (complete set of in/out punches) and that employees are clocking out appropriately for meal and rest periods
- Ensure employee availability is meeting the needs of the business and documented properly in the system
- Verify that the store is within the needed hours and all employees are working the posted schedules
- Ensure both full-time and part-time core staffing levels (as communicated by your DM) are met.
- Review timesheets daily and, if needed, correct unauthorized records.
- Ensure there are no unfilled time shifts.  If unavoidable, unfilled should be minimal.

| | |
|---|---|
| **Scheduling** | The Store Manager will be responsible for correcting all shift violations and the schedule must be published before Monday, prior to the effective week. In addition, all Team Member availability should be current and documented. |
| **Working Scheduled Shifts** | All Team Members are expected to be ready for work at the scheduled time. However, circumstances may arise that necessitate a change in the published schedule. It is the responsibility of the Team Member to request a change in their schedule by exchanging shifts with another Team Member.<br><br>The following absences are excused if documented and approved in advance by the manager and don't require a shift exchange: personal paid absence, personal illness, paid vacation, required jury duty (paid or unpaid), bereavement and all documented approved Leaves of Absence.<br><br>Managers should ensure that scheduled and actual hours do not deviate from allocated hours. |
| **Clocking-In and Clocking Out** | It is the responsibility of everyone (including Managers) to clock-in/out of Workforce Management when beginning/ending a shift and when taking meal breaks. If needed, the Manager should correct any unauthorized records, which could be caused by:<br><br>• Failure to clock-in or out correctly (ex: two clock ins but no clock outs)<br>• Working more than 12 hours in one day<br><br>Store Managers should counsel Team Members any time they fail to clock-in and out properly. |
| **Payroll** | At the end of the payroll week, the Store Manager will complete payroll making adjustments as necessary.<br><br>• The Manager should perform final review of time sheets to ensure that all Team Members have authorized records for each day of the week.<br>• All Team Members must sign off on their time sheet electronically by accessing the Time Card Sign-Off link in the Links section of the WFM LaunchPad home page.<br>• Store Manager will then complete remaining payroll (commissions and SPIFFs) via the payroll system. |

**Additional Materials**



WorkForce Management FAQs: Operations > Store Ops Manual > Operating A Store > Payroll & Scheduling

RS/ALLEN000745

**Dec. of Thompson - Exhibit 2**

## Recruiting



Building a successful team is important to the productivity, overall growth and profitability of your store. Finding the right mix of Team Members is not always easy. In seeking candidates, look for people who have the following qualities: teamwork, pride, trust, integrity, desire, energy, enthusiasm and passion.

Recruiting sources come from both inside and outside the store.  The Recruitment Advertising Team in the Home Office is a direct source for information on recruiting events, tools, and support.  They can be reached via email at Recruitment.Advertising@RadioShack.com.

**Store Manager Responsibilities:**
* Store Managers are responsible for proactively recruiting inside and outside the store.  Regular utilization of R Recruits will assist a manager in finding qualified individuals from an available pool of applicants.

| In-Store | A store's own Sales Associates can be the best in-store source.  Associates are the direct communication vehicle to customers.  Sales Associates should be aware of the recruiting and interviewing process, so they can communicate effectively to customers and candidates that "walk in" looking for opportunities.  The Recruiting website on Answers Online provides information on the various in-store tools.  All Store Managers should be familiar with R Recruits and utilizing it on a regular basis. |
|---|---|
| Outside the Store | Sources for recruiting outside the store consist of career fairs, both in the community and at local colleges and universities, networking at local organizations and our competitors.  Each District Manager has access to information made available by an Area Recruiting team to assist with local hiring opportunities. <br><br>**Local career fairs:** Community/Educational institutions.  Participation in career fairs in the local community will help to increase positive brand recognition and also give exposure to meet potential Sales Associate and Manager-in-Training candidates. The local Chamber Of Commerce, newspapers and the Area Recruiting Managers are great sources for information on fairs in the area.  Recruitment Advertising can also help by supporting with materials needed at career fairs. <br><br>**Organizations in the community**: Managers should constantly be active recruiters in their community.  They should reach out to everyone they interact with - at the soccer field, after the PTA meeting, at religious organizations - everyone should be on the lookout for potential candidates. Networking is THE best source for recruiting. <br><br>**Competitors:** Good pools of candidates are those who are gainfully employed and successful in their current position.  As a result, it takes persistence, enthusiasm, and a friendly approach to uproot them from their current employer.  Refer to the Recruitment SOP on Answers Online for tips on how to approach and convert potential candidates from competitors. |

### Additional Materials



Hiring & Recruiting Website: Human Resources > Recruiting

RS/ALLEN000746

Dec. of Thompson - Exhibit 2

## Training



Our customers look to RadioShack for the answers to their questions. In order for your associates to help customers understand our products and services, they have to understand them first. A key part of your job is to ensure your Team Members are practicing the Working Together Sales and Service approach and are knowledgeable in the products and services we sell. Our customers expect our Associates to have this knowledge, especially as it relates to new products and those featured in our weekly advertisements.

**Store Manager Responsibilities:**
- All employees are current with their Individual Learning Plan.
- Ensure all new store employees complete their Shack Track training within the defined training schedule.
- Ensure all Associates have completed the latest Associate Training Guide training and can demonstrate the skills learned.
- Ensure Assistant Store Manager in Training is following the program and receiving appropriate support.
- Ensure all Associates know (or are able to find for their customers) all of a product's features, and more importantly, be able to translate them into benefits (what the feature does for you).
- Ensure all Associates are able to advise customers on how products are set up, hooked up, and which accessories are needed.

| | |
|---|---|
| **Shack Track** | Shack Track training is designed to develop Sales Associates to be ready for their current position and see the career path to their next position. It consists of online training modules, self-paced study guides and on-the-job training and practice. Training doesn't end here. True performance results come through your involvement in continued on-the-job training and performance coaching. It is also important that you teach the right behaviors through role-modeling.<br><br>A Manager's Guide and a Training Checklist containing all of the activities referenced in the Shack Track modules are available on the Answers Online Training site. |
| **Individual Learning Plan** | Each Team Member has his or her own unique Learning Plan which lists the curriculums and courses assigned to them. |
| **Online Courses** | The interactive online courses are designed to give Associates foundational knowledge of a given subject.<br><br>Coaching guides are available to help Managers gauge Associate understanding of content. Each coaching guide contains tips on how you can work with your Associates to make sure they understand the content and are able to apply the principles on the sales floor. Each guide includes a course outline, coaching tips, and exercises (i.e. verbal knowledge checks, skills practice, product knowledge questions, etc.). |
| **Associate Training Guide** | While the Associate Training Guide has self-directed learning activities, the most important part of the guide is the activities that they perform with you. The activities (which are often skills-practices or product demonstrations) let you gauge your Associates' readiness to serve and sell to customers. Based on how well they do, you can show your Associates how it should be done and provide additional tips, training, coaching, and positive reinforcement. You should not certify that the guide is complete until your Associates can demonstrate that they can do the activities on the checklist.<br><br>Like with all courses in the Learning Center, you can view the completion results of the Associate Training Guide for the Associates in your store by running your Detail Progress Report on your Course Report in the Learning Center. |

RS/ALLEN000747

**Dec. of Thompson - Exhibit 2**

| Assistant Store Manager Training | You must be selected to help develop our people who have chosen a career with RadioShack as a Store Manager. During this training, you will partner with your District Manager to ensure they have the knowledge, skills, and experience to be a successful Store Manager.

Store Managers can provide support to MITs by encouraging and assisting with the on-the-job experiences and Learning and Action Checklist activities included in the ASM Training Program. Your support includes skills practices and providing opportunities to participate in management activities such as performance evaluations, assisting with recruiting, inventory preparation, etc.

One of the toughest things new Assistant Store Managers face is balancing their time between personal sales, coaching others and performing their management duties. As they complete their assigned training, you should let them take over the management responsibility themselves. Your job then shifts to coaching them to be a successful Store Manager. |
| --- | --- |
| Product Knowledge | As you display new products, have your Associates read the product manual, and then tell you about the product, its benefits, and how it hooks up. You can check for understanding by asking questions like:

- What does it do/how does it work?
- What is the price? What accessories will you suggest and why?
- What are the key features?
- What are the benefits of those features?
- What are some other uses for the product? |
| Internet Resources | RadioShack.com, manufacturer's Web sites, Product Reference Sheets on Answers Online, in-store signs, and local vendor representatives are excellent resources. |

**Additional Materials**



Learning Center FAQs: Operations > Training > Learning Center > Learning Center Login > Help/FAQ

Product Reference Sheets: Products > Product Reference Sheets

Customer Promotions: Products > Customer Promotions

RadioShack.com

RS/ALLEN000748

**Dec. of Thompson - Exhibit 2**

## Dress Code



Our customers expect your store and your team members to exhibit high standards of appearance. And their perception of our "People Readiness" and "Sales Readiness" is the ultimate deciding factor in determining whether or not they choose to honor us with their business. That's why we have established dress guidelines.

**Store Manager Responsibilities:**
- Ensure all Team Members are in compliance with the RadioShack Dress Code Guidelines.

| | |
|---|---|
| **Name Badges** | All Team Members are wearing their RadioShack name badge while working. |
| **Clothing** | All Team Members clothing is neat, clean, pressed, in good repair, and are in compliance with our Dress Code. Clothing should be tasteful and fit well with appropriate undergarments.<br><br>• Shirts or blouses must be oxford style, white or black in color, and have a button-down or straight collar. Any color other than white or black is only approved when it is an HPI RadioShack logo shirt. All shirts worn must be buttoned up to one button below the collar.<br>• Slacks must be Dockers-style chinos or twills in solid colors (black, brown, gray, or traditional khaki). Women can also wear skirts in twill or wool (colors same as slacks) and must be no shorter than three inches above the knee and worn with pantyhose/nylons. |
| **Shoes** | All Team Members' shoes should be clean and polished (if appropriate). |
| **Hair** | All Team Members' hair is clean, natural looking, well maintained, and neatly styled. Extreme styling or unnatural hair color for men or women is not permitted. Facial hair for men is neatly trimmed. |
| **Fingernails** | Ensure all Team Members fingernails are clean, trimmed, and not of excessive length. |
| **Personal Hygiene** | All Team Members are using antiperspirant or deodorant. The use of heavy scents and fragrances should be avoided. |
| **Jewelry** | Jewelry should be in good taste. Earrings must be worn on the lower ear lobe and limited to two earrings per lobe. Ear cuffs and pierced jewelry for the eyebrow, tongue, nose, or other areas are not acceptable to be worn at work. |
| **Sunglasses** | Sunglasses should not be worn indoors nor worn resting on the top of the head. However, prescription lenses that adjust to the lighting are acceptable. |
| **Tattoos** | Tattoos may not be exposed. |
| **Makeup (woman)** | Makeup should be natural in appearance and not excessive or extreme. |

| Additional Materials |
|---|
| **RadioShack Dress Guidelines**: Human Resources > HR Reference > Dress Guidelines<br><br>**RadioShack Apparel Program Catalog**: Human Resources > HR Reference > Dress Guidelines<br><br>**RadioShack Apparel Program Sizing Guide**: Human Resources > HR Reference > Dress Guidelines<br><br>**HPI Apparel Purchase Program Payroll Deduction**: Human Resources > HR Reference > Dress Guidelines |

RS/ALLEN000749

**Dec. of Thompson - Exhibit 2**

## Goal Setting 

Working with each team member to set daily and monthly goals is a key activity to improve personal and store performance.  Successful execution requires that you role model the desired behavior and performance and provide fair and honest feedback through regular coaching sessions.

**Store Manager Responsibilities:**
- Work collaboratively with each associate to set goals within the goal setting window using the Performance Management Tool on Answers Online. Ensure that all Associates understand their individual contribution to the store goals.
- Ensure that each team member accesses the Performance Management Tool daily and can correctly communicate their personal goals and performance results.
- Ensure Associates know how to achieve personal goals with the correct sales mix of end product, add-ons, accessories and services.
- Role model the desired behavior and performance.
- Provide feedback to each Associate based on observations on the sales floor.

| | |
|---|---|
| **Associate Sales Plan and Goals** | A week before the end of each month, you will be able to view your monthly plan numbers for the next month on the Profit and Sales Report and Performance Management Tool. Prior to the beginning of the next month, you must use this plan to discuss and set individual goals with each Associate in your store.  Team member sales goals must meet or exceed the store's plan up-against. |
| **Associate Action Plan and Goals** | Schedule and block 20-30 minutes with each associate to discuss goals and create the action plan with minimal interruptions. Populate the Associate Action Plan in the Performance Management Tool when working with your associates to complete their sales goals.<br>  o  Previous performance and associate skills should be taken into consideration when creating goals and developing plans.<br>  o  Goals and Action Plans should be clear, measurable, and realistic based on the associates skill level, however they should encourage them to grow their productivity to a higher level. |
| **Associate Earning Plan and Goals** | Use the past month's performance and the Monthly Performance Plan as a guide in setting Earning Plans. While discussing the Earning Plan, use the online Income Planner as a tool to help set specific Earning Goals. |

**Additional Materials**

ANSWERS ONLINE

Associate Income Planner: Performance > Calculators

Associate Performance Management Tool: Answers Online homepage > Daily Planner (calendar)

RS/ALLEN000750

**Dec. of Thompson - Exhibit 2**

## Performance Review 

Formal one-on-one feedback is important to an Associate's development. When consistent feedback is provided, sales goals can be reviewed, new goals can be set and overall performance can be addressed. This will provide awareness of the performance areas where they excel and where they need improvement. Performance Reviews must be captured in the Performance Management Tool on Answers Online.

**Store Manager Responsibilities:**
- Review performance results and opportunities with each team member.
- Meet weekly with each Associate below 100% of MTD goal to document coaching and feedback on the Weekly Manager/Associate Review section of the Performance Management Tool.
- Schedule and conduct a 20-30 minute (without interruption) Performance Review with each Associate at the end of each month. Document coaching and feedback on the Month End Manager/Associate Review section of the Performance Management Tool.
- Properly prepare for each review by having the needed tools ahead of time.
- Rate each Associate's activities and sales results objectively and consistently.

| Performing the Review | Managers must complete a monthly Performance Review with each Associate using the Performance Management Tool on Answers Online; this should be a collaborative effort. If applicable, use documented weekly Performance Reviews as a tool to facilitate a discussion about actions and activities that contributed to the final results. Associate performance below 100% of the month to date plan must be reviewed with the Associate and documented on a weekly basis. |
|---|---|
| | **Sales Performance:** Using the individual's data from the Performance Management Tool, Sales Associate performance will be reviewed in the following areas: |
| |     • Sales Dollars, SGP$ – Selling Gross Profit Dollars, SGP % – Selling Gross Profit Percentage, Tickets, SPH – Sales Per Hour, SGP $/Hour – Selling Gross Profit Dollar per Hour, Post Paid Units, No Contract Units and the Four Plan Drivers that were selected |
| | **Activities:** Rate their compliance using **A**cceptable or **N**eeds Coaching in the following areas: |
| |     • Teamwork, Selling Skills, Assigned Task completion, Dress Code Adherence, Customer Care, Schedule Adherence<br>    • Discuss with the Associate how they are performing in each Activity area. Make sure they understand your expectations for each item and capture the final ratings. |
| | **Discussing and Planning:** Discuss whether or not they used the Action Plans from the previous month's Performance Review. Compliment and critique accordingly. Talking points: |
| |     • How were targets achieved and how can they be maintained or grown?<br>    • What behaviors caused the performance?<br>    • For targets that were missed, what happened?<br>    • Look at Action Plans in the previous reviews, were plans completed?<br>    • Did the plans yield the desired results? |

RS/ALLEN000751

**Dec. of Thompson - Exhibit 2**

| Performing the Review (cont.) | Open the discussion with your Associate by reviewing your observations of their behaviors and activities.  Discuss any Associate "wins"; these can be anything from a great customer interaction, demonstration of teamwork, taking extra training, etc. |
|---|---|
| | • Review the Associate's goals vs. actual results.  For each item, discuss and identify areas that need coaching.  Working with the Associate, develop a plan to improve this gap in their selling skills. |
| | • After you and your Associate have developed a plan, enter the details into their individual plan. |
| | • Always follow up on any direction that you have given in previous goal setting and review conversations.  Keep in mind that the action plan serves as a reminder of the goal setting process from the beginning of the month (for both the manager and associate). |
| | • Conversations surrounding performance should always tie back to income opportunities. |
| Month End | At the end of the month, all completed Associate Weekly and Month End Reviews should be filed in each Associate's employee file for a period of one year. |

---

**Additional Materials**



Associate Performance Review Procedure > Operations > Store Ops Manual > Operating Store > General Ops

Associate Performance Management Tool: Answers Online homepage > Daily Planner (calendar)

---

RS/ALLEN000752

**Dec. of Thompson - Exhibit 2**

## Employee Awareness



One of the most important responsibilities that you are entrusted with is ensuring your Associates understand how they get paid, and what impact each team member's actions have.

**Store Manager Responsibilities:**
- Ensure all Associates understand how they get paid, current spiffs, and what they must do to earn more.
- Ensure all employees are familiar with current promos and events, complete Associate Training Guide training and read and initial The Shack This Week and The Shack This Weekend on a weekly basis.
- Confirm that all employees are aware and adhere to our Information Security Policy and follow all PCI compliance standards per the Store Records and Filing Procedure.
- Ensure that the Trade In Program guidelines are followed and related items are shipped within the defined timeline.
- Follow call2recycle guidelines and ensure timely battery shipments.

| | |
|---|---|
| **Earnings Opportunities** | It's also important for you to motivate Associates to want to earn more, and teach them how. Set earnings goals with each associate weekly. After a sale, ask them how that sale helped them reach their goal. Ask what else they could have sold (like accessories, a related product, a special offer), to help them reach that goal faster.<br>Associates: They have control to increase their earning potential and are rewarded for their performance as they meet specific business needs and goals.<br>Customers:  They are treated to great service from Associates who are interested in exploring their needs, and helping them with complete solutions.<br>Managers:  Your compensation is impacted by your Associates' performance.<br>RadioShack:  The Company's ultimate profitability is the cumulative result of each store's sales and profit, benefiting both our employees and stockholders. |
| **Utilizing Resources** | Our Associates increase their opportunities for earning more and taking care of our customers by staying up to date on current promotions and special events.  By staying current on Associate Training Guide training, reading The Shack This Week and The Shack This Weekend, Store Specific Memos, and the Customer Promotions site on Answers Online, Associates can obtain vital information to support sales and customers on a daily basis. |
| **Company Programs** | All team members must maintain awareness of specific company programs and their benefits and execute accordingly.  The Trade In Program and call2recycle program are examples of programs where stores must comply with guidelines for follow up.<br>    ◦ Confirm that all Trade In products are shipped with guidelines.<br>    ◦ Confirm that all team members are accepting approved batteries, bagging each battery, and sealing and shipping the boxes to the call2recycle address (must be less than 40 pounds per box). |

RS/ALLEN000753

**Dec. of Thompson - Exhibit 2**

| Information Security, Information Privacy, and PCI Compliance | Information Systems Security, Usage, and Information Policies: These policies were designed to protect the integrity of the Company's information and information systems, including telephone, voicemail, email, fax, data, computer systems, and other related resources. As a reminder, authorized representatives of the Company may periodically monitor the use of information systems. Team members are advised that they should have no expectation of privacy in any communication or information systems.

PCI Compliance: It is policy that employees, contractors, temporaries, and other workers must take appropriate steps to ensure that confidential and proprietary information is protected for the safety and well being of our customers, employees, and our company. Secure destruction of confidential or personally identifiable information is also required by law in many states and by regulatory agencies that oversee our business. Failure to comply could harm our customers and employees, and could lead to negative publicity, expensive lawsuits, fines, and could even cause us to lose our right to accept credit cards as a form of payment. |

## Additional Materials



Employee Pay Plans: Human Resources > Compensation

SPIFFs, Ring Credits, and Bolt-Ons List: Human Resources > Compensation

Performance SPIFF Product Categories: Human Resources > Compensation

RadioShack Service Plan Gross Profit Chart: Human Resources > Compensation

RadioShack Today: Answers Online Homepage

Customer Promotions: Products > Customer Promotions

Information Systems Security and Usage Policy: Human Resources > HR Reference > Policies and Procedures > Information & Assets

Store Records and Filing Procedures: Operations > Store Ops Manual > Operating A Store > Store Records

Confidential Information Guidelines: Human Resources > HR Reference > Team Answer Book > Policies – Protecting Our Information

Shred Program Procedure: Operations > Store Ops Manual > Operating A Store > Store Environment.

Call2Recycle Procedures: Human Resources > RS In The Community > Environment

Trade-In Program Procedures: Operations > Store Ops Manual > Selling Standards > Trade-In Program

RS/ALLEN000754

**Dec. of Thompson - Exhibit 2**

## Customer Service



Customers shouldn't have to approach Associates and ask for help; Associates should approach them, and ask how they can help. They should follow the Working Together Sales and Service Approach to better serve and sell to their customers.

**Store Manager Responsibilities:**
- Managers must be a role-model of the high standards they expect from their Associates.
- Review results of Mystery Shops with all team members to coach and improve.
- Ensure all employees are circling the Customer Satisfaction Survey on every receipt and inviting customers to give their feedback.
- Ensure the 8.5 X 11 "How are we doing?" sign is posted at the counter and visible to all customers.

| | |
|---|---|
| **Customer Service Programs** | The Mystery Shop and Customer Satisfaction Survey programs are an important way to evaluate the value and service your team is offering our customers. Use these tools to learn from the feedback and coach your team to successful customer service. |
| **Role Model** | Associates learn about exceptional customer service in their New Hire Training, sales and service can't be learned from reading. Associates learn from the example you set. You must role-model the high standards you expect your Associates to exhibit. |
| **Serving Customers** | After Associates have served a customer, ask them, "What did your customer want to do with what he or she came in for?"<br><br>• Associates who know the answer are providing exceptional service, adding on accessories, and related products consistently.<br>• Associates who don't know are not asking questions to explore their customers' needs, which mean they could not have recommended a complete solution (all the accessories, services, and add-ons). |
| **Working Together and Service Approach** | Review the Working Together Sales and Service Approach training with your Associates to reinforce the proper sales and service techniques. Observe them as they interact with customers and coach them afterwards. Every time you "catch them doing it right" provide immediate and specific feedback. |

| Additional Materials |
|---|
| <u>Introduction to the Customer Returns Toolkit Course</u>: Operations > Training > Learning Center > Learning Center Login<br><br><u>Returns and Distressed Merchandise</u>: Operations > Store Ops Manual > Selling Standards > Sales Refunds<br><br><u>Mystery Shops</u>: Reports Ops > Customer Satisfaction Report<br><br><u>Customer Service Survey</u>: Reports Ops > Customer Satisfaction Report |

ANSWERS ONLINE

RS/ALLEN000755

**Dec. of Thompson - Exhibit 2**

## Handling Returns



Returns and exchanges are a natural part of the job, but that doesn't have to mean lost sales. How we manage our relationship with customers during returns and exchanges makes all the difference in our continuing efforts to make them our raving fans in the future. It's important that your team is prepared to provide outstanding service to our customers.

**Store Manager Responsibilities:**
- Customers returning products for a refund or exchange receive efficient and friendly service in accordance with our current Return Policy.
- All employees resolve customer concerns and attempt to "save the sale".
- Ensure that all employees are familiar with restocking fees and are presenting the details to customers when completing sales involving these fees.
- Confirm that the receipt is being attached to all wireless phones that are returned to RMAC as the result of a swap or refund.

| Resolving Customer Concerns and Saving Sales | Associates should never assume that the return customer they're helping will only be satisfied with a refund. Associates should use the Apologize, Determine, and Resolve technique to satisfy customers with service (like an exchange), the sale of an additional product or accessory, or a refund. |
|---|---|
| | **Apologize** that your customer had to come back to the store or experienced difficulty. |
| | **Determine** the reason for the return, and whether money, service, or another product will satisfy your customer. Find out whether your customer needs or wants the benefits the product they want to return provides. Next, find the specific problem that's making your customer unhappy. |
| | • For instance, if your customer is returning an MP3 player, you could ask, "Do you still want to have something that lets you listen to music portably?" If so, you may be able to satisfy your customer without having to issue a refund.<br>• Next, find the specific problem that's making your customer unhappy. Use qualifying questions like "What doesn't this do that you'd like it to?" and "What features are you looking for?" Another helpful question is, "What do you like best/least about this?" Once you know those things, you can solve the problem. |
| | **Resolve:** Based on what you learned, resolve the situation by suggesting a product with better features, one that does what your customer wants it to do, or an accessory that makes it work the way your customer expects. Either way, you minimize potential refunds, and maximize your customer's satisfaction, and their impression of you. |
| | Of course, some customers will only be satisfied by a refund. Help them cheerfully. It's better to lose a few dollars than to lose a valuable, life-long RadioShack customer. Customers may return a product for a refund or exchange for any reason, provided the item in question conforms to established return requirements (available on Answers Online). |

RS/ALLEN000756

**Dec. of Thompson - Exhibit 2**