Dm → SA  — to grand make day
          — no consent it.

HL → t Advised to document H.

Dm/Omna   Tenn t day: 4-27-10

          — Sh very rate
              — Sud bm Shady
              — Thanks for freeing a Nare
              —

RS/ALLEN000267

Dec. of Thompson - Exhibit 3

EXHIBIT 4

Allen vs. Radio Shack    Amy Tam                    6/12/12

1                    UNITED STATES DISTRICT COURT

2                  NORTHERN DISTRICT OF CALIFORNIA

3                     SAN FRANCISCO DIVISION

4                          --oOo--

5    FRANK ALLEN,

6              Plaintiff,

7         vs.                        No. CV 11-03110 WHA

8    RADIO SHACK CORPORATION, and
     Does 1-20, Inclusive,
9

10             Defendants.

11   _____/

12

13

14

15                 DEPOSITION OF AMY TAM

16               Tuesday, June 12, 2012

17

18

19

20   REPORTED BY:  DEBRA J. SKAGGS, CSR 7857

21

22

23              DE SOUZA & ASSOCIATES
              Certified Shorthand Reporters
24                 P.O BOX 1675
              San Mateo, California  94401
25          (650) 341-2671  desouzacr@att.net

                                               1

De Souza & Associates   650-341-2671      desouzacr@att.net

Dec. of Thompson - Exhibit 4

Allen vs. Radio Shack    Amy Tam                    6/12/12

```
 1                      ---oOo---
 2           BE IT REMEMBERED that, pursuant to notice, and
 3   on Tuesday, the 12th day of June 2012, commencing at the
 4   hour of 10:14 a.m., thereof, at the Law Offices of
 5   JOSEPH L. ALIOTO AND ANGELA ALIOTO, 700 Montgomery
 6   Street, San Francisco, California, before me,
 7   DEBRA J. SKAGGS, CSR No. 7857, a Certified Shorthand
 8   Reporter
 9                      --oOo--
10                     EXAMINATION
11   BY MS. ALIOTO:
12   Q.        Okay.  Can you spell your name for the record.
13   A.        Amy, A-M-Y; last name Tam, T-A-M.
14   Q.        Okay.  All right.  Ms. Tam, I'm going to ask
15   you a couple of background questions first.
16             First of all, have you ever had your
17   deposition taken?
18   A.        No.
19   Q.        Well, any time you want to go the ladies room,
20   just say so and we will stop.  Any time you want to have
21   a rest, just say so, I will stop.
22   A.        Okay.
23   Q.        Everything you say here is as though we are in
24   a court of law in front of a judge.  You have been sworn
25   under penalty of perjury and everything that the court
```

                                                        4

De Souza & Associates    650-341-2671    desouzacr@att.net

**Dec. of Thompson - Exhibit 4**

Allen vs. Radio Shack     Amy Tam                    6/12/12

```
1    A.       No.
2    Q.       So did you apply for a job at RadioShack when
3    you were 19 years old?
4    A.       I was not doing any work for RadioShack.
5    Q.       When did you start working for RadioShack?
6    A.       2006.
7    Q.       Okay.  In 2006 -- how old were you in 2006?
8    A.       18, probably, going on -- probably 19.
9    Q.       Okay.  18.
10   A.       Uh-huh.
11   Q.       Well, 18, probably 19.
12            When you were 18 or probably 19, how did you
13   apply for a position at RadioShack?
14   A.       I applied online.
15   Q.       Okay.
16   A.       And I got a phone call.
17   Q.       Do you recall who called you?
18   A.       Hani.
19   Q.       Hani.
20            And do you recall at the time what position
21   was Hani in?
22   A.       District manager.
23   Q.       Do you recall how big the district was that
24   Hani was the manager of?
25            MS. SHY:  At that time?
```

                                                      11

**Dec. of Thompson - Exhibit 4**

Allen vs. Radio Shack    Amy Tam                    6/12/12

1           MS. ALIOTO:  At the time that he called you to
2    interview you to be an employee.
3           THE WITNESS:  I don't remember.
4    BY MS. ALIOTO:
5    Q.      Okay.  But you do know it was at least over
6    San Francisco's RadioShack.
7    A.      I don't know anything.  I mean I -- it was
8    just, you know, a part-time job for me.  I don't really
9    go into details with -- you know.
10   Q.      Okay.  So did you go in and meet Hani?
11   A.      Yes, I had an interview.
12   Q.      You had an interview.
13           Was anyone else in the room when you had an
14   interview with Hani?
15   A.      Yes.
16   Q.      Who else was in the room?
17   A.      His -- the office clerk.
18   Q.      Office clerk.
19           And do you know what that person's name is?
20   A.      Veronica Morales.
21   Q.      Okay.  And where did you go to meet with Hani
22   and Veronica Morales?
23   A.      In 19th Avenue District Office.
24   Q.      Where is that?  19th Avenue and what?
25   A.      19th and Quintara.

                                                        12

De Souza & Associates    650-341-2671    desouzacr@att.net

**Dec. of Thompson - Exhibit 4**

Allen vs. Radio Shack        Amy Tam                    6/12/12

1    Q.        Quintara?

2    A.        Yes.

3    Q.        Okay.  And you were applying for a part-time

4    job?

5    A.        Part-time position.

6    Q.        And did you get the job?

7    A.        Yes.

8    Q.        And which RadioShack did you start at?

9    A.        Clement Street store.

10   Q.        Okay.  Is this all in 2006?  Did you start

11   working as a part-time employee of the Clement

12   RadioShack in 2006?

13   A.        Yes.

14   Q.        And when you started working on Clement -- at

15   the Clement store -- first of all, what is the number of

16   that store, do you know?

17   A.        3826.

18   Q.        3826.  Okay.

19             When you started working there, who was the

20   manager of the store?

21   A.        Alejandra Aranibar.

22   Q.        How long were you part-time?

23   A.        I don't remember.

24   Q.        Can you give me an estimate?  In other

25   words --

                                                          13

De Souza & Associates    650-341-2671      desouzacr@att.net

**Dec. of Thompson - Exhibit 4**

Allen vs. Radio Shack     Amy Tam                     6/12/12

```
1    A.       I don't remember, honestly.

2    Q.       At all.

3    A.       I don't remember.

4    Q.       But you know that in 2010 you were not

5    part-time, right?

6    A.       Yes.

7    Q.       Were you part-time in 2009?

8    A.       It's too far back.  I don't remember.

9    Q.       Too far back?  2009?

10   A.       I don't remember.

11   Q.       Okay.  Do you know how long you were -- from

12   2006, you don't remember when you started working

13   full-time?

14   A.       I don't recall.  I mean -- no.

15   Q.       Okay.  Do you know who you interviewed with in

16   order to work full-time?

17   A.       Hani.

18   Q.       So you interviewed with Hani for the full-time

19   position.  Okay.

20            And Hani gave you the full-time position at

21   the Clement Street store, this 3826 --

22   A.       Correct.

23   Q.       -- is that right?

24            We just don't know the year that happened; is

25   that right?
```

                                                              14

De Souza & Associates    650-341-2671        desouzacr@att.net

**Dec. of Thompson - Exhibit 4**

Allen vs. Radio Shack      Amy Tam                  6/12/12

1    A.        Correct.

2    Q.        Okay.  The time that he gave you the full-time

3    position, was Alejandra still the manager of the store?

4    A.        Yes.

5    Q.        And what was your position at the time that

6    you became full-time?

7    A.        Part-time sales associate.

8    Q.        So your full-time position was a part-time

9    sales associate.

10   A.        Repeat your question.

11   Q.        When you became a full-time --

12   A.        Uh-huh.

13   Q.        -- employee --

14   A.        Uh-huh.

15   Q.        -- what was your title?

16   A.        No title.  Just full-time associate.

17   Q.        Okay.  Full-time associate.

18   A.        Uh-huh.

19   Q.        Does that mean that you were a full-time

20   salesperson?

21   A.        Full-time sales associate.

22   Q.        Okay.  So you were a salesperson; is that

23   right?

24   A.        Yes.  Correct.

25   Q.        Okay.  You're out on the floor of 3826 as a

                                                          15

De Souza & Associates    650-341-2671      desouzacr@att.net

**Dec. of Thompson - Exhibit 4**

Allen vs. Radio Shack     Amy Tam                     6/12/12

1   salesperson, correct?
2   A.        Correct.
3   Q.        All right.  And you reported directly to the
4   manager of 3826, which was Alexandra?
5   A.        Alejandra.
6   Q.        Alejandra.  Okay.
7             Is it true that you reported to her?
8   A.        Yes.
9   Q.        Okay.  Did you report to anybody above her,
10  like Hani?
11  A.        Yes.
12  Q.        So you reported to both Alejandra and Hani; is
13  that right?
14  A.        Correct.
15  Q.        Anyone else that you reported to?
16  A.        No.
17  Q.        How long did you remain a full-time associate
18  salesperson?
19  A.        About a year.
20  Q.        Okay.  What happened after the year?
21  A.        I was promoted to MIT, so Manager-In-Training.
22  Q.        Who promoted you?
23  A.        Hani.
24  Q.        Okay.  Now, do we have a year on that
25  promotion?

                                                          16

De Souza & Associates     650-341-2671        desouzacr@att.net

**Dec. of Thompson - Exhibit 4**

Allen vs. Radio Shack     Amy Tam                6/12/12

```
1    A.        It's -- I don't remember.

2    Q.        You don't remember when you became

3    manager-in-training?

4    A.        No, I don't remember.  I just remember when I

5    became store manager.

6    Q.        Okay.  So when you were a manager-in-training,

7    was Alejandra your supervisor?  Your manager?

8    A.        Correct.

9    Q.        And do you know how long you were -- a month,

10   two months, a year, two years, ten years -- a

11   manager-in-training?

12   A.        Six months.

13   Q.        Okay.  What happened after six months of being

14   a manager-in-training?

15   A.        I was promoted to store manager.

16   Q.        Okay.  By the way, who was your trainer when

17   you were manager-in-training?

18   A.        Both Alejandra and Hani.

19   Q.        Okay.  So who promoted you to store manager?

20   A.        Hani.

21   Q.        And what year was that?

22   A.        2007.

23   Q.        Okay.  So you went from a part-time student to

24   a full-time salesperson to a manager-in-training and

25   then to the store manager of the whole store in a year?
```

17

De Souza & Associates     650-341-2671          desouzacr@att.net

**Dec. of Thompson - Exhibit 4**

```
 1   A.        No.  We look for our own people and district
 2   manager does a final interview.
 3   Q.        Okay.  So you recommend to him who to hire and
 4   he approves or not.
 5   A.        Correct.
 6   Q.        Okay.  Do you ever remember recommending an
 7   African American to be hired under your supervision
 8   while you were at Clement?
 9   A.        I -- I don't remember.  Probably.
10   Q.        You're shaking your head no and you're not
11   saying no.
12   A.        I don't remember.
13   Q.        You don't remember.
14   A.        I don't remember.
15   Q.        Okay.  To today, which is 2012, have you had
16   an African American working under you that you hired,
17   or, that you recommended -- that you recommended to be
18   hired?
19   A.        Are we talking about this current store?
20   Q.        Yeah.
21   A.        Yes.
22   Q.        Okay.  And is that Shalimar?
23   A.        No.
24   Q.        Who is that?
25   A.        Jacqueline.
```

                                                         24

**Dec. of Thompson - Exhibit 4**

Allen vs. Radio Shack      Amy Tam                    6/12/12

1   Q.        Jacqueline.  Okay.

2             When did you hire Jacqueline?

3   A.        Two weeks ago.

4   Q.        Okay.  So you just hired Jacqueline.

5   A.        Yes.

6   Q.        Prior to just now, did you hire any

7   African Americans from 2007 to two weeks ago?

8             MS. SHY:  Objection.  Misstates her testimony.

9             Did she recommend any?

10            MS. ALIOTO:  Right.

11            MS. SHY:  Okay.

12            THE WITNESS:  Yes.

13  BY MS. ALIOTO:

14  Q.        Okay.  Can you give me some names?

15  A.        Michael.  There is Janice.

16  Q.        Janice is the new one, right?

17  A.        Jacqueline is the new one.

18  Q.        Jacqueline is new.  Okay.

19  A.        Okay.  Shalimar.

20  Q.        Okay.

21  A.        There is probably -- Brooke.

22  Q.        Okay.

23  A.        As far as I remember.

24  Q.        Okay.  Did you recommend that Michael be

25  hired?

                                                        25

De Souza & Associates    650-341-2671      desouzacr@att.net

**Dec. of Thompson - Exhibit 4**

Allen vs. Radio Shack    Amy Tam                    6/12/12

1   A.        Yes.
2   Q.        Did you recommend that -- did you do an
3   interview with Michael?
4   A.        Yes.
5   Q.        Was Michael hired?
6   A.        Yes.
7   Q.        And how long -- does Michael still work for
8   you?
9   A.        No.
10  Q.        Okay.  How long did Michael work for you?
11  A.        No more than six months, seven months.
12  Q.        Okay.  When Michael left, do you know who you
13  replaced him with?
14            MS. SHY:  Objection.  Lacks foundation --
15            THE WITNESS:  I don't remember.
16            MS. SHY:  -- misstates her testimony.
17            THE WITNESS:  I don't remember.
18  BY MS. ALIOTO:
19  Q.        Okay.  Janice.  Did you interview Janice?
20  A.        Yes.
21  Q.        Did you recommend Janice?
22  A.        Yes.
23  Q.        Was Janice hired?
24  A.        Yes.
25  Q.        Does Janice still work for you?

                                                        26

De Souza & Associates    650-341-2671      desouzacr@att.net

**Dec. of Thompson - Exhibit 4**

Allen vs. Radio Shack      Amy Tam                6/12/12

| | | |
|---|---|---|
| 1 | A. | No. |
| 2 | Q. | How long did Janice work? |
| 3 | A. | Also six months to seven. |
| 4 | Q. | Let me ask you:  Was Michael terminated? |
| 5 | A. | Michael was not terminated. |
| 6 | Q. | He left on his own? |
| 7 | A. | He left on his own. |
| 8 | Q. | What's Michael's last name? |
| 9 | A. | Cadwell. |
| 10 | Q. | Okay.  What's Janice's last name? |
| 11 | A. | Johnson. |
| 12 | Q. | Was Janice terminated? |
| 13 | A. | No. |
| 14 | Q. | She left on her own after six months? |
| 15 | A. | Left on her own. |

16    Q.      What's Janice's -- I'm sorry.  I didn't get

17   Janice's last name?

18    A.      Johnson.

19    Q.      Okay.  Shalimar.  What's his last name, or her

20   last name?

21    A.      Don't remember.

22    Q.      Okay.  When did Shalimar work under your

23   supervision?

24    A.      I don't remember.

25    Q.      Do you know Shalimar?

27

**Dec. of Thompson - Exhibit 4**

Allen vs. Radio Shack     Amy Tam                6/12/12

1   A.      I do.

2   Q.      Okay.  Was Shalimar there in 2010?  Summer of

3   2010.

4   A.      Yes.

5   Q.      Okay.  Did you recommend that Shalimar be

6   hired?

7   A.      Yes.

8   Q.      And was Shalimar hired?

9   A.      Yes.

10  Q.      And how long did Shalimar stay?

11  A.      I don't recall.

12  Q.      Was Shalimar terminated?

13  A.      No.

14  Q.      Did Shalimar leave -- is Shalimar a man or a

15  woman?

16  A.      She's a woman.

17  Q.      And did she leave on her own?

18  A.      Yes.

19  Q.      And about how many months did Shalimar work

20  under you?

21  A.      I don't recall.

22  Q.      Did she work under you more than six months?

23  A.      I really don't recall.

24  Q.      Do you know what an estimate is as opposed to

25  a guess?

28

De Souza & Associates    650-341-2671     desouzacr@att.net

**Dec. of Thompson - Exhibit 4**

Allen vs. Radio Shack       Amy Tam                6/12/12

1    A.      Right, but I don't want to give a guess.  I'm
2    not sure of --
3    Q.      No, I don't want a guess.  I want an estimate.
4    A.      I -- under six.
5    Q.      Under six months?
6    A.      Uh-huh.
7    Q.      Okay.  Do you know who you replaced Shalimar
8    with?
9    A.      I don't recall.
10   Q.      Okay, Brooke.  Did you recommend Brooke's
11   hiring?
12   A.      Donna.
13   Q.      To Donna?
14   A.      Yeah, Donna recommended her.
15   Q.      Okay.  Donna recommended Brooke.
16   A.      Yes.
17   Q.      When was that?
18   A.      The same year I took over 30 --
19   Q.      Would that be April of 2010?
20   A.      Correct.
21   Q.      Okay.  So Donna recommended Brooke.
22           Brooke is an African American male?
23   A.      Female.
24   Q.      Female.
25           Do you know about how old Brooke was, or is?

                                                         29

**Dec. of Thompson - Exhibit 4**

Allen vs. Radio Shack     Amy Tam                    6/12/12

1   A.       I don't know.

2   Q.       Was she in her eighties?

3   A.       Huh-uh.  No.

4   Q.       Is she in her twenties?

5   A.       I -- probably.  Possibly.

6   Q.       Okay.  How about Shalimar; in her twenties and

7   thirties?

8   A.       Maybe.  I don't go into asking about

9   employees' age.

10  Q.       Okay.  Do you have an idea?  Was Shalimar in

11  her twenties?

12  A.       Maybe around twenties, yeah.

13  Q.       Okay.  Janice.  About how old was Janice?

14  A.       Maybe 30.

15  Q.       And Michael?

16  A.       Mid-thirties.

17  Q.       Okay.  So Michael, Janice, Shalimar, and

18  Brooke are all gone in 2010 and 2011; is that correct?

19  A.       To my --

20           MS. SHY:  Objection.  Vague and ambiguous.

21           MS. ALIOTO:  I don't mean they died.  I mean

22  they left.

23           THE WITNESS:  To my knowledge, yes.

24  BY MS. ALIOTO:

25  Q.       Okay.  Now, let's start with 2011.  Last year.

                                                        30

De Souza & Associates   650-341-2671      desouzacr@att.net

**Dec. of Thompson - Exhibit 4**

Allen vs. Radio Shack     Amy Tam                  6/12/12

| | |
|---|---|
| 1 | A.        Uh-huh. |
| 2 | Q.        Can you name the employees that worked for you |
| 3 | last year? |
| 4 | A.        Nester Lopez, Walter Valencia, Miguel Badonka, |
| 5 | Jesus Aguirre, Daniel Velasquez, Michael Cadwell. |
| 6 | Q.        That's -- okay. |
| 7 | A.        Yeah, he -- I don't recall anymore.  Probably |
| 8 | that's about it. |
| 9 | Q.        Any women? |
| 10 | A.        I think Janice. |
| 11 | Q.        No.  For 2011. |
| 12 | A.        20- -- I don't recall. |
| 13 | Q.        You don't? |
| 14 | A.        I don't recall.  I have the same staff.  I |
| 15 | haven't made that much change. |
| 16 | Q.        So you have this same staff today except for |
| 17 | Michael, right? |
| 18 | A.        Correct. |
| 19 | Q.        All right.  So your staff is Nester, Walter, |
| 20 | Miguel, Jose, and Daniel. |
| 21 | MS. SHY:  That misstates her testimony.  She |
| 22 | named more names. |
| 23 | THE WITNESS:  No Jose. |
| 24 | MS. ALIOTO:  I'm sorry.  Did you say Jesus? |
| 25 | THE WITNESS:  Jesus. |

31

De Souza & Associates     650-341-2671       desouzacr@att.net

**Dec. of Thompson - Exhibit 4**

Allen vs. Radio Shack    Amy Tam                    6/12/12

```
 1              MS. ALIOTO:  Okay.  So did I miss a name?
 2              THE WITNESS:  Jacqueline is with me.
 3              MS. ALIOTO:  In 2011?
 4              THE WITNESS:  Oh, no, no.  Till today.  Well,
 5    you're talking about --
 6              MS. ALIOTO:  No, I'm talking about 2011.
 7              THE WITNESS:  Okay.
 8              MS. ALIOTO:  Last year.
 9              THE WITNESS:  Yes.  Then --
10    BY MS. ALIOTO:
11    Q.        Last year.  Nester, Walter, Miguel, Jesus, and
12    Daniel worked under your supervision, right?
13    A.        Correct.
14    Q.        All right.  Now, is Nester African American?
15    A.        Hispanic.
16    Q.        Is Walter African American?
17    A.        Hispanic.
18    Q.        Is Miguel African American?
19    A.        Portuguese.
20    Q.        But you know you can be Portuguese and
21    Hispanic.  And maybe I should be asking this
22    differently.
23              Is Nester, Walter, or Miguel black?
24    A.        No.
25    Q.        Is Jesus black?
                                                          32
```

De Souza & Associates    650-341-2671    desouzacr@att.net

**Dec. of Thompson - Exhibit 4**

Allen vs. Radio Shack      Amy Tam              6/12/12

```
 1   A.        No.

 2   Q.        Is Daniel black?

 3   A.        No.

 4   Q.        Okay.  So, now, what is Nester?  Is he

 5   Hispanic?

 6   A.        Hispanic.

 7   Q.        And Walter?

 8   A.        Hispanic.

 9   Q.        Miguel?

10   A.        Caucasian.

11   Q.        Of Hispanic --

12   A.        He speaks Portuguese.

13   Q.        He's Portuguese.

14   A.        Sure.

15   Q.        Okay.  Jesus?

16   A.        Hispanic.

17   Q.        And Daniel?

18   A.        Hispanic.

19   Q.        Okay.  So did you recommend Nester to --

20             THE REPORTER:  Hani?

21             MS. ALIOTO:  No.  At this point it's Ocampo,

22   right?

23   BY MS. ALIOTO:

24   Q.        Who did you recommend to hire Nester?

25   A.        To John Robbins.

                                                          33
```

De Souza & Associates    650-341-2671    desouzacr@att.net

**Dec. of Thompson - Exhibit 4**

Allen vs. Radio Shack    Amy Tam                    6/12/12

```
 1    A.        No.
 2    Q.        Is she in her twenties or thirties?
 3    A.        Maybe thirties.
 4    Q.        Thirties.
 5              Okay.  Now, let's go back to the chronology.
 6              Do you know who the actual person it was that
 7    hired you in 2006?
 8    A.        Hani.
 9    Q.        And Hani promoted you, right --
10    A.        Correct.
11    Q.        -- to manager in 2007?
12              Now, do you know Mr. Pattakos?
13    A.        Yes.
14    Q.        When did you first meet Mr. Pattakos?
15              MS. SHY:  Objection.  Lacks foundation.
16              THE WITNESS:  I've never met him.
17              MS. ALIOTO:  You've never met him?
18              THE WITNESS:  Huh-uh.
19    BY MS. ALIOTO:
20    Q.        Okay.  So when I asked if you know him, how do
21    you know him?
22    A.        He's an authority figure for the company.  I
23    knew of him.
24    Q.        You've never talked to him on the phone?
25    A.        No.
```

                                                        38

Dec. of Thompson - Exhibit 4

Allen vs. Radio Shack     Amy Tam                    6/12/12

1   Q.        You've never personally met him?

2   A.        No.

3   Q.        Okay.  In the chain of command, what was he to

4   you in 2010 when you were manager of the store?  Of the

5   new store --

6           MS. SHY:  You mean his title?

7           MS. ALIOTO:  -- 38 -- let me finish the

8   concept.

9   BY MS. ALIOTO:

10  Q.        In the chain of command, what was he to you

11  when you became the manager of the store at 3830?

12          MS. SHY:  Objection.  Vague and ambiguous.

13          Go ahead if you understand.

14          THE WITNESS:  I don't even recall.  I just

15  know that he is from the executive -- from the executive

16  team.

17  BY MS. ALIOTO:

18  Q.        Okay.  And you never saw him.

19  A.        No.

20  Q.        Would you recognize him if you saw him walking

21  down the street?

22  A.        I never met him.

23  Q.        So is that a no?

24  A.        No.

25  Q.        And you never talked to him on the phone.

                                                              39

**Dec. of Thompson - Exhibit 4**

Allen vs. Radio Shack     Amy Tam                    6/12/12

1    A.        That's a man.

2    Q.        And where is he located?

3    A.        23rd and Mission.

4    Q.        And what was his title?

5    A.        Senior store manager.

6    Q.        Okay.  Let's go to 2010.

7    A.        Uh-huh.

8    Q.        When did you first hear that you were going to

9    be moved to the 3830 position store?

10   A.        I don't know.  I mean the day was -- it was in

11   the month of May.

12   Q.        Didn't you start working there on April 27th,

13   2010?

14   A.        That's when I -- I don't -- it's in May.

15   Q.        When did you first learn -- okay.  Who called

16   you and said we want to move you to 3830?

17   A.        Donna.

18   Q.        Okay.  Donna.

19             Do you know what month Donna called you and

20   told you that she wanted to move you?

21   A.        May, as far as I remember.

22   Q.        So you don't remember the exact date you

23   started working at 3830?

24   A.        I don't remember the exact date.

25   Q.        Okay.  And you don't remember the exact date

                                                            41

De Souza & Associates    650-341-2671    desouzacr@att.net

**Dec. of Thompson - Exhibit 4**

Allen vs. Radio Shack     Amy Tam                    6/12/12

```
 1   BY MS. ALIOTO:
 2   Q.        Okay.  Do you recall when Donna -- did Donna
 3   call you or meet with you to tell you she wanted you to
 4   be the manager?
 5   A.        Call me.
 6   Q.        Okay.  And you think that call was in May of
 7   2010.
 8   A.        I -- yeah.  Estimate it.
 9   Q.        Estimate.
10             Could it have been April?
11   A.        It could have been April.
12   Q.        Could it have been March?
13   A.        No.
14   Q.        Okay.  Is there any demarcation point that
15   you're -- you were so definite on it could not be March.
16             Is there anything that makes you remember that
17   it could have been April and it could have been May but
18   it definitely wasn't March?
19   A.        No.  It's either April or May --
20   Q.        Okay.
21   A.        -- I believe.
22   Q.        When Donna called you, did you write this down
23   on your calendar?  Did you send her an email about it?
24   A.        Repeat it.
25   Q.        When Donna called you.
```

                                                             43

**Dec. of Thompson - Exhibit 4**

Allen vs. Radio Shack     Amy Tam                6/12/12

| | |
|---|---|
| 1 | A.       Uh-huh. |
| 2 | Q.       After the call, did you either write it down |
| 3 | on your calendar that you talked to Donna about moving |
| 4 | to the new store or did you send her an email? |
| 5 | A.       None of the above.  We were just on the phone. |
| 6 | Q.       Did she send you an email? |
| 7 | A.       No. |
| 8 | Q.       Okay.  Do you have any emails at all about |
| 9 | changing from the first store to the second store? |
| 10 | A.       No. |
| 11 | Q.       And Donna never sent you any emails -- |
| 12 | A.       No. |
| 13 | Q.       -- about moving from the first store to the |
| 14 | second store? |
| 15 | A.       No. |
| 16 | Q.       Okay.  Tell me about the call when Donna |
| 17 | called and talked to you.  What did she say? |
| 18 | A.       She basically said that she can try me |
| 19 | for -- try me out for 3830 and, you know, they needed |
| 20 | somebody to oversee that store, temporary. |
| 21 | Q.       So did she tell you it would be a temporary |
| 22 | position? |
| 23 | A.       Yes. |
| 24 | Q.       So temporary position as the store manager. |
| 25 | A.       Just to oversee.  I don't know for what |

44

De Souza & Associates   650-341-2671     desouzacr@att.net

**Dec. of Thompson - Exhibit 4**

Allen vs. Radio Shack     Amy Tam                6/12/12

1    reasons, but this is what I was told.

2    Q.        Okay, fine.

3              Would you consider going to 3830 a dream

4    position?

5              MS. SHY:  At what point?  Vague and ambiguous.

6              THE WITNESS:  Yes.

7    BY MS. ALIOTO:

8    Q.        Okay.  So going from Clement to 3830 was a

9    dream position for you?

10   A.        Yes.

11   Q.        Okay.  Did it pay more?

12   A.        A little.

13   Q.        So it paid a little more.

14             The benefits better?

15   A.        No.  Same.

16   Q.        Did you work on a commission basis at all?

17             MS. SHY:  I think -- vague and ambiguous.

18             Are we talking about now?  3830?

19             MS. ALIOTO:  No, no.  When you moved to

20   3830 in -- well, what we believe is April, you believe

21   is May of 2010.

22             MS. SHY:  Misstates her testimony.  She said

23   it could either be April or May.

24             THE WITNESS:  Repeat your question.

25             MS. ALIOTO:  Work on commission.

45

De Souza & Associates    650-341-2671     desouzacr@att.net

**Dec. of Thompson - Exhibit 4**

Allen vs. Radio Shack       Amy Tam                    6/12/12

```
 1              MS. SHY:  Let her finish the question.  Slow
 2    down.
 3              THE WITNESS:  Okay.  No.
 4    BY MS. ALIOTO:
 5    Q.        Okay.  Do you recall an email you wrote to
 6    Carlos stating that you were going to be moving to 3830
 7    in a month?
 8    A.        No.
 9    Q.        So as you sit here today, you know of no
10    conversation you had with Carlos about you moving to
11    become the manager at 3830 prior to you actually moving.
12    A.        Not that I recall.
13    Q.        Okay, now, not that you recall means there is
14    a possibility that it had happened.
15              Do you recall any conversation at all --
16    A.        No.
17    Q.        -- with Carlos about you moving?
18    A.        No.
19    Q.        Okay.  And do you recall any conversation at
20    all with any other employee about you moving to the new
21    store?
22    A.        No.
23    Q.        Okay.  So is it your testimony, as you sit
24    here today under oath, that the first time you ever
25    heard of moving to 3830 was when Donna Ocampo called
```
                                                          49

De Souza & Associates    650-341-2671       desouzacr@att.net

**Dec. of Thompson - Exhibit 4**

Allen vs. Radio Shack     Amy Tam                    6/12/12

1    you --

2    A.        Yes.

3    Q.        -- in April of 2010?

4    A.        Yes.

5    Q.        Okay.  And when she called you, Frank was

6    already gone; is that right?

7    A.        I don't know where is Frank, actually.  I

8    mean --

9    Q.        Okay.  Tell me --

10             MS. SHY:  Let her finish.  She's still

11   answering her question.

12             MS. ALIOTO:  I apologize.  And I understand

13   that.  Please, I want all of your question, believe me.

14             MS. SHY:  All of her answer.

15             Go ahead and finish.

16             THE WITNESS:  Okay.  I was saying that, yeah,

17   that's -- the only time I answered was, you know, when

18   Donna call me.  That's how I learned that I was -- you

19   know, I don't know what happened to -- I didn't ask her

20   what happened.

21   BY MS. ALIOTO:

22   Q.        But you knew Frank.

23   A.        I knew Frank.

24   Q.        And you had managers meetings --

25   A.        Correct.

                                                        50

De Souza & Associates    650-341-2671      desouzacr@att.net

**Dec. of Thompson - Exhibit 4**

Allen vs. Radio Shack     Amy Tam                6/12/12

```
 1   Q.          -- with Frank years before that, right?
 2               MS. SHY:  You have to let her finish her
 3   question.  You're jumping in the middle of a question.
 4               MS. ALIOTO:  Right?
 5               THE WITNESS:  Right.
 6   BY MS. ALIOTO:
 7   Q.          Okay.  So when you heard that you were being
 8   moved to 3830, did you ask Ocampo what happened to
 9   Frank?
10   A.          No.
11   Q.          No.
12               And you didn't ask anybody what happened to
13   Frank?
14   A.          Not on the same day.  Probably days after,
15   yes.
16   Q.          Okay.  Days after -- you mean days after you
17   started working as the manager at 3830?
18   A.          Correct.
19   Q.          So who do you recall talking to after you
20   started working there about Frank's departure?
21   A.          Bill Hamilton, Mayank, John Robbins, Alex.
22   Q.          Okay.  I'm sorry.  Bill, John, Alex --
23   A.          Mayank.
24   Q.          Okay.  Do you recall what your conversation
25   was with Bill about Frank leaving?
```

                                                       51

**Dec. of Thompson - Exhibit 4**

1   Q.        Are all of them full-time sales associates?

2   A.        No.

3   Q.        Who is not a full-time sales associate out of

4   those seven?

5   A.        Monica is not a full-time sales associate,

6   Kenneth is not, and Jacqueline is not.

7   Q.        Okay.  Hold on one second.  So Jacqueline,

8   Kenneth, and Monica are what?

9   A.        They're part-time sales associates.

10  Q.        So they work part-time.

11  A.        Correct.

12  Q.        So they're not on salary.

13  A.        They are -- they are all not on salary.

14  Q.        Nobody is on salary.  Everybody is hourly.

15  A.        Correct.

16  Q.        But you are on salary.

17  A.        I am on salary.

18  Q.        Okay.

19  A.        And I believe -- did I mention Kenneth is

20  part-time?

21  Q.        Yep.

22  A.        Okay.

23  Q.        Anything else?

24  A.        And also the -- I was thinking about the time

25  frame for the -- when I was a store manager for Clement

                                                          62

De Souza & Associates     650-341-2671        desouzacr@att.net

**Dec. of Thompson - Exhibit 4**

Allen vs. Radio Shack      Amy Tam                    6/12/12

1    store.

2              So actually I thought about it a little bit

3    and it's actually 2008.

4    Q.        And you said 7?

5    A.        Yeah, I said 7.

6    Q.        Okay.

7    A.        I just didn't think of it.

8              MS. ALIOTO:  Counsel, do you have a problem if

9    we go back in the record and change that 2007 to 2008?

10             MS. SHY:  I don't.  I think we should have

11   this part on the record, too, just so it's clear there.

12             MS. ALIOTO:  So you don't?

13             MS. SHY:  I don't.

14             MS. ALIOTO:  That way we don't start reading

15   the depo and we're in the wrong era.

16             MS. SHY:  Okay.  I agree.

17             MS. ALIOTO:  Okay?  Madam court reporter, is

18   that okay?

19             THE REPORTER:  Yes, that's okay.  I'll be

20   changing more than just that answer, though.

21             MS. SHY:  Because it came out several times.

22             THE REPORTER:  Because you actually put all

23   your questions in the 2007 time frame, so you will be

24   requiring me to change all of that.

25             MS. SHY:  Maybe we should just leave it alone.

                                                         63

De Souza & Associates     650-341-2671      desouzacr@att.net

**Dec. of Thompson - Exhibit 4**

Allen vs. Radio Shack      Amy Tam                    6/12/12

1   and there was Bruce.

2   Q.      Okay.

3   A.      And also Nabor.  I'm sorry.

4   Q.      Nabor.

5           And when you first took over the store, were

6   you using the back room desk to put cash in?

7   A.      Basically I didn't know.  This is my first

8   time taking over, you know, a higher volume store.  So I

9   never saw anything done like that before.  So for the

10  first day, yes.

11  Q.      Okay.

12  A.      Because I -- I don't know.  But the second day

13  it was -- it was corrected.

14  Q.      When you say corrected, what does that mean?

15  A.      Actually I was visited by a senior store

16  manager, which was Alex Bashiri, and he actually

17  rectified that.

18  Q.      Okay.  What did Alex say?

19  A.      Alex told me that it was against the company

20  policy to have cash in the back.  And he basically told

21  me to take it all out and put it back in the cash

22  drawer.

23  Q.      Okay.  So let me -- what's Alex's -- this is

24  the day after -- the week after you started?  This is

25  right at the time you started?

                                                          65

De Souza & Associates    650-341-2671       desouzacr@att.net

**Dec. of Thompson - Exhibit 4**

Allen vs. Radio Shack     Amy Tam                    6/12/12

1              MS. SHY:  Objection.  Misstates her testimony

2       and vague and ambiguous.

3              THE WITNESS:  Sorry.  Could you repeat that?

4       BY MS. ALIOTO:

5       Q.     Was this about the time you started?

6              MS. SHY:  Objection.  Vague and ambiguous.

7              THE WITNESS:  It's -- yeah.

8       BY MS. ALIOTO:

9       Q.     Okay.  So you were using the cash drawer in

10      the back room --

11      A.     Uh-huh.

12      Q.     -- for a day or two --

13      A.     No, no, no, no, no.  It was --

14      Q.     For a day.

15      A.     -- only for that couple hours, actually, that

16      I was there --

17      Q.     Okay.

18      A.     -- to oversee the store after I went there.

19      Q.     All right.  And then the next day Alex comes

20      in --

21      A.     Correct.

22      Q.     -- and tells you --

23             MS. SHY:  Let her finish.

24      Q.     -- tells you you shouldn't be doing that.

25      A.     Yes.

                                                          66

De Souza & Associates    650-341-2671       desouzacr@att.net

**Dec. of Thompson - Exhibit 4**

Allen vs. Radio Shack    Amy Tam                6/12/12

1    Q.        What was Alex's title?

2    A.        Senior store manager.

3    Q.        Okay.  And what store was he located at?

4    A.        3204.

5    Q.        And I'm sorry.  You may have said this but I

6    didn't get it.

7              What's Alex's last name?

8    A.        Bashiri.  Bashiri.

9    Q.        B-A --

10   A.        B-A-S-H-I-R-I.

11   Q.        Okay.  At this time --

12             (Off the record conference between

13             Ms. Alioto and Mr. Allen.)

14   BY MS. ALIOTO:

15   Q.        Hani was no longer the district manager; is

16   that correct?

17   A.        Correct.

18   Q.        So when you started, had Ocampo taken over

19   Hani's job as district manager?

20             MS. SHY:  Objection.  Vague and ambiguous.

21             THE WITNESS:  Yes.

22   BY MS. ALIOTO:

23   Q.        Okay.  Did Ocampo ever tell you anything about

24   not using the drawer in the back room?

25             MS. SHY:  At any point in time?

                                                        67

**Dec. of Thompson - Exhibit 4**

Allen vs. Radio Shack    Amy Tam                    6/12/12

1           THE WITNESS:  Yes --
2           MS. ALIOTO:  When you started to take over.
3           THE WITNESS:  -- you know -- I mean --
4    actually, Alex had already corrected it, so I mean I
5    confirmed with her the same day, and she said at no time
6    should you keep cash in the drawer, so it was -- it was
7    never after that.
8    BY MS. ALIOTO:
9    Q.        Okay.  So did she -- did you have an issue
10   with not being able to put coins into the two cash
11   registers because the two new cash registers didn't
12   really have a place for the coins like the old cash
13   registers did?
14   A.        Never had a problem.
15   Q.        So you never had a problem with putting any
16   coins in the new cash registers?
17   A.        It was the same cash registers.
18   Q.        Yeah.  But they were newer.
19   A.        No --
20           MS. SHY:  Vague and ambiguous.
21           THE WITNESS:  -- it's the same cash registers.
22   BY MS. ALIOTO:
23   Q.        So describe the cash registers that were there
24   when you started working in either April or May of 2010.
25   Did they have the slots for the pennies, nickels, dimes,

                                                          68

**Dec. of Thompson - Exhibit 4**

Allen vs. Radio Shack     Amy Tam           6/12/12

```
1              drawer due to the fact that the two cash
2              registers in Store 3830 did not allow for
3              cash and coins to be placed under the cash
4              drawer."
5              Is that true?
6    A.        False.
7    Q.        Okay.  Great.  Next sentence:
8              "On several occasions when District Manager
9              Hani Alzaghari and Store Manager Frank Allen
10             would be in the back office during store
11             transactions, I had gone to the back office and
12             gotten change from the desk drawer in
13             Mr. Alzaghari's presence."
14             You don't know anything about that, do you?
15   A.        Not in my presence.
16   Q.        Next one:
17             "To my knowledge, the District Manager,
18             Hani Alzaghari, knew and allowed change to be
19             kept in a store manager's drawer."
20             Did you ever talk to Hani about keeping money
21   in the back drawer?
22   A.        No.
23   Q.        "After Mr. Allen was terminated, Amy
24             Tam..." -- strike that.  "Amy Tam became store
25             manager."
```

                                                        76

**Dec. of Thompson - Exhibit 4**

Allen vs. Radio Shack     Amy Tam                6/12/12

1   BY MS. ALIOTO:

2   Q.        As her manager, was she doing a good job for

3   you?

4   A.        I worked too short of a period to give an

5   answer for that.

6   Q.        Was that like a month?

7   A.        No.  It was only, like, one week.

8   Q.        Okay.  So after you became -- Rosetta was only

9   there one week.  All right.  So Rosetta is gone.

10           Now, what happened to -- now, Rosetta is

11  black, right?  What happened to Victoria?

12  A.        Victoria was terminated.

13  Q.        Who terminated Victoria?

14  A.        Donna.

15  Q.        Why?

16  A.        Gave me permission.

17  Q.        Donna told you to terminate Victoria?

18  A.        Victoria was late all the time to work for an

19  hour, and also Victoria used her lunch breaks, extended

20  lunch breaks, to go shopping and expected herself to get

21  paid for those times.

22  Q.        And so you terminated her.

23  A.        I referred the situation to District Manager

24  Donna, and Donna asked me if I was comfortable to term.

25  Q.        Okay.  Is Victoria African American?

                                                          82

De Souza & Associates    650-341-2671       desouzacr@att.net

**Dec. of Thompson - Exhibit 4**

Allen vs. Radio Shack     Amy Tam                    6/12/12

1   A.        Hispanic.

2   Q.        All right.  Nabor.  Did you terminate Nabor?

3   A.        No.

4   Q.        Did Nabor leave?

5   A.        Loss prevention terminated Nabor.

6   Q.        And who in loss prevention terminated him?

7   A.        David.

8   Q.        Do you know why?

9   A.        Yeah.  He was doing false returns.

10  Q.        Did you discover that Nabor was doing false

11  returns?

12  A.        Uh-huh.

13  Q.        You were the one that discovered it?

14  A.        I was the one that discovered it.

15  Q.        Did you recommend the termination to David?

16  A.        No, I have no right.  I just refer the issue

17  to David, and David handles it on his own.

18  Q.        Okay.  Did you sit down and talk to Nabor

19  about false returns?

20  A.        No.

21  Q.        Okay.  Let me see Nabor's.

22            Do you know how long after you started that

23  Nabor was terminated?

24  A.        I don't recall.

25  Q.        Was it either a month, two months, three

                                                        83

**Dec. of Thompson - Exhibit 4**

Allen vs. Radio Shack     Amy Tam              6/12/12

1           in the back office."

2           When you arrived there, did you have an

3   understanding that it was common practice to keep money

4   in the store in the back office?

5           MS. SHY:  Objection.  Vague and ambiguous.

6   Misstates her testimony.

7           THE WITNESS:  No.

8   BY MS. ALIOTO:

9   Q.        Okay.  You never talked to Hani about keeping

10  money in the back drawer, did you?

11  A.        No.

12  Q.        Do you know Hani?

13  A.        Yes.

14  Q.        And did you speak to Hani about Frank's

15  departure?

16  A.        No.

17  Q.        All right.  Do you know whether Hani knew or

18  not whether there was money kept in the back drawer?

19  A.        No.

20  Q.        And then down here it says,

21          "Soon after early summer of 2010, Amy Tam

22          terminated my employment."

23          Is that not true?

24  A.        False.

25  Q.        Okay.  So that takes care of Rosetta is gone

                                                    92

De Souza & Associates     650-341-2671      desouzacr@att.net

**Dec. of Thompson - Exhibit 4**

Allen vs. Radio Shack     Amy Tam                    6/12/12

```
 1   after a week, Nabor is gone after a month of your
 2   arrival.
 3           What happened to Victoria?
 4   A.      I've already answered that question.
 5   Q.      Try it again.
 6   A.      She was late to work an hour here and there,
 7   probably actually every day --
 8           MS. SHY:  The question is what happened to
 9   her.
10           THE WITNESS:  She -- she was terminated.
11   BY MS. ALIOTO:
12   Q.      Okay.  And that one you did do.
13   A.      Yes.
14   Q.      Okay.  Can you tell me about how long after
15   your arrival there that Victoria was terminated?
16   A.      Two and a half weeks.
17   Q.      Okay.  Erica.  Do you know Erica?
18   A.      I know Erica.
19   Q.      Was Erica working there when you started?
20   A.      Yes.
21   Q.      And is Erica African American?
22   A.      Yes.
23   Q.      And did you terminate Erica?
24   A.      No.
25   Q.      What happened with Erica?
```

                                                        93

**Dec. of Thompson - Exhibit 4**

Allen vs. Radio Shack     Amy Tam                    6/12/12

1   A.        She stayed and she transferred to a nearby

2   home store, I believe in Berkeley or Oakland.

3   Q.        So she transferred to Berkeley.

4             Was that on her own will, do you know?

5   A.        On her own will.

6             MS. SHY:  Let her finish.

7   BY MS. ALIOTO:

8   Q.        Is Erica still there in Berkeley?

9   A.        Yes.

10  Q.        All right.  Do you recall, who did you replace

11  Nabor with?

12            MS. SHY:  Objection.

13            MS. ALIOTO:  At the time in 2010.

14            MS. SHY:  Objection.  Misstates her testimony,

15  vague and ambiguous.

16  BY MS. ALIOTO:

17  Q.        Who took Nabor's place?

18            MS. SHY:  Same objections.

19            THE WITNESS:  I don't know.

20  BY MS. ALIOTO:

21  Q.        You don't know?

22  A.        I don't know.  I mean I -- I don't have a

23  particular person I would hire for each one.

24  Q.        All right.  So who took Victoria's place?

25            MS. SHY:  Same objections.

94

**Dec. of Thompson - Exhibit 4**

Allen vs. Radio Shack     Amy Tam                    6/12/12

```
 1                THE WITNESS:  I have no idea.
 2                MS. ALIOTO:  Her objections are fine, but I
 3     want to make sure I get these answers, okay?
 4                MS. SHY:  Slow down so everything gets on the
 5     record.
 6     BY MS. ALIOTO:
 7     Q.         And who took Rosetta's place?
 8     A.         I don't recall.
 9     Q.         And who took Erica's place?
10     A.         I don't -- nobody in particular.
11     Q.         Okay.  Great.
12                The summer after you started in April or May,
13     you had -- correct me if I'm wrong -- Nester, Walter,
14     Miguel, Jesus, and Daniel working.
15                Correct?
16     A.         Repeat the date, please?
17     Q.         Summer of 2010.  After these -- after Nabor,
18     Victoria, Rosetta, and Erica are gone -- you started in
19     April and May.  By summertime, Nabor, Victoria, Rosetta,
20     and Erica are gone.
21                My question is, were Walter, Miguel, Daniel,
22     and Jesus your employees that summer?
23     A.         No.
24     Q.         Who was?
25     A.         It was Janice, Michael, Nester, Walter,
```

                                                              95

De Souza & Associates   650-341-2671      desouzacr@att.net

**Dec. of Thompson - Exhibit 4**

Allen vs. Radio Shack      Amy Tam                    6/12/12

1    Calvin.

2    Q.        Okay.  Calvin is new.  What nationality is

3    Calvin?

4    A.        African American.

5    Q.        How long did Calvin stay?

6    A.        I don't recall the time frame.

7    Q.        Did you terminate him?

8    A.        He left on his own.

9    Q.        Okay.  Did he leave in 2010?

10   A.        I think 2011.

11   Q.        And what's Calvin's last name?

12   A.        Cobar.

13   Q.        And do you know where he works?

14   A.        Now?

15   Q.        Yep.

16   A.        No.

17   Q.        And you're saying he left on his own.  Do you

18   know why?

19   A.        I think he wanted to move back home to

20   Louisiana, one of those.

21   Q.        Okay.  Now, let's talk about the lock on the

22   back door.  Okay?  The back room.

23             When you first got there, was there a new lock

24   on the back door?

25   A.        No.

                                                        96

Dec. of Thompson - Exhibit 4

1           I, DEBRA J. SKAGGS, CSR No. 7857, a Certified

2     Shorthand Reporter, do hereby certify:

3           That AMY TAM, the witness in the foregoing

4     deposition was by me duly sworn to tell the truth, the

5     whole truth, and nothing but the truth in the

6     within-entitled cause;

7           That said deposition was reported by me and

8     transcribed as herein set forth;

9           That, if signed, the deposition was read by or

10    to said witness, corrected in every particular desired

11    way, and was thereafter subscribed by said witness;

12          That, if unsigned, the deposition was retained

13    by me at the offices of DE SOUZA & ASSOCIATES, San

14    Mateo, California and was available for reading,

15    correcting and signing by said witness.

16          I further certify that I am not interested in

17    the outcome of said action, nor connected with, nor

18    related to any of the parties in said action or to their

19    respective counsel.

20                    IN WITNESS WHEREOF I have hereunto

21                    set my hand this _25th_ day of

22                    _June_, 2012.

23

24                    DEBRA J. SKAGGS, CSR NO. 7857

25

                                                          119

De Souza & Associates    650-341-2671      desouzacr@att.net

**Dec. of Thompson - Exhibit 4**

EXHIBIT 5

Allen vs. Radio Shack  Hani Alzaghari                6/14/12

1                    UNITED STATES DISTRICT COURT

2                  NORTHERN DISTRICT OF CALIFORNIA

3                     SAN FRANCISCO DIVISION

4                           --oOo--

5     FRANK ALLEN,

6                    Plaintiff,

7          vs.                         No. CV 11-03110 WHA

8     RADIO SHACK CORPORATION, and
      Does 1-20, Inclusive,
9

10                   Defendants.

11    _____/

12

13

14

15              DEPOSITION OF HANI ALZAGHARI

16                 Thursday, June 14, 2012

17

18

19

20    REPORTED BY:  DEBRA J. SKAGGS, CSR 7857

21

22

23                 DE SOUZA & ASSOCIATES
                Certified Shorthand Reporters
24                     P.O BOX 1675
                 San Mateo, California  94401
25              (650) 341-2671  desouzacr@att.net

                                                            1

De Souza & Associates    650-341-2671    desouzacr@att.net

Dec. of Thompson - Exhibit 5

```
 1                      ---o0o---
 2              BE IT REMEMBERED that, pursuant to notice, and
 3    on Thursday, the 14th day of June 2012, commencing at
 4    the hour of 10:27 a.m., thereof, at the Law Offices of
 5    JOSEPH L. ALIOTO AND ANGELA ALIOTO, 700 Montgomery
 6    Street, San Francisco, California, before me,
 7    DEBRA J. SKAGGS, CSR No. 7857, a Certified Shorthand
 8    Reporter
 9                      --o0o--
10                    EXAMINATION
11    BY MS. ALIOTO:
12    Q.      Okay, sir.  Could you spell your name for the
13    record.
14    A.      Sure.  First name is Hani, H-A-N-I; last name
15    Alzaghari, A-L-Z-A-G-H-A-R-I.
16    Q.      Okay.  Mr. Alzaghari?
17    A.      Correct.
18    Q.      Did I pronounce that right?
19    A.      That is correct.
20    Q.      Have you ever had your deposition taken?
21    A.      No.
22    Q.      So for purposes of this deposition today, so
23    that you know, any time that you want to take a break,
24    or for whatever reason -- you don't have to have a
25    reason -- you just say I'd like to stop for a minute and
```

                                                               5

**Dec. of Thompson - Exhibit 5**

Allen vs. Radio Shack  Hani Alzaghari                6/14/12

```
 1                I love Jordan.  I need to go to Jordan myself.
 2     I've got the whole trip planned.  But to go directly to
 3     Fremont, that's very cool.
 4                So in 1990 you went to Fremont.  And what was
 5     your first job?
 6     A.         Worked in a grocery store, and I was in
 7     San Francisco.
 8     Q.         Okay.  And how long was it?
 9     A.         About three and a half years.
10     Q.         To about '94?
11     A.         '93, yeah -- mid-'93, '94.
12     Q.         Were you working for someone at the grocery
13     store?
14     A.         Yes.
15     Q.         It wasn't your grocery store?
16     A.         No, it was not.
17     Q.         All right.  And what was your next position?
18     A.         I went to Alameda Newspaper Group.
19     Q.         Okay.
20     A.         And I was there for two and a half years or
21     so.
22     Q.         And what was your job there?
23     A.         Delivery.  Newspaper delivery to BART
24     stations.
25     Q.         Okay.  So now we're about 1996?  '95 1/2?
```

                                                            9

De Souza & Associates   650-341-2671      desouzacr@att.net

**Dec. of Thompson - Exhibit 5**

Allen vs. Radio Shack   Hani Alzaghari                    6/14/12

1   A.         '96 or so.  Was unemployed for almost a year
2   or so until I came to RadioShack in 1997.
3   Q.         Okay.  So your date of hire at RadioShack is
4   1997.  Who hired you?
5   A.         My district manager was Vinnie Human.
6   Q.         H-U-M-A-N?
7   A.         Correct.
8   Q.         Okay.  And what were you hired -- what was
9   your job position?
10  A.         I was a manager-in-training.
11  Q.         Is that referred to as an MIT?
12  A.         That is correct.
13  Q.         Okay.  What store were you a
14  manager-in-training at?
15  A.         Store in Milpitas.
16  Q.         And was the manager-in-training about a
17  six-month period?
18  A.         It varies.  On average, yes.
19  Q.         And after your manager-in-training position,
20  what was your position?
21  A.         I was promoted to a store manager in
22  Sunnyvale.
23  Q.         Which location?
24  A.         It was in Sunnyvale Town Center Mall.
25  Q.         Town --

                                                            10

De Souza & Associates    650-341-2671      desouzacr@att.net

**Dec. of Thompson - Exhibit 5**

Allen vs. Radio Shack  Hani Alzaghari                6/14/12

1   so.

2   Q.        Okay.

3   A.        Until the end of 2002.

4   Q.        Okay.  And then where did you move?

5   A.        After that I was promoted to a district

6   manager in January of 2003.

7   Q.        Tell me who promoted you.

8   A.        My regional manager, Tom Schultz.

9   Q.        Tom Schultz.

10            Now, what was the job duty of the district

11  manager?

12  A.        District manager have many jobs they perform.

13  Q.        Yeah.

14  A.        I can list a few of them for you, starting

15  with hiring, training, promoting.  During store visits,

16  training associates, sales associates; training sales

17  associates at the district office.

18  Q.        Where was your job location?

19  A.        I had an office at the district office on

20  19th Avenue.

21  Q.        In San Francisco.

22  A.        In San Francisco.

23  Q.        That's 19th and what?

24  A.        It's between Quintara and Ribera.  It's

25  2145 - 19th Avenue.

                                                        13

De Souza & Associates    650-341-2671      desouzacr@att.net

**Dec. of Thompson - Exhibit 5**

Allen vs. Radio Shack Hani Alzaghari          6/14/12

1   Q.        Okay.  As the district sales manager, what was
2   your district?  How many stores did you have under your
3   supervision?
4   A.        I had -- when I started, I had 22 stores, and
5   it varied throughout the years where we closed a store,
6   so we dropped down to 21.  With also company
7   realignments where they would add stores to my district,
8   take stores away from my district, it stayed within the
9   range of 21, 22.  Sometimes I would have Pacifica,
10  sometimes I would lose Pacifica store to another
11  district.
12  Q.        Okay.  So these 21 or 22 stores.  Can you tell
13  me the jurisdiction?  In other words, are they in
14  San Jose, are they in San Mateo?  Where are they?
15  A.        Okay.  The majority of the stores are in
16  San Francisco.
17  Q.        Okay.
18  A.        There is two stores -- there are two stores in
19  Daly City, there is one store in South San Francisco,
20  one store in Pacifica.
21  Q.        And when you say the majority are in
22  San Francisco, do you recall in 2003 about how many were
23  in San Francisco?
24  A.        At least 17.
25  Q.        So how long were you the district manager?

                                                        14

**Dec. of Thompson - Exhibit 5**

Allen vs. Radio Shack  Hani Alzaghari                6/14/12

1    A.        I was the district manager in the
2    San Francisco district from January 2003 until beginning
3    of 2010.  When --
4    Q.        Beginning January?
5    A.        February.  January, February.
6    Q.        Of 2010.
7    A.        Correct.
8    Q.        Okay.  What happened in February of 2010?
9    A.        I went to another district in San Jose.
10   Q.        Were you still a district manager?
11   A.        That is correct.
12   Q.        So how many stores did you have in your
13   supervision?
14   A.        In San Jose, 19 stores.
15   Q.        Was that a promotion in February of 2010?
16   A.        No, it was not.  It was just a new regional
17   manager and did some moving around between the district
18   managers.
19   Q.        Who was the new regional manager that moved
20   you?
21   A.        Todd Shraeder.
22   Q.        Do you know when he started?
23   A.        Not exactly, but I want to say around the same
24   time.  The 2010 time frame.
25   Q.        So, you're in San Jose with 19 stores but your
                                                              15

De Souza & Associates    650-341-2671      desouzacr@att.net

**Dec. of Thompson - Exhibit 5**

Allen vs. Radio Shack  Hani Alzaghari                   6/14/12

1    title is still district manager.

2    A.        That is correct.

3    Q.        And how long were you in that position?

4    A.        I was there until August of 2010.

5    Q.        So from February 2010 to August.

6    A.        Yes.

7    Q.        What happened in August?

8    A.        That's when I went on leave.  Medical leave.

9    Q.        In August of 2010, when you went on medical

10   leave, who was your immediate supervisor?

11   A.        Todd Shraeder.

12   Q.        Do you recall who he reported to?

13   A.        Yes.  The area vice president, and his name is

14   David Charles.

15   Q.        And then you reported directly to Todd?

16   A.        Yes.

17   Q.        Let me go back for one second to 2009.

18             Who did you report to in 2009?

19   A.        Okay.  We had a gap before Todd came to the

20   company -- or to San Francisco region.  He was with the

21   company.

22             During that gap, we did not have a regional

23   manager, so we have the area vice president oversee the

24   region temporary.

25   Q.        And who was that?

                                                              16

De Souza & Associates    650-341-2671      desouzacr@att.net

Allen vs. Radio Shack  Hani Alzaghari                    6/14/12

1    A.       I believe it was Greg Pattakos.

2    Q.       And he's located in Texas, right?

3    A.       Correct.

4    Q.       So for 2009, you would report to

5    Greg Pattakos.

6             Do you recall who he reported to in 2009?

7    A.       The senior vice president, Brian Bevin.

8    Q.       And where is Mr. Bevin located?

9    A.       In Texas as well.

10   Q.       In 2009, who reported directly to you, if you

11   recall?  Would that be the 19 stores in San Jose area?

12   A.       In 2009?  No.  That would be San Francisco

13   stores.

14   Q.       Oh, I'm sorry.  The stores in --

15   A.       Correct.

16   Q.       So let me go back for a second here.

17            The 22 stores in San Francisco -- 21, 22

18   stores.  Would the individual store manager, like my

19   client, Frank Allen, would they be direct reports to you

20   or is there somebody in between?

21   A.       They would be direct report to me.

22   Q.       So August 2010.  How long did you go out for?

23   A.       I was out -- I did not return to the company,

24   but I was out for four or five months before I left the

25   company.

                                                        17

De Souza & Associates    650-341-2671        desouzacr@att.net

**Dec. of Thompson - Exhibit 5**

Allen vs. Radio Shack  Hani Alzaghari                6/14/12

| 1 | A.        Yes. |
| 2 | Q.        Did you have any other job other than that? |
| 3 | A.        No. |
| 4 | Q.        Now, do you know who Donna Ocampo is? |
| 5 | A.        Yes. |
| 6 | Q.        When did you first meet Donna Ocampo? |
| 7 | A.        I don't remember.  Many years ago.  I want to |
| 8 | say by the time I was promoted to district manager. |
| 9 | Beginning of 2003 or something. |
| 10 | Q.        During the time that you were in charge of the |
| 11 | San Francisco stores, did you have any kind of working |
| 12 | relationship with Donna Ocampo? |
| 13 |           MS. SHY:  Objection.  Vague and ambiguous. |
| 14 |           MS. ALIOTO:  To August 2010.  From -- |
| 15 |           MS. SHY:  You can answer the question. |
| 16 |           THE WITNESS:  We were store -- we were |
| 17 | district managers within the same region. |
| 18 | BY MS. ALIOTO: |
| 19 | Q.        Okay.  So she was a district manager.  She was |
| 20 | never a manager of a store under your supervision? |
| 21 | A.        No. |
| 22 | Q.        When was the first time you met Greg Pattakos? |
| 23 | A.        He came to the San Francisco region for a |
| 24 | meeting.  I want to say towards the end of 2009. |
| 25 | Q.        Okay.  And from that time on, the end of 2009 |

21

**Dec. of Thompson - Exhibit 5**

Allen vs. Radio Shack  Hani Alzaghari          6/14/12

1   to your departure in August of 2010, you reported
2   directly to him?
3   A.        No.
4   Q.        "No?"
5   A.        No.
6   Q.        Who did you report?
7   A.        He was here for a short period.  Could have
8   been two, three months as an acting regional manager.
9   There were also another acting regional manager.
10  Q.        Okay.
11  A.        Until Todd Shraeder came to manage the
12  San Francisco region.
13  Q.        So would it be fair to say that December,
14  January, February, or March of 2009 to 2010, you
15  directly reported to Pattakos?
16  A.        I want to say no more than two months towards
17  the end of 2009.  I just cannot recall the months.
18  November, December of 2009.
19  Q.        And then Todd took over?
20  A.        Todd took over beginning of 2010.  Might have
21  been February or March, I just don't recall exactly.
22  Q.        Do you remember the first time you met
23  Frank Allen?
24  A.        Yes.  That was at the manager's meeting when I
25  first took over the district.

                                                      22

De Souza & Associates   650-341-2671      desouzacr@att.net

**Dec. of Thompson - Exhibit 5**

Allen vs. Radio Shack  Hani Alzaghari                    6/14/12

1   Q.        And that year and month?

2   A.        That was beginning of 2003.

3   Q.        From the time that you first met Frank to the

4   time that he left in April of 2010, did you have a good

5   relationship with Frank?

6             MS. SHY:  Objection.  Vague and ambiguous.

7             THE WITNESS:  Yes.

8   BY MS. ALIOTO:

9   Q.        Did you believe that -- as the district

10  manager, did you believe that Frank was a good worker?

11            MS. SHY:  Objection.  Vague and ambiguous.

12            THE WITNESS:  Yes.

13  BY MS. ALIOTO:

14  Q.        Did you believe that he was a good employee

15  for RadioShack?

16            MS. SHY:  Same objection.

17            THE WITNESS:  Yes.

18  BY MS. ALIOTO:

19  Q.        Now, ask you -- let's start out with some of

20  these documents.

21            The first one would be a document that's Bates

22  stamped 156, dated January 23rd of 2009.  It's called a

23  Quick Visit.

24                      (Plaintiff's Exhibit 1 marked

25                       for identification.)

                                                        23

De Souza & Associates    650-341-2671      desouzacr@att.net

**Dec. of Thompson - Exhibit 5**

Case3:11-cv-03110-WHA  Document40  Filed11/16/12  Page59 of 297

Allen vs. Radio Shack  Hani Alzaghari                    6/14/12

```
 1              MS. SHY:  Objection --

 2              THE WITNESS:  No.

 3              MS. ALIOTO:  Excuse me.  In the back desk.

 4              MS. SHY:  Objection.  Vague and ambiguous,

 5     assumes facts, lacks foundation.

 6              THE WITNESS:  I had no idea.

 7     BY MS. ALIOTO:

 8     Q.      Have you ever heard of any other stores that

 9     were under your supervision in San Francisco that kept

10     cash in the back drawer manager's office?

11              MS. SHY:  Objection.  Vague and ambiguous.

12              THE WITNESS:  No.

13     BY MS. ALIOTO:

14     Q.      Okay.  "To my knowledge, District Manager

15              Hani Alzaghari knew and allowed Store 3830 to

16              keep money in the store's manager's -- to keep

17              money in the store manager's desk drawer in the

18              back office."

19     A.      That is not --

20              MS. SHY:  Wait, there is no question.

21     BY MS. ALIOTO:

22     Q.      Is that true?

23              MS. SHY:  Okay.  Let me object.

24              Vague and ambiguous.  Assumes facts.

25              Go ahead.

                                                          39
```

**Dec. of Thompson - Exhibit 5**

Allen vs. Radio Shack  Hani Alzaghari                    6/14/12

```
 1   A.        Other district managers.
 2   Q.        District managers.  Okay.
 3             Do you recall Frank being at that meeting?
 4   A.        Yes.
 5   Q.        And can you tell me what was discussed at that
 6   meeting?  Is this November or December of 2009?
 7   A.        I don't remember if it's November -- it was
 8   towards the end -- it was towards the end of the year.
 9   Normally we don't have meetings because of the nature of
10   the season, the time is busy, and it's not time to train
11   and pull managers away from the stores.
12   Q.        Right.
13   A.        The purpose of that meeting was to cover
14   action items with the store managers to prepare their
15   stores after a market visit by Greg Pattakos.
16   Q.        Okay.  And the market visit.  Did you go to
17   the market visit?
18   A.        No.
19   Q.        When you say market visit, does that mean that
20   Mr. Pattakos goes from store to store to store?
21   A.        Market visit.  He was the area vice president
22   overseeing this region because there was no regional
23   manager.  Again, I'm not 100 percent sure because Donna
24   had filled in for a short period of time, maybe a month
25   or so, as an acting regional manager, so that might have
                                                          56
```

De Souza & Associates    650-341-2671        desouzacr@att.net

Dec. of Thompson - Exhibit 5

Allen vs. Radio Shack  Hani Alzaghari                6/14/12

1    been the time we did not have a permanent regional

2    manager.

3            The market visit is he's the area vice

4    president, so he would go and visit the San Francisco

5    market, the Los Angeles market and so on.  So the market

6    visit will be visiting this market.  The market is 11

7    districts.  San Francisco district, my district back

8    then, was one of the 11 districts.

9    Q.       But when you say he is visiting the market,

10   does he go to the individual stores in the district

11   without you?

12   A.       He did, yes.

13   Q.       Okay.  And that's what -- and he's supposed to

14   go -- what's the purpose of the market visit?

15   A.       He would go and inspect the stores to see if

16   the stores are up to standards and there is consistency

17   throughout the company.

18   Q.       Okay.  Did he then talk to you as the district

19   manager of the San Francisco district about his visits

20   to the district stores?

21   A.       Yes.

22   Q.       And then after he talked to you about the

23   district stores, you then called in all the managers of

24   the district stores and had a meeting with Ocampo and

25   Suhail.

                                                          57

De Souza & Associates    650-341-2671      desouzacr@att.net

**Dec. of Thompson - Exhibit 5**

Allen vs. Radio Shack  Hani Alzaghari          6/14/12

1           MS. SHY:  Objection.  Misstates his testimony.

2           MS. ALIOTO:  Is that right?

3           THE WITNESS:  Yes, that is correct.

4    BY MS. ALIOTO:

5    Q.       Okay.  So now, what did you and Mr. Pattakos

6    talk about after he had visited your stores in the

7    district?

8    A.       He had told me that the stores that he visited

9    had some issues as far as merchandising and -- I don't

10   remember exactly.  Planograms it could have been,

11   execution of planograms, pricing might have been.  And

12   that we need to get the stores up to company standards

13   for his next visit.

14   Q.       Okay.  And what were the company standards

15   that he felt your stores in this district were lacking?

16   A.       I want to say pricing, following planograms,

17   execution of sales promotions.  Those main things he was

18   pointing out to me.

19   Q.       Okay.  Now, this is right before or around the

20   time of the exhibit that we just saw.  It's January of

21   2000 -- well, strike that.

22           You're talking about the end of 2009, right?

23   A.       Yes.

24   Q.       Okay.  So at the time that he visited Frank's

25   store at the end of 2009, Frank's store was one of the

                                                        58

De Souza & Associates   650-341-2671      desouzacr@att.net

**Dec. of Thompson - Exhibit 5**

1    highest selling stores in the district, right?

2              MS. SHY:  Objection.  Vague and ambiguous.

3              MS. ALIOTO:  If not the highest.

4              THE WITNESS:  I don't remember the exact

5    figures.  Frank's store is one of the top four in the

6    district.

7    BY MS. ALIOTO:

8    Q.        Okay.  Four out of the --

9    A.        Out of 22.

10   Q.        22.

11   A.        21 or 22.

12   Q.        Okay.  And so he told you those were the

13   issues.

14             What did you discuss with the managers when

15   you met with them about Mr. Pattakos's visits?

16   A.        We discussed the issues that he pointed out at

17   Frank's store and gave them probably a lengthy to-do

18   list to follow and go back to the stores.  Because he

19   said he's going to come back and follow-up on the stores

20   and visit again.

21   Q.        Did he tell you that he had any specific

22   problem with Frank's store?  3830.

23   A.        I remember he visited two stores.

24   Q.        And that's all?

25   A.        It might have been three, I'm not

59

Allen vs. Radio Shack  Hani Alzaghari                6/14/12

1    100 percent -- yes, in my district that's -- Frank was
2    one of them.
3    Q.       Okay.
4    A.       I believe the store on Market and Third, Store
5    3204 where the manager is Alex is the other one.  And he
6    had pointed out the issues that he found.
7    Q.       Okay.  So the issues that he pointed out to
8    you that he had found that he felt needed being fixed
9    were at only two to three stores within the 22-store
10   district?
11   A.       That is correct.
12   Q.       All right.  But in your meeting, you called in
13   all 22 stores --
14   A.       Yes.
15   Q.       -- and Ocampo and Mr. Suhail?  Okay.
16            Do you recall what he specifically said about
17   Frank's store, other than the planogram and the --
18   A.       I don't recall exact words.
19   Q.       Did he mention Frank himself?
20   A.       Possible.  I just don't remember the exact
21   conversation, but there is a big possibility that he
22   mentioned the store manager, Frank.
23   Q.       Well, let me ask you.  Did he mention that he
24   felt the store manager and the crew at that specific
25   location needed to be changed?

                                                          60

De Souza & Associates    650-341-2671     desouzacr@att.net

**Dec. of Thompson - Exhibit 5**

Allen vs. Radio Shack  Hani Alzaghari                6/14/12

1           MS. SHY:  Objection.  Vague and ambiguous.

2           MS. ALIOTO:  "Crew" meaning staff.

3           THE WITNESS:  I don't know about his feelings.

4    He did not say anything to me.

5    BY MS. ALIOTO:

6    Q.       So he didn't mention the staff to you at all

7    after his visit to 3830?

8    A.       I don't recall the staff.  I don't recall him

9    talking about the staff.  His main thing was the store

10   appearance.

11   Q.       The store appearance.

12   A.       The appearance.  The planograms, the pricing.

13   Those issues.

14   Q.       So would it be fair to say that his complaints

15   about 3830 were the same complaints he had about the

16   other store, or stores, that he visited?

17           MS. SHY:  Objection.  Misstates his testimony.

18           THE WITNESS:  I'm sorry.  I lost the question.

19   Can you repeat the question one more time.

20   BY MS. ALIOTO:

21   Q.       Would it be fair to say that Mr. Pattakos's

22   complaints about 3830 were the same about the other two

23   stores he visited?

24           MS. SHY:  Same objection.

25           THE WITNESS:  Yes.  It might have been less

                                                        61

De Souza & Associates    650-341-2671      desouzacr@att.net

**Dec. of Thompson - Exhibit 5**

Allen vs. Radio Shack  Hani Alzaghari          6/14/12

1    issues at other store.  I don't remember if it's two or

2    three stores, but I know for sure it's two.  It might

3    have been three stores.

4            But each store had some issues, and Frank had

5    more issues than the other store.

6    BY MS. ALIOTO:

7    Q.        And do you recall what the extra issues were?

8    The more issues that you're saying.

9    A.        It's just the more -- more planogram issues,

10   pricing.  Those type of issues.

11   Q.        Okay.  Now, was the other store manager Alex?

12   A.        Yes.

13   Q.        And if there possibly was a third one, do you

14   recall who the manager was?

15   A.        It might have been the other one in the

16   Financial District, which is on Pine.  Bill Hamilton.

17   Q.        Bill Hamilton.

18   A.        Yes.  It might have been.  Those three are

19   within a walking distance, that's why those would be the

20   three to visit at the same time.

21   Q.        Were you there when Bill Hamilton was

22   terminated?

23   A.        No.

24   Q.        Okay.  Let's go on to what I think is Exhibit

25   No. 6, which is dated April 22nd.  We are still back now

                                                            62

**Dec. of Thompson - Exhibit 5**

Allen vs. Radio Shack  Hani Alzaghari                6/14/12

```
 1            MS. SHY:  This is January --
 2            MS. ALIOTO:  -- performance is outstanding.
 3   That's Exhibit 1.
 4            So, I'm just talking about the exhibits, I'm
 5   not talking about the two declarations mixed in, okay?
 6            THE WITNESS:  Yes.
 7   BY MS. ALIOTO:
 8   Q.       Between that time, did you ever report to
 9   management that Frank Allen had ever, in any way, have
10   any cash shortages from January to April of 2009?
11   A.       I don't remember the exact time, if I did.
12   Cash shortages show on reports that many management
13   levels in the company have access to, including loss
14   prevention, regional managers.
15   Q.       Right.
16   A.       Yeah.
17   Q.       But I'm asking about you.
18   A.       I don't remember reporting anything specific.
19   I just don't remember those three months if I did or
20   not.
21   Q.       As you sit here today, do you ever remember
22   reporting that Frank Allen's store had cash shortages?
23   A.       Yes.
24   Q.       When?
25   A.       I don't remember.
```

                                                          65

De Souza & Associates   650-341-2671      desouzacr@att.net

**Dec. of Thompson - Exhibit 5**

Allen vs. Radio Shack  Hani Alzaghari                    6/14/12

1    Q.        Now, how did you report that?
2    A.        This would be a phone call to the loss
3    prevention manager.
4    Q.        This is a phone call.  You don't have a
5    document?
6    A.        It's already there.  It does exist, the
7    document.
8              The store managers, when they do their daily
9    banking deposit and they count the money before they
10   take it to the bank, it will compare the actual cash to
11   what it's supposed to be.
12   Q.        Right.
13   A.        And if there is any overage or shortage, it
14   will show up there.
15   Q.        Okay.
16   A.        So it's an automated system that tells me, or
17   tells any person, any management person, if there is any
18   shortage or not.
19   Q.        So what you're saying is if I were to get the
20   bank deposits for January, February, March, April, May,
21   I would know whether or not there were shortages.
22   A.        Yes.
23   Q.        Okay.
24   A.        Yes.
25   Q.        And what bank did you bank with?
                                                          66

De Souza & Associates    650-341-2671      desouzacr@att.net

**Dec. of Thompson - Exhibit 5**

```
 1   A.        Okay.
 2   Q.        I take it at this point you still had a really
 3   good -- well, let me ask you this.  When Frank left, up
 4   and to the time that Frank was terminated in April of
 5   2010, did you always have a good relationship with him?
 6   A.        Yes.
 7   Q.        So with this document that's September 9th,
 8   2009, were these suggestions to help him move to the new
 9   location?  In other words, I don't understand this
10   document.
11             Okay.  So you were there on September 9th, and
12   you were there for two hours and 30 minutes.  And you
13   suggest in the second paragraph,
14             "Once you're approved to start, here is some
15             suggestions from me and your fellow manager."
16             Is that fellow manager Alex?
17   A.        I don't remember who was with me.  If I had
18   another manager with me.
19   Q.        Oh, you do take managers to these visits?
20   A.        Once in a while.  Not all the time, but once
21   in a while I will take another manager.
22   Q.        It says,
23             "Schedule no more than three people to make
24             big move."
25             So you're telling him how to physically move
```

78

**Dec. of Thompson - Exhibit 5**

Allen vs. Radio Shack  Hani Alzaghari                    6/14/12

```
1    BY MS. ALIOTO:
2    Q.      All right.  So this is Exhibit No. 11 and it's
3    December 5th.
4            You start out by saying,
5            "Frank, I'm disappointed to see your store
6            behind in execution of non-negotiables."
7            What does that mean?  What are the
8    non-negotiables?
9    A.      Non-negotiatables is a term that the company
10   is using, or introduced.  I don't recall when it
11   started, but it's more of a structured guide for all
12   stores in the company to follow.
13   Q.      Okay.
14   A.      Where before that each region, each district
15   manager can have their own structured to-do list, this
16   is more of a corporate task that needs to be done at
17   every store consistent across the country.
18   Q.      So it's the --
19   A.      It's called the Non-Negotiatables Tasks.
20   Q.      Executing the non-negotiatable, setting up the
21   ready-set sale guide.
22           So was that new?  A new policy by the
23   corporation?
24   A.      Non-negotiatables was new at some point.  I
25   don't think it was new in December 2009.
```
                                                         82

De Souza & Associates    650-341-2671       desouzacr@att.net

**Dec. of Thompson - Exhibit 5**

Allen vs. Radio Shack   Hani Alzaghari                    6/14/12

1   Q.       Okay.

2   A.       This is a document -- this is an execution

3   program document that the executive vice president,

4   Brian Bevin, brought into the company when he came, or

5   within six months from his taking over.

6   Q.       Okay.  So this is prior -- this is -- these

7   negotiables were something that were set up prior to the

8   arrival of Pattakos in San Francisco.

9   A.       They had already been in place, yes.

10  Q.       That's what I mean.  Okay.

11           Okay, now, this is -- turn the page.  Let me

12  ask you something.  Would you make a regular salary with

13  a commission or was it just a plain, regular salary.

14  A.       As a store manager?

15  Q.       No, no, no.  As the district manager.

16  A.       District managers' pay structure consists of a

17  base salary and then a bonus.  The bonus is divided into

18  quarterly and a year-end bonus.  Two bonuses.

19  Q.       Okay.  And would you get a bonus if the store

20  in your district was one of the highest-selling stores

21  in the region?

22  A.       Not if one store is.  It has to be the total

23  district sales over last year.  Sales increases over

24  last year --

25  Q.       Okay.

                                                         83

De Souza & Associates    650-341-2671       desouzacr@att.net

**Dec. of Thompson - Exhibit 5**

Allen vs. Radio Shack  Hani Alzaghari          6/14/12

```
 1              Did you ever see those -- in your many visits,
 2    did you ever see any laptops that were only secured by
 3    streamers?
 4              MS. SHY:  Can I just ask what you're reading
 5    from?
 6              MS. ALIOTO:  Exhibit No. 13, March 14th.
 7              MS. SHY:  What's the Bates number on the page?
 8              MS. ALIOTO:  258.
 9              MS. MIA:  You know what?  That's the wrong
10    one.
11              MS. SHY:  I don't have that page.
12              MS. ALIOTO:  What do you have?
13              MS. SHY:  I have 193 and 194.
14              MS. MIA:  This is an email from March 14th.
15              One second.
16              MS. ALIOTO:  Off the record.
17              (Discussion off the record:  1:04 p.m. to
18              1:04 p.m.)
19              MS. ALIOTO:  So this is 13 and we are going to
20    have to take back the one that she just marked 13.
21                        (Plaintiff's Exhibit 13 remarked
22                         for identification.)
23              MS. SHY:  So Exhibit 13 is Bates No. RS/Allen
24    000258.  One page.
25    //
                                                         113
```

De Souza & Associates   650-341-2671      desouzacr@att.net

**Dec. of Thompson - Exhibit 5**

| | |
|---|---|
| 1 | Q.      No.  Okay, I'm just going to quickly recap |
| 2 | this. |
| 3 | This is a March 2010 document.  In that |
| 4 | paragraph, that last paragraph, we're talking about |
| 5 | something that happened a year before in February of |
| 6 | 2009.  That's why it might be confusing because very |
| 7 | rarely does a company go back a year to talk about |
| 8 | something that went wrong, allegedly. |
| 9 | So, "Allen is aware of the external challenges |
| 10 | of his store due to its location.  However, he |
| 11 | failed to protect our assets in numerous ways. |
| 12 | In February 2009, a visit was conducted and |
| 13 | Allen had just had a laptop stolen." |
| 14 | Do you ever remember that happening? |
| 15 | A.      I remember a laptop stolen from his store, |
| 16 | yes. |
| 17 | Q.      You do. |
| 18 | A.      I do remember a laptop being stolen. |
| 19 | Q.      Did you write about it? |
| 20 | A.      We -- Frank has to report it and -- |
| 21 | Q.      And he did. |
| 22 | A.      -- in the formal logs and theft report. |
| 23 | Q.      Okay.  And did he report it? |
| 24 | A.      I believe so. |
| 25 | Q.      And were there any other issues about it? |

                                                    125

**Dec. of Thompson - Exhibit 5**

1        I, DEBRA J. SKAGGS, CSR No. 7857, a Certified

2    Shorthand Reporter, do hereby certify:

3        That HANI ALZAGHARI, the witness in the

4    foregoing deposition was by me duly sworn to tell the

5    truth, the whole truth, and nothing but the truth in the

6    within-entitled cause;

7        That said deposition was reported by me and

8    transcribed as herein set forth;

9        That, if signed, the deposition was read by or

10   to said witness, corrected in every particular desired

11   way, and was thereafter subscribed by said witness;

12       That, if unsigned, the deposition was retained

13   by me at the offices of DE SOUZA & ASSOCIATES, San

14   Mateo, California and was available for reading,

15   correcting and signing by said witness.

16       I further certify that I am not interested in

17   the outcome of said action, nor connected with, nor

18   related to any of the parties in said action or to their

19   respective counsel.

20                IN WITNESS WHEREOF I have hereunto

21                set my hand this 25ᵗʰ   day of

22                _____, 2012.

23                _____

                  DEBRA J. SKAGGS, CSR No. 7857

24

25

                                                      133

Dec. of Thompson - Exhibit 5

# ℝ RadioShack.
## C O R P O R A T I O N

| | |
|---|---|
| **DATE:** | March 14, 2010 |
| **TO:** | 0538 DM |
| | cc: James Peterson;0340 |
| | AHRD;0101 RSD |
| | Loss Prevention (Corporate) |

*other cc:*

| | |
|---|---|
| **FROM:** | David Gonsolin |
| | Regional LP Manager |
| | Office: |
| | Mobile:   (916)842-9552 |
| **TYPE:** | Failure to Protect Assets |
| **SUBJECT:** | Failure to secure merchandise on the salesfloor, complete weekly cage counts, report cash shortages |
| **RE:** | Store #:   3830      **Employee:**   Allen      Frank |

The following details are provided to you for your information and action deemed appropriate. If you have any questions concerning this matter, please do not hesitate to contact me.

On 3/09/10 a visit was conducted to store 01-3830, San Francisco California. During the visit it was found that Store Manager Frank Allen had 5 laptops on display that were only secured by screamers. It was also found that there were 6 LCD TV's on display and none of them had the required security cable. There were also 3 Schlage locksets, approximately $199.99 each, that had no security devices on them at all. It was also found that Allen had missed a cage count in mid February.

Lastly it was found that over the past several months there were numerous cash shortages. Allen had not reported these and had no explanation as to why they are happening.

Allen is aware of the external challenges of this store due to its location, however, he failed to protect our assets in numerous ways. In February 2009 a visit was conducted and Allen had just had a laptop stolen from the sales floor where he did not have it secured at all. Allen needs to ensure he uses all available resources to protect our assets on the sales floor. Allen must also complete the weekly cage count in full and communicate any missing items to his DM and RLPM. Allen also agreed to start conducting over short inquiries at least 4 times a day and report any large cash shortages to his DM and RLPM.

EXHIBIT 3
Consisting of ___ Pages    For Identification
Witness Alzaghari
Date 5-11-11
Debra J. _____    SF 7857

RS/ALLEN000258

EXHIBIT 6

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION


FRANK ALLEN,

        Plaintiff,

    vs.                          CASE NO.
                                  CV 11 3110 WHA

RADIO SHACK CORPORATION, et al.,

        Defendants.
_____/


DEPOSITION OF ROSETTA LATRICE HOLMES

September 12, 2012


Reported by:
WENDY C. BROWN
C.S.R. NO. 5697


PATRICIA CALLAHAN REPORTING
Certified Shorthand Reporters
(510) 885-2371   (415) 788-3993
Facsimile (510) 247-9775
PATRICIA CALLAHAN REPORTING

3923ef63-cde4-46d1-a00e-61453cc52b9a

Dec. of Thompson - Exhibit 6

Page 5

1          BE IT REMEMBERED THAT, pursuant to Subpoena, and

2    on Wednesday, September 12, 2012, commencing at the hour

3    of 9:58 o'clock a.m. of the said day, at the law offices

4    of MILLER LAW GROUP, 111 Sutter Street, Suite 700,

5    San Francisco, California, before me, WENDY C. BROWN, a

6    certified shorthand reporter, State of California,

7    personally appeared ROSETTA LATRICE HOLMES, a witness in

8    the above-entitled court and cause, produced on behalf

9    of the defendant, who, being by me first duly sworn, was

10   then and there examined and interrogated by Attorney

11   Tracy Thompson, representing the law offices of MILLER

12   LAW GROUP, 111 Sutter Street, Suite 700, San Francisco,

13   California, counsel for the defendant.

14

15                    APPEARANCES OF COUNSEL

16

17   FOR THE PLAINTIFF:

18

19        LAW OFFICES OF MAYOR JOSEPH L. ALIOTO &

20        ANGELA ALIOTO

21        BY:  ANGELA MIA VERONESE, ESQ.

22        700 Montgomery Street

23        San Francisco, California  94111

24

25

PATRICIA CALLAHAN REPORTING

3923ef63-cde4-46d1-a00e-61453cc52b9a
**Dec. of Thompson - Exhibit 6**

1    Q.      And was Frank Allen your manager the entire time

2    you worked at Radio Shack?

3    A.      Yes.

4    Q.      Well, until the time of his termination,

5    correct?

6    A.      Yes.

7    Q.      That was my fault.  Not a good question.  Okay.

8            Did Mr. Allen hire you?

9    A.      No.

10   Q.      Do you remember who hired you?

11   A.      Hani.

12   Q.      Is that Hani Alzaghari?

13   A.      Yes.  That's how you say his last name.  I could

14   never get that right.

15   Q.      And was it your understanding that

16   Hani Alzaghari, at the time that he hired you, was the

17   district manager for San Francisco?

18   A.      Yes.

19   Q.      And was it your understanding that Frank Allen

20   reported to Hani Alzaghari?

21   A.      Yes.

22   Q.      And did you have any understanding of who

23   Hani Alzaghari reported to?

24   A.      No.

25   Q.      Now, when you say that -- were you interviewed

3923ef63-cde4-46d1-a00e-61453cc52b9a

**Dec. of Thompson - Exhibit 6**

Page 24

1    A.        No.

2    Q.        Oh, okay.  All right.  So when did you first

3    speak with Mr. Allen?  When did you first meet

4    Mr. Allen?

5    A.        The first day of work.

6    Q.        Okay.  And what was your first position there?

7    A.        Sales associate.

8    Q.        And did you keep that same position throughout

9    your employment?

10   A.        Yes.

11   Q.        And were you a full-time employee?

12   A.        Yes.

13   Q.        How frequently did you have interactions with

14   Hani Alzaghari while you were employed?

15   A.        Not very frequently.

16   Q.        Can you give me your best recollection of --

17   would it be once a month, once every six months?  How

18   often would you physically see him?

19   A.        Hmm ....

20            MS. VERONESE:  Just to clarify, physically see

21   him, not necessarily interaction, just see him?

22            MS. THOMPSON:  Q.  Yeah, where physically you

23   and he were in the same general vicinity of one another.

24   A.        Maybe three to four, maybe six times.

25   Q.        Total?

3923ef63-cde4-46d1-a00e-61453cc52b9a

**Dec. of Thompson - Exhibit 6**

Page 25

1    A.       At the most, yeah.

2    Q.       Six times over the course of your employment?

3    A.       Hmm, maybe a little more than that, then.

4    Yeah -- we're going to say six, so, yeah.

5    Q.       I'm sorry?

6    A.       Yes.

7    Q.       So what's your best estimate?

8    A.       Six is fine.

9    Q.       So I realize that -- you're giving me your best

10   estimate, right?

11   A.       Yes.

12   Q.       Okay.  So your best estimate was that over the

13   course of your employment you were physically present in

14   the same room or general vicinity with Mr. Hani

15   Alzaghari about six times total, right?

16   A.       Yes.

17   Q.       And were those always at Store 3830?

18   A.       No.

19   Q.       Where else would you actually see Mr. Alzaghari?

20   A.       We had meetings, and he was mostly there at the

21   meetings, so ....

22   Q.       Oh, okay.

23   A.       So I would see him at some of the meetings.

24   Q.       So how many times did you actually see

25   Mr. Alzaghari at Store 3830?

3923ef63-cde4-46d1-a00e-61453cc52b9a

**Dec. of Thompson - Exhibit 6**

Page 26

1   A.      I would say about six times, yeah.

2   Q.      At the store?

3   A.      At the store, yeah.

4   Q.      Okay.  So, just so we're clear then, again --

5   A.      It's, like --

6           MS. VERONESE:  Just --

7           MS. THOMPSON:  Q.  So you saw Mr. Alzaghari at

8   Store 3830 approximately six times throughout the entire

9   course of your employment?

10  A.      Yes.

11  Q.      Okay.  So you mentioned that you would see him

12  at other locations, as well, right?

13  A.      Yes.

14  Q.      So what other locations did you see

15  Mr. Alzaghari at?

16  A.      I'd see him in the conference -- at conferences

17  that we had to go to.  That's about it.

18  Q.      Okay.  So when you say "conferences," where did

19  those conferences take place?

20  A.      In conference halls.  We would have to go to the

21  place and have meetings with him, so, yes.

22  Q.      So how many such conferences did you personally

23  attend where you recall Mr. Alzaghari being there?

24  A.      Two.

25  Q.      And do you remember roughly when the first one

3923ef63-cde4-46d1-a00e-61453cc52b9a

**Dec. of Thompson - Exhibit 6**

1  A.      No, not -- as far as, "Hi, hello, how are you

2  doing?"  No.  I mean, that was mostly it.  Like, "Hello,

3  how are you?"  That was it --

4  Q.      So at each -- I'm sorry.  I didn't mean to

5  interrupt you.

6  A.      No problem.

7  Q.      Just again, so I'm clear, each of these two

8  conferences, to the extent you had any interaction with

9  Hani Alzaghari, it would be basically to say, "Hi, how

10 are you?" kind of thing?

11 A.      Yes.

12 Q.      All right.  Now, of the times that you had

13 interaction with Hani Alzaghari, did you feel that he

14 treated you fairly?

15 A.      Yes.

16 Q.      Did you like working with him?

17 A.      Yes.

18 Q.      You thought he was a good guy?

19 A.      Yes.

20 Q.      Did you think he was a fair boss?

21 A.      Yes.

22 Q.      Did you ever hear Hani Alzaghari ever say

23 anything that you thought was offensive to you, based on

24 your race?

25 A.      No.

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 6**

Page 29

1  Q.      Did you ever hear him say -- Hani Alzaghari say

2  anything any time during your employment that you

3  thought was offensive to anyone, based on race?

4  A.      No.

5  Q.      Did you ever hear Mr. Alzaghari say anything

6  that you thought was derogatory about Mr. Allen?

7  A.      No.

8  Q.      Did you ever hear Mr. Alzaghari say anything

9  that you thought was offensive about Mr. Allen's race?

10  A.      No.

11  Q.      Okay.  Just for the record, what is your race?

12  A.      Black.  African-American, I guess.

13  Q.      Okay.  Did you ever hear Hani Alzaghari make any

14  reference that you thought was offensive about

15  Mr. Allen's age?

16  A.      No.

17  Q.      Did you ever hear anyone at Radio Shack make any

18  comment that you thought was derogatory about

19  African-Americans?

20  A.      No.

21  Q.      Did you ever hear anyone at Radio Shack make any

22  comment that you thought was derogatory of older workers

23  at Radio Shack?

24  A.      No.

25  Q.      Now, during the time that -- let's look again at

3923ef63-cde4-46d1-a00e-61453cc52b9a

**Dec. of Thompson - Exhibit 6**

Page 59

1   at any given time in the manager's desk drawer; is that

2   a fair statement?

3   A.     Yes.

4   Q.     Was one of your -- well, let me ask you another

5   question.  Did you have any conversations with anyone at

6   Radio Shack other than Mr. Allen about keeping money in

7   the manager's desk drawer?

8   A.     No.

9   Q.     Did anyone other than Mr. Allen ever give you

10  instructions about keeping money in the -- keeping cash

11  in the manager's desk drawer as opposed to keeping it in

12  the cash registers?

13  A.     No.

14  Q.     Okay.  Let's look at paragraph 5 on Exhibit 2.

15  Paragraph 5 reads, quote, "Money was kept in the store

16  manager's desk drawer due to the fact that the two cash

17  registers in Store 3830 did not allow for cash and coins

18  to be placed under the cash drawer," end quote.

19         Do you see where I'm reading?

20  A.     Um-hum.

21  Q.     Is that yes?

22  A.     Yes.

23  Q.     So is that a truthful and accurate statement?

24  A.     Yes.

25  Q.     So is it your testimony that -- maybe I'm

3923ef63-cde4-46d1-a00e-61453cc52b9a

**Dec. of Thompson - Exhibit 6**

Page 62

1   A.      You're saying extra or just period?

2   Q.      Cash.  You had room in the cash register drawers

3   to keep bills and coins.  Is that a true statement?

4   A.      Yes.

5   Q.      Okay.  And so there was no reason to place cash

6   or coins under the cash drawer, because you could put

7   them in the cash drawer, right?

8   A.      Yes.

9   Q.      Okay.  So let's look again at paragraph 5 on

10  Exhibit 2.  This is not a true statement, is it, that

11  you've written here?

12          MS. VERONESE:  Well --

13          MS. THOMPSON:  Q.  I really need to ask her

14  this, I'm sorry.

15          MS. VERONESE:  Okay.

16          But read the statement.

17          MS. THOMPSON:  Q.  Please read it and make sure

18  you understand what it says, and then I need you to tell

19  me whether that's a truthful or accurate statement or

20  whether you want to change it.

21  A.      No.  It's truthful, because the way that that --

22  when we were in that store, the way the drawers were set

23  up, you couldn't -- you couldn't -- you couldn't put

24  nothing under them.

25  Q.      Okay.

3923ef63-cde4-46d1-a00e-61453cc52b9a

**Dec. of Thompson - Exhibit 6**

Page 69

1    Q.      I'm sorry?

2            MS. VERONESE:  Let her finish the question.

3            MS. THOMPSON:  Q.  Go ahead.

4    A.      Maybe some of it, yes.

5    Q.      Well, all of it, right?

6    A.      No, not -- I can't say all of it.  I can't say

7    that.

8    Q.      Well, that's what I'm trying to get at.  So

9    let's start again, then.

10   A.      No.

11   Q.      Are you saying it's physically impossible,

12   because there wasn't -- there was never enough room in

13   either or both of the cash registers to keep 100

14   one-dollar bills and twenty five-dollar bills, and 25 to

15   $50, approximately, in rolled coins; are you saying it

16   was physically impossible to keep that amount of money

17   in the cash registers?

18           MS. VERONESE:  Asked and answered.

19           THE WITNESS:  No.

20           MS. THOMPSON:  Q.  So it was physically possible

21   to put the money there, right?

22   A.      Yes.

23   Q.      Okay.  But your understanding was that the

24   reason it was kept in the manager's desk drawer was not

25   because there wasn't room in the cash registers, but

3923ef63-cde4-46d1-a00e-61453cc52b9a

**Dec. of Thompson - Exhibit 6**

Page 71

1   Q.      So but you just drew the conclusion that was the

2   reason?

3   A.      Yes.

4   Q.      Okay.  Did you personally ever have any

5   conversation with Hani Alzaghari about where the cash

6   should be maintained?

7   A.      No.

8   Q.      Other than possibly talking with Mr. Allen about

9   where the cash should be maintained, whether it should

10  be in the back, manager's desk drawer, or in the cash

11  registers, did you talk with anyone else at Radio Shack

12  about what the proper procedures were?

13  A.      No.

14  Q.      Did Hani Alzaghari ever say anything to you

15  which would indicate to you that he thought it was okay

16  for you to keep approximately $250 in cash in the

17  manager's desk drawer?

18  A.      He didn't tell me personally, no.

19  Q.      Did any manager at Radio Shack, other than

20  Mr. Allen, ever tell you that it was acceptable practice

21  to keep approximately $250 in cash in the manager's desk

22  drawer rather than in the register?

23  A.      No.

24  Q.      Did you ever have any conversations with any of

25  your coworkers about whether it was appropriate to keep

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 6**

1    cash in the manager's desk drawer rather than in the

2    cash register drawers?

3    A.        No.

4    Q.        So the one and only person you ever talked to

5    about this subject was Mr. Allen?

6    A.        Yes.

7    Q.        All right.  Now, during the day, when a sales

8    transaction was happening and somebody was paying cash

9    for something, they would give you the cash, and you

10   would typically make change out of the cash register?

11   A.        Yes.

12   Q.        Okay.  And did you ever need to go to the back

13   and use change from the cash in the manager's desk

14   drawer?

15   A.        Sometimes, yes.

16   Q.        How often did that happen during the day, when

17   you were engaged in actual sales transactions that you

18   did not have change in the register to make change for

19   the customer?

20   A.        Maybe two to three times, sometimes.

21   Q.        Two to three times throughout the course of your

22   employment?

23   A.        No.  No.

24   Q.        What do you mean, two to three times?

25   A.        You said through a day.  You said in a day.

**Dec. of Thompson - Exhibit 6**

Page 75

1  Q.      No, I understand that; it would vary from day to

2  day.

3  A.      Yes.

4  Q.      All I'm trying to find out, what was the most

5  where -- that you knew, "Gosh, I've got a thousand

6  dollars in the manager's desk drawer."  That's just

7  throwing that out as an example.

8  A.      Right.

9  Q.      Did you ever have $1,000 in cash in the

10 manager's desk drawer?

11 A.      Yes.

12 Q.      Did you ever have $2,000 in cash in the

13 manager's desk drawer?

14         MS. VERONESE:  Don't guess.

15         THE WITNESS:  Yes.

16         MS. THOMPSON:  Q.  Did you ever have $3,000 in

17 cash in the manager's desk drawer?

18 A.      I mean, we can't say the desk drawer, because if

19 it's that much amount, you know, we're going to make a

20 deposit.  That's too much money to have in the store,

21 like, really period, so --

22 Q.      That's what I'm trying to find out --

23 A.      Yeah.

24 Q.      -- though.  So did you ever have $3,000 in cash

25 in the manager's desk drawer?

3923ef63-cde4-46d1-a00e-61453cc52b9a

**Dec. of Thompson - Exhibit 6**

1   A.      Not just loose.  If it wasn't, you know, going

2   to the bank, no, not just in the drawer, no.  No.

3   Q.      So the most that you remember being in the

4   drawer, the manager's desk drawer, was 2,000 in cash?

5   A.      But it wasn't left, though.  We -- it was

6   just -- okay.  No.  Just $200, then.  Because that's the

7   only thing that's supposed to be back there.  But you're

8   saying maybe through a course of a day, seeing it, yeah,

9   to get deposited or something yes, yes, back there.

10  It's not just in a drawer, no.

11  Q.      All right.  Now you're confusing me again, I'm

12  sorry.  I'm talking about what was ever physically

13  present in the manager's desk drawer.  What's the

14  highest dollar amount that was actually in that drawer

15  for more than five seconds?

16          MS. VERONESE:  That you know of.

17          THE WITNESS:  Okay.  More than -- okay.

18          MS. VERONESE:  Don't guess.

19          MS. THOMPSON:  Q.  Best recollection.

20  A.      We're going to say a thousand is fine.

21  Q.      Okay.  So as you sit here now, your best

22  recollection is that you recall at least one instance

23  where you had as much as $1,000 in the manager's desk

24  drawer, right?

25          MS. VERONESE:  That's an estimate?

Page 77

1           THE WITNESS:  Yes.

2           MS. VERONESE:  And just to clarify, in the

3    manager's -- in the back room --

4           THE WITNESS:  Yes.

5           MS. VERONESE:  -- is that where we're talking

6    about about?

7           THE WITNESS:  Right.  In the back room, right.

8    Okay.

9           MS. THOMPSON:  Q.  And where was it maintained

10   in the back room?

11   A.      At his desk.  It was a big desk, yes.

12   Q.      Which drawer --

13   A.      In a drawer.

14   Q.      -- was it in?

15   A.      The -- mostly the top right drawer.

16   Q.      So the top right drawer on the desk.

17   A.      Yes.

18   Q.      And did that drawer have a lock on it?

19   A.      Yes.

20   Q.      And did you have a key?

21   A.      Yes.

22   Q.      Was that a special key that you had for that

23   desk?

24   A.      Yes, I guess.  Yes.

25   Q.      Okay, but you're sure it's the top right drawer?

3923ef63-cde4-46d1-a00e-61453cc52b9a

**Dec. of Thompson - Exhibit 6**

Page 78

1    A.        Yeah.

2    Q.        Okay.  And then when you opened the drawer, how

3    was the cash maintained?

4    A.        In a money bag from Wells Fargo.

5    Q.        Okay.  So were the bills clipped together, or

6    rubber-banded together?

7    A.        Yes.

8    Q.        Okay.  So there would be a rubber-banded stack

9    of the one-dollar bills?

10   A.        Yes.

11   Q.        And a rubber-banded stack of the five-dollar

12   bills?

13   A.        Yes.

14   Q.        And then there would be how many rolls of coins,

15   typically?

16   A.        Maybe fifteen to twenty rolls.

17   Q.        Fifteen to twenty rolls of coins?

18   A.        Yes.

19   Q.        Okay.  Again, so we're clear, during the day,

20   you would add to the amount of cash that was in the

21   manager's desk drawer; is that true?

22   A.        Yes.

23   Q.        Okay.  So what would cause you to decide to put

24   more money in the cash drawer rather than -- I'm sorry,

25   the manager's desk drawer rather than leaving it in the

3923ef63-cde4-46d1-a00e-61453cc52b9a

**Dec. of Thompson - Exhibit 6**

Page 80

1    A.      No.

2    Q.      All right.   Thank you.

3            Did you first meet Frank Allen when you started

4    at Radio Shack?

5    A.      Yes.

6    Q.      And did you like working with Mr. Allen?

7    A.      Yes.

8    Q.      Did you think he was a good boss?

9    A.      Yes.

10   Q.      Do you consider yourself a personal friend of

11   Mr. Allen's?

12   A.      Now, yes.

13   Q.      When did you consider Mr. Allen to become a

14   personal friend in addition to being a boss?

15           MS. VERONESE:   Vague as to "personal friend."

16           THE WITNESS:   Right, yeah.   What do you mean by

17   "personal friend"?

18           MS. THOMPSON:   Q.   Well, I thought I just asked

19   you that and you said he was your friend.

20   A.      Yeah, he's my friend, yes.

21   Q.      So you consider him a friend?

22   A.      Yes.

23   Q.      Okay.   In addition to being your former boss?

24   A.      Yes.

25   Q.      So when did you consider Mr. Allen to become

3923ef63-cde4-46d1-a00e-61453cc52b9a

**Dec. of Thompson - Exhibit 6**

Page 83

1   Q.      Each of you initiated the calls?

2   A.      Yeah.

3   Q.      And what was your purpose in initiating a call

4   with Mr. Allen?

5   A.      Just to see how he was doing.

6   Q.      Okay.  And when Mr. Allen called you, did he

7   tell you why he would be calling you?

8   A.      Same thing.

9   Q.      Just to see how you were doing?

10  A.      Yeah.

11  Q.      Okay.  So other than that, have you had any

12  other communications --

13  A.      No.

14  Q.      -- with Mr. Allen?

15  A.      No.

16  Q.      Has Mr. Allen talked to you about his claims in

17  this lawsuit?

18  A.      No.

19  Q.      Never said anything at all about it?

20  A.      No.

21  Q.      Okay.  Now, after Mr. Allen left, you reported

22  briefly to Amy Tan?

23  A.      Yes.

24  Q.      Or Tam, I'm sorry.  And you reported to her for

25  how many -- a couple of days?

PATRICIA CALLAHAN REPORTING

3923ef63-cde4-46d1-a00e-61453cc62b9a

**Dec. of Thompson - Exhibit 6**

Page 84

1   A.      Yes.

2   Q.      So Mr. Allen left on April 27th, 2010, right?

3   A.      Yes.

4   Q.      And your last day of work was May 2nd, 2010?

5   A.      Yes.

6   Q.      So Ms. Tam actually started working on

7   April 28th, 2010?

8   A.      She was in there on the 27th.  After he left.

9   She came after he left.

10  Q.      For -- and how many hours was she there that

11  day?

12  A.      Hmm, very short.  Maybe -- maybe, maybe three.

13  Q.      Two to three hours on the 27th?

14  A.      Um-hum.

15  Q.      Is that yes?  Sorry.

16  A.      Yes.

17  Q.      Okay.  And then was she there the next day the

18  whole day, the 28th of April, 2010?

19  A.      Yes, I believe so.

20  Q.      Why did you leave Radio Shack, yourself?

21  A.      She fired me.

22  Q.      Ms. Tam fired you?

23  A.      Yes.

24  Q.      Okay.  And was this a telephone conversation or

25  face-to-face conversation?

3923ef63-cde4-46d1-a00e-61453cc52b9a

**Dec. of Thompson - Exhibit 6**

Page 94

1   came into the store when Mr. Allen had already left for

2   the day?

3   A.      Twice.

4   Q.      Okay.  And who else was present on those

5   occasions?

6   A.      Rosetta.

7   Q.      Anyone besides you and Rosetta?

8   A.      I believe Bruce was there at the time.

9   Q.      Okay.  So on -- let's talk about the first

10  occasion when that happened.  Was Ms. Ocampo by herself

11  or with anybody?

12  A.      She was by herself.

13  Q.      Okay.  And when Ms. Ocampo came into the store

14  by herself on that first occasion, did you speak with

15  her?

16  A.      No, she just went into the back room.

17  Q.      Okay.  Did she say anything to you?

18  A.      No.  That's -- that's the time when I went into

19  the back room, and she was looking at the computers for

20  the -- the -- the -- the store records.  And that's when

21  I went into the back to get a laptop, and that's when

22  she made that comment.

23  Q.      Okay.  So that was the first occasion?

24  A.      That was the first occasion.

25  Q.      Okay.  Let's talk about the second occasion,

b65cbf73-95b9-4725-b61f-6c1255a62cde

**Dec. of Thompson - Exhibit 6**

Page 95

1  Q.      And what did she say in response?

2  A.      It was inventory, and it was mandatory that I

3  was supposed to be there.

4  Q.      Did you know that it was inventory?

5  A.      Yes.  But she didn't tell me it was mandatory we

6  was supposed to be there, though.

7  Q.      Well, had you ever participated in inventory

8  before?

9  A.      Yes.

10  Q.      And you understood that everybody was required

11  to participate in inventory?

12  A.      Yes.

13  Q.      How long in advance did you know that it was

14  inventory?

15  A.      Just that day, the day before.

16  Q.      So on April 27th, 2010, Ms. Tam told you there

17  was going to be inventory the next day?

18  A.      Yep, before we was leaving.

19  Q.      And what did you say to her?

20  A.      What did I say to her?

21  Q.      Yeah, when she told you --

22  A.      I didn't say anything to her.

23  Q.      So Ms. Tam told you on April 27th that

24  April 28th was going to be inventory?

25  A.      Yes.

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 6**

Page 96

1  Q.      And did you say anything at all to her when she

2  told you that?

3  A.      No.  Not to her, no, I didn't.

4  Q.      Did you say to her, "I'm not coming in because

5  it's my day off"?

6  A.      I don't remember -- I don't think I was talking

7  to her, but, yeah.  No, I didn't tell her that

8  indirectly, no.

9  Q.      Did you say anything to her about your not

10  coming in on the 28th for inventory because it was your

11  day off?

12  A.      No, I didn't tell her that.  No, I didn't.

13  Q.      Did you tell anyone that?

14  A.      I did.

15  Q.      Who did you tell?

16  A.      I was talking to Erica.

17  Q.      Okay.  Erica -- what's Erica's last name?

18  A.      What's Erica's last name?  Bird?  Is it Bir --

19  uh, Bird or --

20  Q.      Erica Beard?

21  A.      Beard.  There you go.

22  Q.      Okay.  So Erica Beard was one of your coworkers?

23  A.      Yes.

24  Q.      And what did you tell Erica Beard about that?

25  A.      She said, "It's inventory."  And, "It's my day

3923ef63-cde4-46d1-a00e-61453cc52b9a

**Dec. of Thompson - Exhibit 6**

Page 98

1   the store when Ms. Tam was there when you were there and

2   Erica was there on the 27th of April?

3   A.       The rest of the staff.  Uh, I believe it was

4   Victoria, Bruce.

5   Q.       Victoria?

6   A.       Yes.

7   Q.       Okay.  Who else?

8   A.       And Bruce.

9   Q.       Oh, Bruce.

10  A.       And me and Erica.

11  Q.       Anybody else?

12  A.       In the store?

13  Q.       Yes, on April 27th, 2010, with Ms. Tam.

14  A.       No, and herself.  It was just the five of us.

15  Q.       Okay.  And did Ms. Tam have, like, a group

16  meeting with all the staff in the store that day when

17  she was there?

18  A.       Group staff, no.

19  Q.       Did she have any discussion with all the

20  employees together on April 27th, 2010?

21  A.       Yeah, that's what she said to us.  "We're having

22  inventory tomorrow, and see you all later."  This was

23  before we were going home.

24  Q.       Okay.  So Ms. Tam announced that it was

25  inventory, that everybody was expected to be there on

PATRICIA CALLAHAN REPORTING

3923ef63-cde4-46d1-a00e-61453cc52b9a

**Dec. of Thompson - Exhibit 6**

Page 99

1   April 28th, right?

2   A.      Yep.

3   Q.      So you understood that Ms. Tam believed that you

4   were going to show up on April 28th for inventory,

5   right?

6   A.      She probably did.  I don't know what she

7   thought.

8   Q.      And you never at any time said anything to

9   Ms. Tam that, "You know what?  I'm not coming in,

10  because this is my day off," did you?

11  A.      Yep, I did talk to her about it.  I did speak to

12  her.  I think I did.  I do remember speaking to her and

13  asking her, yep.

14  Q.      And she told you, no, you had to come in for

15  inventory; everybody needed to be there, right?

16  A.      She probably did, yep.

17  Q.      You understood that inventory is a significant

18  event for a store, right?

19  A.      Yep, I did it, so I know what it requires, yes.

20  Q.      So when Ms. Tam talked to you on April 29th, did

21  she tell you that she had tried to reach you on the 28th

22  of April, 2010?

23  A.      She said that, yes.

24  Q.      And it's your testimony that you never got any

25  voice messages from her?

3923ef63-cde4-46d1-a00e-61453cc52b9a

**Dec. of Thompson - Exhibit 6**

Page 100

1   A.      Yes.

2   Q.      And when you told Ms. Tam on the 29th that

3   April 28th had been your day off, what did she say in

4   response?

5   A.      That it was inventory and it was mandatory.

6   Q.      And that's what she had said on April 27th,

7   right?

8   A.      Yeah.

9   Q.      I'm sorry?

10  A.      Yes.

11  Q.      So, I just want to make sure, then, in terms of

12  your interaction with Ms. Tam, you saw her for two to

13  three hours on the 27th, right?

14  A.      That day, yes.

15  Q.      And then you had one telephone conversation with

16  her on April 29th, 2010?

17  A.      Yes.

18  Q.      And how long did that conversation last?

19  A.      No more than five minutes.

20  Q.      Other than those two occasions where you had

21  communications with Ms. Tam, had you ever spoken to her

22  before or since?

23  A.      I had -- I knew of her.  I seen her in the

24  previous -- in another store, yeah.

25          MS. VERONESE:  Answer the question.  Have you

PATRICIA CALLAHAN REPORTING

3923ef63-cde4-46d1-a00e-61453cc52b9a

**Dec. of Thompson - Exhibit 6**

1    A.        Something about the store, in the store, or

2    something, but no, not --

3    Q.        So just casual conversation, "Hello, how are you

4    doing?"

5    A.        Yes.

6    Q.        Had anyone ever told you anything about Ms. Tam

7    before she became the store manager at 3830?

8    A.        No.

9    Q.        Do you believe that your termination was an act

10   of discrimination based on your race?

11   A.        No.

12   Q.        Did you ever have any conversation with Ms. Tam

13   at all about the cash being kept in the back, in the

14   manager's desk?

15   A.        Talk about it, no.

16   Q.        I apologize if I asked you this, but has any

17   manager at Radio Shack ever told you at any time --

18   other than Mr. Allen -- that it was an acceptable

19   practice to keep cash in the manager's desk in the back?

20           MS. VERONESE:  It's asked and answered.

21           THE WITNESS:  No, it --

22           MS. THOMPSON:  Q.  I'm sorry?

23   A.        No.

24   Q.        Did anyone -- let me ask you this.  Sorry.  Do

25   you know Donna Ocampo?

**Dec. of Thompson - Exhibit 6**

1    Q.      Okay.  But there was only one time that you

2    remember Ms. Ocampo actually being in Store 3830, right?

3    A.      Yes.

4    Q.      And was that on or around April 20th, 2010?

5    A.      Yes.

6    Q.      And was somebody with her?

7    A.      Yes.

8    Q.      Do you know who was with her?

9    A.      I don't remember his name.

10   Q.      Okay.  Did you have any understanding that

11   Ms. Ocampo was the district manager at the time that she

12   came to Store 3830 around April of 2010?

13   A.      No, I didn't, no.

14   Q.      Did Ms. Ocampo introduce herself when she came

15   to the store on April 20th, 2010?

16   A.      I believe so.

17   Q.      Did she tell you what she was doing there?

18   A.      I believe so.

19   Q.      What did --

20   A.      I don't remember.

21   Q.      When Ms. Ocampo --

22           MS. VERONESE:  Hold on a second.  If you don't

23   remember, say you don't remember.

24           THE WITNESS:  Okay.

25           MS. THOMPSON:  Q.  Yeah, your attorney's right.

**Dec. of Thompson - Exhibit 6**

Page 105

1  I'm just trying to find out what --

2          MS. VERONESE:  I mean, don't say "yes" and then

3  say "I don't remember."  Please.  If you don't --

4          MS. THOMPSON:  Q.  Right.  Just listen to the

5  question and give me your best recollection, and if you

6  don't have one, say that you don't remember.  That's

7  completely fine.

8          When Ms. Ocampo came to the store on April 20th,

9  2010, was she with a gentleman, a man?

10  A.      Yes.

11  Q.      And at the time they came to your store, had

12  Mr. Allen already left, or was he there, too?

13  A.      I believe he was gone.  I believe.

14          MS. VERONESE:  Left -- just to clarify, left for

15  the day?

16          THE WITNESS:  Yes.

17          MS. THOMPSON:  Right.  That's what I meant.  I

18  apologize.

19          THE WITNESS:  Yes.

20          MS. THOMPSON:  Q.  All right.  Did Ms. Ocampo

21  introduce the man as Basem Abef; does that name ring any

22  bells?

23  A.      Yes.

24  Q.      And did she tell you that Basem Abef was the

25  regional sales director?

PATRICIA CALLAHAN REPORTING

3923ef63-cde4-46d1-a00e-61453cc52b9a

**Dec. of Thompson - Exhibit 6**

1  A.      Yes.

2  Q.      And did Ms. Ocampo, when she came to the store,

3  tell you that she was, in fact, the district manager for

4  the San Francisco district?

5  A.      Yes, and she was taking over for Hani.  Yes, I

6  do remember that.

7  Q.      So at some point you knew that Hani Alzaghari

8  was no longer the district manager, correct?

9  A.      I didn't until she said something -- well, I

10 think I did hear vaguely -- remember that, yeah, that he

11 wasn't going to be our district manager anymore.

12 Q.      So you heard that through the grapevine sometime

13 prior to April 20th, 2010, that Hani was no longer the

14 district manager?

15 A.      Right, wasn't going to be our district manager,

16 yes.

17 Q.      And did you ever talk to Hani about why he was

18 no longer to be the district manager?

19 A.      No.

20 Q.      Did you ever hear anything about why Hani was no

21 longer the district manager?

22 A.      No.

23 Q.      So you believe you heard on the company

24 grapevine -- for lack of a better term -- sometime

25 before April 20th, 2010, that Mr. Alzaghari was not

3923ef63-cde4-46d1-a00e-61453cc52b9a

**Dec. of Thompson - Exhibit 6**

1   going to be the district manager any longer?

2   A.       Right.

3   Q.       And then when Donna Ocampo and Basem Abef came

4   to the store on April 20th, 2010, Ms. Ocampo told you

5   that she was now the district manager taking over for

6   Hani?

7   A.       Yes.

8   Q.       And she explained that Basem Abef was her boss,

9   the regional sales director?

10   A.       Yes.

11   Q.       Had you ever met Basem Abef before that day,

12   April 20th, 2010?

13   A.       Yes.

14   Q.       When had you met him?

15   A.       He came to 3830, yes.  Basem Abef, yes, he did.

16   Q.       When did he come to 3830, Mr. Abef?

17   A.       I don't remember.

18   Q.       Can you tell me in relation to -- can you tell

19   me in relation to April 20th, 2010, when you believe

20   Mr. Abef was in the store?

21   A.       Say it again.

22   Q.       Okay.  You've testified that Mr. Abef was in

23   3830 on April 20th, 2010, with Ms. Ocampo, right?

24   A.       Right.

25   Q.       You also said you think you saw Mr. Abef at 3830

3923ef63-cde4-46d1-a00e-61453cc52b9a

**Dec. of Thompson - Exhibit 6**

1  occasions throughout your employment, right?

2  A.      Right.

3  Q.      Okay.  Did Mr. Abef say or do anything that you

4  thought was inappropriate or offensive in any respect?

5  A.      No.

6  Q.      Did he behave inappropriately at all, in your

7  mind?

8  A.      No.

9  Q.      Have you ever talked with any other employee

10  about Mr. Abef at any time?

11  A.      No.

12  Q.      Now, when Mr. Abef and Ms. Ocampo were in the

13  store on April 20th, 2010, was there anybody else there

14  besides you?

15  A.      Yes.

16  Q.      Who else was there that day?

17  A.      The workers, I believe.  Could have been -- only

18  people it could have been was me, Bruce, Victoria.

19       MS. VERONESE:  Not who could have been.  Who do

20  you remember being there?

21       THE WITNESS:  Me, Bruce and Victoria.

22       MS. THOMPSON:  Q.  Do you think all three of you

23  were there that --

24  A.      Yeah.  I know --

25  Q.      Okay.  What --

PATRICIA CALLAHAN REPORTING

3923ef63-cde4-46d1-a00e-61453cc52b9a

**Dec. of Thompson - Exhibit 6**

1    A.        -- the three of us was there.

2    Q.        Okay.  And Mr. Allen had already left for the

3    day?

4    A.        Yes.

5    Q.        So do you know what time of day it was when

6    Ms. Ocampo and Mr. Abef came to the store?

7    A.        Had to have been late afternoon.

8    Q.        What time did Mr. Allen typically leave, when he

9    would leave for the day?

10   A.        6:00.

11   Q.        So do you believe it was after 6:00 p.m., then,

12   when Ms. Ocampo and Mr. Abef came to the store on

13   April 20th, 2010?

14   A.        Yes.

15   Q.        Did you have some discussion with Ms. Ocampo and

16   Mr. Abef that evening?

17   A.        I don't recall.  I don't even remember.

18   Q.        Do you recall having any major cash transactions

19   that evening?

20   A.        Yes.

21   Q.        So do you remember what -- was it one large

22   transaction, several large transactions?  What do you

23   remember?

24   A.        I believe it was maybe one or two transactions,

25   yes.

**Dec. of Thompson - Exhibit 6**

1    Q.      Cash transactions?

2    A.      Yes.

3    Q.      Was there ever any point that evening when you

4    were walking around with a thousand dollars in cash in

5    your pockets?

6    A.      No.

7    Q.      Did you ever put cash in your pockets to walk

8    around the store?

9    A.      No.  Not physically put in my pocket and walk

10   around with it, no.

11   Q.      Did you have it in your hand; did you have

12   possibly as much as a thousand dollars in your hand

13   while you were working in the store?

14   A.      Yes.  To the back room only, yes.  Not walking

15   around the store on the floor or anything, no.

16   Q.      Okay.  But do you remember that evening having

17   approximately a thousand dollars in cash and walking to

18   the back room?

19   A.      Yes.  Yes.

20   Q.      And did Ms. Ocampo or Mr. Abef say anything to

21   you about that, that that was not appropriate?

22   A.      Yes, I believe, yes, vaguely, yes.

23   Q.      They told you you shouldn't be walking around

24   with that kind of cash, right?

25   A.      I don't think not walking around, but it was

Dec. of Thompson - Exhibit 6

1   just -- I think it was the point that it was in my

2   pocket.  I believe that was what was the problem, and

3   not just out in the open.  Yes, it should have been -- I

4   guess they was saying it should have been out in the

5   open and not to the side and, like, in my pocket, yes.

6   Q.      So you remember now that you had approximately a

7   thousand dollars in cash in your pocket?

8   A.      Well, it was never -- it was in my hand, and,

9   you know, I maybe put it in the pocket, itself, not to

10   be flashing everything, but yes, not fully in the pocket

11   where it was just -- no, it was in my hand.

12   Q.      So you had approximately a thousand dollars in

13   your hand, and you had your hand in your pocket because

14   you didn't want to be waving the money around?

15   A.      Not necessarily waving it around, but, yeah,

16   there was a few people in the store, and you know, I

17   just -- yes, yes.

18   Q.      So there were customers in the store?

19   A.      Yes.

20   Q.      Okay.  And so you were walking from where, the

21   cash register to the back room with a thousand dollars

22   in your hand in your pocket?

23   A.      Yes.

24   Q.      Okay.  And Ms. Ocampo saw that you were doing

25   that; is that right?

Page 113

1   A.      Yes.

2   Q.      And Ms. Ocampo asked you what you were doing?

3   A.      Yes.

4   Q.      And what did you tell her?

5   A.      I was bringing it to the back room, because we

6   was getting ready to make the nightly deposit.

7   Q.      And what did she say to you; did she tell you

8   you should not be walking with that kind of cash in the

9   store?

10  A.      No, she said in my -- in my pocket, like I could

11  have put it behind my back or something, or put it to

12  the side, but not in the pocket.

13  Q.      Did she tell you it should have been in the cash

14  drawer?

15  A.      No.

16  Q.      Did she ask you why the thousand dollars in cash

17  wasn't in the cash register drawer?

18  A.      I was doing a nightly deposit, so it (sic) was

19  coming to the back room to do the deposit.  We do the

20  nightly deposit in the back room.

21  Q.      Okay.  So you're saying you had the entire

22  nightly deposit in your hands when you were walking to

23  the back room?

24  A.      Not the entire, no.  I didn't have the entire.

25  It was still people -- we were still open -- I were

PATRICIA CALLAHAN REPORTING

3923ef63-cde4-46d1-a00e-61453cc52b9a

**Dec. of Thompson - Exhibit 6**

1    getting ready to get everything done, yes, and we had

2    made -- they had had a laptop, I believe, that was,

3    like, directly cash full, and, yes, I was taking that to

4    the back to, yes, get ready for the deposit.

5    Q.      What time was this, approximately?

6    A.      I don't remember.  I don't remember what time.

7    Q.      6:00 o'clock?

8    A.      Maybe a little after that, maybe that.

9    Q.      Between 6:00 and 6:30?

10   A.      Maybe probably like 6:30 and 7:00, yeah, because

11   it was close to closing time, but we wasn't closed yet,

12   so yes.

13   Q.      So the customer bought a laptop --

14   A.      Yes.

15   Q.      -- and gave you cash?

16   A.      Yes.

17   Q.      And is there some reason you didn't put the cash

18   in the cash drawer?

19           MS. VERONESE:  The cash register?

20           MS. THOMPSON:  Q.  Cash register drawer?

21   A.      What do you mean by that?

22   Q.      You're standing -- when the customer gives you

23   cash for the purchase, you're standing at the cash

24   register, correct?

25   A.      Yes.

**Dec. of Thompson - Exhibit 6**

1    Q.      And you're ringing up the transaction, right?

2    A.      Yes.

3    Q.      And the customer hands you cash.  How much cash

4    did the customer hand you?

5    A.      Maybe $300.  Maybe the laptop, whatever the

6    laptop was, maybe $500, $600.  It all depends on how

7    much the laptop was.

8    Q.      No, I understand that, but that's what I'm

9    asking you; what was the value of the transaction?

10   A.      I don't remember the actual transaction amount.

11   Q.      Okay.  So you were handed some cash, right --

12   A.      Right.

13   Q.      -- to pay for the computer?

14   A.      Right.

15   Q.      And you had to make some change, presumably?

16   A.      Right.

17   Q.      So you're opening the cash register drawer,

18   right?

19   A.      Yes.

20   Q.      Making the change, right?

21   A.      Yes.

22   Q.      Okay.  Is there some reason you didn't put the

23   cash in the cash register drawer at the time of the

24   transaction?

25   A.      It -- I -- I remember -- I don't think that's

PATRICIA CALLAHAN REPORTING

3923ef63-cde4-46d1-a00e-61453cc52b9a

**Dec. of Thompson - Exhibit 6**

1   how it went.  The sale was already over, and personally,

2   I was -- I had went and collected the cash from the two

3   drawers to go to the back so I can get ready for the

4   nightly deposit.

5   Q.      Okay.  So -- all right.  So this wasn't -- this

6   wasn't because of a particular transaction, then?

7   A.      No.

8   Q.      You're saying you were getting ready for the

9   nightly deposit.  So you went into the two cash register

10  drawers and took out how much cash?

11  A.      All the large bills.  Twenties, maybe, a fifty

12  or two.  Yes.

13  Q.      So you took out all the large bills, and you

14  were going to put them where?

15  A.      I was taking them to the back so I can make a

16  nightly -- get ready for a nightly deposit, because you

17  can't do the nightly deposit until we're actually

18  closed.

19  Q.      Where were you going to put the cash for the

20  nightly deposit?

21  A.      In the drawer in the back.

22  Q.      So again, my question was, why didn't you just

23  leave the money in the cash register drawer?

24  A.      That's a good question.  Too much, too much.

25  Too much.

---

PATRICIA CALLAHAN REPORTING

3923ef63-cde4-46d1-a00e-61453cc52b9a

Dec. of Thompson - Exhibit 6

Page 117

1   Q.      What do you mean, "too much"?

2   A.      It was too much -- it was too much.

3   Q.      What do you mean by that?

4   A.      Too many bills, I should say.  I could say.

5   Q.      So you're saying there wasn't room in the

6   registers for the bills?

7   A.      I can't say that.  I'm not sure.  I don't

8   remember.

9   Q.      How many bills are we talking about?

10  A.      What do you mean, how many bills are we talking

11  about?  You --

12  Q.      That you were moving to the back room at that

13  point?

14          MS. VERONESE:  On that day?

15          MS. THOMPSON:  At this time of the incident

16  we're talking about.

17  Q.      Are we talking about five bills?

18  A.      No.  Maybe it was more than that.

19  Q.      Ten bills?

20  A.      I don't remember.  I don't.

21  Q.      Twenty bills?

22  A.      I don't remember.

23  Q.      Okay.  But is it your testimony that you

24  physically couldn't fit them into the cash register

25  drawers, and that's why you were putting them in the

3923ef63-cde4-46d1-a00e-61453cc52b9a

**Dec. of Thompson - Exhibit 6**

1   back?

2          MS. VERONESE:  Misstates testimony.

3          THE WITNESS:  No, I can't say that.  I don't --

4   I can't -- no, I can't recall that.  Huh-uh.  I can't

5   say that.

6          MS. THOMPSON:  Q.  So when Ms. Ocampo saw you,

7   she told you that you should not be putting the cash in

8   your pocket; was that your testimony?

9   A.      Yes.

10  Q.      Did she tell you the money should be in the cash

11  drawer rather than anywhere else, the cash register

12  drawer?

13  A.      I don't remember what the -- exactly what she

14  said about that part.  No, I don't remember.

15  Q.      Did Ms. Ocampo instruct you that you needed to

16  immediately make a deposit, rather than having that kind

17  of cash in the store?

18  A.      Yes.

19  Q.      And then did you follow her instructions?

20  A.      Yes, ma'am.

21  Q.      Okay.  Were you disciplined in any way by

22  Ms. Ocampo?

23  A.      Like as far as what?

24  Q.      For having the cash in your hand?

25  A.      No.

3923ef63-cde4-46d1-a00e-61453cc52b9a

**Dec. of Thompson - Exhibit 6**

1    Q.      Did Ms. Ocampo ever say or do anything to you

2    that made you think she was discriminating against you

3    based on race?

4    A.      No.

5    Q.      Did Ms. Ocampo say or do anything that evening

6    of April 20th, 2010, that you thought was inappropriate

7    in any way?

8    A.      No.

9    Q.      Did Ms. Ocampo say anything that you thought

10   was -- say anything at all about Mr. Allen?

11   A.      No.

12   Q.      Did you ever see Ms. Ocampo after April 20th,

13   2010?

14   A.      No.

15   Q.      Did Ms. Ocampo ever tell you what the reasons

16   were for terminating Mr. Allen?

17   A.      No.

18   Q.      Did you ever have any conversations with anyone

19   at Radio Shack about the reasons for Mr. Allen's

20   termination?

21   A.      No.

22   Q.      As you sit here now, do you know anything about

23   the reasons for his termination?

24   A.      Very little.

25   Q.      What do you know, if anything?

3923ef63-cde4-46d1-a00e-61453cc52b9a

**Dec. of Thompson - Exhibit 6**

1        MS. VERONESE:  Don't talk about anything we

2   discussed.

3        THE WITNESS:  I can't -- I don't know.

4        MS. THOMPSON:  Q.  Again, I'm not asking for

5   communications with your lawyer or in the presence of

6   your lawyer.  So, is any information you have about

7   Mr. Allen's termination, does that come from your lawyer

8   or from Mr. Allen?

9   A.      Yes.

10  Q.      Okay.  Other than conversations with your lawyer

11  or Mr. Allen, have you had any conversations with anyone

12  about the reasons for Mr. Allen's termination?

13  A.      No.

14  Q.      Have you heard anything on the rumor mill or the

15  grapevine having anything to do with Mr. Allen's

16  termination?

17  A.      No.

18  Q.      As you sit here now, do you have any reason to

19  believe that Mr. Alzaghari thought it was acceptable to

20  keep cash in the manager's drawer at the store, as

21  opposed to in the cash register?

22  A.      Well, he have been in the back room with

23  Mr. Allen when I have brung cash back there to put in

24  the drawer, so ....

25  Q.      Okay.  On how many occasions did that happen?

1    A.       I could say twice.

2    Q.       Okay.  And on those occasions, how long were you

3    in the back room for?

4    A.       Two, three seconds, not long.

5    Q.       Two or three seconds --

6    A.       Um-hum.

7    Q.       -- is your best estimate?

8    A.       Um-hum.

9    Q.       Is that yes?

10   A.       Yes.

11   Q.       Did you have any conversations with

12   Mr. Alzaghari on those two to three seconds on those

13   occasions?

14   A.       No.

15   Q.       So you went just into the back room.  What were

16   Mr. Allen and Mr. Alzaghari doing on these two occasions

17   in the back room?

18   A.       Sitting there together, I guess -- I don't know

19   what they were doing, whatever they were doing.  I don't

20   know.  They were sitting there though, physic -- like,

21   they were sitting there (indicating).

22   Q.       Where were they sitting?

23   A.       In his office.

24   Q.       At the desk?

25   A.       Yeah.

3923ef63-cde4-46d1-a00e-61453cc52b9a

**Dec. of Thompson - Exhibit 6**

1   Q.      Okay.  And could you hear anything about what

2   they were talking about?

3   A.      No, wasn't my business, no.

4   Q.      So you went in -- on those occasions, what, if

5   anything, did you say?

6   A.      Hello to him, "Hi, how are you doing?"

7   Q.      And then what exactly did you do?

8   A.      Uh, do what I was doing, put the money in the

9   bag and go back to the front.

10  Q.      So what did that involve?

11  A.      Going in Mr. Allen's drawer, taking the bag out,

12  putting the money in the bag, putting the bag back in

13  the drawer, closing and locking the drawer.  Well, if he

14  was sitting there, it didn't have to be locked, or he'd

15  keep it locked, but, yeah.

16  Q.      So if Mr. Allen is sitting there --

17  A.      It would be unlocked for most of the time.

18  Q.      Okay.  So they're sitting in the back.  So

19  you're saying you recall two occasions --

20  A.      Um-hum.

21  Q.      -- specifically where this happened, right?

22  A.      Yes.

23  Q.      Okay.  And so on those two occasions, it's your

24  testimony the desk drawer was unlocked?

25  A.      Yes.

3923ef63-cde4-46d1-a00e-61453cc52b9a

**Dec. of Thompson - Exhibit 6**

Page 123

1  Q.       Okay.  So you went in and basically said, "Hi,

2  excuse me," and opened the drawer and put money in?

3  A.       Yes.

4  Q.       Okay.  And did anybody ask you what you were

5  doing?

6  A.       No.

7  Q.       And did you tell anybody what you were doing?

8  A.       No, they saw what I was doing.

9  Q.       Okay.  Were they talking to each other?

10  A.       Yes.

11  Q.       Do you know what they were talking about?

12  A.       No.

13  Q.       Did you hear any part of their conversation?

14  A.       No.

15  Q.       Okay.  So other than those two occasions, do you

16  have any other reason to think that Mr. Alzaghari

17  thought that it was acceptable to leave cash in the

18  back?

19  A.       Yes, I guess so, yes.

20  Q.       No, I'm just trying to figure out if you have

21  any other reasons in your own mind that lead you to the

22  conclusion that Mr. Alzaghari thought it was okay to

23  leave cash in the back.

24  A.       Oh, my -- no, no.

25  Q.       Okay.  So you're basing that conclusion on the

PATRICIA CALLAHAN REPORTING

3923ef63-cde4-46d1-a00e-61453cc52b9a

**Dec. of Thompson - Exhibit 6**

Page 124

1    two occasions when you went into the back and

2    Mr. Alzaghari and Mr. Allen were back there?

3    A.      Yes.

4    Q.      Okay.  I'm just trying to find out if there's

5    anything else.  Is there anything else?

6    A.      No, ma'am.

7    Q.      Do you know who made the decision to terminate

8    Mr. Allen's employment?

9    A.      No, I don't.

10   Q.      Do you know of any other stores -- do you have

11   any personal knowledge of any other stores where cash

12   was kept in the back --

13   A.      No, I don't.

14   Q.      -- office?  Okay.

15          MS. VERONESE:  Let her finish the question.

16          MS. THOMPSON:  Q.  At the time that Mr. Allen

17   was terminated, do you know how long it had been since

18   Mr. Alzaghari was the district manager?

19   A.      I don't.

20   Q.      Okay.

21   A.      I just knew him being there from when I was --

22   you know, from me first getting there, and I guess he

23   was there before, so, but other than that, no.

24   Q.      Well, my question wasn't very clear, so let me

25   ask it again.  Do you know when Mr. Alzaghari stopped

PATRICIA CALLAHAN REPORTING

3923ef63-cde4-46d1-a00e-61453cc52b9a

**Dec. of Thompson - Exhibit 6**

Page 125

1    being the district manager for the San Francisco

2    district?

3    A.      No, ma'am.

4    Q.      Do you know when Ms. Ocampo officially became

5    the district manager?

6    A.      No, ma'am.

7    Q.      Have you ever talked to Hani Alzaghari about

8    Mr. Allen's termination?

9    A.      No.

10   Q.      All right.  So let's look again at Exhibit 2,

11   please, which is the declaration.  All right.  Look at

12   paragraph 7.  Quote, "To my knowledge, the district

13   Manager Hani Alzaghari knew and allowed change to be

14   kept in the Store manager's drawer," end quote.

15          So, we just talked about that, and I want to

16   make sure that the reason you believe that is because of

17   the two occasions you've described.

18   A.      Yes.

19   Q.      Okay.  And as you've indicated, other than those

20   two occasions, you have no other basis for believing

21   that that was true, right?

22   A.      Right.

23   Q.      Okay.  Then let's look at paragraph 9.  Quote,

24   "At all times, up until my termination in late May

25   2010" -- I thought you said that you were terminated on

**Dec. of Thompson - Exhibit 6**

Page 126

1  April 29th, 2010.  Is that true?

2  A.      Yeah.  We just -- that was just a vaguely --

3  remember -- I couldn't remember exactly what day it was,

4  so I -- yeah, we just went with May, so ....

5  Q.      All right.  But as you sit here now and you're

6  under oath, you believe that, in fact, you were

7  terminated on April 29th, 2010, right?

8  A.      Yes, ma'am.

9  Q.      Okay.  Now, you say, "At all times, up until my

10 termination in late May 2010," okay, "Amy Tam continued

11 to keep store cash in the manager's desk drawer in the

12 back office."

13        And again, what you've testified to here today

14 is that, in fact, you only spent two to three hours in

15 the store with Amy Tam on April 27th, 2010, right?

16 A.      (Nods head.)

17 Q.      Isn't that right?

18 A.      Yes.

19 Q.      Okay.  And then after that, you never worked

20 with Amy Tam again, right?

21 A.      No.

22 Q.      So this paragraph 9 is not correct; is that a

23 fair statement?

24 A.      Yes.  But it was still -- she didn't change it.

25 Well, she probably changed it after that day --

3923ef63-cde4-46d1-a00e-61453cc52b9a

**Dec. of Thompson - Exhibit 6**

Page 127

1        MS. VERONESE:  There's no question on the table

2   here.

3        THE WITNESS:  Okay.

4        MS. THOMPSON:  Q.  So here is my question.

5   A.      So, yes.

6   Q.      Isn't it true that after April 27th, 2010, you

7   don't know one way or the other what Amy Tam did or

8   didn't do with respect to cash in the manager's desk?

9   A.      Right.

10  Q.      Did anyone ever tell you anything about what

11  Amy Tam's policies or practices were after April 27th,

12  2010?

13  A.      No.

14  Q.      So you just don't know one way or the other what

15  happened after April 27th, 2010, true?

16  A.      Right.

17  Q.      Have you ever met a Radio Shack employee named

18  Greg Patakas?

19  A.      No.

20  Q.      Have you ever met an employee, Radio Shack

21  employee, named David Charles?

22  A.      No.

23        MS. VERONESE:  That you know of.

24        THE WITNESS:  No.

25        MS. THOMPSON:  Q.  Have you ever met any loss

3923ef63-cde4-46d1-a00e-61453cc52b9a

**Dec. of Thompson - Exhibit 6**

Page 128

1  prevention employees at Radio Shack?

2  A.      Yes, I did meet the loss prevention.

3  Q.      Do you know who that was?

4  A.      I don't remember his name.

5  Q.      Okay.  In terms of your interactions with any

6  loss prevention personnel at Radio Shack, do you recall

7  any of them ever doing anything that you thought was

8  inappropriate?

9  A.      No.

10         MS. VERONESE:  It's vague and ambiguous.

11         MS. THOMPSON:  Q.  Sorry?

12  A.      No.

13  Q.      Do you recall any of the loss prevention

14  personnel making any derogatory comments about race?

15  A.      No.

16  Q.      Do you recall any loss prevention personnel

17  making any derogatory comments about Mr. Allen?

18  A.      No.

19  Q.      Did you ever talk to any loss prevention

20  personnel about the reasons for Mr. Allen's termination?

21  A.      No.

22  Q.      Has there ever been anything that happened to

23  you at Radio Shack that you thought was an act of

24  harassment or discrimination against you based upon your

25  race?

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 6**

Page 129

1    A.      No.

2    Q.      Have you seen or heard anything by any Radio

3    Shack personnel that would lead you to think that Radio

4    Shack discriminated against older workers?

5    A.      Not personally, no.

6    Q.      Have you heard from any source, even if not

7    personally?

8    A.      No.

9    Q.      Now, on April 27th, 2010, when Ms. Ocampo and

10   Mr. Abef were in the store -- and you've testified that

11   Mr. Allen had left -- when he left, was the drawer in

12   which the cash was kept, was that locked or unlocked?

13   A.      I don't remember.  I don't remember.

14   Q.      It could have been unlocked or could have been

15   locked; you don't know one way or the other?

16   A.      It could have been locked.  It most -- most of

17   the time it is, so, yes.

18   Q.      Okay.  But do you remember one way or the other,

19   or are you guessing?

20   A.      I don't remember if that particular day, no, I

21   don't remember.

22   Q.      Okay.

23           Okay.  Let's mark the next document as

24   Exhibit 4.

25   //

3923ef63-cde4-46d1-a00e-61453cc52b9a

**Dec. of Thompson - Exhibit 6**

1       (DEFENDANT'S EXHIBIT NO. 4

2        WAS MARKED FOR IDENTIFICATION.)

3       MS. THOMPSON:  For the record, I've marked as

4   Exhibit 4 a one-page document that's been Bates numbered

5   Radio Shack/Allen000260, and I think if you turn it on

6   its side -- okay.  You have it the right way.

7   Q.      Have you ever seen Exhibit 4 before today?

8   A.      Yes.

9   Q.      When did you see Exhibit 4?

10  A.      In the store.

11  Q.      So am I correct in understanding that Exhibit 4

12  is a picture of how the cash was maintained in the

13  manager's desk drawer in the back?

14      MS. VERONESE:  Can we just clarify, you've seen

15  this actual picture before or --

16      THE WITNESS:  No.

17      MS. VERONESE:  -- you've seen the drawer?

18      THE WITNESS:  The drawer.

19      MS. THOMPSON:  All right.  That's a fair

20  characterization.  Thank you.

21  Q.      So you have not seen the actual document, but

22  here is my question, then:  Do you believe, as you sit

23  here now, that Exhibit 4 accurately photographs how the

24  cash was maintained in the store manager's desk drawer

25  in the back office?

3923ef63-cde4-46d1-a00e-61453cc52b9a

**Dec. of Thompson - Exhibit 6**

1   A.      Yes, ma'am.

2   Q.      Okay.  So I see there's a -- the bills appear to

3   be in a -- looks like some kind of zippered pouch?

4   A.      Right.

5   Q.      Okay.  And then behind it, there are various

6   rolls of coin?

7   A.      Yes.

8   Q.      Okay.

9   A.      And that's in the new store.  This was not in

10  3830, 'cause 3830, we kept everything in the bag.

11  Q.      Wait.  Let me -- so this was in Store 3830?

12  A.      No.  We were -- that's the store number, period,

13  itself.  But when we were on -- across the street, you

14  know, we just kept everything in the bag.

15  Q.      All right.  So looking at Exhibit 4, you believe

16  that this was a picture that was taken at store -- at

17  the --

18  A.      938.

19  Q.      -- 938 Market Street location?

20  A.      Yes.

21  Q.      Okay.  Because you're saying at the other

22  location before you moved, you kept everything in the

23  zippered bag?

24  A.      Yes.

25  Q.      So what was your understanding of why that

3923ef63-cde4-46d1-a00e-61453cc52b9a

**Dec. of Thompson - Exhibit 6**

1    practice changed?

2    A.      This -- this was a bigger drawer than the first

3    one.  So that's --

4    Q.      The manager's desk drawer was bigger?

5    A.      Yes.

6    Q.      So you had room to keep the coin rolls

7    separately?

8    A.      Yes.

9    Q.      Okay.

10           MS. VERONESE:  Are we going to take a break, or

11   what are we doing?

12           MS. THOMPSON:  Why don't we take one more quick

13   break.  I think I can wrap up.

14           MS. VERONESE:  Okay.  That would be good.

15           (Recess taken.)

16           MS. THOMPSON:  Let's mark the next document as

17   Exhibit 5.

18           (DEFENDANT'S EXHIBIT NO. 5

19            WAS MARKED FOR IDENTIFICATION.)

20           MS. THOMPSON:  Okay.  First of all, we're back

21   on the record.

22   Q.      And do you still feel well enough to proceed,

23   Ms. Holmes?

24   A.      Yes.

25   Q.      And you're going to let me know the second you

PATRICIA CALLAHAN REPORTING

3923ef63-cde4-46d1-a00e-61453cc52b9a

**Dec. of Thompson - Exhibit 6**

1   feel like you can't, right?

2   A.     Yes.

3   Q.     Okay.  Great.

4          So, for the record, I've marked as Exhibit 5 a

5   one-page document marked RS/Allen000091, and ask you to

6   take as much time as you need to review Exhibit 5.

7          (Pause.)

8          Have you had a chance to review Exhibit 5?

9   A.     Yes.

10   Q.     So you've seen Exhibit 5 before today, right?

11   A.     yes.

12   Q.     Did you see Exhibit 5 around April 16th, 2007?

13   A.     Yes.

14   Q.     And did you read Exhibit 5 at that time?

15   A.     Yes.

16   Q.     And is that your signature at the bottom of

17   Exhibit 5, next to the number "5."?

18   A.     Yes.

19   Q.     Okay.  And did you have a conversation with

20   Mr. Frank Allen about Exhibit 5 at the time you signed

21   it?

22   A.     Yes.

23   Q.     And before you signed Exhibit 5, did you read it

24   and understand it?

25   A.     Yes.

**Dec. of Thompson - Exhibit 6**

1    Q.      Did Mr. Allen tell you why he was asking you to

2    sign Exhibit 5?

3    A.      Yes.

4    Q.      What did he say about that?

5    A.      That this what we wasn't doing, and this --

6    what we needed to start paying attention to more

7    carefully and -- yes, and get it done right.

8    Q.      In other words, to make sure that you followed

9    all company policies and procedures regarding various

10   operational matters?

11   A.      Yes.

12           MS. THOMPSON:  Let's mark the next document as

13   Exhibit 6.

14           (DEFENDANT'S EXHIBIT NO. 6

15            WAS MARKED FOR IDENTIFICATION.)

16           MS. THOMPSON:  For the record, I've marked as

17   Exhibit 6 a one-page document headed, "Authorized

18   Deposit Associate Form," and it appears to bear the

19   signature on the lower left-hand corner of Rosetta

20   Holmes, as well as the printed name of Frank Allen and

21   the date of 1/30/07.

22   Q.      So please take as much as time as you need to

23   review Exhibit 6.

24           Oh, I'm sorry.  Have you had a chance to read

25   Exhibit 6?

3923ef63-cde4-46d1-a00e-61453cc52b9a

**Dec. of Thompson - Exhibit 6**

1    your practice would be to put them underneath the

2    drawer?

3    A.      Yeah, you could slid it in the little slot they

4    had.

5    Q.      So you had approximately five slots for bills

6    at --

7    A.      In the drawer?

8    Q.      Yes.

9    A.      Yes.

10   Q.      And how many cups for coins?

11   A.      Same, it's the same drawer.

12   Q.      Okay.

13   A.      Different, a little different.

14   Q.      So you physically had room to keep all the bills

15   and coins at the 938 Market Street location, right?

16           MS. VERONESE:  Think about the question.

17           MS. THOMPSON:  Q.  Do you need the question read

18   back?

19           MS. VERONESE:  Yeah.

20           THE WITNESS:  Yeah.

21           MS. THOMPSON:  Could you read it back, please.

22           (Record read by the reporter:

23           "Question:  So you physically had room to

24           keep all the bills and coins at the 938

25           Market Street location, right?")

PATRICIA CALLAHAN REPORTING

3923ef63-cde4-46d1-a00e-61453cc5?b9a

**Dec. of Thompson - Exhibit 6**

Page 141

1          MS. THOMPSON:  Q.  In the registers at the 938

2    Market Street location?

3    A.        Yes.

4    Q.        Okay.  But you had the same practice when you

5    moved to the 938 Market Street location of keeping some

6    bills and coins in the manager's desk drawer, right?

7    A.        Yes.

8    Q.        Did that practice change at all in any way when

9    you moved from the 989 Market Street location to the

10   938 Market Street location?

11   A.        It was -- I believe it was going to be some --

12   it was talk about it was going to be changed, yes,

13   but --

14   Q.        I'm sorry, what do you mean by that?

15   A.        They was saying these drawers are better, I

16   guess, than the ones that we had and maybe we could be

17   able to put the bills under, yes.

18   Q.        All right.

19   A.        Under the drawer.  Because if you would have

20   seen the cash register in 938, I guess you can

21   understand the difference, I guess, if you would -- you

22   would have to physically see, you know, the way it was.

23   It's not like I can just explain it to you and you can

24   get it.

25   Q.        All right.  So just so I'm clear, we're talking

3923ef63-cde4-46d1-a00e-61453cc52b9a

**Dec. of Thompson - Exhibit 6**

1   about the 938 Market Street location, the new location?

2   A.      Right.

3   Q.      You're saying there was some discussion about

4   keeping all of the cash in the cash register drawer,

5   rather than keeping some in the back?

6   A.      No.  No.  Not -- no.  No.

7   Q.      Okay.  Was there any discussion at all -- when

8   you moved locations from the 989 Market Street to the

9   938 Market Street location, was there any discussion at

10  that time about changing any practices involving keeping

11  cash in the manager's desk drawer in the back?

12  A.      No.

13  Q.      So it was just -- when you moved to the new

14  location, it was just business as usual, as far as you

15  were concerned, in terms of keeping some cash in the

16  manager's desk in the back?

17  A.      Yes.

18  Q.      But you and Mr. Allen did not actually have a

19  discussion about that, right?

20  A.      No.

21  Q.      Did you ever hear anyone at Radio Shack, other

22  than Mr. Allen, at any time say anything about the fact

23  that if a store was in a high crime area, it would

24  justify changing company policies or procedures?

25  A.      No.

3923ef63-cde4-46d1-a00e-61453cc52b9a

**Dec. of Thompson - Exhibit 6**

1   Q.      Were there other stores that you considered to

2   be high crime, as well as Store 3830?

3   A.      Yeah.

4   Q.      Okay.

5   A.      Yes.

6   Q.      What other stores would you consider high crime?

7           MS. VERONESE:  Don't guess.

8           THE WITNESS:  Market, the stores on Market.  The

9   one in my area, the ones on Mission.  Most of -- all of

10  them.

11          MS. THOMPSON:  Q.  Okay.  So --

12          MS. VERONESE:  Well --

13          THE WITNESS:  Well, not saying like that, but

14  from the Radio Shacks that I have walked into, have been

15  in, yeah.

16          MS. THOMPSON:  Q.  Okay.  Let me just be clear.

17  So you're saying, in terms of just your personal opinion

18  and your experience, you're saying that you thought that

19  all of the Radio Shack stores on Market Street you

20  considered to be in high crime areas?

21  A.      No.  Say -- this -- really, his and -- no.

22  Maybe just ours, then.

23          MS. VERONESE:  Don't think out loud.

24          THE WITNESS:  So -- okay.

25          MS. THOMPSON:  Just answer the question.

3923ef63-cde4-46d1-a00e-61453cc52b9a

**Dec. of Thompson - Exhibit 6**

Page 144

1          THE WITNESS:  Okay.  No.

2          MS. THOMPSON:  Q.  All right.  So you're

3    saying --

4    A.     No.

5    Q.     -- yours was high crime?

6    A.     Yes.

7    Q.     But what about the stores on Mission Street?

8    A.     The -- yes.

9    Q.     Which stores on Mission Street did you consider

10   to be high crime?

11   A.     The one right there on 23rd.

12   Q.     Any others?

13   A.     That's the only one I seen on Mission Street,

14   was the 23rd store.  So I -- I mean the 23rd Street

15   store.

16   Q.     Okay.  All right.  And you also said in your

17   area.  What area was that?

18   A.     That's the Mission and Market, is my area,

19   that's where I be.

20   Q.     So the two stores that you think are high crime

21   that you know about would be 23rd and Mission store and

22   the 938 --

23   A.     938.

24   Q.     -- Market Street store?

25   A.     Yes.

3923ef63-cde4-46d1-a00e-61453cc52b9a

**Dec. of Thompson - Exhibit 6**

Page 145

1   Q.      Okay.  Any others?

2   A.      No.

3   Q.      Do you know who the manager was at 23rd and

4   Mission?

5   A.      I don't remember his name.

6   Q.      Did you ever --

7   A.      I have seen him.  Did know, you know, of him

8   being the manager, but that was it.

9   Q.      Did you ever have any discussions with him or

10  anyone that worked in his store about what policies and

11  procedures they followed for cash handling?

12  A.      No.

13  Q.      Has any African-American Radio Shack employee

14  ever told you that they thought they had been

15  discriminated against based on race?

16  A.      I mean, I did heard -- they could say maybe they

17  didn't -- they didn't like the way a person said

18  something.

19          MS. VERONESE:  Just answer the question.

20          MS. THOMPSON:  Q.  Yeah, let's focus on the

21  question.

22  A.      Right.

23  Q.      So my question was pretty specific.  Did any

24  African-American Radio Shack employee ever tell you that

25  they thought they had been discriminated against by

3923ef63-cde4-46d1-a00e-61453c652b9a

**Dec. of Thompson - Exhibit 6**

Page 146

1   Radio Shack based on their race?

2   A.      Yes.

3   Q.      Okay.  Who?

4   A.      Cust -- a few customers.  I can't give you a

5   name.

6           MS. VERONESE:  Answer the question.  That wasn't

7   the question.

8           THE WITNESS:  Yes.

9           MS. THOMPSON:  Q.  Okay.  So I'm not asking

10  about customers.

11  A.      Not -- oh, employees?

12  Q.      Yes.

13  A.      No, no employees, no.

14          MS. THOMPSON:  All right.  So can I just have

15  the question read back?

16  Q.      And then just answer that question.

17  A.      Yes.

18          MS. VERONESE:  Listen to the question and answer

19  the question.

20          (Record read by the reporter:

21          "Question:  Did any African-American Radio

22          Shack employee ever tell you that they

23          thought they had been discriminated against

24          by Radio Shack based on their race?")

25          THE WITNESS:  No.

3923ef63-cde4-46d1-a00e-61453cc52b9a

**Dec. of Thompson - Exhibit 6**

1    MS. THOMPSON:  Q.  Okay.  Did you ever see any
2    Radio Shack manager behave towards Mr. Allen in any way
3    that you thought was disrespectful because of his race?
4    A.    No.
5    Q.    Did you ever hear any Radio Shack manager say
6    anything to or about Mr. Allen that you thought was
7    inappropriate, based on his race?
8    A.    No.

9    Q.    What about, did you ever hear any Radio Shack
10   manager say anything, either to or about Mr. Allen, that
11   you thought was disrespectful of him based on his age?
12   A.    No.
13   Q.    Did you ever hear any Radio Shack manager ever
14   make any comments to or about Mr. Allen, based on his
15   tenure, his length of employment with the company?
16   A.    No.

17   Q.    Did Amy Tam ever say or do anything to you that
18   you thought was inappropriate, based on your race?
19   A.    No.

20   Q.    Okay.  I think -- hang on.
21        Okay.  I think I have no further questions,
22   unless your lawyer gives me some more ideas.
23        Maybe it's a good idea for you to be brief.
24   MS. VERONESE:  What's that?
25   MS. THOMPSON:  Maybe it's a good idea for you to

PATRICIA CALLAHAN REPORTING

3923ef63-cde4-46d1-a00e-61453cc52b9a

**Dec. of Thompson - Exhibit 6**

Page 153

1        MS. VERONESE:  Okay.  I'm done.

2        MS. THOMPSON:  Okay.

3

4        FURTHER EXAMINATION BY MS. THOMPSON

5        MS. THOMPSON:  Q.  Let's go back to just a

6    couple of points that your lawyer just brought out.

7            You've testified that at the 938 Market

8    location, the new location, and the two cash registers,

9    that there was no space for rolls of coins.  Is it your

10   testimony that if I opened those cash drawers and looked

11   at them, there absolutely was no room anywhere in that

12   cash register for rolls of coins?

13   A.      Yes.

14   Q.      Couldn't you put the rolls of coins in the

15   slots -- one of the slots for bills if you wanted to?

16   A.      You may.  You may be.  Yeah.

17   Q.      Right.  So --

18   A.      Coins, rolls of coins, yes, you may.

19   Q.      So depending upon how you used the space in the

20   drawer, there could be room in the drawer for rolls of

21   coins; isn't that true?

22   A.      Yes.

23   Q.      Let's look at -- sorry.  What was the exhibit

24   that's the photograph of the drawer?  Exhibit 4.  Sorry.

25           Yes.  Could you look at Exhibit 4 for me again?

3923ef63-cde4-46d1-a00e-61453cc52b9a

**Dec. of Thompson - Exhibit 6**

Page 154

1   You have that in front of you?  Okay.  So we see the --

2   we can see the photograph of the bills with the rubber

3   bands around them, right?

4   A.      Yes.

5   Q.      So, again, looking -- we're talking about the

6   two registers at the 938 Market Street location.  You're

7   not sitting here testifying that physically, there was

8   no room for the bills that are depicted in Exhibit 4,

9   are you, in the cash register drawers?

10  A.      Say one more time.

11  Q.      Yeah.  So we're looking at Exhibit 4, right?

12  A.      Yes.

13  Q.      And you see -- it looks like there's three

14  rubber-banded groups of what appear to be bills, right?

15  A.      Yes.

16  Q.      You would agree with me that those bills that

17  are depicted in Exhibit 4, you physically could have

18  stored them in the cash register drawers, right?

19  A.      Yes.

20  Q.      There was room enough in those cash register

21  drawers -- you said there were two of them, right --

22  where you could have put those bills if you'd wanted to,

23  right?

24  A.      Yes.

25  Q.      Okay.  Now, you testified about being -- having

PATRICIA CALLAHAN REPORTING

3923ef63-cde4-46d1-a00e-61453cc52b9a

**Dec. of Thompson - Exhibit 6**

Page 155

1    typically been given advance notice for inventory.  Had

2    you ever been in any store where there was inventory

3    that was necessitated by a change in managers?

4    A.      No.

5    Q.      Because Mr. Allen was your manager the entire

6    time, right?

7    A.      Yes.

8    Q.      Did you have any understanding that there had to

9    be an inventory when there was a change of managers?

10   A.      No.

11   Q.      Have you ever heard that from any source?

12   A.      No.

13           MS. THOMPSON:  Okay.  I have nothing further.

14           Anything further?

15           MS. VERONESE:  Um, no.

16           THE REPORTER:  Do you want a copy?

17           MS. VERONESE:  Yes, we'll take a copy.  Yes.

18           (The deposition was concluded at 1:08 o'clock

19   p.m.)

20

21

22

23                               _____

                                 Signature of Witness
24

25

PATRICIA CALLAHAN REPORTING

3923ef63-cde4-46d1-a00e-61453cc52b9a

**Dec. of Thompson - Exhibit 6**

156

## CERTIFICATE

1

2

3       I, the undersigned, a Certified Shorthand

4   Reporter, hereby certify that the witness in the

5   foregoing deposition was first duly sworn to testify to

6   the truth, the whole truth, and nothing but the truth in

7   the within-entitled cause; that said deposition was

8   taken at the time and place therein stated; that the

9   testimony of said witness was reported by me, a

10  disinterested person, and was thereafter transcribed

11  under my direction into typewriting; that the foregoing

12  is a full, complete and true record of said testimony;

13  and that the witness was given an opportunity to read

14  and, if necessary, correct said deposition and to

15  subscribe to the same.

16       I further certify that I am not of counsel or

17  attorney for either or any of the parties in the

18  foregoing deposition and caption named, nor in any way

19  interested in the outcome of the cause named in said

20  caption.  Executed this 20th day of September, 2012.

21

22

23                        _____

24                        CERTIFIED SHORTHAND REPORTER
                          NO. 5690

25

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 6**



RS/ALLEN000260

**Dec. of Thompson - Exhibit 6**



Rpr 25 07 12:46p                                                                P.1

**® RadioShack.**
  C O R P O R A T I O N          *PERFORM*          **POOR QUALITY**
**Loss Prevention Services**      2000 Crow canyon Pt. #140, San Ramon Ca.      925-866-0208
                                                            Fax: 925-866-1129

 431 08 6588

                                              **Tom Nabozny**
                                              Loss Prevention Manager

April 16, 2007              MEMORANDUM

    TO:      Hani Alzaghari DM 01-0538
    cc:      Tom Schultz RSM / Steve Hodgkins, Director, Loss Prevention

    FROM:    Tom Nabozny LPM

    SUBJECT: Policy Violation (Store #01-3830) (Failure follow company compliance
    Operational procedures)

    The following details are provided to you for your information and action deemed appropriate.  If
    you have any questions concerning this matter do not hesitate to contact me.

    On Monday April 16, 2007 I conducted an SVR for store 01-3830 San Francisco Ca and found
    that store manager FRANK ALLEN was not in compliance for operational procedures.

    During my visit I found that ALLEN was not reviewing or signing refunds and voids on a daily
    basis.  Several of the refunds either did not have  the issuers or the customer signatures as per
    policy.

    19 out of 24 refunds reviewed did not have the customers name, address, or phone number on
    the refund.

    I also reviewed all Sprint contracts from the month of April and found that none of them had the
    customer profile sheet attached to the contract.  I also found that one of the contracts did not
    have the sales ticket attached.  This then lead me to review the manager's Redbook and found
    that ALLEN has not filed the wireless transaction checklist for the last 18 days

    ALLEN needs to understand that by just ignoring these operational procedures, he is showing
    that he is not being responsible for maintaining the security of company assets.  The kind of
    negligent attitude that is displayed in this area reflects poorly on ALLEN's managerial skills.

    To better control this area, ALLEN needs to address his operational issues in a timely and
    thorough manner.

    Please review this violation with the associate and return it to me signed within ten days.

    1. _____          6. _____
    2. _____
    3. _____
    4. _____
    5. Rozetta Holmes

        Received Time Apr.25. 11:43AM

RS/ALLEN000091

**Dec. of Thompson - Exhibit 6**

EXHIBIT 7

Page 1

1               UNITED STATES DISTRICT COURT

2              NORTHERN DISTRICT OF CALIFORNIA

3
   --------------------------)
4  FRANK ALLEN,               )
                              )
5          Plaintiff          )  Case No.
                              )  CV 11--03110-WHA
6          vs.                )
                              )
7  RADIO SHACK CORPORATION,   )
   and Does 1-20 Inclusive,   )
8                             )
           Defendants.        )
9  --------------------------)

10

11

12

13          DEPOSITION OF GREGORY PATTAKOS

14                  Dallas, Texas

15          Friday, September 14, 2012

16

17

18

19

20  Reported by:

21  Daniel J. Skur, Notary Public and CSR

22  JOB NO. 53498

23

24

25

**Dec. of Thompson - Exhibit 7**

```
1                P R O C E E D I N G S

2                 GREGORY PATTAKOS,

3    having been duly sworn, testified as follows:

4                   (10:02 a.m.)

5                   EXAMINATION

6  BY MR. VERONESE:

7        Q.    Mr. Pattakos, am I saying that

8  correctly?

9        A.    Yes, Pattakos.

10       Q.    I'm Italian, I'm sensitive to that.

11 My name is butchered regularly so I appreciate

12 the Pattakos.

13             My name is Joe Veronese.  I'm with

14 the Alioto firm.  I represent the plaintiff

15 Frank Allen in this case, Frank Allen versus

16 RadioShack Corporation, Does 1 through a

17 hundred.  Have you heard of this lawsuit?

18       A.    Yes.

19       Q.    And who have you -- who have you

20 spoken to this lawsuit about?

21       A.    My attorney.

22       Q.    Okay.  And who is your attorney?

23       A.    Tracy Thompson.

24       Q.    Have you signed a retainer with

25 Ms. Thompson or her firm?
```

**Dec. of Thompson - Exhibit 7**

1      A.     And then once I got promoted, the --

2    we agreed that this would roll out nationwide.

3      Q.     Any other programs like that that

4    you implemented that were successful?

5      A.     Now you're making me feel bad

6    because I feel like I should have done more.  I

7    thought I was pretty impressed with myself.

8      Q.     Right.  Even successful baseball

9    players bat, you know, 300.

10     A.     That's true.  I think those are

11   probably the two big ones that I would say I

12   think made an impact in the organization.

13     Q.     The first one, you're calling it the

14   implementing the leadership program, and the

15   second was the employee value proposition?

16     A.     Yeah.  I would probably add to that

17   the impact that I made on the nonnegotiable

18   branch standards.

19     Q.     Tell me about that.

20     A.     Those were just standards that GMs,

21   DMs, regional sales directors would utilize to

22   make sure that their store is to operating

23   standard.  It was not nonnegotiable to the

24   organization.  It was nonnegotiable to the

25   customer coming in.  That's what they were

**Dec. of Thompson - Exhibit 7**

1    looking for.  So it was quite interesting, and

2    again, you got to talk about the value, the

3    purpose of it.  So if you just kind of, on the

4    surface, say it's nonnegotiable, I think people

5    could get -- you know, can be really put off.

6    So a lot of this is how you explain it.  Slow

7    down.  How you position it with your team.  Do

8    they understand the value of why standards are

9    important, do they understand the purpose of

10   having standards as a brand.  So should a guest

11   be able to go into a RadioShack in New York

12   City and have a certain experience and also be

13   able to go into San Francisco, let's say, and

14   have a similar experience.  As an organization,

15   our belief was yes, it should be somewhat

16   similar, could be a little bit different, but

17   should be somewhat similar in terms of what

18   they see in the store, pricing execution,

19   display standards, cleanliness standards, those

20   should be fairly consistent.

21        Q.    Across the board, whichever

22   RadioShack you go into.

23        A.    Yes.

24        Q.    Kind of like Starbucks.

25        A.    Very much like Starbucks.  So a

1   customer going into Starbucks has an

2   expectation of what that will look like no

3   matter where they are.

4       Q.    Taste like?

5       A.    And taste like, both.  So what

6   you're talking about, one are standards, the

7   other is the quality of product.

8       Q.    Yeah.

9       A.    And it's quite interesting because

10  the customer has a certain expectation on both.

11  If you have dirty ledges, dirty bathrooms,

12  dirty floors, the condiment counter is dirty,

13  before you ever get to the counter, in your

14  mind as a guest, you've already got a

15  perception of what that store is like.

16      Q.    Right.

17      A.    And so we were trying to -- in

18  effect, at RadioShack, what we were trying to

19  accomplish was have our people be agnostic to

20  what carrier or what product we were

21  recommending more based on the customer's

22  needs.

23      Q.    Was this something you took from

24  Starbucks?  It sounds like something that's

25  similar to their --

**Dec. of Thompson - Exhibit 7**

1       A.      Something I've learned --

2       Q.      -- culture.

3       A.      -- along the way maybe.  I felt

4    if -- as opposed to pushing an Apple product, I

5    wanted to sell you a product that makes the

6    most sense for you.

7       Q.      How did you implement it?

8       A.      Through the branch -- through the

9    nonnegotiable branch standards, that was part

10   of the coaching that went in the branch

11   standards, so there was a people piece, there

12   was a property piece, and there was a product

13   piece.  So it was three -- three kind of

14   distinct pieces in the nonnegotiable standards.

15   So we would look at -- from a people

16   standpoint, we would look at things like

17   training compliance.  We would look at

18   staffing -- staffing levels.  We would look at

19   staffing needs.  We would look at dress code.

20   We would look at a bunch of different things.

21   You could figure out from the guys what was on

22   there.  And then there would be a property

23   piece, and then there would be a -- I thought

24   it was -- what was the last one?  My mind just

25   went blank.

**Dec. of Thompson - Exhibit 7**

```
 1              MS. THOMPSON:  Product.

 2         A.    A product piece.

 3    BY MR. VERONESE:

 4         Q.    So I'm going to show you what I'll

 5    mark as Exhibit 1 because what we've been

 6    talking about kind of rings a bell.  If you

 7    could take a look at page 2 of Exhibit 1, we're

 8    going to have the court reporter mark it first

 9    before you look at it.

10              (Deposition Exhibit 1 marked.)

11    BY MR. VERONESE:

12         Q.    Just so --

13         A.    Refresh my memory.

14         Q.    Does this, what I've marked as

15    Exhibit 2, refresh your memory as to the people

16    part of the -- you know what, before you answer

17    that question, let me give you another one so

18    that I don't confuse you with your answer.

19              (Deposition Exhibit 2 marked.)

20    BY MR. VERONESE:

21         Q.    Okay.  So what I've marked as

22    Exhibit 1 is RSLN2077 to 2078.  What I've

23    marked as Exhibit 2 is RSLN179 through 184.

24    Now, could you tell me by looking at these

25    documents if this is consistent with what you
```

**Dec. of Thompson - Exhibit 7**

1    were talking about, the policy that...

2           MS. THOMPSON:  Objection, vague and

3       ambiguous.

4       A.    The first -- the Exhibit 2 is what

5    typical operators would use, RSDs would use,

6    DMs would use to document a visit.

7           The --

8    BY MR. VERONESE:

9       Q.    What do you mean "to document a

10   visit"?

11      A.    To document your visit with the GM

12   in the store.  This would be the document

13   that -- this would be the vehicle of kind of

14   capturing what happened on a visit.

15      Q.    Got it.  So a GM would go into a

16   store?

17      A.    No, a DM.

18      Q.    A DM.

19      A.    Or an RSD, and be able to utilize

20   this as a -- as a log of their visit, primarily

21   to say, here is what went well, here is what

22   didn't go well, here is what we have to follow

23   up on.

24      Q.    Uh huh.  Okay.

25      A.    Okay.

**Dec. of Thompson - Exhibit 7**

1      Q.    And it's entitled Nonnegotiable

2   consistent with what you were talking about

3   earlier.

4      A.    Yes.

5      Q.    Because they're these standards you

6   want to meet for both -- for purposes of the

7   customer so they're getting consistent

8   standards.

9      A.    Yes.

10     Q.    Okay.  Makes sense.

11     A.    Now, this Exhibit 1 is something

12   that the loss prevention department actually

13   instituted, and I actually -- I was not in

14   favor of the name.  If they called it a

15   nonnegotiable visit, I know I was never in

16   favor of that.  It looks like they tried to

17   copy our format.

18     Q.    When you say "copy" your format, you

19   mean copy your format --

20            (Interruption by the reporter.)

21   BY MR. VERONESE:

22     Q.    From Exhibit 2?

23     A.    Yes.  So this was not an operational

24   document.  This was a loss prevention

25   department document.

**Dec. of Thompson - Exhibit 7**

1       Q.      Exhibit 1?

2       A.      Exhibit 1.

3       Q.      Okay.  How were -- speaking

4    specifically to Exhibit -- the doc -- not the

5    specific document, but the type of document

6    that is Exhibit 2, how were these -- how was

7    the documentation of these nonnegotiable

8    standards actually used on a day to day?  I

9    mean, I see what you're saying is that this

10   document was used to summarize a particular

11   visit.  What was then done with that particular

12   document?

13      A.      So the document would have been

14   entered into the computer system so that it

15   could be used as a reference for the DM or the

16   RSD.  The hope was, if executed properly, that

17   before the next visit took place with the DM

18   and the GM, that there would be a conversation

19   that took place to say, let's just quickly

20   review your last visit, here are some things we

21   were doing really well, it looks like there

22   were a couple of opportunities that we were to

23   address, how are we doing on those

24   opportunities, before we start the next visit.

25      Q.      Okay.

**Dec. of Thompson - Exhibit 7**

1     A.    Does that make sense?  We highly

2  encourage people to even go and get a cup of

3  coffee with this and sit down and just go,

4  where did we leave off.  Where did we do well.

5  You know, almost like a prenonnegotiable visit

6  for the next time.

7     Q.    So a checklist of what needs to be

8  fixed?

9     A.    Or what you're doing really well and

10  you want to encourage that behavior.  So you're

11  doing this really, really well.  Hey, I want to

12  recognize that.

13     Q.    Was this implemented when you were

14  at the VP central?

15     A.    Yes.

16     Q.    Okay.  And do they still use this

17  today, do you know, or did they use it through

18  your leaving the company?

19     A.    I -- for my whole time there, they

20  were using it.  I don't know what happened

21  afterwards.

22     Q.    Do they use it nationally -- did

23  they use it nationally when you left?

24     A.    Yes.

25     Q.    Okay.  The -- what is marked as

1    Exhibit 1, you said this is a loss prevention

2    document.  Did you have any input into how this

3    was done other than what you said about how

4    they copied your standards, --

5          A.     No.

6          Q.     -- or your form?

7          A.     No, I had no input into it.

8          Q.     Okay.  Did you, as VP of ops, did

9    you ever see these pertaining to particular

10   employees?

11              MS. THOMPSON:  Objection, time

12         frame.

13   BY MR. VERONESE:

14         Q.     Central, VP ops central, when you

15   were there.  Was it part of your job to review

16   Exhibit 2 at any time in particular to a -- an

17   employee?

18         A.     No.

19         Q.     Now, what is Exhibit 2, this is --

20   these are documents that -- that log a

21   particular visit to a store, and it's a log

22   about the store, not about an employee,

23   correct?

24              MS. THOMPSON:  Objection, vague and

25         ambiguous.

**Dec. of Thompson - Exhibit 7**

1    BY MR. VERONESE:

2         Q.    You can tell me.

3         A.    I think it details the experience in

4    a store.

5         Q.    Okay.  So looking at, for example,

6    by way of example, Exhibit 2, you have the

7    manager's name there is Frank Allen, and the

8    store is 13830, and the district is 538.  How

9    would this document -- would this document be

10   in Frank Allen's HR file?

11             MS. THOMPSON:  Objection, form,

12        lacks foundation, calls for speculation.

13        A.    Not that I'm aware of.

14   BY MR. VERONESE:

15        Q.    So would an employee like Frank

16   Allen be disciplined based on what is in these

17   documents?

18             MS. THOMPSON:  Objection, --

19   BY MR. VERONESE:

20        Q.    Could he be?

21             MS. THOMPSON:  -- lacks foundation,

22        calls for speculation.

23        A.    I would say that, in itself, this is

24   not the HR program that we would discipline

25   someone with.  It could be used as supporting

**Dec. of Thompson - Exhibit 7**

1   documentation if there's a consistent -- a

2   consistent number of these types of visits that

3   go very poorly.

4   BY MR. VERONESE:

5        Q.    Okay.  For example, section 4, need

6   clean in space, the place is a dump, and it

7   continues to be a dump.

8        A.    If the place is a dump, and we coach

9   the employee and we teach them and we show them

10  and we spend time with them, and we come back

11  and it's still a dump, and then we coach them

12  and we come back and it's still -- eventually,

13  yes, it could become part of, hey, we don't

14  think you're doing your job.  But this --

15  this -- this program is not developed to be an

16  HR program.  This is developed to help the

17  operator stay on track with what the most

18  critical things in the store are.

19            One of the things I tried to do

20  was -- you know, I'm a believer in that it's

21  okay to ask for help.  So the reality is, not

22  everybody knows everything.  So how do we get

23  our people to be open enough to go, hey, I

24  don't understand what you're asking for here.

25  When you use a system like this, it's okay to

**Dec. of Thompson - Exhibit 7**

Page 104

1    say, hey, I didn't get the POP right, and I'm

2    not sure what I'm supposed to do here.  Can you

3    help me?  And the DO's job -- the DM's job is

4    to help them and support them.

5             Now, if there's a consistent track

6    record where we just can't get it done or we're

7    not learning or we're not getting better at

8    managing execution, then it could become a

9    performance issue, but in itself, this should

10   not be used as a method for counseling people.

11        Q.    Okay.  Have you ever -- do you know

12   who Frank Allen is?

13        A.    No.

14        Q.    You've never met Frank Allen?

15        A.    I'm sure I did, at some point.  I --

16             MS. THOMPSON:  Objection, don't

17        speculate.

18        A.    I don't know.  I don't know who

19   Frank Allen is.  Heard his name now a couple

20   times.

21   BY MR. VERONESE:

22        Q.    Through this litigation?

23        A.    Through my attorney.

24        Q.    Okay.  But you haven't heard your

25   name -- heard his name talking to anybody else?

**Dec. of Thompson - Exhibit 7**

Page 105

```
 1        A.    No.

 2        Q.    Other than your counsel.

 3        A.    No.

 4        Q.    Okay.  So I'm assuming that you've

 5   never seen Exhibit 2 before?

 6        A.    I've never seen that before.

 7        Q.    Okay.  You've seen the form, just

 8   not the --

 9        A.    I've seen the form; I've never seen

10   this.

11        Q.    Okay.  When you say "this," just for

12   the record is, you've never seen this form with

13   these details in them.

14        A.    I've never seen Exhibit 2.  I've

15   never seen Exhibit 1.

16        Q.    Okay.  You've seen the form Exhibit

17   1 before, just not the -- just not with these

18   specific details in them?

19        A.    I don't remember ever seeing the

20   form Exhibit 1.

21        Q.    Oh.

22        A.    This would not be something that at

23   my level I would typically look at.

24        Q.    Why is that?

25        A.    I have 2,000 stores.  This appears
```

**Dec. of Thompson - Exhibit 7**

Page 106

1    to be a unit.  I would not -- this would

2    typically be looked at by the LP team, the loss

3    prevention manager, the DM, maybe the regional

4    sales director.

5         Q.    How many branch managers have you --

6    did you terminate when you were a VP ops

7    central?

8              MS. THOMPSON:  Objection, assumes

9         facts, and vague and ambiguous as to branch

10        manager.

11        A.    General manager I'm assuming is what

12   we're talking about.

13   BY MR. VERONESE:

14        Q.    Unit manager.

15        A.    Unit manager.

16             MS. THOMPSON:  Is that a store --

17        are we talking store managers?

18   BY MR. VERONESE:

19        Q.    Okay.  Yes.

20        A.    Yes.

21        Q.    What you have been describing as --

22        A.    A general manager, a store manager,

23   a unit manager, all the same.

24        Q.    GM.

25        A.    GM.  I would say zero.  I've never

**Dec. of Thompson - Exhibit 7**

1    terminated a GM.

2         Q.    How many have you hired?

3         A.    Zero.

4         Q.    And is that also true in your

5    position as west VP of ops?

6         A.    Yes.

7         Q.    Zero fired, zero hired?

8         A.    It was two levels -- it was -- yeah,

9    I didn't go down that far.

10        Q.    Okay.  Were you involved at all in

11   the termination of Frank Allen?

12        A.    No.

13        Q.    Can you list for me the people that

14   you did hire while you were at RadioShack?

15             MS. THOMPSON:  You mean their job

16        positions?

17             MR. VERONESE:  No, people.

18             MS. THOMPSON:  Relevance of that?

19   BY MR. VERONESE:

20        Q.    Do you recall people that you hired?

21             MS. THOMPSON:  You can answer as to

22        job titles.  I don't see the relevance of

23        getting into names.

24             MR. VERONESE:  Are you instructing

25        him not to answer my question?

**Dec. of Thompson - Exhibit 7**

1      Q.    Do you know who she was -- the

2   regional sales manager was that she reported

3   to?

4      A.    No, I don't remember.

5      Q.    Who -- did you know who the HR

6   manager was that she reported to?

7           MS. THOMPSON:  Objection, assumes

8        facts, misstates testimony.

9      A.    I can't remember the name.  She's a

10  heavy set gal.  I can't remember her name now.

11  She was really nice.  I can't remember her

12  name.

13  BY MR. VERONESE:

14     Q.    If you recall her name, let us know.

15     A.    Okay.

16     Q.    You're familiar with store number --

17  here we go, 3830?  Do you know where that is?

18     A.    No.

19     Q.    Could you look at Exhibit 2?  Does

20  that exhibit refresh your recollection as to

21  where that store is?

22     A.    No.  It's somewhere in San Francisco

23  because I remember Hani was somewhere in San

24  Francisco.

25     Q.    And who is Hani?

**Dec. of Thompson - Exhibit 7**

1        A.    Hani Alzaghari was a district

2    manager in the west.

3        Q.    Okay.  And did -- was Hani the

4    district manager of store 13830?

5        A.    Based on Exhibit 2, it would appear

6    that way.

7              MS. THOMPSON:  Okay.  Well, I'm

8         going to caution you not to guess or

9         speculate if you don't --

10        A.    I don't know.

11              MS. THOMPSON:  -- personally know.

12        A.    I have no idea.

13   BY MR. VERONESE:

14        Q.    Okay.  Did Miss O'Campo take the

15   place of Mr. Alzaghari as district manager?

16        A.    I do not recall.  I think there was

17   some realignments done, but I don't recall

18   specifically what -- if that was the case.

19        Q.    What realignments were done?  Can

20   you tell me about that?

21        A.    I just know that there were some

22   realignments with certain stores going into

23   some markets and other stores going into other

24   markets, but I don't recall exactly.

25        Q.    Do you know who Mr. Hani Alzaghari

**Dec. of Thompson - Exhibit 7**

Page 119

1    is?

2         A.    I know the name, I don't know him

3    personally.

4         Q.    Okay.  Have you ever met Mr. Hani

5    Alzaghari?

6         A.    I don't recall.  I may have.  I

7    don't know.

8         Q.    Okay.  If Mr. Alzaghari says that he

9    had met you, would he be lying?

10        A.    I don't think so.

11        Q.    How about Miss O'Campo; do you know

12   who she is?

13        A.    Yes.

14        Q.    Okay.  You've met her before?

15        A.    Yes.

16        Q.    Okay.  And did you hire her?

17        A.    No.

18        Q.    When was the first time you had met

19   her?

20        A.    Would have been the first time I

21   went to California.

22        Q.    Do you recall when that was?

23        A.    Probably about a year before I left

24   the company.

25        Q.    How many times have you gone to

**Dec. of Thompson - Exhibit 7**

Page 120

1    California and met with Ms. O'Campo?

2        A.    I don't know.

3        Q.    Less than ten?

4        A.    Probably.  I'm trying to include

5    meetings and things like that that she might

6    have attended.  Maybe a dozen.

7             MS. THOMPSON:  Times in California?

8        A.    No, but between the meetings at

9    headquarters, DM meetings, I did a meeting with

10   the west team, so, you know, maybe a dozen

11   times.

12   BY MR. VERONESE:

13       Q.    How many times had you met with

14   Ms. O'Campo in California?

15       A.    Maybe three.

16       Q.    Okay.  And would you recall the

17   first time you had met with her in California?

18       A.    No.

19       Q.    Would that have been -- were all

20   three of the meetings that you had met with

21   Ms. O'Campo, were they all at her district

22   store?

23             MS. THOMPSON:  Objection, vague and

24        ambiguous.

25       A.    I don't know.  I don't remember.

**Dec. of Thompson - Exhibit 7**

Page 121

1    BY MR. VERONESE:

2        Q.    Where would you have met her in

3    California if not at the store?

4        A.    I probably would have met her at the

5    regional office.

6        Q.    Where is the regional office?

7        A.    I don't recall, but there was a

8    regional office for the west in -- somewhere, I

9    don't remember.

10       Q.    Somewhere in California?

11       A.    Yes.

12       Q.    Ms. O'Campo testified that you

13   visited store 13830 in San Francisco in or

14   about December of 2009.  Do you recall that

15   visit?

16       A.    No.

17       Q.    Do you deny that you actually

18   visited the store at that time?

19       A.    No.

20       Q.    Okay.

21       A.    Very well could have.

22       Q.    Do you recall meeting Mr. Allen at

23   the store at that time?

24       A.    I don't recall, but I may have.

25       Q.    Do you recall making a comment to

**Dec. of Thompson - Exhibit 7**

Page 123

1   that he had been there for a long time, but he

2   wouldn't be there for longer than another year?

3           MS. THOMPSON:  Objection, assumes

4       facts.

5       A.    No.  I would not -- that would not

6   come out of my mouth.

7       Q.    Anything like that?

8       A.    Never.

9       Q.    Just trying to get your memory here.

10      A.    I would not say that.  That's not

11  consistent with what I would say to a general

12  manager.

13      Q.    Do you recall making comments to

14  Ms. O'Campo about the condition of the store in

15  San Francisco following your visit or at your

16  visit?

17          MS. THOMPSON:  Objection to the

18      extent it assumes facts.

19      A.    I don't recall any specific

20  conversation regarding any specific store in

21  San Francisco.  I do recall that I was somewhat

22  disappointed in the condition of some of our

23  stores.

24  BY MR. VERONESE:

25      Q.    Okay.  Well, is store 13830 one of

**Dec. of Thompson - Exhibit 7**

1   those stores that you were disappointed in the

2   condition of?

3        A.    I don't know because I don't know

4   that I specifically was in this store.  Now, if

5   Mrs. O'Campo says I was, I don't think she

6   would lie about it.

7        Q.    Okay.  But --

8        A.    Assuming I was, how many stores did

9   we see?  I could have seen a dozen stores.  I

10  don't know.

11       Q.    Okay.  So you don't know whether or

12  not you made that comment specifically, you

13  expressed concerns specifically about that

14  store.

15       A.    I expressed concerns about the

16  market, said, jeez, I'm disappointed -- I know

17  I was disappointed in the store standards and

18  what I saw.

19       Q.    But when you say the "market," what

20  do you mean?

21       A.    The --

22       Q.    Because the store --

23       A.    The Bay area.

24       Q.    The store is on Market Street.  I

25  want to make --

**Dec. of Thompson - Exhibit 7**

1       A.      The Bay area.

2       Q.      The Bay area?

3       A.      Yeah, there were four -- I think

4   there were four distinct markets inside the Bay

5   area.

6       Q.      Okay.

7       A.      So I visited all of them.

8       Q.      How many times did you visit them?

9       A.      Three.

10      Q.      Okay.  And what markets existed in

11  the Bay area?

12      A.      I don't remember.  You would -- you

13  could get a map, though, a company map would

14  show you.

15      Q.      Okay.

16      A.      I just don't --

17      Q.      But you don't recall --

18      A.      I don't recall.

19      Q.      -- what market San Francisco was in?

20      A.      I think it was one of those four

21  that I'm talking about.

22      Q.      Do you recall how many stores in

23  that market you had actually visited?

24      A.      Quite a few.

25      Q.      Did you visit all of them at some

**Dec. of Thompson - Exhibit 7**

1      A.    I don't know.

2  BY MR. VERONESE:

3      Q.    I don't want you to guess --

4      A.    I think in the center of the city

5  there was really cool hotels and buildings, and

6  I'm thinking that's probably what you're

7  talking about, but I don't know.

8      Q.    Okay.  So you don't have a specific

9  recollection of the store -- being in the store

10  on Market Street?

11      A.    No.

12      Q.    Although it's possible that you

13  were?

14      A.    That's correct.

15      Q.    Okay.  Earlier you talked about --

16  when we were discussing Exhibit 2, we talked

17  about the nonnegotiable standards and if

18  certain standards weren't met there would be a

19  process essentially to get things up to

20  standard, and if that process wasn't satisfied,

21  then perhaps it would be disciplinary, right?

22            MS. THOMPSON:  Objection to the

23       extent it misstates testimony.

24  BY MR. VERONESE:

25      Q.    You can -- if I was wrong, you

**Dec. of Thompson - Exhibit 7**

Page 136

1   reasons --

2       Q.   At RadioShack, though.

3       A.   At RadioShack.  I've seen people get

4   terminated because they fail to go to the bank

5   and they lost money, the safe was missing

6   money, sexual harass -- proven sexual

7   harassment, falsifying time records from

8   employees to either underpay or overpay people,

9   theft.  Things like that were, upon being

10  investigated, of course, proven, people were

11  terminated without progressive discipline being

12  put in play.

13      Q.   Now, were you familiar with certain

14  units keeping money in the back room?

15          MS. THOMPSON:  Objection, assumes

16      facts.

17  BY MR. VERONESE:

18      Q.   As change?

19          MS. THOMPSON:  Objection, assumes

20      facts.

21      A.   No.

22  BY MR. VERONESE:

23      Q.   Did you know that that was happening

24  in San Francisco?  Did you ever learn that that

25  was actually happening in San Francisco?

**Dec. of Thompson - Exhibit 7**

Page 137

1          MS. THOMPSON:  Objection, assumes

2      facts.

3      A.    I don't know.  I have no idea about

4  that.

5  BY MR. VERONESE:

6      Q.    Did you ever learn that district

7  managers had actually approved keeping money in

8  the back room?

9          MS. THOMPSON:  Objection, assumes

10     facts.

11     A.    No.

12         MS. THOMPSON:  Got to wait, really

13     got to wait for me.

14  BY MR. VERONESE:

15     Q.    Did every store have a safe?

16     A.    To the best of my recollection, it

17  did.

18     Q.    Okay.  And if money wasn't in the

19  cash register, did it have to be in the safe?

20         MS. THOMPSON:  Objection, lacks

21     foundation, incomplete hypothetical.

22  BY MR. VERONESE:

23     Q.    Is that a policy?

24         MS. THOMPSON:  Calls for

25     speculation.

**Dec. of Thompson - Exhibit 7**

```
1       A.    Just don't -- I don't understand.  I
2  gave -- I'm sure I gave, although I cannot
3  specifically recall, I'm sure I gave some
4  direction on what I wanted the standards --
5  what the standards should look like, the
6  standards being the physical standards of a
7  store.
8  BY MR. VERONESE:
9       Q.    Okay.  What was Ms. O'Campo's, what
10  was her role?  What was her title and her job
11  description?
12            MS. THOMPSON:  Vague and ambiguous
13       as to time.
14       A.    As I best can recollect, she was a
15  district manager.
16  BY MR. VERONESE:
17       Q.    And the district managers have the
18  authority to hire and fire employees?
19       A.    Yes.
20       Q.    If you told a district manager to
21  fire an employee, would they have to do that?
22            MS. THOMPSON:  Objection, incomplete
23       hypothetical, vague and ambiguous.
24       A.    I would never tell a district
25  manager that they had to fire an employee.
```

**Dec. of Thompson - Exhibit 7**

1   a training issue, might be a knowledge gap,

2   could be a performance issue.

3        Q.    If there was a cash shortage, would

4   the unit manager know that daily in follow-up

5   procedures?

6              MS. THOMPSON:   Vague and ambiguous.

7        A.    I don't know.

8   BY MR. VERONESE:

9        Q.    When would the district manager, for

10  example, find out that there was a cash

11  shortage?

12             MS. THOMPSON:   Objection, incomplete

13         hypothetical, lacks foundation.

14       A.    I don't know.

15  BY MR. VERONESE:

16       Q.    Do you know who replaced Mr. Frank

17  Allen when he was terminated?

18       A.    I have no idea.

19       Q.    Does a store manager have the

20  authority to keep money in a locked drawer?

21             MS. THOMPSON:   Objection, vague and

22         ambiguous.

23       A.    I don't know the answer to that.

24  The authority.  I guess they could do it if

25  they want.  I don't know what the policy is or

Page 154

1          MS. THOMPSON:  Objection, lacks

2      foundation, calls for speculation.

3      A.    To the best of my recollection, he

4  was also a district manager.  Donna and he were

5  colleagues.

6  BY MR. VERONESE:

7      Q.    Okay.  So they worked at the same

8  time as district managers?

9      A.    Yes.

10     Q.    And --

11     A.    In the same market with different

12 stores.

13     Q.    Okay.

14     A.    Remember I told you there were four

15 districts in that Bay area?

16     Q.    Yes.

17     A.    So they were two of the four people.

18     Q.    Okay.  So they would not -- just to

19 clarify, both of them would not be district

20 managers over the same store.  They would be

21 over different stores, correct?

22     A.    That's correct.

23     Q.    Did you ever tell Ms. O'Campo that

24 plaintiff did not fit the image that RadioShack

25 wants?

**Dec. of Thompson - Exhibit 7**

1      A.    Never said that.

2      Q.    Did you ever tell Ms. O'Campo that

3  she didn't have the right people in the San

4  Francisco store?

5      A.    Never said that.

6      Q.    Or that she needed to upgrade her

7  employees?

8      A.    Never said that.

9      Q.    Almost done here.

10          MR. VERONESE:  Okay.  Why don't we

11          do this.  Why don't I review my notes for

12          five minutes, take a quick break, and then

13          we'll finish up with the last round of

14          questions, get out of here.

15          (Recess held.)

16  BY MR. VERONESE:

17      Q.    All right.  Ms. O'Campo, why did she

18  leave RadioShack?

19          MS. THOMPSON:  Objection, lacks

20          foundation, calls for speculation.

21  BY MR. VERONESE:

22      Q.    If you know.

23      A.    I was unaware that she left.  I'm

24  not aware of any of that.

25      Q.    Do you know she was terminated?

1    financial -- the financial state of the

2    business was not in good shape, and they were

3    looking to cut overhead.  So they did some mass

4    layoffs.

5    BY MR. VERONESE:

6         Q.    And when did you leave RadioShack?

7         A.    June of '11.

8         Q.    What was your title at the time?

9    Was it still VP ops west?

10        A.    Yes.

11        Q.    And were you terminated?

12              MS. THOMPSON:  Wait -- no, no, no,

13        wait.  That's -- can you read the question

14        back?

15              (Record read.)

16              MS. THOMPSON:  You got to listen to

17        the question.  When you left.

18        A.    I think we -- but we had agreed that

19   we would just call it VP of ops west just for

20   clarity, right?  I was vice president of

21   operations was my official title.

22   BY MR. VERONESE:

23        Q.    Right.  And we agreed that we would

24   differentiate that between your VP of ops

25   central by calling it VP ops west.

Dec. of Thompson - Exhibit 7

1          MS. THOMPSON:  Okay.  Fair enough.

2     A.    Yeah.  I left --

3          MS. THOMPSON:  Fair enough.

4          MR. VERONESE:  I thought we

5     clarified that.

6          MS. THOMPSON:  My mistake.

7     A.    Just for talking sake.

8          MS. THOMPSON:  My mistake.  Okay.

9  BY MR. VERONESE:

10    Q.    Okay.  So your title essentially

11 didn't change is my purpose?

12    A.    It did not change.

13    Q.    Okay.  And why did you leave

14 RadioShack?

15    A.    I just left.  I got a really good

16 offer from TGI Fridays to be a senior vice

17 president in charge of all operations.

18    Q.    All operations nationwide?

19    A.    Nationwide.

20    Q.    How many stores report to you?

21    A.    About 700 restaurants.

22    Q.    Okay.  How many employees under you?

23    A.    About 20,000, 25,000.

24    Q.    Where are they headquartered?

25    A.    In Dallas Fort Worth, Dallas.

**Dec. of Thompson - Exhibit 7**

1    Q.    And that's currently your job?

2    A.    Yes.

3    Q.    And has your title changed since

4  you've been there?

5    A.    No.

6    Q.    And it's VP of operations period?

7    A.    Senior vice president of operations.

8    Q.    Who do you report to?

9    A.    President of the company.

10    Q.    Is that the same as the CEO?

11    A.    Similar.

12    Q.    Was there a CEO?

13    A.    There's a chief executive officer,

14  yes.

15    Q.    Were you -- at any time while you

16  were at RadioShack, had you ever been

17  disciplined?

18    A.    No.

19    Q.    Ever written up?

20    A.    No.

21    Q.    No verbal warnings?

22    A.    Never.

23    Q.    Were you terminated from RadioShack?

24    A.    No.

25    Q.    So you left voluntarily?

**Dec. of Thompson - Exhibit 7**

1       A.      Voluntarily left.

2       Q.      Okay.  And did -- while you were at

3    RadioShack, did you ever receive any complaints

4    against you?

5       A.      I may have.  I mean, I interacted

6    with a lot of people.  I'm not aware of any

7    specifics, no.

8       Q.      Were you aware of any written

9    complaints about you?

10      A.      Not that I'm aware of.

11      Q.      Any complaint about you being

12   racially insensitive?

13      A.      Never.

14      Q.      Any complaint about you being

15   discriminatory against somebody because of

16   their race or age?

17      A.      Never.

18      Q.      Okay.  And that's -- when you say

19   "never," you mean never at RadioShack or never

20   in your life?

21      A.      Never in my life have I ever -- has

22   that ever come up.

23      Q.      Okay.

24              MR. VERONESE:  I think that's it.

25              MS. THOMPSON:  Okay.  I have a

**Dec. of Thompson - Exhibit 7**

1      couple of quick questions to follow up.

2               EXAMINATION

3  BY MS. THOMPSON:

4      Q.    At any time during your employment

5  at RadioShack, did you have any role whatsoever

6  with establishing cash handling policies or

7  procedures?

8      A.    No.

9      Q.    Who, to your knowledge, had that

10  responsibility?

11      A.    That would have been LP, LP team.

12      Q.    Loss prevention?

13      A.    Yes, and probably some input from

14  central ops, who they reported in to.

15      Q.    As you -- again, in terms of while

16  you were employed at RadioShack, as you sit

17  here now, do you know one way or the other

18  whether you -- whether violation of company

19  cash handling policies and procedures could be

20  grounds for a termination without progressive

21  discipline?  Do you know one way or the other?

22      A.    It depends on the situation.

23      Q.    What do you mean by that?

24      A.    Can you repeat the question again?

25      Q.    Yes.  I'm talking about during your

1   employment at RadioShack, do you know one way

2   or the other whether violation of cash handling

3   policies or procedures could be grounds for

4   termination without following any form of

5   progressive discipline?

6       A.    They could.

7       Q.    And what are you basing that

8   statement on?

9       A.    That was one of the things that

10  people tended to lose their job for was cash

11  handling, money shortages.  There were specific

12  policies in place, and you could be terminated

13  for violating those.

14      Q.    Did there need to be -- in terms of

15  your understanding, did there need to be an

16  actual cash shortage in order for there to be

17  termination for violation of policies or

18  procedures?

19      A.    So let me be clear on this.  This is

20  way below my pay grade.  You're asking me

21  questions, both of you, that are so far below

22  my pay grade, I can conjecture and give you

23  what I think it should be or it might have

24  been, but I think there's people far better

25  qualified to answer these questions than I.

**Dec. of Thompson - Exhibit 7**

1          MR. VERONESE:  Then you shouldn't be

2      guessing.

3          THE WITNESS:  Okay.

4   BY MS. THOMPSON:

5      Q.    Right, okay, are you saying now that

6   you were guessing during -- when you were being

7   asked questions about these issues during your

8   testimony?

9          MR. VERONESE:  Vague as to issues

10      and which questions exactly.  You would

11      have to go to the exact question to have

12      that apply.

13   BY MS. THOMPSON:

14      Q.    Well, there were a series of

15   questions regarding the application of the

16   progressive discipline policy.  Do you recall

17   that testimony generally?

18      A.    Yes.

19      Q.    Were you -- were you guessing when

20   you gave your testimony?

21      A.    I was giving an overview of what it

22   might look like, but every situation is

23   different.  The allegations are different, and

24   the charges could be very, very different.

25      Q.    Well, was it -- I just want to be

**Dec. of Thompson - Exhibit 7**

1    clear here.  Given the -- your -- in the

2    position you occupied in the company, was it

3    your -- part of your roles and responsibilities

4    to make sure that progressive discipline was

5    followed, or was that somebody else's

6    responsibility?

7         A.    That was somebody else's

8    responsibility.

9         Q.    And who would that be?

10        A.    Human resource team.

11        Q.    Were you ever, throughout your

12   employment at RadioShack, personally involved

13   in any store manager termination?

14        A.    No.

15        Q.    Do you have some understanding, as

16   you sit here now, in terms of who would

17   typically be involved in that kind of

18   termination, that level termination?

19             MR. VERONESE:  Vague as to who we're

20        talking about.

21             MS. THOMPSON:  Store manager

22        terminations.  As a matter --

23        A.    Can you repeat the question?

24   BY MS. THOMPSON:

25        Q.    Okay.  And again, if you don't have

**Dec. of Thompson - Exhibit 7**

Page 166

1    any understanding, please tell me.  The

2    question is, do you have any understanding in

3    terms of during the course of your employment

4    at RadioShack what parties needed to be

5    involved, if anyone, in a store manager

6    termination?

7        A.    To the best of my understanding, it

8    would be the district manager, the human

9    resource manager, if appropriate, the loss

10   prevention manager, and the regional sales

11   director.

12       Q.    And were you ever even informed, as

13   a matter of course, of store manager

14   terminations?

15       A.    No.

16       Q.    Does a district manager have the

17   authority to modify the company's cash-handling

18   policies and procedures?

19       A.    No.

20       Q.    Were store managers -- again, based

21   upon your knowledge and experience at

22   RadioShack, were store managers held

23   accountable for adhering to cash-handling

24   policies and procedures?

25       A.    Yes.

**Dec. of Thompson - Exhibit 7**

1    evaluating a situation -- first of all, would

2    you ask the district manager whether that had,

3    in fact, occurred?

4            MR. VERONESE:  Under what

5        circumstances?

6            MS. THOMPSON:  I'm sorry?

7            MR. VERONESE:  What do you mean, did

8        he ask, has he asked?

9            MS. THOMPSON:  It's all hypothetical

10       so -- could I have my question read back?

11           MR. VERONESE:  Please.

12           (Record read.)

13   BY MS. THOMPSON:

14       Q.    All right.  Let me go back.  You

15   were asked a hypothetical question about what

16   would happen if a district manager allowed a

17   store manager to keep cash in the manager's

18   desk in the back of the store.  Do you recall

19   that testimony generally?

20       A.    Generally, yes.

21       Q.    Okay.  And you rendered -- you

22   offered your personal opinion about that

23   subject.  Do you recall that generally?

24       A.    Yes.

25       Q.    Okay.  First of all -- well, were

**Dec. of Thompson - Exhibit 7**

1  you expressing your personal opinion or

2  RadioShack policy?

3      A.   My personal opinion.  I thought it

4  was pretty clear that it was my personal

5  opinion.

6      Q.   Okay.  So in terms of evaluating

7  that particular circumstance, if a store

8  manager told you that the reason I'm keeping

9  cash in the manager's desk in the back was

10  because my district manager said it was okay

11  for me to do so, what, if anything, would you

12  do to follow up on that?

13      A.   Okay.  I would not have that

14  conversation, first off.  That would not be a

15  conversation at my level of employment.

16      Q.   Okay.  Let's say someone reported --

17  let's assume for purposes of this that someone

18  reported to you that a store manager had said,

19  my district manager told me it was okay for me

20  to keep cash in the back desk drawer in my

21  office at the store.

22          MR. VERONESE:  Assumes facts not in

23      evidence.  Are we just creating fiction

24      now?

25          MS. THOMPSON:  Can you -- I haven't

Page 170

 1      finished my question.  Could you read my

 2      question back?

 3          (Record read.)

 4   BY MS. THOMPSON:

 5      Q.   So if someone reported that set of

 6   circumstances to you, what, if anything, would

 7   you do or tell someone to do to follow up on

 8   that statement?

 9          MR. VERONESE:  In his position as

10      vice -- as operations?

11          MS. THOMPSON:  Right.

12      A.   I probably would call the loss

13   prevention manager and loop in the district

14   manager and regional sales director to get

15   clarity around what the policy is and what has

16   been our instruction to the employee.

17   BY MS. THOMPSON:

18      Q.   Would you direct any kind of

19   investigation -- any investigation be

20   undertaken?

21          MR. VERONESE:  Vague as to

22      investigation.

23      A.   It depends on what came back from

24   the people that were experts in the situation.

25   So, for example, that's a store-level policy,

**Dec. of Thompson - Exhibit 7**

1  which I'm sure the GM is well aware of and the

2  DM is well aware of and the RSD is well aware

3  of as is the LP manager.  So it would depend on

4  what they came back with.

5  BY MS. THOMPSON:

6      Q.    So would you leave the decision in

7  terms of how that store manager should be dealt

8  with up to them?

9      A.    It certainly would not be my call.

10     Q.    Okay.  And whose call would it be,

11  to your understanding?

12     A.    It would be the DM's call with

13  oversight from HR, loss prevention, and the

14  RSD.  Which would not be done in a vacuum.

15     Q.    Okay.

16         MS. THOMPSON:  I have no further

17     questions.

18            FURTHER EXAMINATION

19  BY MR. VERONESE:

20     Q.    As you sit here today, do you recall

21  of ever being informed of employees being

22  terminated at the unit level?

23         MS. THOMPSON:  Objection, vague and

24     ambiguous.

25     A.    I don't recall.  Certainly not in a

**Dec. of Thompson - Exhibit 7**

Page 172

1    formal manner.  It might have been in an

2    off-the-cuff conversation, but I have way too

3    many employees to get down to that level.

4              MR. VERONESE:  Okay.

5              MS. THOMPSON:  We're finished?

6              MR. VERONESE:  Yes.

7              MS. THOMPSON:  Great.

8    BY MR. VERONESE:

9         Q.    You mentioned -- you just testified

10   that -- when you just testified, you mentioned

11   that it was store-level policy, is that how the

12   cash is handled?  Is that what you meant, is

13   the store-level policy?

14             MS. THOMPSON:  Well, objection.  I'm

15        going to -- I think misstates the

16        testimony.

17             MR. VERONESE:  I'm asking him.

18             MS. THOMPSON:  I know, but I think

19        it misstates testimony.  It's vague and

20        ambiguous.

21        A.    My comment was meant that it was a

22   policy that adheres to the stores, meaning it

23   was not a policy of corporate headquarters or

24   anything of that nature, but it was policy laid

25   out for store operations for the -- you know,

**Dec. of Thompson - Exhibit 7**

1    for how the unit -- how did the units run.

2    BY MR. VERONESE:

3         Q.    Because some stores could have

4    different situations than others?

5         A.    No.

6         Q.    Okay.

7         A.    No.  No, I think policy for the --

8    for all stores.

9         Q.    Right.  Okay.

10             MS. THOMPSON:  So let me ask a quick

11        follow-up question then.

12                   FURTHER EXAMINATION

13   BY MS. THOMPSON:

14        Q.    Where -- to your understanding,

15   where -- who established these cash-handling

16   policies and procedures, at what level?

17        A.    That was done by the loss prevention

18   group.

19        Q.    At what level?

20        A.    At the VP and above executive level

21   and it was rolled out through the LP team.  The

22   LP team had access, unfettered access, to our

23   GMs and our DMs, and attended all meetings, all

24   quarterly meetings, all informational seminar

25   meetings and...

Page 174

1     Q.    Okay.  So were the cash handling

2  policies and procedures established at the

3  corporate level?

4     A.    Yes.

5     Q.    Did store managers have discretion

6  to deviate from those policies?

7     A.    No.

8     Q.    Did district managers have authority

9  to deviate from those policies?

10    A.    No.

11    Q.    Did regional sales directors have

12  authority to deviate from those policies?

13    A.    No.

14    Q.    Did you have authority to deviate

15  from those policies?

16    A.    No.

17          MS. THOMPSON:  I have nothing

18       further.

19              FURTHER EXAMINATION

20  BY MR. VERONESE:

21    Q.    Did loss prevention have -- did loss

22  prevention ever deviate from those policies?

23          MS. THOMPSON:  Objection, lacks

24       foundation, calls for speculation.

25  BY MR. VERONESE:

**Dec. of Thompson - Exhibit 7**

Page 176

```
 1                C E R T I F I C A T E
      STATE OF TEXAS       )
 2                         )
      COUNTY OF DALLAS     )
 3
                I, Daniel J. Skur, a Notary Public
 4      within and for the State of Texas, do
        hereby certify:
 5              That GREGORY PATTAKOS, the witness
        whose deposition is hereinbefore set forth,
 6      was duly sworn by me and that such
        deposition is a true record of the
 7      testimony given by such witness.
                I further certify that I am not
 8      related to any of the parties to this
        action by blood or marriage; and that I am
 9      in no way interested in the outcome of this
        matter.
10              IN WITNESS WHEREOF, I have hereunto
        set my hand this 26th day of September,
11      2012.

12

13

14      _____
        Daniel J. Skur
15      Notary Public, State of Texas.
        My Commission Expires 7/10/2014
16

17

18

19

20

21

22

23

24

25
```

███████████████████████████████████████

| | |
|---|---|
| From: | David Gonsolin |
| Sent: | Monday, March 22, 2010 6:01 PM |
| To: | 0538 DM Donna Ocampo |
| Subject: | 3830 visit |



LPSC 3830
020409.xls

David Gonsolin
Regional Loss Prevention Manager
San Francisco Region 11
Cell (916) 842-9552
Fax (916) 983-9503



DEPOSITION
EXHIBIT

PENGAD 800-631-6989

1

REDACTED

RS/ALLEN002077

**Dec. of Thompson - Exhibit 7**



RS/ALLEN002078

**Dec. of Thompson - Exhibit 7**

Unit Visit Log

| District: | 0538 |
| Store: | 013830 |
| Date Visited: | 01/15/2010 |
| Time of Visit: | 09:45 AM - 11:45 AM |
| Duration of Visit: | 2 hour(s) 00 minute(s) |
| Manager Name: | Frank Allen |
| Visit Conducted By: | Hani Altaghawi |

## FOLLOW-UP FOR NON-NEGOTIABLE STANDARDS

### STANDARDS REVIEW

**1  PROJECT STATUS**  All Standards met

Comments:

Follow Up:

**2  ALL PRODUCTS ON DISPLAY AND FUNCTIONAL**  Standard(s) not met

[M] All products are merchandised according to planogram.

Comments:

- Some sections needs an update for the planograms, the company will send you tables for wireless and you will gain some wall space, I will map the store with you so you can have more room to follow planograms exactly.
- Move the handheld TVs from computer section to where the FLO TV is.
- Fill the computer section with more merchandise, laptops must be on and demo ready.
- Floor stacks of Karokio must be 3 units high with 5x 7 signs
- Make every section neat, clean and organized...priced 100%

Follow Up:

- Today we move the tables to the right location, make sure you move the pods to match the planograms.
- We replaced the floor as follows: iPro, BT, Wireless Accessories, Music, Sirius, GPS.
- You have two extra panels for batteries so now you can do the 8 panels section for power.
- Make sure you do the planograms for all sections we printed by Jan 29, the store must be Perfect.

**3  EVERYTHING PRICED PROPERLY**  All Standards met

Comments:

Follow Up:

**4  NEAT, CLEAN AND SPACED**  All Standards met

Comments:

Follow Up:

http://itome.rsonline.tandy.com/unitvisitlog/displaylog.aspx?pagemode=print&FormId=23&UserNbr=01&StrId=3830&VisitDate=01/...   12/14/2010

RS/ALLEN000179

DEPOSITION
EXHIBIT

PENGAD 800-631-6989

**Dec. of Thompson - Exhibit 7**

Page 2 of 6

Unit Visit Log

**5** | STORE EXTERIOR | All Standards met

Comments:

Follow Up:

**6** | CUSTOMER ENVIRONMENT | All Standards met

Comments:

Follow Up:

**7** | WORKING ENVIRONMENT | Standard(s) not met
(N) Store restroom and appliances are clean, uncluttered and fully functional.
• Refrigerator, water fountain, microwave, coffee maker, etc.
(N) Backroom inventory area is neat, clean and well organized per Backroom and Counter Standards.
(N) Under and behind counter is neat, clean and well organized per Backroom and Counter Standards.

Comments:
- Restroom sink needs to be cleaned
- Floor must be cleaned; remove the POP signs to the basement
- Organize the boxes in the backroom, make sure they are faced and fronted on every shelf.

Follow Up:
- Its done.

**8** | STORE SAFETY | All Standards met

Comments:

Follow Up:

**9** | ASSET PROTECTION | All Standards met

Comments:

Follow Up:

**10** | SCHEDULING | All Standards met

Comments:

Follow Up:

**11** | RECRUITING | All Standards met

Comments:

Follow Up:

http://home.rsonline.tandy.com/imtvisitlog/displaylog.aspx?pagemode=print&FormId=23&UserNbr=01&StrId=3830&VisitDate=01/... 12/14/2010

RS/ALLEN000180

**Dec. of Thompson - Exhibit 7**

Unit Visit Log

| 12 | TRAINING | All Standards met |

Comments:

Follow Up:

| 13 | PRODUCT KNOWLEDGE | Standard(s) not met |
| | | (N) All team members can confidently demonstrate features of Key product categories (Wireless, LCD TV, Digital Cameras, GPS, MP3). |
| | | (N) Team members can articulate current competitive wireless offers in the local market and demonstrate our superior value. |

Comments:

- One of the most important tasks this week is to get everyone certified with ATG. Have them visit the customer promotions link on a daily basis so you can get them trained with what is on sale.

Follow Up:

- All done except Victoria, she needs to be done today.

| 14 | DRESS CODE | All Standards met |

Comments:

Follow Up:

| 15 | GOAL SETTING | All Standards met |

Comments:

Follow Up:

| 16 | PERFORMANCE REVIEW | Standard(s) not met |
| | | (N) Performance results are reviewed with every team member weekly, progress towards goals and coaching opportunities are discussed and documented. |
| | | (N) Monthly performance reviews are documented with all team members to recap all weekly coaching sessions and set expectations for the upcoming month. |

Comments:

Performance reviews need to be focused on the different needs for each employee. They need to have different plans and action items so they will follow exactly what you asked them to do. Here are some ideas for each KPI:

Power Action Plan:

- Bundle up the eligible 4-4-11 batteries and place them on the counter for adding on with sales
- Compare the value for button cell batteries that are available for 3 packs (use the phrases such as "this one pack of cr2032 is 5.99 or you can get the 3 packs for 11.99)
- Utilize RSAP for 15% lifetime off on batteries
- Ask open ended questions to the customers about their other devices that might need batteries such as wife's garage door opener or car remote control and so on.
- Explain the batteries as necessity not as an option by saying: "you are gonna need these batteries to make this work"
- Offer battery installation to guarantee one pack sale and then offer 4-4-11 or eligible multi packs to increase power.
- Print the reference chart with new sku's (Eneraell) to match up new skus with old ones. It will prevent the employees from thinking that we don't have the wanted battery.

RS/ALLEN000181

**Dec. of Thompson - Exhibit 7**

Unit Visit Log

Page 4 of 6

**RSSP Action Plan:**

1. Do not make the decision for the customer! Never hit escape without offering RSSP and trying to overcome at least one objection, and follow up on the associates who do not offer.

2. Have associates write down why the customer declined the RSSP and then initial it. This will allow for more pointed skills practice at overcoming specific customer objections.

3. Give associates measurable daily targets, i.e. 1 per day for part time, 3 per day for full time.

4. Bring up the protection plan during the product presentation so the customer is already thinking about the expense before getting to the counter.

5. Know basic price points for RSSP and whether it is a Repair or a Replacement Plan.

6. Place the brochure in the customer's hand to create the feeling of purchasing a tangible product, and use it to show the cost benefit of the RSSP.

7. Do role-play and skills practice on commonly sold products. For example: For cordless phones or anything with a rechargeable battery mention that it covers battery replacement(s). On converter boxes it is an in-store replacement and it covers surge protection. On wireless post-paid phones it covers up to 4 accessories on the same ticket and two batteries, and on pre-paid phones it is an in-store replacement. On car chargers that have a fuse, it will replace the charger or the fuse for less than the cost of the replacement fuse.

**Wireless Attach:**

1. Managers/Associates MUST use the new "Wireless Choice" form. Have associates just fill some blank forms out on their own, and then start role playing and have them fill out the form until they are comfortable using it.

2. Role play with 5 "must have" items (screen protectors, memory cards, car chargers, case, and headsets). If you show the customer 5 items, they will usually take at least 1 or 2.

3. Keep some (Go and screen protectors in the cage as a constant reminder when associates go to get the phone.

4. Sell airtime with the no contract phones; don't let the customer under-estimate their usage.

5. Print the latest wireless accessory reference chart, and remember to update it regularly. (Products>Product Reference Sheets>Wireless Handsets>Wireless Accessory Reference Sheet) or (http://home.rsonline.tandy.com/mod/documents/ProductReferenceSheets/Wireless/Accessories/Wireless%20Accessory%20Reference%20Sheet.pdf)

6. Remember to ask wireless customers if they need any accessories for other phones they or family members might own.

7. Remember the disco phones with gift card...perfect for attaching accessories! (Products>Customer Promotions>Wireless Information Site>Handset Offers)

**Key Category Attach:**

1) Mention earlier in sales process
2) Bring them to the counter
3) Leading questions (example: Do you store your gas in the glove compartment or under your car seat? Then you need a screen protector or carrying case.)
4) Multiple usage
5) More coaching to associates
6) Role play for two weeks to develop habit.

Follow Up:

| 17 | EMPLOYEE AWARENESS | All Standards met |

Comments:

Follow Up:

**Dec. of Thompson - Exhibit 7**

Unit Visit Log

| 18 | CUSTOMER SERVICE | All Standards met |

Comments:

Follow Up:

| 19 | HANDLING RETURNS | All Standards met |

Comments:

Follow Up:

## PROPERTY ACTION PLAN

**Describe Area of Opportunity:**

Frank,

A huge improvement in store image since my last visit.

Now it is up to you and your team to keep working on it DAILY by utilizing the Non-Negotiables list.

On 1/11 the company will launch the Refresh @ the Shack, this will be our yearly after the holidays cleaning up. Many planograms will be updated and you need to make sure the store is 100% ready by 1/29

**Follow Up:**

**Timeline / Milestone(s):**

I will be back next week to map the store with you and work on the new wireless tables that will be shipped.

**Follow Up:**

**Action Plan to achieve milestone:**

**Follow Up:**

## PEOPLE ACTION PLAN

**Describe Area of Opportunity:**

**Follow Up:**

**Timeline / Milestone(s):**

**Follow Up:**

**Action Plan to achieve milestone:**

**Follow Up:**

## PERFORMANCE REVIEW & ACTION PLAN

| | $ / # | % | Target Bonus | $ / # | % | | $ / # | % |
|---|---|---|---|---|---|---|---|---|
| YTD NPBB to Plan | | | YTD Ticket (+/-) | | | $/Ticket (+/-) | | |
| YTD Net Sales to Plan | | | YTD SGP to Plan | | | YTD Inv Cont to Plan | | |
| YTD MGP to Plan | | | YTD Payroll to Plan | | | YTD Mgr Exp to Plan | | |
| YTD Cont Exp to Plan | | | | | | LM Post Pay | | |
| LM Sales to Plan | | | LM SGP to Plan | | | LM Pre Pay (+/-) | | |
| MTD Sales to Plan | | | MTD SGP to Plan | | | | | |

RS/ALLEN000183

**Dec. of Thompson - Exhibit 7**

Unit Visit Log

Describe Area of Opportunity:
Frank,
Great job on your wireless performance in December, you sold 20 phones with 54% increase. You have to improve in wireless attach to at least 75% this month. You also need your team to work on getting the accessory bag to the counter with every sale, last month your attach was 53%.
RSSP is another KPI that I expect you to get your team to hit 65% every week, 9.98% for December is an improvement, however you are not at 15%.
This month you need to hit 15% every week.
Emails: less than 1%...Why?, I expect your team to ask for customer emails every day, This is a simple task and you need to get behind it.
Follow Up:
- This week your performance as follows:
- You lead the district in sales (YOY)...great job!
- Your pass this week is poor, I need every employee to sell one phone per week at minimum.
- Today we have an RSSP, (4-4-11) focus day, I want to see everyone on the Survey Monekly link today.
- RSSP number for this week is belwo 10%, you need to be at 15%, The only way is to hit 25% today and 25% on Saturday.
- Conduct a full one on one with each employee to review the performance, I need one phone, 15% RSSP, 10% Emails and 2 (4-4-11) daily.
Timeline / Milestone(s):

Follow Up:
Action Plan to achieve milestone:
Follow Up:

CLOSING COMMENTS
Expectations Summary:
Follow Up:
Schedule next visit:
Follow Up:
Closing
Follow Up:


_____        _____
Visit Conducted By                                      Unit Manager

RS/ALLEN000184

**Dec. of Thompson - Exhibit 7**

EXHIBIT 8

ORIGINAL
10/16/12

1                   UNITED STATES DISTRICT COURT

2                  NORTHERN DISTRICT OF CALIFORNIA

3                     SAN FRANCISCO DIVISION

4                          --oOo--

5   FRANK ALLEN,

6              Plaintiff,

7        vs.                          No. CV 11-03110 **WHA**

8   RADIO SHACK CORPORATION, and
    Does 1-20, Inclusive,

9

10             Defendants.

11   _____/

12

13

14

15             DEPOSITION OF DAVID GONSOLIN

16              Tuesday, October 16, 2012

17

18

19

20   REPORTED BY:  DEBRA J. SKAGGS, CSR 7857

21

22

23                  DE SOUZA & ASSOCIATES
                  Certified Shorthand Reporters
24                     P.O BOX 1675
                  San Mateo, California  94401
25              (650) 341-2671  desouzacr@att.net

                                                      1

Dec. of Thompson - Exhibit 8

Allen vs. Radio Shack   David Gonsolin                    10/16/12

1                      ---oOo---

2              BE IT REMEMBERED that, pursuant to notice, and

3    on Tuesday, the 16th day of October 2012, commencing at

4    the hour of 10:15 a.m., thereof, at the Law Offices of

5    JOSEPH L. ALIOTO AND ANGELA ALIOTO, 700 Montgomery

6    Street, San Francisco, California, before me,

7    DEBRA J. SKAGGS, CSR No. 7857, a Certified Shorthand

8    Reporter

9                      --oOo--

10                   EXAMINATION

11             MS. ALIOTO:  Q.   Okay.  So sir, can you

12   spell your name for the record.

13   A.        First name is David, D-A-V-I-D; last name is

14   Gonsolin, G-O-N-S-O-L-I-N.

15   Q.        Okay.  Mr. Gonsolin, where do you presently

16   reside?  You don't need to give me your individual --

17   A.        I live in Folsom, California.

18   Q.        Have you ever had your deposition taken?

19   A.        Yes, once before.

20   Q.        Was that -- how long ago was that, do you

21   know?

22   A.        Three, maybe four years ago, roughly.

23   Q.        Was that where you worked at Radio Shack?

24   A.        Yeah, it was when I was working for them.

25   Q.        And do you know what the lawsuit was about?

                                                          6

**Dec. of Thompson - Exhibit 8**

1   for the whole area.

2   Q.        Okay.  So you don't remember going into this

3   particular store in December of 2009 with Ocampo and

4   Pattakos?

5   A.        No, I do not.

6   Q.        Okay.  But you could have.

7            MS. THOMPSON:  Well --

8            THE WITNESS:  Yeah, I could have but I

9   honestly don't think I did because I did not do too many

10  store visits with Gregg Pattakos.

11           MS. ALIOTO:  Q.  Okay.  "Mr. Pattakos was

12                immediately confrontational with the Plaintiff.

13                He wanted to know, among other things, how long

14                Plaintiff had been unemployed by Radio Shack."

15                Do you recall Mr. Pattakos asking the managers

16  that you did go with, go into their store, how long

17  they -- they would ask how long have you been here, how

18  long have you worked for Radio Shack.

19           MS. THOMPSON:  Objection.  Assumes facts.

20           THE WITNESS:  Oh.  I don't recall that, no.

21           MS. ALIOTO:  Q.  Okay.  Then the next

22  sentence says,

23                "After Plaintiff answered him, Pattakos looked

24                at him from head to toe and told Plaintiff,

25                quote, 'You may have a year left with

                                                          26

Dec. of Thompson - Exhibit 8

Allen vs. Radio Shack  David Gonsolin                10/16/12

1              Radio Shack.  You have been in charge of the

2              whole store for a while.  You may have another

3              year.'"

4         Did anyone ever tell you that Mr. Pattakos

5    told the Plaintiff in this action, Frank Allen, that?

6    A.       No.  I've never heard of this.

7    Q.       You've never heard of that.

8    A.       No.

9    Q.       Okay.  Did you know -- did anyone tell you

10   that Mr. Allen had complained about Mr. Pattakos's

11   behavior?

12   A.       No.

13   Q.       Okay.  So Ocampo never told you that Allen had

14   complained about Pattakos's behavior?

15            MS. THOMPSON:  Objection.  Assumes facts.

16   Misstates the record.

17            THE WITNESS:  Not that I recall, no.

18            MS. ALIOTO:  Q.  So the next paragraph

19   says,

20              "Plaintiff immediately made a formal complaint

21              about Mr. Pattakos's comments and behavior to

22              his then district manager Hani."

23         Did you know Hani?

24   A.       Yes.

25   Q.       Okay.  "Plaintiff also made a complaint about

27

De Souza & Associates   650-341-2671      desouzacr@att.net

**Dec. of Thompson - Exhibit 8**

Allen vs. Radio Shack   David Gonsolin          10/16/12

```
 1              Pattakos at the next manager's meeting where
 2              District Managers Hani and Defendant Ocampo
 3              were present."
 4              Would you attend the manager's meetings?
 5   A.      I would as I could.  I had, I don't know, ten
 6   districts, so I wasn't always able to attend the
 7   meetings.
 8   Q.      Okay.  So it wasn't obligatory for you to
 9   attend the manager's meetings?
10   A.      No.
11   Q.      All right.  Do you recall attending this
12   meeting where the discussion of Mr. Pattakos's behavior
13   took place?
14              MS. THOMPSON:  Objection --
15              THE WITNESS:  No.  And I don't believe I did.
16              MS. THOMPSON:  Objection.  Assumes facts.
17              MS. ALIOTO:  Q.  Okay.  Do you remember,
18   in January of 2010, when Ocampo took the place of
19   Mr. Hani?
20   A.      Yes.
21   Q.      At that point did she then become either a
22   peer of yours or a supervisor of yours?
23   A.      She was a partner of mine.  She was a district
24   manager.
25   Q.      Okay.  So she would be a partner of yours.
```

                                                    28

De Souza & Associates   650-341-2671        desouzacr@att.net

**Dec. of Thompson - Exhibit 8**

Allen vs. Radio Shack  David Gonsolin                    10/16/12

1    you see something on a little peg hook sticking off a

2    wall and you pull it off it, the lockinpeg peg hooks are

3    for the high value items and they lock.  So you actually

4    need a key to unlock it and get the item off it.

5    Q.        Okay.  Do you recall if at this time you knew

6    whether or not there was a problem with the lockinpegs

7    at the 3830 store?  March of 2010.

8    A.        I do not remember.

9    Q.        Well, were the lockinpegs a normal problem?  I

10   mean, was this an issue with the different stores?

11            MS. THOMPSON:  Objection.  Vague and

12   ambiguous.

13            THE WITNESS:  Yeah, I don't understand what

14   you mean by was it an issue.

15            MS. ALIOTO:  Q.  Well, was it an issue

16   that lockinpegs were either not there or not

17   properly put on?

18   A.        That's a pretty common issue I would think.

19   Q.        Okay.

20            "Defendant Ocampo told Plaintiff Allen, 'you

21            don't fit the image that Radio Shack wants.

22   You

23            don't have the right people in this store.  You

24            need to upgrade your employees.'"

25            Had you ever been told that Ocampo told

                                                        30

De Souza & Associates   650-341-2671        desouzacr@att.net

**Dec. of Thompson - Exhibit 8**

Allen vs. Radio Shack  David Gonsolin                10/16/12

1    Mr. Allen that his store didn't fit the image of
2    Radio Shack once?
3              MS. THOMPSON:  Objection.  Assumes facts.
4              And make it clear that you're reading from the
5    allegations that are in the Complaint, not stated facts.
6              THE WITNESS:  No, I've never heard that and
7    I -- just a personal opinion.  I would find that hard to
8    believe that Donna would say that.
9              MS. ALIOTO:  Q.  Okay.  So now tell me why
10   would you find that hard to believe?
11   A.         Just her personality.  I worked with her
12   pretty close and that doesn't sound like something that
13   she would say.  It doesn't mean she didn't say it, no.
14   I don't know --
15   Q.         Right.
16   A.         -- but --
17   Q.         Now at this point she is under the supervision
18   of Mr. Pattakos, right?
19             MS. THOMPSON:  Objection.  Assumes facts --
20             MS. ALIOTO:  If you know.
21             MS. THOMPSON:  -- misstates the record.
22             THE WITNESS:  I don't know for sure, but no --
23   well, normally a chain of command went district manager,
24   which was Donna; regional manager, then --
25             MS. ALIOTO:  Vice president.

                                                    31

**Dec. of Thompson - Exhibit 8**

Allen vs. Radio Shack  David Gonsolin                10/16/12

```
 1            THE WITNESS:  -- area manager, area vice
 2  president, which was Pattakos.  There was a gap where we
 3  didn't have a regional manager.  So I don't know who her
 4  direct report was.
 5            MS. ALIOTO:  Let me go to the next exhibit,
 6  keeping Exhibit No. 1 in front of you.
 7            Let's go to the January 15th Unit Visit Log,
 8  Bates stamp 000179.
 9                      (Plaintiff's Exhibit 2 marked
10                       for identification.)
11            MS. ALIOTO:  Q.  Exhibit No. 2.  Let me
12  ask you.  I want to make sure I pronounce your last
13  name properly.  Can you pronounce it for me so I
14  hear it?
15  A.        Gonsolin.
16  Q.        Gonsolin.
17  A.        (Witness nodded head.)
18  Q.        Gonsolin.
19            Okay.  Mr. Gonsolin, at this point in January,
20  February, March of 2010, were you working with a lot of
21  store managers?
22  A.        Yes.
23  Q.        About how many were you working with?
24  A.        Maybe close to 200.  Radio Shack store
25  managers.
                                                      32
```

**Dec. of Thompson - Exhibit 8**

1   Q.        Okay.  Did you see the unit visit log like

2   Exhibit No. 2?

3   A.        Would I see these?

4   Q.        Would you be privy to these?  Would these be

5   sent to you?

6   A.        They were not sent on to me on a routine

7   basis.  I wasn't part of, you know, the distribution

8   list when this would get sent out.  However, could I see

9   this?  Yeah, I can ask one of my business partners, hey,

10  do you have something like this I could see.  But no, I

11  wouldn't.

12  Q.        So how does this work.  Let me know.

13            If the manager believes that there is a loss

14  prevention problem, does a manager then call you or does

15  the manager give you a write-up like this if he believes

16  that there is a loss prevention problem?

17  A.        It could probably happen either way.

18  Q.        Okay.  But generally if there is a loss

19  prevention problem, you would be called in.

20  A.        Yes.

21  Q.        All right.  And you were not called into Store

22  3830 prior to March of 2010, right?

23  A.        Oh, I can't say that, no.

24  Q.        Do you ever recall being called into 3830

25  prior to March of 2010?

                                                          33

De Souza & Associates    650-341-2671      desouzacr@att.net

**Dec. of Thompson - Exhibit 8**

Allen vs. Radio Shack  David Gonsolin                    10/16/12

1   A.       I couldn't tell you honestly with the date.
2            I know I -- I can't even say I know.  Pretty
3   sure I had been to that store prior to then and had seen
4   some loss prevention issues.  I don't know when the
5   store relocated.  If it was prior to March 2010, then I
6   chose to go to that store.
7   Q.       Right.
8   A.       And it was the old location, I remember that.
9            So, I've been to the store most likely prior
10  to 2010.
11  Q.       Okay.  But you don't recall ever going in
12  there because there -- specifically because there was a
13  loss prevention problem prior to March of 2010?
14  A.       I can't say that for sure.
15  Q.       Okay.  Let's take a look at this.  This is
16  from Hani about Frank's store.  And it's dated
17  January 15th, 2010.
18           Okay.  If you could turn to Page -- without
19  going over this entire document -- Page 2 of 6, Bates
20  stamp 180, section number nine, asset protection.
21           Do you see there where it says all standards
22  met?
23  A.       Yes.
24  Q.       Okay.  Now if it were an asset protection
25  problem at this point in January of 2010, it would be

                                                        34

**Dec. of Thompson - Exhibit 8**

1   written there, right?

2           MS. THOMPSON:  Objection --

3           THE WITNESS:  No.

4           MS. THOMPSON:  -- lacks foundation, calls for

5   speculation.

6           MS. ALIOTO:  Q.  Why not?

7   A.      Because the district manager does not always

8   look for loss prevention or asset protections things.

9   This is -- loss prevention or asset protect is often

10  either overlooked by the district managers or they don't

11  know exactly how to identify loss prevention issues like

12  someone who is trained in loss prevention has experience

13  in it, so no.

14  Q.      Okay.  But they have to fill out this form

15  where it says asset protection.

16  A.      Uh-huh.

17  Q.      If they put "all standards met" are you saying

18  they're putting that there not knowing whether or not

19  all standards are really and truly met?

20          MS. THOMPSON:  Objection.  Lacks foundation,

21  calls for speculation.

22          THE WITNESS:  I think that's entirely a

23  possibility.

24          MS. ALIOTO:  Q.  So do you think that's a

25  problem with the company that managers would be

                                                        35

Allen vs. Radio Shack  David Gonsolin                    10/16/12

1   saying --

2   A.        No --

3   Q.        -- that all standards are met in a certain

4   area when they may or may not be?

5   A.        No.  I don't think it's a problem, especially

6   specifically for a company.  I think it happens in all

7   companies where someone might go in.  And when you see a

8   list like this, there are things that can get missed.

9   Everybody is human.  Everybody can miss something.

10  Especially if that's not your specialty, that's not your

11  area of expertise is loss prevention.

12            If I was to try and go do a store visit from a

13  sales standpoint, I would probably miss some stuff

14  because I'm not experienced in sales.  Obviously up

15  until now, but back then I had no experience in sales.

16  So no, this has happened throughout all the companies

17  I've worked for that I can remember and it's something

18  that's fairly common.

19  Q.        Okay.  So it's something that's fairly common

20  that they put "all standards met?"

21  A.        Not that that was directly written.  But that

22  somebody could overlook and not identify it or fail to

23  even look at it, that's possible.

24  Q.        Okay.  Did you ever become aware of the

25  fact -- let's start, first of all, with the fact that

                                                          36

**Dec. of Thompson - Exhibit 8**

Allen vs. Radio Shack   David Gonsolin          10/16/12

1   store that was vulnerable to loss?

2   A.       I feel almost every single Radio Shack was

3   vulnerable to loss.

4   Q.       No matter where it's located.

5   A.       Yeah.

6   Q.       And those that are in different areas you

7   don't feel are at greater risk of loss prevention.

8   A.       No.

9   Q.       Excuse me.  Loss prevention.

10  A.       No, absolutely not.

11  Q.       Okay.  You see on the last page here in

12  January where his manager says that -- it would be --

13  A.       On Page 6?

14  Q.       -- Page 5 of 6.

15           MS. THOMPSON:  5 of 6?

16           MS. ALIOTO:  Q.  5 of 6.

17           Where it says, "Huge improvement in store

18           image since my last visit.  Now it's up to you

19           and your team to keep working on it daily by

20           utilizing the non-negotiables list."

21           Have you ever seen this document before?

22  A.       This specific one --

23  Q.       Right.

24  A.       -- in our hands?

25  Q.       Right.

38

De Souza & Associates   650-341-2671      desouzacr@att.net

**Dec. of Thompson - Exhibit 8**

1   A.        I don't recall.

2   Q.        Do you ever recall Hani telling you that there

3   is a huge improvement in the store since --

4   A.        Not that I recall.

5   Q.        -- your visit?

6             Okay.

7   A.        Could have been, but.

8   Q.        On the last page, it says,

9             "Great job on your wireless performance in

10            December.  You sold 20 phones with 54 percent

11            increase.  You have to improve in wireless

12            attach to at least 75 percent this month."

13            I'm sorry.  "You have to improve in wireless

14            attach to at..." --

15            I don't know if I'm not reading that properly

16  or how that is supposed to be written.  But the bottom

17  line is that his manager at this point in January of

18  2010 felt that Frank was doing a great job on the

19  wireless performance, right?

20            MS. THOMPSON:  Objection.  Document speaks for

21  itself.  Lacks foundation.

22            THE WITNESS:  Yeah, it does.  I agree with

23  her.  It says exactly what he's doing well on the

24  wireless performance, it tells me what he needs

25  improvement on the wireless attach rate.  So -- I mean

                                                        39

**Dec. of Thompson - Exhibit 8**

```
 1    A.        And, yes, there was documents on it.
 2    Q.        On loss prevention after -- I mean, I'm sorry,
 3    before January 2010?
 4    A.        Couldn't tell you the date, but -- I'd have to
 5    look at the documents or I'd have to have access to
 6    them.  But do I think there is prior to that date?  Yes,
 7    I do.
 8    Q.        Okay.  Well I'm going to show you some
 9    documents and you tell me -- because we don't have any
10    documents prior to January 2010.
11    A.        Okay.
12              MS. ALIOTO:  Let's take a look at the next
13    exhibit, which is dated March 23rd, 2010.
14                        (Plaintiff's Exhibit 3 marked
15                         for identification.)
16              MS. ALIOTO:  Q.  Okay.  Let me ask you.
17    As you sit here today, do you know what the
18    progressive discipline was at Radio Shack in 2010,
19    if any?
20    A.        What do you mean by that?
21    Q.        Do you know whether or not the policy at
22    Radio Shack had a disciplinary procedure that was
23    progressive in steps.  You get an oral, you get a verbal,
24    you get a write-up, you get two write-ups, three
25    write-ups, suspension --
```

                                                        44

Dec. of Thompson - Exhibit 8

Allen vs. Radio Shack  David Gonsolin                    10/16/12

1    A.          I understand what you're saying.

2               MS. THOMPSON:  Objection.  Vague and ambiguous

3    and lacks foundation.

4               THE WITNESS:  I do not know.  Possibly -- I

5    don't recall.

6               MS. ALIOTO:  Q.  So how long were you

7    there, two and a half years?

8    A.          About that.  Almost three.

9    Q.          So you don't know whether or not there is any

10   policy on disciplinary actions?

11   A.          I know a lot of things are handled case by

12   case.  I mean it depends.  If you came into work an hour

13   late, that would be handled differently than, you know,

14   something more serious.  I can give you an example of

15   something very serious.

16              If you -- I think this was actually a

17   situation here but I could be wrong.  If you were a

18   store manager and it was called for you to have your

19   laptops secured with a certain product protection item

20   and you didn't have them secured, and all laptops got

21   stolen because of you neglecting to secure those --

22   Q.          Right.

23   A.          -- that would be a little more serious than

24   coming into work an hour late.  So it would all depend

25   on what it was.

                                                          45

De Souza & Associates   650-341-2671      desouzacr@att.net

**Dec. of Thompson - Exhibit 8**

1           Now, do I recall what RadioShack's specific

2    policy was?  No, I don't know what steps they would use

3    in certain situations.  I know a lot of it depends on

4    what the situation is.

5    Q.        So let me go back to your situation for a

6    moment.  You were put on the PIP in the summer, July of

7    2010, right?

8    A.        Uh-huh.

9    Q.        And after that you went out in November of

10   2010 for disability leave?

11   A.        Just a medical leave.

12   Q.        For a medical leave.

13   A.        Yeah.

14   Q.        During the time period from July to the end of

15   October, say, did you have any other problems with your

16   supervisors other than the PIP?

17   A.        Yeah.  I mean, we didn't have a great

18   relationship.  We constantly disagreed on things, so

19   yeah, yeah.

20   Q.        Okay.  Did you ever complain to them again

21   after you received the PIP?

22   A.        To my direct supervisor?

23   Q.        Or HR.

24   A.        Yes.

25   Q.        Okay.  How about -- do you recall whether in

                                                        46

De Souza & Associates    650-341-2671        desouzacr@att.net

**Dec. of Thompson - Exhibit 8**

Allen vs. Radio Shack  David Gonsolin                10/16/12

1   A.        Yeah, I don't want to talk about that.

2   Q.        Okay.  When you left, did you ever plan on

3   going back?

4   A.        It was an option.

5   Q.        Did you plan on going back?

6   A.        I didn't want to.  However, if some things

7   changed, I would be more than willing to go back.

8   Q.        As in people?

9   A.        Yeah.  Or maybe the way certain things were

10  handled.

11  Q.        Okay.  Now, let's go back to this.  Take a

12  look at this because I'm not going to know a lot of the

13  esoteric language on here, okay?  The Radio Shack lingo

14  that is on here.

15            Have you ever seen this document before?

16  A.        Possibly.  I don't recall.

17  Q.        Okay.  See where it says on the second -- this

18  is dated March 23rd, and it is signed, I believe, by

19  Donna Ocampo.

20  A.        Uh-huh.

21  Q.        Do you see where it says,

22            "Failure to protect company assets from

23            internal and external theft.  Five laptops on

24            display, not secured."

25            Okay, so -- and it says only screamers.

                                                        48

**Dec. of Thompson - Exhibit 8**

1       When you -- explain that to me.  What does
2  that mean?
3  A.      There was different product protection things
4  for different items.  A screamer -- it's like -- it's
5  got two ends to it and a little cord.  One end sticks to
6  the fixture, the other end sticks to the product.  And
7  what it does is if you remove that product and the --
8  you know, it gets detached from it, it makes a little
9  screaming noise.
10  Q.      Okay.
11  A.      It's a little alarm.
12          Required?  I want to say, I can't say for
13  sure.  But normally we had these laptop displays that
14  would -- they would lock the laptop down so they
15  couldn't be picked up.  It was just you could see them,
16  kind of put your hands on the keyboard, but you couldn't
17  remove the laptop.  Like a screamer, a ten-year-old
18  could take that thing off.
19  Q.      Right.
20  A.      And I believe that's what was required in this
21  store.
22  Q.      The what?  The screamer?
23  A.      No.  That the actual laptop locks were
24  required for that store.
25  Q.      The locks.  Laptop locks.  It says,

                                                    49

Dec. of Thompson - Exhibit 8

Allen vs. Radio Shack   David Gonsolin                    10/16/12

1           "Five laptops on display, not secured (only
2    screamers)."
3           Meaning they needed laptop locks.
4    A.        Meaning they were not secured properly, which,
5    again, I can't say for sure because this is so old.  But
6    I believe the requirement was the laptop locks.
7    Q.        Okay.  Now, do you recall going there in
8    February of 2009 with Ocampo?
9           MS. THOMPSON:  Objection.  Assumes facts,
10   misstates the record.
11          THE WITNESS:  In 2009?
12          MS. ALIOTO:  I'm sorry.  2010.  Okay, let me
13   go line by line here.
14          THE WITNESS:  I don't.
15          MS. ALIOTO:  Q.  It says, "Laptops were
16               not secured in the back room.  David Gonsolin,
17               RLPM.." --
18               What is that?
19   A.        Regional Loss Prevention Manager.
20   Q.        "...and I made room in the cage to protect
21               the laptops."
22               Do you recall doing that with Ocampo?
23   A.        I don't.  But anything that I wrote -- I
24   didn't write this.  Anything that I wrote on any of my
25   documentation happened.

                                                        50

**Dec. of Thompson - Exhibit 8**

Allen vs. Radio Shack  David Gonsolin                    10/16/12

1   Q.       No, I understand that.

2   A.       So --

3   Q.       I'm just asking you whether you recall what

4   she's recalling.

5   A.       Sounds familiar but I don't know for sure.

6   Q.       Okay.  Do you have any personal present

7   knowledge of going in the back room with Ocampo to make

8   room in the cage to protect laptops?

9   A.       No.

10  Q.       Next one.

11           "Several months of numerous cash shortages

12           were found."

13           Did you ever find several months of numerous

14  cash shortages?

15  A.       Sounds familiar, yeah.

16  Q.       Sounds familiar, but did you personally -- do

17  you have personal knowledge you remember as you're

18  sitting here right now that there were actually several

19  months of cash shortages?

20  A.       I remember there were numerous cash shortages

21  for that store.

22  Q.       Now let me ask you something, because I don't

23  understand.

24           Explain this telephone situation to me where a

25  customer comes in and buys a telephone card.

                                                        51

De Souza & Associates   650-341-2671      desouzacr@att.net

**Dec. of Thompson - Exhibit 8**

Allen vs. Radio Shack   David Gonsolin                10/16/12

1   A.        Uh-huh.

2   Q.        So that amount gets put on the books as being

3   income.

4   A.        A telephone card?

5   Q.        Yeah.  Do you know the situation with the

6   telephone cards?

7   A.        (Witness shook head.)

8             MS. THOMPSON:  Objection.  Lacks foundation,

9   misstates the record, assumes facts.

10            MS. ALIOTO:  Q.  We're going to find out

11  what the exact wordage is and get back to you on

12  that.

13  A.        Okay.

14  Q.        Because this is a big issue of the difference

15  in cash amounts when people either bring the card back

16  in or don't use it or something.

17  A.        Okay.

18  Q.        All right.  So going on with this document

19  that's Exhibit No. 3.

20            "Several months of numerous cash shortages

21            were found.  You failed to report the shortages

22            and did not have an explanation as to why they

23            are happening."

24            Do you remember any -- did you have any

25  conversation like that with Frank Allen at this time in

                                                          52

**Dec. of Thompson - Exhibit 8**

Allen vs. Radio Shack  David Gonsolin                10/16/12

1    March of 2010?

2    A.       On that specific date?  I don't recall.

3    Q.       No.  At this time.

4             Did you ever have any discussion directly with

5    him about the alleged issue of failing to report

6    shortages?

7    A.       I don't know when, but I can say for sure

8    Frank and I had spoke about cash shortages in his store.

9    Q.       Okay.  Can you tell me what you spoke about?

10   A.       I mean I really couldn't tell you details.  I

11   couldn't even tell you anything for sure about our

12   specific conversation aside from I know I've spoke to

13   him about his cash shortages.

14   Q.       Okay.

15   A.       I mean I could say possibly I asked him this,

16   possibly I asked him that.  But this was so long ago, a

17   word-for-word conversation I can't be quoted on it

18   because I could be wrong on how or what I asked.

19   Q.       I don't want you to guess.

20   A.       Okay.

21   Q.       I just want to know what you really do

22   remember.  And if you don't remember anything, that's

23   fine, but let's go the next paragraph where it says --

24   or next box.  Store Visits.

25            Let me ask you.  Did you make more than one

                                                          53

**Dec. of Thompson - Exhibit 8**

1    visit prior to March of -- I'm going to withdraw that.

2              It says, "Store visits from Dave Gonsolin RLPM

3              2/04/2009 documenting similar issues with asset

4              protection."

5              Do you recall that occurring, or do you think

6    that's a typo in year?

7    A.        I don't know.  Again, if we had any of my

8    documentation, I had all of my store visits, I had all

9    the dates, what the issues were when found --

10   Q.        Okay.

11   A.        I mean, that would be able to answer every

12   single question as far as when I was there, what was

13   discussed --

14   Q.        I agree with you 100 percent.  I'm with you.

15             Okay.  So do you know if you visited him on

16   February 4th of 2010?

17   A.        I don't.  I don't know.

18   Q.        And you don't know if you visited him on

19   February 4th of 2009.

20   A.        You know she might have typed the wrong date.

21   I don't know.  If she wrote it in there, I would think

22   it's correct.  But she could have mistyped it.  I mean I

23   could have been there in 2009.  Like I said, I don't

24   know.

25   Q.        Okay.  It says, "Previous DM communication.

                                                           54

Dec. of Thompson - Exhibit 8

Allen vs. Radio Shack  David Gonsolin          10/16/12

```
1            Through store visits, district meeting, and
2            one-on-one conversations."
3            Do you know what she's referring to there?
4    A.      I don't.  That's a pretty vague statement.
5    Q.      Okay.  Next one.
6            "Consequences of Failure to Improve: Failure
7            to achieve the required improvement will lead
8            to additional disciplinary action including and
9            up to termination."
10           Have you ever seen this corrective action
11   document before?
12   A.      I don't know.
13   Q.      Okay.  Do you have any idea what Mr. Allen's
14   sales were in March of 2010?
15   A.      I have no idea.
16   Q.      How about his sales for February and January
17   of 2010?
18   A.      No idea.
19   Q.      Did anyone ever tell you that he was number
20   one in the district for all those months?
21   A.      Possibly but I don't know.
22           MS. ALIOTO:  Okay.  Then let's go to the next
23   document, Exhibit No. 4.
24                    (Plaintiff's Exhibit 4 marked
25                     for identification.)
```

55

**Dec. of Thompson - Exhibit 8**

Allen vs. Radio Shack   David Gonsolin                    10/16/12

1           MS. ALIOTO:   Q.   All right.   Loss

2    prevention.   So from loss prevention.   Loss

3    prevention corporate.   Who is that?

4    A.          The top --

5    Q.          Yeah, you see --

6    A.          -- from --

7    Q.          Yeah.

8    A.          -- I don't know.   Obviously it's -- according

9    to the -- I don't know.   It's from somebody in corporate

10   loss prevention.

11   Q.          So when you get an email like that you don't

12   know who it's from, it's just from corporate?

13   A.          That was not to me.   That was something -- if

14   you look below on the body of the email, that was

15   something that I had written, forwarded from loss

16   prevention -- it appears.   Forwarded from loss

17   prevention to Candice Vaughn and Chris Allen.

18   Q.          Okay.   So this is something that you sent

19   to -- see it has a cc, so I guess it's to Donna, James

20   Peterson, Donetta, and Loss Prevention Corporate.

21   A.          Uh-huh.

22   Q.          So that Loss Prevention Corporate is not a

23   person that you know specifically, it's just anyone at

24   Loss Prevention Corporate.

25   A.          I believe that it just goes into -- gosh, I

                                                            56

De Souza & Associates    650-341-2671      desouzacr@att.net

**Dec. of Thompson - Exhibit 8**

1    ambiguous.

2              THE WITNESS:  Our area.

3              MS. ALIOTO:  Q.  Your area?

4    A.       Yeah.

5    Q.       Okay.  Do you know Donetta?

6    A.       I knew her.

7    Q.       Okay.  You knew her at the time.

8    A.       Yes.

9    Q.       And -- so you don't remember whether or not

10   she was Shaan's boss?

11   A.       She was leaving around the same time Shaan was

12   starting.

13   Q.       She was leaving.  Okay.

14   A.       Yeah, I don't recall.

15   Q.       Okay.  Do you know why this was sent to HR?

16   Why you sent it to HR?

17   A.       Probably part of the distribution list.

18   Q.       So it wasn't specific to HR?

19   A.       No.  She was copied on it.  I mean carbon

20   copied for James Peterson, Donetta, and LP Corporate.

21   Q.       Okay.  Now what is VCOP?

22   A.       Violation of Company Policy.

23   Q.       Okay.  And it says, "Please see attached.

24            Violation of Company Policy Memo regarding

25            Store 3830."

                                                    58

Allen vs. Radio Shack  David Gonsolin          10/16/12

1           Now, let me ask you.  You do have two pages
2   there, right?
3   A.      Yes.
4   Q.      Okay.  Is this a document that was attached to
5   your email that's dated -- Bates stamped 000191.
6   A.      Certainly appears to be.
7   Q.      Okay.
8   A.      I'd have to read it word-for-word, but sure
9   looks like the same thing.
10  Q.      Do you recall going to visit Frank's store at
11  all in February of 2010?
12  A.      February of 2010?
13  Q.      Right.
14  A.      No.  The date on here is March of 2010.
15  Q.      Oh, I understand that.
16  A.      So could I say if I was there in January?  I
17  don't know.
18  Q.      No, no not January.  February.
19  A.      Oh, excuse me, February.  No, I do not know.
20  Q.      Okay.  Now, it says,
21          "See attached Violation of Company Policy
22          regarding 3830.  3/14 - Failure to secure
23          merchandise."
24          Does this mean you were physically there on
25  3/14?

                                                        59

De Souza & Associates    650-341-2671      desouzacr@att.net

**Dec. of Thompson - Exhibit 8**

Allen vs. Radio Shack  David Gonsolin                10/16/12

1   A.        Yes.

2   Q.        When you went there on 3/14, who did you go

3   with, if anybody?

4   A.        Let me correct myself.

5             No, it does not mean I was there on 3/14.  I

6   believe 3/14 was the date that this document was sent in

7   and emailed.

8   Q.        Okay.

9   A.        Could I be allowed a minute to read through

10  this entire thing to make sure I know what I'm saying?

11  Q.        Absolutely.  Please go right ahead.

12  A.        (Pause for review.)

13            Okay.

14  Q.        Okay.  Let me ask you, did Ocampo tell you to

15  go do a visit to the store in March of 2010?

16  A.        I don't recall if she had asked me to.

17  Q.        Okay.  Let me show you -- going to give you

18  another document that's Exhibit No. 5.

19  A.        Okay.

20                      (Plaintiff's Exhibit 5 marked

21                       for identification.)

22            MS. ALIOTO:  Q.  Now, Exhibit No. 5, as I

23  understand it, was written on March 14th at 11:55

24  a.m., where Exhibit No. 4 was written on

25  March 14th -- no, wait.  Strike that.  On March 14th

                                                        60

Dec. of Thompson - Exhibit 8

Allen vs. Radio Shack  David Gonsolin          10/16/12

```
 1    A.        Visit category?

 2    Q.        Right.  It says DM Request.

 3    A.        Am I missing this?

 4    Q.        Yeah, up at the top.  No, no.  Page 2.

 5    A.        Oh, Page 2.  I apologize.

 6    Q.        See where it says "Visit Category: DM

 7    Request?"

 8    A.        Yes.

 9    Q.        So do you recall in if fact Ocampo requested

10    you go do this visit or not?

11    A.        Don't recall, but if I had written it on here

12    then yes, she had.

13    Q.        She did ask you.  And you filled this out,

14    right?

15    A.        Yes.

16    Q.        So going back to Exhibit No. 4.  On the middle

17    of the page, it says.

18              "3/09/10 - A visit was conducted to Store

19              01-3830, San Francisco.  During the visit, it

20              was found that store manager Frank Allen had

21              five laptops on display that were only secured

22              by streamers (sic)."

23              MS. THOMPSON:  Screamers.

24              MS. ALIOTO:  Q.  Screamers also.

25              Let me ask you something, sir.  Is this the
```

                                                          62

**Dec. of Thompson - Exhibit 8**

Allen vs. Radio Shack  David Gonsolin                    10/16/12

1   day you were there?  I'm trying to figure out what day
2   you were there.
3   A.        I wrote it on -- if I said that on 3/9/2010 I
4   conducted the visit, that was the day I was there.
5   Q.        Okay.  So you were there on March 9.
6             Do you know if you were there alone or were
7   you with Ocampo?
8   A.        I don't recall.
9   Q.        Okay.  Is this the visit that she requested
10  that you do?
11  A.        On the same day as the other one?  So -- yes.
12  Q.        Okay.  So then it says -- okay.  So we don't
13  have screamers on the laptops.  But we're not missing
14  any laptops, right?
15  A.        Not to my knowledge.
16  Q.        Okay.  "During the visit it was found that
17            Store Manager Frank Allen had five laptops on
18            display that were only secured by screamers.
19            It was also found that there were 6 LCD TV's on
20            display and none of them had the required
21            security cable."
22  A.        (Witness nodded head.)
23  Q.        There were also three Schlage -- I can never
24            pronounce that -- locksets, approximately
25            199.99 each, that had no security devices on

                                                          63

De Souza & Associates    650-341-2671        desouzacr@att.net

**Dec. of Thompson - Exhibit 8**

1            them at all.  It was found that Allen had

2            missed a cage count in mid-February."

3            What does it mean, he missed a cage count in

4  mid-February?

5  A.        There were required -- all store managers are

6  required to do a weekly cage count.  The cage count is

7  essentially -- it's a lockup of all the high-end items.

8  The cell phones -- you know, it was like the gaming

9  consoles.  Just our high-end stuff.  Every week they had

10 to do a cage count, make sure what they had in their

11 cage matched their on-hands.  If there was a variance,

12 they had to write it down there and figure out why it

13 was.  If they couldn't figure it out, communicate it to

14 myself and the district manager so we know what was

15 going on.

16 Q.        Did you have a one-on-one relationship with

17 Frank Allen such that if he was missing something or had

18 a loss prevention issue, he would pick the phone up and

19 call you?

20 A.        I always try and establish that relationship

21 with absolutely anybody I work with.  Whether it's a

22 store manager, or a brand new person.  My cards are

23 there with my phone number.  Never hesitate to call my

24 cell phone.  Most people never hesitated to call me.

25 Q.        And do you recall Frank calling you?

                                                        64

1   A.        Calling me?

2   Q.        Uh-huh.

3   A.        I don't know.

4   Q.        Well, do you recall having that kind of

5   relationship with Frank, such that --

6   A.        It's kind of up to interpretation.  I would

7   think we had that relationship, but he might have

8   thought different.

9   Q.        Okay.  Do you ever remember having

10  conversations with him about loss prevention?

11  A.        Yeah.

12  Q.        Alone.  Just you and he.

13  A.        I don't know if I was alone on this date --

14  Q.        Uh-huh.

15  A.        -- but we had the conversation on this date

16  about the issues.

17  Q.        Okay.  So on this March 9th date, you had a

18  conversation with him where you were doing your visit

19  that Ocampo asked you to do.

20  A.        Uh-huh.

21  Q.        All right.  Did you discuss this issue that

22  you're saying about the locksets and the security

23  devices and missing a cage count?

24  A.        Did I discuss it with him?

25  Q.        Right.

                                                        65

Allen vs. Radio Shack  David Gonsolin                    10/16/12

1   A.        Absolutely.

2   Q.        Okay.  Do you recall what his answers were?

3   A.        No.

4   Q.        No.  Okay.  Did you write down what his

5   answers were?

6   A.        Don't believe so.  Apparently, according to

7   this,

8               "Allen is aware of the challenges of the store

9               due to its location.  Allen also agreed to

10              start conducting over short inquiries at least

11              four times a day and report any large cash

12              shortages to his DM and myself."

13             So, I'd say Allen stated that he would start

14  doing cash inquiries at least four times a day.  I can

15  say that was probably -- or that was something that was

16  discussed at the time of this visit.

17  Q.        Okay.  That's a remedy to what you're saying

18  was wrong.  My question was, did he tell you why he

19  thought -- why any of the violations you were pointing

20  out occurred?

21  A.        No.

22  Q.        Okay.  So you didn't have any discussion with

23  him about why there were allegedly three locksets?

24  A.        I'm going to correct myself there.

25             I can't say no that didn't happen.  I don't

                                                              66

**Dec. of Thompson - Exhibit 8**

Allen vs. Radio Shack  David Gonsolin                    10/16/12

1   recall.

2   Q.      Okay.

3   A.      Most likely it probably did.  He would

4   probably explain why this happened.  So, yeah, I

5   apologize.  I don't recall.

6   Q.      That's okay.

7           Let me ask you.  On a monthly basis --

8   January, February, March, April of 2010 -- how many

9   times can you recall Ocampo telling you to go do a

10  visit?

11  A.      At that store, or at any store in her

12  district?

13  Q.      At that store.

14  A.      I couldn't tell you.  I mean -- I don't know.

15  Q.      Okay.  Now, when the district manager would

16  tell you as loss prevention to go do a visit at a

17  particular store, would they give a reason?

18  A.      Yeah.  Normally.  If they were going to

19  request a visit, they normally have a reason why.

20  Q.      And do you recall why she asked you to go

21  visit Frank Allen's store, 3830?

22  A.      No.  But I'm sure there was a reason.

23  Q.      Okay.  So on a monthly basis, about how many

24  stores within the district would she ask you to go

25  visit?

                                                        67

Dec. of Thompson - Exhibit 8

1   A.         I couldn't tell you.  There was so many stores

2   and so many districts, I couldn't tell you how many she

3   specifically requested that I come visit --

4   Q.         Okay.

5   A.         -- within a month.

6   Q.         But how many -- would you visit them on your

7   own without her telling you what to do?

8   A.         Oh, yeah.  Absolutely.

9   Q.         Okay.  All right.  So going down to -- it

10  says,

11             "Lastly it was found that over the past

12             several months there were numerous cash

13             shortages.  Allen had not reported these and

14             had no explanation as to why they were

15             happening."

16             Did you find that there were cash shortages?

17  A.         Yes.

18  Q.         How did you find that?

19  A.         I believe we were able to see the cash

20  shortages on the monthly P & L, which is the profit and

21  loss.  I don't recall if that's the resource I used.  I

22  believe that's where we found them though.

23  Q.         And the P & L is created by whom?

24  A.         Corporate.

25  Q.         Okay.  And the P & L is specific to 3830 for

68

Allen vs. Radio Shack  David Gonsolin                    10/16/12

1   that month?

2   A.         They have them for each store, I guess.  If

3   I'm not mistaken, each store, each district, each

4   region.  You can kind of pull up all the numbers you

5   need to and review them.

6   Q.         So did you bring in the P & L and show it to

7   Frank and say what are these shortages about?

8   A.         I couldn't tell you if I actually had it in

9   hand and I reviewed it with him.  I mean, the way I

10  identified it was most likely off the P & L.  And when I

11  pull the P & L report, typically I would do it while at

12  the store and review it with the store manager.  I can't

13  say if that actually happened on this day, but I would

14  assume that's typically what I did.

15  Q.         Okay.  So do you know how many other stores

16  within the San Francisco region, including those that

17  are outside of San Francisco included in the

18  San Francisco region, how many stores for the month of

19  January or February had cash shortages?

20  A.         Oh, I have no idea.

21  Q.         On a comparative level, do you know -- can you

22  give me a general idea of how many stores on a monthly

23  basis had a cash shortage?

24  A.         Almost every single store in Radio Shack would

25  have a cash shortage, but some would be $2.

                                                        69

Dec. of Thompson - Exhibit 8

1   Q.       Right.

2   A.       It wouldn't be anything even worth

3   investigating.

4   Q.       Well, do you recall what the cash shortage was

5   here when you wrote this document?

6   A.       I don't, but I recall it was high.  Higher

7   than the norm.

8   Q.       Okay.  Higher than the norm but you don't know

9   what it was and we could get that from the P & L

10  statement for the month before.

11  A.       Should be able to, yeah.  Could you do it

12  right now?  I don't know if the P & L would still be

13  available for back then, but...

14  Q.       Then it says, "for the past several months."

15  So would that be the P & L for the past several months?

16  A.       Yes.

17  Q.       Okay.  Now it says, "Allen is aware of the

18           external challenges of the store due to its

19           location."

20           What did you mean by that?

21  A.       It kind of contradicts what I said earlier as

22  far as the location of the store.  So when I saw that, I

23  was like, well, that must have been what I thought at

24  the time.  So --

25  Q.       So you think that 3830 -- according to this

                                                        70

1   document.  At the time, you felt that 3830 was a store

2   that had external challenges because of where it was

3   located, right?

4   A.      Uh-huh.

5   Q.      And those external challenges have to do with

6   loss prevention, correct?

7   A.      Yes.

8   Q.      All right.  Then it goes on to say,

9           "However, he failed to protect our assets in

10          numerous ways.  In February 2009, a visit was

11          conducted and Allen had just..." --

12          Does that mean a visit with you?

13  A.      Pretty sure, yes.

14  Q.      Okay.  So as of right now we have you visiting

15  Allen's store in February of 2009 and in March of 2010,

16  correct?

17  A.      There should be another visit like this, the

18  LP non-negotiables, or something along those lines, that

19  has that date on there.

20  Q.      Okay.

21  A.      I mean, if it wasn't me, shame on me.  I

22  should have said, "a visit was conducted by someone

23  else."  But by the way I'm writing it, and if I was in

24  front of my laptop, I could probably pull it up right

25  away and say yes, I conducted the visit on this date.

                                                        71

1   having said that, I want all the documents possible.

2   A.        I probably wouldn't know if there was

3   something missing.

4   Q.        Okay.  Well, let's go one by one.

5   A.        Okay.

6   Q.        So it goes on to say, "Allen had just had a

7             laptop stolen from the sales floor where he did

8             not have it secured at all.  Allen needs to

9             ensure he uses all available resources to

10            protect our assets on the sales floor.  Allen

11            must also complete the weekly cage count in

12            full and communicate any missing items to his

13            DM and RLPM."

14            So that's to you.

15  A.        And the district manager, yes.

16  Q.        The RLPM is you.

17  A.        Yes.

18  Q.        Okay.  After this, did he report to you on a

19  weekly basis the items -- no, wait a minute.  The weekly

20  cage count.  After this, of March 14th, did he

21  communicate to you that there was anything missing from

22  the cage count on a weekly basis?

23  A.        I don't recall.

24  Q.        Okay.  Do you recall if he reported any large

25  cash shortages to you after this document of March 14th?

                                                        73

Allen vs. Radio Shack  David Gonsolin          10/16/12

1   A.      No, I don't.

2   Q.      Do you know why he was terminated, in your

3   mind?

4   A.      It was -- I mean I could guess as far as

5   exactly why, I don't know.  But it was something along

6   the lines of failing to protect the company's assets.

7   Repeat issues as far as him neglecting to do certain

8   things that were required of a store manager.

9   Q.      Okay.  Now, is there any document from you

10  telling him that he repeatedly fails to do something

11  that has to do with loss prevention?

12  A.      All this should be going to him.  The

13  violation of company policy does not go to him.

14  Q.      Right.  And that's the one that is -- what's

15  the Bates stamp at the bottom of what you're saying does

16  not go to him?

17  A.      I'm sorry.  It's the No. 4 on the stamp.

18  Exhibit 4.

19  Q.      No.  On the bottom it says 000190?

20  A.      Yes.

21  Q.      Okay.

22  A.      That does not go to him.  That goes to his

23  supervisor.

24  Q.      Okay.

25  A.      The store visit, the bottom 000193, that does

                                                        74

**Dec. of Thompson - Exhibit 8**

Allen vs. Radio Shack  David Gonsolin                    10/16/12

1   go to his store.

2   Q.        But this email goes to his store?

3   A.        This one right here?

4   Q.        This email went to Frank?

5   A.        Yes.

6   Q.        Okay.

7             MS. THOMPSON:  What email are we talking

8   about?  Can we identify it by Bates number?

9             MS. ALIOTO:  He did; 000193.

10            MS. THOMPSON:  All right.

11            MS. ALIOTO:  Q.  But he's not on the

12  email, right?

13  A.        The email list?  Yes.  It's 2013830.  That's

14  him.  That's his store.

15  Q.        Now, the second page of Exhibit 4, which is

16  Bates stamp 000191.

17  A.        191?

18  Q.        Yeah. Page 2 of Exhibit 4.

19            MS. THOMPSON:  Oh.

20            THE WITNESS:  Gotcha.

21            MS. ALIOTO:  Q.  Okay.  This also went to

22  him, correct?

23  A.        No.

24  Q.        Okay.  Well you see where it says to -- oh, I

25  see.  That's to 536 DM.

                                                           75

De Souza & Associates   650-341-2671      desouzacr@att.net

**Dec. of Thompson - Exhibit 8**

Allen vs. Radio Shack   David Gonsolin                10/16/12

1   A.        Uh-huh.

2             MS. THOMPSON:   538.

3             THE WITNESS:   She might be right.

4             MS. ALIOTO:   Mine looks like a six.

5             MS. THOMPSON:   It's District 538, I believe.

6             MS. ALIOTO:   Q.   Is it District 538?

7   A.        You've got me.

8   Q.        All of these documents are in very little

9   font.

10  A.        Yes.   And the copy, after copy, after copy

11  doesn't make it look any better.

12  Q.        Really.   It's like very stressful.

13            All right.   Now, the subject is "Failure to

14  secure merchandise on the sales floor, complete weekly

15  cage count, report cash shortages."   Now, the date on

16  this is March 14th.

17            So this is the same complaint as that which we

18  just looked at, right?

19  A.        The one from March 9th, yes.

20  Q.        There is nothing new here.

21  A.        No.   No.   This is the one we were reading.

22  Q.        Okay.   Let's go to Exhibit 5.

23            Now, can you explain to me, you wrote

24  Exhibit 4, again, at 12:04 and then you wrote Exhibit 5

25  at 11:55.

                                                          76

Dec. of Thompson - Exhibit 8

Allen vs. Radio Shack  David Gonsolin                10/16/12

```
1              Do you know, are you sending this to different
2    people?
3    A.       Yes.
4    Q.       And who is Monique?
5    A.       Monique Hebert is somebody in Corporate Loss
6    Prevention.  I forget who.
7    Q.       And where is that located?  Dallas?  I mean,
8    Texas.
9    A.       Fort Worth.  Is that -- somewhere in Texas.
10   Q.       Okay.  And Candice.  Who is Candice?
11   A.       I believe another person in loss prevention.
12   Again, if you look at the top, that's not from me.
13   Q.       Right.  That's from them to Monique and
14   Candice.
15   A.       Yeah, it's from the loss prevention corporate
16   box to them.
17   Q.       Right.  And you sent it to the loss prevention
18   corporate box?
19   A.       Yep.
20   Q.       Okay.  Did anyone ask you to send this out,
21   this document that's Exhibit 5?
22   A.       Ask me to send it out?
23   Q.       Right.  Did Ocampo say you need to send this
24   out?  Send this to these people?
25   A.       No.  This is what's required.
```

                                                        77

**Dec. of Thompson - Exhibit 8**

Allen vs. Radio Shack   David Gonsolin                10/16/12

1    Q.        After she asked you to go visit the store, did

2    you then report back to her on the findings of your

3    visit?

4    A.        Absolutely.

5    Q.        Okay.  And when did that -- did that occur in

6    an email?

7    A.        Email.  Phone call most likely as well.

8    Q.        Do you know if you told her on the phone what

9    you found before you wrote these two documents?

10   A.        Most likely, yes.  With the issues here, I

11   would think that there would be a phone call to her

12   right away.

13   Q.        Okay.  So basically this is recounting the

14   same things that's in Exhibit No. 4, right?

15   A.        Yeah.  And a little -- a little more stuff.

16   There is some operational things on here.

17   Q.        Right.  But this is from the same visit of

18   March 9th.

19   A.        Yes.

20   Q.        Okay.  Now let me ask you something.  In your

21   visit of March 9th, did you have any questions about any

22   cash drawer in the back room?

23   A.        I'm just going to read over this.

24   Q.        Okay.

25             MS. THOMPSON:  Read both pages, too.

                                                            78

Dec. of Thompson - Exhibit 8

1          THE WITNESS:  (Pause for review.)

2          Nope.  Doesn't look like I document anything

3    saying something like that.  And something like that I

4    would document.

5          MS. ALIOTO:  Q.  Right.

6          So under the comments, you're basically

7    repeating what you said in the email?

8          MS. THOMPSON:  Well, objection.  Documents

9    speak for themselves.

10         MS. ALIOTO:  Q.  There is nothing new

11   added in the comments?  I can read the comments

12   if -- or actually, why don't you read it to yourself

13   at the bottom of page 000194.

14   A.        It appears to be just cut and paste onto 193.

15   Normally we cut and paste our comments into the body of

16   the email.

17   Q.        Okay.  So now was there any follow-up to this

18   after this meeting?  Did you call Frank and ask him if

19   he had done what you suggested he do?

20   A.        I mean if there is another form that shows

21   that I went and followed up?  Yes.  Is that normally how

22   I work?  Yes, absolutely.  If we have an issue like

23   this, I would almost always conduct a follow-up visit.

24   Q.        Okay.  So should there -- so if you had done a

25   follow-up visit to this document -- to these two

                                                      79

Allen vs. Radio Shack   David Gonsolin                    10/16/12

```
1                    (Plaintiff's Exhibit 6 marked

2                     for identification.)

3           MS. ALIOTO:  Q.   Okay.  This document

4    that's Bates stamped 000261 is from -- the top of it

5    is from Donna, sent to Shaan Smith at HR.  3830

6    Summary.

7           "Below are notes from David Gonsolin from

8            today's termination with Frank Allen."

9           Okay.  So far we have you there in February 9th

10   of '09, March --

11          MS. THOMPSON:  I'm going to object to the

12   extent that misstates the record.

13          MS. ALIOTO:  She's absolutely right.  It's

14   February 4th, '09.

15          MS. THOMPSON:  Well, same objection.

16          MS. ALIOTO:  Q.   March 9th, 2010.  And

17   then you went back and visited on April 27th.

18          Correct?

19   A.      The February 4th of '09, that's the one that

20   Donna had in her corrective action --

21   Q.      Right.

22   A.      -- that we weren't really sure about what she

23   meant when she worded it store visits from David

24   Gonsolin, RLPM, February 4th, 2009, documenting similar

25   issues.

                                                        82
```

De Souza & Associates   650-341-2671      desouzacr@att.net

**Dec. of Thompson - Exhibit 8**

1          I can't say for sure I was there that day.  If
2    she wrote it, most likely I was but it could have been a
3    typo.  It -- so --
4    Q.      You know --
5    A.      -- I can't say yes, I was there.
6    Q.      Yeah, no, you're absolutely right, and thank
7    you for correcting me.
8          If you had done a visit in February of 2009,
9    there would be a document --
10   A.      Yeah --
11   Q.      -- documenting your --
12   A.      -- to see that these two are the only ones --
13   Q.      Right.
14   A.      -- of my visits to the store, I know for
15   certain that's not right.  I know there is more.
16   Q.      Okay.
17   A.      Okay, so this one -- did I say I was there?
18   Yes, I was there on April 27th, 2010.
19          THE REPORTER:  April 27th?
20          THE WITNESS:  Yes.  I'm sorry.  Talking too
21   fast.
22          MS. ALIOTO:  Q.  Okay.  So this top one is
23   from Donna Ocampo to HR.
24          "Below are the notes from David Gonsolin."
25          Okay.  Now, when you went to 3830 with Donna

83

De Souza & Associates    650-341-2671    desouzacr@att.net

**Dec. of Thompson - Exhibit 8**

Allen vs. Radio Shack  David Gonsolin                10/16/12

1   Ocampo, okay?  After that, did she ask you to write up

2   what occurred at that meeting?

3   A.        I don't think she asked me to, no.

4   Q.        Okay.  So did you write up this Page 2 of

5   Exhibit 6 on your own?

6   A.        Most likely, yes.

7   Q.        Okay.

8   A.        Well, I wrote it on my own.  Did I write it

9   because I wanted to and nobody requested me to?  Most

10  likely.

11  Q.        Okay.  Now tell me how the meeting occurred on

12  the 27th?  Did Ocampo call you and say we're going to go

13  over to 3830?

14  A.        I don't know.  All I could tell you I'd have

15  to read through this and it would just be kind of --

16            MS. THOMPSON:  Would you let him read the

17  document?

18            THE WITNESS:  -- stating everything that's

19  there.

20            MS. ALIOTO:  Q.  Okay, but I want you to

21  understand I'm not asking you about the document yet

22  and I'll certainly let you read the document --

23  A.        Okay.

24  Q.        -- when I'm asking about the document.

25            I'm talking about before you went, did she

                                                        84

De Souza & Associates    650-341-2671      desouzacr@att.net

**Dec. of Thompson - Exhibit 8**

Allen vs. Radio Shack   David Gonsolin                10/16/12

```
 1    call and ask you to go with her?
 2    A.       I don't know.  I could have called her,
 3    somebody else could have called us and said we need you
 4    to go to the store.  So I don't know.
 5    Q.       Okay.  Do you know who that somebody else
 6    could have been?
 7    A.       I don't even know if that happened.  I don't
 8    know what happened.
 9    Q.       Okay.  All right.  So do you know if it was
10    your idea to go to the store and terminate Frank?
11    A.       No.  I don't know if it was, and I don't have
12    the authority to terminate a store manager.
13    Q.       Did you ever recommend his termination prior
14    to going there in April?
15    A.       I don't know.  I know I communicated all the
16    issues we had.  Everything that I had documented would
17    get communicated.
18    Q.       Right.  But do you -- did you ever recommend
19    anybody be terminated?
20    A.       We always recommend a termination for issues
21    where somebody was actually causing a loss.  For
22    example, a dishonest employee.
23    Q.       Right.
24    A.       That was always recommended.  It was kind of
25    almost a given if they're causing losses and taking
```

85

De Souza & Associates   650-341-2671        desouzacr@att.net

**Dec. of Thompson - Exhibit 8**

Allen vs. Radio Shack  David Gonsolin                10/16/12

1    product or cash, they should be terminated.

2            In this situation, I mean I can't say for

3    sure.  I could say here are all the issues, they

4    continue to be issues, we need to get this fixed.  I

5    mean I don't know what I said to them specifically, but

6    looking at everything, I think he deserved to be

7    terminated.  Recalling all the incidents, just -- I

8    mean --

9    Q.       I know that.  You've told me that.  But I'm

10   not asking you what you think.  I'm asking whether you

11   actually recommended to Ocampo, before you all went

12   there, that he be terminated.

13   A.       Well, that's kind of the same as me saying "I

14   think he should have been terminated."  I mean if I'm

15   saying it to you, I probably said it to them.  But I

16   always leave it in their hands because it's not my

17   decision.  So if I tell them, yeah, I mean, here is

18   everything that's been going on --

19   Q.       Uh-huh.

20   A.       Here is all the issues, all the communication,

21   all the training we've given him or talked to him about.

22   And it continues to be a problem.  All the documentation

23   from everything.  You know, what other option do we

24   have?  I mean my opinion, yeah, I think he should have

25   been terminated.

                                                          86

De Souza & Associates    650-341-2671       desouzacr@att.net

**Dec. of Thompson - Exhibit 8**

Allen vs. Radio Shack  David Gonsolin                10/16/12

1   Q.        Okay.  I got your opinion.  I want to know
2   whether or not you told Ocampo your opinion.
3   A.        Most likely.
4   Q.        Most likely.
5   A.        Yeah.
6   Q.        Did she tell you she thought he should be
7   terminated?
8   A.        I don't recall specifically.  She probably
9   did.
10  Q.        Okay.  When you guys were going there --
11  you're saying you don't know who called who?
12  A.        No.  No.
13  Q.        Okay.  But where did you meet Ocampo to go
14  there?
15  A.        I don't recall.  We could have met at the
16  store, we could have met at a prior store and done a
17  visit there and then gone there.  I don't recall where
18  we met specifically.
19  Q.        When you met with her to go to 3830 that day
20  on April 27th, were you going -- did she tell you she
21  was going to terminate Frank?
22  A.        Oh, I don't remember.  I don't think it was on
23  the spot just like, hey, guess what?  You're terminated.
24  It's normally something you plan in advance and you make
25  sure you have communicated to the right business

                                                          87

**Dec. of Thompson - Exhibit 8**

Allen vs. Radio Shack  David Gonsolin          10/16/12

1    partners and that you have approval on this and that
2    everybody is in agreement.
3           A district manager is not going to go and just
4    terminate a store manager just like, I don't like what
5    this guy is doing, he's terminated.
6           They're going to make sure they partner with
7    their regional or with HR.  Especially in a situation
8    like this where Frank has been around for a while.  You
9    don't want to just make a bad decision and be like, you
10   made some mistakes, you're terminated.
11          So I would think if I -- I mean I can't say
12   for sure exactly what was told to me, but I'm pretty
13   sure that we knew that he was going to be terminated on
14   this visit.  Because Donna had been communicating
15   everything to her bosses, and I think the joint
16   agreement from everybody was this guy should be
17   terminated.
18   Q.       Okay, now, who were her bosses at this time?
19   A.       There was so much change in the regional
20   level, I don't remember.  There was one email -- or one
21   document earlier that you can see it went to -- gosh,
22   what's his name.  You know, I don't know who her boss
23   was at the time of this, honestly.  We got a new
24   regional named Todd towards the end of my run.  There
25   was a guy -- and I don't even remember his name -- who

                                                      88

**Dec. of Thompson - Exhibit 8**

Allen vs. Radio Shack  David Gonsolin                10/16/12

1    was filling in for a couple months.  I -- I don't know.

2    Q.        Okay.

3    A.        I don't know.  I mean I --

4    Q.        All right.  So when you went to meet her

5    there, whatever, or however you all got there, you knew

6    that Frank was going to be terminated.

7    A.        Most likely, yes.

8    Q.        Did you have any separation papers for Frank?

9    Did you --

10              MS. THOMPSON:  Objection.  Vague and

11   ambiguous.

12              MS. ALIOTO:  Q.  Did you create any

13   separation papers for Frank?

14   A.        Did I write anything for his termination?

15   Q.        Right.

16   A.        Aside from this afterwards?

17   Q.        Right.  No, no, no.  I mean for the -- a

18   separation.  You're terminating, here is the termination

19   document.

20              MS. THOMPSON:  Objection.  Vague and

21   ambiguous.

22              THE WITNESS:  I do not think so.

23              MS. ALIOTO:  Q.  Okay.  Do you know if

24   Ocampo had a termination document, whether it's

25   called a separation agreement or not?

                                                        89

**Dec. of Thompson - Exhibit 8**

Allen vs. Radio Shack  David Gonsolin          10/16/12

1           MS. THOMPSON:  Objection.  Vague and
2     ambiguous.
3           THE WITNESS:  I don't know.  I mean I believe
4     there is something that you have to give them when
5     you're terminating them and let them know in writing,
6     but I don't know for sure.  But, I mean, I can say I
7     assume that most likely.
8           MS. ALIOTO:  Q.  Now read this.  Because
9     now I don't want you to think I am tricking you --
10    A.        Okay.  Let me read it.
11    Q.        -- because you do say there is something.
12    A.        (Pause for review.)
13              Okay.
14    Q.        Let's start at the top.
15              "On 4/27/2010, District Manager Donna
16              Ocampo and I arrived at Store 01-3830 to speak
17              with Store Manager Frank Allen."
18              Do you know what time of day that was?
19    A.        I don't.
20    Q.        "Upon arrival to the store, Frank stated that.
21              He was expecting us."
22              Do you know if you called Frank and told him
23    that you were coming in?
24    A.        No, I don't know if I called him.  I don't
25    think I did, but I don't know.

                                                        90

De Souza & Associates   650-341-2671      desouzacr@att.net

**Dec. of Thompson - Exhibit 8**

Allen vs. Radio Shack   David Gonsolin                    10/16/12

1    Q.        Okay.  "We went to the back room to speak

2              with Frank, at which time Donna asked him to

3              explain why she had found 200 in cash left

4              unsecured in the drawer in the back room."

5              Now, let me ask you something.  Did you go

6    visit this store when Frank wasn't there with Donna

7    prior to this April 27th meeting?

8    A.        I don't know.  It's possible.  Again, I'd have

9    to refer to all my notes that I don't have.  All my

10   visit documentation and everything.

11   Q.        So you don't know if you went?

12   A.        Prior to this?

13   Q.        Right.

14   A.        With Donna?

15   Q.        Right.

16   A.        Without Frank there?

17   Q.        Right.

18   A.        I don't know.

19   Q.        You have a good memory.  Right.  That was

20   great.

21             All right.  So having said that --

22   A.        What was that?  What was that?

23   Q.        No, you remembered that well, the question.

24   You remembered the question well.

25   A.        Oh, oh, I thought you were kind of poking fun,

                                                              91

Dec. of Thompson - Exhibit 8

Allen vs. Radio Shack  David Gonsolin          10/16/12

1  like, oh, you have a great memory, you can't remember.
2  Sorry, I took it the wrong way.  That was my --
3  Q.        No, no, no --
4  A.        -- fault.
5  Q.        -- I told you.  You talk to her --
6  A.        You're a sweetheart.  I took it the wrong way.
7  Q.        I just want to get the job done.  No, no, no.
8            So, I just want to understand.  There was a
9  day that she went to the store.  Frank had left.  He had
10 gone to the bank.  And she went in the back room and was
11 there with a staff member named Rosetta.
12            Do you know if -- Rosetta.
13            MS. VERONESE:  Yeah.
14            MS. ALIOTO:  Q.  Do you know if you were
15 at that meeting?
16 A.        I don't know.
17 Q.        Okay.  So when it says here, "we went to the
18 backroom to speak with Frank, at which time Donna asked
19 him to explain why she had found 200 in cash," did Donna
20 explain to you that she had found 200 in cash left in
21 the drawer in the back?
22 A.        I believe so because I'm pretty sure I
23 remember hearing about that.
24 Q.        Okay.  "Frank tried to explain that he was
25            not there when it happened and another

92

**Dec. of Thompson - Exhibit 8**

Allen vs. Radio Shack   David Gonsolin                10/16/12

```
 1              associate must have left it unlocked."
 2              Do you recall him telling you both that?
 3   A.         I don't.
 4   Q.         Okay.
 5   A.         I don't recall being there.  And if I wasn't
 6   there, I definitely don't recall him telling us that
 7   because I wasn't there to hear it.
 8   Q.         No, but this is at the April 27th meeting you
 9   were at.
10   A.         Oh, this is when he is explaining when we're
11   there.
12   Q.         Yeah.  Do you remember him telling you that?
13   A.         I don't.
14   Q.         Okay.  "I explained to Frank that he had
15              a very significant cash loss problem that we
16              had discussed on our prior visit and this was
17              unacceptable to leave cash unsecured like
18              this."
19              Let me ask you, do you know other stores that
20   keep small cash in the back room?
21   A.         No --
22              MS. THOMPSON:  Objection.  Assumes facts.
23   Q.         -- desk?
24              What?
25   A.         Not that I recall.
```

                                                                93

De Souza & Associates    650-341-2671        desouzacr@att.net

**Dec. of Thompson - Exhibit 8**

Allen vs. Radio Shack  David Gonsolin          10/16/12

```
 1   Q.        Okay.  Do you know of any high-volume stores
 2   that are allowed to keep cash in the back room?
 3   A.        Not that I recall, no.
 4   Q.        No.  Okay.
 5             As far as loss prevention goes, do you
 6   know -- well, we'll go --
 7   A.        Okay.
 8   Q.        I want to continue with this.
 9             "I explained to Frank that he had a very
10             significant cash loss problem that we had
11             discussed..."
12             Now that's the cash loss problem you discussed
13   in the March 14th document?
14   A.        Yes.
15   Q.        That came from the P & L?
16   A.        I believe so, yes.
17   Q.        Okay.  "...on our prior visit and this was
18             unacceptable to leave cash unsecured like this.
19             Frank immediately began asking what was going
20             to happen to him."
21             Do you recall what Frank said to you two?
22   A.        Specifically?  No.  I mean I did quote him on
23   one part because I remember that stuck out in my head at
24   the very bottom of this.  But that's why nothing is
25   quoted because I can't say exactly what he said with the
```

                                                           94

**Dec. of Thompson - Exhibit 8**

Allen vs. Radio Shack  David Gonsolin                10/16/12

1   exception of that last line there.

2   Q.        Okay.  So let me -- do you know -- so this was

3   on the same day that you sent this document to -- taking

4   a look at the first page of Exhibit No. 6, to Basem and

5   Peterson and Donna.

6   A.        Basem was the guy who was acting as the

7   regional.  So at that time he was Donna's -- I was

8   talking about who I don't remember.

9   Q.        Right.

10  A.        There's another guy I didn't remember his

11  name.  That's him.

12  Q.        So it was the same day that the event

13  occurred --

14  A.        Yeah.

15  Q.        -- that you sent this document.

16            So you went right back to the office, or where

17  did you go to write this document?

18  A.        Probably wrote it at home, can't say for sure.

19  I might have been doing store visits and had a hotel or

20  something.  But probably wrote it at home.

21  Q.        Okay.  Did you write this on the Radio Shack

22  computer?

23  A.        Yes.

24  Q.        Okay.  So it says --

25  A.        Most likely I wrote almost everything on that.

                                                        95

**Dec. of Thompson - Exhibit 8**

```
 1   Q.         Okay.  "Donna informed him that the company
 2              is removing him from his position and
 3              terminating his employment.  Frank slammed his
 4              store keys down on the desk and began using
 5              foul language."
 6              Okay.  Do you recall him doing that?
 7   A.         Yes.  If I wrote it, yeah, absolutely.
 8   Q.         No, I understand that you believe it occurred.
 9   I'm asking whether sitting here today you recall him
10   slamming the keys down on the desk and using foul
11   language.
12   A.         When you're asking me if I recall it, can I
13   play it through in my head and say I remember this is
14   what he was wearing, this is where he slammed the keys?
15   No, I don't remember that many details.  I know what
16   happened because I remember that stuff happening.  But
17   can I say exactly where did he slam his keys down, what
18   foul language, what words did he use and how did he use
19   them.  No, I don't recall that much detail.
20   Q.         Okay.
21   A.         But when I refer to this -- before looking at
22   this if you had asked me did Frank use foul language
23   during the termination, I'd say I don't know.  But now
24   I'm reading this, I'm like, oh, obviously he did.
25   Because I --
```

                                                              96

**Dec. of Thompson - Exhibit 8**

Allen vs. Radio Shack   David Gonsolin                    10/16/12

1   Q.        See, I didn't ask you that to trick you.  Hey,
2   I could have done that.
3   A.        No, no, I know.  So yes, if I wrote it here,
4   yes, absolutely it happened.  Do I recall specifically
5   what was said, all the details?  No.
6   Q.        Okay.  Let me ask you.  Were you afraid of
7   him?
8   A.        No.
9   Q.        Okay.  At any point have you ever been afraid
10  of Frank Allen?
11  A.        He did strike me as I guess unstable.  He
12  was -- especially in this situation.  You know what,
13  honestly.  At the time of it, no, I'm not afraid of him.
14  Because I feel like, okay, if something happens, I'll be
15  all right.  I'm really good at defusing situations.  If
16  he attacks me, I should be okay.  But I can't say for
17  sure.  But I'm pretty sure I remember thinking this is
18  the type of guy who would come back to the store and
19  hurt somebody.  And I mean he was kind of scary like
20  that.  Not in the sense that he's a big, intimidating
21  guy and he acts like a tough guy.  But in the sense that
22  this guy seems like he would come back and hurt someone.
23  Q.        Why?
24  A.        I mean his comments, just his behavior.  He
25  was --

                                                            97

**Dec. of Thompson - Exhibit 8**

Allen vs. Radio Shack  David Gonsolin          10/16/12

1    Q.        No, no, I'm talking about in the way -- in the
2    manner you're expressing --
3    A.        Oh, did he come back and shoot up the store?
4    Obviously not.
5    Q.        No.
6    A.        No.
7    Q.        Did he come back and yell at anybody?
8    A.        I don't think so, no.
9    Q.        Did he ever yell at you?
10   A.        I think he was raising his voice.  He was
11   getting upset.  He was cursing and yelling --
12   Q.        No, no, after this.
13   A.        After?  No, I didn't see him after.  I don't
14   think --
15   Q.        You have never heard from him since, right?
16   A.        No.  No, no, no.
17   Q.        And Ocampo, as far as you know, has never
18   heard from him, right?
19   A.        I don't think so.  She might have.  I don't
20   know.
21   Q.        So if you don't know, you don't know.
22   A.        Yeah.
23   Q.        All right.  So let's go on with this.
24             He asked for the reason -- wait.
25             "Frank slammed the keys down on the desk and
                                                          101

De Souza & Associates    650-341-2671      desouzacr@att.net

**Dec. of Thompson - Exhibit 8**

Allen vs. Radio Shack  David Gonsolin          10/16/12

1           began using foul -- expressing his disagreement
2           with the decision.  He asked what the reason
3           for his termination was and Donna explained
4           that it was due to his failure to protect the
5           company assets."
6       Okay.  So is Donna telling him it was due to
7   the document -- the company assets that you referred to
8   in the document of March 14th?
9           MS. THOMPSON:  Objection.  Lacks foundation --
10          THE WITNESS:  I'm sure that was --
11          MS. THOMPSON:  -- calls for speculation.
12          THE WITNESS:  -- a piece of it.
13      One thing I can say for certain, there are
14  other violation of company policies that I had written
15  for Frank Allen.  Because I remember -- this is a
16  detail -- for some reason I do remember it.  My folder,
17  Violation of Company Policies.  Every time I had to
18  write one for Frank Allen, there was number one, there
19  was number two.  There was multiple, I can say that.
20      So, it's probably a combination of everything
21  that had happened.  I mean if you guys have one, you
22  should probably get the rest.
23          MS. ALIOTO:  Q.  Yeah, no, I'm with you.
24  We've asked for everything.  Okay?  We've asked for
25  everything.  And all we have is, allegedly,

                                                        102

Dec. of Thompson - Exhibit 8

Allen vs. Radio Shack  David Gonsolin          10/16/12

1   can't say he was actually going to come and shoot up the

2   place.  Obviously he just gave us a feeling -- or gave

3   myself a feeling like, you know, he would be -- he could

4   be something that -- someone who would do something

5   irrational like that.  Due to his anger, just due to my

6   interactions with him before, the comment he made, it

7   was just --

8   Q.        Okay.  But my point is, he's the only one that

9   you've ever had that feeling about.

10  A.        That I ever recall, yeah.

11  Q.        Okay.  Going onto the next sentence.

12            "Frank agreed that he is not responsible

13            for what his associates do..." -- oh, excuse

14            me.

15            "Frank argued that he is not responsible for

16            what his associates do when he is not here as

17            he had left the store before the money was left

18            unsecured in the desk drawer."

19            So there was a conversation about the money in

20  the desk drawer.

21  A.        Sounds like it.

22  Q.        You don't recall it.

23  A.        If I wrote it, there was one.

24  Q.        But you don't recall the conversation.

25  A.        Not word-for-word, no.

                                                        104

**Dec. of Thompson - Exhibit 8**

Allen vs. Radio Shack   David Gonsolin                    10/16/12

1   Q.        Okay.  "Frank then called Donna shady, at

2             which -- at which time she told him to leave

3             the store."

4             Do you recall Donna telling Frank -- strike

5   that.

6             Do you recall Frank calling Donna shady?

7   A.        Yes.

8   Q.        Okay.  Did he call you anything?

9   A.        Not that I recall.

10  Q.        Okay.  Do you recall the two of you staying

11  there and telling him that he needed to leave the store

12  as opposed to you two leaving as you testified to a

13  minute ago?

14  A.        Could you say that one more time?

15  Q.        Do you recall the two of you staying there and

16  telling him to leave the store after he allegedly called

17  Donna shady?

18  A.        I remember Donna asking him to leave the

19  store.

20  Q.        Okay.

21  A.        I don't recall if I asked him.

22  Q.        "Frank continued to argue with Donna and

23            I attempted to step in and calm down."

24            That's what you were referring to earlier,

25  right?

                                                        105

**Dec. of Thompson - Exhibit 8**

```
 1    A.        Calm him down, yeah.
 2    Q.        Do you recall what he was arguing with her
 3    about?
 4    A.        No.  Specifically no.  It was probably in
 5    regards to the termination and why he's being
 6    terminated.
 7    Q.        Okay.  "I tried to talk him into leaving
 8              the store quietly."
 9              So you did try to get him to leave.
10    A.        Okay.  Then yes.
11    Q.        Okay.  Do you recall what you said to him?
12    A.        I don't remember word-for-word what I said.
13    Q.        So at this point you're not afraid that he is
14    quote-unquote "shaky?"
15    A.        Shaky?
16    Q.        That's what you referred to him earlier.
17              MS. THOMPSON:  Objection.  Misstates the
18    testimony.
19              THE WITNESS:  I don't think I said shaky.
20              MS. ALIOTO:  I'm sorry.
21              THE WITNESS:  I was going to say that's not a
22    word that I ever use.
23              MS. ALIOTO:  I'm sorry.  You referred to him
24    earlier as unstable.
25              THE WITNESS:  Unstable.
```

106

**Dec. of Thompson - Exhibit 8**

1        At this time, no.  At this time I'm kind of in
2   the moment.  He's upset that we've got to de-escalate
3   this as quickly as possible because it's starting to get
4   uncomfortable, to say the least.
5            MS. ALIOTO:  Q.  Okay.  So were you
6   successful in getting him to leave?
7   A.       He left.  I don't know if it was due to my,
8   you know, words to him.  But he eventually left, so
9   yeah, I guess it was successful.  Whether he left
10  because of what I was saying or he left because he was
11  just done.
12  Q.       Okay.  It says here that he stated that he did
13  not want to hear what I had to say.
14           Did he tell you that he didn't want to hear
15  what you had to say?
16  A.       Yep.
17  Q.       Okay.  So his upset had nothing to do with
18  you.  It was all directed at Donna.
19  A.       I don't know.  I don't know what's going
20  through his mind, but I would think some of it is
21  directed towards me.
22  Q.       Okay.  It said, "Donna gave him his letter of
23           separation which he refused to sign."
24           Now, do you actually recall her having a
25  physical document in her hand that she gave him?

                                                    107

Allen vs. Radio Shack  David Gonsolin                    10/16/12

1   A.      Do I remember seeing it in her hand?  No.  But
2   if I wrote it, then I know it was there.
3   Q.      Have you ever seen a physical separation
4   document at all?
5   A.      Ever with the company?
6   Q.      Yeah.
7   A.      Ever with any company?
8   Q.      No.  This one.
9   A.      Specifically with Radio Shack?
10  Q.      No.  This one with Frank.
11  A.      Do I ever --
12          MS. THOMPSON:  Objection -- wait a second.
13          Objection.  Vague and ambiguous.
14          Can you restate the question?
15          MS. ALIOTO:  Q.  Have you ever seen a
16  letter of separation, physically seen with your eyes
17  a letter of separation, that was allegedly attempted
18  to be given to Frank?
19  A.      Yes.  If I wrote it in here, yes, I did see
20  it.  Do I recall seeing it and seeing it in her hand and
21  what it looked like?  No.
22  Q.      You don't recall seeing it.
23  A.      But if I wrote it in here, yes, I saw it at
24  the time of this.
25  Q.      Okay.  And then you say he refused to sign it.

                                                          108

**Dec. of Thompson - Exhibit 8**

Allen vs. Radio Shack  David Gonsolin                10/16/12

1   Do you recall that?
2   A.        Yeah.  It's in here.  Yes.  And again, I don't
3   want to play dumb.  Do I recall it now?  No.  But I know
4   everything I've ever written in any report is
5   100 percent honest and accurate.
6   Q.        Okay.
7   A.        Because I've gone to court a lot of times for
8   criminal cases and stuff.  So I make sure everything is
9   always 100 percent honest and 100 percent accurate.
10  Q.        Okay.  We have no termination document.  We
11  have no separation document.  At all.  Anywhere.  We
12  don't.
13            Okay.  So you're saying there actually was one
14  and that he actually refused to sign it.  That's your
15  testimony.
16  A.        I mean -- I'll give you a far out possibility.
17  Maybe she had something that was not written up for
18  Frank Allen that appeared to be a termination letter
19  that she gave him and said this is it, and he said, no,
20  I refuse to sign it.  I might not have looked at and
21  been like, okay, that says Frank Allen --
22  Q.        Right, right, right.
23  A.        So that's a possibility.  But again in my
24  report, if I'm saying that she gave him a letter of
25  separation, there was one there that I was -- I saw.

                                                      109

**Dec. of Thompson - Exhibit 8**

```
 1   Q.        Okay.  But you don't remember seeing it.
 2   You're saying just because it's in this document.
 3   A.        If it's in this document and I wrote it, I'm
 4   saying it happened.
 5   Q.        Well, did you write that?
 6   A.        Yes.  I wrote all this.  This is all me.
 7   Q.        Okay.  Then it says, "after giving him the
 8   letter of separation."  Do you recall her giving him any
 9   document?
10   A.        If it's in here.  Again, it's hard for me to
11   say I remember her giving it to him.
12   Q.        Uh-huh.
13   A.        She might have set it down and he -- kind
14   of -- I think he snatched it, but I don't remember.  I
15   don't remember that.
16             If it's in here, then yes, she gave him the
17   letter of separation.  Did he walk away with it, did he
18   throw it way, did he leave it there?  I don't remember.
19   And it's not in here so I couldn't say for sure.
20   Q.        So it says, "After giving him the letter of
21             separation, he said, quote, 'Thank you for
22             freeing a slave' and began to walk out."
23             Do you recall that?
24   A.        Yes.
25   Q.        Okay.  So you recall him saying, "thank you
                                                         110
```

Allen vs. Radio Shack  David Gonsolin                10/16/12

1   for freeing a slave?"

2   A.       Absolutely.

3   Q.       Okay.

4   A.       I still recall that specifically right now.

5   That's one thing that I can say I do recall that

6   100 percent now and back then.

7   Q.       Exactly.  And do you think that is a reference

8   to his race?

9           MS. THOMPSON:  Objection.  Calls for

10  speculation.  Lacks foundation.

11          MS. ALIOTO:  No, no.  He's --

12          THE WITNESS:  In my opinion it could be.  I

13  don't know how he meant it.  But when you say a comment

14  like that, it's absolutely inappropriate.  If -- I mean

15  I -- do I think it is?  My opinion doesn't matter.  But

16  do I think it could have been interpreted as that?

17  Absolutely.

18          MS. ALIOTO:  Q.  Okay.  So why do you

19  think that a comment like that is inappropriate?

20  A.       Why would you say something like that.  That

21  is inappropriate.  That's -- you're a slave to our

22  company?  You work here voluntarily.  We give you money

23  to work here.  We give you money to do a specific job.

24  And if you're not doing your job repeatedly, and we're

25  repeatedly giving you the opportunity to correct this,

                                                      111

De Souza & Associates   650-341-2671        desouzacr@att.net

**Dec. of Thompson - Exhibit 8**

Allen vs. Radio Shack  David Gonsolin                    10/16/12

1    and we're telling you how, we're saying we're here for
2    you, call me if you need me.  What does he say?  Oh,
3    you're freeing a slave.  Again, that's assuming it
4    wasn't in reference to his race.  If it wasn't -- I
5    don't know how he meant it, but that's still saying he's
6    a slave to the company.  I mean a slave is a very, very
7    bad term --

8    Q.        Yeah.
9    A.        -- I mean.
10   Q.        You just used the word repeatedly.

11             Other than the March 14th document, can you
12   think of any specific time that you told Frank Allen he
13   was in violation?
14   A.        Yes.  But I can't tell you when.  Like I said
15   earlier, I know for 100 percent there is other
16   violations of company policy I had written for Frank
17   Allen.  Minimum one other.  I believe there was at least
18   two other.

19   Q.        Okay.
20   A.        So I'm surprised you guys didn't have that.
21   If you have these --
22   Q.        Okay.
23   A.        -- I know for certain there was other ones
24   with Frank Allen.
25   Q.        Okay.  Let me ask you.  Minimum one another.

                                                          112

**Dec. of Thompson - Exhibit 8**

1          Do you have any idea what year that one other
2   was?
3   A.      I have no idea.
4   Q.      No idea.
5   A.      No.
6   Q.      So it could have been 2008, 2009, 2010?
7   A.      Could have been.  Yeah, it could have been any
8   of those.
9   Q.      Okay.  Now, let me ask you.  Since you wrote
10  this document, did anyone from HR call and talk to you
11  about this comment, quote-unquote, "thank you for
12  freeing a slave?"
13  A.      I don't know.
14  Q.      You don't know.  Did --
15  A.      No.
16  Q.      -- anyone call and investigate in any way the
17  potential of that statement being a complaint of racism?
18          MS. THOMPSON:  Objection.  Lacks foundation.
19  Calls for speculation.  Assumes facts.
20          THE WITNESS:  I don't know.  I don't know.
21          MS. ALIOTO:  Q.  Well, do you recall
22  whether anyone called and said, hey, do you feel
23  that Frank Allen was in any way discriminated
24  against because of his race?
25  A.      I don't recall anybody ever asking me that.

113

**Dec. of Thompson - Exhibit 8**

Allen vs. Radio Shack   David Gonsolin                    10/16/12

1            MS. THOMPSON:  Why don't we take a break.  I'm
2   going to have some questions, too, so it's probably
3   going to go on for a while.
4            THE WITNESS:  So break yes?
5            MS. ALIOTO:  Yeah.  Yeah, yeah.  Ten-minute
6   break.
7            (Recess:  12:11 p.m. to 12:29 p.m.)
8            MS. ALIOTO:  Q.  So going back to the
9   question about fitting the image.
10           Did you ever have any discussion with Ocampo
11  as to whether or not the staff at 3830 was proper?
12           MS. THOMPSON:  Objection.  Vague and
13  ambiguous.
14           THE WITNESS:  What do you mean by proper?
15           MS. ALIOTO:  Properly staffed.  Whether they
16  fit the image of Radio Shack.
17           THE WITNESS:  As far as the image goes, no, I
18  don't recall ever hearing that.
19           MS. ALIOTO:  Q.  In the summer of 2010,
20  did you participate in any other terminations of
21  3830?
22  A.       I don't know.
23  Q.       You don't know?
24  A.       I don't know.
25  Q.       Okay.  Do you remember returning to 3830 after
                                                         115

De Souza & Associates    650-341-2671       desouzacr@att.net

**Dec. of Thompson - Exhibit 8**

Allen vs. Radio Shack  David Gonsolin                10/16/12

1    the termination of Frank in April?

2    A.        I don't.  I don't remember.  I don't know if I

3    was there again.  Totally possible, but I don't know.

4    Q.        Do you recall any issue about getting a lock

5    for the door going to the office?

6    A.        It sounds kind of familiar, but, again, I had,

7    like, 200 stores.

8    Q.        Yeah, I know.

9    A.        It's really hard to say, yeah, that was the

10   store.  I have no idea if that was actually it.

11   Q.        Okay.  Take a look at Exhibit No. 1.  Go over

12   some of these quotes.  That's the lawsuit.

13             Page 7.

14   A.        Okay.

15   Q.        Okay.  Paragraph 38.  It says,

16             "Plaintiff Allen was stunned.  He replied, 'I

17             have the best inventory in the district.  What

18             is really going on here.  It's not about the

19             merchandise.  Why are you really firing me.'"

20             Do you recall him saying something like that?

21   A.        No.

22             MS. THOMPSON:  Objection.  Assumes facts.

23             MS. ALIOTO:  Hm?

24             THE WITNESS:  No, I don't recall that.

25             MS. ALIOTO:  Q.  Do you recall Ocampo

                                                          116

De Souza & Associates    650-341-2671    desouzacr@att.net

**Dec. of Thompson - Exhibit 8**

Allen vs. Radio Shack   David Gonsolin                    10/16/12

1    saying "sue me?"

2    A.        Not at all.

3    Q.        Do you recall whether or not Frank Allen asked

4    Ocampo for something in writing stating the reasons for

5    his termination?

6    A.        I don't recall if he asked that.

7    Q.        So I take it you don't recall whether she said

8    that he would be receiving something in the mail?

9    A.        No, I don't recall that.  That doesn't really

10   make sense.  I don't know why she would say that, if she

11   even said that to him.

12             No.  Sorry.  I don't recall that, no.

13   Q.        Okay.  Let me ask you.  There is another

14   lawsuit -- actually, a couple -- in the region right

15   now.

16             Have you been involved in -- have you been

17   deposed in any of those other than the one that you

18   testified to earlier?

19   A.        No, I've never heard of any.

20   Q.        And did you ever take any action against

21   Radio Shack?

22   A.        No.

23             MS. ALIOTO:  Okay.  Let's go onto the next

24   exhibit.  Hold on.  I think I might have taken my

25   exhibits out of the room.

                                                         117

De Souza & Associates    650-341-2671        desouzacr@att.net

**Dec. of Thompson - Exhibit 8**

1          (Off the record: 12:33 p.m. to 12:33 p.m.)

2               MS. ALIOTO:  Okay.  Let's make Bates stamp

3     000177 the next one in line, which, I believe, is

4     Exhibit 7.

5                         (Plaintiff's Exhibit 7 marked

6                         for identification.)

7               MS. ALIOTO:  Q.  Okay.  Taking a look at

8     this exhibit.  Do you know -- this is Exhibit No. 7

9     that is to Ms. Smith in HR asking for the reasons

10    why Frank was terminated by Frank.

11              Did Shaan ever call and ask you anything about

12    the termination of Frank Allen?

13    A.        Not that I recall.

14    Q.        Did you ever have any meeting with her about

15    the termination of Frank Allen?  "Her" being Shaan

16    Smith.

17    A.        Not that I recall, no.

18    Q.        Did you ever hear from Frank asking for the

19    reasons for his termination?

20    A.        Aside from at the time of the termination?

21    Q.        Right.

22    A.        No, not that I recall.

23    Q.        Okay.  And at the time of the termination, he

24    asked you why he was being terminated.

25    A.        It was explained to him why he was being

                                                    118

Allen vs. Radio Shack  David Gonsolin                    10/16/12

1    terminated.  I can't say if he asked, but.

2    Q.      Okay.  And have you ever seen this document

3    before?

4    A.      Not that I recall, no.  Possibly.

5    Q.      Possibly?

6    A.      Yeah, I'm not sure if I've seen it before.

7    Q.      Okay.  This is the one that's dated May 5th,

8    2010.

9    A.      Uh-huh.

10            MS. ALIOTO:  Okay.  So let's take a look at

11   Exhibit No. 8.

12                    (Plaintiff's Exhibit 8 marked

13                     for identification.)

14            MS. ALIOTO:  Q.  Okay.  Do you know whose

15   handwriting that is?

16   A.      No.

17   Q.      Do you know what RSP is?

18            MS. THOMPSON:  Well, I think that's RSD.

19            THE WITNESS:  Regional sales director -- is it

20   Aybeth?  Was that the guy I was talking about earlier?

21            MS. ALIOTO:  Basem.

22            THE WITNESS:  What's his last name?

23            MS. THOMPSON:  Aybeth.

24            THE WITNESS:  Oh, okay.  So I'm assuming

25   that's regional sales director.

                                                          119

De Souza & Associates    650-341-2671        desouzacr@att.net

**Dec. of Thompson - Exhibit 8**

Allen vs. Radio Shack  David Gonsolin          10/16/12

1          MS. ALIOTO:  Q.  Did you ever talk to one
2    of the employees named Rosetta?
3    A.          I don't know.
4    Q.          Did you talk to anyone at the store when you
5    went there in February of 2010 about any of the issues
6    other than Frank?
7          MS. THOMPSON:  Objection.  Assumes facts,
8    misstates the record.
9          THE WITNESS:  I don't know.  About the issues
10   in regards to --
11         MS. ALIOTO:  I'm sorry.  I'm sorry.  It's
12   March of 2010.
13         THE WITNESS:  And about what now?
14         MS. ALIOTO:  Q.  About any of the issues
15   that you discussed with Frank did you talk to any of
16   the other employees about those issues?
17   A.          I don't know.  I couldn't tell you who I
18   talked to when and about what there.
19   Q.          Have you ever seen this document before?
20   A.          No, not that I recall.
21         MS. ALIOTO:  All right.  Let's see the next
22   exhibit, Exhibit No. 9.
23                   (Plaintiff's Exhibit 9 marked
24                    for identification.)
25         MS. ALIOTO:  Q.  Okay.  After the

                                                        120

De Souza & Associates    650-341-2671      desouzacr@att.net

**Dec. of Thompson - Exhibit 8**

1   April 27th meeting, the termination meeting at 3830,

2   did Shaan from HR call you and ask you any

3   questions.  Not just about racism, but any

4   questions.

5   A.        I don't recall.

6   Q.        Do you recall who took over 3830 when he

7   was -- when Frank was terminated?

8   A.        I don't.

9   Q.        No?

10            Do you know Amy?

11  A.        Amy Mazuki?

12  Q.        No.  Amy Tam.

13  A.        Oh, yes.  I'm sorry.  Amy Mazuki is somebody

14  in our company now at Kohl's.

15            Yeah.

16  Q.        Okay.  Do you recall Amy taking over at 3830?

17  A.        That sounds right.

18  Q.        Okay.  Did you have anything to do with her

19  moving from the store she was in to 3830?

20  A.        No.

21  Q.        No?

22            Would that be something that Donna did and it

23  would not be within your job description?

24  A.        That's totally up to her.  And she's the one

25  who has to do everything to get it done.  She might have

                                                        121

Dec. of Thompson - Exhibit 8

Allen vs. Radio Shack  David Gonsolin          10/16/12

1   asked me, hey, what do you think about moving Amy over

2   there.

3   Q.        Right.  Do you know if she did ask you that?

4   A.        I don't know.

5   Q.        Okay.  When you went into the store that day

6   when you were terminating Frank, did she tell you that

7   Amy was going to take over?

8   A.        I don't think so.  I don't know.

9   Q.        Did you ask who was going to take over?

10  A.        I don't recall.

11  Q.        Okay.  But you were in charge of loss

12  prevention.

13  A.        Uh-huh.

14  Q.        The manager's walked out, upset.

15  A.        (Witness nodded head.)

16  Q.        Did you ask who was going to be in charge

17  here?

18  A.        I don't know.  I don't know.

19  Q.        Would that have been a concern of yours?

20  A.        It's something I probably would have wanted to

21  know.  But honestly, at that specific day, especially

22  that day, I don't know.  Because the whole incident was

23  not a standard termination.  So there was -- it was

24  uncomfortable.  So that might have been something I

25  asked later, I don't know.

                                                    122

**Dec. of Thompson - Exhibit 8**

Allen vs. Radio Shack  David Gonsolin                10/16/12

1   Q.        Why -- your expression is pretty funny.  It's
2   like getting out of dodge.
3   A.        It was.  It was uncomfortable, I'm telling
4   you.
5   Q.        Why wasn't it a standard termination?
6   A.        It was a standard termination in how it was
7   handled.  Just his reaction made it uncomfortable.
8   Q.        But you have some kind of understanding of a
9   13-year employee that has a stellar reputation?
10  A.        I can understand anybody getting terminated
11  whether it's for theft, or for performance, anybody
12  right now doesn't want to lose their job.  It's not a
13  good time to lose your job, especially when you've been
14  there for a while and that hurts a little bit.  I
15  understand him getting upset, but I feel he went
16  overboard, so --
17  Q.        He scared you.
18  A.        But that's just my opinion again.  Doesn't
19  mean he did.  Just my opinion.  Which I guess isn't
20  really relevant, so.
21  Q.        Okay.  But at any point did you feel he raised
22  his voice at you?
23  A.        I don't remember.  Probably.  He was kind
24  of -- he was going at both of us, so -- I mean -- if he
25  was yelling, it was probably going at both of us.  So I

                                                          123

De Souza & Associates   650-341-2671        desouzacr@att.net

**Dec. of Thompson - Exhibit 8**

1   wasn't -- I don't think he saw me as a separate entity

2   from Donna.  I think he saw us both together and he

3   probably thought we were teaming up on him or something.

4   Q.       And, again, have you ever seen this document?

5   A.       No.  Not that I recall, no.

6            MS. ALIOTO:  Okay.  And the last one of this

7   series is 4/28/10.  Exhibit 10.

8                        (Plaintiff's Exhibit 10 marked

9                         for identification.)

10           THE WITNESS:  (Pause for review.)

11           MS. ALIOTO:  Q.  Okay.  Were you ever told

12  by anybody at this company that Frank Allen was

13  terminated for not locking the cash drawer?

14           MS. THOMPSON:  I'm sorry.  Could you read that

15  back again.

16           (Record read by the Reporter as follows:

17               "Q.  Okay.  Were you ever told by anybody

18               at this company that Frank Allen was

19               terminated for not locking the cash

20               drawer?")

21           THE WITNESS:  I don't recall.  I don't know if

22  somebody, anybody, said that statement to me.

23           MS. ALIOTO:  Q.  Okay.  Did you say it to

24  Frank?

25  A.       Did I say that statement to Frank?

                                                        124

**Dec. of Thompson - Exhibit 8**

1   Q.      Yeah.

2   A.      No.

3   Q.      And, again, have you ever seen this document?

4   A.      No.

5   Q.      Do you recognize the handwriting?

6   A.      No.

7   Q.      All right.  Moving right along.  Let's do

8   Exhibit No. -- now Facebook has been a contributor to

9   all depositions.

10  A.      Really?

11  Q.      Yeah.  Facebook is a big issue in the legal

12  world.

13  A.      You know what?  It helped us out in loss

14  prevention.  Because you would see people getting on

15  there and bragging about stuff that they did.

16          My wife works loss prevention for a credit

17  union.  And she had a case where an employee was showing

18  off the money they had taken.  It was, like, really

19  guys?  Really?

20          MS. ALIOTO:  Wow.

21                  (Plaintiff's Exhibit 11 marked

22                   for identification.)

23          MS. ALIOTO:  Q.  Do you know who Carlos

24  Venegas is?

25  A.      No.

125

**Dec. of Thompson - Exhibit 8**

Allen vs. Radio Shack  David Gonsolin                    10/16/12

```
 1    Q.        You don't know him as a manager?
 2    A.        If I saw his face, I might recognize him or
 3    know, but no.
 4    Q.        Okay.  Did you ever talk to Amy Tam before the
 5    termination of Frank?
 6    A.        Yeah, I've done visits at her old store and
 7    stuff.
 8    Q.        Did you ever talk to Amy about moving to
 9    Frank's store?
10    A.        I don't know.
11    Q.        Have you ever felt that a particular employee
12    had been set up to be terminated?  No?
13              MS. THOMPSON:  Objection.  Vague and
14    ambiguous.
15              MS. ALIOTO:  "No?"
16              THE WITNESS:  Not at all.  Well --
17              MS. ALIOTO:  Other than yourself.
18              THE WITNESS:  I felt that as myself honestly,
19    so yes.
20              MS. ALIOTO:  Okay.  You don't know him.
21              THE WITNESS:  I probably interacted with him.
22    I'm sure I met him, probably.  Again, 200 stores, 200
23    store managers, new ones coming in and out all the time.
24              MS. ALIOTO:  Q.  What I'm trying to get at
25    is whether or not you knew Amy Tam had been told
```

                                                         126

**Dec. of Thompson - Exhibit 8**

Allen vs. Radio Shack  David Gonsolin          10/16/12

1   that she was going to be moving to that store
2   earlier than the date of termination?
3          MS. THOMPSON:  Objection -- excuse me.
4   Assumes facts --
5          THE WITNESS:  I don't know.
6          MS. THOMPSON:  -- lacks foundation.
7          MS. ALIOTO:  Actually it doesn't.  It is in
8   evidence, but go on.
9          THE WITNESS:  Well --
10         MS. THOMPSON:  No, it's not in evidence.
11         THE WITNESS:  I don't know what you guys are
12  saying.  But no, I don't know.
13         MS. ALIOTO:  Yeah.
14         THE WITNESS:  Could it have happened?  Yeah.
15  Did it happen?  I have no idea.
16         MS. ALIOTO:  Q.  Okay.  You weren't
17  brought in on any conversations with either Ocampo
18  or Pattakos concerning who would be moving to that
19  store after Frank was terminated?
20  A.      I don't recall.  Honestly, I mean this is a
21  conversation you're asking me about from two and a half
22  years ago.
23  Q.      Right.
24  A.      I really have no idea.
25  Q.      Okay.  Last exhibit.

                                                      127

**Dec. of Thompson - Exhibit 8**

Allen vs. Radio Shack   David Gonsolin                    10/16/12

1              (Plaintiff's Exhibit 12 marked

2                  for identification.)

3              MS. ALIOTO:   Q.   Do you know who Thomas

4     Nabozny, N-A-B-O-Z-N-Y, is?

5     A.        Thomas Nabozny?

6     Q.        Yeah.

7     A.        Yeah.

8     Q.        How do you know Thomas Nabozny?

9     A.        He was one of my peers.  He was one of my

10    trainers when I got hired.

11    Q.        Is he a good guy?

12    A.        Very good guy.

13    Q.        Honest guy?

14    A.        Very honest.

15    Q.        Let's see what his declaration says here.

16              So was he -- did you take over his position

17    when he left?

18    A.        Yes.

19    Q.        All right.

20    A.        That's when I left being the investigations

21    manager and went to the actual regional loss prevention

22    manager.

23    Q.        Okay.  And did he train you?

24    A.        Yeah.  He took part in my training when I got

25    hired.

                                                          128

De Souza & Associates    650-341-2671      desouzacr@att.net

**Dec. of Thompson - Exhibit 8**

1   specifically see if the manager was following corporate

2   policy or loss prevention procedures?

3   A.        I can't quote an exact manager and store

4   location they asked me to go to.  But yeah, if a

5   district manager had a concern about a store, they would

6   ask me to go in and say, hey, you know, there has been

7   problems, or I think there is problems.  Then you go in

8   and do a visit.  Absolutely.  It's what we're here for.

9   Q.        Okay.  Did you ever feel that Radio Shack

10  targeted older employees?

11  A.        Not at all.  Never.

12  Q.        For instance approximately -- because he says

13  Radio Shack targeted older employees.

14  A.        And I mean whether you're talking about older

15  in age or older in tenure with the company, I don't feel

16  they targeted either ever.

17  Q.        Okay.  Going to 8.

18            "Radio Shack looked the other way when it came

19            to company violations at certain stores with

20            younger managers.  In one instance I wrote up a

21            store manager approximately 8 to 12 times and

22            the company looked the other way because the

23            employee was younger and a go-getter."

24  A.        What do you want me to say?

25            MS. THOMPSON:  What is the question.

130

**Dec. of Thompson - Exhibit 8**

```
 1              THE WITNESS:  That's Tom's opinion.
 2              MS. ALIOTO:  Q.  Okay.  Did you ever
 3   experience that?
 4   A.         No.  No.  Not -- I've seen managers look the
 5   other way but not because somebody was younger.  I don't
 6   even think it was they looked the other way, they're
 7   just too busy and they don't address certain issues.
 8   Specifically -- well, yeah.
 9   Q.         Okay.  "Store 3830..." --
10              That looks like a 90 but it's a 30.
11              "...was a high volume and sales store."
12              You agree with that, right?
13   A.         Yeah.
14   Q.         "Several years ago I went to Store 3830 to do
15              an inventory investigation and an audit.  In
16              the process I found that Mr. Allen was keeping
17              cash in the desk drawer."
18              Now, had you ever been told by anybody that
19   Mr. Allen was keeping money in the cash drawer?
20   A.         Not that I recall.
21   Q.         I'm sorry.  Let me get that straight.
22              In the desk drawer.
23   A.         Not that I recall.
24   Q.         Okay.  "I gave Mr. Allen a violation of
25              company policy for keeping company cash in the
                                                           131
```

**Dec. of Thompson - Exhibit 8**