Allen vs. Radio Shack   David Gonsolin              10/16/12

1          back room in his desk drawer.  Mr. Allen's
2          district manager, Hani Alzaghari..." --
3          Now, do you know Hani Alzaghari?
4    A.      Uh-huh.
5    Q.      Okay.  Well let me ask you.  If a district
6    manager comes to you in loss prevention and says,
7    listen, I think it's important at this high volume store
8    that they keep at least minor cash in the back
9    office -- in the back desk, what would you say to that?
10          MS. THOMPSON:  Objection.  Incomplete
11   hypothetical, lacks foundation, calls for speculation,
12   assumes facts.
13          THE WITNESS:  I wouldn't say yes.  I
14   would -- if I'm going to violate a major company policy
15   and put us at risk like that, I'm going to get it from
16   corporate, the people who write the policies.
17          MS. ALIOTO:  Q.  Right.  Okay.  Did
18   anybody ever come to you and ask you that?
19   A.      No.
20   Q.      All right.  So, "Mr. Allen:  Assistant manager
21          Hani Alzaghari approached me and asked..." --
22   A.      Can I take back what I said?
23   Q.      Sure.
24   A.      Not that I recall.
25   Q.      Okay.  So do you know -- not that you recall

                                              132

De Souza & Associates    650-341-2671    desouzacr@att.net

Dec. of Thompson - Exhibit 8

Allen vs. Radio Shack  David Gonsolin          10/16/12

1   as far as any of the other store managers asking you if
2   they -- or district managers --
3   A.        Keep cash in the back drawer?  The desk
4   drawer?  No.  I don't ever recall that.  And --
5   Q.        Okay.
6   A.        -- the only reason I changed it is because I'm
7   thinking there might have been a store where they took
8   the cash and locked it in the cage at night just due to
9   some specific burglaries they were having at night.
10  But, again, I'm not 100 percent, so that's why I wanted
11  to change it instead of a "no" to "not 100 percent".
12  Q.        Okay.  "Mr. Allen's district manager, Hani
13            Alzaghari approached me and asked to make an
14            exception for Store 3830 and allowed Mr. Allen
15            to keep cash in the desk drawer.  Mr. Algazhari
16            explained that because Store 3830 was a high
17            volume store and very busy with tourists on the
18            weekends, Mr. Allen needed to keep cash in the
19            desk drawer.  Furthermore, there had been times
20            when the store had run out of cash and was
21            forced to go to another Radio Shack to borrow
22            some cash."
23            Did you hear about that happening often where
24  one store runs out of cash and they go to another store?
25  A.        Not that I recall.

                                                        133

De Souza & Associates   650-341-2671      desouzacr@att.net

**Dec. of Thompson - Exhibit 8**

Allen vs. Radio Shack  David Gonsolin                10/16/12

```
 1   Q.       Okay.  "I explained to Mr. Algazhari if
 2            Mr. Allen had the district manager and the
 3            regional manager's approval, then Mr. Allen
 4            could keep the cash in the desk drawer.  I
 5            explained that the regional manager had the
 6            authority to override certain policies when it
 7            was in the best interests of the business."
 8            Is that also your understanding as the loss
 9   prevention manager?
10            MS. THOMPSON:  Objection.  Lacks foundation.
11            MS. ALIOTO:  Q.  That the regional manager
12   had the authority to override certain policies?
13            MS. THOMPSON:  Objection.  Assumes facts,
14   lacks foundation, calls for speculation.
15            THE WITNESS:  No, that's not my understanding.
16            MS. ALIOTO:  Q.  That's not your
17   understanding?
18   A.       Huh-uh.
19   Q.       What is your understanding when it comes to --
20   A.       Overriding a company policy?
21   Q.       Yeah.
22   A.       Go to the people who write the policy.  You
23   need to get everybody on board to override a company
24   policy like that.
25   Q.       Right.  So you're saying more than the
                                                      134
```

De Souza & Associates     650-341-2671     desouzacr@att.net

**Dec. of Thompson - Exhibit 8**

Allen vs. Radio Shack  David Gonsolin          10/16/12

1    regional manager and more than the district manager?

2    A.        Yeah.

3    Q.        Okay.  "The regional manager at the time was

4              Tom Schultz."

5              Do you know Tom Schultz?

6    A.        Uh-huh.

7    Q.        Do you believe Mr. Schultz is an honest man?

8    A.        Absolutely.  I don't know him as well as I

9    knew Tom Nabozny, but yes, I think he is an honest guy.

10   Q.        "Mr. Schultz was promoted and then another

11             gentleman then took his place.  Both men, as

12             well as Mr. Hani Alghazari allowed and

13             approved Mr. Allen to keep cash in the desk

14             drawer."

15             Anyone ever tell you that?

16   A.        No.

17   Q.        "Store 3830 was not the only high volume

18             store that was allowed to keep company cash

19             outside the cash register.  Other Radio Shack

20             stores were allowed to keep company cash

21             outside of the cash register."

22   A.        Let me re-read that.  Can you -- hold on a

23   second.

24   Q.        Uh-huh.

25   A.        Okay.  I'm going to back up a little bit to

                                                    135

De Souza & Associates   650-341-2671      desouzacr@att.net

**Dec. of Thompson - Exhibit 8**

Allen vs. Radio Shack David Gonsolin                    10/16/12

```
 1    where you said --
 2    Q.        Okay.
 3    A.        -- did I know that they had approved it.
 4    Q.        Right.
 5    A.        Or did anybody ever tell me that.
 6              Not that I recall.  Frank might have said it
 7    during the termination or something like that.  But I
 8    don't recall anybody ever telling me that.
 9    Q.        Okay.  When you became -- when you took over
10    this gentleman's position, were you given his files?
11    A.        No, I don't think so.
12    Q.        So if this occurred just before you took his
13    place, you wouldn't have had access to his files to know
14    that.
15    A.        No.  I would -- probably had to request them.
16    Q.        And, again, do you know of any other
17    Radio Shack stores that are allowed to keep company cash
18    outside of the cash drawer because they are high volume
19    stores?
20    A.        Not that I can recall, no.
21    Q.        And again this issue of the $200 being in the
22    back drawer of the store.  That was never an issue on
23    any of your visits with Frank, right?
24              MS. THOMPSON:  Objection.  Misstates the
25    testimony.
```

                                                        136

De Souza & Associates    650-341-2671        desouzacr@att.net

**Dec. of Thompson - Exhibit 8**

Allen vs. Radio Shack  David Gonsolin          10/16/12

```
 1              MS. ALIOTO:  Right.
 2              THE WITNESS:  Can I ask for a clarification on
 3    what she just said?
 4              MS. ALIOTO:  No, she's just saying that's not
 5    what you've said before.
 6              THE WITNESS:  So repeat your question one more
 7    time, I'm sorry.
 8              MS. ALIOTO:  I'm going to have her do that
 9    because it was not the best phrasing.
10              (Record read by the Reporter as follows:
11              "Q.  And again this issue of the $200
12              being in the back drawer of the store.
13              That was never an issue on any of your
14              visits with Frank, right?"
15         MS. THOMPSON:  Same objection.
16         THE WITNESS:  Not that I recall.
17         MS. ALIOTO:  Q.  Not that you recall?
18    A.        No.
19              It could have been there and I could have
20    never found it, never seen it.  I don't know.
21    Q.        Right.  But you never had a discussion with
22    Frank about any cash in the back drawer, right?
23    A.        Not that I recall.  Maybe up until the
24    incident towards the end of his employment.
25    Q.        What was the incident?
```

                                                   137

**Dec. of Thompson - Exhibit 8**

Allen vs. Radio Shack   David Gonsolin                     10/16/12

1    A.        That you were talking about with Donna and
2    everything where they found the cash money in the back
3    drawer?
4    Q.        Yeah.
5    A.        Might have had a conversation with him on that
6    one.
7    Q.        With Frank.
8    A.        Might have.
9    Q.        Okay.  I don't want you to guess.  I want to
10   know whether you did.
11   A.        Okay.  Well then I can't really answer much,
12   so no.
13   Q.        That's good.  That's good.
14   A.        I don't know.  I don't know.
15   Q.        Did you have a conversation with Donna Ocampo
16   about cash in the back drawer?
17   A.        I don't know.  Can't say for sure.
18   Q.        Okay.  At the termination day, was cash in the
19   drawer discussed?
20   A.        I can't say for sure.  I mean I can reference
21   back to that report I wrote.  The narrative.
22   Q.        Your report doesn't have it.
23   A.        Okay, then I can't say for sure.
24   Q.        Okay.  Let's look at the report.  I don't want
25   to upset opposing counsel.

                                                        138

**Dec. of Thompson - Exhibit 8**

Allen vs. Radio Shack  David Gonsolin                    10/16/12

1   A.        I'm guessing maybe towards the end of

2   2009-ish.  If you guys have the date Tom Nabozny left, I

3   would be able to get it much closer.

4   Q.        Yeah, I think he says in his declaration,

5   which was the last exhibit --

6   A.        That's what I was going to say.  He probably

7   said it somewhere.

8   Q.        Let's see.

9   A.        Because once he left, I accepted his position

10  fairly quickly.

11  Q.        Okay.  Looking at Exhibit 12, Mr. Nabozny

12  states in Paragraph 17, "in October 2009, I retired from

13  Radio Shack Corporation.

14  A.        Sounds about right.

15  Q.        Okay.  So from about October 2009 until

16  January of 2011, your position was regional loss

17  prevention manager.

18  A.        Yes.

19  Q.        And during that entire time you reported to

20  James Peterson?

21  A.        Yes.

22  Q.        And what were your general duties and

23  responsibilities during that period when you were the

24  regional loss prevention manager?

25  A.        I mean, generally speaking, like I said

                                                          142

De Souza & Associates    650-341-2671        desouzacr@att.net

**Dec. of Thompson - Exhibit 8**

Allen vs. Radio Shack  David Gonsolin          10/16/12

1  before, protecting the company's assets.  You know from
2  both operational, external/internal losses.
3  Q.      What was the company policy during that
4  period, at least -- well let me back up.
5          During the entire period you were in loss
6  prevention at Radio Shack, was it your understanding
7  that there was a company policy with regard to where
8  cash should be maintained at the stores?
9  A.      I can't say for sure.  I mean I can say I
10 believe there was a policy, but there was some policy
11 that wasn't always -- I don't know.  Honestly, I don't
12 know.  I think there was.  I can't say for certain.
13 Q.      When you were the regional loss prevention
14 manager, where was cash supposed to be maintained in the
15 stores?
16 A.      Cash drawer.  And like I said I believe there
17 were some situations where we allowed certain stores to
18 lock it in their cage at night because we had a high
19 rate of burglaries going around the area.
20 Q.      Okay.  So when you say cash drawer, you mean
21 the cash register drawer?
22 A.      Yeah.  Yeah, I'm sorry.
23 Q.      And what --
24         MS. ALIOTO:  I'm sorry.  Locked in the cage?
25         THE WITNESS:  Yeah, in the security cage where

                                                    143

De Souza & Associates   650-341-2671    desouzacr@att.net

**Dec. of Thompson - Exhibit 8**

Allen vs. Radio Shack  David Gonsolin          10/16/12

1   all the high-theft items were -- excuse me.  High-priced
2   items.  So -- and that was -- I believe that was rare.
3   I think we had maybe one or two.  We had strings of
4   burglaries going around a specific area.
5              MS. THOMPSON:  Q.  All right.  So let me
6   make sure I understand something.
7              So the policy, as you understood it, while you
8   were regional loss prevention manager, was that all cash
9   was supposed to be kept in the cash register drawers at
10  the stores, correct?
11  A.        Correct.
12  Q.        And it's your recollection that that there
13  might have been a few exceptions where cash was allowed
14  to be locked into the cage -- the security cage in the
15  back?
16  A.        Yes.
17  Q.        Were there any other exceptions to the
18  policy --
19  A.        Some stores got the drop safes where they
20  could drop their cash.  We never -- as far as I know, I
21  don't think I had any in my region.  It was like a test
22  thing they were doing out -- putting out.
23  Q.        All right.  I'm just asking about what --
24  right now I'm asking about stores that you're familiar
25  with.

                                                     144

De Souza & Associates    650-341-2671      desouzacr@att.net

**Dec. of Thompson - Exhibit 8**

Allen vs. Radio Shack  David Gonsolin                10/16/12

```
1    A.        Okay.

2    Q.        So the general policy was that they're

3    supposed to be kept in the cash register drawer, right?

4    A.        Uh-huh.

5    Q.        You have to respond audibly.

6    A.        Yes.

7    Q.        Okay.  And you're saying that there were some

8    exceptions, you believe, where cash could be locked in

9    the security cage in the back.

10   A.        (Witness nodded head.)

11   Q.        Right?

12   A.        Yes.

13   Q.        Okay.  Were there any other places where store

14   managers were permitted to keep cash other than those

15   two?

16             MS. ALIOTO:  Those two.

17             THE WITNESS:  Aside from the safe that I said?

18             MS. THOMPSON:  All right.

19             THE WITNESS:  From the few select stores that

20   had a drop safe, they could do it there.

21             MS. THOMPSON:  Q.  What's a drop safe?

22   A.        It's just a little safe that you drop your

23   money into.

24   Q.        Okay.  So some stores you understood had

25   what's called a drop safe.
```

                                                           145

**Dec. of Thompson - Exhibit 8**

1   A.       Yeah.

2   Q.       And those stores that had a drop safe were

3   permitted to store their cash in the drop safe.

4   A.       Yes.

5   Q.       Okay.  So you've given me -- there is the drop

6   safe -- there was no drop safe in Frank Allen's store,

7   was there?

8   A.       No.

9   Q.       Okay.  And you said that there were -- you

10  believe there were some rare instances where the money

11  was allowed to be kept in the security cage in the back,

12  right?

13  A.       Yes.

14  Q.       Was that your understanding that that

15  exception applied to Frank Allen's store?

16  A.       No.

17  Q.       So other than -- if there wasn't a drop safe

18  and the store wasn't permitted to keep the cash locked

19  in the security cage in the back, was it your

20  understanding that the cash was supposed to be kept at

21  all times in the cash drawer?

22  A.       Yes.

23  Q.       Okay.  What was your understanding of the

24  purpose of that policy?

25  A.       I guess just to protect the cash.  For

                                                    146

Dec. of Thompson - Exhibit 8

Allen vs. Radio Shack  David Gonsolin                    10/16/12

1    whatever reason they figured this was the safest spot.
2    They couldn't invest the funds into any other better
3    protections like the safes, so.
4    Q.        Okay.  As you sit here now, are you aware of
5    any other store manager, other than Mr. Allen, who kept
6    cash in a manager's desk drawer?
7    A.        No.  Not that I can recall.
8    Q.        Would that be something that would stand out
9    in your mind?
10   A.        Not really, no.
11   Q.        All right.  You mentioned that there were
12   three people that you had a problem with at Radio Shack;
13   is that right?
14   A.        I think there were three people I said that
15   there were issues on.  I could probably think of a
16   couple more.
17   Q.        All right.  Well, why don't you tell me who
18   the people were that you had problems with at
19   Radio Shack?
20   A.        James Peterson.
21   Q.        Right.
22   A.        David Charles.
23   Q.        Yep.
24   A.        After going to HR, I had a serious problem
25   with Shaan Smith.

                                                          147

De Souza & Associates     650-341-2671      desouzacr@att.net

**Dec. of Thompson - Exhibit 8**

Allen vs. Radio Shack  David Gonsolin                    10/16/12

```
 1    Q.         Okay.
 2               MS. ALIOTO:  Who is the "he?"  James?
 3               THE WITNESS:  David Charles.
 4               MS. ALIOTO:  David Charles.
 5               MS. THOMPSON:  David Charles is who we are
 6    talking about right now.
 7               MS. THOMPSON:  Q.  Now, at any time during
 8    the course of your employment with Radio Shack, did
 9    you ever hear anyone at Radio Shack make any
10    derogatory comments based on an employee's race?
11    A.         No.
12    Q.         Okay.  Again, throughout the period of your
13    entire employment with Radio Shack, did you ever hear
14    anybody, any Radio Shack employee, make any comment that
15    you thought was derogatory based on age?
16    A.         Never.
17    Q.         Did you ever hear anyone make any derogatory
18    comments about Mr. Allen's race?
19    A.         Never.
20    Q.         Did you ever hear anyone make any derogatory
21    comments about Mr. Allen's age?
22    A.         Never.
23    Q.         Did you ever hear Donna Ocampo make any
24    derogatory comments about any employee's age or race?
25    A.         Never.
```

166

De Souza & Associates   650-341-2671      desouzacr@att.net

**Dec. of Thompson - Exhibit 8**

Allen vs. Radio Shack  David Gonsolin                10/16/12

1   Q.       Do you have any reason to believe, as you sit
2   here now, that Donna Ocampo was biased against Mr. Allen
3   because he was African American?
4   A.       Not at all.  No way.
5   Q.       Why do you say that?
6   A.       Because I worked close enough with her and I
7   was involved in the situation enough to know why he was
8   terminated.  I knew Donna fairly well professionally and
9   that's not her -- I mean in my opinion.
10  Q.       Right.
11  A.       Who knows, they could have a second
12  personality outside of work.  But I've never experienced
13  never even a hint of anything like that from Donna.
14  Q.       When did you first meet Donna Ocampo?
15  A.       It was probably when I got hired.  Shortly
16  after.  Probably within a month or two of me getting
17  hired and going around and meeting people, so.
18  Q.       In 2008?
19  A.       Yeah.
20  Q.       Okay.  Did you continue to work with her
21  fairly closely throughout the course of your employment
22  until you went out on leave?
23  A.       No.  My relationship with her was more like
24  "hello" in passing for the first year or so until I
25  became the regional loss prevention manager.

167

Dec. of Thompson - Exhibit 8

Allen vs. Radio Shack   David Gonsolin                    10/16/12

1   Q.        Okay.

2   A.        She was actually a temporary regional sales

3   director when we were -- that spot was kind of open for

4   a while.  And she was awesome.  She was a great business

5   partner, she was professional, she knew what she was

6   doing, she was supportive.  I've got nothing but

7   positive things to say about her.

8   Q.        Did anyone ever complain to you that they felt

9   that Donna was discriminating against them because of

10  age or race?

11  A.        No.

12  Q.        Did you ever hear that at all in the

13  Radio Shack grapevine?

14  A.        Not that I can recall.

15  Q.        So from October 2009 until the time you went

16  out on your leave, you worked fairly closely with Donna

17  Ocampo during that period?

18  A.        Yes.

19  Q.        And during your interactions with her, you

20  perceived her to be professional?

21  A.        Extremely.

22  Q.        Did you observe any instance where you felt

23  that Donna Ocampo was treating any of her employees in a

24  manner you thought was unfair or inappropriate?

25  A.        No.

                                                        168

De Souza & Associates   650-341-2671        desouzacr@att.net

**Dec. of Thompson - Exhibit 8**

Allen vs. Radio Shack  David Gonsolin                    10/16/12

1   Q.        Now, do you believe that you bear any bias
2   against Mr. Allen because of his race?
3   A.        Never.  No.
4   Q.        Do you believe you bear any bias against him
5   because of his age?
6   A.        No.
7   Q.        Based upon your observations of how Mr. Allen
8   was treated by Ms. Ocampo, was there anything at all in
9   the way she treated him that you thought was unfair or
10  inappropriate?
11  A.        Absolutely not.
12  Q.        Was she ever rude or disrespectful to him?
13  A.        Her approach sometimes, depending on who it
14  is, could be interpreted as rude.  It's more
15  straightforward, to the point, which I've always said is
16  kind of up in the air as far as it's a thin line between
17  being rude and being, you know, just blunt and honest
18  and not sugar-coating things.
19        When you stack her up against Greg Pattakos or
20  David Charles, they were rude.  They talked down to
21  people.  You know, they actually insulted people.
22        Donna would never do that.  But she would come
23  in and say, I don't know if this is considered rude, but
24  listen, this is a repeat issue.  This is unacceptable.
25        Some people might take that as rude in retail

                                                        169

De Souza & Associates   650-341-2671      desouzacr@att.net

**Dec. of Thompson - Exhibit 8**

Allen vs. Radio Shack  David Gonsolin                    10/16/12

1    management.  Maybe you need to acknowledge the positive
2    first and then go into the, you know, the negative and
3    how we need to fix things, but.
4    Q.        So based on your observations of working with
5    her somewhat closely for some number of months, you
6    found her to be blunt and direct?
7    A.        Yeah.  I personally didn't take any of her
8    comments as rude.  But she was very forward, very to the
9    point.
10   Q.        Did any employees ever complain to you that
11   they thought Donna Ocampo had treated them rudely?
12   A.        Not that I can recall.
13   Q.        Did Frank Allen ever tell you that he thought
14   Donna Ocampo had been rude to him?
15   A.        Not that I recall.  The last question I was
16   going to say, if anybody had, it was probably Frank.
17   But I don't know if he has, so I can't say that.
18   Q.        Did you ever observe -- any time you saw
19   interaction between Donna Ocampo and Frank Allen, did
20   you ever observe her to engage in any conduct that you
21   thought was rude or inappropriate?
22   A.        No.  No.
23   Q.        Had you ever heard from any source, up till
24   today, that Frank Allen had ever made a complaint to
25   human resources about discrimination or harassment based

                                                        170

De Souza & Associates    650-341-2671        desouzacr@att.net

**Dec. of Thompson - Exhibit 8**

Allen vs. Radio Shack  David Gonsolin                    10/16/12

1    on his race or age?
2    A.        I do believe I heard that.
3    Q.        When did you hear that first?
4    A.        After the termination.  I don't recall when, I
5    don't recall who, but I know I had heard that Frank
6    Allen was -- I don't know what the word would be.
7    Pushing back.  You know, trying to say that something
8    was against or -- I'm not trying to -- let me think of
9    what I'm trying to say here.
10             I had heard through the grapevine that
11   Frank Allen was saying that we had done something wrong.
12   Whether it was his race or his age, he felt that he was
13   wrongfully terminated.
14   Q.        So you heard that from some source after the
15   termination.
16   A.        Yes.
17   Q.        And do you remember from what source you heard
18   that?
19   A.        I don't.  I don't.
20   Q.        Okay.  Before the termination, had you heard
21   from any source that Frank Allen had ever made any kind
22   of complaint about alleged race discrimination or age
23   discrimination?
24   A.        Not that I recall.
25   Q.        Has anyone at Radio Shack ever instructed you

                                                          171

**Dec. of Thompson - Exhibit 8**

Allen vs. Radio Shack  David Gonsolin                    10/16/12

1    to engage in any conduct that you thought was an act of

2    discrimination against an employee based on age or race?

3    A.        Absolutely not.

4    Q.        Did you ever hear Greg Pattakos make any kind

5    of comment that you thought was based on age or race?

6    A.        No.

7    Q.        What about David Charles?

8    A.        Not that I recall.

9    Q.        Is that something you think would have stood

10   out in your mind?

11   A.        If it was by race, absolutely it would.  If he

12   had made a comment -- you know, I would think an age

13   comment as well.  Anything that's absolutely

14   inappropriate and unprofessional can get you in trouble

15   would probably stand out in my mind if I was present for

16   it.  Because I would be worried about myself.  I don't

17   care if you get fired for saying something stupid.

18   Don't get me involved.

19   Q.        Okay.  So against that backdrop, you don't

20   recall anybody ever making any comments that you thought

21   were inappropriate based on age or race, is that --

22   A.        No.

23   Q.        Okay.  As the regional loss prevention

24   manager, did you believe it was appropriate to terminate

25   Mr. Allen based on the conduct that you had observed and

                                                          172

De Souza & Associates    650-341-2671        desouzacr@att.net

**Dec. of Thompson - Exhibit 8**

Allen vs. Radio Shack  David Gonsolin                    10/16/12

1   were familiar with?

2   A.      Absolutely.

3   Q.      What was the role of the store manager with

4   regard to protecting company assets?

5   A.      There is --

6   Q.      What was your understanding of it during the

7   course of your employment.

8   A.      I mean to get into specifics, I know the

9   weekly cage count is required.  And it's not just to

10  complete it.  The big thing that we pushed was, yes,

11  obviously you have to complete it each week.  But you

12  have to let us know, if there is something missing, that

13  you don't have a reason for it.  So that was one of the

14  major ones was the weekly cage count.

15  Q.      Well, I guess maybe my question wasn't clear

16  and I apologize.  I'm just speaking in a general sense.

17          Did the store manager have some responsibility

18  with regard to protecting company assets?

19  A.      Yes.

20          MS. ALIOTO:  I'm going to object.  He was

21  answering it in the general.

22          MS. THOMPSON:  Did I cut you off?

23          THE WITNESS:  Well, I mean I thought that was

24  probably the most important answer to that question was

25  the cage count as far as what we asked them to do.

                                                    173

**Dec. of Thompson - Exhibit 8**

Allen vs. Radio Shack  David Gonsolin                10/16/12

1       Some other ones were product protection.  Like
2  I had talked about with the laptop locks and whatever
3  else.  Obviously protecting the cash as well.  If you
4  left cash laying around and it got stolen, that's not
5  really protecting our assets.
6       MS. THOMPSON:  Q.  What was your
7  understanding, as the regional loss prevention
8  manager, in terms of what the store manager's
9  responsibilities were with regard to the store
10  employees in terms of their --
11       MS. ALIOTO:  That's vague --
12  Q.       -- obligations to the company?
13       MS. ALIOTO:  Vague and ambiguous.
14       THE WITNESS:  That is -- there is a lot of
15  responsibilities for their employees.  I mean --
16       MS. THOMPSON:  With respect to loss
17  prevention.
18       THE WITNESS:  With respect to loss prevention?
19  I mean I guess ensure that they adhere to loss
20  prevention policies, and if not, you hold them
21  accountable.
22       I mean, they're not the ones necessarily
23  responsible for executing a lot of the loss prevention
24  things.  But with the store manager doing his part on
25  the loss prevention things, and following the policies

                                                      174

De Souza & Associates   650-341-2671      desouzacr@att.net

**Dec. of Thompson - Exhibit 8**

Allen vs. Radio Shack   David Gonsolin                    10/16/12

1   and procedures that can detect if an employee is doing

2   something dishonest -- I'm falling back to the cage

3   count again.  The weekly cage count.  Because that was

4   one of the biggest things:  Employees stealing

5   high-priced items out of the cage.  Well, if you're not

6   doing that, you're not ensuring your employees are

7   following procedures and being honest.  So.

8            MS. THOMPSON:  Q.  So was it a store

9   manager's responsibility to make sure that the store

10  employees adhere to company policies and procedures

11  even if the store manager wasn't there?

12  A.        Yes.

13  Q.        Based upon your experience at Radio Shack and

14  your position as a regional loss prevention manager, was

15  the fact that if a policy was violated and the store

16  manager was not present, would that absolve the store

17  manager of responsibility for the employee's violations?

18  A.        I would think it totally depends on the

19  situation and what happens.

20  Q.        Okay.  Could you look at Exhibit 5, please.

21  A.        Yep.  Okay.

22  Q.        All right.  So look at the second page, which

23  has got the number 194 in the lower right-hand corner.

24           MS. ALIOTO:  You guys are going to be faster

25  than I with these exhibits, so one second.

                                                     175

**Dec. of Thompson - Exhibit 8**

1          Exhibit 5.  What did you say after that?

2          MS. THOMPSON:  I just said turn to the second

3    page.

4          MS. ALIOTO:  Okay.

5          MS. THOMPSON:  Q.  Okay.  So there was

6    some questioning earlier about the fact that

7    apparently this visit was prompted by a request from

8    the district manager.  Do you recall that question

9    generally?

10   A.        Yes, I do recall that.

11   Q.        Is that an unusual occurrence to have a

12   district manager ask for you to come visit the store?

13   A.        No.  It's encouraged.  It shows that they're

14   paying attention to loss prevention things in their

15   store and that they care.

16   Q.        Okay.  So did your DM's typically do that on a

17   fairly regularly basis?

18   A.        Yeah.

19   Q.        And did Donna, I take it, request that you

20   visit stores other than Frank Allen's store?

21   A.        Yes.

22   Q.        You did not feel -- did Donna ever say or do

23   anything which led you to believe that she was singling

24   Frank Allen out for any purpose?

25   A.        Aside from the purpose of he was really

                                                        176

De Souza & Associates   650-341-2671      desouzacr@att.net

**Dec. of Thompson - Exhibit 8**

Allen vs. Radio Shack  David Gonsolin                10/16/12

1   neglecting a lot of policies and she needed support,
2   since loss prevention is my area of expertise and that's
3   the majority of what he was violating, no, it wasn't for
4   any unacceptable reason.  It was, hey, we keep
5   identifying a repeat issue with this guy.  I need to
6   take a partner.  Since a lot of it is loss prevention
7   related, you're my regional loss prevention manager, I
8   need your help in this.
9            MS. ALIOTO:  Facts not in evidence.
10           MS. THOMPSON:  Q.  As you sit here now, do
11  you remember having specific -- you personally
12  having specific concerns about Frank Allen's
13  compliance with loss prevention policies and
14  procedures?
15  A.       Yes.  It was all documented.
16  Q.       I understand that it's documented, but I'm
17  just again wondering, do you in your mind, as you sit
18  here, without looking at the documents, do you remember
19  having -- specifically having issues with Frank Allen
20  when he was the store manager that involved loss
21  prevention issues?
22  A.       Yes.  Whether it was Frank Allen or anybody
23  else, anybody who neglected the policies this bad, I had
24  a major concern with.
25  Q.       Well, how was Frank Allen's discharge of his

                                                        177

**Dec. of Thompson - Exhibit 8**

Allen vs. Radio Shack  David Gonsolin          10/16/12

1    responsibilities with regard to loss prevention policies
2    and procedures, how did that compare to other store
3    managers in that district?
4    A.       It was a lot worse than other people.  Were
5    there other people in my region like that?  Yeah.
6    Q.       Okay.
7    A.       Did they end up getting terminated?  Yeah.  I
8    mean, can I give you a specific example?  Obviously not.
9    I don't recall.  But.
10   Q.       So in your opinion was Frank Allen the worst
11   in his district in terms of loss prevention policies and
12   procedures?
13   A.       In the whole time I worked in that district, I
14   can't say that for sure.  I'd have to go back and think
15   about every store visit and everything that's ever
16   happened in any store.  We had a lot of issues in
17   San Francisco District.
18   Q.       Okay.  Okay.  Looking at, again, the second
19   page of Exhibit 5.  And under Non-Negotiable.  The
20   heading Non-Negotiable.
21            Do you see where I'm reading from?
22   A.       Uh-huh.
23   Q.       Okay.  The third entry down says "no."  And
24   the question is,
25            "Does the store manager know how to pull their
                                                         178

Dec. of Thompson - Exhibit 8

Allen vs. Radio Shack  David Gonsolin                    10/16/12

 1              P & L and review the inventory control numbers,
 2              review store strength and other lost
 3              performance with SM?"
 4          So why did you answer "no" there?
 5   A.      Because he did not know how to pull his P & L.
 6   Q.      How do you know that?
 7   A.      Because if I hadn't had done this, it would be
 8   an N/A.
 9              THE REPORTER:  I'm sorry, it would be what?
10              THE WITNESS:  I'm sorry.  Non-applicable.
11          So if I mark this as a "no," that means I sat
12   down with him at the computer, asked him do you know how
13   to pull up your P & L.  When he says no, I pull it up
14   with them and review the numbers.
15              MS. THOMPSON:  Q.  Was that a serious
16   issue in your mind?
17   A.      It was not an issue as far as potentially
18   causing any loss to the store by not knowing how to do
19   that.  However, this is where, if he was looking at
20   this, a manager for 13 years should know how to pull his
21   P & L.  And if he was reviewing it, he would have seen
22   the cash shortages he had had from numerous months.
23   Q.      And was that -- you know, the fact that he
24   wasn't seeing and was not aware of his cash shortages,
25   was that a problem in your mind as the regional loss

                                                        179

De Souza & Associates   650-341-2671      desouzacr@att.net

**Dec. of Thompson - Exhibit 8**

Allen vs. Radio Shack  David Gonsolin                    10/16/12

1   prevention manager?

2   A.        Yes.  I would expect a store manager, who had

3   been there for 13 years, to know how to look at, I mean,

4   what's to them one of the most important reports.  So,

5   yeah.

6   Q.        And why would it be important for the store

7   manager to know how to pull and read those reports?

8   A.        Well, just from a loss prevention standpoint,

9   it is a great indicator of potential losses not just

10  with cash but with product as well.  And it's not their

11  job to do the investigating.  We're not asking that.

12  Just if you see something unusual, that's where you call

13  us.

14  Q.        The next "no" entry under Non-Negotiables

15  under -- on the second page of Exhibit 5, it says,

16            "No - If there were variances in excess of

17            $5 in the past 30 days, were there less than

18            three?  What were the total number of days with

19            a cash variance greater than 5?"

20            So what does that entry mean?

21  A.        Well, we pull up the individual days and the

22  cash shortages for each day.  Unfortunately, when I

23  answered this, I only answered -- there were more than

24  three cash shortages that were over $5 in the last 30

25  days.  However, I did not answer the second part which

                                                        180

Allen vs. Radio Shack  David Gonsolin                    10/16/12

1    actually told you how many days and how much.  So I only
2    said that there were more than three over $5 in 30 days.
3    Q.        Then moving down the column of
4    Non-Negotiables, you answered "no" to the question,
5              "Are there count sheets for secured inventory
6              for the last eight weeks?  Are discrepancies
7              reconciled?"
8              MS. ALIOTO:  I'm sorry.  Where are you?  You
9    said moving down, but --
10             MS. THOMPSON:  I'm reading the question.
11             MS. ALIOTO:  Are you in the middle?  Where are
12   you?
13             THE WITNESS:  Right here.  If you go --
14             MS. ALIOTO:  Okay.  Great, great, great.  Got
15   it.  Thank you.
16             MS. THOMPSON:  Q.  Okay.  Are there -- so
17   the questions are,
18             "Are there count sheets for secured inventory
19             for the last eight weeks?  Are discrepancies
20             reconciled?  Have the discrepancies been
21             reported to the RLPM and DM?  Cage count should
22             be located on the clipboard in the cage."
23             Now, why did you answer "no" to that?
24   A.        Let me read my notes.
25             There was a cage count that wasn't completed

                                                         181

De Souza & Associates   650-341-2671        desouzacr@att.net

**Dec. of Thompson - Exhibit 8**

Allen vs. Radio Shack  David Gonsolin                    10/16/12

1    in February.  So for the first question, are there count

2    sheets for secured inventory for the last eight weeks,

3    that would make it a no.

4    Q.        Okay.  What's the significance of that?

5    A.        They didn't count all their high-end product

6    for a week.

7    Q.        And why is that important?

8    A.        It's the highest theft items.  I mean you need

9    to -- it's required, as a store manager, you do that

10   once a week and ensure that you're not losing anything

11   out of there.

12   Q.        Now, did you discuss all of these items

13   directly that are listed on Exhibit 5 with Mr. Allen

14   that day in the store?

15            MS. ALIOTO:  That day.  Vague and ambiguous.

16            MS. THOMPSON:  Q.  The day you were in the

17   store on March 9th, 2010.

18   A.        I can't say for certain that I discussed every

19   single point on this sheet with him.  I can say every

20   time I did a visit like this, it was my routine to sit

21   down with a store manager after the visit, print this

22   out, and they would have a copy attached to their

23   clipboard and review everything with them.

24   Q.        That was your standard policy and practice?

25   A.        Yes.  That was my routine.

                                                         182

Allen vs. Radio Shack  David Gonsolin                    10/16/12

```
1   Q.        And do you have any reason to think you
2   deviated from that policy and routine on your store
3   visit on March 9th, 2010?
4   A.        Not at all.  If anything, I spent more time
5   with him going over this because this is another
6   follow-up visit for repeat issues.  So, again, I don't
7   remember sitting down and talking about every single
8   point on this, so I can't say yes I talked about, you
9   know, this deactivation detail.  It's the third to the
10  last on there.  I don't know if I talked about that,
11  but --
12  Q.        By the way, preparing Exhibit 5, both the
13  first and second pages.  Was it your goal to be as
14  truthful and accurate as you could be?
15  A.        On everything, yes.
16  Q.        And do you believe that the items that are
17  listed -- that are included on Exhibit 5, are truthful
18  and accurate in all respects --
19  A.        Absolutely.
20  Q.        -- to the best of your recollection?
21  A.        Sorry.
22            Absolutely.
23  Q.        So moving down to, like, the bottom quarter of
24  the Non-Negotiatable column on the second page of
25  Exhibit 5.  The question is,
```

                                                        183

De Souza & Associates    650-341-2671        desouzacr@att.net

**Dec. of Thompson - Exhibit 8**

1              "Are all security devices being used properly

2              including lockinpeg hooks, fill toppers and

3              laptop cables," and you answered no.

4          Why were you answering "no" there?

5   A.      Again, if I refer down to my notes.  Sales

6   floor -- that's not it.

7              "There were five laptops that did not have a

8              proper security device on them."

9          And the next question for LCD's.  There were

10  all six LCD TV's did not have the security cables on

11  there.

12  Q.      Is that important?

13  A.      Extremely important.

14  Q.      Why is that?

15  A.      Because we have grab and runs on laptop -- a

16  grab and run is where somebody comes in, grabs an item,

17  runs out.  That happens all the time, if I'm not

18  mistaken.  If we had all my documentation ever, there

19  was a situation where that happened in this store, and

20  he still failed to secure laptops.

21  Q.      Okay.

22  A.      Plus, I'm sorry, there is a lot of burglaries

23  as well where people break in.  If you cable up the

24  TV's, it makes it extremely difficult for them to get

25  the TV's off.

                                                      184

Allen vs. Radio Shack  David Gonsolin                    10/16/12

1   Q.        Now, again, about maybe the seventh entry up
2   from the end.
3   A.        Uh-huh.
4   Q.        The question is,
5             "Have all ICST's been received in the RSS
6             within seven days."
7             First of all, what is an ICST?
8   A.        Oh.  Inner-Company Stock Transfer, I believe.
9   Q.        And what does RSS mean?
10  A.        I couldn't tell you what the acronym is.  It's
11  essentially the computer system where you receive your
12  shipments.
13  Q.        Okay.  Why is that important to do?
14  A.        You know what, I couldn't even really
15  elaborate on it.  There is a time frame for you to
16  receive your shipments.  I think it's more of an
17  operational/organizational priority there.  Because if
18  you have shipments piling up that are not received
19  within the seven days, it could take you 14, 21 days,
20  however long.  Something could be taken out of that
21  shipment.  You might not notice.  Your stockroom will
22  get cluttered.  So I mean that's, I guess, some
23  importance of it.
24  Q.        Okay.  Let's see.  The third up from the
25  bottom, Review Deactivation Detail.

                                                        185

Dec. of Thompson - Exhibit 8

1             "Are there indications of internal

2             involvement, common associates names or other

3             unusual patterns that can indicate fraud..." --

4             So the answer to that is no.

5   A.        Yes.  That was okay.

6   Q.        That was no.  Okay.

7             The one right above that.

8             "Review the shipments in the RSS system.  Were

9             all shipments received into the RSS system

10            within 24 hours of receipt?  Is there evidence

11            that the SM is completing the must-count list?"

12            And you answered no to that.

13            What does -- what's that about?

14  A.        You know, this is such a -- I don't want to

15  say it's unimportant, these questions right here, as far

16  as the transfers go.  But it was -- it's tougher for me

17  to speak to them.  I don't really recall.  I know it was

18  in regards to the transfers, checking them in, detailing

19  certain ones.  Meaning if there is a box that's -- you

20  know -- your cell phones.  You have to detail and

21  receive that.  Count each and every one and account for

22  it on the packing list.  If there is a box of speaker

23  wire and little teeny gadgets and pieces and parts of

24  stuff, you don't need to detail-receive that.  Meaning

25  you just accept the shipment and assume what's there is

                                                        186

Allen vs. Radio Shack  David Gonsolin                    10/16/12

1    supposed to be there.  And that's company policy on that
2    stuff.
3    Q.       Okay.  So looking at this entire list of
4    Non-Negotiables.  What, from your perspective as the
5    regional loss prevention manager, were the most
6    important items?
7    A.       Going down the list --
8    Q.       And please review it carefully and just
9    highlight for me which ones you think are the most
10   important.
11   A.       The cash shortages.  Cage count.  Cage count
12   would probably be number one for me.  And then the
13   merchandise protection as far as the laptops, LCD TV's.
14   And then last I'd say is knowing how to pull your P & L.
15   And I just -- that's not -- like I said, that's not
16   really going to cause a loss if you don't know how to
17   pull your P & L, but it's going to make it so you can't
18   detect certain losses.  And as a store manager for 13
19   years, that is one of the most important reports.  You
20   should know how to pull your P & L.
21   Q.       Why would it be important for a store manager
22   to know whether he was having -- he or she were having
23   cash shortages?
24   A.       I mean even on their reviews -- they're not
25   loss prevention, but -- I'm not 100 percent, so I can't

                                                        187

**Dec. of Thompson - Exhibit 8**

1   say for certain.  But I believe it is on a store

2   manager, a district manager's review as far as shrink

3   goes.

4   Q.       Okay.  So how would you rate -- what was -- if

5   you had to give a rating to the store visit on

6   March 9th, 2010 from a loss prevention perspective, how

7   would you rate that visit?

8   A.       D, D- maybe.  Not a total F, but -- yeah, D or

9   D-.

10           And I think you have to look at that specific

11  visit for that store.  This is not a brand new store

12  manager who is new with the company and didn't go

13  through training and didn't know the policies and

14  procedures.

15           Again, if I was able to refer back to all my

16  documentation, this is stuff that has happened in the

17  past, this is stuff that has happened with a manager who

18  has been here long enough and knows the policies and

19  procedures, and for whatever reason, I don't know,

20  chooses not to follow them.

21  Q.       Has any employee ever accused you of being

22  discriminating against them based on race or age?

23  A.       No.

24  Q.       So look, if you will, at Exhibit 3, which is

25  the Corrective Action Record.

                                                       188

1    A.      Okay.

2    Q.      Were you aware that -- did Ms. Ocampo ever

3    discuss with you whether she was going to issue

4    Mr. Allen a Corrective Action Record based upon the

5    March store visit that you made?

6    A.      I don't recall.

7    Q.      I forgot.  Maybe Ms. Alioto asked you this.

8            Was Ms. Ocampo with you on the day of the

9    store visit on March 9th, 2010?

10   A.      I don't recall.  I mean if she was, I would

11   hope that I would have noted it in the visit.  But it's

12   been entirely possible that she was and I didn't.  I

13   really don't know.

14   Q.      Okay.  You just don't recall one way or the

15   other.

16   A.      Yeah, yeah.  I do not.

17   Q.      Okay.  Did Ms. Ocampo have anything at all to

18   do with your preparing the two documents that are

19   included in Exhibit 5?

20   A.      Exhibit 5?

21   Q.      Yeah.  Page 1 and Page 2.

22   A.      Do you mean did she -- like, having a say in

23   what I was putting there?

24   Q.      Right.  Let's start with that.

25   A.      No.  This is all my findings, my words.

                                                        189

Allen vs. Radio Shack  David Gonsolin               10/16/12

1   Q.        Okay.  Did she direct you to prepare either
2   Page 1 or Page 2 of Exhibit 5?
3   A.        No, she didn't direct me to prepare anything.
4   When I go in, I do a store visit, we fill these out.  I
5   mean she might have requested a copy of it, but she
6   knows she's getting a copy anyways because I send it to
7   her, so I don't think that's the case.  So, no -- to
8   answer your question, no.
9   Q.        I take it she is not your superior in any
10  way --
11  A.        No.
12  Q.        -- was she?
13            She wasn't in a position to give you orders
14  and instructions?
15  A.        No.
16            MS. ALIOTO:  Well --
17            MS. THOMPSON:  Q.  Would you say --
18            MS. ALIOTO:  -- objection.  Misstates prior
19  testimony.
20            THE WITNESS:  No, you asked me that and I said
21  no.  She is not my superior.
22            MS. ALIOTO:  Versus a DM request.  She
23  requested that you --
24            THE WITNESS:  Oh, yeah, she could request.
25  She could request anything.  A store manager can make a

                                                        190

De Souza & Associates  650-341-2671      desouzacr@att.net

**Dec. of Thompson - Exhibit 8**

Allen vs. Radio Shack  David Gonsolin                    10/16/12

1   A.        Yes.

2   Q.        And the region included a number of different

3   districts, right?

4   A.        Yes.

5   Q.        And so you had a number of different district

6   managers that you were dealing with other than

7   Ms. Ocampo; is that right?

8   A.        Yes.

9   Q.        Okay.   And how would you compare Ms. Ocampo to

10  the other district managers that you worked with in your

11  region at this time in terms of their competency in

12  their job?

13  A.        She was one of the best.

14  Q.        We talked a little bit about -- or you

15  referred to Basem Aybeth.   And he was a temporary

16  regional sales director?

17  A.        Uh-huh.

18  Q.        Is that "yes?"

19  A.        Yes.   I'm sorry.

20  Q.        Did you have any -- how much interaction did

21  you have with him?

22  A.        We did one round of store visits that I

23  recall, and this was the one where I had James Peterson

24  and -- David Charles?   Was that his name?   Yeah.

25            And that was the one where I had some major

                                                          192

De Souza & Associates   650-341-2671        desouzacr@att.net

**Dec. of Thompson - Exhibit 8**

Allen vs. Radio Shack   David Gonsolin                10/16/12

1   problems.  They were making fun of me for doing the

2   knocking on the ceiling.  Basem was present for that

3   visit.  So I remember we did some store visits with him

4   one week.  I might have met him a couple other times,

5   but that was, like, the one interaction where I was

6   present with him for a couple days.

7   Q.      So in terms of your interactions with Basem,

8   did you have any difficulty -- did you personally have

9   any problems in dealing with him?

10  A.      Not that I recall.

11  Q.      Did you ever observe Basem Aybeth treating any

12  employees in a manner that you thought was not

13  appropriate?

14  A.      Not that I recall.  I really did have limited

15  interaction with him just that one, you know, little

16  tour we did around the region.

17  Q.      Did you ever hear Basem Aybeth say anything

18  that you thought was derogatory about any employee based

19  on their race or their age?

20  A.      Not that I recall, no.

21  Q.      And, again, as you indicated earlier, that's

22  something you would remember.

23  A.      I would think it would stand out in my head,

24  especially -- yeah, if I'm there, I want to get away

25  from that.

                                                        193

**Dec. of Thompson - Exhibit 8**

1   Q.      Could you look at Exhibit 6, please.

2   A.      Yeah.  Got it.

3   Q.      This is the narrative that you wrote on the

4   second page of Exhibit 6.  Is that truthful and accurate

5   to the best of your recollection?

6   A.      One hundred percent.

7   Q.      What was your purpose in writing up this

8   narrative on Exhibit 6?

9   A.      To give a detailed account of what happened.

10  With his reaction, I'd like to say I, if not we --

11  Donna -- could anticipate it wouldn't be a good

12  reaction.  So personally, something like this happening

13  with a lawsuit going against Radio Shack from Frank

14  Allen doesn't surprise me.  So I would like to make sure

15  that I have all the facts out there and I have my

16  statement as far as what happened goes.  So --

17  Q.      Did --

18  A.      -- I can't say this took place on every single

19  store manager termination.  Since this was a rather

20  difficult one, and very detailed, and he had been there

21  13 years, we want to make sure we have everything

22  perfect.

23  Q.      Well, let me back up a little bit and ask you.

24          What was your understanding of why you -- why

25  you and Ms. Ocampo were going to the store, to Frank

                                                    194

Allen vs. Radio Shack  David Gonsolin                    10/16/12

1   Allen's store, on April 27th, 2010?

2   A.        I want to say I just -- I can't say for

3   certain that we were going there knowing that he was

4   going to be terminated.  But I know I earlier said -- I

5   said that I can't say that for certain.  I believe we

6   went there knowing we were going to deliver the

7   termination.  I want to say that Donna requested I was

8   there because Frank did not care for her.  I can't say

9   that for sure.

10  Q.        What makes you say that Frank did not care for

11  Donna Ocampo?

12  A.        I believe she told me that.  You know what, I

13  guess I shouldn't even say that because I can't really

14  support it with anything.  You know, any statements that

15  I remember specifically.

16  Q.        Well, I'd like you to read, again, your

17  narrative, if you don't mind, so I can ask you some

18  questions about it.

19  A.        Do you want me to read it out loud?

20  Q.        No.  Just to yourself.  And let me know when

21  you feel like you've done it.

22            MS. ALIOTO:  Can I ask the court reporter a

23  question?  Do you know what page you're on?

24            THE REPORTER:  Yeah.  About 187.

25            (Pause for review.)

                                                        195

De Souza & Associates   650-341-2671        desouzacr@att.net

**Dec. of Thompson - Exhibit 8**

Allen vs. Radio Shack  David Gonsolin                10/16/12

1          THE WITNESS:  I think I'm ready if you want to

2     ask some questions.

3          MS. THOMPSON:  Q.  Okay.  And you wrote

4     this narrative shortly after the events that it's

5     describing; is that a fair statement?

6     A.        I believe I wrote it the same day.

7     Q.        Okay.  So the events were still pretty fresh

8     in your mind?

9     A.        Yes.  And I did write it the same day.  I'm

10    sorry.

11    Q.        So is there any doubt in your mind that the

12    reason that the reason you and Ms. Ocampo were going to

13    the store that day was to advise Mr. Allen that he was

14    being terminated?  Is there any doubt in your mind about

15    that?

16    A.        That that's why we were going there?

17    Q.        Right.

18    A.        You know, the only thing is -- I said it

19    earlier -- I don't recall -- I can't say for certain

20    that we had a discussion that we were going there to

21    terminate him.

22          I know this probably isn't valid.  I'd say I'm

23    99 percent sure that that's why we were going there, and

24    I want to say 99 percent sure that she requested I was

25    there.  But --

                                                      196

**Dec. of Thompson - Exhibit 8**

Allen vs. Radio Shack  David Gonsolin                10/16/12

1   Q.       Given your role in loss prevention, did you

2   have any role in the decision to terminate Mr. Allen's

3   employment?

4   A.       Yes.  My role was, you know, compile

5   everything that I had, present it to them.  You know.  I

6   stated what I thought here and I stated the same thing

7   to them.

8   Q.       So did Ms. Ocampo ask for your input in terms

9   of whether you thought Mr. Allen should be terminated?

10  A.       I don't recall if she asked.

11  Q.       Did you volunteer your opinion?

12  A.       I stated what I thought.

13  Q.       And what was your -- what did you tell

14  Ms. Ocampo?

15  A.       You know I can't say word-for-word.

16  Q.       No, I understand that.  But to the best of

17  your recollection, understanding it's not word-for-word,

18  what was --

19  A.       My thought is --

20  Q.       -- the general effect of what you were saying?

21  A.       -- he should not be a store manager with us.

22  Too many repeat issues.  The guy is -- yeah, he deserved

23  to be terminated.  I mean, just based on his

24  performance.  His sales might have been phenomenal, but

25  it doesn't, you know, excuse neglecting all these

                                                        197

De Souza & Associates   650-341-2671      desouzacr@att.net

**Dec. of Thompson - Exhibit 8**

Allen vs. Radio Shack  David Gonsolin                    10/16/12

1    different things, repeatedly.
2    Q.        And you shared that opinion with Ms. Ocampo,
3    you believe.
4    A.        I'm sure it was something very similar to what
5    I just said.
6    Q.        Were you ever asked by Shaan Smith your
7    opinion about whether Mr. Allen should be terminated?
8    A.        I don't recall.
9    Q.        So looking at your narrative.  You make the
10   statement -- first of all, let me ask you something.
11            Do you have any actual memory of any of these
12   events, even if it's vague, about what actually happened
13   that day on April 27th, 2010?
14   A.        I remember him saying, "thank you for freeing
15   a slave."  Because that really stuck out in my mind.
16   Q.        Okay.  Do you remember anything else
17   specifically?
18   A.        Specifically, no.  Like I said, I can say I
19   remember that he was angry.  I remember that it was
20   uncomfortable.
21   Q.        When you say he was angry, what do you mean?
22   What was he doing that led you to believe he was angry?
23   A.        I think when he started using foul language in
24   a professional environment, that shows that you're
25   angry.

                                                        198

De Souza & Associates    650-341-2671        desouzacr@att.net

**Dec. of Thompson - Exhibit 8**

Allen vs. Radio Shack  David Gonsolin                    10/16/12

1   Q.        So --
2   A.        You slam your keys down.  I think that kind of
3   displays, you know, a little anger.
4   Q.        When you say he was using foul language, was
5   it the F word?  Was it --
6   A.        I couldn't tell you exactly what it was.
7   Q.        Was the language offensive to you?
8   A.        Honestly I have thick skin, so it didn't
9   offend me.  But it was absolutely inappropriate.  It was
10  unprofessional.
11            If he was getting a write-up instead of a
12  termination for that language alone, I think everybody
13  would say this guy needs to be terminated.
14  Q.        And is the -- when he asked what the reason
15  was for his termination, the reason given was that he
16  was failing to protect company assets?
17            MS. ALIOTO:  Objection.  Misstates his
18  testimony.
19            THE WITNESS:  Donna explained to him that it
20  was due to his failure to protect company assets.
21            MS. THOMPSON:  Q.  So when you were
22  preparing the narrative set forth in Exhibit 6, were
23  you doing your best to be as accurate as possible
24  and reflecting what was said and done, right?
25  A.        Absolutely.

                                                         199

Dec. of Thompson - Exhibit 8

Allen vs. Radio Shack  David Gonsolin                    10/16/12

1    Q.        Okay.  And to the best of your knowledge and
2    belief, what Donna said that -- Donna, quote, "explained
3    that it was due to his failure to protect company
4    assets," end quote.  Is that right?
5    A.        That's correct.
6    Q.        The next statement in the narrative says,
7    quote,
8              "Frank argued that he is not responsible for
9              what his associates do when he is not here, as
10             he had left the store before the money was left
11             unsecured in the desk drawer," end quote.
12             Did you think that was a valid explanation or
13   excuse?
14   A.        I think we would need to have a conversation
15   about that to figure out if it is.  If he had told them
16   you can do this, then absolutely he's responsible for
17   it.  If he told them you are not allowed to do this and
18   then they do it, he's responsible for holding them
19   accountable for it.  He's responsible for communicating
20   it up to us.  But I wouldn't say he is accountable for
21   them doing it if he told them specifically "do not do
22   this."  But we didn't get into that detail, so I don't
23   know.
24   Q.        Okay.
25   A.        So it could be a valid point.

                                                        200

**Dec. of Thompson - Exhibit 8**

Allen vs. Radio Shack  David Gonsolin                    10/16/12

1    Q.        Okay.  But if he told his associates that it

2    was acceptable for them to put cash in the manager's

3    desk drawer in the back, he would be -- in your view, he

4    should be held responsible for it?

5    A.        Absolutely.  If you direct your associates to

6    break company policy --

7              MS. ALIOTO:  Objection.  Misstates the facts

8    in evidence.

9              MS. THOMPSON:  You can finish your answer.

10             THE WITNESS:  Okay.  I just feel as a manager,

11   if you direct your associates to break a policy, I think

12   you're responsible for that.  As well as them.

13             MS. THOMPSON:  Q.  Okay.  Then you say,

14   quote,

15             "Frank then called Donna shady, at which time

16             she told him to leave the store," end quote.

17             You have the word "shady" in quotes.  Is that

18   the exact word he used?

19   A.        Yes.

20   Q.        And did he tell you what he meant by that?

21   A.        No.  I mean shady normally means --

22             MS. ALIOTO:  No, no.  Objection.  Calls for

23   speculation.

24             THE WITNESS:  Okay.  Yeah.  I mean people can

25   interpret that word as they want.

                                                          201

Dec. of Thompson - Exhibit 8

Allen vs. Radio Shack  David Gonsolin                    10/16/12

1          MS. THOMPSON:   Q.  Did you have any
2    interpretation of what he meant when he called
3    Donna, quote, "shady?"
4    A.        From my use of the word shady and from my
5    hearing it throughout my life, it means you're kind of
6    dishonest, a little I guess weasely, and, you know, you
7    can't be trusted.
8    Q.        Did you think that was appropriate for him to
9    be calling Donna shady?
10   A.        No.
11   Q.        Did you think that was a fair characterization
12   of Donna?
13   A.        No.
14   Q.        At the end you say,
15             "After giving him the letter of separation,
16             he said, quote, 'Thank you for freeing a
17             slave,' end quote, and began to walk out.
18             After that comment, I told Frank that was not
19             appropriate, and he walked out of the store
20             yelling."
21             Did you tell Mr. Allen that his comment about
22   freeing a slave was not appropriate?
23   A.        Yes.
24   Q.        And then you said he walked out of the store
25   yelling.  Was he literally yelling when he walked out?

                                                        202

De Souza & Associates    650-341-2671       desouzacr@att.net

**Dec. of Thompson - Exhibit 8**

Allen vs. Radio Shack  David Gonsolin                10/16/12

1    A.        Was he screaming at the top of his lungs?  No.

2    Was he talking real loud?  Yes.

3    Q.        So his voice was raised?

4    A.        His back was to us and he was walking to the

5    doors and we could still hear his voice towards the back

6    of the store where we were at.  So, do I remember what

7    he was saying on the way out?  I have no idea, but --

8    Q.        Okay.

9    A.        I talk loud.  He was talking way louder than I

10   was, or that I currently am.

11   Q.        But you don't know what he was saying.

12   A.        I don't recall, no.

13   Q.        Okay.

14             THE WITNESS:  I'm sorry, guys.  Can I take

15   just two more minutes to run to the restroom real quick?

16             MS. ALIOTO:  Sure.

17             MS. THOMPSON:  Yeah.

18             (Recess:  2:11 p.m. to 2:14 p.m.)

19             MS. THOMPSON:  Q.  Was there anything

20   about the way that Donna behaved during the

21   termination discussion on April 27th, 2010 that you

22   thought was in any way inappropriate or

23   unprofessional?

24   A.        No.  I thought she did a great job.

25   Q.        Based upon what you know, is there

                                                            203

De Souza & Associates    650-341-2671        desouzacr@att.net

**Dec. of Thompson - Exhibit 8**

Allen vs. Radio Shack  David Gonsolin                    10/16/12

1    anything -- let me withdraw that.

2              Maybe you asked this -- maybe Ms. Alioto asked

3    you this and you answered and I apologize --

4              MS. ALIOTO:  Okay.  Asked and answered.

5              MS. THOMPSON:  I thought you didn't object.

6              MS. THOMPSON:  Q.  As you sit here now, do

7    you know of any store manager that kept cash in the

8    store manager's desk drawer?

9    A.        Not that I can recall, no.

10   Q.        Was there anything at all about the way that

11   Frank Allen was treated at any time, that you're aware

12   of, that you thought was discriminatory against him

13   based on his age or his race?

14   A.        No.  Not at all.

15             MS. THOMPSON:  I have nothing further.

16             MS. ALIOTO:  Okay.  Just a couple of

17   questions.

18             THE WITNESS:  No problem.

19                  FURTHER EXAMINATION

20             MS. ALIOTO:  Q.  You said there were two

21   exemptions to this cash rule, and one is a drop bank

22   and the other is the cage?

23   A.        Uh-huh.

24             MS. THOMPSON:  No.  Drop safe I think he said.

25             THE WITNESS:  Yes, drop safe.  I'm sorry.

                                                        204

**Dec. of Thompson - Exhibit 8**

Allen vs. Radio Shack  David Gonsolin                    10/16/12

1              MS. ALIOTO:  I like drop bank.

2              MS. THOMPSON:  Okay.

3              MS. ALIOTO:  No, no.  Drop safe, cage.

4              THE WITNESS:  (Witness nodded head.)

5              MS. ALIOTO:  Two exceptions to the cash

6      drawer.

7              MS. THOMPSON:  Right.

8              MS. ALIOTO:  Q.  And what do you mean by

9      cage?  How do you put the money in the cage?

10     A.        It's just a big security cage.  They had --

11     every store had like a different type of cage.  There

12     are several different styles of the cage.

13             But essentially -- like I believe Frank's

14     store, it was a big chain-link fenced-in cage with

15     shelves in there.  And you put your high-end product in

16     there.  Your cell phones, your gaming consoles, and

17     stuff like that in there.

18             So, give you an example.  If there was a

19     string of burglaries in Livermore -- because we had four

20     stores in Livermore and they were constantly getting

21     burglarized.  We would get authorization to take the

22     cash out of the drawers at night and lock it in the

23     security cage.  Because it's harder to get in the

24     security cage.

25     Q.        Who would you get authorization from?

                                                           205

De Souza & Associates    650-341-2671        desouzacr@att.net

**Dec. of Thompson - Exhibit 8**

Allen vs. Radio Shack   David Gonsolin          10/16/12

1  A.         I would go to James Peterson.  And then I
2  don't know if he would go higher up the food chain.  I'm
3  assuming he would take another partner.  He wouldn't
4  just make the decision on his own.
5  Q.         And in the stores -- so let me understand
6  this.  You put it in an envelope and you just put it in
7  with the inventory that's in the security cage.
8  A.         No.  You keep it in the register till itself.
9  You know when the drawer pops out, there's a little back
10 part that you just lift up --
11 Q.         So you take the whole tray out the way it is
12 and put it in the security cage.
13 A.         I don't know if that's how they were doing it,
14 but honestly I don't know.  I believe that's how they
15 did it.
16 Q.         Okay.  And who in the stores had -- did the
17 staff have the key to the security cage?
18 A.         Policy is the store manager is supposed to
19 have the key and there is authorized keyholders for when
20 the store manager is not there.
21 Q.         So the staff can have it if they were
22 authorized --
23 A.         Yes.
24 Q.         -- to have it.
25            And do you know what the amount was for this

                                                      206

De Souza & Associates    650-341-2671      desouzacr@att.net

**Dec. of Thompson - Exhibit 8**

Allen vs. Radio Shack  David Gonsolin                    10/16/12

1  exemption to put it in the security cage?  Was there a
2  cash amount?
3  A.        I don't think it mattered as far as the
4  denomination.  It was just what was the situation to
5  where we had to put it back there.  Like I said, if
6  there is a string of burglaries and they're targeting
7  cash, they're just smashing in and grabbing the cash and
8  running out, then we lock it up in the cage if need be.
9  Q.        And you're talking about at nighttime.
10 A.        Yes.
11 Q.        Okay.  Are you talking about at all during the
12 day?
13 A.        Pardon?
14 Q.        Are you talking at all about during the day?
15 A.        No.
16 Q.        No.
17 A.        No.
18 Q.        So you're saying the whole cash drawer comes
19 out and goes in for the night.
20           The other exception.  The drop safe.  Is that
21 up to the store manager whether he wants to get a drop
22 safe or not?
23 A.        No.  No.  It's just a very few select stores
24 that they tested them in.  So, I mean, if it was up to
25 me, every single store would have one.  It would make

207

De Souza & Associates    650-341-2671         desouzacr@att.net

**Dec. of Thompson - Exhibit 8**

Allen vs. Radio Shack  David Gonsolin                10/16/12

```
 1   Q.       Okay.
 2   A.       Because I remember when I first started -- not
 3   when I first started.  Obviously it was about a year
 4   after I started.  But when I was in the investigations
 5   manager position, I believe, I came and did a visit at
 6   that store.  I did a couple visits in the San Francisco
 7   market just to look at it because I hadn't been out here
 8   and obviously it's a big market.
 9   Q.       Okay.
10   A.       So, there is -- it's totally possible that
11   there are visits in between then -- the February 2009
12   and the March 9th -- actually -- well -- I wish we had
13   all the documentation.
14   Q.       I understand what you're saying, but you don't
15   know of any that you can think of.
16   A.       In that time frame?
17   Q.       Yeah.
18   A.       I don't know if during that time frame.
19   Q.       Okay.
20   A.       I know there were other visits.
21   Q.       Okay.  Let me ask you about -- did anyone ever
22   tell you that Frank Allen had complained and had a
23   management meeting concerning Mr. Pattakos?
24            MS. THOMPSON:  Objection.  Assumes facts not
25   in evidence.
```

                                                                 212

**Dec. of Thompson - Exhibit 8**

Allen vs. Radio Shack  David Gonsolin                10/16/12

1          THE WITNESS:  Not that I recall.

2          MS. ALIOTO:  Q.  Okay.  Did anyone ever

3    tell you that there had been a group of people who

4    had been complaining about the way they were treated

5    by Pattakos that were at a management meeting in

6    December of 2009?

7          MS. THOMPSON:  Objection.  Misstates the

8    record and assumes facts.

9          THE WITNESS:  I remember hearing that a lot of

10   people were complaining about Greg Pattakos.  I can't

11   say I remember that specifically though.

12         MS. ALIOTO:  Q.  But did you ever hear

13   that there actually had been a meeting about these

14   complaints concerning Greg Pattakos and that Frank

15   Allen was at the meeting?

16   A.       I can't say for sure yes or no.  I mean it

17   sounds vaguely familiar, but I can't say, yeah, I

18   remember that.

19   Q.       Okay.  Did Ocampo ever tell you, prior to

20   her -- wait.

21         She requested you go make a store visit in

22   March.  You go make the visit.  At any point in March or

23   April, prior to the termination on the 27th, did Ocampo

24   tell you that he had complained about Pattakos?

25   A.       Not that I recall.

                                                   213

De Souza & Associates    650-341-2671      desouzacr@att.net

**Dec. of Thompson - Exhibit 8**

1   Q.        Okay.  Is it possible that when you went to

2   the April 27th termination -- what I'm calling the

3   termination -- that when you were going there with

4   Ocampo, you didn't know he was going to be terminated?

5             MS. THOMPSON:  Objection.  Calls for

6   speculation.

7             THE WITNESS:  Anything is possible, but like I

8   said earlier, I'm 99 percent sure that when I went there

9   I knew what I was going there for because I believe I

10  went there because Donna requested I would go because it

11  might be an uncomfortable situation.

12            MS. ALIOTO:  Q.  Well, that's what I'm

13  asking you about.  Do you recall any conversation

14  with Ocampo before going there about why you were

15  going there?

16  A.        I believe so.  Just like I said, I don't want

17  to say 100 percent that, yes, I remember exactly what we

18  said, and that we were going there for the termination.

19  I mean -- I know it doesn't hold any water if I say

20  99 percent sure --

21  Q.        No.

22  A.        -- but --

23  Q.        Let me just ask you this.  As you sit here

24  today, are you positive that you were going there with

25  Ocampo to terminate him?

                                                    214

Allen vs. Radio Shack  David Gonsolin          10/16/12

1          MS. THOMPSON:  Objection.  Asked and answered
2     about eight times now.
3              THE WITNESS:  That's true.
4              MS. ALIOTO:  Call it ten.
5              THE WITNESS:  Ten?
6              MS. ALIOTO:  Yeah.
7              THE WITNESS:  Same thing.  I mean I'm
8     99 percent sure I knew exactly why I was going there,
9     which was -- well, I knew I was going there to terminate
10    him and accompanied Donna because she requested me
11    there.  I'm just -- I'm worried that maybe she called me
12    asking me to meet her there.  When I got there, she told
13    me.  I don't know.  I mean I can't say 100 percent.
14             MS. ALIOTO:  Q.  Okay.  All right.  Do you
15    have any documents from Ocampo asking you to go to
16    that meeting?
17    A.         I don't have anything in regards to
18    Radio Shack with the exception of possibly all the
19    documents that I had in regards to my HR complaints.
20    Q.         Right.  Now you testified that you moved jobs
21    because you found a better opportunity.  But wasn't it
22    also because you felt that you were being harassed?
23             MS. THOMPSON:  Objection.
24             THE WITNESS:  It was also better for my
25    health.

215

De Souza & Associates   650-341-2671       desouzacr@att.net

**Dec. of Thompson - Exhibit 8**

1          MS. ALIOTO:  Q.  Better for your health

2     because you felt that at the workplace -- as you

3     stated earlier -- that you felt there was

4     harassment.

5     A.         Yeah, I mean the fact that I was getting

6     harassed and the fact that I felt I was getting

7     retaliated on.  Yeah, it was a big factor in it.  Like I

8     said, I would have gone back but things would have had

9     to change.  I wasn't going back to what I was in.

10    Q.         Right.  Under the same supervision you were

11    under.

12    A.         Huh-uh.  Absolutely not.

13          MS. ALIOTO:  Okay.  I think that is it.

14          All right.  I think that's it.  Thank you so

15    much.

16          MS. THOMPSON:  Okay.  I now have a couple of

17    follow-ups.

18                    FURTHER EXAMINATION

19          MS. THOMPSON:  Q.  So going back to this

20    business -- the exception of the cash -- leaving the

21    cash in the cage.  I just want to be really clear.

22          Your understanding was that to the extent

23    there was such an exception, it applied only at night

24    after the store was closed; is that right?

25    A.         From my understanding.  There may have been

                                                    216

**Dec. of Thompson - Exhibit 8**

Allen vs. Radio Shack  David Gonsolin          10/16/12

1   other exceptions in other regions that I don't know
2   about.  But as far as I remember doing it in our region,
3   which was rare, yeah, it was locked up at night in the
4   cage.
5   Q.        Okay.  Are you ever aware of any situation
6   where money was put in the cage, cash was put in the
7   cage, during the day while the store was open?
8   A.        Not that I recall.
9   Q.        Going back to Exhibit 4, which was the --
10  A.        Uh-huh.  Got it.
11  Q.        What was your purpose in preparing Exhibit 4?
12  A.        Any time we do a visit and there is a
13  violation of company policy, we should be documenting it
14  every time.
15  Q.        Okay.  Looking at the last paragraph on the
16  first page of Exhibit 4 where you state,
17            "In February 2009, a visit was conducted and
18            Allen had just had a laptop stolen from the
19            sales floor where he did not have it secured at
20            all," end quote.
21            Were you referring to your earlier
22  documentation in preparing that part of the Exhibit 4?
23            MS. ALIOTO:  Vague and ambiguous --
24            THE WITNESS:  I don't follow what you said.
25            MS. ALIOTO:  -- I don't know what you said.

                                                      217

De Souza & Associates    650-341-2671      desouzacr@att.net

**Dec. of Thompson - Exhibit 8**

Allen vs. Radio Shack  David Gonsolin                    10/16/12

1            MS. THOMPSON:  Okay.

2            THE WITNESS:  The February visit?  Was I

3    referring to that for what?

4            MS. THOMPSON:  Q.  No.  My question was --

5    and I'm sorry if it was not very artful.  I'm sure

6    it wasn't.

7            When you were preparing Exhibit 4, did you go

8    back to look at your earlier documentation regarding

9    Frank Allen?

10   A.        Most likely, yeah -- yes.  I don't know why I

11   wouldn't have.

12   Q.        Was that your normal practice?

13   A.        Yes.  If it's a repeat issue, I go back and I

14   put in dates and what happened to show that, hey, this

15   happened then, it's happening again now.

16   Q.        And was that your purpose in putting in the

17   reference to what happened in February 2009 --

18   A.        Yes.

19   Q.        -- in Exhibit 4?

20   A.        Yes.

21   Q.        Okay.  So my question was, were you reviewing

22   your earlier documentation when you prepared Exhibit 4?

23   In other words, did you go back and look to see what you

24   had said about Mr. Allen earlier?

25   A.        That's my normal practice.  I don't see why I

                                                        218

De Souza & Associates   650-341-2671        desouzacr@att.net

**Dec. of Thompson - Exhibit 8**

Allen vs. Radio Shack  David Gonsolin          10/16/12

1    wouldn't have here.

2    Q.      Okay.  And do you believe, then, that you were

3    reviewing a document that said that in February 2009,

4    Frank Allen had had a laptop stolen that was not

5    secured?

6    A.      Yes.

7    Q.      You were asked before about a question about

8    whether you had ever heard -- well, let me ask you the

9    question.

10        Did you ever hear Donna Ocampo make any kind

11   of statement, ever, about the image projected by any of

12   the store employees?

13   A.      Not that I recall.

14   Q.      Did she ever even use that word in referring

15   to employees?

16   A.      Not that I recall.

17   Q.      Did she ever say anything to you about Frank

18   Allen's image or use the word image in connection with

19   Frank Allen?

20   A.      Again, not that I can recall.

21   Q.      Would it have surprised you if you heard Donna

22   say something like that, or that somebody would

23   attribute that statement to Donna Ocampo?

24   A.      It depends on how it's said.  I mean if Donna

25   was to say it the way Frank is running this store is not

                                                        219

De Souza & Associates    650-341-2671       desouzacr@att.net

**Dec. of Thompson - Exhibit 8**

Allen vs. Radio Shack  David Gonsolin                    10/16/12

1   the image of how we want a Radio Shack, well, that would
2   make sense in the sense if Frank's store was a mess.
3   That's not the image we want to present.
4           Now if Frank as an individual -- if Frank
5   doesn't fit our image, that would be wrong.  I've never
6   heard anything like that from her in that context.
7   Q.      Have you heard anything like that from anyone
8   at Radio Shack referring to the image presented by an
9   individual and not the store?
10  A.      Not that I recall.
11          MS. THOMPSON:  Okay.  Let's mark the next
12  document as 12.
13                      (Plaintiff's Exhibit 12 - should
14                      be 13 - marked for
15                      identification.)
16          MS. THOMPSON:  Q.  Okay.  For the record,
17  I've marked as Exhibit 12, a one-page document Bates
18  numbered RS Allen 91.  It appears to be a memo from
19  Tom Nabozny to Hani Alghazari, dated April 16th,
20  2007.
21          And if you would just take a minute to read
22  Exhibit 12, Mr. Gonsolin.  Take as much time as you need.
23  A.      Uh-huh.
24          (Pause for review.)
25          Okay.

                                                        220

De Souza & Associates    650-341-2671    desouzacr@att.net

**Dec. of Thompson - Exhibit 8**

Allen vs. Radio Shack  David Gonsolin          10/16/12

1    Q.         Have you seen Exhibit 12 before today?

2    A.         Not that I recall, no.

3    Q.         With regard to the kind of issues that are

4    being outlined here by Mr. Nabozny in this memorandum,

5    had you encountered similar kinds of issues with regard

6    to Frank Allen?

7              MS. ALIOTO:  That calls for speculation.

8    There is no document like that.

9              THE WITNESS:  That's what I was going to say.

10   It's entirely possible.  I would have to refer back to

11   any of my store visit notes that we don't have here, so

12   I don't know.

13             MS. THOMPSON:  Q.  Okay.  Did Donna Ocampo

14   ever say or do anything to you that would suggest

15   that she had a bias against African Americans?

16   A.         No.  Not at all.  I mean --

17   Q.         Do you know anything about her children -- her

18   child?

19   A.         Yeah.  That's what I was going to say.  And I

20   know it's something that people will say, oh, well, my

21   friend is black.

22             MS. ALIOTO:  Come on you guys, really?

23             THE WITNESS:  Isn't her husband?  I don't know

24   if they ever got married, but, yeah, isn't he African

25   American?

                                                        221

De Souza & Associates   650-341-2671      desouzacr@att.net

**Dec. of Thompson - Exhibit 8**

Allen vs. Radio Shack  David Gonsolin                    10/16/12

1           MS. THOMPSON:  Yes.

2           THE WITNESS:  Yeah.

3               No, never would she ever say anything like

4       that to me, or did she ever say anything like that to

5       me.

6               MS. THOMPSON:  Okay.  I have nothing further.

7               MS. ALIOTO:  Okay.  Then I have one last

8       question.

9                       FURTHER EXAMINATION

10              MS. ALIOTO:  Q.  And that is on the

11      document that's Exhibit No. 4, since you did

12      reference the February 2009 and you don't reference

13      any other date -- and you were looking at all of the

14      documents you had on Frank, right?

15      A.      I might have just been looking at ones that

16      pertained to these issues.

17      Q.      Right.  But you didn't have any documents

18      between February '09 and March of 2010.

19      A.      No.  We don't have any here.

20      Q.      No, no.  I mean in this document you don't

21      reference any --

22      A.      I don't reference any, yes.

23      Q.      Right.

24              MS. THOMPSON:  The document speaks for itself.

25              MS. ALIOTO:  Exactly.

                                                        222

**Dec. of Thompson - Exhibit 8**

Allen vs. Radio Shack   David Gonsolin          10/16/12

1           I, DEBRA J. SKAGGS, CSR No. 7857, a Certified
2    Shorthand Reporter, do hereby certify:
3           That DAVID GONSOLIN, the witness in the
4    foregoing deposition was by me duly sworn to tell the
5    truth, the whole truth, and nothing but the truth in the
6    within-entitled cause;
7           That said deposition was reported by me and
8    transcribed as herein set forth;
9           That, if signed, the deposition was read by or
10   to said witness, corrected in every particular desired
11   way, and was thereafter subscribed by said witness;
12          That, if unsigned, the deposition was retained
13   by me at the offices of DE SOUZA & ASSOCIATES, San
14   Mateo, California and was available for reading,
15   correcting and signing by said witness.
16          I further certify that I am not interested in
17   the outcome of said action, nor connected with, nor
18   related to any of the parties in said action or to their
19   respective counsel.
20               IN WITNESS WHEREOF I have hereunto
21          set my hand this _25th_ day of
22          _____, 2012.
23          _____
24          DEBRA J. SKAGGS, CSR No. 7857
25

                                                        225

**Dec. of Thompson - Exhibit 8**

Page 1 of 6

Unit Visit Log

| District: | 0530 |
|---|---|
| Store: | 013920 |
| Date Visited: | 01/15/2010 |
| Time of Visit: | 09:45 AM - 11:45 AM |
| Duration of Visit: | 2 hour(s), 00 minute(s) |
| Manager Name: | Frank Allen |
| Visit Conducted By: | Hani Alzaghari |

## FOLLOW-UP FOR NON-NEGOTIABLE STANDARDS

### STANDARDS REVIEW

**1** | PROJECT STATUS | All Standards met

Comments:

Follow Up:

**2** | ALL PRODUCTS ON DISPLAY AND FUNCTIONAL | Standard(s) not met
(M) All products are merchandised according to planogram.

Comments:

- Some sections meets an update for the planograms, the company will send you labels for wireless and you will gate some wall space, I will mov the store with you so you can have more room to follow planograms exactly.
- Move the handheld TVs from computer section to where the FLO TVs is
- Fill the computer section with more merchandise, laptops must be on and demo ready.
- Floor stacks of kitties must be 3 units high with 5x 7 signs
- Make every section neat, clean and organized...about 100%.

Follow Up:

- Today we move the tables to the right location, make sure you move the pods to match the planograms.
- We replaced the floor as follows: IPTD, BT, Wireless Accessories, Music, Sirius, GPS.
- You have two extra panels for batteries so now you can do the 8 panels section for power.
- Make sure you do the planograms for all sections we printed by Jan 29, the store must be Perfect.

**3** | EVERYTHING PRICED PROPERLY | All Standards met

Comments:

Follow Up:

**4** | NEAT, CLEAN AND SPACED | All Standards met

Comments:

Follow Up:

http://bomc.rsonline.tandy.com/univisitlog/displaylog.aspx?pagemode=print&FormId=23&UserNbr=01&StrId=3830&VisitDate=01/...  12/14/2010

RS/ALLEN000179

EXHIBIT 2
Consisting of ___ Deft. ___ For Identification
Witness ___ Pages
Date ___

**Dec. of Thompson - Exhibit 8**

Unit Visit Log

5 | STORE EXTERIOR | All Standards met

Comments:

Follow Up:

6 | CUSTOMER ENVIRONMENT | All Standards met

Comments:

Follow Up:

7 | WORKING ENVIRONMENT | Standard(s) not met
[N] Store restroom and appliances are clean, uncluttered and fully functional.
 - Refrigerator, water fountain, microwave, coffee maker, etc.
[N] Backroom inventory area is neat, clean and well organized per Backroom and Counter Standards.
[N] Under and behind counter is neat, clean and well organized per Backroom and Counter Standards.

Comments:
- Restroom SiNK needs to be cleaned
- Floor must be cleaned, remove the PDP signs to the basement
- Organize the boxes in the backroom, make sure they are faced and fronted on every shelf.

Follow Up:
- Its done.

8 | STORE SAFETY | All Standards met

Comments:

Follow Up:

9 | ASSET PROTECTION | All Standards met

Comments:

Follow Up:

10 | SCHEDULING | All Standards met

Comments:

Follow Up:

11 | RECRUITING | All Standards met

Comments:

Follow Up:

http://home.rsonline.tandy.com/univisitlog/displaylog.aspx?pagemode=print&Formid=23&UserNbr=01&Strid=3830&VisitDate=01/...   12/14/2010

RS/ALLEN000180

Dec. of Thompson - Exhibit 8

Page 3 of 6

Unit Visit Log

| 12 | TRAINING | All Standards met |

Comments:

Follow Up:

| 13 | PRODUCT KNOWLEDGE | Standard(s) not met |

(N) All team members can confidently demonstrate features of Key product categories (Wireless, LCD TV, Digital Cameras, GPS, MP3).
(N) Team members can articulate current competitive wireless offers in the local market and demonstrate our superior value.

Comments:

- One of the most important tasks this week is to get everyone certified with ATG. Have them visit the customer promotions link on a daily basis so you can get them trained with what is on sale.
- All done except Victoria, she needs to be done today.

Follow Up:

| 14 | DRESS CODE | All Standards met |

Comments:

Follow Up:

| 15 | GOAL SETTING | All Standards met |

Comments:

Follow Up:

| 16 | PERFORMANCE REVIEW | Standard(s) not met |

(N) Performance results are reviewed with every team member weekly, progress towards goals and coaching opportunities are discussed and documented.
(N) Monthly performance reviews are documented with all team members to recap all weekly coaching sessions and set expectations for the upcoming month.

Comments:

Performance reviews need to be focused on the different needs for each employee. They need to have different plans and action items so they will follow exactly what you asked them to do. Here are some ideas for each KPI:

-Bundle up the eligible r-4-11 batteries and place them on the counter for adding on with sales
-Compare the value for button cell batteries that are available for 3 packs (use the phrases such as "this one pack of cr2032 is $.99 or you can get the 3 packs for 11.99)
-Utilize FSD-IP for 15% lifetime off on batteries
-Ask about mobile structures to the customers about their other devices that might need batteries such as wife's garage door opener or car remote control and so on.
-Explain the batteries as necessity not as an option by saying; "you are gonna need these batteries to make this work"
-Offer battery installation to guarantee new pack sales and then offer 4-4-11 or eligible multi packs to increase power.
-Print the coherence chart with new sku's (Generalite match up new sku with old ones. It will prevent the employees from thinking that we don't have 24 wanted battery.

http://home.rsonline.landy.com/unitvisitlog/displaylog.aspx?pagemode=print&Formid=23&UserNbr=01&Strid=3330&VisitDate=01/...   12/14/2010

RS/ALLEN000181

**Dec. of Thompson - Exhibit 8**

Page 4 of 6

Unit Visit Log

**RSSP Action Plan:**

1. Do not make the decision for the customer Never fill escape without offering RSSP and trying to overcome at least one objection, and focus on the associates who do not offer.
2. Have associates write down why the customer declined the RSSP and then initial it. This will allow for more pointed skills practice at overcoming specific customer objections.
3. Give associates measurable daily targets, i.e. 1 per day for part time, 3 per day for full time.
4. Bring up the protection plan during the product presentation so the customer is already thinking about the expense before getting to the counter.
5. Know basic price points for RSSP and whether it is a Repair or a Replacement Plan.
6. Place the brochure in the customer's hand to create the feeling of purchasing a tangible product, and use it to show the cost benefit of the RSSP.
7. Do role-play and skills practice on commonly sold products. For example: For cordless phones or anything with a rechargeable battery, mention that it covers battery replacement. On converter boxes it is an in-store replacement and it covers surge protection. On wireless post-paid phones, it covers up to 4 accessories on the same label and two batteries, and on pre-paid phones it is an in-store replacement. On wireless car chargers that have a fuse, it will replace the charger or the fuse for less than the cost of the replacement fuse.

**Wireless Attach:**

1. AllchargersAllaccessories MUST use the new "Wireless Choice" form. Have associates just fill some blank forms out on their own, and then start role playing and have them fill out the form until they are comfortable using it.

2. Role play with 5 "must have" items; (screen protectors, memory cards, car chargers, case, and headsets). If you show the customer 5 items, they will usually take at least 1 or 2.

3. Keep some iGo and screen protectors in the cage as a constant reminder when associates go to get the phone.

4. Sell airtime with the no contract phones; don't let the customer under-estimate their usage.

5. Print the latest wireless necessary reference chart, and remember to update it regularly. (Products>Product Reference Sheets>Wireless Handsets>Wireless Accessory Reference Sheet) or (http://home.rsonline.tandy.com/knodocuments/ProductReferenceSheets/Wireless/AccessoriesWireless%20Accessory%20Reference%20Sheet.pdf)

6. Remember to ask wireless customers if they need any accessories for other phones they or family members might own.

7. Remember the place phones with gift card...perfect for attaching accessories! (Products>Customer Promotions>Wireless Information Site>Handset Offers)

**Key Category Attach:**

1) Mention airtime in sales process
2) Bring them to the counter
3) Leading questions (example: Do you store your gas in the glove compartment or under your car seat? Then you need a screen protector or carrying case.)
4) Multiple usage
5) More coaching to associates
6) Role play for two weeks to develop habit.

Follow Up:

| 17 | EMPLOYEE AWARENESS | All Standards met |
|----|--------------------|-------------------|

Comments:

Follow Up:

**Dec. of Thompson - Exhibit 8**

Unit Visit Log

| 18 | CUSTOMER SERVICE | All Standards met |

Comments:

Follow Up:

| 19 | HANDLING RETURNS | All Standards met |

Comments:

Follow Up:

## PROPERTY ACTION PLAN

Describe Area of Opportunity:

Frank,

A huge improvement in store image since my last visit.

Now it is up to you and your team to keep working on it DAILY by utilizing the Non-Negotiable list on 1/1 the company will launch the Planset @ the Shock, this will be our yearly after the holidays cleaning up. Many planograms will be updated and you need to make sure the store is 100% ready by 1/28

Follow Up:

Timeline / Milestone(s):

I will be back next week to mop the store with you and work on the new wireless cables that will be shipped.

Follow Up:

Action Plan to achieve milestone:

Follow Up:

## PEOPLE ACTION PLAN

Describe Area of Opportunity:

Follow Up:

Timeline / Milestone(s):

Follow Up:

Action Plan to achieve milestone:

Follow Up:

## PERFORMANCE REVIEW & ACTION PLAN

| | $ / # | % | | $ / # | % | | $ / # | % |
|---|---|---|---|---|---|---|---|---|
| YTD NPBB to Plan | | | Target Bonus | | | | | |
| | | | YTD Ticket (+/-) | | | $/Ticket (+/-) | | |
| YTD Net Sales to Plan | | | | | | | | |
| YTD MGP to Plan | | | YTD SGP to Plan | | | YTD Inv Cont to Plan | | |
| YTD Cont Exp to Plan | | | YTD Payroll to Plan | | | YTD Mgr Exp to Plan | | |
| LM Sales to Plan | | | | | | LM Post Pay | | |
| | | | LM SGP to Plan | | | | | |
| MTD Sales to Plan | | | | | | LM Prv Pay (+/-) | | |
| | | | MTD SGP to Plan | | | | | |

RS/ALLEN000183

**Dec. of Thompson - Exhibit 8**

Unit Visit Log

Page 6 of 6

Describe Area of Opportunity:

Frank,

Great job on your wireless performances in December, you sold 20 phones with 54% increase. You have to improve in wireless attach to at least 75% this month. You also need your team to work on getting the accessory bag to the counter with every sale, last month your attach was 50%.

RSSP is another KPI that I coach you to get your team to sell, 0.89% for December is an improvement, however you are not at 15%. This month you need to hit 15% every week.

Emails less than 1%...Why?, I expect your team to ask for customer emails every day. This is a simple task and you need to get behind it.

Follow Up:
- This week your performance as follows;
- You lead the district in sales (YOY)...great job!
- Your data pts week is poor, I need every employee to sell one phone per week at minimum.
- Today we have an RSSP. (4-4-11) Essa day, I want to see everyone on the Survey Monkey link today.
- RSSP number for this week is below 15%, you need to be at 15%. The only way is to hit 25% today and 25% on Saturday.
- Conduct a list one on one with each employee to review the performance, I need one phone, 15% RSSP, 10% Emails and 2 (4-4-11) daily.

Timeline / Milestone(s):

Follow Up:

Action Plan to achieve milestone:

Follow Up:

## CLOSING COMMENTS

Expectations Summary:

Follow Up:

Schedule next visit:

Follow Up:

Closing

Follow Up:

_____
Visit Conducted By

_____
Unit Manager

RS/ALLEN000184

**Dec. of Thompson - Exhibit 8**

## Corrective Action Record



**RadioShack.**
CORPORATION

| Employee Name: | Frank Allen | | | |
|---|---|---|---|---|
| Job Title: | Store Manager | | District | 538 |
| Supervisor: | Donni Ocampo | | Date: | 3/23/2010 |
| | | | Area: | West |

| | *Identify behavior, performance, special issues, or events requiring corrective action:* |
|---|---|
| **Issue to Correct** | Failure to protect company assets from internal and external theft.<br><br>• 5 laptops on display, not secured (only screamers)<br>• Missing Cage Counts for Mid February<br>• Laptops were not secured in the backroom. David Gonsolin RLPM and I made room in the cage to protect the laptops.<br>• Several months of numerous cash shortages were found. You failed to report the shortages and did not have an explanation as to why they were happening. |

| | *List date(s) and summarize all previous counseling's both verbal and written:* |
|---|---|
| **Previous Actions (Specific)** | Store Visits from David Gonsolin RLPM 2/04/2009 documenting similar issues with asset protection.<br><br>Previous DM communication through Store Visits, District Meeting and One on One conversations. |

| | *What disciplinary action may occur due to failure to improve?* |
|---|---|
| **Consequences Of Failure To Improve** | Failure to achieve the required improvement will lead to additional disciplinary action including and up to termination. |

| | |
|---|---|
| **Employee Comments** | |

I have received a copy of this Corrective Action Record and understand RadioShack has an Open Door Policy. I may discuss this issue or any other employee relations issue with my Area Human Resources Director, _____, the Employee Relations Department or any member of Management in my chain of command.

_____ Employee    3/23/10 Date          _____ Supervisor    3/23/10 Date

RS/ALLEN000192

EXHIBIT 3
Deft.      For Identification
Consisting of _____ Pages
Witness Gonsolin
Date 10-16-12
Debra J. Skaggs CSR 7667

**Dec. of Thompson - Exhibit 8**

**From:** Loss Prevention (Corporate)
**Sent:** Sunday, March 14, 2010 12:05 PM
**To:** Candice Vaughn; Chris Allen
**Subject:** FW: VOCP 3830 Allen 031410

**Attachments:** VOCP 3830 Allen.xls

---

**From:** David Gonsolin
**Sent:** Sunday, March 14, 2010 12:04:25 PM
**To:** 0101 RSD Donna Ocampo
**Cc:** James Peterson; 0340 AHRD Donetta Gunnells; Loss Prevention (Corporate)
**Subject:** VOCP 3830 Allen 031410
**Auto forwarded by a Rule**

Please see the attached Violation of Company Policy Memo regarding Store 3830

3/14/2010 - Failure to secure merchandise on the salesfloor, complete weekly cage counts, report cash shortages

On 3/08/10 a visit was conducted to store 01-3830, San Francisco California. During the visit it was found that Store Manager Frank Allen had 5 laptops on display that were only secured by screamers. It was also found that there were 6 LCD TV's on display and none of them had the required security cable. There were also 3 Schlage locksets, approximately $199.99 each, that had no security devices on them at all. It was also found that Allen had missed a cage count in mid February.

Lastly it was found that over the past several months there were numerous cash shortages. Allen had not reported these and had no explanation as to why they are happening.

Allen is aware of the external challenges of this store due to its location, however, he failed to protect our assets in numerous ways. In February 2009 a visit was conducted and Allen had just had a laptop stolen from the sales floor where he did not have it secured at all. Allen needs to ensure he uses all available resources to protect our assets on the sales floor. Allen must also complete the weekly cage count in full and communicate any missing items to his DM and RLPM. Allen also agreed to start conducting over short inquiries at least 4 times a day and report any large cash shortages to his DM and RLPM.

VOCP 3830
Allen.xls (687 KB)

1

REDACTED

RS/ALLEN000190



EXHIBIT ___
Deft. ___ For Identification
Consisting of ___ Pages
Witness ___
Date ___
Debra L Skaggs CSR 7857

**Dec. of Thompson - Exhibit 8**



**(R) RadioShack.**
CORPORATION

UPLOAD SUCCESSFUL!

DATE:     March 14, 2010

TO:       0536 DM
          cc:  James Peterson,0340
               AHRD,0101 RSD          other cc:
               Loss Prevention (Corporate)

FROM:     David Gonzalez
          Regional LP Manager
          Office:
          Mobile:  (916)842-9552

TYPE:     Failure to Protect Assets

SUBJECT:  Failure to secure merchandise on the salesfloor, complete weekly cage counts, report cash shortages

RE:       Store #:   3830          Employee:   Allen          Frank

The following details are provided to you for your information and action deemed appropriate.  If you have any questions concerning this matter, please do not hesitate to contact me.

On 3/09/10 a visit was conducted to store 01-3830, San Francisco California.  During the visit it was found that Store Manager Frank Allen had 6 laptops on display that were only secured by screwners.  It was also found that there were 6 LCD TV's on display and none of them had the required security cable.  There were also 3 Schlage locksets, approximately $199.99 each, that had no security devices on them at all.  It was also found that Allen had missed a cage count in mid February.

Lastly it was found that over the past several months there were numerous cash shortages.  Allen had not reported these and had no explanation as to why they are happening.

Allen is aware of the external challenges of this store due to its location, however, he failed to protect our assets in numerous ways.  In February 2009 a visit was conducted and Allen had just had a laptop stolen from the sales floor where he did not have it secured at all.  Allen needs to ensure he uses all available resources to protect our assets on the sales floor.  Allen must also complete the weekly cage count in full and communicate any missing items to his DM and RLPM.  Allen also agreed to start conducting over short inquiries at least 4 times a day and report any large cash shortages to his DM and RLPM.

RS/ALLEN000191

Debra J. Skaggs

**Dec. of Thompson - Exhibit 8**

| | |
|---|---|
| **From:** | Loss Prevention (Corporate) |
| **To:** | Monique Hebert; Candice Vaughn |
| **Subject:** | FW: LPNN 3830 030910 |
| **Date:** | Sunday, March 14, 2010 9:55:39 AM |
| **Attachments:** | LPNN 3830 030910.xls |

---

**From:** David Gonsolin
**Sent:** Sunday, March 14, 2010 11:55:23 AM
**To:** 013830
**Cc:** James Petarson; 0101 RSD Donna Ocampo; Loss Prevention (Corporate)
**Subject:** LPNN 3830 030910
**Auto forwarded by a Rule**

Please see the attached LP Non-Negotiables for Store 3830

During the course of this visit it was found that there have been numerous cash shortages in the last several months. The SM needs to start conducting over short inquiries at least 4 times a day. There was one cage count missed in mid February. There were several items in the product inspection area that need to be secured in the cage. The sales floor had 3 Schlage lock sets that were not secured with screams or anything. Also, there were 5 laptops that did not have proper security device on them and all 6 LCD TV's did not have the cables. There was an ICST that was autoreceived on 2/20 and two shipments that were autoreceived on 2/21 and 1/31. A follow up visit will be conducted by the DM and RLPM to ensure these items are all corrected.



EXHIBIT 5
Deft. _____ For Identification
Consisting of 2 Pages
Witness Gonsolin
Date 10-12-12
Debra J. Skaggs CSR 7857

RS/ALLEN000193

**Dec. of Thompson - Exhibit 8**

# ® RadioShack
## CORPORATION

**LP Non-Negotiables**
UPLOAD SUCCESSFUL!

| | |
|---|---|
| **Store:** | 3830 |
| **Region:** | 11 - San Francisco |
| **District:** | 0538 - San Francisco |
| **Date:** | 3/9/2010 |
| **RLPM Name:** | David Gonsolin |
| **Manager Name:** | Frank Allen |
| **Visit Category:** | DM Request |

| Non-Negotiables | |
|---|---|
| Yes | Does store associate know who to contact in the event of a serious incident. (Burglary, Robbery, Assault) |
| N/A | Review the daily deposits (ANSO > Admin > Daily Deposits > Exception Report) for the past 30 days. Was the store consistently making deposits in a timely manner (no late deposits)? What was the total quantity of late deposits identified? |
| No | Does the store manager know how to pull their P&L and review the inventory control numbers? Review store's shrink and other loss performance with SM. |
| N/A | Locate the last 3 days of daily reports. Were all refunds and voids documents present and signed? Conduct an on hand count and verify all refunds over $35.00 from the same days. |
| N/A | Of the refund items selected, were you able to match physical counts with store on hand quantities? |
| N/A | Conduct an Over/Short inquiry with the person in charge. Was the discrepancy less than $2.00? |
| No | If there were variances in excess of $5 in the past 30 days, were there less than 37 What was the total number of days with a cash variance >$5? |
| No | Is a trend of cash discrepancies that indicate internal theft (large loss, an employee consistently tracks for cash variances? |
| Yes | Is a working Manual Credit Card Imprinter available and being used at all times. |
| N/A | Run a Credit Card report for the last 7 days and verify an imprint was obtained for all manually entered bank cards. |
| N/A | Are associates aware of the weekly password program? |
| N/A | Do all key carriers have keys to open the lock box and locking file cabinet? |
| No | Are there count sheets for secured inventory for the last eight weeks? Are discrepancies reconciled? Have the discrepancies been report to the RLPM and DM? (Cage counts should be located on the clipboard in the cage.) |
| N/A | Inspect 20 items that are more than $25 in retail value.  Are the merchandise tagging guidelines being followed? Is store consistent with tagging placement? |
| N/A | Run an on hand report for high dollar merchandise (160,170,200,250,260,420) and randomly check a minimum of 15 high risk items from the stores cage and 10 items from the sales floor for accuracy. |
| No | Visually inspect the entire backroom area for merchandise that does not appear sellable (loose product). Is the store taking proper steps to dispose of the merchandise (RMAC, ICST, Repair, etc)?  (If secured merchandise is in the product inspection area this answer is no) |
| N/A | Is the store completing the Daily and Weekly Non-Negotiable Standards of Operational Performance Checklist? |
| N/A | Review the DM's last Non-Negotiable visit, if any discrepancies noted have they been corrected? |
| N/A | Are all keys including perimeter, cage, locking peg and displays cases secured and in the possession of an authorized key holder? |
| N/A | Are all the store locks keyed to the RadioShack approved Medico locks? |
| N/A | Does store have adequate alarm protection (motion covering exterior glass, exterior exits, back stockroom, etc). Is cage vulnerable and need additional protection (e.g. interior common wall with other retailer)? |
| N/A | Was the backdoor secured? If opened was an associate present at all times? |
| Yes | If the store has a public view monitor is it properly working? |
| Yes | Is the CCTV system operable and being used?  Are the time and date set correctly? |
| N/A | Is the EAS system operating properly (inspect by activating the alarm)? |
| N/A | Using the "Stock File List - All DISCO / DEVAL On Hand Items Report", Select 10 random items from the report with a difference between retail and current pricing of $50. Were all 10 items on display and priced correctly? |
| N/A | Are all display cases secured with slide locks? |
| No | Are all security devices being used properly (including locking peg hooks, acrylic toppers and  laptop cables)? |
| No | Verify all laptops are properly secured (a screamer by itself is not adequate protection) |
| No | Verify all LCD TV's are secured with mechanical cable to prevent theft and for safety. |
| No | Have all ICST's been received into the RSS within seven days? |
| No | Review last 5 packing lists. Is there evidence that the location was verifying shipments and is there corresponding SAR's for overages, shortages or damages? (Finalized SAR's should be attached to the Packing List or they can be reprinted from the RSS under Utilities>Print Manager>Receiving Reports) |
| No | Review the shipments in the RSS system (Whse Bulk Receiving).  Were all shipments received into the RSS system within 24 hours of receipt?  Is there evidence that the SM is completing the must count list? |
| No | Review Deactivation detail. Are there indications of internal involvement, common associates, names or other unusual patterns that can indicate fraud? Talk with associates about wireless knowledge of activation procedures. |
| N/A | Review store's trash procedure. Are there safety procedures in place and adequate internal controls? |
| N/A | Are fire exits clear, exit light illuminated? Are there any safety issues that need immediate correction? |

| | |
|---|---|
| **Comments:** | During the course of this visit it was found that there have been numerous cash shortages in the last several months.  The SM needs to start conducting one short inquiries at least 4 times a day.  There was one cage count missed in mid February.  There were several items in the product inspection area that need to be secured in the cage.  The sales floor had 3 Schlage lock sets that were not secured with screamers or anything.  Also, there were 5 laptops that did not have proper security device on them and all 6 LCD TV's did not have the cables.  There was an ICST that was autoreceived on 2/20 and two shipments that were autoreceived on 2/21 and 1/31.  A follow up visit will be conducted by the DM and RLPM to ensure these items are all corrected. |

RS/ALLEN000194

**Dec. of Thompson - Exhibit 8**

**0340 AHRM Shaan Smith**

| | |
|---|---|
| **From:** | 0538 DM Donna Ocampo |
| **Sent:** | Tuesday, April 27, 2010 8:12 PM |
| **To:** | 0340 AHRM Shaan Smith |
| **Subject:** | FW: 3830 Summary |

Below are notes from David Gonsolin from today's termination with Frank Allen.

**From:** David Gonsolin
**Sent:** Tuesday, April 27, 2010 8:07 PM
**To:** 0538 DM Donna Ocampo
**Cc:** 0534 RSD Basem Aybef; James Peterson
**Subject:** 3830 Summary

Here is my narrative about the termination that took place at 3830 today.  Please let me know if there is anything else needed in regards to this incident.

David Gonsolin
Regional Loss Prevention Manager
San Francisco Region 11
Cell (916) 842-9552
Fax (916) 863-9503



3830 summary.doc

1

RS/ALLEN000261



**Dec. of Thompson - Exhibit 8**

On 4/27/2010, District Manager Donna Ocampo and I arrived at store 01-3830 to speak with Store Manager Frank Allen. Upon arrival to the store Frank stated that he was expecting us. We went to the backroom to speak with Frank at which time Donna asked him to explain why she had found $200 in cash left unsecured in the desk drawer in the backroom. Frank tried to explain that he was not here when that had happened and another associate must have left it unlocked. I explained to Frank that he had a very significant cash loss problem that we had discussed on our prior visit and this was unacceptable to leave cash unsecured like this. Frank immediately began asking what was going to happen with him. Donna informed him that the company is removing him from his position and terminating his employment. Frank slammed his store keys down on the desk and began using foul language, expressing his disagreement with the decision. He asked what the reason for his termination was and Donna explained that it was due to his failure to protect company assets. Frank argued that he is not responsible for what his associates do when he is not here, as he had left the store before the money was left unsecured in the desk drawer. Frank then called Donna "shady" at which time she told him to leave the store. Frank continued to argue with Donna and I attempted to step in and calm him down. I tried to talk him into leaving the store quietly; however, he stated he did not want to hear what I had to say. Donna gave him his letter of separation which he refused to sign. After giving him the letter of separation he said, "thank you for freeing a slave" and began to walk out. After that comment I told Frank that was not appropriate and he walked out of the store yelling.

RS/ALLEN000262

**Dec. of Thompson - Exhibit 8**

Aug 29 12 02:56p     Frank Allen            15102222560              P.4
Print                                                       Page 1 of 1

**From:** FRANK ALLEN (f.allen6588@sbcglobal.net)
**To:** shaansmith@radioshack.com;
**Date:** Wed, May 5, 2010 9:24:58 PM
**Cc:**
**Subject:** [ No Subject ]

Ms. Smith,

I spoke with you on April 28, 2010 regarding the reason I was terminated by Donna on April 27, 2010.
You were going to look into the problem and get back to me.  As of today I have not heard from your
nor have I received any termination papers.  Please advise.

Frank Allen



EXHIBIT 1
                    Deft.          For Identification
Consisting of     1              Pages
Witness  consolio
Date  10-12-12
Debra J. Skaggs CSR 7657

ALLEN V RS 000177

**Dec. of Thompson - Exhibit 8**

Apr 25 07 12:46p


**RadioShack.**
C O R P O R A T I O N




**POOR QUALITY**

925-866-0208

**Loss Prevention Services**

2000 Crow canyon Pl. #140, San Ramon Ca.          Fax: 925-866-1129

431 08 6588

**Tom Nabozny**
Loss Prevention Manager

**April 16, 2007**                    **MEMORANDUM**

**TO:**      **Hani Alzaghari DM 01-0538**
**cc:**      **Tom Schultz RSM / Steve Hodgkins, Director, Loss Prevention**

**FROM:**    **Tom Nabozny LPM**

**SUBJECT:  Policy Violation (Store #01-3830) (Failure follow company compliance
Operational procedures)**

The following details are provided to you for your information and action deemed appropriate.  If
you have any questions concerning this matter do not hesitate to contact me.

On Monday April 16, 2007 I conducted an SVR for store 01-3830 San Francisco Ca and found
that store manager FRANK ALLEN was not in compliance for operational procedures.

During my visit I found that ALLEN was not reviewing or signing refunds and voids on a daily
basis.  Several of the refunds either did not have  the issuers or the customer signatures as per
policy.

19 out of 24 refunds reviewed did not have the customers name, address, or phone number on
the refund.

I also reviewed all Sprint contracts from the month of April and found that none of them had the
customer profile sheet attached to the contract.  I also found that one of the contracts did not
have the sales ticket attached.  This then lead me to review the manager's Redbook and found
that ALLEN has not filed the wireless transaction checklist for the last 18 days

ALLEN needs to understand that by just ignoring these operational procedures, he is showing
that he is not being responsible for maintaining the security of company assets.  The kind of
negligent attitude that is displayed in this area reflects poorly on ALLEN's managerial skills.

To better control this area, ALLEN needs to address his operational issues in a timely and
thorough manner.

Please review this violation with the associate and return it to me signed within ten days.

1.
2.
3.
4.
5.

Received Time Apr.25.  11:43AM

EXHIBIT
For Identification
Consisting of                    Pages
Witness
Date
Debra J. Skaggs CSR 7857

**Dec. of Thompson - Exhibit 8**

EXHIBIT 9

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION


FRANK ALLEN,

       Plaintiff,

    vs.                     CASE NO.
                         CV 11 3110 WHA

RADIO SHACK CORPORATION, et al.,

       Defendants.

_____/


DEPOSITION OF NABOR ANDREW BACA

October 17, 2012


Reported by:
WENDY C. BROWN
C.S.R. NO. 5697


PATRICIA CALLAHAN REPORTING
Certified Shorthand Reporters
(510) 885-2371   (415) 788-3993
Facsimile (510) 247-9775
PATRICIA CALLAHAN REPORTING

b65cbf73-95b9-4725-b61f-6c1255a62cde

Dec. of Thompson - Exhibit 9

1       BE IT REMEMBERED THAT, pursuant to Notice of

2   Taking Deposition, and on Wednesday, October 17, 2012,

3   commencing at the hour of 11:00 o'clock a.m. of the said

4   day, at the law offices of MILLER LAW GROUP, 111 Sutter

5   Street, Suite 700, San Francisco, California, before me,

6   WENDY C. BROWN, a certified shorthand reporter, State of

7   California, personally appeared NABOR ANDREW BACA, a

8   witness in the above-entitled court and cause, produced

9   on behalf of the defendant, who, being by me first duly

10  sworn, was then and there examined and interrogated by

11  Attorney Tracy Thompson, representing the law offices

12  of MILLER LAW GROUP, 111 Sutter Street, Suite 700,

13  San Francisco, California, counsel for the defendant.

14

15                  APPEARANCES OF COUNSEL

16

17  FOR THE PLAINTIFF:

18

19          LAW OFFICES OF MAYOR JOSEPH L. ALIOTO &

20          ANGELA ALIOTO

21          BY:  ANGELA MIA VERONESE, ESQ.

22          700 Montgomery Street

23          San Francisco, California  94111

24

25

b65cbf73-95b9-4725-b61f-6c1255a62cde

**Dec. of Thompson - Exhibit 9**

Page 26

1    assigned to?

2    A.      Yes, they told me I would be assigned to

3    Frank Allen's store.

4    Q.      And what number store was that?

5    A.      3830.

6    Q.      So this was in April of 2004, you were told you

7    were going to be assigned to Frank Allen's store?

8    A.      Yes.

9    Q.      And you left Radio Shack when?

10   A.      I'm not sure of the exact date.

11   Q.      Was it about --

12   A.      But it was in 2010.

13   Q.      Was it in about June of 2010?

14   A.      Yes, about that time.

15   Q.      I'm sorry?

16   A.      Yes.

17   Q.      So April of 2004 until June of 2010, is it your

18   testimony, then, you were at Frank Allen's Store 3830

19   that entire time?

20   A.      No.  No.  I would transfer to different stores

21   to work, not -- I would transfer to Frank Allen's store

22   to help him out once I transferred to Alex's store,

23   because they were moving Frank's store.

24   Q.      Okay.

25   A.      And remodeling it.

PATRICIA CALLAHAN REPORTING

b65cbf73-95b9-4725-b61f-6c1255a62cde

Dec. of Thompson - Exhibit 9

1   Q.      All right.  So how long did you stay working at

2   Frank Allen's store after April of 2004?

3   A.      About a year or so.

4   Q.      Okay.

5   A.      Because then they moved the store.

6   Q.      Okay.  So till about April of 2005?

7   A.      Yes.

8   Q.      And then where did you work?

9   A.      Alex Basheri's store.

10  Q.      The same store that we talked about --

11  A.      Yes.

12  Q.      What was the address again?

13  A.      652 Market Street.

14  Q.      Okay.  And how long did you work at Alex

15  Basheri's store at 652 Market Street?

16  A.      Pretty much the whole time, the rest of the time

17  that I was there at Radio Shack, except for the times

18  when I would transfer back to Frank's store to help him

19  out, and when they had a shortage of people.

20  Q.      You don't remember what Alex's store number was?

21  A.      I think it's 1502.

22  Q.      All right.  So you were regularly assigned to

23  Alex Basheri's store from about April 2005 until the

24  time you left?

25  A.      No.  No.  I transferred to Frank's store.

Dec. of Thompson - Exhibit 9

1    Q.      Okay.  So when did you transfer back to Frank

2    Allen's store?

3    A.      That would be in 2010.

4    Q.      Do you remember, was that January of 2010?

5    A.      Not sure of the -- the date.

6    Q.      But sometime in 2010, you were assigned back to

7    Frank Allen's store?

8    A.      Yes.

9    Q.      So, to the best of your recollection, then, from

10   about April of 2005 to some point in 2010, you worked at

11   Alex Basheri's store?

12   A.      Yes.

13   Q.      Did you work at any other stores during that

14   period?

15   A.      Yes.

16   Q.      What other stores did you work at?

17   A.      I can't remember the names.  There was others,

18   Radio Shack stores, and they were always short of

19   people, so I would -- they would e-mail and say, "You

20   need somebody to transfer to this store to help out for

21   a while."

22   Q.      Okay.  So if they would ask you to go

23   temporarily to another store, that's what you did?

24   A.      Yes, I would do it.  I would volunteer.

25   Q.      So in 2010 when you transferred to Frank Allen's

PATRICIA CALLAHAN REPORTING

b05cb79-95b9-4725-b011-0c1255a02cde

**Dec. of Thompson - Exhibit 9**

Page 29

1    store, did you stay at Frank Allen's store until the

2    time you left the company in about June of 2010?

3    A.      Yes.

4    Q.      During that period, from 2010 when you

5    transferred into Frank Allen's store to June 2010 when

6    you left, did you work at any other stores?

7    A.      No.

8    Q.      And were you a full-time employee at Mr. Allen's

9    store during the period from 2010?

10   A.      Yes.

11   Q.      Now, why did you leave Radio Shack in about June

12   of 2010?

13   A.      I found a job with Home Depot.

14   Q.      What was the job that you found with Home Depot?

15   A.      Working in the paint department.

16   Q.      Is that a sales position?

17   A.      Yes.

18   Q.      And which Home Depot was that?

19   A.      Emeryville, California, across the bay.

20   Q.      So did you leave Radio Shack voluntarily or were

21   you terminated?

22   A.      I was terminated.

23   Q.      And who told you you were terminated?

24   A.      Donna Ocampo.

25   Q.      And what did Ms. Ocampo tell you was the reason

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 9**

Page 30

1   why you were being terminated?

2   A.      Because I signed a document and admitted to

3   retail -- something about retail.  I can't remember.

4   Q.      I'm sorry?

5   A.      Something about retail.  I can't remember --

6   Q.      Well, what did the --

7   A.      -- what it was, but I was placed under duress by

8   the loss prevention manager at the Store 3830, and he

9   told me, "How do you fix this?  How do we fix this?

10  We're missing money from the drawer.  How do we fix it?"

11  So I just -- he said -- and I said, "Well, yes, how do

12  we fix it, 'cause you're looking to me to fix it.  So

13  how do you fix it?"  And he told me to go ahead and

14  sign -- sign this and pay money back to them that they

15  were missing, and that's what I did.

16          And then shortly after that, Donna Ocampo called

17  me and told me I was terminated.  But I told her I

18  didn't do anything wrong.

19  Q.      Let me just make sure I understand something.

20  Who was the loss prevention manager that you were --

21  A.      I'm not sure.

22  Q.      -- talking to?

23          MS. VERONESE:  Let her finish the question.

24          THE WITNESS:  Okay.

25          MS. THOMPSON:  Q.  Was it David Gonsolin?

PATRICIA CALLAHAN REPORTING

b65cbf73-95b9-4725-b61f-6c1255a6fcde

**Dec. of Thompson - Exhibit 9**

Page 31

1   A.      I'm not sure.   I'm not sure who it was.

2   Q.      So how many conversations did you have with the

3   loss prevention manager?

4   A.      Just that one.

5   Q.      And where did that conversation take place?

6   A.      In the back room.

7   Q.      Was anybody else present besides you and the

8   loss prevention manager?

9   A.      No, there was -- there wasn't anybody there in

10  the back room, but there were people in the store.

11  Q.      Okay.  Did the loss prevention manager have any

12  documents with him when he was talking to you?

13  A.      No, not that I -- I don't think he did.

14  Q.      Tell me, to the best you can recall, what

15  exactly he said to you during this one discussion you

16  had with him in the back room.

17  A.      He said that they were missing money from the

18  drawer, and that he was going to have me count the

19  drawer every time I came in.  And there was merchandise

20  missing, also.  And, uh, that there was a -- "How do we

21  fix this?"  So I listened to him, "How do we fix this?"

22  And so, okay, how can I fix it; what can I do?  He said

23  "Go ahead, sign this," so that's what I did.  I signed

24  it.

25  Q.      So he gave you a document to sign?

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 9**

Page 32

1   A.      Yes, yes.

2   Q.      Okay.  What did the document say, to the extent

3   that you remember?

4   A.      Well, it was some type of admission of guilt,

5   you know.  I don't know what it was, but it was -- he

6   told me to -- as he said things, he told me to write

7   them down.  So as he said it, I was writing it down

8   (indicating).

9   Q.      Did you read the document before you signed it?

10  A.      Yes, yes.

11  Q.      What kinds of things were you writing down?

12  A.      Well, what he said, I admit to retail theft and

13  that I would pay back the, uh -- the, uh, money, you

14  know, that was missing, you know, $129 that -- the

15  cashier's check, you know.

16  Q.      So there was $129 missing from the register?

17  A.      I'm not sure if that's where it was missing

18  from, but it was in merchandise or something like that.

19  Q.      So the loss prevention manager told you that

20  there was either money or merchandise missing that was

21  valued at $129?

22  A.      Yeah.

23  Q.      And was this something that -- had you taken the

24  money or the merchandise?

25  A.      I didn't do anything wrong.  I didn't take any

b65cbf73-95b9-4725-b61f-6c1255a62cde

**Dec. of Thompson - Exhibit 9**

Page 34

1   A.      And.

2   Q.      -- "can we fix it?"

3   A.      Yes.

4   Q.      Is that right?

5   A.      (Nods head.)

6   Q.      Is that "yes"?

7   A.      Yes.

8   Q.      Other than -- was he raising his voice at you?

9   A.      No.

10  Q.      Was he physically abusive in any way?

11  A.      No.

12  Q.      Did he threaten you in any way?

13  A.      In a way, yes.

14  Q.      What did he say to threaten you?

15  A.      After I signed that document, he told me that I

16  can be pursued in court of law.

17  Q.      So after you had signed the document --

18  A.      Yeah.

19  Q.      -- he told you that you could be criminally

20  prosecuted?

21  A.      Yes.

22  Q.      Okay.  Did he say anything else to threaten you

23  during that conversation?

24  A.      No.

25  Q.      Did he make any threats to you before you signed

PATRICIA CALLAHAN REPORTING

Dec. of Thompson - Exhibit 9

Page 35

1    the admission of guilt?

2    A.       No.

3    Q.       Did he use any kind of profanity at you during

4    this meeting?

5    A.       No.

6    Q.       Was he polite?

7    A.       Yes, he was polite.

8    Q.       Was he professional?

9    A.       Yes, he was.

10   Q.       Did he do anything that you thought was not

11   appropriate, in terms of his interaction with you?

12   A.       Yes, coming into the workplace like that

13   unannounced and taking me totally by surprise.

14   Q.       Okay.  Other than that, did he do anything else

15   that you thought was not appropriate, in terms of his

16   interaction with you?

17   A.       No.

18   Q.       Had you ever met this loss prevention manager

19   before this time?

20   A.       No, no, that's the first time I met him.

21   Q.       Did you ever actually pay the money back?

22   A.       Yes, I did.

23   Q.       When did you pay the money back?

24   A.       Well, they sent me a letter in the mail, and

25   then I sent the check to them.

b65cbf73-95b9-4725-b61f-6c1255a62cde

**Dec. of Thompson - Exhibit 9**

1    A.       I didn't do anything wrong.

2    Q.       And you told him that?

3    A.       Yes.

4    Q.       Did you ever make any complaint to anyone at

5    Radio Shack about being accused of something you felt

6    you hadn't done?

7    A.       No.

8    Q.       Is there any reason why you didn't make any

9    complaint to Radio Shack?

10   A.       Because I found a job working for Home Depot

11   shortly after that.

12   Q.       How soon after leaving Radio Shack did you find

13   the job with Home Depot?

14   A.       Two weeks.

15   Q.       So after you had this interview with the loss

16   prevention manager at the store, how soon thereafter

17   were you terminated?

18   A.       The next week.

19   Q.       About a week later?

20   A.       Yes.

21   Q.       So between the time of the interview and the

22   time you were being told you were terminated, did you

23   make any kind of complaint to anyone at Radio Shack

24   about how you were being treated?

25   A.       No.

PATRICIA CALLAHAN REPORTING

b65cbf73-95b9-4725-b6f1-6c1255a6zcde

**Dec. of Thompson - Exhibit 9**

Page 40

1    Q.      Did you happen to keep a copy of the statement

2    that you signed?

3    A.      Yes, I think I have one.

4    Q.      You didn't happen to bring that with you today,

5    did you?

6    A.      No, I haven't -- I didn't bring it today.

7    Q.      Did you tell Ms. Ocampo or anyone at Radio Shack

8    that you felt that you had signed the statement under

9    duress?

10   A.      No, no.  It was my wife that pointed out to me

11   that that was under duress.

12   Q.      Okay.  But just so we're clear, though, your

13   wife told you that, in her opinion, from what you

14   described, that you had signed the statement under

15   duress?

16   A.      Yes.

17   Q.      But my question, though, was did you ever tell

18   anyone at Radio Shack that you felt that you had signed

19   the admission of guilt under duress?

20   A.      No.

21   Q.      Did you think that your termination was an act

22   of discrimination against you because of your national

23   origin?

24          MS. VERONESE:  Calls for a legal conclusion.

25          You can answer.

PATRICIA CALLAHAN REPORTING

b65cbf73-95b9-4725-b61f-6c1255a62cde

**Dec. of Thompson - Exhibit 9**

1       MS. THOMPSON:  Q.  You can answer.

2  A.      Come from a background where I'm

3  Mexican-American, okay.  Very few job opportunities

4  happen for me.  Yeah, I do.

5  Q.      Okay.  You thought you were being discriminated

6  against by Radio Shack based upon your Mexican-American

7  A.      There's --

8  Q.      -- national --

9       MS. VERONESE:  Just let her finish.

10       MS. THOMPSON:  Q.  All right.  So let me just

11  ask the question again.  I know this is really hard, but

12  wait until I'm finished, and then I'll make sure you

13  have a chance to tell me whatever you need to tell me,

14  okay?

15  A.      Okay.

16  Q.      So, as you sit here now, it's your opinion or

17  your belief that your termination was an act of

18  discrimination against you by Radio Shack, based on upon

19  your Mexican-American national origin?

20  A.      Hmm, not really, but, you know, it's --

21  Q.      When you say "not really," what do you mean?

22  A.      I mean that Radio Shack has a -- has a history

23  of terminating people for the littlest things, like

24  being late, not making your sales quota, things like

25  that.

PATRICIA CALLAHAN REPORTING

Dec. of Thompson - Exhibit 9

Page 42

1   Q.      So --

2   A.      So it's -- it's -- it's a high turnaround type

3   of thing.

4   Q.      So you were aware of a lot of people employed by

5   Radio Shack that were being terminated for various

6   reasons?

7   A.      Oh, yeah.  There was a lot of them.

8   Q.      Okay.  So, again, just focusing on your beliefs,

9   though, did you believe that Radio Shack was

10  discriminating against you because you're

11  Mexican-American?

12  A.      No, no.

13  Q.      Did you ever hear anyone at Radio Shack make any

14  derogatory comments about your national origin?

15  A.      Yes.

16  Q.      Who?

17  A.      There was some -- some guys there that worked

18  there.

19  Q.      Some of your coworkers?

20  A.      Some of the coworkers, and some of the other

21  store people you know, at other stores that worked

22  there, they just made comments, when I was -- but

23  that's --

24  Q.      So Frank -- go ahead.

25  A.      But that was -- that was different people there,

b65cbf73-95b9-4725-b61f-6c1255a62cde

**Dec. of Thompson - Exhibit 9**

Page 44

1  thought were derogatory about your Mexican-American

2  national origin?

3  A.      Yes.

4  Q.      What specifically did he say?

5  A.      Uh, let's see.  I can't remember.

6  Q.      Do you remember any -- any instance where Bruce

7  made a comment or a joke that you thought was derogatory

8  towards you because you're Mexican-American?

9  A.      Uh, no, I don't.

10  Q.      Other than Bruce, can you name any other

11  employee at Radio Shack that you thought made derogatory

12  comments about your Mexican-American national origin?

13  A.      No.

14  Q.      Did you ever complain to Mr. Allen that Bruce

15  was making jokes that you thought were derogatory to you

16  based on your national origin?

17  A.      No.  No.

18  Q.      Did you ever complain to human resources at

19  Radio Shack that anyone at any time was making

20  derogatory comments about your -- or jokes about your

21  Mexican-American national origin?

22  A.      No.

23  Q.      Did you ever hear any Radio Shack employee make

24  any derogatory comments or jokes about

25  African-Americans?

b65cbf73-95b9-4725-b61f-6c1255a62cde

**Dec. of Thompson - Exhibit 9**

Page 45

1    A.       No, I haven't.

2    Q.       Did you ever hear any Radio Shack employees ever

3    make any comments, derogatory comments or jokes, about

4    older workers at Radio Shack?

5    A.       No.

6    Q.       When did you first meet Donna Ocampo?

7    A.       That was in 2010; she came by the store maybe

8    three times.

9    Q.       Okay.  So am I correct, then, in understanding

10   that you saw Ms. Ocampo, physically, a total of three

11   times during your employment at Radio Shack?

12   A.       Yes.

13   Q.       And did you actually speak with Ms. Ocampo on

14   any of those three occasions?

15   A.       When -- no.  She -- she was busy doing stuff in

16   the back room.

17   Q.       Okay.  So on any of those three occasions, did

18   you and Ms. Ocampo have any chance to speak to one

19   another?

20   A.       Well, when she was in the back room, I went back

21   there to get a laptop, and she just mentioned, you know,

22   that, "Donna doesn't like Frank," you know, like that to

23   me.  I was like, okay.  So --

24   Q.       Wait a --

25   A.       It was just a comment she made.  That's all.

b65cbf73-95b9-4725-b61f-6c1255a62cde

**Dec. of Thompson - Exhibit 9**

Page 52

1    Q.      Did you report that incident to anyone?

2    A.      No.

3    Q.      Did you ever tell Mr. Allen that Donna Ocampo

4    had made the statement, quote, "Donna don't like Frank"?

5    A.      No, I didn't.

6    Q.      Did you ever have any -- other than hearing that

7    one comment on that one occasion, did you ever have any

8    actual conversations with Ms. Ocampo at any time during

9    your employment?

10   A.      No.

11   Q.      Did you ever hear Ms. Ocampo make any statements

12   about Mr. Allen's race?

13   A.      No.

14   Q.      Did you ever hear Ms. Ocampo make any statements

15   about Mr. Allen's age?

16   A.      No.

17   Q.      Did you ever hear Ms. Ocampo make any derogatory

18   comments about African-Americans generally?

19   A.      No.

20   Q.      Did you ever hear Ms. Ocampo make any derogatory

21   comments about older workers at Radio Shack?

22   A.      No.

23   Q.      Did you ever hear the loss prevention manager

24   that you met with, as you described earlier, make any

25   derogatory comments about African-Americans?

PATRICIA CALLAHAN REPORTING

Dec. of Thompson - Exhibit 9

Page 53

1    A.      No.

2    Q.      Or about Mr. Allen, any derogatory comments by

3    the loss prevention manager about Mr. Allen?

4    A.      No.

5    Q.      Did the loss prevention manager make any

6    derogatory comments about older workers at Radio Shack?

7    A.      No.

8    Q.      Now, you mentioned that you had a phone

9    conversation with Ms. Ocampo when she terminated your

10   employment, right?

11   A.      Yes.

12   Q.      Other than that occasion when she told you your

13   employment was being terminated, did you ever have any

14   other phone conversations with Ms. Ocampo?

15   A.      No.

16   Q.      Have you told me everything that you can

17   remember about -- well, let me go back.  Let's talk

18   about the phone conversation when you were terminated by

19   Ms. Ocampo.  Can you tell me everything that she said to

20   you and you said to her during that phone conversation?

21   A.      Well, she called and she told me that I was

22   being terminated.  And I told her, I didn't do anything

23   wrong."  And she goes, "I know.  We can't see anything

24   on the video camera that you did do anything wrong."

25   Q.      Did she say anything else during that

b65cbf73-95b9-4725-b61f-6c1255a62cde

**Dec. of Thompson - Exhibit 9**

1   conversation?

2   A.      No, that was pretty much it.

3   Q.      Did you say anything else during that

4   conversation?

5   A.      No.

6   Q.      So you've told me now everything you can

7   remember --

8   A.      Yes.

9   Q.      -- about the termination conversation between

10  you and Ms. Ocampo?

11  A.      Yes, that's all I know.   That's all I can

12  remember.

13  Q.      Do you know somebody named David Gonsolin at

14  Radio Shack?

15  A.      I can't remember that name.

16  Q.      Okay.  How about Basem Abef, have you met anyone

17  named Basem Abef?

18  A.      Basim?

19  Q.      No, Basem Abef.

20  A.      No.

21  Q.      How about Greg Patakas, have you met anyone

22  named Greg Patakas?

23  A.      No, I can't remember.

24  Q.      How many registers were there at Frank Allen's

25  store in 2010?

b65cbf73-95b9-4725-b61f-6c1255a62cde

**Dec. of Thompson - Exhibit 9**

1    Q.    Okay.  So that was one occasion.  What was the

2    second occasion, what was stolen --

3    A.    It was --

4    Q.    -- from 3830 --

5         MS. VERONESE:  Let her finish.

6         MS. THOMPSON:  Q.  -- in 2010?

7    A.    It was a digital CD player.

8    Q.    Okay.  And what was stolen from Alex Basheri's

9    store on the one occasion you remember?

10   A.    A laptop.

11   Q.    Were you aware of any thefts of cash at 3830 at

12   any time you worked there?

13   A.    No.

14   Q.    Were you aware of the theft of cash at any time

15   at Alex Basheri's store?

16   A.    No.

17   Q.    Did Alex Basheri, to your knowledge -- where did

18   Alex Basheri keep his cash; was it in a cash register

19   drawer?

20   A.    Yes.

21   Q.    Other than the cash register drawer, did

22   Alex Basheri keep his cash anywhere else?

23   A.    No, he didn't.

24   Q.    What about at any other stores that you worked

25   in, did you ever see cash being kept somewhere other

PATRICIA CALLAHAN REPORTING

b65cbf73-95b9-4725-b61f-6c1255a62cde

**Dec. of Thompson - Exhibit 9**

1    than the cash register drawer at any other store that

2    you worked?

3    A.        No.

4    Q.        You testified that there were two cash registers

5    at Store 3830 in 2010 when you went back to Mr. Allen's

6    store, correct?

7    A.        Yes.

8    Q.        And just so we're clear, when you went back to

9    the store, the entire time that you were there in 2010,

10   the store was located at 5th and Market?

11   A.        Yes.

12   Q.        Okay.  And the two cash registers, was there

13   room in the cash register drawers for the cash that the

14   customers would use to pay for merchandise?

15   A.        Yes.

16   Q.        So there was room for the bills, correct, in the

17   cash register drawer?

18   A.        Yes.

19   Q.        And there was also room for the coins?

20   A.        Yes.

21   Q.        Did you ever have any occasion where you

22   couldn't fit any of the money into the cash register?

23   A.        No.

24   Q.        Did anyone at the store ever tell you that they

25   couldn't fit money into the cash register drawers?

PATRICIA CALLAHAN REPORTING

b65cbf73-95b9-4725-b611-0c1295a62cde

**Dec. of Thompson - Exhibit 9**

1   A.      No.

2   Q.      Was that something that you ever discussed with

3   Mr. Allen, that money couldn't -- there wasn't enough

4   room in the cash register drawers for the bills and

5   coins?

6   A.      No.

7   Q.      So, were you aware of a practice of Mr. Allen's

8   of keeping some cash in the manager's desk drawer in the

9   back office?

10  A.      Yes.

11  Q.      Did you have access to that cash that was kept

12  in the back?

13  A.      No.  It was always locked.

14  Q.      Did you have a key?

15  A.      I was a keyholder sometimes.  I didn't have

16  access to it all the time.

17  Q.      Did you have a key to the manager's desk drawer

18  in 2010, while you were working at Mr. Allen's store?

19  A.      No.

20  Q.      So in 2010, then, when you were working at store

21  3830 under Mr. Allen, it's your testimony that you did

22  not have a key to the manager's desk drawer at all,

23  right?

24  A.      No, they -- they would swap the keys out.  When

25  I closed, they would give me the keys then.

b65cbf73-95b9-4725-b61f-6c1255a62cde

**Dec. of Thompson - Exhibit 9**

1    A.      Yes.

2           MS. VERONESE:  Let her finish the question.

3           THE WITNESS:  Yes.

4           MS. THOMPSON:  Q.  All right.  Did you ever

5    discuss -- other than talking with Mr. Allen about this

6    practice, did you ever talk with any other manager in

7    Radio Shack about the practice of keeping money in the

8    manager's desk drawer?

9    A.      No.

10   Q.      Did you ever speak with Hani Alzaghari about

11   keeping money in the manager's desk drawer?

12   A.      No.

13   Q.      Did you ever hear Mr. Alzaghari talk to

14   Frank Allen about keeping money in the manager's desk

15   drawer?

16   A.      No.

17   Q.      Did Mr. Alzaghari ever tell you that it was okay

18   to keep money in the manager's desk drawer?

19   A.      Huh-uh.

20   Q.      How many times did you see Mr. Alzaghari in

21   Frank Allen's store?  How often did that happen?

22   A.      He would come by maybe quarterly, on a quarterly

23   basis.

24   Q.      Okay.  And he would do a store visit once a

25   quarter?

**Dec. of Thompson - Exhibit 9**

1  A.      Yes.

2  Q.      Okay.  And would you speak to Mr. Alzaghari on

3  those occasions?

4  A.      No.  He -- he would -- he came to see Frank.

5  Q.      Okay.  So you never actually spoke with

6  Mr. Alzaghari; is that right?

7  A.      Not very often.  He would just say hi, and

8  that's about it.

9  Q.      Did you ever actually see Mr. Alzaghari in the

10 back room at Mr. Allen's store on the occasion of any of

11 those visits?

12 A.      No.  No.  It was usually just Frank and Hani

13 back there.

14 Q.      Okay.  And were you ever part of any of their

15 conversations in the back room?

16 A.      No.

17 Q.      Were you ever present when Mr. Alzaghari and

18 Mr. Allen were in the back room?

19 A.      Yes, I was out -- would be out on the sales

20 floor.

21 Q.      I understand you would be out on the sales

22 floor, and Mr. Alzaghari and Mr. Allen would be meeting

23 in the manager's office?

24 A.      Yes.

25 Q.      Okay.  Did you ever happen to go back there and

b65cbf73-95b9-4725-b61f-6c1255a62cde

**Dec. of Thompson - Exhibit 9**

Page 91

1   participate in any conversations with them?

2   A.      No.

3   Q.      Did you ever actually physically go into the

4   back office while Mr. Alzaghari and Mr. Allen were

5   there, that you can think of?

6   A.      Just to get merchandise.  No, that was it.

7   Q.      So the only time that you would go in the back

8   room when Mr. Alzaghari and Mr. Allen were there was to

9   get merchandise; is that right?

10  A.      Yes.

11  Q.      And on those occasions when you went back to get

12  merchandise when Mr. Alzaghari was there, did you happen

13  to speak with him?

14  A.      Other than saying hi, no.  It's ....

15  Q.      Did you ever ask Mr. Alzaghari if it was okay

16  for you -- for the store to be keeping money in the back

17  as opposed to in the cash register?

18  A.      No.

19  Q.      Did that subject ever come up with --

20  A.      No.

21  Q.      Did you ever talk with Ms. Ocampo about keeping

22  money in the back?

23  A.      No.

24  Q.      Did you ever talk with Amy Tam about keeping

25  money in the back?

PATRICIA CALLAHAN REPORTING

b65cbf73-95b9-4725-b61f-6c1255a62cde

**Dec. of Thompson - Exhibit 9**

1   A.      No.

2   Q.      Do you have any basis for believing that

3   Mr. Alzaghari knew that the store's practice was to keep

4   cash in the manager's desk drawer rather than in the

5   cash registers?

6   A.      Yes, because that's, like -- that's the first

7   store that I -- or the second store that I was working

8   at, and that's -- like I -- when I started there,

9   working there, that's the way they -- that's where they

10  kept it.

11  Q.      Okay.

12  A.      I thought Hani was okay with it.

13  Q.      What makes you think Hani was okay with it?

14  A.      Because that's the way it was.

15  Q.      Okay.  Other than your belief that that's the

16  way it was, do you have any other reason to believe that

17  Hani was okay with the store keeping money in the store

18  manager's desk, rather than in the cash registers?

19  A.      Yeah, I thought he -- it was okay.

20  Q.      Well, I understand you thought that.  I'm trying

21  to find out what makes you think Hani thought it was

22  okay.  You never talked --

23  A.      I don't know.

24  Q.      -- to him about it, right?

25  A.      No.

b65cbf73-95b9-4725-b61f-6c1255a62cde

**Dec. of Thompson - Exhibit 9**

1   Q.      Okay.  So what's the basis for your belief that

2   Hani was okay with that practice?  Do you have any facts

3   to back that up?

4   A.      No.

5   Q.      So you're basing it just on your understanding

6   that that's the way it was always done, right?

7   A.      Yes, that -- as far as I know.

8   Q.      And so because you thought that's the way it was

9   always done, you're just assuming that Mr. Alzaghari

10  knew it, right?

11  A.      Yes.

12  Q.      But as you sit here now, you have no reason to

13  believe that Hani actually did know it, do you?

14  A.      I don't know.

15  Q.      Now, were you ever present in the store when

16  Ms. Ocampo came by after Mr. Allen had already left?

17          MS. VERONESE:  After he was terminated or left

18  for the day?

19          MS. THOMPSON:  I -- good clarification.  Let me

20  ask the question again.

21  Q.      Were you ever present in the store while

22  Mr. Allen was the manager, but he had already left for

23  the day, when Ms. Ocampo came into the store?

24  A.      Yes.

25  Q.      How many times did that happen, where Ms. Ocampo

b65cbf73-95b9-4725-b61f-6c1255a62cde

**Dec. of Thompson - Exhibit 9**

Page 101

1    A.      I'm not sure.

2           MS. VERONESE:  Calls for -- yeah, calls for

3    speculation.

4           MS. THOMPSON:  Q.  Well, was there any kind of

5    group meeting or discussion with either Ms. Ocampo or

6    Ms. Tam about the inventory?

7    A.      No.  They just said, "We're having inventory."

8    Q.      Who said that?

9    A.      Tam.  Amy Tam.

10   Q.      And who was present when she said that?

11   A.      Everybody was present.  We had meetings, so --

12   Q.      Okay.  So Ms. Tam had a meeting, and she talked

13   about the inventory; is that right?

14   A.      Yes, and she said it was mandatory and everybody

15   had to come.

16   Q.      So at this meeting were you and all the store

17   associates, right?

18   A.      Um-hum.

19   Q.      Is that "yes"?

20   A.      Yes.

21   Q.      And Ms. Tam told you that you all had to attend

22   the -- or participate in the inventory; is that right?

23   A.      Yes.

24   Q.      Now, had you ever met Amy Tan before she became

25   the store manager?

PATRICIA CALLAHAN REPORTING

b65cbf73-95b9-4725-b61f-6c1255a62cde

**Dec. of Thompson - Exhibit 9**

1   A.      No.

2   Q.      So the first time you ever saw Ms. Tam was after

3   Mr. Allen had been terminated?

4   A.      Yes.

5   Q.      Have you ever heard anything about Ms. Tam

6   before she became the store manager at 3830?

7   A.      I mean, I heard that she was at another store,

8   as the manager over there.

9           THE REPORTER:  I'm sorry, did you say "never

10  heard" or "I heard"?

11          MS. THOMPSON:  Q.  I thought you said you heard

12  that Amy Tam was at another store --

13  A.      Yeah.

14  Q.      -- before she came to 3830 --

15  A.      Yes.

16  Q.      -- is that right?

17  A.      Yes.

18  Q.      Other than hearing that Ms. Tam was at another

19  store, had you heard anything at all about her before

20  she came to your store, 3830?

21  A.      That she was working under Basim at his store on

22  Clement, I believe it was.

23  Q.      Who is Basim?

24  A.      Basim is the first -- one of the many assistant

25  managers when I went through the assistant managers

b65cbf73-95b9-4725-b61f-6c1255a62cde

Page 104

1    and I saw Amy Tam there.  It was a group photo, you

2    know, of them.  Or Basim brought it by the store and

3    showed me.

4    Q.     By the way, I meant to ask you this before.  Do

5    you think that Radio Shack's decision to terminate your

6    employment had anything to do with your age?

7    A.     No.

8    Q.     Do you have any opinion or belief as to why

9    Radio Shack terminated your employment?

10   A.     No.

11   Q.     All right.  So other than -- I understand from

12   what you're saying -- and correct me if I'm wrong --

13   that because at some point you'd seen a picture of

14   Amy Tam and Basim, you drew the conclusion that Amy Tam

15   was an assistant manager working for Basim at Clement

16   Street; is that right?

17   A.     Yes.

18   Q.     Now, how did Amy Tam treat you as the store

19   manager?  Did she -- what was your impression of her as

20   the store manager?

21   A.     She was more interested in cell phone sales and

22   the sales part of everything.  And very aggressive on

23   the sales floor.

24   Q.     So Ms. Tam was more aggressive than Mr. Allen on

25   the sales floor?

b65cbf73-95b9-4725-b61f-6c1255a62cde

Dec. of Thompson - Exhibit 9

1   there -- 'cause I hadn't been there very long, okay; I

2   hadn't been there very long --

3   Q.      Well, how --

4   A.      -- Amy Tam came in.  Then that incident happened

5   on a Friday; they came in -- Donna Ocampo and the

6   regional matter came in, went into the back room, with

7   me and Rosetta closing the store, and the next thing I

8   know, they say the money was back in the drawer and that

9   Frank was terminated the following week.

10  Q.      Who told you that?

11  A.      That was -- that was Bruce told me.

12  Q.      Okay.  Who told you that Mr. Allen had been

13  terminated?

14  A.      Bruce.

15  Q.      And did Bruce tell you why Mr. Allen had been

16  terminated?

17  A.      Because Rosetta left the drawer unlocked in the

18  back where the money was kept.

19  Q.      Did you ever talk with Donna Ocampo about why

20  Mr. Allen had been terminated?

21  A.      No.

22  Q.      Did you ever talk with Amy Tam about Mr. Allen's

23  termination?

24  A.      No.

25  Q.      Okay.  So let's go back to this transfer

b65cbf73-95b9-4725-b61f-6c1255a62cde

**Dec. of Thompson - Exhibit 9**

1  Ms. Tam discriminated against you in any way because of

2  your Mexican-American national origin?

3  A.      No.

4  Q.      Do you know of any other older employees, or

5  elderly, as you've used the term, that were terminated

6  by Ms. Tam at any time?

7  A.      No.

8  Q.      Did you ever make any complaint to human

9  resources that you thought Ms. Tam was writing you up

10  because -- in your opinion, because of your age?

11  A.      No.

12  Q.      All right.  Did you ever have any conversations

13  with Ms. Tam about keeping money in the store manager's

14  desk drawer?

15  A.      No.

16  Q.      When Ms. Tam was there, do you know one way or

17  the other whether that practice continued, in terms of

18  having money in the back, or did that --

19  A.      No, it stopped.

20  Q.      Did it stop as soon as Ms. Tam became the store

21  manager?

22  A.      Yes.

23  Q.      So the entire time that Ms. Tam was the store

24  manager, the required practice was that all cash was to

25  be kept in the cash register; is that right?

b65cbf73-95b9-4725-b61f-6c1255a62cde

**Dec. of Thompson - Exhibit 9**

1   A.      Yes.

2           MS. VERONESE:  While you were there.

3           THE WITNESS:  Yeah.  Yes.

4           MS. THOMPSON:  Q.  I'm sorry.

5   A.      Yes.

6   Q.      Okay.

7   A.      While I was there.

8   Q.      Yes, that's all I'm asking about, is while you

9   were there.

10  A.      Um-hum.

11  Q.      Is that "yes"?

12  A.      Yes.

13  Q.      And I think I asked you this before, but of all

14  the other stores that you had worked in for Radio Shack,

15  did you ever know of any other store manager that kept

16  money in the store manager's desk drawer?

17  A.      No.

18  Q.      Do you know who made the decision to terminate

19  your employment?

20  A.      Donna Ocampo made the final decision.

21  Q.      Who told you that?

22  A.      Amy.  Amy told me that Donna would call me.

23  Q.      Okay.

24  A.      And then Donna called me.

25  Q.      So what conversation did you have with Amy about

b65cbf73-95b9-4725-b61f-6c1255a62cde

**Dec. of Thompson - Exhibit 9**

137

CERTIFICATE

1

2

3        I, the undersigned, a Certified Shorthand

4   Reporter, hereby certify that the witness in the

5   foregoing deposition was first duly sworn to testify to

6   the truth, the whole truth, and nothing but the truth in

7   the within-entitled cause; that said deposition was

8   taken at the time and place therein stated; that the

9   testimony of said witness was reported by me, a

10  disinterested person, and was thereafter transcribed

11  under my direction into typewriting; that the foregoing

12  is a full, complete and true record of said testimony;

13  and that the witness was given an opportunity to read

14  and, if necessary, correct said deposition and to

15  subscribe to the same.

16       I further certify that I am not of counsel or

17  attorney for either or any of the parties in the

18  foregoing deposition and caption named, nor in any way

19  interested in the outcome of the cause named in said

20  caption.  Executed this 22nd day of October, 2012.

21

22

23  _____
    CERTIFIED SHORTHAND REPORTER
24  NO. 5697

25

**Dec. of Thompson - Exhibit 9**

EXHIBIT 10

Allen vs. Radio Shack    Shaan Smith                10-23-12

```
 1              UNITED STATES DISTRICT COURT

 2            NORTHERN DISTRICT OF CALIFORNIA

 3               SAN FRANCISCO DIVISION

 4                      --oOo--

 5   FRANK ALLEN,

 6              Plaintiff,

 7       vs.                      No. CV 11-03110 WHA

 8   RADIO SHACK CORPORATION, and
     Does 1-20, Inclusive,
 9

10              Defendants.

11   _____/

12

13

14

15            DEPOSITION OF SHAAN SMITH

16            Tuesday, October 23, 2012

17

18

19

20   REPORTED BY:  DEBRA J. SKAGGS, CSR 7857

21

22

23            DE SOUZA & ASSOCIATES
            Certified Shorthand Reporters
24               P.O BOX 1675
            San Mateo, California  94401
25        (650) 341-2671  desouzacr@att.net

                                                1
```

**Dec. of Thompson - Exhibit 10**

1                          ---oOo---

2               BE IT REMEMBERED that, pursuant to notice, and

3    on Tuesday, the 23rd day of October 2012, commencing at

4    the hour of 10:20 a.m., thereof, at the Law Offices of

5    JOSEPH L. ALIOTO AND ANGELA ALIOTO, 700 Montgomery

6    Street, San Francisco, California, before me,

7    DEBRA J. SKAGGS, CSR No. 7857, a Certified Shorthand

8    Reporter

9                          --oOo--

10                         EXAMINATION

11              MS. ALIOTO:  Q.  Okay.  Can you state your

12   name for the record and spell it.

13   A.          Shaan Smith.  S-H-A-A-N.  S-M-I-T-H.

14              (Off the record: 10:20 a.m. to 10:20 a.m.)

15              MS. ALIOTO:  Okay.  Hi.

16              THE WITNESS:  Hi.

17              MS. ALIOTO:  Q.  My name is Angela Alioto

18   and I represent Frank Allen, the Plaintiff in this

19   action.

20              Have you ever had your deposition taken

21   before?

22   A.          Yes.

23   Q.          When was the last time you had your deposition

24   taken?

25              MS. THOMPSON:  Your best estimate.

                                                            6

Dec. of Thompson - Exhibit 10

Allen vs. Radio Shack    Shaan Smith          10-23-12

1   California.

2   Q.        Okay.

3   A.        Then that's when I went to Radio Shack in

4   October.

5   Q.        So October of 2009 you went to Radio Shack.

6   A.        Uh-huh.

7   Q.        Okay.  How did you find out about the job at

8   Radio Shack?

9   A.        Posting.  Job posting.

10  Q.        On the Internet?

11  A.        Yes.

12  Q.        And what job did you apply for?

13  A.        It was -- I started as an area human resources

14  manager, and then my position, they -- the company

15  reorged and then that changed.

16  Q.        When did the company reorganize?

17  A.        The end of 2010.  I think it was November of

18  2010.  That's when all of our positions changed.

19  Q.        And your prior position of HR manager changed

20  into what it in November of 2010?

21  A.        So we went from area human resources manager

22  to regional HR manager.

23  Q.        You did.

24  A.        I did.  Along with my counterparts.

25  Q.        And so regional HR manager.

17

**Dec. of Thompson - Exhibit 10**

Allen vs. Radio Shack    Shaan Smith                10-23-12

```
 1   Q.         Let me go over -- you're looking at
 2   Exhibit No. 1.  Let me go over a couple names with you.
 3   A.         I'm sorry.  You said you're going to go over a
 4   couple of what?
 5   Q.         A couple of names.
 6   A.         Oh, okay.
 7   Q.         Okay.  Do you recall the first time -- well,
 8   did you ever meet Frank Allen?
 9   A.         Not that I can recall.
10   Q.         Okay.  Did you ever talk to Frank Allen?
11   A.         Yes.
12   Q.         Okay.  Do you recall the first time you spoke
13   to Frank Allen?
14   A.         I reviewed my notes, so I don't remember the
15   date.  But from my understanding, it was around his
16   termination.
17   Q.         Okay.  Do you recall speaking to him before
18   the termination at all?
19   A.         I don't recall.
20   Q.         So that I'm clear, are you testifying that the
21   first time you ever talked to Frank Allen was around
22   April of 2010 when he was terminated?
23   A.         Again, I don't recall.
24   Q.         You don't know.
25              Have you ever been to Store 3830 during that
```
                                                        39

**Dec. of Thompson - Exhibit 10**

Allen vs. Radio Shack   Shaan Smith                10-23-12

1    time period of 2010?

2    A.        I can't specifically say I can.  I don't know.

3    I visited a lot of different stores.

4    Q.        You did?

5    A.        Uh-huh.

6    Q.        Okay.  And what was your job when you would be

7    visiting stores?

8    A.        Just familiarizing myself with the field.  It

9    wasn't a requirement.

10   Q.        As the HR -- again, what was your proper title

11   at this time in April of 2010?

12   A.        April of 2010 it was the area HR manager.

13   Q.        Area.

14             So it was before the reorganization --

15   A.        Correct.

16   Q.        -- of November 20 --

17   A.        '10.

18   Q.        '10.

19   A.        Correct.

20   Q.        Was there any reorganizing going on from

21   November of 2009 to April of 2010 that you recall?

22             MS. THOMPSON:  Objection.  Vague and

23   ambiguous.

24             THE WITNESS:  From November of '09?

25             MS. ALIOTO:  Yeah.

                                                           40

De Souza & Associates    650-341-2671      desouzacr@att.net

**Dec. of Thompson - Exhibit 10**

1           THE WITNESS:  Not that -- oh, I can't -- I

2     don't know.  My position was new, but I'm not sure if

3     that was a part of a reorg or anything.

4           MS. ALIOTO:  Q.  Oh, you mean you didn't

5     replace anybody; that was a brand new position?

6     A.          Correct.

7     Q.          Okay.  And that's area HR?

8     A.          Correct.

9     Q.          So let me understand.  Where did you

10    physically go to work?

11    A.          Where?

12    Q.          As area HR in January, February, March, and

13    April of 2010.

14    A.          I was in San Ramon the whole time of my

15    employment at Radio Shack.

16    Q.          Okay.  Describe to me your office of HR in

17    San Ramon?  How many HR reps were there at this time

18    period, January to April of 2010.

19    A.          Technically it was myself and Donetta.

20    Q.          Okay.

21    A.          And she went out on leave, so it was just me

22    by myself.

23    Q.          Okay.  And then did Christopher and Kelly join

24    you?

25    A.          They were in different locations, but they did

                                                        41

Dec. of Thompson - Exhibit 10

Allen vs. Radio Shack    Shaan Smith              10-23-12

1     vague and ambiguous, and lacks foundation.

2               Can you repeat that question, please.

3               MS. ALIOTO:  Q.  Yeah, I'm going to fix

4     all the things that she says were wrong with it.

5               Did you ever meet with Mr. Pattakos at the end

6     of 2009?

7     A.          Did I ever meet with him?

8     Q.          Right.

9     A.          No.

10    Q.          Did he ever -- did he call you on the phone in

11    2000 -- at the end of 2009 when he took Tom's position?

12    A.          Did he call me?

13    Q.          Uh-huh.

14    A.          Not that I -- I don't think so.

15    Q.          Okay.  Do you recall ever meeting him or

16    talking to him or emailing him in the year 2009?  "Him"

17    being Pattakos.

18    A.          I met him when he came to San Ramon.

19    Q.          And when did he come to San Ramon?

20    A.          Again, I don't remember the month.  It was

21    when Tom left.

22    Q.          And Donetta was still there?

23    A.          Correct.

24    Q.          Okay.  Now, Tom is loss prevention, right?

25    A.          No.  He was the area vice president.

                                                              49

De Souza & Associates    650-341-2671    desouzacr@att.net

**Dec. of Thompson - Exhibit 10**

1   went?

2           MS. THOMPSON:  Well, objection.  Lacks

3   foundation.

4           MS. ALIOTO:  Q.  Do you recall what she

5   said how her store visits went?

6           MS. THOMPSON:  Assumes facts.

7           Okay.  Never mind.  Go ahead.

8           THE WITNESS:  She had a lot of store visits.

9   So she would tell me how some -- she would tell me how

10  some of them went, you know.

11          MS. ALIOTO:  Q.  Okay.  In that you mean

12  she would have a lot of store visits with Pattakos.

13  A.        No.  She had a lot of store visits not

14  specifically -- some with Pattakos when he was there and

15  then she did a lot with the regional directors.

16  Q.        Okay.

17  A.        I think the DMs too.

18  Q.        The DMs.

19  A.        District managers.

20  Q.        Managers, yeah.

21          Okay.  So let me ask you.  Do you know

22  Donna Ocampo?

23  A.        I do.

24  Q.        When you were there, what position was

25  Donna Ocampo in?

                                                    56

**Dec. of Thompson - Exhibit 10**

Allen vs. Radio Shack    Shaan Smith                10-23-12

1   A.        She was in two different positions.  She was a

2   district manager and then she was the interim regional

3   RSD.  Regional sales director.

4   Q.        Do you remember Donna Ocampo saying anything

5   to you about Mr. Pattakos?

6   A.        No, not that I can recall.

7   Q.        Do you remember -- do you know Amy Tam?

8   A.        Amy Tam?

9   Q.        Uh-huh.

10  A.        I believe she was a store manager.  Or

11  assistant store manager.  One of them.

12  Q.        Did you participate at all in the decision to

13  move Amy Tam to 3830?

14  A.        I don't believe so.

15  Q.        Did you ever work one-on-one with Ocampo in

16  changing people from store to store or --

17            MS. THOMPSON:  Objection.  Vague and

18  ambiguous.

19            THE WITNESS:  It depended -- depends --

20  depended on the situation.

21            MS. ALIOTO:  Q.  Okay.  So has there been

22  times when you did work with her?

23  A.        If it was -- if HR was involved and, you know,

24  we were -- if I told her that we need to temporarily

25  move someone because of an investigation, something like

                                                        57

**Dec. of Thompson - Exhibit 10**

Allen vs. Radio Shack    Shaan Smith              10-23-12

1    that, then yeah.  Outside of that, no.
2    Q.        Okay.  So, again, do you recall that there was
3    a meeting in December of 2009 concerning Mr. Pattakos --
4              MS. THOMPSON:  Objection --
5    Q.        -- with the different store managers?
6              MS. THOMPSON:  Objection.  Assumes facts and
7    lacks foundation.
8              THE WITNESS:  Okay.  Say that again.
9              MS. ALIOTO:  Q.  Do you recall if there
10   was a meeting in December of 2009 concerning
11   Mr. Pattakos?
12             MS. THOMPSON:  Objection.  Assumes facts and
13   lacks foundation.
14             THE WITNESS:  Not that I recall.
15             MS. ALIOTO:  Q.  Do you recall if there
16   was ever a meeting of the store managers or the
17   district managers or the regional managers
18   concerning Mr. Pattakos's behavior?
19   A.        Not that I can recall.
20   Q.        Okay.  So you were never invited to
21   anything --
22   A.        No.
23   Q.        -- concerning Mr. Pattakos's behavior?
24   A.        No.
25   Q.        And did Donna Ocampo ever tell you that there

                                                        58

De Souza & Associates    650-341-2671        desouzacr@att.net

**Dec. of Thompson - Exhibit 10**

Allen vs. Radio Shack    Shaan Smith                10-23-12

1   was a meeting concerning Mr. Pattakos?

2           MS. THOMPSON:  Objection.  Assumes facts.

3   Misstates the record.

4           THE WITNESS:  I can't recall that.

5           MS. ALIOTO:  Q.  How about Donetta.  Did

6   she ever mention that there was a meeting concerning

7   his -- Mr. Pattakos's behavior?

8           MS. THOMPSON:  Objection.  Assumes facts.

9   Misstates the record.

10           MS. ALIOTO:  Q.  Or complaints.  A meeting

11   of general managers or store managers or anybody

12   complaining about Mr. Pattakos.

13   A.       I don't recall a meeting taking place.  It

14   might have, but I don't know.

15   Q.       Okay.  Bottom line is you weren't invited to

16   anything.

17   A.       Right.

18   Q.       Okay.  Let's take a look at the Exhibit No. 1

19   that you have in front of you.

20   A.       Uh-huh.

21   Q.       Page 5.

22           Would you consider Donna Ocampo to have been a

23   friend of yours?

24   A.       A friend?

25   Q.       Uh-huh.

                                                        59

**Dec. of Thompson - Exhibit 10**

Allen vs. Radio Shack    Shaan Smith                10-23-12

1    A.         We had a good working relationship but not

2    outside of work.

3    Q.         So you weren't social outside of work at all?

4    A.         No.

5    Q.         Now, did you ever hear -- in Paragraph 27, it

6    says,

7               "Defendant Ocampo told Plaintiff..." -- that

8               would be Mr. Allen, "...to set up interviews

9               for her and that she would come in and

10              interview applicants for the new staff that he,

11              Plaintiff, was to terminate because they didn't

12              fit the image."

13              Did Donna Ocampo ever tell you that she wanted

14   to change the image at Store 3830?

15   A.         Not that I can recall.

16   Q.         Okay.  Would you be involved in hiring new

17   people for a specific store if a group of people were

18   let go?

19              MS. THOMPSON:  Objection.  Vague and

20   ambiguous.

21              THE WITNESS:  As an area HR manager, I was not

22   involved in area recruiting.

23              MS. ALIOTO:  Q.  Okay.  So let me ask you.

24   Do you recall who worked at 3830 from January to

25   April of 2010?

                                                        60

De Souza & Associates    650-341-2671        desouzacr@att.net

**Dec. of Thompson - Exhibit 10**

1    A.        No.

2    Q.        Okay.  Did you know Rosetta?  An employee

3    named Rosetta?

4    A.        Did I know her or I --

5    Q.        Did you know of her at 3830.

6    A.        Yes.

7    Q.        Okay.  Did you know of Victoria at 3830?

8    A.        No.

9    Q.        Did you know of Nabor?

10   A.        No.

11   Q.        No.  Did you know Erica?

12   A.        I don't -- no.

13   Q.        Okay.  How about Bruce?

14   A.        I don't believe so, no.

15   Q.        Tell me what do you recall about Rosetta?

16   A.        I remember she was one of the store associates

17   that Donna was talking to on some kind of cash

18   transaction.  She had money in the back of her pocket.

19   Q.        Okay.  And did Donna tell you about that?

20   A.        Yes.

21   Q.        Did you get involved at all in that situation?

22   A.        Get involved --

23             MS. THOMPSON:  Vague and ambiguous.

24             THE WITNESS:  To what extent?

25             MS. ALIOTO:  Q.  Did you call Rosetta?

                                                        61

**Dec. of Thompson - Exhibit 10**

```
1                          (Plaintiff's Exhibit 2 marked
2                          for identification.)
3               (Off the record.)
4               MS. ALIOTO:  Q.  All right.  Is this your
5     handwriting, Exhibit 2, that's Bates stamped 000266?
6     A.        Yes.
7     Q.        All right.  So can you read it for me?  Just
8     read the whole document.
9     A.        Okay.  "Talked to Donna April 27, 2010
10                regarding store manager.  Been there for ten
11                years.  She advised that on 3/24 he was given a
12                final written warning issued on file.  He
13                didn't adhere to the final.  District
14                manager/RSD Aybeth visited the store last
15                Tuesday regarding $200 in unprotected
16                cash -- in unprotected cash."
17              THE REPORTER:  I'm sorry, "in unprotected?"
18              THE WITNESS:  I'm reading what I said, but I
19    don't -- "...$200 in..." -- I don't know how -- "...in
20    an unprotected cash."
21              It looks like the way that I wrote it here,
22    that a CAR, which is a Corrective Action Record, was
23    given.  It's there to identify -- so, a corrective
24    action was given due to his failure to identify more
25    than $1000 in the till.
```

                                                              66

1               MS. THOMPSON:  Wait.  In cash.

2               THE WITNESS:  In -- I'm sorry.  A thousand

3    dollars in cash in the till.

4               MS. ALIOTO:  Q.  I'm sorry.  The word

5    after "in cash."  What is that?

6    A.        It's crossed out.  I'm not sure.  But after

7    that it says "in the till."

8    Q.        Okay.

9    A.        And then sitting in the drawer in the back,

10   not locked.

11              So the $200, I think --

12   Q.        Okay.

13   A.        -- I'm not sure.  But basically there was

14   money in the drawer in the back that wasn't locked.

15   Q.        But for right now, just read the words because

16   I can't read your writing.

17   A.        Oh, okay.

18   Q.        And then we're going to go back and I'm going

19   to ask you questions about it.

20   A.        Okay.

21              "2.  District manager went to talk to sales

22              associate Rosetta to inquire on the money in

23              the back.  Witness was Basem Aybef."

24   Q.        I'm sorry.  Where do you see that?

25   A.        On the far left.  "Witness Basem."

                                                        67

1    Q.        That's "witness."

2              Okay.  Thank you.

3    A.        So this is her -- this is Donna's discussion

4    with Rosetta.  She said,

5              "This is where we put the extra change.  This

6              is where we always put it.  Then she pulled out

7              $1100 from her back pocket.  District manager

8              took that, then they went to the back to do the

9              midday."

10             And then that was the DM -- District

11   Manager -- RSD, and sales associate that went into the

12   back.

13   Q.        Who is the DM?

14   A.        Donna.

15   Q.        And who is the RSD?

16   A.        Basem.

17   Q.        Okay.

18   A.        "DM told sales associates go and make the

19             drop.  She verbally counts..." -- oh.  "She

20             verbally counseled it.  HR..." -- so that's

21             me -- "...advised Donna to document it."

22             And then "DM, Donna, termed today, April 27th.

23             Store manager very irate.  Said DM shady,

24             thanks for freeing a slave."

25   Q.        Okay.  Now, it says "DM terminated today

                                                          68

**Dec. of Thompson - Exhibit 10**

Allen vs. Radio Shack    Shaan Smith                    10-23-12

1   4/27," but you don't say who.

2   A.         We were talking about the store manager.

3   Q.         So let's go back to the beginning.

4              Okay.  This is regarding store manager, ten

5   years.

6              Who told you he had been there ten years?

7   A.         Donna.

8   Q.         Did you look up and see if that was true?  Did

9   you investigate any of the things she told you?

10  A.         I'm not sure.

11  Q.         On April 27th of 2010, do you have any idea

12  how many years he really had been there?

13             MS. THOMPSON:  Well, objection.  Assumes

14  facts, misstates the document.

15             MS. ALIOTO:  No, I want to know what you knew.

16             MS. THOMPSON:  Well, to the extent you can

17  remember.

18             THE WITNESS:  Yeah, I'm not sure what I did.

19             MS. ALIOTO:  Q.  Okay.  But do you know of

20  any -- do you know whether or not the ten years is

21  correct?

22             MS. THOMPSON:  Objection.  Vague and

23  ambiguous.

24             "Correct" as to what?

25             MS. ALIOTO:  Correct as to the time that the

                                                              69

Dec. of Thompson - Exhibit 10

Allen vs. Radio Shack    Shaan Smith              10-23-12

1    store manager had actually worked there.

2              MS. THOMPSON:  Well, see, that's the problem

3    I'm having.  It doesn't say that he worked at

4    Radio Shack ten years, it says he was a store manager for

5    ten years.

6              MS. ALIOTO:  She just trans -- okay --

7              MS. THOMPSON:  Well, I don't even know that

8    that's right.  I have no idea.

9              MS. ALIOTO:  Yeah, it isn't.

10             MS. THOMPSON:  Well I don't know, but I think

11   you're -- well, I'm just objecting.

12             MS. ALIOTO:  Q.  Here is my point, okay?

13   Because, yeah, I really appreciate your lawyer but I

14   can't spend time talking to lawyers.

15             In that second line there, it says "store

16   manager, ten years."  So is it your interpretation that

17   he was store manager for ten years?

18             MS. THOMPSON:  Well --

19   Q.        Or was it --

20             THE WITNESS:  Not necessarily.

21   Q.        -- that's what Donna told you?

22   A.        Again, this is a conversation that happened

23   over two years ago.

24   Q.        Okay, but, are you writing down what Donna

25   told you?

                                                        70

De Souza & Associates    650-341-2671      desouzacr@att.net

**Dec. of Thompson - Exhibit 10**

Allen vs. Radio Shack    Shaan Smith                    10-23-12

1    A.        I'm writing down, but the way that I
2    write -- I mean I can't remember what Donna exactly told
3    me.
4    Q.        Okay.  Did anybody verify the man worked there
5    for ten years?
6    A.        I don't recall.
7    Q.        Okay.  Next sentence.  I still can't read the
8    second -- finally something issued on file.
9    A.        "A final written warning issued on file."
10   Q.        Okay.  I'm sorry.  Where do you see "written
11   warning?"
12   A.        WW.
13   Q.        Okay.  So WW is written warning.
14             "Final written warning issued on file."
15             Do you know -- is that 3/24?
16             You're saying there was a final written
17   warning written on 3/24?
18   A.        That's what it looks like.
19             MS. ALIOTO:  Okay.  Let's introduce as No. 3,
20   the alleged final written warning, a Corrective Action
21   Record.
22                        (Plaintiff's Exhibit 3 marked
23                         for identification.)
24             MS. ALIOTO:  Q.  Before we go back to the
25   document that's No. 2, Exhibit No. 2.  What are

                                                        71

**Dec. of Thompson - Exhibit 10**

Allen vs. Radio Shack    Shaan Smith                    10-23-12

1    these notes?

2    A.        What do you mean what are they?

3    Q.        Are they a telephone conversation with Donna?

4    What are they?

5    A.        I don't recall.  It might have been a

6    telephone, it might have been in person, I'm not sure.

7    Q.        But it's a conversation with Donna, right?

8    A.        Yes.

9    Q.        All right.  So you have final written warning.

10   Can you take a look at Exhibit No. 3.

11   A.        Uh-huh.

12   Q.        It's the corrective action of March 23rd.

13   A.        Uh-huh.

14   Q.        Okay.  Do you see anywhere on here where this

15   says "final?"

16             MS. THOMPSON:  Well, object to the extent the

17   document speaks for itself.

18             THE WITNESS:  (Pause for review.)

19             Restate the question again.

20             MS. ALIOTO:  Q.  Do you see anywhere on

21   this document, Exhibit No. 3, Corrective Action

22   Record of March 23rd, 2010, where it says "final?"

23   A.        No.

24   Q.        Okay.  Do you know at this time whether or not

25   there was a progressive disciplinary process in place at

                                                            72

De Souza & Associates    650-341-2671        desouzacr@att.net

**Dec. of Thompson - Exhibit 10**

1   Radio Shack?

2   A.        If there --

3             MS. THOMPSON:  Objection.  Vague and

4   ambiguous.

5             THE WITNESS:  Do I know -- say that again.

6             (Record read by the Reporter as follows:

7             "Q.  Okay.  Do you know at this time

8             whether or not there was a progressive

9             disciplinary process in place at Radio

10            Shack?")

11            THE WITNESS:  Yeah, there was a progressive

12   disciplinary process.

13            MS. ALIOTO:  Q.  Okay.  Can you tell me

14   what the progressive disciplinary process was?

15   A.        I mean it just really depended on -- we

16   weren't -- the company is not bound by the progressive

17   discipline.  It really depends on the infraction.  So,

18   it wouldn't be progressive if certain things happened.

19   You can go, you know, from zero to term depending on

20   what the infraction was, so.

21   Q.        And where is this policy located, if anywhere?

22   A.        I can't -- I don't remember.

23   Q.        Where did you learn about it?

24   A.        Could have been online, could have been from

25   Donetta.

                                                          73

Dec. of Thompson - Exhibit 10

Allen vs. Radio Shack     Shaan Smith                    10-23-12

1    Q.        Okay.  What --

2    A.        Training.  I'm not -- I don't specifically

3    remember.

4    Q.        In your mind, as the area HR

5    person -- actually at this point of the game in April of

6    2010, you are the regional, correct?

7    A.        No.

8    Q.        What was your job title in April of 2010?

9    A.        Area.

10   Q.        Okay.  Area.

11             So what was your understanding of the

12   progressive disciplinary process at that time?

13   A.        Again, it just depended on the infraction.

14   Q.        Okay.  But what's the process?

15   A.        We weren't -- the company wasn't bound by

16   certain steps, so it just depends on what the

17   infractions were.

18   Q.        I understand that.  What was your

19   understanding of the process?  What were the steps?

20   A.        Okay, again, that is my understanding of it.

21   Q.        Okay.

22   A.        Depends on what the infractions were.

23   Q.        All right.  When you put down -- are you

24   saying -- as you sit here today, do you know if there is

25   a specific policy that states someone gets spoken to, an

                                                          74

De Souza & Associates     650-341-2671        desouzacr@att.net

**Dec. of Thompson - Exhibit 10**

```
 1   Exhibit No. 2 did you call it a final written warning?
 2   Is that what Donna told you?
 3   A.        Based on this --
 4   Q.        Yes.
 5   A.        -- more than likely.
 6   Q.        Okay.  Then it says, "He didn't adhere to
 7             final."
 8             When she told you that, did you ask her what
 9   she meant?
10   A.        I don't recall.
11   Q.        But you are saying that the final was written
12   on March 24th and you're writing this a month and three
13   days later, correct?
14   A.        I'm writing, yeah, what is on this paper, yes.
15   Q.        Okay.  Let's address the $200 in unprotected
16   cash drawer.
17             She told you that?  Donna told you that?
18   A.        I'm assuming.
19   Q.        Okay.  Did you investigate it?
20   A.        I don't think so.
21   Q.        Do you know of any high volume stores that are
22   allowed to keep petty cash in the back drawers?
23   A.        I don't recall.
24   Q.        When she told you that they visited the store
25   and there was $200 in unprotected cash, does that mean
```

                                                          77

**Dec. of Thompson - Exhibit 10**

Allen vs. Radio Shack    Shaan Smith                10-23-12

1   cash drawer?

2   A.        Cash in the till.

3   Q.        No, no, no.  We're up at 200.

4   A.        Yeah.

5   Q.        Okay.  "$200 in an unprotected cash."

6             Is that just in unprotected cash?  Did you

7   know where the unprotected cash was?

8   A.        I don't recall.

9   Q.        Okay.  Next sentence.

10            "Corrective action due to failure to identify

11            more than a thousand in cash in the till."

12            Okay.  Who failed to identify more than a

13  thousand in cash in the till?

14  A.        Oh.  His failure to identify.  So we're

15  probably talking about the store manager.

16  Q.        Okay.  What's "in the till" mean?

17            What does "in the till" mean?

18  A.        I don't remember what till.  I think it means

19  cash -- I'm not sure.  I can't remember what till means.

20  Q.        Okay.  So when it says, "His failure to

21  identify more than a thousand dollars in cash in the

22  till," do you mean the cash register or what do you

23  mean?

24  A.        Again, I don't remember.

25  Q.        Okay.  You don't know.

                                                          78

De Souza & Associates    650-341-2671      desouzacr@att.net

**Dec. of Thompson - Exhibit 10**

Allen vs. Radio Shack    Shaan Smith                10-23-12

1           Did you ask Donna -- did Donna tell you this,

2    that he failed to identify more than a thousand in cash

3    in the till?

4    A.        It looks like she did.

5    Q.        Okay.  Did you ask her what she meant?

6    A.        I don't recall.

7    Q.        Okay.  Next one.

8              "Sitting in the drawer in the back not

9              locked."

10   A.        I think that might be related to the 200.

11   Q.        Right.

12   A.        I don't -- I don't know.  Just the way that

13   it's written here, it looks like it would have been

14   related to that.

15   Q.        And did you investigate that issue at all,

16   whether or not there was actually $200 sitting in the

17   back not locked?

18   A.        I know that Donna sent me some pictures, so.

19   Q.        Pictures of a drawer?

20   A.        Uh-huh.  Yes.

21   Q.        Did you investigate it?

22             MS. THOMPSON:  Objection.  Vague and

23   ambiguous.

24             MS. ALIOTO:  Q.  Did you call Frank and

25   say, "Do you have 200 in the back drawer, and if you

                                                       79

De Souza & Associates    650-341-2671      desouzacr@att.net

**Dec. of Thompson - Exhibit 10**

1    did, why did you?"

2    A.       No.

3    Q.       Okay.  Next sentence.

4             "DM went to talk..."  --

5             Is that what that is?  TT - to talk.

6    A.       Yes.  Uh-huh.

7    Q.       "...to sales assistant Rosetta to inquire on

8             money in the back."

9    A.       Correct.

10   Q.       Okay.  "She said this is where we put the

11            extra change."

12            And on the side here it says "Witness Basem."

13            What is Basem witness?

14   A.       I probably asked her who all was there when

15   she was talking with Rosetta.

16   Q.       Okay.  So Donna tells you that just Basem and

17   she are doing this, right?

18   A.       Correct.

19   Q.       Put it -- I'm sorry.  Extra change dash this?

20   A.       "This is where we always put it."

21   Q.       Is where we always put it.

22            "Then she pulled out 1100 from her back

23            pocket."

24            Did you do any personal investigation of

25   whether or not Rosetta actually pulled 1100 out of her

                                                          80

Dec. of Thompson - Exhibit 10

1    pocket?

2    A.        No.

3    Q.        DM took that -- oh, boy.  DM took that

4    they -- that then they went back to the -- I'm sorry.

5    A.        "Went back to do the midday."

6    Q.        DM did what?

7    A.        "DM took that, then they went to the back

8              to do the midday."

9    Q.        Took that.  Meaning took the thousand dollars?

10   A.        Yes.

11   Q.        The 1100?

12   A.        Yes.

13   Q.        Okay.  And then they went back to do

14   the -- what is the midday?

15   A.        I think that's some -- I don't know exactly

16   what time, but they basically take a certain amount of

17   money, or -- I don't know exactly how much money,

18   but -- or what -- I don't know if they have to do a

19   midday every day.  But I know they take a certain amount

20   of money from the store and then do a drop deposit at the

21   bank.

22   Q.        Who is "they?"

23   A.        Whoever works at the store.

24   Q.        Okay.  So whoever works at the store --

25   A.        Store managers, keyholder.  I'm not exactly

                                                        81

Dec. of Thompson - Exhibit 10

1   sure who does it, but a store employee.

2   Q.        Do you know what time this visit was?  What

3   time of day this visit was?

4   A.        No.

5   Q.        Do you know who did the midday?  If anybody

6   went to the bank and deposited any money?

7   A.        I can't tell.

8   Q.        Do you know why Donna called you?  Why would

9   she call you for this?

10  A.        She was calling me to tell me about the whole

11  situation.

12  Q.        Why call you?  Were you supposed to do

13  something about it?

14  A.        I'm HR, so any time there is -- well, not any

15  time.  But performance issues, terminations.

16  Q.        Okay.  Prior to this call from Donna, had you

17  ever heard of any problems with Frank Allen?

18  A.        I don't -- I don't know.

19  Q.        And as I understand it, prior to this call

20  from Donna you didn't -- you had not spoken to

21  Frank Allen.

22  A.        Again, I don't know.

23  Q.        Okay.  The next one is,

24            "DM to SA.  Go and make day drop."

25            No.  "Go and make drop."

82

Allen vs. Radio Shack    Shaan Smith                    10-23-12

1    A.       Uh-huh.

2    Q.       I'm sorry.  I didn't get what the bottom thing

3    says.

4    A.       "Go and make the drop.  She verbally

5             counseled it."

6    Q.       Who verbally counseled what?

7    A.       So, based on my notes --

8    Q.       Yeah.

9    A.       -- it looks as if Donna coached -- she

10   probably coached her.  She said she verbally counseled

11   it.  So she probably -- and then I told her -- so the

12   next line says,

13            "HR advised to document it."

14            So she verbally counseled Rosetta.  I told her

15   to document it.

16   Q.       You told Donna to document the verbal

17   counseling of Rosetta.

18   A.       Correct.

19   Q.       And did she?

20   A.       I don't know.

21   Q.       Did you do any verbal counseling document for

22   Rosetta?

23   A.       No.

24   Q.       Do you do counseling warnings?

25            MS. THOMPSON:  Objection.  Vague and

                                                            83

De Souza & Associates    650-341-2671       desouzacr@att.net

**Dec. of Thompson - Exhibit 10**

Allen vs. Radio Shack    Shaan Smith                    10-23-12

1    ambiguous.

2              THE WITNESS:  What do you mean?

3              MS. ALIOTO:  Q.  Do you do disciplinary

4    actions and corrective actions that are set down by

5    the manager?

6    A.        HR does not issue them --

7    Q.        Right.

8    A.        -- no.  No.

9    Q.        Okay.  Next line.

10             "DM and Donna termed today, 4/27..." --

11             MS. THOMPSON:  It doesn't say DM and Donna.

12   It says DM slash Donna.

13             MS. ALIOTO:  Q.  What's that mean, DM

14   slash Donna?

15   A.        Donna is the DM.

16   Q.        Right.  Donna is the DM.

17             "DM/Donna..." --

18   A.        DM/Donna.

19   Q.        Okay.  "...termed today, 4/27/10."

20   A.        Uh-huh.

21   Q.        So in this telephone call, Donna told you she

22   was terminating Frank Allen?

23             MS. THOMPSON:  Objection.  Assumes facts.

24   Vague and ambiguous.

25             THE WITNESS:  In a discussion with Donna, we

                                                              84

Dec. of Thompson - Exhibit 10

Allen vs. Radio Shack    Shaan Smith                    10-23-12

1   did talk about the term.  I don't remember at what
2   point.
3              MS. ALIOTO:  Q.  Okay.  Well, you wrote
4   this.  Going back to the front page.  You wrote this
5   on 4/27 and you're saying terminate today.
6   A.         Yeah, I'm not saying that I didn't write this.
7   Q.         Okay.  So did you ask her why -- did she tell
8   you why she's terminating Frank?
9   A.         I'm sure she did.  Yeah, the -- because of the
10  money in the back.
11  Q.         Okay.  Where is that?
12  A.         I don't recall.
13  Q.         The $200 in the back drawer is the reason he
14  was terminated?
15  A.         I believe --
16             MS. THOMPSON:  Well, objection --
17  A.         -- that was the discussion.  So from what I
18  recall, I know it was dealing -- the issue is dealing
19  with not protecting company assets.
20             MS. ALIOTO:  Q.  Okay.  And did she talk
21  to you about the $200 in the back drawer being the
22  reason for the termination?
23  A.         I know that had something to do with it
24  because she sent me the pictures.
25  Q.         Right.  Okay.  Now, let me ask you.  Did she

                                                            85

De Souza & Associates    650-341-2671        desouzacr@att.net

Dec. of Thompson - Exhibit 10

Allen vs. Radio Shack    Shaan Smith                10-23-12

1    mention that David Gonsolin was with her on this day?

2    A.      Yeah.

3    Q.      Okay.  But you don't have him anywhere in this

4    document, do you?

5            MS. THOMPSON:  Objection.  The document speaks

6    for itself.

7            THE WITNESS:  In this document?

8            MS. ALIOTO:  Yeah.  I want to make sure I

9    didn't miss any of your handwriting.  You have Basem

10   being there.

11           THE WITNESS:  Uh-huh.

12           MS. THOMPSON:  Well, no, objection.  Misstates

13   the testimony, misstates the document.

14           MS. ALIOTO:  Q.  So what was your

15   understanding of who was there that day on

16   April 27th?

17   A.      Well, I know that David was a part of this.

18   Q.      Okay, but was it your understanding that Basem

19   was there on the day of the termination?

20   A.      I'm not sure.

21   Q.      Okay.  When you say you know that David was --

22   A.      I'm not sure if this was the same -- the issue

23   with Rosetta was the same day of the term.  I'm not sure

24   if that was -- I can't tell whether or not that was the

25   same day or not.

                                                        86

De Souza & Associates    650-341-2671        desouzacr@att.net

**Dec. of Thompson - Exhibit 10**

Allen vs. Radio Shack    Shaan Smith                10-23-12

1   Q.       Okay.  You just said you know that David had
2   something to do with it.  Do you know what he had to do
3   with it?  What was his involvement?
4   A.       He was the loss prevention manager.
5   Q.       Did she ever tell you that he was there with
6   her that day that she terminated him?  The day of this
7   document.
8   A.       I believe so.
9   Q.       You believe so.
10           Did she tell you why David was accompanying
11  her there?
12  A.       I have to look.  I know I have additional
13  notes, so.
14  Q.       Did David tell you that he was afraid of
15  Frank Allen?
16  A.       I don't remember my entire conversation with
17  David.
18  Q.       Did you speak to David that day?
19  A.       I don't know if it was that day.
20  Q.       Did you speak to him soon thereafter?
21  A.       I talked to him around that period.
22  Q.       Okay.  Did he tell you he was afraid of --
23  A.       No, I don't --
24  Q.       -- this big guy?
25  A.       -- I don't remember.

                                                          87

**Dec. of Thompson - Exhibit 10**

Allen vs. Radio Shack    Shaan Smith                10-23-12

1   Q.        Did he say anything about David (sic) Allen

2   that made you think it was different than other

3   terminations?

4             MS. THOMPSON:  Frank.

5             MS. VERONESE:  Frank Allen.

6             MS. ALIOTO:  I'm sorry.  Frank Allen.

7             THE WITNESS:  I don't recall that.  I don't

8   recall our conversation to the extent of it.

9             MS. ALIOTO:  Q.  Okay.  What did David say

10  to you in the conversation, if anything?

11  A.        I don't recall specifics.

12  Q.        At all.

13  A.        I don't.

14  Q.        At all.

15  A.        I can look at my notes and I can tell you.

16  Q.        But you don't recall at all as you sit here?

17  A.        If I look at my notes, then I can probably

18  tell you.

19  Q.        Okay.  Do you recall whether David told you

20  that he felt that Frank Allen was going to come back and

21  shoot up the place?

22  A.        I don't recall that.

23  Q.        Okay.  Now, if a --

24  A.        He may have, but I don't recall that.

25  Q.        Well, if a loss prevention person tells you

                                                        88

**Dec. of Thompson - Exhibit 10**

1    that, would you have called security or somebody else?

2    A.        I don't remember what our protocol would have

3    been.  I think that's something that loss prevention may

4    have handled.  I'm not sure.  I don't want to assume.

5    Q.        Okay.  And then it says -- no, I don't want

6    you to assume anything.

7    A.        Yeah.

8    Q.        I want to know what you knew as the HR area

9    representative.

10   A.        And I'm trying to think back two and a half

11   years ago.

12   Q.        And you can't remember.

13   A.        Nope.

14   Q.        Then it says, "SM very irate."

15            Who told you that?

16   A.        It must -- Donna.

17   Q.        When Donna is in this conversation with you

18   about Frank Allen, did you know Frank Allen is

19   African American?

20   A.        No.  I don't think so.

21   Q.        The next sentence says, "Said DM shady."

22   A.        Yes.

23   Q.        Okay.  Did you ask her anything about that?

24   A.        I may have.  I don't know.

25   Q.        You don't know.  And then it says,

                                                         89

**Dec. of Thompson - Exhibit 10**

Allen vs. Radio Shack    Shaan Smith                    10-23-12

1               "Thanks for freeing a slave."
2    A.        Uh-huh.
3    Q.        Okay.  She told you that he said thanks for
4    freeing a slave, right?
5    A.        Looks like it.
6    Q.        All right.  When she said that, did you ask
7    her any questions about that statement?
8    A.        I don't recall.  I don't know.  I may have.
9    Q.        But you don't remember.
10   A.        But I didn't write it down, so I'm not sure.
11   Q.        Okay.  Did you consider that to be a complaint
12   of racism?
13   A.        No.
14   Q.        Okay.  Why didn't you consider that to be a
15   complaint of racism?
16             MS. THOMPSON:  Objection.  Argumentative.
17             MS. ALIOTO:  No, I want to know what her
18   thinking is as the HR manager, which is what we have a
19   right to know.
20             MS. THOMPSON:  Yeah.  Same objection.
21             THE WITNESS:  Did I think of that as a
22   race -- as a complaint of racism?
23             MS. ALIOTO:  Right.
24             THE WITNESS:  I mean, this came from Donna,
25   so, if it was a complaint, I would think that Allen

                                                           90

**Dec. of Thompson - Exhibit 10**

Allen vs. Radio Shack    Shaan Smith                    10-23-12

1   would have indicated that, which he didn't.  Not to me
2   anyway.
3            MS. ALIOTO:  Q.  Okay.  But when she told
4   you that he said that, did you consider that to be
5   any kind of complaint?
6   A.       No.
7   Q.       Okay.  Did you ask her any questions about
8   that statement, "thanks for freeing a slave?"
9   A.       I don't recall.
10  Q.       All right.  Now you see the Post-It below?
11  Your handwriting here?
12  A.       Yep.
13  Q.       Do you know what that is?
14  A.       It looks like a -- it's a Post-It that has
15  Frank Alle -- I guess it's Frank Alle.  A phone number.
16  Has April 27th.  12:42, I guess.  And then it has 558,
17  Store 30 -- so ST3830.  So that's probably the district,
18  558.  And then Donna termed 4/27.
19  Q.       So was it your understanding that Donna
20  terminated him on that day?
21  A.       It looks like it, yeah.
22  Q.       Now, she had the authority to terminate; is
23  that correct?
24  A.       Donna?
25  Q.       Yep.

                                                        91

**Dec. of Thompson - Exhibit 10**

Allen vs. Radio Shack    Shaan Smith                10-23-12

1   A.        Yes.  But we had a -- Radio Shack had a one-up
2   policy too.
3   Q.        What's that mean?
4   A.        Usually you have to -- let me see.
5             If there was a store manager being termed,
6   then you had -- the DM had to have the RD's approval.
7   Concurrence.
8   Q.        And who was the RD?
9   A.        Based on this, it looks like the RD was Basem
10  at that time.
11  Q.        Approval to terminate?
12  A.        Yes.
13  Q.        Okay.  But you wrote here that DM terminated,
14  right?
15  A.        Where?
16  Q.        On this Post-It.
17            MS. THOMPSON:  Objection --
18            THE WITNESS:  That's not my writing on the
19  Post-It.
20            MS. ALIOTO:  Q.  Do you know whose writing
21  it is?
22  A.        Not specifically, but --
23            MS. THOMPSON:  Objection.  Lacks foundation,
24  calls for speculation.
25            Don't speculate or guess, please.

                                                        92

De Souza & Associates    650-341-2671        desouzacr@att.net

**Dec. of Thompson - Exhibit 10**

Allen vs. Radio Shack    Shaan Smith                10-23-12

1           MS. ALIOTO:  Q.  No, if you know, do you

2      know whose it is?

3      A.        No, I don't.  Not specifically, no.

4      Q.        Okay.  Did you put this Post-It on there?

5      A.        I don't -- I may have.  I don't know.  It's

6      probably a message --

7      Q.        A message from who?

8      A.        -- if I'm not mistaken.

9                Well, Frank Allen is at the top with a phone

10     number.  So it was probably a message left for me.

11     Q.        That he called?

12     A.        Uh-huh.

13     Q.        So it's a message he left for you.  Who would

14     take your messages?

15     A.        Anybody that answered the area phone.

16     Q.        Okay.  And do you recognize that handwriting

17     as anyone that gave you your messages?

18     A.        It could have been a couple of different

19     people.  I don't know.

20           MS. ALIOTO:  Okay.  Let's go to Exhibit No. 4,

21     which is dated August 28th, 2010.

22                     (Plaintiff's Exhibit 4 marked

23                      for identification.)

24           MS. ALIOTO:  Q.  Okay.  Is this your

25     handwriting?

                                                       93

De Souza & Associates    650-341-2671    desouzacr@att.net

**Dec. of Thompson - Exhibit 10**

| 1  | A. | Yes. |
|----|----|------|

1   A.      Yes.

2   Q.      The date is April 28, 2010, right?

3   A.      Correct.

4   Q.      And that's "talked to Frank?"

5   A.      Correct.

6   Q.      And what's the next sentence?

7   A.      "He advised of his term."

8   Q.      And "term" means termination?

9   A.      Correct.

10  Q.      Okay.

11  A.      Ready?

12  Q.      Next sentence.

13  A.      "Advised of..." -- I think that's ops.  I'm

14  not -- I can't remember.

15          "Advised of ops decision to term."

16  Q.      Okay.  Who is ops?

17  A.      If that's what I wrote, ops probably would

18  have been operations, like management.

19  Q.      And do you know who that is?

20  A.      It would have been, again, Donna and the RD.

21  Q.      Okay.  Next sentence.

22  A.      "Advised of pattern of LP issues."

23  Q.      What does that mean?

24  A.      Advised -- I must have advised him that there

25  was a pattern of loss prevention issues.

94

Allen vs. Radio Shack    Shaan Smith                10-23-12

1   Q.        And where did you get that knowledge?

2   A.        Donna and David -- I know Donna forwarded me a

3   few different emails.  I'm not sure if David did.

4   Q.        Okay.  As you sit here today, do you have any

5   idea what that pattern of loss prevention is?

6   A.        Yeah, I'd have to refer to the emails that

7   Donna sent.

8   Q.        Okay.  And the next sentence.

9   A.        "Advised of CAR, etc."

10  Q.        So you are -- let me understand this.  This is

11  a telephone conversation that you're having with Frank?

12  A.        Yes.

13  Q.        And you advised him of his corrective action?

14  A.        Yeah.  I spoke to the CAR that he was given.

15  Q.        Okay.  Had you seen the CAR?

16  A.        Yeah, I'm sure I did.

17  Q.        Okay.  Next sentence.

18  A.        "Advised I will talk to Donna RSD to get

19            additional info on reason for term."

20  Q.        Okay.  Was he nice to you in this telephone

21  conversation?

22  A.        I don't remember how his tone was.

23  Q.        Well, did he scare you?

24  A.        I don't think so.

25  Q.        Next sentence.

                                                        95

De Souza & Associates    650-341-2671    desouzacr@att.net

**Dec. of Thompson - Exhibit 10**

Allen vs. Radio Shack    Shaan Smith                    10-23-12

1    A.        "Store manager termed for sales associate not

2              locking the cash drawer."

3    Q.        Okay.

4    A.        "The store manager wasn't there."

5              So that was him telling me -- I remember him

6    specifically just being upset about how could he get

7    terminated for -- when -- for when he wasn't there.  Or

8    how could be held accountable for a sales associate

9    doing something -- something to that nature, he was

10   saying.

11   Q.        Okay.

12   A.        Not verbatim.

13   Q.        And then the SM meaning he was not there.

14   A.        Correct.

15   Q.        Did you ask him about the comment that she

16   told you he said about freeing a slave?

17   A.        If I didn't write it down, probably not.

18   Q.        Was he respectful to you in this conversation?

19   A.        I don't -- I don't remember.  I know -- I

20   remember him continuously asking me the same question

21   over and over again, how could he be terminated for

22   something that -- for when he wasn't there.  I do

23   remember that.

24   Q.        Was there anything from the conversation that

25   made you afraid of him or made you think he's going to

                                                            96

De Souza & Associates    650-341-2671       desouzacr@att.net

**Dec. of Thompson - Exhibit 10**

Allen vs. Radio Shack    Shaan Smith                10-23-12

1   blow up Radio Shack?
2   A.      I can't -- I don't recall that.
3   Q.      And that would be something you would
4   remember, wouldn't it?
5   A.      I would think so.
6   Q.      Okay.  Let's go to the next one, which is
7   4/20/10.
8   A.      What next one?
9   Q.      Do you know if this was in the morning --
10          MS. THOMPSON:  What are we --
11          MS. ALIOTO:  Q.  Just a minute.  Let me
12  finish describing it.
13          The one we just looked at, No. 4.  Do you know
14  if that's in the morning?
15  A.      I don't remember.
16          MS. ALIOTO:  Okay.  Now let's look at No. 5.
17                  (Plaintiff's Exhibit 5 marked
18                  for identification.)
19          MS. ALIOTO:  Q.  Okay.  Now, do you know
20  if this was after you talked to Frank?
21          MS. THOMPSON:  Well, go ahead and read it
22  first.
23          THE WITNESS:  Yeah, I don't -- it looks --
24          MS. THOMPSON:  Read the document --
25          THE WITNESS:  Okay.

                                                    97

De Souza & Associates    650-341-2671    desouzacr@att.net

**Dec. of Thompson - Exhibit 10**

Allen vs. Radio Shack    Shaan Smith                10-23-12

1           MS. THOMPSON:  -- before you answer questions
2    about it.
3           THE WITNESS:  "April 28, 2010, talked to
4           Donna on Frank.  Advised of convo with Frank."
5           MS. ALIOTO:  Hold it.  Advised of what?
6           THE WITNESS:  Convo.  Conversation.
7           "Advised of convo with Frank."
8           MS. ALIOTO:  Q.  Okay.  What does that
9    mean?  You told Donna about your conversation with
10   Frank?
11   A.       Looks like I followed up with Donna because
12   that's what I told him I would do.
13   Q.       Right.  Okay.
14   A.       Ready?
15   Q.       Yep.
16   A.       "Practice is consistent."
17   Q.       What does that mean?
18   A.       I don't remember what I specifically asked
19   her, but for me to write down practice is consistent, I
20   probably would have asked her -- well, let's see.  Let
21   me finish reading it.
22          So the next one is, "Picture was..." -- is
23   the -- probably meant was in the back room.
24          "The store manager..." -- "In the store
25          manager's desk.  She just randomly opened it.

                                                        98

De Souza & Associates    650-341-2671        desouzacr@att.net

**Dec. of Thompson - Exhibit 10**

Allen vs. Radio Shack    Shaan Smith                    10-23-12

1           Her habit to check that is appropriate."

2           So that's what he was referring to.  Practice

3    is consistent.

4    Q.        Okay.  So her habit to check that it's

5    appropriate, meaning the contents of his back drawer?

6    A.        No.  Her habit to check.

7    Q.        Right.

8    A.        I'm saying that is appropriate.  I would have

9    asked her, and that's what I meant.

10   Q.        Okay.  Her habit to check what?

11   A.        The back door.  The back --

12   Q.        Drawer.

13   A.        -- drawer.  The desk.

14             Just randomly checking it.

15   Q.        Okay.

16   A.        Uh-huh.

17   Q.        Next one.

18   A.        Next.  "Donna inquired about the $200 to the

19             sales associate and that reminded her..." --

20             "...and that reminded her..." --

21             Prompt her to do -- oh, prompted her -- I

22   don't know what that is.  But the next one.

23             "Sales associate says, 'oh, my God, I just

24             did a sale.  Paid in cash.'  Donna then said,

25             'Okay.  Then let's do the midday.'"

                                                          99

De Souza & Associates    650-341-2671        desouzacr@att.net

**Dec. of Thompson - Exhibit 10**

Allen vs. Radio Shack    Shaan Smith                10-23-12

1   Q.        Meaning, let's go to the bank?

2   A.        I don't remember ever -- I think so.  Yeah.  I

3   believe they did go to the bank.

4   Q.        Okay.

5   A.        Or that's supposed to go to the bank.

6   Q.        Next sentence.

7   A.        "Donna..." -- so DM talked to store manager.

8   And this is an asterisk there, so I just -- I think

9   that -- that would have been, like, a note to myself.  I

10  don't know when this occurred, but -- let's see.

11            "Over a thousand dollars of loss in the store

12            that he doesn't know about.  He just looked at

13            Donna.  Store manager missing the point.  He's

14            not setting clear expectations to sales

15            associate.  He's responsible for the store."

16  Q.        Okay.  "Over a thousand dollars of loss in

17            the store that he doesn't know about."

18            What is that?  What did Donna tell you that

19  was?

20  A.        I don't remember.

21  Q.        Where did she get that information from, if

22  anywhere?

23            MS. THOMPSON:  Objection.  Lacks foundation.

24  Calls for speculation.

25            THE WITNESS:  I don't remember.

                                                        100

Allen vs. Radio Shack    Shaan Smith                    10-23-12

1              MS. ALIOTO:  Q.  Did anyone tell you,
2    other than Donna, that there had been any loss of a
3    thousand dollars in that store?
4    A.        Maybe.  I don't remember.
5    Q.        Did David ever tell you there was any thousand
6    dollar loss?
7    A.        Maybe.  I don't remember.
8    Q.        Okay.  Now what does that say, the third
9    sentence down?
10             "He just looked at Donna."
11   A.        "He just looked at Donna."
12   Q.        And that's what Donna is telling you he did?
13   A.        Yes.
14   Q.        And when did this conversation take place, do
15   you know?
16   A.        When did what conversation --
17   Q.        Is this before or after the termination the
18   day before?
19   A.        Don't remember.
20             MS. THOMPSON:  Before or after the -- well,
21   objection --
22             THE WITNESS:  This conversation that Donna is
23   telling me about, or the conversation with Donna?
24             MS. ALIOTO:  Q.  The conversation Donna is
25   telling you about this new thousand dollars.

                                                         101

**Dec. of Thompson - Exhibit 10**

1    A.        Yeah, that's why I'm saying I don't know the

2    date.

3    Q.        Okay.  Page 2.

4    A.        "Donna will issue a CAR..." -- I guess that's

5              "...Saturday to sales associate Rosetta.

6              Donna took the keys..." --

7              I'm not sure what -- something -- something

8    today.

9              MS. THOMPSON:  Replaced?

10             THE WITNESS:  I don't know.

11             "Will issue a CAR, as opposed to term, due

12             to store manager not -- store manager

13             non-direction of how to protect cash."

14             MS. ALIOTO:  Q.  Okay.  So to paraphrase

15   that, she's not going to give Rosetta -- she's not

16   going to terminate her, she's going to give her a

17   corrective action because Donna feels that it was

18   the store manager's fault that he didn't give her

19   protection -- her -- didn't give her direction on

20   how to protect cash.

21   A.        Correct.

22   Q.        And do you know what cash she's referring to

23   here?

24   A.        Based on my notes, I'm not sure if she's

25   referring to the money that was in the back or

                                                        102

Dec. of Thompson - Exhibit 10

Allen vs. Radio Shack    Shaan Smith                    10-23-12

1    the -- probably the money that she had on her in her back

2    pocket.  But I'm not sure.  I don't want to assume.

3    Q.       Now, did you give the CAR to Rosetta or does

4    Donna do that?

5    A.       No.  Donna.

6    Q.       Donna does that.

7             MS. ALIOTO:  All right.  Should we go for 45

8    minutes and then come back?

9             MS. THOMPSON:  Yes.

10            MS. ALIOTO:  And it won't be too much longer

11   after that.

12            (Lunch recess:  12:25 p.m. to 1:19 p.m.)

13                       --o0o--

14

15

16

17

18

19

20

21

22

23

24

25

                                                          103

**Dec. of Thompson - Exhibit 10**

Allen vs. Radio Shack    Shaan Smith                    10-23-12

```
1                      AFTERNOON SESSION
2                    EXAMINATION (RESUMED)
3           (Record read by the Reporter as follows:
4           "Q.  Now, did you give the CAR to Rosetta
5           or does Donna do that?
6           "A.  No.  Donna.
7           "Q.  Donna does that.")
8           THE WITNESS:  No, in the -- you mentioned CAR.
9    Going back to the CAR that was issued to Frank Allen
10   where it said -- we were talking about written warning.
11           MS. ALIOTO:  Right.  Okay.  Say it again.
12           THE WITNESS:  No, I just wanted to clarify
13   where we were talking about final -- or final written
14   warning.  You had asked me to -- if I see anywhere where
15   it says final in here.
16           MS. ALIOTO:  Right.
17           THE WITNESS:  Well, the last part where it
18   says, "failure to achieve" -- I should have said this
19   before, but,
20           "Failure to achieve the required improvement
21           will lead to additional discipline action
22           including and up to termination."
23           MS. ALIOTO:  Yep.
24           THE WITNESS:  That essentially supports the
25   final --
                                                        104
```

De Souza & Associates    650-341-2671    desouzacr@att.net

**Dec. of Thompson - Exhibit 10**

Allen vs. Radio Shack   Shaan Smith                    10-23-12

1              MS. ALIOTO:  Well --
2              THE WITNESS:  -- for the discipline.
3              MS. ALIOTO:  Q.  Yeah, but this is also
4    what you give to people who get a first warning,
5    correct, as opposed to a final warning?
6    A.        It could be but it doesn't necessarily have to
7    specifically state "final."  That opens it up to lead to
8    that.  If there is another infraction, it could be
9    termination.
10   Q.        Okay.  So is it your testimony that as the HR
11   representative for the area at the time, you did not
12   have an understanding that there are corrective actions
13   that are not final?
14   A.        I did not have an understanding?
15   Q.        Right.
16   A.        What do you mean?
17   Q.        Did you understand that there are corrective
18   actions that are not final corrective actions that say
19   the same word, wording, that says action including and
20   up to termination but they are not final?
21   A.        It just depends.
22   Q.        Right.
23             So to have a final one, don't you have to have
24   a couple of them before this one?
25   A.        No.

                                                         105

**Dec. of Thompson - Exhibit 10**

Allen vs. Radio Shack   Shaan Smith                     10-23-12

```
1              MS. THOMPSON:  Objection.  Assumes facts.
2              MS. ALIOTO:  Q.  Okay.  All right.  Let's
3    go back to the exhibit we were on real quick here.
4              MS. THOMPSON:  Which one was it?
5              MS. ALIOTO:  I believe the last exhibit was
6    Exhibit No. --
7              THE REPORTER:  No. 5.
8              MS. THOMPSON:  Oh, 5.  I'm sorry.
9              MS. ALIOTO:  It's the one that's dated --
10             THE REPORTER:  It's dated 4/28, Angela.
11             MS. ALIOTO:  Q.  Right.  And it's the one
12   that says,
13             "SM terminated for SA not locking the cash
14             drawer."
15             Okay.  Is that what Donna told you he was
16   terminated for?
17   A.        Wait.  I'm sorry.  I thought we were on --
18             MS. THOMPSON:  Where are we?  Are you talking
19   about Exhibit 4 now?
20             MS. ALIOTO:  Yeah.
21             THE WITNESS:  We were on 5.
22             MS. THOMPSON:  Where it says, quote -- okay.
23   Store manager term.
24             MS. ALIOTO:  Q.  "Terminated for SA not
25             locking the cash drawer."
```

106

De Souza & Associates   650-341-2671       desouzacr@att.net

**Dec. of Thompson - Exhibit 10**

Allen vs. Radio Shack    Shaan Smith                10-23-12

1              Is that what Donna told you?

2    A.        No.  I'm talking to Frank on this one.  So

3    this would have been Frank telling me this.

4    Q.        Okay.  So Frank told you that he believed he

5    was terminated for not locking the cash drawer.

6    A.        "Store manager termed for sales associate not

7              locking the cash drawer.  The store manager

8              wasn't there."

9              This is what he would have told me.

10   Q.        Okay.  So that's what he believed.

11             Now let's go to the Exhibit No. 5, which you

12   had.  And at the bottom of the first page, the DM

13   something -- where you put an asterisk.

14             Do you know what you put down below that would

15   explain the asterisk?

16   A.        No.

17   Q.        But you did put something down below or the

18   asterisk wouldn't be there, right?

19             MS. THOMPSON:  Objection.  Assumes facts.

20             THE WITNESS:  Say that again?

21             MS. ALIOTO:  Q.  You put a quote or a

22   notation down below or the asterisk wouldn't be

23   there, right?

24   A.        Down below --

25             MS. THOMPSON:  Vague and ambiguous.

                                                        107

De Souza & Associates    650-341-2671    desouzacr@att.net

**Dec. of Thompson - Exhibit 10**

1          Let's go to that sentence there.

2          "Over a thousand dollars of loss in the..." --

3          In the what?

4   A.      Store.

5   Q.      Okay.  Now, let me ask you something.  What is

6   this -- did you ever hear that there was a $1,000 loss

7   in the store other than Donna telling you this?

8   A.      I don't remember.

9   Q.      Was there ever any investigation about this

10  alleged thousand dollar loss?

11  A.      I don't remember.

12  Q.      And did she ever write to you any other

13  document, if you know, about a $1,000 loss?

14  A.      I have to look in her emails that she sent me.

15  Q.      Let's go to this Exhibit No. 6, which you

16  referred earlier to a photograph that Donna sent you.

17  A.      Yes.

18  Q.      Okay.  Let's make this Exhibit No. 6 and let

19  me ask you if this is the photograph that Donna sent

20  you.

21              (Plaintiff's Exhibit 6 marked

22              for identification.)

23          MS. ALIOTO:  Q.  Is that the photograph?

24  A.      I believe so.

25  Q.      Okay.  So then the top -- those are quarters,

                                                        109

1    correct?

2              MS. THOMPSON:  Well, objection.  Calls for

3    speculation.

4              THE WITNESS:  I can't tell.

5              MS. ALIOTO:  Q.  Okay.  Are those coins?

6    A.       Coins.  It looks like it.

7    Q.       And then what else do you see in this picture?

8    A.       This looks like a bag because it looks like a

9    zipper.

10   Q.       Okay.

11   A.       And then there is money in bundles.

12   Q.       Okay.  Do you have any idea how much the money

13   there adds up to?

14   A.       I don't recall.

15   Q.       Did anyone tell you it was about $200?

16   A.       Based on my notes, it looks like it.

17   Q.       See anything else there?

18   A.       These look like rubberbands.  And I don't know

19   what this big square is to the right of the rubberbands.

20   Q.       And again that's the -- you believe that's the

21   picture that Donna sent you, right?

22   A.       I believe so.

23   Q.       Now, did you -- well, why were you writing

24   down these notes of these telephone calls?

25   A.       Why was I writing down the notes?  Because I

                                                          110

**Dec. of Thompson - Exhibit 10**

Allen vs. Radio Shack    Shaan Smith              10-23-12

1    generally write down --

2    Q.        Well, were you asked to do an investigation of

3    this or were you asked to memorialize this in these

4    documents?

5    A.        No.

6    Q.        Why were you participating in talking to Frank

7    and Donna?  What was your role?

8    A.        Well as HR, if the store manager -- or -- I

9    mean any employee can call me.  So Donna was dealing

10   with a situation with a loss or asset protection.  It

11   was involving the LPM.  And so when she's determining or

12   wanting to do a termination, then getting guidance

13   and/or concurrence from HR.  It was general practice.

14   Q.        And did you concur with her that he should be

15   terminated?

16   A.        Based on what -- the information that she

17   provided, and that LP was involved, it was supported.

18   Q.        Okay.  Was it solely based on the information

19   provided by Donna and by Gonsolin?

20   A.        Solely?

21   Q.        Uh-huh.

22   A.        I mean he had a history, so it's not -- I

23   mean, everything was provided from them, but, yeah.

24   Q.        Okay.  So when you're saying he had a history,

25   what are you basing that on?

111

De Souza & Associates    650-341-2671        desouzacr@att.net

**Dec. of Thompson - Exhibit 10**

Allen vs. Radio Shack    Shaan Smith                10-23-12

1    A.        The information that was sent to me.
2    Q.        Did you ever see any documents that in any
3    way, shape, or form documented a history of --
4    A.        A pattern, I should say.
5    Q.        Or a pattern.
6              Did you see any documents that documented a
7    pattern?
8    A.        The emails that Donna sent me as well as
9    David.
10   Q.        And that's all.
11   A.        From what I -- from what I recall.
12   Q.        Okay.  You never did any independent study of
13   whether any of it was true?
14   A.        No.  That's not my -- that's not my role.  If
15   they have a potential violation of company policy, LP is
16   responsible for -- LP is always involved in those
17   issues, and they generally partner with HR to talk
18   through the facts that they found.
19   Q.        Okay.
20   A.        So it's a potential -- it's not a loss but it
21   falls under the loss prevention.
22   Q.        Okay.  So that wasn't your role.
23   A.        Right.
24             MS. ALIOTO:  Okay.  So let's take a look at
25   Exhibit No. 7.

                                                         112

De Souza & Associates    650-341-2671        desouzacr@att.net

**Dec. of Thompson - Exhibit 10**

Allen vs. Radio Shack    Shaan Smith                10-23-12

```
 1                    (Plaintiff's Exhibit 7 marked
 2                     for identification.)
 3            MS. ALIOTO:  Q.  Okay.  Now, Exhibit No.
 4    7, which is a document that's dated March 14th, 2010
 5    at 9:55.  You are not cc'd on here, correct?
 6    A.        No.
```
```
 7    Q.        Take a look at both pages.  One is a
 8    Radio Shack Corporation document that Mr. Gonsolin filled
 9    out at the request of Donna Ocampo.  Page 2 --
10            MS. THOMPSON:  Objection.  Not --
11    Q.        -- and Page 1 is the email.
```
```
12            Have you ever seen either one of these
13    documents?
14            MS. THOMPSON:  I'm just going to object to the
15    characterization of the documents which I think speak
16    for themselves.
17            You can answer the question.
18            THE WITNESS:  I don't -- I'm not -- I don't
19    think so, but Donna forwarded me a few different emails
20    and I can't recall if this is one of them or not.
21            MS. ALIOTO:  Q.  Well, as you sit here
22    today, have you ever seen this document, either one?
23    A.        I may have.
24    Q.        Page 1 or 2?
25    A.        I may have.
```
                                                    113

**Dec. of Thompson - Exhibit 10**

1   A.        My notes would have been in a file, but emails

2   may be -- sometimes I would have printed them off and

3   sometimes I would have just conserved paper.

4   Q.        Okay.  So that I understand your testimony,

5   you don't remember ever seeing this but you might have.

6             MS. THOMPSON:  Well, misstates the testimony.

7             MS. ALIOTO:  That's why I'm asking.  I want to

8   make it clear so I can go on.

9             THE WITNESS:  I said I don't remember.  I may

10  have.

11            MS. ALIOTO:  Q.  Okay.  I want you to take

12  a good look at Exhibit -- at Page 2 of this Exhibit

13  No. 7 and tell me, does it look at all familiar to

14  you?

15  A.        Again, same thing.  I may have seen this

16  before.

17  Q.        But you don't know.

18  A.        I may have seen this before.  I don't know.

19  Q.        Okay.  Let's go to the next exhibit, which

20  would be No. 8, which would be dated April 27th from

21  Donna Ocampo to you --

22  A.        And just for the record, I've seen a million

23  of non-negotiable forms, so that's why I'm saying

24  specifically I don't remember.

25  //

                                                    116

Dec. of Thompson - Exhibit 10

1                    (Plaintiff's Exhibit 8 marked

2                    for identification.)

3              MS. ALIOTO:  Q.   Okay.  Now when you say

4    you've seen a million non-negotiable forms, this

5    Page 2 to Exhibit 7 --

6    A.         Quote-unquote, a million.

7    Q.         Right.

8              And what is it about your job as area HR

9    manager that you would be seeing these non-negotiables?

10   A.         Generally for performance issues or concerns.

11   Complaints.  Whether it was the employee -- the -- or

12   complaints, concerns, performance concerns, so.

13   Q.         So would you say you've seen them on thousands

14   of employees?  You said millions.  I'm sure you haven't

15   seen millions, so --

16   A.         Yeah.

17   Q.         -- thousands?

18   A.         I don't know.  Thousands.  A lot.

19   Q.         Okay.  Taking a look at No. 8.  This was sent

20   to you.

21   A.         Uh-huh.

22   Q.         So do you know why Donna Ocampo sent you this

23   on April 27th, Tuesday?  Sent you Exhibit No. 8?

24   A.         I probably told her to send it to me.

25   Q.         What is VCOP?

                                                    117

Allen vs. Radio Shack    Shaan Smith                    10-23-12

1   A.        Violation of Company Policy.
2   Q.        And what is LPM?
3   A.        Loss Prevention Manager.
4   Q.        Okay.  Now, let me ask you something.
5   Mr. Gonsolin wrote up a paragraph that we're going to
6   get to.  Is it the policy of the company to write up a
7   paragraph on a -- and send it to HR on an employee who
8   is being terminated?
9             MS. THOMPSON:  Objection.  Lacks foundation.
10  Calls for speculation.  Vague and ambiguous.
11            THE WITNESS:  I probably --
12            MS. THOMPSON:  Just what paragraph are we
13  talking about?
14            MS. ALIOTO:  I haven't showed it to her yet
15  and I have a right to not to do that.  I mean --
16            MS. THOMPSON:  All right.
17            MS. ALIOTO:  -- she stops when you do that.
18  We're going to be here all day.
19            MS. THOMPSON:  All right.  I'm sorry.
20            MS. ALIOTO:  So now we have to re-read it,
21  right?  Right.
22            Can you re-read it for her.
23            (Record read by the Reporter as follows:
24            "Q.  Okay.  Now, let me ask you
25            something.  Mr. Gonsolin wrote up a

                                                        118

De Souza & Associates    650-341-2671        desouzacr@att.net

**Dec. of Thompson - Exhibit 10**

Allen vs. Radio Shack    Shaan Smith                    10-23-12

1               paragraph that we're going to get to.  Is
2               it the policy of the company to write up
3               a paragraph on a -- and send it to HR on
4               an employee who is being terminated?"
5               MS. THOMPSON:  Objection.  Vague and
6       ambiguous.
7               THE WITNESS:  So are you talking about this
8       paragraph --
9               MS. ALIOTO:  No.
10              THE WITNESS:  -- that he wrote up?
11              MS. ALIOTO:  No.
12              THE WITNESS:  Okay.
13              MS. ALIOTO:  Q.  I'm asking about policy.
14      Is it a policy to write a paragraph on an employee
15      and send it to HR when they're being terminated?
16      A.      Policy?
17      Q.      Yeah.
18      A.      I can't speak to that.
19      Q.      All right.  So taking a look at this that
20      Donna Ocampo sent you.  Did you call anyone other than
21      Donna Ocampo and ask them if any one of the items listed
22      in the forwarded email that's Exhibit No. 8 were true or
23      not?
24      A.      If any of these --
25      Q.      Right.

                                                        119

De Souza & Associates    650-341-2671      desouzacr@att.net

**Dec. of Thompson - Exhibit 10**

Allen vs. Radio Shack    Shaan Smith                    10-23-12

1    A.        -- that he calls out here?

2    Q.        I don't know what you mean by calls out.  Is

3    that some kind of slang?

4    A.        That he says.

5              No, it's not slang.

6    Q.        What is it?

7    A.        That he calls out.  That he states.

8    Q.        That he states.  Okay.

9              Exactly.  We can go over them one by one, if

10   you want.  Or you can look at all the paragraphs here

11   and tell me if you called anyone and asked anyone if

12   these were true.  Other than Ocampo --

13   A.        No --

14   Q.        -- and Gonsolin.

15   A.        -- no.  It's not my role.

16   Q.        Okay.

17   A.        I had no reason to question these.  This was

18   handled by LP and this is what LP found.

19   Q.        So Donna Ocampo sent this to you on April 27th

20   and it is a document written by David Gonsolin on

21   March 14th, correct?

22   A.        Looks like it here, yeah.

23   Q.        Okay.  So between that time period, did you

24   receive any other document concerning Frank Allen?  Any

25   other corrective action or any other write-up for that

                                                         120

Dec. of Thompson - Exhibit 10

Allen vs. Radio Shack    Shaan Smith                    10-23-12

1    matter?

2    A.        I'm not sure.

3    Q.        In the year prior to -- the year prior to

4    April of 2010, had you ever received any write-up of

5    Frank Allen?

6    A.        I don't know.

7    Q.        When you talked to Ocampo, were you aware at

8    all of any prior corrective actions that Mr. Allen had

9    or didn't have?

10   A.        Restate that.

11             (Record read by the Reporter as follows:

12             "Q.  When you talked to Ocampo, were you

13             aware at all of any prior corrective

14             actions that Mr. Allen had or didn't

15             have?")

16             MS. THOMPSON:  Objection.  Asked and answered.

17             THE WITNESS:  Based on my notes, it looks like

18   Donna told me about a previous CAR.

19             MS. ALIOTO:  Q.  No, no.  I'm asking you

20   whether you ever saw one.

21   A.        I don't know.

22   Q.        So you don't have any personal knowledge.  You

23   didn't see it --

24   A.        I don't know.

25             MS. ALIOTO:  Okay.  Let's go to our Exhibit

                                                          121

**Dec. of Thompson - Exhibit 10**

1   No. 11.

2                          (Plaintiff's Exhibit 9 marked

3                           for identification.)

4              MS. ALIOTO:  Q.  Okay.  Now, this is from

5   David Gonsolin to Donna Ocampo, Basem Aybef,

6   James -- that's A-Y-B-E-F.  James Peterson.  She is

7   forwarding this to you, Shaana (sic) Smith.

8   A.         Shaan.

9   Q.         I'm sorry.  Shaan Smith on April 27th, 2010.

10             Correct?

11  A.         Yes.

12  Q.         Okay.  Do you know why she sent this to you?

13  A.         I probably told her to send it to me.

14  Q.         And why would you tell her to send it to you?

15  A.         For documentation supporting the term.

16  Q.         Did you tell David to write this document

17  that's Page 2?  Take a look at Page 2.

18  A.         I don't know.  I don't know if I told him.

19  Q.         Have you ever seen a document like Page 2

20  documenting a termination from loss prevention in

21  regards to a termination?

22  A.         Not necessarily regarding a termination.

23  Sometimes I did ask for statements to be sent, so I

24  don't know if I did specifically with this one.

25  Q.         Okay.

                                                      122

Allen vs. Radio Shack    Shaan Smith                10-23-12

| | |
|---|---|
| 1 | A.        But not sure. |
| 2 | Q.        You never received another one from |
| 3 | Mr. Gonsolin, did you -- |
| 4 | A.        I don't remember. |
| 5 | Q.        -- concerning any other employee? |
| 6 | A.        Any other employee? |
| 7 | Q.        Right. |
| 8 | A.        Oh.  I'm sure I have. |

9    Q.        If he said this is the only one he's ever
10   written, do you recall him writing --
11             MS. THOMPSON:  Objection --
12   Q.        -- a statement like this on any other employee
13   that was being terminated?
14             MS. THOMPSON:  I have to object.  Misstates
15   the testimony, assumes facts not in evidence.
16             He did not testify to that at all.
17             MS. ALIOTO:  He did testify to that.
18   So -- I'm not going to debate that.  So I'll make it a
19   hypothetical.
20             MS. ALIOTO:  Q.  If he said that he's
21   never done a document like this before for any other
22   employee, do you recall him doing a document like
23   this for any other employee and sending it to you at
24   HR?
25             MS. THOMPSON:  Again, misstates the record and

                                                        123

**Dec. of Thompson - Exhibit 10**

1    A.        Say it again.

2    Q.        Did your relationship, your working

3    relationship, end with Mr. Gonsolin on an amicable -- on

4    a friendly basis in your mind?

5    A.        For the most part, yeah.  I mean he left

6    before I did.  For the most part, yeah.  But I knew he

7    was very bitter.

8    Q.        Okay.  Well, any time before he left or after

9    he left, did any person from this company talk to you

10   about him?

11   A.        Talk to me about David?

12   Q.        About accusations he made about you.

13   A.        No.

14             MS. THOMPSON:  Objection.  Assumes facts.

15             Sorry.

16             MS. ALIOTO:  Q.  All right.  So let's go

17   to his paragraph.

18   A.        Which one?

19   Q.        This right in front of you.  Page 2 of

20   Exhibit 9.

21             Okay.  It says that -- I'm going to give you

22   time to read it all, okay?

23   A.        I'm sorry?

24   Q.        I want you to read it all.

25   A.        Yeah, I am.

                                                      128

Allen vs. Radio Shack    Shaan Smith                10-23-12

```
1              (Pause for review.)
2    Q.        Let me know when you're finished, okay?
3    A.        Uh-huh.
4              (Pause for review.)
5              Okay.
6    Q.        Okay.  Going up to the -- after Ocampo sent
7    this to you on April 27th at 8:12 p.m., did you speak to
8    Mr. Gonsolin about this document?
9    A.        I don't know.  I may have.
10   Q.        Okay, you don't know.
11             Do you see where it says in the middle of the
12   paragraph,
13             "Frank slammed his store keys down on the
14             desk and began using foul language
15             expressing his disagreement with the decision."
16   A.        Uh-huh.  I see that.
17   Q.        Did Donna say anything to you about that, or
18   did you ask Donna anything about that?
19   A.        About what this says specifically?
20   Q.        Right.
21   A.        Did I ask Donna about this?
22   Q.        Right.
23   A.        I don't know.  Donna said it to me and I wrote
24   down in my notes that Frank was irate, but I don't
25   remember specifically on this.
```
                                                        129

De Souza & Associates    650-341-2671        desouzacr@att.net

**Dec. of Thompson - Exhibit 10**

Allen vs. Radio Shack    Shaan Smith                10-23-12

1   Q.        But you didn't write down that he used foul
2   language, did you?
3   A.        No, I didn't write that down.
4   Q.        Do you have any idea what this means in
5   David's document that he used foul language?
6   A.        I don't remember.
7             MS. THOMPSON:  Objection.  Lacks foundation.
8   Calls for speculation.
9             MS. ALIOTO:  Q.  Only if you know.  Do you
10  have any idea?
11  A.        I don't remember.
12  Q.        Okay.  Going down a couple of sentences, it
13  says,
14            "Frank then called Donna shady."
15            Did Donna tell you that Frank called her
16  shady?
17  A.        I have to look on my notes.
18  Q.        Or that Frank called her anything.
19            MS. THOMPSON:  Well, let's look -- let her
20  look at the notes.
21            THE WITNESS:  So it looks like I talked to
22  Donna on the 27th.  She did tell me that store manager
23  was very irate.  Said DM, which is Donna, shady.
24            Yeah.  So Donna did tell me that.
25            MS. ALIOTO:  Q.  And did you ask

                                                        130

De Souza & Associates    650-341-2671      desouzacr@att.net

**Dec. of Thompson - Exhibit 10**

Allen vs. Radio Shack    Shaan Smith                  10-23-12

1   Donna -- after you read that, did you -- when Donna told
2   you that he told her she was shady, did you ask her any
3   questions about it, like what did he mean?
4   A.        I may have.  I don't know.
5   Q.        You don't know.
6             And you don't know -- you didn't talk to Frank
7   at all, right?
8             MS. THOMPSON:  Well, objection --
9             THE WITNESS:  What do you mean?
10            MS. THOMPSON:  -- misstates the testimony.
11  She talked about --
12            MS. ALIOTO:  I'm sorry.  I didn't finish the
13  sentence.
14            MS. ALIOTO:  Q.  You didn't talk to Frank
15  at all about calling Donna shady, correct?
16  A.        Based on my notes, it doesn't look like that
17  was discussed.
18  Q.        Okay.
19  A.        That nor the slave piece.  I mean it doesn't
20  look like Frank brought that up at all.
21  Q.        And you didn't either.
22  A.        Right.  He talked to me.  I'm not going to
23  feed him that information.
24  Q.        And Frank continued to argue -- what do you
25  mean you're not going to feed him that information?

                                                        131

De Souza & Associates    650-341-2671       desouzacr@att.net

**Dec. of Thompson - Exhibit 10**

Allen vs. Radio Shack    Shaan Smith          10-23-12

1          So you don't know if they gave it to him or

2    not, do you?

3    A.        I'm not sure.

4    Q.        Okay.  It says, quote, "thank you for freeing

5    a slave."

6    A.        Uh-huh.

7    Q.        Okay.  Now, when you read this, did you -- you

8    knew Mr. Allen was African American, right?

9              MS. THOMPSON:  Objection --

10             THE WITNESS:  No.  Again, you keep asking me

11   the same questions I've already answered.

12             MS. ALIOTO:  Q.  No.  When you read this.

13   When you received this.

14   A.        How would I have known that he's

15   African American?

16   Q.        I'm asking you whether you knew or not.  You

17   could have known several different ways.

18   A.        And, again, I don't know.

19   Q.        Okay.  And one way you should have known is

20   through filing with the federal government on what the

21   race of people are --

22             MS. THOMPSON:  Well, objection --

23   Q.        -- so that's what the HR office does.

24             MS. THOMPSON:  Objection -- wait, wait, wait,

25   wait.

                                                   134

De Souza & Associates    650-341-2671      desouzacr@att.net

**Dec. of Thompson - Exhibit 10**

```
 1              Argumentative.
 2              MS. ALIOTO:  Q.  Okay.  So you're saying
 3    you've never filed those documents anyway, right?
 4              MS. THOMPSON:  Objection.  Vague and
 5    ambiguous.  Assumes facts.
 6              MS. ALIOTO:  Q.  EEO-1s and affirmative
 7    action plans for a massive company that's supposed
 8    to --
 9              MS. THOMPSON:  Assume -- never mind.  This is
10    just silly.  Come on.
11              MS. ALIOTO:  Q.  So I'm just saying.  So
12    it's your testimony now that you did not know that
13    Frank Allen was black; is that your testimony?
14    A.        Correct.
15    Q.        And so you didn't talk to Frank at all about
16    the "freeing a slave" comment?
17    A.        No.  Doesn't look like it.
18    Q.        Okay.  Did you ask him if he walked out of the
19    store yelling?
20    A.        Don't know.
21    Q.        So you didn't investigate any of these
22    statements here?  You didn't ask Frank about any of the
23    statements that are in the David Gonsolin letter, did
24    you?
25    A.        I looked into what Frank advised me.
                                                        135
```

**Dec. of Thompson - Exhibit 10**

Allen vs. Radio Shack    Shaan Smith                10-23-12

1   Q.        Right.  I'm asking you whether you asked Frank
2   any --
3   A.        I don't remember.
4   Q.        -- of the questions that were in the David
5   letter?
6   A.        Don't remember.
7   Q.        Okay.  The David document, for the record, is
8   Exhibit No. 9.
9             Okay.  Let's go to the next one, Exhibit
10  No. 10, dated April 27th at 8:09.
11            Okay.  So this is from Donna to --
12                       (Plaintiff's Exhibit 10 marked
13                        for identification.)
14            MS. ALIOTO:  Q.  Is your name spelled
15  right here?  Yeah, it is.  To you with jpgs.
16            Do you know if this is the email that was
17  attached to the photographs?
18  A.        I don't know.
19  Q.        Do you know if these attachments are
20  photographs?
21  A.        I don't know.
22  Q.        Okay.  So you don't know whether these are the
23  pictures of the drawer and you don't know whether these
24  are pictures at all; is that your testimony?
25  A.        Yeah, I'm not sure.

                                                        136

**Dec. of Thompson - Exhibit 10**

Allen vs. Radio Shack    Shaan Smith        10-23-12

1   document.  It's nothing -- I'm not -- it's nothing we
2   haven't already discussed.
3           MS. ALIOTO:  Well, that's your opinion and
4   it's my depo.
5           Let me see what she's saying on Exhibit 8.
6           MS. ALIOTO:  Q.  Okay.  There is no
7   written document by David Gonsolin from 3/09 that's
8   attached to it.  This is just a summary of what he
9   wrote on 3/09, but there is no 3/09 document.
10          Right?
11          MS. THOMPSON:  Well, okay, here is the
12  problem.  She didn't -- this witness did not write that
13  document.  She asked --
14          MS. ALIOTO:  Q.  I want to know if she saw
15  the write-up of January -- if she ever saw any
16  write-up from 2009?
17          MS. THOMPSON:  Then I'm going to object to the
18  extent that it's vague and ambiguous and assumes facts.
19          MS. ALIOTO:  Q.  Did you ever see a
20  document from March of 2009 that was allegedly a
21  write-up of Frank Allen?
22  A.        I don't know.
23  Q.        Okay.
24          MS. THOMPSON:  Wasn't that, I'm sorry,
25  Exhibit 7?  Is the --

                                                138

De Souza & Associates    650-341-2671    desouzacr@att.net

**Dec. of Thompson - Exhibit 10**

1   going to happen.

2                    (Plaintiff's Exhibit 11 marked

3                    for identification.)

4        MS. ALIOTO:  Q.  Okay.  This is to you at

5   Radio Shack from Frank Allen on May 5th.

6        Do you see this?

7   A.        Yes.

8   Q.        Okay.  Did you receive this?

9   A.        Looks like I did.

10  Q.        Okay.  "I spoke with you on April 28th."

11       Did you speak with Frank Allen on April 28th

12  regarding the reason he was terminated other than what

13  you've already testified to?

14  A.        On the 28th, yes.

15  Q.        Okay.  Is he referring to the conversation

16  you've already discussed with us today and the document

17  that we went over?

18       MS. THOMPSON:  I just have to object as calls

19  for speculation and lacks foundation in terms of what

20  he's referring to.

21       MS. ALIOTO:  Q.  Did you speak to him more

22  than once?

23  A.        I'm not sure.

24  Q.        It says, "Ms. Smith, I spoke with you on

25            April 28th, 2010 regarding the reason I was

                                                          143

Dec. of Thompson - Exhibit 10

Allen vs. Radio Shack    Shaan Smith                10-23-12

1              terminated by Donna on the 27th, 2010.  You
2              were going to look into the problem and get
3              back to me."
4              Did you tell him you would look into it and
5      get back to him?
6      A.       Based on my notes -- based on my notes, it
7      doesn't specifically say that.  Based on my notes, it
8      says I will advise -- "I will talk to Donna in RSD to
9      get additional information on reason for term."
10             But I didn't document that I would actually be
11     following up with him.
12     Q.       Okay.  But when you said you will talk to
13     Donna and other people for further information, you told
14     him that.
15     A.       "Advised I will talk to Donna/RSD to get
16              additional information."
17     Q.       That's what you told him, right?
18     A.       Yes.
19     Q.       Okay.  "As of today I have not heard back -- I
20              have not heard from you, nor have I received
21              any termination papers.  Please advise."
22              Did you answer this email?
23     A.       I don't know.
24     Q.       You don't know?
25     A.       I don't know.

                                                          144

De Souza & Associates    650-341-2671    desouzacr@att.net

Dec. of Thompson - Exhibit 10

Allen vs. Radio Shack    Shaan Smith                    10-23-12

1    Q.        You don't know.
2              Did you ever send him any termination papers?
3    A.        That wasn't my role.  I didn't provide it.
4    Q.        I didn't ask you what your role is now, I'm
5    asking you whether you did it.
6              Did you send him termination papers?
7    A.        No, it wasn't my role.
8    Q.        When he says here, "As of today I have not
9    heard back from you, nor have I received termination
10   papers," did you -- do you know if you called him or
11   wrote him back and said, that's not my role, I'm not
12   supposed to give you termination papers?
13   A.        I'm not sure.
14   Q.        Okay.  And then where it says please advise,
15   did you give him any advice at all after your
16   conversation -- strike that.
17             Did you speak to him at all again after
18   April 28th?
19   A.        I'm not sure.
20   Q.        And do you know if you spoke to him after he
21   wrote you this email on May 5th of 2010?
22   A.        I'm not sure.
23   Q.        Do you know if you spoke to him at all in the
24   year 2010 after April?
25   A.        Not sure.

                                                        145

De Souza & Associates    650-341-2671    desouzacr@att.net

**Dec. of Thompson - Exhibit 10**

Allen vs. Radio Shack    Shaan Smith                10-23-12

1   Q.        Now, do you know if you spoke to him in 2011?

2   A.        I'm not sure.

3   Q.        I'm not going to introduce this.

4             Is this the -- what was the name of the

5   gentleman, Carlos, that you mentioned earlier?  What's

6   his last name?

7   A.        You said Carlos?

8   Q.        Carlos.

9   A.        Juarez.

10  Q.        Juarez.

11            Do you know Carlos Venegas?  V-E-N-E-G-A-S.

12  A.        I don't think so.  The name doesn't sound

13  familiar.

14  Q.        Is it your role, or did you have anything to

15  do with replacing people who get terminated?

16            MS. THOMPSON:  Asked and answered.  You went

17  over this earlier.

18            THE WITNESS:  No.

19            Well, I take that back.  As an area HR

20  manager?

21            MS. ALIOTO:  Uh-huh.

22            THE WITNESS:  No.

23            MS. ALIOTO:  Q.  As a regional?

24  A.        I was responsible for recruiting.

25  Q.        And what was the date of you becoming

                                                    146

De Souza & Associates    650-341-2671       desouzacr@att.net

**Dec. of Thompson - Exhibit 10**

Allen vs. Radio Shack    Shaan Smith                    10-23-12

1    Q.        Okay.  Have you ever heard that certain stores

2    that have a high volume and that also have a risk,

3    because they're allegedly in dangerous areas, like the

4    Tenderloin, that they were allowed to keep a cash drawer

5    in the back so they wouldn't have to change -- make

6    change?

7    A.        I --

8              MS. THOMPSON:  Objection -- wait, wait, wait.

9              Objection.  Assumes facts.  Lacks foundation.

10             THE WITNESS:  Can you restate that.

11             (Record read by the Reporter as follows:

12             "Q.  Okay.  Have you ever heard that

13             certain stores that have a high volume

14             and that also have a risk, because

15             they're allegedly in dangerous areas,

16             like the Tenderloin, that they were

17             allowed to keep a cash drawer in the back

18             so they wouldn't have to change -- make

19             change?")

20             MS. THOMPSON:  Objection.  Assumes facts.  It

21   misstates the record.  Lacks foundation.

22             THE WITNESS:  That's not familiar to me.  I'm

23   not aware of that.

24             MS. ALIOTO:  Q.  Okay.  Have you ever

25   heard of the concept that if the district manager

                                                        149

De Souza & Associates    650-341-2671        desouzacr@att.net

**Dec. of Thompson - Exhibit 10**

Allen vs. Radio Shack    Shaan Smith                    10-23-12

1   and the regional manager okay'd it, a store manager

2   could keep cash in the back drawer the way

3   Mr. Nabozny is testifying here?

4           MS. THOMPSON:  Objection.  Lacks foundation,

5   calls for speculation, assumes facts and misstates the

6   record.

7           THE WITNESS:  I'm not aware of that.

8           MS. ALIOTO:   Q.   Have you ever been aware

9   of anybody else ever being terminated for keeping

10  cash in the back drawer?

11  A.          I can't recall specifically.

12  Q.          Do you know Hani Alzaghari?

13  A.          Yeah.

14  Q.          Okay.  Did he ever talk to you about keeping

15  cash in the back drawer?

16  A.          I don't know specifically.  He may have.  I

17  talk with DMs about a lot of different things.

18  Q.          Okay.  So how often would you -- well, let me

19  ask you.  How well do you know Hani?

20  A.          Say that again?

21  Q.          How well did you know Hani?

22  A.          He was a DM.

23  Q.          Okay.  Did you know him socially?

24  A.          No.

25  Q.          Would you talk to him on the phone monthly?

                                                            150

**Dec. of Thompson - Exhibit 10**

Allen vs. Radio Shack    Shaan Smith                10-23-12

1    A.        As-needed.

2    Q.        As-needed.

3              So do you ever recall meeting with Hani?

4    A.        If I was investigating a matter that he was

5    involved in, or his district, then yeah.  But I don't

6    know how many times.

7    Q.        Okay.  But did you ever meet with Hani

8    concerning Frank Allen?

9    A.        I don't believe so.

10   Q.        Okay.  I want you to finish reading this

11   document.  I'm going to ask you one last question on it

12   and then --

13             MS. THOMPSON:  Which document now?

14             MS. ALIOTO:  The one in front of her.

15             THE WITNESS:  I was only reading the part that

16   you were reading.

17             MS. ALIOTO:  No, I understand that.  I want

18   you to finish reading the document.

19             THE WITNESS:  (Pause for review.)

20             MS. ALIOTO:  Q.  Okay.  Can I ask you --

21   A.        Do you want me to finish reading this?

22   Q.        Sure.

23   A.        (Pause for review.)

24             Okay.

25   Q.        Okay.  Now, do you know Mr. Tom Schultz?

                                                        151

**Dec. of Thompson - Exhibit 10**

Allen vs. Radio Shack    Shaan Smith                10-23-12

1   A.        Yes.

2   Q.        All right.  Mr. Tom Schultz, at the time, was

3   the regional manager when you were there?

4   A.        No.

5   Q.        What was he when you were there?

6   A.        Area vice -- AVP.  Area vice president.

7   Q.        As area vice president, had he ever discussed

8   with you keeping money in the back room?

9   A.        No.

10  Q.        Okay.  Had he ever discussed Frank Allen with

11  you?

12  A.        No, he wouldn't have talked to me about that.

13  Q.        How often would you have meetings with the

14  area vice president as the area HR person?

15  A.        I join when Donetta invited me.  So they had

16  meetings all the time.  There was I think, like, maybe a

17  meeting a month or something that I would go to.  But

18  outside of that, never.

19  Q.        Okay.  Were you still there when

20  Donetta -- Donetta didn't come back, right?

21  A.        No, she didn't.

22  Q.        Okay.  All right.  Now, let me just ask you

23  something about the service for coming to this

24  deposition.

25            Did you meet with our service processor and

152

Dec. of Thompson - Exhibit 10

Allen vs. Radio Shack    Shaan Smith                    10-23-12

1            I, DEBRA J. SKAGGS, CSR No. 7857, a Certified
2    Shorthand Reporter, do hereby certify:
3            That SHAAN SMITH, the witness in the foregoing
4    deposition was by me duly sworn to tell the truth, the
5    whole truth, and nothing but the truth in the
6    within-entitled cause;
7            That said deposition was reported by me and
8    transcribed as herein set forth;
9            That, if signed, the deposition was read by or
10   to said witness, corrected in every particular desired
11   way, and was thereafter subscribed by said witness;
12           That, if unsigned, the deposition was retained
13   by me at the offices of DE SOUZA & ASSOCIATES, San
14   Mateo, California and was available for reading,
15   correcting and signing by said witness.
16           I further certify that I am not interested in
17   the outcome of said action, nor connected with, nor
18   related to any of the parties in said action or to their
19   respective counsel.
20                   IN WITNESS WHEREOF I have hereunto
21               set my hand this ___ day of
22               _____, 2012.
23               _____
24               DEBRA J. SKAGGS, CSR No. 7857
25

                                                        156

De Souza & Associates    650-341-2671        desouzacr@att.net

**Dec. of Thompson - Exhibit 10**

TT  Dana   4-27-10
SM - 10 yrs

3/24 — Finall - uw issued on file
       - he didn't address to final

DM/ RSD  Aybeth  visit store last
Tuesday
       - $200 in an unprotected cash
         ↳ CAR = her failure to identify
       more than $1000 in cash values in the
       till.
       - sitting in the drawer in the
       back not locked.

2)  DM went to SA - Rosetta to inquire
    on $ in the back
witness   - she said this is where we put the
Bayron    extra change = this where we always put
          it then she pull out $1100 from her
          back pocket
          - DM tore that then they went to
          back to do the cash midday
          - DM/ RSD/ SA.

┌─────────────────────────────┐
│ EXHIBIT ⎯⎯⎯ 2               │
│         Deft.    For Identification │
│ Consisting of  2   Pages    │
│ Witness Smith               │
│ Date  10-23-12              │
│ Debra J. Skaggs CSR 7857    │
└─────────────────────────────┘

RS/ALLEN000266

**Dec. of Thompson - Exhibit 10**

Om → SA - & cs and make dug
- ro Con sent it.

HL → Advised to document it.

Om/Dnna   term + day: 4-27-10

- Sh very irate
   - Sud om shady
   - Thanx for being a Nare
   -

RS/ALLEN000267

**Dec. of Thompson - Exhibit 10**

# Corrective Action Record

 **RadioShack.**
CORPORATION

| Employee Name: | Frank Allen | | |
|---|---|---|---|
| Job Title: | Store Manager | District: | 538 |
| Supervisor: | Donna Ocampo | Date: | 3/23/2010 |
| | | Area: | West |

| | *Identify behavior, performance, special issues, or events requiring corrective action:* |
|---|---|
| **Issue to Correct** | Failure to protect company assets from internal and external theft.<br><br>• 5 laptops on display, not secured (only screamers)<br>• Missing Cage Counts for Mid February<br>• Laptops were not secured in the backroom. David Gonsolin RLPM and I made room in the cage to protect the laptops.<br>• Several months of numerous cash shortages were found. You failed to report the shortages and did not have an explanation as to why they are happening. |

| | *List date(s) and summarize all previous counseling's both verbal and written:* |
|---|---|
| **Previous Actions (Specific)** | Store Visits from David Gonsolin RLPM 2/04/2009 documenting similar issues with asset protection.<br><br>Previous DM communication through Store Visits, District Meeting and One on One conversations. |

| | *What disciplinary action may occur due to failure to improve?* |
|---|---|
| **Consequence Of Failure To Improve** | Failure to achieve the required improvement will lead to additional disciplinary action including and up to termination. |

| | |
|---|---|
| **Employee Comments** | |

I have received a copy of this Corrective Action Record and understand RadioShack has an Open Door Policy. I may discuss this issue or any other employee relations issue with my Area Human Resources Director, _____ the Employee Relations Department or any member of Management in my chain of command.

_____ Employee          3/23/10 Date          _____ Supervisor          3/23/10 Date

EXHIBIT 3
Deft.    For Identification
Consisting of _____ Pages
Witness Smith
Date 10-23-12
Debra J. Skaggs CSR 7857

RS/ALLEN000192

**Dec. of Thompson - Exhibit 10**

4-08-10
TT Frank
he adv of his term
adv of Opr decision to term

- adv of pattern of cp issues
- adv of CAL, etc.

- adv / will tt Lanna / RLD
to get addl info
- on reason for term

- Sm term'd for SA not locking
the cash drawer.
- TL Sm wasn't the.

EXHIBIT 4
Deft.
For Identification
Consisting of _____ Pages
Witness Smith
Date 10-23-12
Debra J. Skaggs, CSR 7857

RS/ALLEN000265

**Dec. of Thompson - Exhibit 10**

4-28-10
TT Donna    on Frank
— adv of Consoul Frank
— practice is consistent

Sm's
— picture = now is the back room = the desk.
She just randomly open it — she had it
to check that it's appropriate.
—

Baker —   Donna — inquired about the $200 total
present      SA and that reminded her/prompt her
             to do.

SA —   "omen I just did a sale... paid in
       cash" —

—   Donna then said ok then lets do the end day.

pm→pm   there $1000 of loss in the store that
        he doesn't know about.
        — Report looked at Donna.
        — Sm missing the point.
        — He's not setting clear expectations
        to SA = he's responsible for the store.

RS/ALLEN000263

EXHIBIT 5
Deft.        For Identification
Consisting of 2        Pages
Witness  Smith

**Dec. of Thompson - Exhibit 10**

Ⓣ Donna will issue cash out to SA: Rosetta
  - Donna took the keys (removed)
  - will issue a cash                    today
    as opposed to term due!
                    Donna
  - SM direction ea of her to put cash
    the cash.

RS/ALLEN000264

**Dec. of Thompson - Exhibit 10**



RS/ALLEN000260

EXHIBIT 06
Deft.
Consisting of 1 For Identification
Witness Smith Pages

**Dec. of Thompson - Exhibit 10**

| From: | Loss Prevention (Corporate) |
|---|---|
| To: | Monique Hebert; Candice Vaughn |
| Subject: | FW: LPNN 3830 030910 |
| Date: | Sunday, March 14, 2010 9:55:39 AM |
| Attachments: | LPNN 3830 030910.xls |

-----------------------------------

From: David Gonsolin
Sent: Sunday, March 14, 2010 11:55:23 AM
To: 013830
Cc: James Peterson; 0101 RSD Donna Ocampo; Loss Prevention (Corporate)
Subject: LPNN 3830 030910
Auto forwarded by a Rule

Please see the attached LP Non-Negotiables for Store 3830

During the course of this visit it was found that there have been numerous cash shortages in the last several months. The SM needs to start conducting over short inquiries at least 4 times a day. There was one cage count missed in mid February. There were several items in the product inspection area that need to be secured in the cage. The sales floor had 3 Schlage lock sets that were not secured with screams or anything. Also, there were 5 laptops that did not have proper security device on them and all 6 LCD TV's did not have the cables. There was an ICST that was autoreceived on 2/20 and two shipments that were autoreceived on 2/21 and 1/31. A follow up visit will be conducted by the DM and RLPM to ensure these items are all corrected.



RS/ALLEN000193

**Dec. of Thompson - Exhibit 10**



## RadioShack CORPORATION

**LP Non-Negotiables**
**UPLOAD SUCCESSFUL!**

| | |
|---|---|
| **Store:** | 3830 |
| **Region:** | 11 - San Francisco |
| **District:** | 0538 - San Francisco |
| **Date:** | 3/9/2010 |
| **RLPM Name:** | David Gonsolin |
| **Manager Name:** | Frank Allen |
| **Visit Category:** | DM Request |

| Non-Negotiables | |
|---|---|
| Yes | Do store associate know who to contact in the event of a serious incident. (Burglary, Robbery, Assault) |
| N/A | Review the daily deposits (ANSO > Admin > Daily Deposits > Exception Report) for the past 30 days. Was the store consistently making deposits in a timely manner (no late deposits)? What was the total quantity of late deposits identified? |
| No | Does the store manager know how to pull their P&L and review the inventory control numbers? Review store's shrink and other loss performance with SM. |
| N/A | Locate the last 3 days of daily reports. Were all refunds and voids documents present and signed? Conduct an on hand count and verify all refunds over $35.00 from the same days. |
| N/A | Of the refund items selected, were you able to match physical counts with store on hand quantities? |
| N/A | Conduct an Over/Short inquiry with the person in charge. Was the discrepancy less than $2.00? |
| No | If there were variances in excess of $5 in the past 30 days, were there less than 3? What were the total number of days with a cash variance >$5? |
| No | Is there a trend of cash discrepancies that indicate internal theft (large loss, an employee consistently tracks for cash variances? |
| Yes | Is a working Manual Credit Card Imprinter available and being used at all times. |
| N/A | Run a Credit Card report for the last 7 days and verify an imprint was obtained for all manually entered bank cards. |
| N/A | Are associates aware of the weekly password program? |
| N/A | Do all key carriers have keys to open the lock box and locking file cabinet? |
| No | Are there count sheets for secured inventory for the last eight weeks? Are discrepancies reconciled? Have the discrepancies been report to the RLPM and DM? (Cage counts should be located on the clipboard in the cage.) |
| N/A | Inspect 20 items that are more than $25 in retail value. Are the merchandise tagging guidelines being followed? Is store consistent with tagging placement? |
| N/A | Run an on hand report for high dollar merchandise (160,170,200,250,260,420) and randomly check a minimum of 15 high risk items from the stores cage and 10 items from the sales floor for accuracy. |
| No | Visually inspect the entire backroom area for merchandise that does not appear sellable (loose product). Is the store taking proper steps to dispose of the merchandise (RMAC, ICST, Repair, etc)? (If secured merchandise is in the product inspection area this answer is no) |
| N/A | Is the store completing the Daily and Weekly Non-Negotiable Standards of Operational Performance Checklist? |
| N/A | Review the DM's last Non-Negotiable visit, if any discrepancies noted have they been corrected? |
| N/A | Are all keys including perimeter, cage, locking peg and displays cases secured and in the possession of an authorized key holder? |
| N/A | Are all the store locks keyed to the RadioShack approved Medico locks? |
| N/A | Does store have adequate alarm protection (motion covering exterior glass, exterior exits, back stockroom, etc). Is cage vulnerable and need additional protection (e.g. interior common wall with other retailer)? |
| N/A | Was the backdoor secured? If opened was an associate present at all times? |
| Yes | If the store has a public view monitor is it properly working? |
| Yes | Is the CCTV system operable and being used? Are the time and date set correctly? |
| N/A | Is the EAS system operating properly (inspect by activating the alarm)? |
| N/A | Using the "Stock File List - All DISCO / DEVAL On Hand Items Report", Select 10 random items from the report with a difference between retail and current pricing of $50. Were all 10 items on display and priced correctly? |
| N/A | Are all display cases secured with slide locks? |
| No | Are all security devices being used properly (including locking peg hooks, acrylic toppers and  laptop cables)? |
| No | Verify all laptops are properly secured (a screamer by itself is not adequate protection) |
| No | Verify all LCD TV's are secured with mechanical cable to prevent theft and for safety. |
| No | Have all ICST's been received into the RSS within seven days? |
| No | Review last 5 packing lists. Is there evidence that the location was verifying shipments and is there corresponding SAR's for overages, shortages or damages? (Finalized SAR's should be attached to the Packing List or they can be reprinted from the RSS under Utilities>Print Manager>Receiving Reports) |
| No | Review the shipments in the RSS system (Whse Bulk Receiving). Were all shipments received into the RSS system within 24 hours of receipt? Is there evidence that the SM is completing the must count list? |
| No | Review Deactivation detail. Are there indications of internal involvement, common associates, names or other unusual patterns that can indicate fraud? Talk with associates about wireless knowledge of activation procedures. |
| N/A | Review store's trash procedure. Are there safety procedures in place and adequate internal controls? |
| N/A | Are fire exits clear, exit light illuminated? Are there any safety issues that need immediate correction? |

| | |
|---|---|
| **Comments:** | During the course of this visit it was found that there have been numerous cash shortages in the last several months.  The SM needs to start conducting over short inquiries at least 4 times a day.  There was one cage count missed in mid February.  There were several items in the product inspection area that need to be secured in the cage.  The sales floor had 3 Schlage lock sets that were not secured with screams or anything.  Also, there were 5 laptops that did not have proper security device on them and all 6 LCD TV's did not have the cables.  There was an ICST that was autoreceived on 2/20 and two shipments that were autoreceived on 2/21 end 1/31.  A follow up visit will be conducted by the DM and RLPM to ensure these items are all corrected. |

RS/ALLEN000194

**Dec. of Thompson - Exhibit 10**

**0340 AHRM Shaan Smith**

| | |
|---|---|
| **From:** | 0538 DM Donna Ocampo |
| **Sent:** | Tuesday, April 27, 2010 8:10 PM |
| **To:** | 0340 AHRM Shaan Smith |
| **Cc:** | 0534 RSD Basem Aybef |
| **Subject:** | FW: VOCP 3830 Allen 031410 |

Frank Allen-

VOCP and LPM notes from 3/09 Store Visit.

---

**From:** David Gonsolin
**Sent:** Sunday, March 14, 2010 10:04 AM
**To:** 0101 RSD Donna Ocampo
**Cc:** James Peterson; 0340 AHRD Donetta Gunnells; Loss Prevention (Corporate)
**Subject:** VOCP 3830 Allen 031410

Please see the attached Violation of Company Polioy Memo regarding Store 3830

3/14/2010 - Failure to secure merchandise on the salesfloor, complete weekly cage counts, report cash shortages

On 3/09/10 a visit was conducted to store 01-3830, San Francisco California. During the visit it was found that Store Manager Frank Allen had 5 laptops on display that were only secured by screamers. It was also found that there were 6 LCD TV's on display and none of them had the required security cable. There were also 3 Schlage locksets, approximately $199.99 each, that had no security devices on them at all. It was also found that Allen had missed a cage count in mid February.

Lastly it was found that over the past several months there were numerous cash shortages. Allen had not reported these and had no explanation as to why they are happening.

Allen is aware of the external challenges of this store due to its location, however, he failed to protect our assets in numerous ways. In February 2009 a visit was conducted and Allen had just had a laptop stolen from the sales floor where he did not have it secured at all. Allen needs to ensure he uses all available resources to protect our assets on the sales floor. Allen must also complete the weekly cage count in full and communicate any missing items to his DM and RLPM. Allen also agreed to start conducting over short inquiries at least 4 times a day and report any large cash shortages to his DM and RLPM.



**VOCP 3830**
**Allen.xls**



EXHIBIT 8
Deft ☐ For Identification
Consisting of 2 Pages
Witness Smith
Date 13-23-12
Debra J. Skaags CSR 7857

RS/ALLEN000257

**Dec. of Thompson - Exhibit 10**



**(R) RadioShack.**
C O R P O R A T I O N

DATE:       March 14, 2010

TO:         0538 DM
            cc: James Peterson;0340          *other cc:*
            AHRD;0101 RSD
            Loss Prevention (Corporate)

FROM:       David Gonsolin
            Regional LP Manager
            Office:
            Mobile:    (916)842-9552

TYPE:       Failure to Protect Assets
SUBJECT:    Failure to secure merchandise on the salesfloor, complete weekly cage counts, report cash shortages
RE:         Store #:    3830     Employee:    Allen                    Frank

The following details are provided to you for your information and action deemed appropriate. If you have any questions concerning this matter, please do not hesitate to contact me.

On 3/09/10 a visit was conducted to store 01-3830, San Francisco California. During the visit it was found that Store Manager Frank Allen had 8 laptops on display that were only secured by screamers. It was also found that there were 6 LCD TV's on display and none of them had the required security cable. There were also 3 Schlage locksets, approximately $199.99 each, that had no security devices on them at all. It was also found that Allen had missed a cage count in mid February.

Lastly it was found that over the past several months there were numerous cash shortages. Allen had not reported these and had no explanation as to why they are happening.

Allen is aware of the external challenges of this store due to its location, however, he failed to protect our assets in numerous ways. In February 2009 a visit was conducted and Allen had just had a laptop
stolen from the sales floor where he did not have it secured at all. Allen needs to ensure he uses all available
resources to protect our assets on the sales floor. Allen must also complete the weekly cage count in
full and communicate any missing items to his DM and RLPM. Allen also agreed to start conducting over short inquiries
at least 4 times a day and report any large cash shortages to his DM and RLPM.

RS/ALLEN000258

**Dec. of Thompson - Exhibit 10**

## 0340 AHRM Shaan Smith

| | |
|---|---|
| **From:** | 0538 DM Donna Ocampo |
| **Sent:** | Tuesday, April 27, 2010 8:12 PM |
| **To:** | 0340 AHRM Shaan Smith |
| **Subject:** | FW: 3830 Summary |

Below are notes from David Gonsolin from today's termination with Frank Allen.

**From:** David Gonsolin
**Sent:** Tuesday, April 27, 2010 8:07 PM
**To:** 0538 DM Donna Ocampo
**Cc:** 0534 RSD Basem Aybef; James Peterson
**Subject:** 3830 Summary

Here is my narrative about the termination that took place at 3830 today. Please let me know if there is anything else needed in regards to this incident.

David Gonsolin
Regional Loss Prevention Manager
San Francisco Region 11
Cell (916) 842-9552
Fax (916) 983-9503



3830 summary.doc

1



RS/ALLEN000261

**Dec. of Thompson - Exhibit 10**

On 4/27/2010, District Manager Donna Ocampo and I arrived at store 01-3830 to speak with Store Manager Frank Allen. Upon arrival to the store Frank stated that he was expecting us. We went to the backroom to speak with Frank at which time Donna asked him to explain why she had found $200 in cash left unsecured in the desk drawer in the backroom. Frank tried to explain that he was not here when that had happened and another associate must have left it unlocked. I explained to Frank that he had a very significant cash loss problem that we had discussed on our prior visit and this was unacceptable to leave cash unsecured like this. Frank immediately began asking what was going to happen with him. Donna informed him that the company is removing him from his position and terminating his employment. Frank slammed his store keys down on the desk and began using foul language, expressing his disagreement with the decision. He asked what the reason for his termination was and Donna explained that it was due to his failure to protect company assets. Frank argued that he is not responsible for what his associates do when he is not here, as he had left the store before the money was left unsecured in the desk drawer. Frank then called Donna "shady" at which time she told him to leave the store. Frank continued to argue with Donna and I attempted to step in and calm him down. I tried to talk him into leaving the store quietly; however, he stated he did not want to hear what I had to say. Donna gave him his letter of separation which he refused to sign. After giving him the letter of separation he said, "thank you for freeing a slave" and began to walk out. After that comment I told Frank that was not appropriate and he walked out of the store yelling.

RS/ALLEN000262

**Dec. of Thompson - Exhibit 10**

0340 AHRM Shaan Smith

| | |
|---|---|
| **From:** | 0538 DM Donna Ocampo |
| **Sent:** | Tuesday, April 27, 2010 8:09 PM |
| **To:** | 0340 AHRM Shaan Smith |
| **Cc:** | 0534 RSD Basem Aybef |
| **Subject:** | FW: IMG00303-20100420-1911.jpg |
| **Attachments:** | IMG00303-20100420-1911.jpg |

Shaan: Below are details regarding Frank Allen.

On 3/23/2010 Frank Allen was given a CAR (Failure to Protect Company Assets). The only copy I have available is the signed copy. I will also be emailing you written documentation provided by LPM David Gonsolin during our visit on 3/09. The last and final incident happened on 4/20, the picture and the email I sent to David is below.

Thanks,
Donnas

-----Original Message-----
From: 0538 DM Donna Ocampo
Sent: Tuesday, April 20, 2010 7:24 PM
To: David Gonsolin
Subject: IMG00303-20100420-1911.jpg

3830. 7:16pm cash is left unprotected in the desk drawer. About $150. Plus another $1000 for a midday unprotected. Please call me when you have a moment.

Thanks, Donna

1

EXHIBIT 10
Deft.    For Identification
Consisting of ____ Pages
Witness Smith
Date 10-23-12
Debra J. Skeens CSR 7657

RS/ALLEN000259

**Dec. of Thompson - Exhibit 10**

Aug 29 12 02:56p      Frank Allen              15102222560              P.4
      Print                                                             Page 1 of 1

**From:** FRANK ALLEN (f.allen6588@sbcglobal.net)
**To:** shaansmith@radioshack.com;
**Date:** Wed, May 5, 2010 9:24:58 PM
**Cc:**
**Subject:** [ No Subject ]

Ms. Smith,

I spoke with you on April 28, 2010 regarding the reason I was terminated by Donna on April 27, 2010.
You were going to look into the problem and get back to me.  As of today I have not heard from your
nor have I received any termination papers.  Please advise.

Frank Allen



EXHIBIT 11
                    Deft.        For Identification
Consisting of        1           Pages
Witness  Smith
Date     9-23-12
        Debra J. Skaggs CSR 7857

http://us.mg205.mail.yahoo.com/dc/launch?.partner=sbc&.gx=1&.rand=fncamftqfljd7          8/29/2012

ALLEN V RS 000177

**Dec. of Thompson - Exhibit 10**

Exhibit 11

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION


FRANK ALLEN,

             Plaintiff,

      vs.                          CASE NO.
                                     CV 11 3110 WHA

RADIO SHACK CORPORATION, et al.,

             Defendants.
_____/


DEPOSITION OF THOMAS NABOZNY

October 25, 2012


Reported by:
WENDY C. BROWN
C.S.R. NO. 5697


PATRICIA CALLAHAN REPORTING
Certified Shorthand Reporters
(510) 885-2371   (415) 788-3993
Facsimile (510) 247-9775
PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 11**

1          BE IT REMEMBERED THAT, pursuant to Notice of

2     Taking Deposition, and on Thursday, October 25, 2012,

3     commencing at the hour of 11:00 o'clock a.m. of the said

4     day, at the law offices of MILLER LAW GROUP, 111 Sutter

5     Street, Suite 700, San Francisco, California, before me,

6     WENDY C. BROWN, a certified shorthand reporter, State of

7     California, personally appeared THOMAS NABOZNY, a

8     witness in the above-entitled court and cause, produced

9     on behalf of the defendant, who, being by me first duly

10    sworn, was then and there examined and interrogated by

11    Attorney Tracy Thompson, representing the law offices

12    of MILLER LAW GROUP, 111 Sutter Street, Suite 700,

13    San Francisco, California, counsel for the defendant.

14

15                    APPEARANCES OF COUNSEL

16

17    FOR THE PLAINTIFF:

18

19          LAW OFFICES OF MAYOR JOSEPH L. ALIOTO &

20          ANGELA ALIOTO

21          BY:  ANGELA MIA VERONESE, ESQ.

22          700 Montgomery Street

23          San Francisco, California  94111

24

25

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 11**

1    Q.      Okay.

2            Do you have any reason to believe that that

3    medication will affect your ability either to understand

4    my questions or to respond truthfully to them?

5    A.      No.

6    Q.      Is there any reason we shouldn't go forward

7    today?

8    A.      No.

9    Q.      Okay.  All right.  Are you represented by

10   counsel today?

11   A.      Yes.

12   Q.      Okay.  And is that Ms. Veronese?

13   A.      Yes.

14   Q.      When did you retain Ms. Veronese?

15   A.      Couple weeks ago, maybe a month ago.

16   Q.      Okay.  Now, you worked at Radio Shack -- I

17   understand that you worked at Radio Shack sometime in

18   the 1980's; is that right?

19   A.      1984 to 1986.

20   Q.      And were you in loss prevention during that time

21   period?

22   A.      Yes.

23   Q.      And was that out here in California?

24   A.      No.

25   Q.      Where were you working in 1984 to 1986?

Dec. of Thompson - Exhibit 11

1   A.      Do you want the region or do you want where my

2   office was?

3   Q.      Why don't you tell me where your office was and

4   then what region you covered.

5   A.      My office was out of New Jersey and

6   Pennsylvania.  We moved it into Pennsylvania eventually.

7   But my region was half of Pennsylvania and all of

8   New Jersey, and at that time, it was a portion of

9   Delaware.

10  Q.      And what was your job title then?

11  A.      Regional loss prevention manager.

12  Q.      You left voluntarly, I take it?

13  A.      Yes.

14  Q.      And then you returned to Radio Shack in 2000?

15  A.      2000, correct.

16  Q.      And you left then in about October of 2009?

17  A.      Yes.

18  Q.      And during that entire time, am I correct in

19  understanding that your job title was regional loss

20  prevention manager?

21  A.      Yes, that's the title.

22  Q.      Did you hold any other jobs during that period,

23  from 2000 to October 2009?

24  A.      With Radio Shack?

25  Q.      Yeah.

**Dec. of Thompson - Exhibit 11**

1    A.      No, that was the only job I had.

2    Q.      And as a regional loss prevention manager, what

3    was the title of the person to whom you directly

4    reported?  Was that the area --

5    A.      Yeah, the area -- area loss -- they call him the

6    area loss prevention manager.

7    Q.      So the area loss prevention manager.

8    A.      Yeah.

9    Q.      Was that abbreviated ALPM?

10   A.      I think so.

11   Q.      And who was the area loss prevention manager --

12   was it area -- okay, area loss prevention manager when

13   you first started in 2000?

14   A.      Oh, no, that was different.

15   Q.      Okay.

16   A.      The area loss prevention manager came toward the

17   end.  When I first started, I reported to the director

18   of -- director and assistant director of loss

19   prevention.

20   Q.      And was the director of loss prevention -- was

21   that a position that was based in California or based at

22   corporate?

23   A.      Based at corporate, Fort Worth, Texas.

24   Q.      So when you first started in 2000, who did you

25   report to?

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 11**

1   Q.      Do you think it's G-l-a-d-n-y?

2   A.      Maybe.

3   Q.      Okay.

4   A.      God, if I knew there was a test, I would have

5   brought all this stuff.

6   Q.      That's all right.  I'm just asking --

7   A.      Okay.

8   Q.      -- to the best of your knowledge and

9   recollection.

10  Q.      All right.  So Mr. Gladney assumed the position

11  of area loss prevention manager?

12  A.      Correct.

13  Q.      What year was that, approximately?

14  A.      I'm saying 2004, maybe, 2005.  I don't remember.

15  Q.      Okay.  That's your best recollection?

16  A.      Yeah.

17  Q.      Best estimate?  Okay.

18          And how long did you report to Mr. Gladney?

19  A.      For about two years.

20  Q.      And then to whom did you report?

21  A.      Uh, James Peterson.

22  Q.      So was that about 2007, 2006?

23  A.      About 2000 ... let's see.  About 2007.

24  Q.      Now, had Mr. Peterson been employed in a

25  different position --

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 11**

1    A.      No.

2    Q.      -- by Radio Shack, or did he come from outside,

3    to your knowledge?

4    A.      He worked -- he started about a couple of months

5    after I did, in 2000, as just a regional loss prevention

6    manager.

7    Q.      So you and Mr. Peterson started at Radio Shack

8    about the same time, and you were both regional loss

9    prevention managers?

10   A.      Correct.

11   Q.      And he was in a different region than you,

12   obviously?

13   A.      Yeah, he was down to San Diego.

14   Q.      Okay.  So in around 2007, it's your

15   understanding that he was promoted to the position of

16   area loss prevention manager?

17   A.      Yes.

18   Q.      And at that point, did you begin reporting

19   directly to Mr. Peterson?

20   A.      Yes.

21   Q.      And did you continue to report, then, to

22   Mr. Peterson until you left the company?

23   A.      Yes.

24   Q.      And where were you based while you were working

25   from 2007 to the time you left; where was your office?

**Dec. of Thompson - Exhibit 11**

1   A.      Okay.  Why 2007?  Is that just the time I

2   reported to James?  'Cause the whole time I worked in

3   2000 --

4   Q.      All right.  Well, let's -- okay, fine.  So from

5   2000 until the time you left, did you work in one

6   location?

7   A.      Yes.

8   Q.      And where was that?

9   A.      San Ramon.

10  Q.      And that was the area offices for Radio Shack?

11  A.      Regional, area, divisional.  They had a bunch of

12  names for it.

13  Q.      Okay.  And when Mr. Peterson became the area

14  loss prevention manager, did he then work out of the

15  San Ramon office, as well?

16  A.      No.

17  Q.      Where was he based, to your knowledge?

18  A.      San Diego, San Diego, Riverside, somewhere down

19  there.  That's all I remember.

20  Q.      Were you the only regional loss prevention

21  manager working out of San Ramon?

22  A.      During what period of time?

23  Q.      During the entire 2000 to 2009.

24  A.      Between -- between 2000, no, we had, one, two --

25  three other people that were what they called loss

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 11**

1   A.      Correct.

2   Q.      -- fair?

3   A.      Um-hum.

4   Q.      Is that "yes"?

5   A.      Yes, yes.

6   Q.      Okay.  Sorry.  So who was in charge of the area

7   from 2000 to 2009 in San Ramon while you were working

8   there?

9   A.      Okay.  During that time, we only had a regional,

10  between 2000 and probably 2005 or '6, when Tom Schultz

11  kind of moved up to a different title.

12  Q.      So who was the regional during that period, as

13  you've described it?

14  A.      Okay.  During what period of time?

15  Q.      From 2000 to 2005 or '6.

16  A.      Okay, Tom Schultz was the regional, and then he

17  got promoted.

18  Q.      Okay.  So is Tom Schultz in charge of the

19  San Ramon office, from the store perspective, for the

20  entire time from 2000 to 2009, as far as you knew?

21  A.      Yes and no.  Tom Schultz was promoted, I'm

22  thinking, 2006 or 2007 to the -- what they call the VP

23  area -- division VP, whatever his title was.  And then

24  they hired in a -- a regional manager by the name of

25  Duncan something.  I can't remember his last name.  And

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 11**

1   he was the regional between, I would say 2007 -- end

2   part of 2007, 2008, to around halfway through 2009.  He

3   was there about a year and a half.

4   Q.      Duncan was.

5   A.      Duncan, yes.

6   Q.      Okay.  Your understanding was that during that

7   period, Duncan had overall responsibility for everything

8   that came under the San Ramon office.

9   A.      Under the San Ramon region, yes.

10  Q.      Okay.  So was Tom Schultz there the entire time

11  that you were there, from 2000 to 2009?

12  A.      Yes.

13  Q.      He was in the San Ramon office, working with

14  you --

15  A.      Yeah, that office became --

16          MS. VERONESE:  Let her finish.

17          MS. THOMPSON:  Q.  You need to wait.  I'm sorry.

18          So was Mr. Schultz -- so you and Mr. Schultz

19  were working together the entire time, from 2000 to

20  2009?

21  A.      Yeah, you could say that, as I came in and out

22  of the office and stuff.

23  Q.      And how would you characterize your working

24  relationship with Mr. Schultz?

25  A.      Good.  I had a great relation.

**Dec. of Thompson - Exhibit 11**

Page 25

1    Q.        Did you like Mr. Schultz?

2    A.        Yes.

3    Q.        Did you respect him?

4    A.        Yes.

5    Q.        Did you think that he was doing a good job?

6    A.        Yes.

7    Q.        Did you think that he was a fair person?

8    A.        Yes.

9    Q.        Do you think he was truthful and honest?

10   A.        Yes.

11   Q.        Any difficulties at all in working with

12   Mr. Schultz?

13   A.        None.

14   Q.        All right.  So as the regional loss prevention

15   manager, what were your duties and responsibilities?

16   A.        As the regional, there was -- we had different

17   areas.  One would be, of course, investigations into

18   employee theft, employee fraud, things like that.  The

19   other thing would be auditing stores, training and

20   mostly liaison with the outside authority, police

21   departments, district attorneys, things like that.

22   Q.        When you say one of your -- let me ask you this:

23   The duties and responsibilities that you just outlined,

24   did those pretty much remain the same during the period

25   2000 to 2009?

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 11**

1   A.      Yes.

2   Q.      Now, you mentioned that one of your

3   responsibilities was auditing stores.  Can you tell me

4   what you meant by that?

5   A.      Well, there's two different types of audit.  One

6   would be just a regular visit, where we'd go in and take

7   a snapshot of the store and we'd report that to the

8   district manager, saying, "Okay, we came in.  We found

9   that the back door to the stockroom was open," or "the

10  cage was unlocked," or "his cases weren't locked" or --

11  things like that.

12          Then the other one was a full-blown audit, where

13  we actually went through a lot of the paperwork, making

14  sure all compliances were, in fact, being completed

15  properly as per policy and procedure.

16  Q.      Okay.  With respect to the full-blown audit as

17  you've described it, did those happen on some kind of

18  periodic basis?

19  A.      Uh, the way it would work is sometimes we

20  would -- we would look at the stores based upon

21  inventory levels, things like that.  If there was issues

22  that we needed to look into, we would go in and

23  investigate there.

24  Q.      So I'm talking about the full-blown audit,

25  though.  Was there a policy or practice that stores

**Dec. of Thompson - Exhibit 11**

1    would be audited with a full-blown audit once a year,

2    once a month --

3    A.      No, no.

4    Q.      Nothing like that?

5    A.      Sorry.

6    Q.      So when would you determine whether to do a,

7    quote, full-blown audit?

8    A.      As I said, we would then review things such as

9    their inventories, and we would look at that, and we'd

10   look if they're in compliance with paperwork, 'cause get

11   information from Fort Worth, saying, you know, "We had a

12   problem with this store; maybe you need to go do an

13   audit."  I might get the thing from the company, asking

14   me to do it; I might get it from a district manager,

15   asking me if I can do an audit of the store.

16   Q.      Okay.  So either your superiors or the district

17   managers could make a request for a, quote, full-blown

18   audit at any time?

19   A.      Um-hum.

20   Q.      Is that "yes"?

21   A.      Yes.  I'm sorry.

22   Q.      That's okay.

23           Would you also -- was it a company policy or

24   practice -- excuse me, I'm going to sneeze.

25           (Discussion off the record.)

**Dec. of Thompson - Exhibit 11**

1          MS. THOMPSON:  Q.  If a store manager left for

2    any reason, was it a company policy or practice to do a,

3    quote, full-blown audit at the time of the turnover to

4    the new manager?

5    A.      If a manager left, there would be an inventory

6    done.

7    Q.      And by "inventory," you mean a complete count of

8    all the merchandise?

9    A.      Right, with the manager going out, to the new

10   manager coming in.

11   Q.      What was your understanding of the purpose of

12   that inventory?

13   A.      Because what they never wanted to see was this

14   manager taking over the store that had tremendous

15   inventory losses --

16          THE REPORTER:  Slow down a little bit.

17          MS. THOMPSON:  Yeah, I'm sorry.  You're worse

18   than I am.

19          (Record read by the reporter:

20          "Answer:  Because what they never wanted to

21          see was this manager taking over the store

22          that had tremendous --")

23          THE WITNESS:  New manager taking over the store

24   and having to inherit an inventory problem.  So this

25   way, they would take the inventory and say, "Okay, it's

**Dec. of Thompson - Exhibit 11**

1  a 4-, $5,000 loss.  They know what it is; it goes to the

2  manager leaving.  The new manager would start over.

3          MS. THOMPSON:  Q.  Okay.  And how soon after a

4  manager leaving would that inventory take place,

5  typically?

6  A.      Usually it would be anywhere between 24 hours up

7  to 72 hours.

8  Q.      And would the store employees participate in

9  that inventory?

10 A.      Yes.

11 Q.      All of the store employees?

12 A.      In that store, yes.

13 Q.      That's what I meant.  I'm sorry.  So all of the

14 employees in the store would be required to participate

15 in the inventory that would follow the departure of a

16 store manager?

17 A.      Yes.  Now, in some cases -- I'll change it a

18 little bit, because they do this -- or they did -- that

19 is, the district manager can then say, "All I want is

20 this" -- "how this to be done, I just want managers to

21 do the inventory."  So each district manager was a

22 little bit different.

23 Q.      Okay.  So the district manager might say, "For

24 this particular inventory, I only want managers to

25 participate"?

**Dec. of Thompson - Exhibit 11**

1    A.      Correct.

2    Q.      But if the district manager didn't make that

3    instruction, the expectation would be that all store

4    employees would participate in the audit?

5    A.      Along with the new manager.

6    Q.      Would the district manager also participate?

7    A.      They were supposed to, yes.

8    Q.      Okay.  You also mentioned what you referred to

9    to as, quote, regular visits, end quote, where you would

10   get a snapshot of the store.  How often would you

11   undertake these regular visits, as you have described

12   them?

13   A.      Every day, every day I was out in the field.

14   Q.      Okay.  But how frequently would you hit a

15   particular store on, quote, a regular visit?

16   A.      "A particular store," I don't understand what

17   you mean by "particular store."

18   Q.      Well, how often -- well, let's say with

19   Mr. Allen's store.

20   A.      Okay.

21   Q.      Store 3830.  How frequently would you do a

22   regular visit of his store?

23   A.      Maybe once a year, maybe.  You know, it all

24   depends.

25   Q.      And what does it depend on, I'm sorry?

1   A.      Well, for instance, let's say Frank had a
2   problem in the store with a person stealing.  Well, I
3   would go in the store, do a visit, waiting for the
4   person.  I'd just sit there and wait.
5   Q.      Okay.  So, let me make sure I understand
6   something.  Did you have a regular schedule of visits to
7   the various stores in your area?
8   A.      No.
9   Q.      Okay.  So you would make these visits upon the
10  request from a store manager?
11  A.      No.
12  Q.      If the store manager asked you to come, you
13  wouldn't come?
14  A.      Sometimes they didn't even know I was coming.
15  I'd just walk in the building, 'cause I had an
16  investigation going.
17          THE REPORTER:  I need you to slow down.
18          THE WITNESS:  I'm sorry.
19          MS. THOMPSON:  Q.  Well, that's what I'm trying
20  to figure out.
21  A.      Okay.
22  Q.      What would prompt you to go to a store to do a
23  regular visit?
24  A.      Okay.
25  Q.      Please go as slowly as you can.

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 11**

1   A.      Okay.  If I was going to a store, it might be --

2   I have an investigation of an employee.  And part of the

3   thing was, sometimes we -- almost all the time, unless

4   the manager, himself, told us that this person was

5   stealing, they didn't know why I was there.

6   Q.      Who didn't know why you were there?

7   A.      The store manager.

8   Q.      I'm just trying to figure out -- all right.  So

9   one reason you might go is to investigate an employee?

10  A.      Correct.

11  Q.      What other reasons would prompt you to visit a

12  particular store at a particular time for a regular

13  visit?

14  A.      It could be a district manager calling me up,

15  "Hey, could you stop by the store and take a look at it,

16  see what you think," for loss prevention issues.

17  Q.      Okay.  Was that a frequent occurrence?

18  A.      It happened, but not -- they didn't call me up

19  every day.

20  Q.      No, but was that a regular practice of district

21  managers to --

22  A.      Yes.

23  Q.      -- ask you to -- you need to wait, and we really

24  both need to slow down.

25          So let me start the question again.  During the

**Dec. of Thompson - Exhibit 11**

1  period you were there, from 2000 to 2009, was it a

2  common occurrence for district managers to ask you to

3  come by particular stores?

4  A.      Yes.

5  Q.      Okay.  There was nothing unusual about such a

6  request, was there?

7  A.      No.

8  Q.      And so what I started to ask you earlier, did

9  store managers have the ability to request you to come

10 to their stores, or did they have to go through the

11 district manager, to your understanding?

12 A.      Sometimes a brand-new store -- because when I

13 did training, one of the things I would tell them,

14 "Within the next six months after becoming a manager, I

15 will be stopping by your store to see how you're doing,

16 to go over things."  Sometimes these new managers would

17 call me up and ask me to come in to do a visit to see

18 how they're doing, to see what I can -- how I can help

19 them.

20 Q.      Okay.  And so if a new store manager made that

21 request of you, would you comply?

22 A.      Yes, I'd say, "I'll be there within a few days."

23 Q.      Okay.  So other than in the situation that

24 you've just described where there's a new manager, did

25 store managers have the authority on their own to ask

**Dec. of Thompson - Exhibit 11**

1    you to come by their store to conduct a visit?

2    A.      Yes.

3    Q.      Okay.  So either district managers could ask you

4    to do it; that would be one way, right?

5    A.      Um-hum.

6    Q.      Is that "yes"?

7    A.      Yes.

8    Q.      And store managers could ask you; that would be

9    another reason why you might go to a store?

10   A.      Yes.

11   Q.      How about regional sales directors, could they

12   also ask you --

13   A.      Yes.  Okay.  I'm sorry.

14   Q.      All right.  So when you conducted one of these

15   regular visits, tell me what kinds of things you did and

16   were looking for.

17   A.      You're talking about visits.

18   Q.      You've described, quote, regular visits.

19   A.      Okay, regular visit.

20   Q.      That's what I'm talking about now.  I'm not

21   talking about -- you gave me two --

22   A.      Two things.  The audit --

23   Q.      You said there was a -- what you've described as

24   a, quote, full-blown audit, and the second thing was a

25   regular visit.  Did I understand you correctly?

**Dec. of Thompson - Exhibit 11**

1   A.      Correct.

2   Q.      Okay.  So now I'm talking about what you're

3   referring to as regular visits.

4   A.      Okay.

5   Q.      Okay.  So when you went to a store to do a

6   regular visit, as you've used that term, tell me what

7   kinds of things you would do, please.

8   A.      One of the things we would do is count the cash

9   drawer; that would be one of our first things.

10  Q.      So what do you mean, you would count the cash

11  drawer?

12  A.      To make sure that -- what happens is we can see

13  at any one time on the computer how much cash is in the

14  drawer.

15  Q.      And what was your purpose in doing that?

16  A.      To make sure nothing was missing.

17  Q.      Well, how would you determine whether something

18  was missing by just counting the cash?

19  A.      You would count the cash, and then the system

20  would tell you, "You're to have this much money in the

21  drawer."

22  Q.      I see.  So you would count the cash in the cash

23  drawer.  What other kinds of things would you do on a

24  regular visit?

25  A.      Regular visit, I think I mentioned before, we

**Dec. of Thompson - Exhibit 11**

1    would see if the -- when we walk in, we'd just kind of

2    do a snapshot, look around.

3    Q.    What would you be looking for?

4    A.    See if the back door to the stockroom was open.

5    Q.    Was the door -- the back -- when you say the

6    back door to the stockroom, do you mean at the manager's

7    office?

8    A.    Kind of.  We had a door -- a lot of places had

9    doors, and they had a back room.

10   Q.    Right.

11   A.    And the door could lead over to the manager's

12   office or to the stockroom.  Each building is different.

13   Q.    Okay.  So was the door either to the stock room

14   or to the manager's office, was that supposed to be

15   opened or closed?

16   A.    Closed.

17   Q.    At all times?

18   A.    At all times.

19   Q.    Okay.  What other kinds of things would you look

20   at?

21   A.    See if the security cage was locked.

22   Q.    And where was the security cage?

23   A.    Usually in the back, back stockroom.

24   Q.    And I take it the security cage was supposed to

25   be locked at all times?

**Dec. of Thompson - Exhibit 11**

1    A.       Yes.

2    Q.       Okay.  What other things would you be looking

3    for on a regular visit?

4    A.       Uh, make sure that the cabinets -- cabinets up

5    front were locked.

6    Q.       Okay.

7    A.       Make sure that the EAS system, the Electronic

8    Article Surveillance system, I think it's called, was

9    working properly.

10   Q.       And what was the point of that particular

11   system, as you understood it?

12   A.       Merchandise had tags on them called ESA (sic)

13   tags, and their things were -- when you walked out, it

14   automatically put an alarm at the door, saying somebody

15   is trying to walk out without paying for something.

16   Q.       Right.  Okay.  So what would you do to make sure

17   that surveillance system was working properly?

18   A.       Just test it.  Get a -- get a piece of

19   merchandise and pass it through.

20   Q.       What other kinds of things would you do on a

21   regular visit, other than what you've told me?

22   A.       The log for the EAS system, make sure they're

23   tested on a daily basis.

24   Q.       Anything else?

25   A.       Um, what else was there?  Um, if they had alarm

**Dec. of Thompson - Exhibit 11**

1   systems for the merchandise that was on the floor, we

2   tested that to make sure that was working.

3   Q.      Did you do any review of required paperwork --

4   A.      Um --

5   Q.      -- on these regular visits?

6   A.      The only thing we would look at, really, when we

7   looked at paperwork, is make sure the deposits were

8   made, the deposit slips were there and that they were

9   being made during the proper time.

10  Q.      Was there any protocol with respect to how much

11  cash was permitted to be in the store at any given

12  moment before a bank deposit was made?

13  A.      Yes.  There was a -- the company had a policy,

14  and -- where Fort Worth banking would set a limit for

15  each store, based upon their volume.

16  Q.      So, once a store reached that limit that had

17  been set by corporate --

18  A.      Um-hum.

19  Q.      -- once that limit in cash had been reached at a

20  particular store, was it the store's responsibility to

21  make sure that a bank deposit was then made?

22  A.      Again, it all depended upon the volume.  Like,

23  for instance, holiday weekend, coming up Christmas,

24  volume there would be much more.  They might have to

25  go, "Okay, I'm two" -- Fort Worth would say, "We only

**Dec. of Thompson - Exhibit 11**

1  want you to have $300 over your bank."  They would have

2  to then -- or 500.  They would say, "Make the deposit."

3  Q.     Okay.  So, no, I think we're saying the same

4  thing --

5  A.     Okay.

6  Q.     -- but I want to make sure that we're clear.

7  What you told me is that each store, depending on

8  volume, had a level that was set by corporate --

9  A.     Um-hum.

10  Q.     -- for the maximum amount of cash you were

11  supposed to have in the store at any one time, right?

12  A.     Correct.

13  Q.     Okay, so whatever the store was and whatever

14  their limit was, once the store reached its designated

15  limit --

16  A.     Um-hum.

17  Q.     -- the store employees would be required to make

18  a deposit?

19  A.     Correct.

20  Q.     And so there was no fixed number of deposits for

21  any given day; it would just depend on the levels of

22  cash against the protocols that had been -- the limits

23  that had been established; is that right?

24  A.     Yeah, kind of.  Again, I have to change it just

25  a little bit.

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 11**

1   Q.      Okay, sure.

2   A.      And that's because, in certain circumstances,

3   our downtown stores, we didn't want them going to the

4   bank all the time, especially during Christmas, because

5   of incidents that could happen.  And we've had them

6   throughout -- I worked for Radio Shack -- we've had

7   numerous incidents throughout the country of places for

8   downtown, like New York, Chicago, places like that,

9   employees being robbed.

10  Q.      So I want to make sure I understand something,

11  then.  So how would that affect the number of bank

12  deposits per day compared to the cash limits that you've

13  just described?

14  A.      Well, for instance, they would have to remove

15  the money from the drawer and make up the bank thing

16  showing they made a bank deposit, and take the thing and

17  put it in a plastic envelope.  That envelope would

18  usually be put in another drawer.  In case we got

19  robbed, nobody would know where it was at.

20          So the end of the day, these guys could go

21  together -- two people could go to the bank.  That's

22  what our ob -- the object behind it was, so there would

23  be two people making a deposit during the Christmastime.

24  Q.      Was this a particular policy that applied during

25  the holiday season?

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 11**

Page 41

1   A.        For certain areas, yes.

2   Q.        And can you tell me what those areas were, how

3   was that --

4   A.        It depended upon, like, if your area --

5   Los Angeles, we had the Watts area.  Nobody made a

6   deposit unless you went two when you went -- together in

7   two.

8   Q.        So the policy for certain areas was that you

9   would always have at least two people making the bank

10  deposit?

11  A.        Right, and it would always be at the end of the

12  business day.

13  Q.        So -- and was that true throughout the year or

14  just during the holiday season?

15  A.        Just during the holidays.

16  Q.        Okay.  So assuming -- if it's not a holiday

17  season?

18  A.        Um-hum.

19  Q.        -- what was the company policy in terms of

20  making the bank deposits?

21  A.        The bank deposits would be made between --

22  again, depending upon where it is.  Like here in

23  San Francisco, downtown area, they had to make it

24  between a certain time because of where they were at.

25  And we would say, "You need to make it between" -- I

**Dec. of Thompson - Exhibit 11**

1  think we changed it to 4:00, between 4:00 to 6:00.  Most

2  everybody else did it at closing, and they would go to

3  the bank after the store closed.

4         Now --

5  Q.    So how many close -- how many bank deposits --

6  again, we're not talking about the holiday season now.

7  How many bank deposits were supposed to be made during

8  the day; was it only one, generally?

9  A.    Only one, but we had high, high-volume stores in

10 certain areas.  I only had two of them, so -- but, like,

11 in parts of Los Angeles, you know, different places in

12 the country where it's real high volume, they would have

13 to make midday deposits.

14 Q.    Okay.  So when you say you only had two stores

15 that were high volume, as you've described it, what

16 stores were those?

17 A.    I had one up in Sacramento.  And I'm trying to

18 think where the other one was at at that time.  I'm

19 sorry, I can't remember the other store.  I remember one

20 was in Sacramento.  The store I'm thinking about

21 eventually, it was reduced from a high-volume store

22 because of sales.

23 Q.    Where was that?

24 A.    Redwood City.

25 Q.    So there was one store in Sacramento, one in

**Dec. of Thompson - Exhibit 11**

1   Redwood City?

2   A.      Uh-huh.

3   Q.      Any others?

4   A.      Not that I can remember.  But they could also --

5   at their discretion, if they had large amounts, they

6   could make a midday deposit to get their money out of

7   there.

8   Q.      So you're saying any store at their discretion

9   could make a midday deposit?

10  A.      Yes.

11  Q.      All right.  So if we're not talking about one of

12  the two stores that you just talked about, and we're not

13  talking about the holiday season, am I correct in

14  understanding that the deposits were then to be made

15  later in each day?

16  A.      Yes.

17  Q.      Okay.  So for most stores -- so, what time was

18  the deposit supposed to be made?  Again, we're not

19  talking about the two high-volume stores and we're not

20  talking about the holiday season.  When would the

21  deposits typically be made?

22  A.      Okay.  Are we talking about downtown

23  San Francisco or are we talking about the overall?

24  Q.      Okay.  So when you say, "downtown San

25  Francisco," what do you mean by that?

**Dec. of Thompson - Exhibit 11**

1  A.      We had two -- two stores, one at this -- at

2  Frank's store, 3830.

3  Q.      Okay.  So one store that -- you're considering

4  3830 to be a downtown store?

5  A.      Yeah.

6  Q.      Okay.  What else was a downtown store the way

7  you're using the term?

8  A.      Um, the other end of Market Street.  Cannot

9  think of the store number.

10  Q.      Where on Market was it located?

11  A.      It's down in the business area.

12  Q.      What do you mean, "the business area"?

13  A.      Down here somewhere.  It's right on Market

14  Street.  I can't really explain.  It's the business

15  area, we had a store there.

16  Q.      So Mr. Allen's store was on Market Street, as

17  well, right?

18  A.      Um-hum.

19  Q.      Is that "yes"?

20  A.      Yes.

21  Q.      Okay.  So the two stores that you're referring

22  to as "downtown San Francisco" are two stores located on

23  Market Street, right?

24  A.      Correct.

25  Q.      Were there any other stores that you considered

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 11**

1    "downtown San Francisco" stores?

2    A.      No.

3    Q.      So with respect to the two stores that you're

4    referring to as "downtown San Francisco," what was your

5    understanding, during your employment, of the policies

6    with regard to making the deposits?

7    A.      Um, again, this became -- with the district

8    manager, regional manager approval -- and they did

9    something at Fort Worth where they got approval, where

10   they could make the deposit earlier.

11   Q.      Okay.  So when you say to "make the deposit

12   earlier," what do you mean by that?

13   A.      Um, they can make the deposit between 4:00 and

14   6:00.

15   Q.      So does that mean that those two stores were

16   required to make the deposit between 4:00 and 6:00?

17   A.      No, they just gave them an option to do that.

18   Because we have complaints from the managers -- the

19   manager down there at the store -- the other store,

20   which I don't remember the number -- that he was afraid

21   that he would be robbed.

22   Q.      Okay.

23   A.      So --

24   Q.      So let me make sure.  In those two stores,

25   Mr. Allen's store and the other Market Street store,

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 11**

Page 46

1    those store managers had the option of making a bank

2    deposit either between 4:00 and 6:00 p.m., or after

3    closing?

4    A.       After closing, yes.

5    Q.       And it was just up to the store manager's

6    discretion?

7    A.       Right, correct.

8    Q.       And what time was the closing of those two

9    stores?

10   A.       I would say --

11            MS. VERONESE:  Don't guess.

12            MS. THOMPSON:  Q.  Well, if you don't know --

13   A.       Okay.  I don't know.

14   Q.       Okay.  That's fine.

15   A.       Okay.

16   Q.       All right.  We're going back to -- I'm sorry --

17   what you described as the regular visits that you would

18   make, and I was asking you what kinds of things would

19   you be looking for, and I think I started to ask you

20   about paperwork.  Would you be reviewing -- you

21   mentioned bank deposits.

22   A.       Um-hum.

23   Q.       Was there any other paperwork that you would

24   look at on one of the regular visits?

25   A.       I would also sometimes look at voids and

**Dec. of Thompson - Exhibit 11**

1   refunds.

2   Q.      I'm sorry?

3   A.      Voids and refunds.

4   Q.      And what do you mean by that; what would you be

5   looking at?

6   A.      I would be making sure that the customer signed

7   them, that the manager reviewed the voids and signed

8   them.

9   Q.      Why were you doing that?

10  A.      To make sure -- the policy behind that was the

11  manager had to review them to make sure that the

12  merchandise was there, and that he approved these

13  things.

14  Q.      So basically you're making sure that company

15  policy was being followed?

16  A.      Correct.

17  Q.      What other paperwork would you look at on a

18  regular visit at the store, to determine whether there

19  was compliance with company policy?

20  A.      From what I remember, that was about it.

21  Q.      Okay.  Was part of your job to make sure that

22  merchandise was properly secured on the sales floor?

23  A.      Yes.

24  Q.      What would you be looking for there?

25  A.      We had alarms and things for certain

**Dec. of Thompson - Exhibit 11**

1   merchandise, the bigger merchandise.  We would test it

2   to make sure the alarms are working.

3   Q.     Okay.  Other than testing for the alarms, would

4   you do anything else to make sure merchandise was

5   properly secured?

6   A.     Well, we also had security pegs that had a

7   little magnet thing to them.

8   Q.     When you say -- are those called the locking

9   pegs?

10  A.     Locking pegs, yes.

11  Q.     And what would you be looking for with respect

12  to the locking pegs?

13  A.     I would go around and check them to make sure

14  they were locked.

15  Q.     Now, when you were doing a regular visit, did

16  you have any kind of checklist that you were using?

17  A.     For the visit?

18  Q.     Yes.

19  A.     Um, not really.  It was just certain things they

20  wanted us to look at, you know, when we did a visit.

21  During my training this is what they talked about, so --

22  Q.     But what I'm trying to understand is whether,

23  when you actually went to the store, did you have any

24  kind of documentation or checklist with you that you

25  would go down to make sure you were covering everything

**Dec. of Thompson - Exhibit 11**

1   you needed to cover?

2   A.      No.

3   Q.      Was it your practice to write some kind of

4   report after a regular visit?

5   A.      Yes.

6   Q.      Would you do these visits by yourself, or would

7   the district manager be with you, typically?

8   A.      Not typically, but they would be with us

9   sometimes, once in a great while.

10   Q.      I'm sorry.  Most of the great while, the

11   district manager would be present with you?

12   A.      No.

13   Q.      Okay.

14   A.      Once in a great while they would be with me.

15   Q.      Okay.

16   A.      It was far and between when they were with me.

17   Q.      So most of the visits you would do by yourself;

18   is that --

19   A.      Yes.

20   Q.      -- a fair statement?

21   A.      Um-hum.

22   Q.      Now, would the store manager typically be

23   present while you were doing the regular visit, or not?

24   A.      I might walk into a store, and there's a store

25   manager doing stuff with the -- with the -- let me start

**Dec. of Thompson - Exhibit 11**

1    over -- the district manager with the store manager

2    doing something about the store.  And I'm just doing a

3    visit, look over some things and I'm taking off after.

4    Q.     So my question was this time just about the

5    store manager.  Typically, would the store manager be

6    present on one of your visits, or not?

7    A.     No, doesn't have to be.

8    Q.     Okay.  Well, if a store manager was present

9    during one of your visits, regular visits, would you

10   have interaction with him or her while you were

11   conducting your review?

12   A.     Yes.

13   Q.     Would you ask the store manager to kind of

14   follow you around the store while you were conducting

15   your compliance review?

16   A.     No.  That would be more at the end.

17   Q.     Okay.  So your practice would be that you would

18   basically conduct the review, yourself -- by the way,

19   how long would these regular visits typically take, on

20   average?

21   A.     Twenty minutes to half hour.

22   Q.     So once you were finished with your review,

23   would it be your practice, then, to meet with the store

24   manager?

25   A.     Yes.

**Dec. of Thompson - Exhibit 11**

1   Q.      Would you be writing some kind of documentation

2   about your visit?

3   A.      Yes.

4   Q.      Would you review the documentation with the

5   store manager?

6   A.      Yes.

7   Q.      And then what would you do with the

8   documentation once you finished your review and left the

9   store?

10   A.      I would then forward it on to the district

11   manager.

12   Q.      Other than forwarding it to the district

13   manager, did you forward the documentation of the store

14   visit to anyone else?

15   A.      Um, usually the regional manager.

16   Q.      The regional manager?

17   A.      Um-hum.

18   Q.      I'm sorry, "yes"?

19   A.      Yes.  I'm sorry.

20   Q.      When you say the regional manager, do you mean,

21   like, the regional sales director or the regional loss

22   prevention --

23   A.      It would go there, too.  He would get a copy,

24   the regional manager of stores would get a copy, um, and

25   then I would send my copy on to, like, Fort Worth,

Dec. of Thompson - Exhibit 11

1   because you have, like, a list of things to send it out

2   to, and we kept the hard copy.

3   Q.      And you kept a hard copy in the office in

4   San Ramon?

5   A.      Um-hum.

6   Q.      Is that "yes"?

7   A.      Yes.

8   Q.      Okay.

9   A.      I'm sorry.

10  Q.      And would you also send a copy to -- well, you

11  said Tom Schultz was pretty much running the San Ramon

12  office during the 2000 to 2009 period, at least from the

13  store perspective, is that -- did I understand that

14  correctly?

15  A.      Yeah, kind of.  He had already become the vice

16  president.  Duncan had taken over then.  And I would

17  send stuff to Duncan.

18  Q.      Oh, I see.  Okay.

19  A.      But that was only for, like, a year and a half.

20  Q.      So while Duncan was there, you would send

21  reports to Duncan, and when Duncan -- during the rest of

22  the time when Duncan wasn't working at Radio Shack, it

23  would all go to Tom Schultz?

24  A.      Right, because he would then take over for a

25  while.

---

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 11**

1   Q.      Did you have the ability to recommend

2   disciplinary action of any employee for violations of

3   company policy with respect to loss prevention?

4   A.      What I would do then, after I do a visit, if

5   there was problems in there, I would write what they

6   call a VOCP, violation of company policy, and send that

7   to the district manager and the regional manager; there

8   was a copy to them.  It was up to the district manager

9   then to do disciplinary actions.  It wasn't my job to do

10  that or give recommendations.

11  Q.      Okay.  So you never made any recommendations for

12  disciplinary action?

13  A.      No.  They would ask me, and I would say, you

14  know, "Our history of things like this, other district

15  managers have terminated; others" -- because they would

16  always say, "What do you think I should do?"  Especially

17  new district managers.  "What do you think I should do?"

18  I says, "Well, history, if you want to be continuous," I

19  said "some would do this, some would do this.  You're

20  the district manager."

21  Q.      Okay.

22  A.      "You can make your mind up."

23  Q.      So, just making sure I understand your

24  testimony, then, you might be asked for your

25  recommendation, but your policy and practice was to say,

1   "That's not my job to give recommendations"?

2   A.      Correct.

3   Q.      "That's your job, District Manager"?

4   A.      Correct.

5   Q.      Okay.  So, in terms of how you view your role,

6   you were basically simply presenting the facts?

7   A.      Yes.

8   Q.      And then it was up to the district manager to

9   decide what, if any, disciplinary action should be

10  imposed?

11  A.      Right.  That's on VOCPs, I should tell you that

12  right now.

13  Q.      What other kind of write-ups did you do besides

14  VOCPs?

15  A.      Investigations into theft.

16  Q.      So would you make -- once you completed an

17  investigation into theft, would it be your policy or

18  practice to make recommendations for disciplinary

19  action?

20  A.      The policy was, is that we could either have the

21  person arrested or we would turn it over to the district

22  manager.  If the district manager goes, "well, gee, you

23  know, he" --

24          THE REPORTER:  Slow down.

25          MS. THOMPSON:  Q.  Yeah, this is really hard.

**Dec. of Thompson - Exhibit 11**

1  Sorry.

2  A.      Well, if -- if -- "I'm looking to just demote

3  him."

4          "No, this is a terminable offense.  He stole

5  from us.  We terminate people for this.  And it wouldn't

6  look good if we had somebody arrested and we kept them,"

7  so --

8  Q.      So you would take a more affirmative position

9  with respect to recommending disciplinary action or

10 termination in the event of employee theft?

11 A.      Employee theft would only be termination.

12 Q.      So, all right.  And you viewed your job, in the

13 instances of employee theft, to tell the district

14 manager --

15 A.      Advise.  Advise.

16 Q.      Okay.

17 A.      Not tell.

18 Q.      To recommend to the district manager that the

19 store employee be terminated?

20 A.      Usually they knew what to do, the district

21 managers.  It was usually the newer district managers

22 who didn't know what to do.

23 Q.      Okay.  But you saw your role in that situation,

24 where you were dealing with employee theft, to make a

25 specific recommendation for termination when needed?

**Dec. of Thompson - Exhibit 11**

1    A.      When needed, yes.

2    Q.      So, let's go back to the VOCP situation.  Was a

3    VOCP, to your understanding, a disciplinary document?

4    A.      From what I understand, yes.

5    Q.      Okay.  And was there a particular form that was

6    used for a VOCP?

7    A.      It wasn't a form.  It was a thing that said

8    VOCP, and then we typed out what the violation is,

9    da-da-da-da-da, and then we would send it off to the

10   district manager.

11   Q.      Okay.  So, what circumstances would cause you to

12   come to the conclusion that there had been a violation

13   of company policy?

14   A.      Uh, for instance, say I went into a store and I

15   went to the back room and the cage was unlocked.  First

16   thing I would do, I would note it down in my first

17   report and tell the manager, you know, "You can't do

18   this," you know, "You must make sure this is locked at

19   all times; this is the policy of the company."

20           Let's say I came back three, four months from

21   then, I walk in -- because now maybe I'm doing an audit

22   or investigation.  I walk in, there's the cage unlocked,

23   you know.  This time I would do a VOCP.

24   Q.      All right.  So let me make sure I understand

25   something.  So the first time you would go in and you

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 11**

1    would see the cage unlocked, for example, that, itself,

2    would be a violation of company policy, right?

3    A.      Correct.  Yes.

4    Q.      But in your mind, you would make the judgment

5    that, "Well, this is the first time I've seen this.

6    I'll point it out to the store manager, but I'm not

7    going to write up a VOCP"; is that true?

8    A.      No, that's not true.

9    Q.      Okay.

10   A.      I would put it in my -- my -- my visitor's notes

11   that, "Upon arrival, I found the cage unlocked; I

12   reviewed this with the store manager."

13   Q.      Okay.  And would you write up -- it was a

14   violation of policy, right?

15   A.      Right.

16   Q.      So would you then write-up a VOCP?

17   A.      Uh, it depended upon if it was a brand-new

18   manager, okay, because they're kind of still learning

19   how to do their job, so --

20   Q.      So if it was a brand-new manager, are you saying

21   you would not write the person up?

22   A.      No, 'cause I would want the district manager to

23   sit down with him and go over this with him.

24   Q.      Okay.

25   A.      So that would be a training issue.

**Dec. of Thompson - Exhibit 11**

1   Q.      So if it was a brand-new manager, you would not

2   write up a violation of company policy for the first

3   offense?

4   A.      Right.

5   Q.      But if it was an experienced store manager,

6   would you write up a VOCP?

7   A.      Yes.

8   Q.      Even if it was a first offense?

9   A.      Usually on these things, they knew better.  And

10  again, I would write it up and the district manager

11  could argue he's not going to do anything.

12  Q.      Okay.  No, I understand that.  I'm just talking

13  about writing up what you referred to as a VOCP.

14  A.      Correct.

15  Q.      Okay.  So, again, if it's an experienced manager

16  and you found any violation of company policy, it would

17  be your practice to write up a VOCP; is that true?

18          THE WITNESS:  Do you have a question?

19          MS. THOMPSON:  Q.  You don't have to look at

20  her.

21  A.      Okay.  Okay.

22  Q.      Yeah.

23  A.      Uh, it would be -- again, let me -- I'm sorry.

24          MS. THOMPSON:  Could you read it back?

25          (Record read by the reporter:

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 11**

1          "Question:  So, again, if it's an

2          experienced manager and you found any

3          violation of company policy, it would be

4          your practice to write up a VOCP; is that

5          true?")

6          THE WITNESS:  Yes.

7          MS. THOMPSON:  Q.  And then as you testified, it

8     would be up to the district manager to decide what

9     disciplinary action, if any, was appropriate?

10    A.        Correct.

11    Q.        So was part of your job ensuring that store

12    personnel complied with loss prevention policies and

13    procedures?

14    A.        Actually, yes and no, because the reason is, it

15    was the store manager's responsibility to make sure that

16    his people were doing -- giving -- he was giving the

17    right direction, or she was giving the right directions

18    to people for loss prevention.

19    Q.        That was the store manager's responsibility?

20    A.        Correct.

21    Q.        And was it part of your responsibility, though,

22    to make sure that the store manager was complying with

23    loss prevention policies and procedures?

24    A.        Correct.

25    Q.        But in terms of actually making sure the store

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 11**

1   employees were complying fully with all applicable loss

2   prevention policies, you left that up to the store

3   manager?

4   A.      I left it up to the store manager, but there

5   might be issues --

6   Q.      Wait, I'm sorry.  Did you leave it up to the

7   store managers?

8   A.      Yes.

9   Q.      Okay.

10  A.      But there would other -- there would be

11  circumstances where the district managers go in a couple

12  times, the regional manager's gone, and they find

13  problems with the back door being left open all the time

14  by the employees.  They may say, "You know what?  We

15  need you to go in there and take a look at this.  If you

16  think the employees are not following policy, I want the

17  individual -- the people to be written up on a VOCP, I

18  want this" --

19  Q.      Yeah, you're really -- this is really brutal for

20  her.  I know it's your normal way of speaking.

21          (Discussion off the record.)

22          MS. THOMPSON:  Q.  So I think what you were

23  saying -- and correct me if I'm wrong -- I'm just trying

24  to jog your memory -- there might be instances where the

25  district manager would ask you to deal at the employee

**Dec. of Thompson - Exhibit 11**

1   level, as well?

2   A.      Correct.

3   Q.      Was there anything else you wanted to say about

4   that?  I don't mean to be --

5   A.      Oh, no, it was just -- that would be the

6   district manager, regional manager.

7   Q.      The district manager or the regional manager

8   might ask you to do what?

9   A.      To go into the store, because when they went

10  into the store for a visit, or whatever, they noticed

11  that the back door was open.  The store manager wasn't

12  there that day.  So they look at it as an employee

13  issue.  They would say, "Could you go by there, do a

14  visit and see if that's a continuous prob" -- 'cause

15  they might have addressed it to the employees already.

16  So I may go into a store, see the back door open, then I

17  write up an employee there on the VOCP.

18  Q.      Okay.  Now, if you were conducting a visit and

19  writing up your report and you felt that there were

20  violations of company policy -- let me withdraw that.

21  A.      Can we have a break?

22          MS. THOMPSON:  Oh, of course.  That would be

23  good, good for the court reporter, too.

24          (Recess taken.)

25          MS. THOMPSON:  All right.  We can go back on the

**Dec. of Thompson - Exhibit 11**

1    record.

2    Q.      And again, Mr. Nabozny, any time you need a

3    break, just let me know, okay?

4    A.      (Witness nods head.)

5    Q.      And a reminder to speak -- you know, even if it

6    feels exaggerated to you, just talk as slowly as you

7    can, and try to remember to wait for me to finish.

8    A.      I'll try.

9    Q.      I know.  I know this is hard, and I'll try to

10   remind you, but if I go like this, that means slow down.

11           (Discussion off the record.)

12           MS. THOMPSON:  Okay.  So we're back on the

13   record.

14   Q.      Now, you mentioned that -- I think you mentioned

15   this -- and correct me if I'm wrong -- that training was

16   one of your responsibilities?

17   A.      Yes.

18   Q.      Okay.  So tell me what your responsibilities

19   were with regard to training?

20   A.      Well, there would be -- I would train new

21   managers, be it at a meeting -- we'd have, like,

22   training sessions.  I would -- there would also be

23   training sessions when I go into stores, work with

24   different people.  District meetings where the managers

25   would come to a meeting.

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 11**

1    Q.      Okay.  So with new managers, would it be a new

2    manager training session kind of thing --

3    A.      Yes.

4    Q.      -- or would it be one on one, or would it be

5    both?

6    A.      It would be both.  I mean, actually, the one

7    meeting would be we'd bring people into a district

8    office, and I'd spend four or five hours going over loss

9    prevention issues, things they need to do, how to do

10   things, what to look for.

11   Q.      Would you also do training at the store level?

12   A.      Yes.

13   Q.      And that would be with the store manager?

14   A.      Yes.

15   Q.      And would it also be with the store employees?

16   A.      Usually, no.  It would only be with the store

17   managers, because it would usually be for a new store

18   manager.

19   Q.      Okay.  So for new store managers, you would have

20   a formal training session at a --

21   A.      District office.

22   Q.      At the district office.  For new managers only?

23   A.      For new managers only, yes.

24   Q.      And then for new managers, also you might do

25   one-on-one training at the person's store?

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 11**

1   A.      Yes, after they went through this training -- if

2   you remember, I told you I would go back to a store

3   three to six months later.

4   Q.      Okay.  So you would have the formal training at

5   the district office, and then a few months later you

6   would go back and have one-on-one training with the new

7   manager?

8   A.      Yes.  I'd spend maybe an hour, two hours with

9   them at the store level.

10  Q.      So was it your expectation that if the store

11  manager was trained, that he or she would then take

12  responsibility for the store employees' compliance with

13  policies and procedures?

14  A.      Yes.

15  Q.      So you, yourself, were not responsible for

16  making sure that the store employees were familiar with

17  the company's loss prevention policies and practices; is

18  that true?

19  A.      Hmm, not really, 'cause, I mean, we really never

20  did that many training sessions with employees.

21  Q.      Did you, during the nine years, nine-plus years

22  that you worked at Radio Shack, ever do training of

23  store employees other than store managers?

24  A.      We used to have what they call these Christmas

25  meetings, where employees would come to the Christmas

**Dec. of Thompson - Exhibit 11**

1    meeting.  I would do it then, and it would only be for

2    an hour.

3    Q.    And during what period of time were these

4    Christmas meetings taking place, what years?

5    A.    2000 to about 2006, maybe, 2007.

6    Q.    Okay.  And those Christmas meetings were

7    suspended after about 2006, 2007?

8    A.    From what I remember, you know.

9    Q.    Okay.

10   A.    They did things differently.

11   Q.    So, again, other than the Christmas meetings,

12   did you, yourself, ever engage in any training of store

13   employees other than the store manager?

14   A.    Well, at those meetings -- those meetings I

15   mentioned, the store would be -- store associates would

16   be there.

17   Q.    Oh, okay.

18   A.    We'd have --

19   Q.    So what meetings would those be?  When would you

20   have meetings where all the store associates were

21   present?

22   A.    During the Christmastime.

23   Q.    Okay.  So, my question was other than that,

24   okay?

25   A.    Okay.

**Dec. of Thompson - Exhibit 11**

1   Q.      So let me try the question again.  So you said

2   the Christmas meeting was a one-time meeting around the

3   Christmas holidays where you would -- where all store

4   personnel, including store associates and store

5   managers, would be present, correct?

6   A.      It wasn't -- it was a before-Christmas meeting.

7   So it was, like, October, we'd have this meeting.

8   Q.      Okay.  So during the period 2000 to 2006, around

9   October of each year, you would have what's called a

10  Christmas meeting, correct?

11  A.      The company would, the region or the district.

12  Usually it's a region having this Christmas meeting.

13  Q.      Okay.  The region would have what you're calling

14  the Christmas meeting around October of each year --

15  A.      Yeah.

16  Q.      -- during the period 2000 to 2006, correct?

17  A.      Yes.

18  Q.      And at that meeting, all store personnel,

19  including store managers and store associates, would be

20  expected to attend?

21  A.      Correct.

22  Q.      And would that be a one-day meeting?

23  A.      Yes.

24  Q.      And as part of that meeting, you would offer

25  some training to all the employees assembled with regard

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 11**

Page 67

1    to loss prevention?

2    A.        Dealing with Christmas, yes.

3    Q.        So the focus on this October meeting would be on

4    loss prevention issues that might arise during the

5    holiday season?

6    A.        Correct.

7    Q.        And you said that practice of having what you're

8    referring to as Christmas meetings ended in about 2006?

9    A.        The two separate meetings did.  Then what they

10   did is they just brought everybody together.  I never

11   knew who the associates were, and we had managers and

12   associates together.

13   Q.        All right.  Now you're really confusing me.  You

14   just described a practice from 2000 to 2006 --

15   A.        Correct.

16   Q.        -- of the annual meeting for the region that

17   took place in October where everybody was present.

18   Right?

19   A.        Correct.  One would be a store manager meeting

20   for Christmas, where it would be all, "Let's go, team,"

21   and then the other one, within about a week later, would

22   be just for the associates, the same thing.  And at each

23   meeting, I would talk.

24   Q.        All right.  So now I think I'm clear, then.

25             So this -- what you're referring to as the

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 11**

1   October meeting, there would be one meeting for all

2   store managers in a region, correct?

3   A.      Correct.

4   Q.      And then there would be a second meeting around

5   the same time frame, where all store associates would be

6   present?

7   A.      Correct.

8   Q.      And this all happened during the period roughly

9   2000 to 2006, correct?

10  A.      Correct.

11  Q.      Okay.  And during the store manager meeting and

12  the associate meeting, you would make a presentation

13  about loss prevention issues that were particularly

14  relevant to the holiday season?

15  A.      Correct.

16  Q.      Okay.  So other than this --

17  A.      Okay.

18  Q.      -- Christmas -- yes.

19  A.      I have to stop you, because you forgot to

20  mention the other part.  They stopped that part, but

21  then they changed it, where we'd have these three-day

22  meetings, where associates and managers would come

23  together.

24  Q.      Okay.  So when did the practice start of having

25  the three-day meetings that you just described?

**Dec. of Thompson - Exhibit 11**

1   A.      Oh, I would say around 2007, the next year, they

2   decided it would be more efficient.  And the reason --

3   Q.      Okay.

4   A.      Okay.  And it wouldn't be at the same place.  It

5   would be different places.  That's why it was three

6   days.

7   Q.      All right.  So at some point starting in around

8   2007 until the time -- and it continued through the time

9   you left --

10  A.      Um-hum.

11  Q.      -- correct?

12  A.      Yes.

13  Q.      -- there would be three-day training meetings in

14  the region; is that right?

15  A.      Well, I don't know if you'd call them training.

16  It was mostly Christmas things, what we're selling, how

17  to do it, what they wanted you to do, things like that.

18  It was more of a Christmas --

19  Q.      Okay.

20  A.      My thing was to go in and just talk about

21  Christmastime.

22  Q.      All right.  Again, so we're clear, then, so

23  starting in about 2007, there would still be an annual

24  Christmas meeting, but it would be over three days?

25  A.      Correct.

**Dec. of Thompson - Exhibit 11**

1  Q.      And starting in 2007 for the three-day -- for

2  these three-day meetings, would store associates

3  participate?

4  A.      Yes.

5  Q.      And so would the store managers?

6  A.      Yes.

7  Q.      And so would district managers?

8  A.      Yes.

9  Q.      Okay.  Was everybody at all these meetings all

10  together, or were the meetings separate for store

11  associates?

12  A.      No, they would be all together.

13  Q.      So, again, these three-day meetings took place

14  around the holiday season, correct?

15  A.      Before the holiday season.

16  Q.      So October?

17  A.      October, yeah.

18  Q.      Okay.  So the company had October meetings

19  focused on the holiday season throughout the entire

20  period of your employment; is that what you're saying?

21  A.      Correct, yes.

22  Q.      And as part of those holiday meetings, you would

23  have an opportunity to address the store associates as

24  well as the store managers?

25  A.      Correct.

**Dec. of Thompson - Exhibit 11**

1   Q.      So other than those holiday meetings, which

2   we've now covered pretty exhaustively, did you ever have

3   any other training of store associates directly?

4   A.      Not that I can remember.

5   Q.      So the rest of the training that you

6   participated in would be with respect to store managers;

7   is that a fair statement?

8   A.      Yes.

9   Q.      Was it your opinion, based upon your experience

10  and your years of work there, that Radio Shack took loss

11  prevention issues seriously?

12  A.      Yes.

13  Q.      And was it part of your job to make sure that at

14  least store managers consistently followed store

15  policies and procedures?

16  A.      Yes.

17  Q.      And I take it you took that job seriously?

18  A.      Yes.

19  Q.      Did you know a district manager named

20  Hani Alzaghari?

21  A.      Yes.

22  Q.      Did Hani -- am I pronouncing that right?  Did

23  you call him Hani or Hani?

24  A.      Call him Hani.

25  Q.      Hani.  Okay.  When did you first meet

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 11**

Page 72

1   Mr. Alzaghari?

2   A.      When he was a store manager.

3   Q.      Do you remember what store he was the manager at

4   when you met him?

5   A.      Yes, a store in Fremont.

6   Q.      Do you remember roughly when that was when you

7   first met him?

8   A.      I couldn't tell you.  He -- you know, it was a

9   while.

10  Q.      Sometime in early 2000's?

11  A.      Probably early 2000's.  That's the best I can

12  remember.

13  Q.      And at some point, you became aware that

14  Mr. Alzaghari was promoted to district manager?

15  A.      Correct.

16  Q.      Now, did you work with -- did you have occasion

17  to work with Mr. Alzaghari while he was the store

18  manager, while you were the regional loss prevention

19  manager?

20  A.      Yes.

21  Q.      And did you form any opinion with respect to how

22  well Mr. Alzaghari, as a store manager, was doing in

23  complying with Radio Shack policies and procedures that

24  deal with loss prevention?

25  A.      Yeah, from what I remember, yeah.

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 11**

1    Q.      And what was your opinion?

2    A.      He did a good job.

3    Q.      Now, when Mr. Alzaghari was promoted to district

4    manager, did you also have occasion to work with him on

5    a professional level in your capacity as regional loss

6    prevention manager?

7    A.      Yes.  One of the policies of the company is when

8    a new district manager became a district manager, I have

9    to spend at least a day or two with him, where he

10   shadowed me going to different stores, and we would go

11   over different responsibilities and what his

12   responsibilities were for loss prevention.

13   Q.      And did you do that with Mr. Alzaghari?

14   A.      Yes.

15   Q.      And even after that initial meeting with

16   Mr. Alzaghari, did you have kind of an ongoing working

17   relationship with him in his capacity as district

18   manager while you were the regional loss prevention

19   manager?

20   A.      Yes.

21   Q.      And did you form an opinion with respect to

22   Mr. Hani's compliance with Radio Shack loss prevention

23   policies and procedures as a district manager?

24   A.      I'm -- I don't know what you're asking me.

25   Q.      Okay.  You don't understand the question?

**Dec. of Thompson - Exhibit 11**

1   A.      Yeah, I don't.  I mean --

2   Q.      Okay.  Well, was part of your job just making

3   sure that store managers and district managers were

4   familiar with and complied with Radio Shack loss

5   prevention company policies and procedures?

6   A.      Yeah, I would say yes.

7   Q.      Okay.  So, in connection with that, I'm just

8   trying to figure out whether you ever formed an opinion

9   with respect to how well Hani Alzaghari was performing

10  that part of his job.

11  A.      Oh, okay.  I would say he did a good job.

12  Q.      Did you have any concerns about Mr. Alzaghari's

13  ability to comply with Radio Shack's loss prevention

14  policies and procedures?

15          MS. VERONESE:  When he was the district manager?

16          MS. THOMPSON:  Right.

17          THE WITNESS:  I didn't have any problems.

18          MS. THOMPSON:  Q.  Okay.

19  A.      That I can remember.  I mean ....

20  Q.      Would you characterize your working relationship

21  with Mr. Alzaghari as a positive one?

22  A.      Yes.

23  Q.      Did you like working with Mr. Alzaghari?

24  A.      Yes.

25  Q.      Did you believe that basically he was doing a

**Dec. of Thompson - Exhibit 11**

1  good job as a district manager?

2  A.      Yes.

3  Q.      Did you believe that he was -- from what you

4  could observe, was he fair?

5  A.      I think he was fair.

6  Q.      Did you believe that he was an honest person?

7  A.      I think he was an honest person.

8  Q.      As you sit here now, do you have any reason at

9  all to question Mr. Alzaghari's integrity or honesty?

10  A.      No.

11  Q.      Did you ever know Mr. Alzaghari to lie?

12          MS. VERONESE:  Vague.

13          THE WITNESS:  That's -- I could say I don't

14  remember.  I don't remember ever having an issue with

15  him --

16          MS. THOMPSON:  Q.  Okay.

17  A.      -- you know.

18  Q.      So I'm just asking you -- I mean --

19  A.      I know.

20  Q.      All I'm trying to find out is what you know or

21  what you remember.  So my question again is, based upon

22  your interactions with him, did you ever know

23  Mr. Alzaghari to lie or be untruthful?

24  A.      To be honest with you, no, I just ... never had

25  an issue with him.

**Dec. of Thompson - Exhibit 11**

1  Q.      Have you ever heard of something called "cage

2  counts"?

3  A.      Yes.

4  Q.      While you were at Radio Shack?

5  A.      Yes.

6  Q.      Okay.  Can you tell me what your understanding

7  is of "cage counts"?

8  A.      The manager had to take his -- oh, I forget what

9  it was called.  We had a system where we could pull up

10  the system and know how much -- what merchandise was in

11  the cage.

12  Q.      And just so we're clear on the record, the cage

13  is a locked facility in the stockroom in which

14  high-value merchandise was stored?

15  A.      Correct.

16          MS. THOMPSON:  I'm sorry.  Could you read back

17  his prior answer?

18          (Record read by the reporter:

19          "Question:  The manager had to take his --

20          oh, I forget what it was called.  We had a

21          system where we could pull up the system and

22          know how much -- what merchandise was in the

23          cage.")

24          MS. THOMPSON:  Q.  So in terms of conducting a

25  cage count, how would a store manager go about doing

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 11**

1  that?

2  A.      He could pull up -- again, I don't remember the

3  report.  He would pull it up and he would know how many,

4  for instance, cell phones.  And each one had a SKU on

5  it.  They could take that SKU, go to the cage and count

6  how many cell phones are in there for that one SKU.

7  They would then match it against the -- what was on the

8  inventory.

9  Q.      And what was the purpose of doing a cage count?

10 A.      To make sure nothing was missing.

11 Q.      And how frequently was the manager supposed to,

12 under company policy and procedure, conduct a cage

13 count, as you've described it?

14 A.      Once a week.

15 Q.      Was it important that a store manager do that

16 every week?

17 A.      Um-hum.

18 Q.      Is that "yes"?

19 A.      Yes.  Yes.

20 Q.      Why was that important?

21 A.      To make sure that nothing had disappeared, see

22 if we had a theft issue or inventory problem with

23 shipments.

24 Q.      Did you ever write up any store manager for

25 failing to conduct a cage count?

**Dec. of Thompson - Exhibit 11**

1   A.      I -- I suppose I did.  I don't remember.  I --

2           MS. VERONESE:  You don't remember.

3           MS. THOMPSON:  Q.  Okay.  So do you -- I realize

4   you might not remember any specific incidents, but is

5   that the kind of thing -- failure to conduct a weekly

6   cage count, would that be a topic or reason why you

7   might write up a VOCP?

8   A.      Yes.  And just to put in, we would do it like a

9   visit.  Remember the visits I talked about, and audits?

10  That would be part of it.

11  Q.      So the cage count -- your reviewing of the cage

12  count would be part of the regular visit you've

13  described?

14  A.      Yeah.

15  Q.      Would it also be part of the full-blown audit

16  you've described?

17  A.      Yes.

18  Q.      So the cage count was something that was

19  important?

20  A.      Yes.

21  Q.      And is that something -- a policy that you would

22  expect an experienced store manager to know, that they

23  would be required to do a weekly cage count?

24          MS. VERONESE:  Calls --

25          THE WITNESS:  Yes.

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 11**

1          MS. THOMPSON:  Q.  So in your mind, if a store

2     manager missed a weekly cage count, would that be, in

3     your mind, a serious violation of company policy?

4          You don't have to look at her.  She's not asking

5     you to look at her.

6     A.     Yeah, if -- again, if we walked into the store

7     and -- you're asking every manager?  Remember, I

8     mentioned before, new managers, okay, compared to

9     experienced managers, okay?  If we walked in and we

10    found the cage, the counts were off, manager wasn't

11    doing them, he would be written up on a VOCP.

12         MS. THOMPSON:  Can I have my question read back?

13    I just want to make sure I get an answer to that.

14         (Record read by the reporter:

15         "Question:  So in your mind, if a store

16          manager missed a weekly cage count, would

17          that be, in your mind, a serious violation

18          of company policy?")

19         THE WITNESS:  Yes.

20         MS. THOMPSON:  Q.  Okay.  Were store managers

21    responsible -- again, while you were working at Radio

22    Shack -- for monitoring cash shortages in their store?

23    A.     Yes.

24    Q.     And what is the definition of a cash shortage?

25    A.     Anything over five dollars.  I think we set a

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 11**

1  limit to that.

2  Q.     Okay.  So anything over five dollars compared to

3  what, can you just explain to me what a cash shortage

4  is.

5  A.     If they counted down their drawer and they're

6  missing five dollars or more, they would have to -- it

7  would be automatically -- when they would print up at

8  the end of the day -- I forget what the sheet's called;

9  I think it was called the deposit sheet or something --

10 and on there it would show that they were five dollars

11 short.

12 Q.     Okay.  So if a cash short -- "short" meaning

13 that the register was showing that there should be a

14 certain dollar -- that the computer was showing that

15 there should be a certain dollar amount in the cash

16 register?

17 A.     Correct.

18 Q.     But the actual cash would come up somewhat less

19 than what the computer said it should contain?

20 A.     Correct.

21 Q.     And so if it was under five dollars, would that

22 be noted anywhere in any kind of record or report?

23 A.     It would show up on that report.

24 Q.     And the report you're talking about is some kind

25 of report that's printed at the end of each day?

**Dec. of Thompson - Exhibit 11**

1   A.      Yeah.  I think it was called the daily deposit

2   report; I don't remember.

3   Q.      So all cash shortages would show up on the daily

4   deposit report; is that right?

5   A.      Yes.

6   Q.      So what was the significance of having a cash

7   shortage of five dollars or more?

8   A.      For some reason, when we have reports that come

9   out, it would automatically be flagged, anything over

10  five dollars.

11  Q.      And what was the store manager's responsibility

12  if he or she had a cash shortage that was over five

13  dollars?

14  A.      They had to find it.  If they couldn't find it,

15  they would have to note it down in the report.

16  Q.      Have to ...?

17  A.      Note it in the report.

18  Q.      When you say that the store manager would be

19  responsible for finding it, meaning finding the cash

20  shortage, how would a store manager go about doing that?

21  A.      He would have to probably check -- again, there

22  were different reports.  He would look at his refunds;

23  he would look on the actual daily of tickets that were

24  written or -- on the printout sheet.  I forget what

25  that's called.  And there he could go through sales and

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 11**

1   look at the sales.

2          For instance, um, let's say a person rang a sale

3   up and the customer said, "Oh, you know what?  I don't

4   want this, but I want that, the other item."  They would

5   say, "Okay."  They would have to void the sale.  They

6   would forget to void the sale and ring up the next sale,

7   causing the drawer to be short.

8   Q.      So, when would the manager be responsible for

9   finding the cash shortage, as you've described it; would

10  it be that day or the next morning?

11  A.      It depends.  If he was doing the deposit himself

12  that night, it would be that night he would look for it.

13  If, let's say, the -- I forget what they're called,

14  assistant -- whoever the other person was in the store

15  that could do deposits -- would leave it for the manager

16  the next day to look for when he came in.

17  Q.      So was it your understanding in terms of Radio

18  Shack company policies and procedures that it was the

19  store manager's responsibility to find out what caused

20  the cash shortage?

21  A.      Yes.

22  Q.      And that would be true for any cash shortage

23  greater than five dollars?

24  A.      Yeah, over or short.

25  Q.      Okay.  So -- I see.

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 11**

1   A.      Right.

2   Q.      So, in other words, you might have a cash

3   overage?

4   A.      Correct.

5   Q.      So again, that would be a discrepancy, but that

6   would be in favor of the company?

7   A.      Yes, but it was still an over, and they needed

8   to find out why.

9   Q.      So either a shortage or overage of five dollars

10  or more, it would be the store manager's responsibility

11  with respect to each such shortage to find out why it

12  occurred?

13  A.      Correct.

14  Q.      And the store manager was supposed to do this

15  either the night of the deposit or the next morning?

16  A.      Yes.

17  Q.      And what was the store manager supposed to do

18  with the information, once he or she located the cause?

19  A.      Note it down on the report.

20  Q.      And when you say, "Note it down on the report,"

21  do you know what report we're talking about?

22  A.      That bank report, whatever it was called.

23  Q.      Was there any policy or practice requiring the

24  store manager to notify either loss prevention or the

25  district manager if there was a significant cash

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 11**

1  shortage?

2  A.     Yes, anything over twenty dollars.

3  Q.     So what was the policy, if they're -- would that

4  be an overage or underage?

5  A.     Usually an overage -- I mean a shortage.

6  Q.     Okay.

7  A.     But --

8  Q.     I'm sorry.  Did you want to clarify something?

9  A.     Let's clarify one thing.  What they would do is

10 if they had an overage or shortage, they would wait till

11 the next day to look for it to see if it would balance

12 out before they would notify me.

13 Q.     Okay.  But your understanding of company policy

14 was that if there was a cash shortage or overage that

15 was greater than twenty dollars, the regional loss

16 prevention manager was required to be notified?

17 A.     Yes.  Usually it came from either the store

18 manager or the district manager.

19 Q.     Was it your understanding that the store manager

20 was required to notify his or her district manager if he

21 or she found a cash shortage or overage greater than

22 twenty dollars?

23 A.     I'm going to drive you nuts now.  Yes or no.

24 Each district manager was different.

25 Q.     Okay.  Was it your understanding that the store

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 11**

1   manager had to notify somebody every time there was a

2   shortage or overage greater than twenty dollars, or

3   could they keep that information to themselves?

4   A.      Usually, some district managers would report it,

5   like, send me an e-mail.  Some would wait until he had

6   maybe a hundred dollars short for the whole week and

7   then sent me the e-mail.  It varied upon district

8   manager.

9   Q.      All I'm trying to find out, though, was the

10  store manager allowed to keep cash shortages to him or

11  herself, as opposed to reporting it up the chain to

12  somebody?

13  A.      Uh, well, they couldn't keep it to themselves,

14  because everybody would know because of the report.

15  Once it would go into Fort Worth, they would

16  automatically know there was a shortage, so --

17  Q.      Okay.  I realize that there's thousands of

18  stores, right, and thousands of reports.  Whose

19  responsibility was it to make sure that the company was

20  notified of shortages or overages greater than twenty

21  dollars?

22  A.      What would happen is, okay, he would do this

23  bank report.  And it would go into Fort Worth.  Forth

24  Worth banking would then send out a daily report to me,

25  the loss prevention manager, stating we had five-dollar

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 11**

1   shortage, okay?  Anything over five dollars, it was a

2   report.

3           And then we would look at it, whatever.

4   Sometimes I would call the store, I would call the

5   district manager and have them look into it.

6   Q.      Okay.  I'm still a little bit unclear.  I

7   thought that there was a difference once you hit twenty

8   dollars or more.  So what's the difference?  When

9   there's a shortage that's greater than twenty dollars --

10  A.      Right.

11  Q.      -- tell me what the store manager's

12  responsibility is.

13  A.      If he had a twenty-dollar shortage, he's to

14  notify his district manager or they can notify me.

15  Usually it was better for them if they notify their

16  district manager.  They would call me and say, "I had a

17  twenty-dollar shortage" --

18          THE REPORTER:  Okay.  Whoa.

19          MS. THOMPSON:  Yeah, yeah, yeah, yeah.

20  Q.      Sorry.  Can you start again?

21  A.      Okay.  They would -- if they had a

22  twenty-dollar shortage, they would either notify me or

23  the district manager.

24  Q.      So it was the store manager's option, if they

25  had a shortage that was greater than twenty dollars, to

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 11**

1   either notify their district manager or to notify loss

2   prevention; is that right?

3   A.      Correct.

4   Q.      But they had to report it to one or the other;

5   is that a fair statement?

6   A.      Yeah, they did.

7   Q.      And then what would -- and would these cash

8   shortages, whether they were reported directly to you or

9   whether they were reported to you through the district

10  manager, what would be your responsibility, then, with

11  respect to that shortage?

12  A.      Most of the time I would say, "What's the

13  history?"

14  Q.      Now, what would happen if a store manager did

15  not note on the daily report that you're referring to

16  that there was a cash shortage over twenty dollars?

17  A.      Again, the report would automatically show there

18  was a twenty-dollar shortage.  That would go into the

19  Fort Worth banking department.

20  Q.      And what would Forth Worth banking do with that

21  information, to your understanding?

22  A.      They would send a report out to me saying, "The

23  store was short twenty dollars," or "The store was over

24  twenty dollars," you know, "Can you research it?"

25  Q.      So ultimately, it would come back to loss

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 11**

1   prevention; is that right?

2   A.      Correct.  But I would -- besides me, the

3   district manager would also get that same report.

4   Q.      Okay.  I get that.

5   A.      Okay.

6   Q.      So if you learned of a significant cash shortage

7   at a particular store, let's say a hundred dollars,

8   would that be significant?

9   A.      Yes.

10  Q.      What, if anything, would you do about it?

11  A.      We would run all -- first we would run the

12  report, see who was working, things like that.  And it

13  would depend.  If it was a hundred-dollar shortage, was

14  it one $100 shortage or for a period of time, for, like,

15  say the month there was a hundred-dollar shortage?

16  Q.      Right.

17  A.      Each time we had to look at it differently.  If

18  it was just a hundred-dollar shortage, we kind of waited

19  until the bank cleared it, because sometimes the bank

20  makes mistakes.  So we would wait for that, come back,

21  "Oh, we found it.  We found out where we made our

22  mistake"; it was a check or whatever.

23          If it was twenty dollars today, couple days

24  later, another twenty dollars, and nothing cleared, we

25  would say, "Okay, now we got an internal problem."  I

**Dec. of Thompson - Exhibit 11**

1   would have to go and investigate.

2   Q.      So if there was a pattern of cumulative

3   shortages over a period of time, would that be something

4   that would cause you concern?

5   A.      Yes.

6   Q.      And why would it cause you concern?

7   A.      Because we would have to think right off the bat

8   the money's being stolen.

9   Q.      Would that be important -- would it be important

10  information for you to have, as loss prevention, that

11  there was a cumulative history of cash shortages at a

12  particular store?

13  A.      Yes.

14  Q.      Even if each individual shortage was relatively

15  small?

16  A.      Even -- again, it would depend upon if they

17  cleared or not.  Like, for instance, it was a

18  five-dollar shortage, each -- say every other day we had

19  a five-dollar shortage and they never came back, and all

20  of a sudden the next week, it was ten dollars every

21  other day, the next week, it became twenty dollars, then

22  we would see a pattern of someone stealing the money.

23  Then we would investigate that.

24  Q.      Okay.  So let's just assume that the shortages

25  are not being cleared by the bank, but -- you're seeing

**Dec. of Thompson - Exhibit 11**

1    not necessarily a pattern as you've just described, but

2    you're seeing an ongoing history --

3    A.       Correct.

4    Q.       -- of cash shortages?

5    A.       Um-hum.

6    Q.       Is that "yes"?

7    A.       Yes.

8    Q.       That would be serious, in your mind?

9    A.       Yes.

10   Q.       And that would warrant an investigation?

11   A.       Correct.

12   Q.       And what would be the store manager's role in

13   that investigation or that process?

14   A.       Really, none.  It would be my job now, along

15   with the district manager.  He could do some research

16   for me.

17   Q.       Well, would the store manager have some

18   responsibility with respect to having a history of cash

19   shortages like that?

20   A.       Well, what we would look at is we would try to

21   get timesheets -- which the district manager would work

22   with me -- get timesheets so I could see who was working

23   during what period of time, and then I would chart it

24   out to see if Bob is still -- because every time, it

25   might be Bob taking the money.  Well, Bob and Bill were

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 11**

1   always together; they might be the people I interview.

2   Q.      Right, but I'm just trying to understand what

3   responsibility, if any, the store manager would have in

4   a situation where a store was showing an ongoing pattern

5   of shortages.

6   A.      He -- he would probably report it to the

7   district manager, say, "I got a problem here."

8   Q.      Would it be the store manager's responsibility

9   to report an ongoing pattern of cash shortages to the

10  district manager?

11  A.      Yes.

12  Q.      Would it be the store manager's responsibility

13  to report an ongoing history of shortages to loss

14  prevention?

15  A.      Yes.

16  Q.      So other than reporting it, would the store

17  manager have any other responsibility with respect to

18  the cash shortages?

19  A.      It depended upon the store manager.  New store

20  managers had no clue.  Experienced store manager's knew

21  what to look for and would start researching it,

22  themselves.

23  Q.      That's what you would expect of an experienced

24  store manager?

25  A.      Sometimes.

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 11**

1  Q.      What do you mean, "sometimes"?

2  A.      Some district manager -- I'm sorry.  Some store

3  managers were more into really looking for the stuff.

4  Others didn't do that stuff because they're more

5  concerned about sales.

6  Q.      Okay.  But I'm just talking about in terms of

7  your expectations as regional loss prevention manager.

8  Would it be your expectation that a store manager who

9  had a history of cash shortages, that that store manager

10  would have some rule with respect to researching to find

11  out why there was this problem in his or her store?

12          MS. VERONESE:  Calls for speculation.

13          MS. THOMPSON:  Can you read the question back.

14          (Record read.)

15          MS. THOMPSON:  Q.  Would that be your

16  expectation as regional loss prevention manager at Radio

17  Shack?

18  A.      Again, I'd have to say it depended upon the

19  manager.

20  Q.      Okay.  So, my question again would be if the

21  store manager was an experienced store manager, had been

22  with the company for a number of years, would you expect

23  that store manager who -- if he or she had a history of

24  ongoing cash shortages, that he or she would have some

25  responsibility with respect to looking into why that was

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 11**

1   occurring?

2   A.      Again, it depended upon the manager.  I have --

3   you have to understand the mentality of our man -- the

4   managers at Radio Shack.  Some could care less of what's

5   going on over here as long as their sales were up.

6   Q.      Okay.  So, again, I'm not asking about what the

7   managers are thinking.  I'm asking about what your

8   expectations were, if you had any.  If you didn't have

9   any, you can tell me that.

10  A.      On that situation, it's hard for me to answer

11  that question, because I -- I would say yes and no.  It

12  depended upon the manager, to be very honest with you.

13  Q.      So some store managers you would expect --

14  A.      Yes.

15          MS. VERONESE:  Let her finish the question.

16          MS. THOMPSON:  Q.  Yeah.  And so some store

17  managers you're saying you would expect that they would

18  take some ownership of an ongoing cash shortage problem

19  and take some interest in trying to find out why it

20  happened?

21  A.      Yes.

22  Q.      And you're saying some other store managers had

23  no interest in that?

24  A.      Correct.

25  Q.      And as far as you were concerned, it made no

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 11**

```
 1   difference to you, whether --
 2            MS. VERONESE:  That misstates testimony.
 3            MS. THOMPSON:  Q.  Well, that's what I'm asking.
 4   A.      I -- I -- explain the question.  I mean, I'm --
 5   that's --
 6   Q.      Okay.  I originally started off by asking what
 7   your expectation was.
 8   A.      Right.
 9   Q.      Okay.  So, did it matter to you one way or the
10   other, as regional loss prevention manager, whether a
11   store manager with a pattern of ongoing cash shortages
12   took an interest in that or decided they weren't
13   interested; would that matter to you in any way?
14   A.      Yes.
15   Q.      Okay.  What difference would it make to you?
16   A.      That I would see managers that had concern about
17   things like that, um, were more into making sure that
18   their store ran properly, and that anything with the
19   store, they brought it up right away, any kind of issues
20   or whatever, be it cash shortages, inventory, whatever.
21   Q.      And was it the store manager's responsibility,
22   as far as you knew, to make sure that their store was
23   running properly and that they weren't having ongoing
24   cash shortages; was that part of their job?
25   A.      Yeah, that's part of their job.
```

**Dec. of Thompson - Exhibit 11**

1  Q.      So would it cause you some concern if you had a

2  store manager who had an ongoing pattern of cash

3  shortages, when that store manager showed absolutely no

4  interest in finding out why that was occurring?  Would

5  that be a cause of concern to you?

6  A.      Yes.

7  Q.      And why would that be a cause of concern?

8  A.      Because that would automatically make me start

9  thinking he's the one that's taking the money.  He's

10 trying to hide something.

11 Q.      What would lead you to that conclusion, or that

12 inference?

13 A.      For instance, if I went into a store and I said,

14 "Bob, you've got all these cash shortages."

15         "Oh, yeah, yeah.

16         "What are you doing about it?

17         "Oh, I looked into it.  I looked into it.

18         "Explain."

19         And find out he didn't do anything, and he was

20 very nervous, then that would lead from me just talking

21 to him into a full-blown investigation and interrogation

22 of him.

23 Q.      Would you expect an experienced store manager to

24 be aware of any history of ongoing cash shortages in

25 their store?

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 11**

1   A.      Again, the ones I mentioned, the ones that do

2   things, yes, the ones that I would say really paid more

3   attention to the operation of their store and the

4   security of their store.

5   Q.      But didn't all store managers have the same

6   responsibilities with respect to the security and

7   operation of their stores?

8   A.      You would think so.

9   Q.      Well, wasn't that, as a matter of company

10  policy --

11  A.      Yes, you would think so.

12  Q.      Well, I'm not asking you what you would think,

13  so let me make sure the record is clear.  Isn't it true

14  as a matter of company policy, based upon your

15  experience at Radio Shack, that all store managers were

16  expected to assume responsibility for the proper

17  operation and protection of company assets?

18  A.      Yes.

19  Q.      And there was no difference -- some store

20  managers weren't held to a higher standard than others

21  with regard to the protection of company assets, were

22  they?

23  A.      No.

24  Q.      Everyone was held to the same standards?

25  A.      Yes.

Dec. of Thompson - Exhibit 11

1  Q.     And you enforced those standards consistently

2  across the board; is that true?

3  A.     Well, I passed on the things to the district

4  managers.  It was their job to enforce them.

5  Q.     But in terms of your reporting or writing up,

6  you tried to be consistent across the board?

7  A.     Yes.

8  Q.     You didn't allow some store managers to get away

9  with noncompliance while forcing others to adhere to the

10  standards, did you?

11  A.     Again, when it came to newer managers, you know,

12  we'd have to -- we'd have to bend -- bend the -- bend

13  the branch a little bit, because they're new.

14  Q.     Okay.  How long would you consider someone to be

15  new, as you're using that term?

16  A.     Um, new would be anywhere from two to three

17  months, maybe up to six months.

18  Q.     Okay.  But after six months, your expectation

19  would be that all store managers, regardless of who they

20  were, where they worked, that they were all required to

21  adhere to company policies and procedures with regard to

22  loss prevention.

23  A.     Correct.

24  Q.     And that would include with respect to

25  monitoring and reporting cash shortages?

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 11**

Page 98

1    A.      Yes.

2    Q.      And being familiar with cash shortages in your

3    own store?

4    A.      Yes.

5    Q.      So if you were a store manager and you wanted to

6    find out if you were having a pattern of cash shortages

7    in your store, how would you go about doing that?

8            MS. VERONESE:  Calls for speculation.  And a

9    hypothetical.  You can go ahead and answer.  So if you

10   were a store manager ....

11           THE WITNESS:  I was never a store manager, so

12   it's hard to understand their mentality.

13           MS. THOMPSON:  Q.  I'm not asking about

14   mentality.  So I'm just talking about logistics and what

15   tools are available to you.  So let's --

16           Can I have the question read back.

17           (Record read by the reporter:

18               "Question:  So if you were a store manager

19               and you wanted to find out if you were

20               having a pattern of cash shortages in your

21               store, how would you go about doing that?")

22           MS. VERONESE:  Same objection.

23           MS. THOMPSON:  Q.  I'm just talking about what

24   resources would be available to you, based on your

25   knowledge in loss prevention.

**Dec. of Thompson - Exhibit 11**

1   A.      Okay.  What the managers would know to do, they

2   can go back and review those bank reports.

3   Q.      Review what?

4   A.      The bank reports.  They can review their sales

5   for the day.

6   Q.      Could they review profit and loss reports?

7   A.      For the day?

8   Q.      I'm not -- I didn't say for the day.

9   A.      Okay.

10  Q.      Could they review -- first of all, are you

11  familiar with anything called "profit and" --

12  A.      Yes.

13  Q.      -- "loss reports"?

14  A.      Yes.  Comes out monthly.

15  Q.      And it comes out monthly for each store; is that

16  true?

17  A.      Right.  It's always a month behind.

18  Q.      Okay.  So what do you mean, it's a month behind?

19  A.      So right now we're in October.  So at the end of

20  October, you're going to get September, because all the

21  numbers haven't been done yet.

22  Q.      Okay.

23  A.      So you're always a month behind.

24  Q.      All right.  But the profit and loss reports

25  would come out on a monthly basis -- a month behind, as

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 11**

1  you've described -- for each and every store; is that

2  right?

3  A.       Right.

4  Q.       And what information would be available on a

5  profit and loss report?

6  A.       A lot of things.  I -- I'd have to see one in

7  front of me to go over it.  I just don't remember what

8  was on it.

9  Q.       Okay.  But would a store manager, in

10 reviewing -- well, first of all, was it your

11 understanding that store managers would be expected to

12 review their profit and loss reports for their store?

13 A.       Yes, because they were trained for it.

14 Q.       I'm sorry?

15 A.       They were trained by the district manager for

16 it.

17 Q.       And how do you know they were trained by the

18 district manager?

19 A.       At that time, that was part of their training,

20 how to review and go over a profit and loss statement.

21 Q.       Did you have any role in this training?

22 A.       No.

23 Q.       So how do you know the training took place?

24 A.       Because I've gone into these meetings beforehand

25 where I walked in, and they were talking about profit

**Dec. of Thompson - Exhibit 11**

1    and loss.

2    Q.       Okay.  So you've been present at district

3    meetings where store managers were being trained by

4    their district manager to review profit and loss

5    statements?

6    A.       Yes.

7    Q.       And it was your understanding that company

8    policy was that store managers were to regularly review

9    the profit and loss statements --

10   A.       Yes.

11   Q.       -- for their particular store?

12   A.       Yes.

13   Q.       Okay.  And would a review of the profit and loss

14   statements tell the store manager if there was a pattern

15   or history of cash shortages at his or her store?

16   A.       Yes, if the -- okay.  Yes and no.  The reason I

17   say that is, because we have an experienced manager that

18   can read that thing like a Bible, and then you have a

19   brand-new manager.  It all looks to him like just

20   numbers.

21   Q.       All right.  So, I know you keep making that

22   distinction, so next time I'll have to remember to call

23   that out.  So let's assume we're talking about

24   experienced store managers.

25   A.       Okay.

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 11**

1          MS. THOMPSON:  Could I have my question read

2    back, please.

3          (Record read by the reporter:

4          "Question:  And would a review of the profit

5          and loss statements tell the store manager

6          if there was a pattern or history of cash

7          shortages at his or her store?")

8          MS. THOMPSON:  Q.  So my question, assuming a

9    store manager who's worked for Radio Shack for more than

10   six months -- because by your testimony, after six

11   months, you would consider the store manager

12   experienced; is that a fair statement?

13   A.     Yes.

14   Q.     So if we're dealing with an experienced store

15   manager, as you've defined --

16         MS. VERONESE:  Well, misstates testimony.  Okay.

17         MS. THOMPSON:  Did I misstate anything?

18         MS. VERONESE:  You said experienced manager.  He

19   didn't say six months he knew how to read the profit and

20   loss reports.

21         MS. THOMPSON:  That wasn't the question.

22         Could I have my question read back?

23         (Record read by the reporter:

24         "Question:  So my question, assuming a store

25          manager who's worked for Radio Shack for

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 11**

1          more than six months -- because by your

2          testimony, after six months, you would

3          consider the store manager experienced; is

4          that a fair statement?

5          "Answer:  Yes.

6          "Question:  So if we're dealing with a

7          experienced store manager, as you've

8          defined --

9          "Ms. Veronese:  Well, misstates testimony.")

10         THE WITNESS:  Experience in -- some of these

11    people, even at that level, right, after six months,

12    I've gone into stores where they haven't even looked at

13    the P&L, profit and loss statement.

14         MS. THOMPSON:  Q.  Okay.  If you walked into a

15    store where the store manager had been with Radio Shack

16    say, five, six, seven years --

17    A.      Uh-huh.

18    Q.      -- and they told you they did not know how to

19    read a profit and loss statement, would that cause you

20    some concern?

21         MS. VERONESE:  Calls for hypothetical.

22         THE WITNESS:  Yep.

23         MS. THOMPSON:  Q.  Was it your understanding,

24    based upon your position in loss prevention, that it was

25    part of the store manager's job duties and

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 11**

Page 104

1    responsibilities to know how to read a profit and loss

2    statement?

3    A.      They were trained to do that, yes.

4    Q.      And as far as you understood company policy, the

5    expectation was that store managers were expected to

6    read and understand profit and loss statements for their

7    store, correct?

8    A.      Correct.

9    Q.      So, would it concern you, from a loss prevention

10   standpoint, if you went into a Radio Shack store and you

11   knew the manager had multiple years of experience --

12   again, from a loss prevention standpoint, would it

13   concern you if that manager said, "I don't know how to

14   read these things"?

15   A.      Yes.  I would report it.

16   Q.      How would you report that?

17   A.      Write that up in a VOCP, or I could call the

18   district manager personally and say, "I have a problem.

19   Tom here is" -- "he's been with us how many years?  I've

20   just gone through his P&L's.  He hasn't even looked at

21   them.  He hasn't made any notations."

22   Q.      Why would that concern you, from a loss

23   prevention standpoint?

24   A.      Again, because there's many things in that

25   profit and loss statement, not just cash shortages, as

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 11**

1   you keep emphasizing there's a lot of things.  You're

2   talking about inventory levels.  You're talking about --

3   I can't remember everything that's on there.  Um,

4   electrical bills, things like that, you know, that they

5   have to review to see -- 'cause they had to stay within

6   their budget, you know.

7   Q.      Right, but I'm talking about from a -- I

8   understand from an operational standpoint why it

9   obviously would be important, but I'm focusing

10  specifically on loss prevention issues.  From a loss

11  prevention perspective, why would it concern you if a

12  store manager told you that he or she did not know how

13  to read the reports?

14  A.      Well, that would be because it would give

15  them -- give the store, employees or whoever, an

16  opportunity to steal from the company, manipulating the

17  system.

18  Q.      How would it give the store employees an

19  opportunity to steal or manipulate the system?

20  A.      I'll give you a for-instance.  UPS.  All of a

21  sudden, we have these tremendous charges on UPS because

22  the employees are taking merchandise and shipping it to

23  their friends all over -- all over the country, you

24  know, down to Mexico or up to Canada, or whatever, and

25  not paying for any of it.  That's one way the

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 11**

1   merchandise would get out of the store.

2   Q.      So in other words, you would expect the store

3   manager to review the profit and loss statement on a

4   regular basis; is that a fair statement?

5   A.      Yes, looking for things.  Every month, they had

6   to do it.

7   Q.      So it was part of the store manager's job, as

8   you understood it, to review the profit and loss

9   statement every month when the report came out, right?

10  A.      Correct.

11  Q.      And their task in undertaking that review would

12  be to identify any irregularities that might raise a red

13  flag?

14  A.      Correct.

15  Q.      And if there were irregularities that should

16  raise a red flag or did raise a red flag, what, if

17  anything, would the store manager be expected to do with

18  that information?

19  A.      He would then have to call his district manager,

20  who would then have to come down and review it with him.

21  Q.      Would he or she also have the option of calling

22  loss prevention directly?

23  A.      When it came to the P&L, I rarely ever got any

24  calls from managers on the P&L.

25  Q.      Have there been any occasions over the course of

**Dec. of Thompson - Exhibit 11**

1    have the other thing coming to them every day.

2    Q.      Okay.  So you would expect an experienced and

3    competent store manager to be reviewing the daily

4    reports to determine whether there was an ongoing

5    problem with cash shortages?

6    A.      Correct.

7    Q.      And in your mind, if a store manager waited

8    until the profit and loss report came out to try to

9    figure that out, they would not be doing their job

10   properly, is that a fair statement, from a loss

11   prevention standpoint?

12   A.      Well, again, the issue is, all right, the

13   manager would know about this, even the district manager

14   would know about it, before that P&L came out.  So what

15   I'm trying to say is, really, that P&L report coming out

16   for cash shortages would be kind of obsolete, because by

17   now they had the cash shortages, and all the reports

18   coming in from Fort Worth would have already alerted the

19   district manager and myself and the store manager, too.

20   Q.      Okay.  So, I think I hear what you're saying --

21   and correct me if I'm misunderstanding anything -- that

22   the profit and loss statement was not the best vehicle

23   for determining whether there was a cash shortage or

24   not?

25   A.      Correct.

**Dec. of Thompson - Exhibit 11**

Page 110

1    Q.      There were other and better and more timely

2    reports that would give the store manager, the district

3    manager and loss prevention that information?

4    A.      Correct.

5    Q.      Okay.  That's fair enough.

6    A.      Can we stop?

7            MS. THOMPSON:  Absolutely.  Let's go off the

8    record.

9            (A lunch recess was taken from 12:53 to 1:35

10   p.m.)

11           MS. THOMPSON:  Q.  The same ground rules

12   continue to apply, Mr. Nabozny.  And again, if at any

13   time you need a break, just let me know and I will make

14   sure I accommodate you.

15   A.      Okay.

16   Q.      Is it fair to say that the protection of company

17   assets was an important part of the store manager's job

18   at Radio Shack, based on your knowledge of company

19   policies and procedures?

20   A.      It was one of the -- one of the

21   responsibilities.

22   Q.      Well, in your mind, was it --

23   A.      In my mind --

24   Q.      -- was it your understanding that it was an

25   important part of the store manager's job?

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 11**

1    A.      Yes, in my mind, it was.

2    Q.      Okay, but based on your understanding of company

3    policy, was it an important part of the store manager's

4    job?  So I'm not just asking your opinion, I'm asking

5    based upon the -- you know, in terms of what Radio Shack

6    communicated to you in terms of its policies?

7    A.      Again, the reason I say yes and no, it's because

8    it would be something that, yes, they would have to do,

9    but their managers -- district manager would say, "You

10   know what?  Your sales are low.  You're doing a great

11   job doing loss prevention, but you could bring your

12   sales up."

13   Q.      Well, I just want to make sure I understand

14   something.  Are you sitting here testifying that from

15   Radio Shack's perspective, protection of company assets

16   was not -- again, I'm talking about overall company

17   policy --

18   A.      Company policy.

19   Q.      -- not your opinion --

20   A.      Okay.

21   Q.      -- not individual district managers.

22   A.      Okay.

23   Q.      I'm talking about company policy.

24   A.      Okay.

25   Q.      Is it your understanding of Radio Shack's

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 11**

1    corporate policy, based upon your working there for nine

2    years as regional loss prevention manager, the

3    protection of company assets was an important part of a

4    store manager's job?

5    A.      Yes.

6    Q.      Do you have some understanding of why it was

7    that Radio Shack made protection of company assets an

8    important part of a store manager's job?

9    A.      Yes, I think so.

10   Q.      Okay.  What's your understanding, based on your

11   years of experience?

12   A.      My understanding is because they are the first

13   line of defense to protect the assets and profits of the

14   company.

15   Q.      Therefore, store managers were in an important

16   position in terms of protecting --

17   A.      Protecting --

18   Q.      -- those assets?

19   A.      Yes.

20           MS. THOMPSON:  Okay.  Let's mark the first, this

21   document, as Exhibit 1.

22           (DEFENDANT'S EXHIBIT NO. 1

23            WAS MARKED FOR IDENTIFICATION.)

24           MS. THOMPSON:  For the record, I have marked as

25   Exhibit 1 a two-page document Bates numbered RS/Allen222

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 11**

1    and -223, which appears to be a memorandum dated

2    February 20th, 2003, prepared by Tom Nabozny.

3    Q.     And please take as much time as you need to read

4    Exhibit 1, please, and let me know when you've finished.

5           (Pause.)

6    A.     Okay.

7    Q.     Before we get into Exhibit 1, when did you first

8    meet Frank Allen, approximately?

9    A.     Sometime in maybe 2000.

10   Q.     Okay.  So fairly shortly after you started

11   working at Radio Shack?

12   A.     I would say within three to six months.

13   Q.     Okay.

14   A.     Yeah.

15   Q.     And how did you meet Mr. Allen?

16   A.     At a district manager's meeting, maybe.

17   Q.     So are you -- is that your best recollection?

18   A.     Yes.  I don't remember.

19   Q.     Okay.  No, that's fair.  If you don't remember,

20   you can tell me you don't remember.

21   A.     Okay.

22   Q.     I'm just entitled to your best recollection --

23   A.     Okay.

24   Q.     -- okay?  So, is it your best recollection that

25   you first met Mr. Allen at a district meeting?

**Dec. of Thompson - Exhibit 11**

1    Q.      That's a "yes" or "no."

2    A.      "Yes" or "no," boy.  "Yes" or "no"?  It's, like,

3    yeah, I mean, when I went in there, he was doing --

4    doing what I -- you know, kind of what I wanted for loss

5    prevention.

6    Q.      Okay.  So you're saying that on every occasion

7    that you went to Mr. Allen's store, he was doing what

8    you wanted him to do from a loss prevention standpoint?

9    A.      Well, not every time, you know.  I mean, there

10   could be issues where he left the cage unlocked this

11   time.  Again, I'm going from memory.  I don't remember

12   every little thing.

13   Q.      I'm not asking you that.

14   A.      I know, I know, I know, but I just -- you're

15   asking a question that you're --

16   Q.      No, I'm asking you a very simple question, and

17   that is -- and you can answer it "yes" or "no" -- and

18   that is whether -- as you sit here now --

19   A.      Right.

20   Q.      -- whether you had any impression at the time --

21   A.      Um-hum.

22   Q.      -- of Mr. Allen's performance with respect to

23   loss prevention.  And that really is "yes" or "no."

24   Because if you don't, we can move on; if you do, I'll

25   ask you what it is.

**Dec. of Thompson - Exhibit 11**

1    A.      I mean, I would say no, because there was issues

2    where I wrote him up on things.

3    Q.      Okay.

4    A.      Okay?

5    Q.      So you have no impression one way or the other?

6    A.      Right.

7    Q.      And as you've noted, you did have occasion to

8    write him up for violations of company policy from time

9    to time?

10   A.      Yes.

11   Q.      Do you know whether you wrote him up more

12   frequently than other store managers in the district?

13   A.      In the district, no, not really.  I mean, I

14   always tried to be fair, so I -- I mean, if there was

15   something there, I wrote him up, no matter who he was.

16   Q.      But all I'm -- again, just trying to find out.

17   A.      I know.

18   Q.      -- whether -- and if you don't have a

19   recollection, that's fine.

20   A.      Okay.

21   Q.      All I'm trying to find out is what you remember

22   and what you don't.

23   A.      All right.

24   Q.      So if you don't have a recollection, just tell

25   me.  I'm just trying to figure out, as you sit here now,

**Dec. of Thompson - Exhibit 11**

1    up Mr. Allen more frequently for violations of company

2    policy than other managers in the district?

3              MS. VERONESE:  Asked and answered.

4              MS. THOMPSON:  Q.  Is that --

5    A.        Huh?

6    Q.        Is that true?

7    A.        Yes, that's the answer.

8    Q.        I'm sorry?

9    A.        Yes, that's the answer.

10   Q.        Okay.

11             All right.  Let's look back at Exhibit 1, if you

12   don't mind.  First of all, did you prepare Exhibit 1?

13   A.        Yes.  My name's on it.

14   Q.        I see that your name is on it, but I'm asking

15   you right now, did you prepare Exhibit 1?

16   A.        Yes.

17   Q.        And you prepared Exhibit 1 on or about

18   February 20th, 2003?

19   A.        Yes.

20   Q.        And is it true that you had a store visit at

21   Mr. Allen's store on or about February 20th, 2003?

22   A.        Yes.

23   Q.        And Mr. Allen was present during that visit?

24   A.        Let me look real quick.  Sometimes I put a note

25   back here.  I don't remember.  I don't know if he was

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 11**

Page 121

1    there or not.

2    Q.      Look at the first page, top right hand.  Says,

3    "Manager present during visit?"  "Yes."

4            Do you see where that's --

5    A.      Oh, right here.  Okay, yes.

6    Q.      First of all, let me make sure, did you prepare

7    Exhibit 1 in its entirety?

8    A.      Yes.

9    Q.      Did you have any assistance in preparing

10   Exhibit 1?

11   A.      No.

12   Q.      And did you prepare Exhibit 1 shortly after the

13   store visit, on or about February 20th, 2003?

14   A.      Um, the reason I'm holding on there is because

15   this was a different kind of -- when I first started,

16   and they changed it, so I'm trying to remember.  We used

17   to be able to do these in the store and give them a

18   hand -- hand it to them, but then they said hold off,

19   because you got to review the P&L.

20           So I can't remember exactly if I gave it to him

21   that time, reviewed it with him and said I'd be sending

22   him a copy.  It'd all depend.

23   Q.      All I'm trying to find out is whether you

24   prepared Exhibit 1 close to the time of the actual visit

25   on February 20th --

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 11**

1   A.      Yes.

2   Q.      -- 2003.

3   A.      Yes.

4   Q.      Now, the document states "Date/Time:  2/20/03

5   10:00 a.m."  Does this mean that you prepared the

6   document at 10:00 a.m. or that you did the visit then?

7   A.      Did the visit.

8   Q.      And as you sit here now and having reviewed

9   Exhibit 1, are all the statements that are made in

10  Exhibit 1 truthful and accurate in all respects?

11  A.      Yes, I think so.  I mean, I wrote the thing,

12  yeah.

13  Q.      As you sit here now, you believe all of the

14  statements made in Exhibit 1 to be truthful and

15  accurate, right?

16  A.      Yes.

17  Q.      Okay.  And it was the company policy for you to

18  prepare a store visit report following each store visit?

19  A.      Yes.

20  Q.      And so what was your purpose in preparing

21  Exhibit 1?

22  A.      Store visit.

23  Q.      But why did you prepare the document?

24  A.      'Cause after doing a store visit, I have to

25  prepare a document and send it to the district manager

**Dec. of Thompson - Exhibit 11**

Page 123

1  and to everybody else to have a copy of this.

2  Q.      So you prepared Exhibit 1 in accordance with

3  company policies and procedures?

4  A.      Correct.

5  Q.      And you distributed Exhibit 1 in accordance with

6  company policies and procedures?

7  A.      Correct.

8  Q.      Okay.  Now, you talked about managers being

9  experience or inexperienced.  And looking at Exhibit 1

10  in the upper right-hand corner, it says, "Manager's

11  Tenure "3/98."  Do you see where I'm reading from?

12  A.      Um-hum.

13  Q.      Is that "yes"?

14  A.      Yes.

15  Q.      Okay.  Was it your understanding that Mr. Allen

16  had been a store manager as of March of 1998?

17  A.      Yes.

18  Q.      Is that why you made the notation of 3/98 next

19  to "Manager's Tenure"?

20  A.      Yes.

21  Q.      So I take it from what you testified earlier

22  that it was your opinion or expectation that Mr. Allen

23  was an experienced store manager by the time of this

24  visit in February of 2003; is that a fair statement?

25  A.      It's a fair statement.

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 11**

1   Q.      Now, at the top of page one of Exhibit 1, the

2   heading is "Purpose of Visit:  To review Regional

3   Inventory Action Plans with the SM."

4   A.      Right.

5   Q.      "SM" means store manager?

6   A.      Correct.

7   Q.      So what did you mean by the statement that the

8   purpose of the visit was, quote, "To review Regional

9   Inventory Action Plans with the SM"?

10  A.      Going back that far, we used to have a setup of

11  what they wanted us to look for, and one of the things

12  might have been the regional might have sent -- again,

13  going from my memory -- might have been something where

14  we set up a regional action plan for all the stores of

15  what they needed to follow to get down certain things as

16  charge-backs, things like that.  And when I would go in,

17  these are the things that I would focus on.

18  Q.      Okay.  And at some point did you review

19  Exhibit 1 with Mr. Allen, himself?

20  A.      Yes.

21  Q.      The actual document?

22  A.      I probably did, yes.

23  Q.      Was that your normal practice?

24  A.      Yes.

25  Q.      Do you have any reason to believe that you

**Dec. of Thompson - Exhibit 11**

Page 125

1  deviated from your practice?

2  A.     The only time I would deviate is if he was not

3  there.

4  Q.     Okay.  And as you've indicated on the document,

5  Exhibit 1, Mr. Allen was present during this store

6  visit?

7  A.     Okay, yes.  It's there.

8  Q.     That's what it says.

9  A.     Yes, okay.

10  Q.     I take it you were trying to be as accurate as

11  possible preparing Exhibit 1?

12  A.     Um-hum.

13  Q.     Is that "yes"?

14  A.     Yes.

15  Q.     And that you were trying to be fair to

16  Mr. Allen, as well, correct?

17  A.     Fair in which way?

18  Q.     To be objective and fair.

19  A.     To be objective, yes.

20  Q.     Okay.  In other words, you did not go into the

21  store visit with any kind of bias against --

22  A.     No.

23  Q.     -- Mr. Allen, did you?

24  A.     Huh-uh.

25  Q.     Is that --

**Dec. of Thompson - Exhibit 11**

1    A.       No.

2    Q.       Okay.  And was it your practice to be as fair as

3    possible in preparing write-ups of your store visits?

4    A.       To be objective, yes.

5    Q.       Okay.

6    A.       Never to be one side or the other.

7    Q.       Okay.  Do you have a problem with the word

8    "fair," because that's why I --

9    A.       "Fair" means that I would give them an

10   opportunity to -- 'cause maybe I like Frank better than

11   I like Bill.  No, it wasn't like that.  When I went in,

12   it was always the same thing.

13   Q.       So your practice was to treat all store managers

14   consistently?

15   A.       Yes.

16   Q.       And to stick with the objective facts?

17   A.       Yes.

18   Q.       And not to show bias or favoritism for or

19   against any employee --

20   A.       No.

21   Q.       -- correct?

22   A.       That's right.

23   Q.       All right.  So then right under the heading, it

24   says, "Profit and Loss Statement Reviewed:

25   January 2003."

**Dec. of Thompson - Exhibit 11**

1          Now, I thought you said that the reports came

2    out a month later.  So this is January -- the profit and

3    loss statement was for January 2003 that you reviewed?

4    A.        No -- yeah, it would be for January, because

5    this is February.

6    Q.        Right.

7    A.        And this would come out -- now, again, they have

8    changed things.  I don't remember when they changed it,

9    but it used to be from, like, the 15th to the 15th, but

10   then they changed it to the end of the month.  So I

11   don't remember.  I remember this was the month

12   backwards.

13   Q.        All right.  So, just so we're clear, as of

14   February 20th, 2003, you had the January 2003 profit and

15   loss statement, correct?

16   A.        Correct.

17   Q.        Because you were reviewing that profit and loss

18   statement with Mr. Allen on your store visit on

19   February 20th, 2003, right?

20   A.        Correct.

21   Q.        Okay.  What was your purpose in reviewing the

22   profit and loss statement with Mr. Allen on the occasion

23   of this visit?

24   A.        Because we were instructed by our department,

25   when we did these reviews -- especially the profit and

**Dec. of Thompson - Exhibit 11**

1   statement things -- we had to review it with the

2   manager.  If the manager was not there, we'd send the

3   thing to them.  I always put a note down, "Please call

4   me when you review this," and then we would go over it

5   together.

6   Q.      Okay.  I understand that, but were you looking

7   for anything in particular in reviewing the profit and

8   loss statement with Mr. Allen on February 20th, 2003?

9   A.      This was a premade form, I should tell you.

10  These are the things we had to answer, we put the

11  numbers in.  Anything would be flagged out to us, we

12  would then review it with him.

13  Q.      When you say it was a preprinted form, what

14  information was on the form that you got that you had to

15  fill in?

16  A.      This part right here, the "Profit and Loss

17  Statement" part.

18  Q.      So the document came to you with the profit and

19  loss information already on it?

20  A.      No, we inputted that at the store.

21  Q.      Okay.  So that's what I'm trying to figure out.

22  What are you saying was already on the document?

23  A.      Well, this part here, the "Profit and Loss" --

24  the "Profit and Loss Statement" part here, this part I

25  typed in, all this part.  This part would be here, and

**Dec. of Thompson - Exhibit 11**

1   we would fill this part in, the "Profit and Loss" part

2   (indicating).

3   Q.      Tell me what words were on the document when you

4   got it.

5   A.      All the stuff on the side over here, where it

6   says total inventory losses, refunds, chargebacks,

7   deposit differences, credit card chargebacks and

8   contract chargebacks.

9   Q.      Okay.  So those headings were there, but the

10  actual numbers you put in based upon information pulled

11  off the computer?

12  A.      Off the P&L.

13  Q.      Off the profit and loss statement?

14  A.      Correct.

15  Q.      Which was on the computer?

16  A.      At that time, this came in as a paper form.

17  Q.      So you actually sat -- in preparing Exhibit 1,

18  you sat at the computer and input manually the numbers

19  that are under the heading "Profit and Loss Statement

20  Reviewed"?

21  A.      Yes.  Question:  You say "at the computer."  Do

22  you mean the store computer or my computer?

23  Q.      At any computer.

24  A.      Okay, at my computer, yes.  I would do it at

25  my -- I had my own laptop.

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 11**

1   Q.      Okay.  So, did you fill out this information

2   before you -- in other words, did you input the numbers

3   under the "Profit and Loss Statement" heading before you

4   met with Mr. Allen or afterwards?

5   A.      After I got in the store and pulled off his P&L.

6   Q.      Okay.  So then you used the store computer to

7   populate the numbers?

8   A.      As I said, at that time, it would either be on

9   the system, or it used to be in paper form.  So I don't

10  remember which one it was at that time.  This might have

11  been the paper form, where I had to go to the drawer,

12  open the drawer and pull the P&L out and review it.

13  Q.      All right.  Let's assume, if it was a paper

14  copy, at the store, you would be looking at the hard

15  paper copy, correct?

16  A.      Correct.

17  Q.      When did you put these numbers in on Exhibit 1?

18  A.      That day, the day we started to do the report.

19  Q.      So you did that at the store?

20  A.      Correct.

21  Q.      Okay.  In the presence of Mr. Allen?

22  A.      No.  I would do this and then have the person --

23  manager or Mr. Allen come back with me and review it

24  with him then.

25  Q.      All right.  So am I correct, then, in

**Dec. of Thompson - Exhibit 11**

1    understanding that before you actually met with

2    Mr. Allen, you looked at the profit and loss report for

3    his store and input onto Exhibit 1 the relevant numbers?

4    A.      Correct, yes.

5    Q.      Okay.  So, when it says "Total Inventory Loss,"

6    what does that mean?

7    A.      Tell how much the store -- it probably means --

8    see, for some reason, this part's blacked out here, and

9    if I remembered right, this used to have the year to

10   date and things like that.  But I don't know why it's

11   like this.  I have no idea.  And it used to have, like,

12   the year.

13          So this would be, I would say to the year, he's

14   lost $814.  It's 7.5 percentage of profit or whatever.

15   This might be an over -- not a loss but a gain.

16   Q.      You need to slow down.  Okay.

17   A.      The first number is a gain number, from what I

18   remember.  So that may mean 75 percent of what he was

19   supposed to get.  Again, without having all the

20   information up here, it's hard for me to remember that

21   stuff.

22   Q.      That's fair enough.  I see what you're saying.

23   We appear to be --

24          MS. VERONESE:  The headings are --

25          MS. THOMPSON:  Q.  -- missing headings.

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 11**

1   A.       Right.

2   Q.       Assuming they were over there, which I don't

3   know.  I've only seen the document like this.

4   A.       Right.

5   Q.       Okay.  So moving beyond "Profit and Loss

6   Statement Reviewed" to "Daily Reports and Operational

7   Review" -- by the way, I assume that you made sure that

8   you accurately input the numbers here from the profit

9   and loss statement on Exhibit 1?

10  A.       If it was on the report, that's what I put in.

11  Q.       Okay.  Under the heading "Daily Reports and

12  Operational Review," where it says "Refunds" "0 out of

13  29 refunds either had the SM or issuers signature as per

14  company policy."  So tell me what that statement means.

15  A.       Well, it means that yes, signed the refund, is

16  what it means.

17  Q.       Well, how many -- out of -- there are 29 refunds

18  total, right?

19  A.       Right, um-hum.

20  Q.       And how many of those had the store manager --

21  had the store manager's signature on it as per company

22  policy?

23  A.       The issuer would be the sales associate, from

24  what I remember.  We changed that, so I'm trying to

25  remember that part.  It would mean that 0 out of 29 had

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 11**

1   this information, had them either sign it, either by the

2   store manager or by the issuer.

3   Q.      Okay.  So --

4   A.      That was within policy.  He was within policy.

5   Q.      Wait.  Company policy required that either the

6   store manager or the issuer sign the refund, right?

7   A.      Right.  Okay.

8   Q.      And there were 29 times -- there were a total of

9   29 refunds, right?

10  A.      One second.  Let me read this here.

11  Q.      Yeah, please do.

12  A.      This is a long time ago.

13  Q.      No, please take as much time as you need to read

14  it.

15  A.      Okay.  What that means is 0 out of the 29 either

16  did not have the manager's signature or the issuer's

17  signature.

18  Q.      So that meant that company policy had not been

19  complied with --

20  A.      Correct.

21  Q.      -- 29 times, right --

22  A.      Correct.

23  Q.      -- with respect to the refunds, right?

24  A.      Correct.

25  Q.      So, in your mind, what did that tell you about

**Dec. of Thompson - Exhibit 11**

1   how the store manager was performing on that aspect of

2   his job?

3   A.      He wasn't following policy or procedure.

4   Q.      And was it, to your understanding, an important

5   requirement, that either the store manager or the issuer

6   sign the refunds?

7   A.      Yes.

8   Q.      And why was that important?

9   A.      It showed that the manager reviewed them, right,

10  to make sure they were in compliance.  'Cause what the

11  manager would have to do -- again, this is going way

12  back, because they've changed things -- the manager

13  would have to review it, take the ticket and check the

14  merchandise to make sure the merchandise was there.  So

15  if a person returned something, the item should be back

16  on the shelf and the count should be correct.

17  Q.      So did it cause you concern that -- was this --

18  this says "Daily Reports and Operational Review."  So

19  were these refunds in one day that you were looking at?

20  A.      Usually, when I reviewed things, right, again,

21  everything changed.  Trying to remember if it was -- I

22  did a couple of days, or they only wanted us to look at

23  one day.

24  Q.      Okay.

25  A.      I don't remember that part.  I remember -- to me

**Dec. of Thompson - Exhibit 11**

1   it might have been because of so many tickets in 29 days

2   being his store, it might have been just one day I

3   looked at.

4   Q.      29 refunds.

5   A.      29 refunds, yeah.

6   Q.      Not like --

7   A.      Or it could have been over a period of time.  I

8   don't -- that part I don't remember.

9   Q.      But I'm just talking about your general

10  practice, then.  Would you be looking at one day or --

11  or what was the longest period of time you would be

12  looking at, in terms of this consistency of following

13  company policy with regard to refunds?

14  A.      Usually about a week, five days.

15  Q.      Okay.  So you don't know whether you were

16  looking at one day or up to a week of refunds?

17  A.      Yes, that I don't remember.

18  Q.      Did it cause you --

19  A.      I mean --

20  Q.      Did it cause you any concern that 0 out of 29

21  refunds were noncompliant with company policy?

22  A.      Yes.

23  Q.      And did you think that was a serious violation?

24  A.      Yes.

25  Q.      Did you speak with Mr. Allen about it at the

**Dec. of Thompson - Exhibit 11**

1   time?

2   A.      Yes.

3   Q.      And what was his response?

4   A.      If I, like I said, did speak to him, probably,

5   but I think --

6   Q.      Well, no, I'm not asking you to guess or

7   speculate.  Do you have any memory now --

8   A.      No.

9   Q.      -- of what Mr. Allen said, if anything?

10  A.      I don't remember.  I'm sorry, it was so long

11  ago.

12  Q.      That's fair.

13  A.      Okay.

14  Q.      And I totally understand that.  So I don't want

15  you to torture yourself if you don't remember.  If you

16  don't remember, you can tell me, okay?

17  A.      I just -- I don't remember.

18  Q.      Okay.  The next thing is voids.  What is a void?

19  A.      A void is to void out a sale so that sale

20  doesn't sit up there in the system, because what will

21  happen is if you don't void out a sale, that's where a

22  cash shortage is.

23  Q.      Would you keep your voice up and slow down?

24  A.      That's where a cash shortage could happen.

25  Q.      Okay.  This states, quote, "0 out of 2 voids

**Dec. of Thompson - Exhibit 11**

1   were not signed by the store manager as per company

2   policy."

3   A.      Right.

4   Q.      Was it company policy that the store manager,

5   himself or herself, actually signed the void?

6   A.      Yes, except when they're on vacation.

7   Q.      Okay.  But assuming the store manager is not on

8   vacation, he or should would be required under all

9   circumstances to sign the voids, correct?

10  A.      Correct.

11  Q.      And would you expect Mr. Allen, as an

12  experienced store manager, to know that?

13  A.      Yes.

14  Q.      And is this a particularly -- is this difficult

15  to comply with this requirement of having voids signed

16  by the store manager?

17  A.      Typical?  No.

18  Q.      Difficult.

19  A.      No.

20  Q.      Would you expect Mr. Allen to understand and be

21  familiar with the company's policies with respect to

22  signing refunds?

23  A.      Say it again.  I'm sorry.

24          MS. THOMPSON:  Could you read it back, please.

25          (Record read by the reporter:

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 11**

1           "Question:  Would you expect Mr. Allen to

2           understand and be familiar with the

3           company's policies with respect to signing

4           refunds?")

5           THE WITNESS:  Yes.

6           MS. THOMPSON:  Q.  Again, that's not a

7    particularly difficult requirement, is it?

8    A.      No.

9    Q.      Why was it important, as a matter of company

10   policy, to have the store manager sign the voids?

11   A.      Again, the same thing, is to review the voids,

12   sign them to make sure they were real, and at the same

13   time, he can, you know, verify that there's no -- any

14   kind of dishonesty going on.  By signing the void, he

15   knows it's a void.  So when he does his -- the banking

16   at the end of the day, it doesn't show up as a cash

17   shortage.  Because a void has happened, now there's no

18   cash in the drawer for that void.

19   Q.      So was that an important -- was it your

20   understanding that Radio Shack viewed that as an

21   important control?

22   A.      Yes.

23   Q.      The next item says "Cash Settlement."  Quote,

24   "The store had a $130 shortage in the past 30 days," end

25   quote.  Was that a significant shortage for 30 days?

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 11**

1    A.      Yes.

2    Q.      Would there be any kind of average shortage that

3    you might expect in a 30-day period?

4    A.      Um --

5    Q.      Or would you expect zero?

6    A.      I'd expect zero, really.  Any shortage -- like

7    they said, any shortage is a bad shortage.  We're short.

8    Q.      So I'm just trying to understand, based upon

9    your experience and familiarity with Radio Shack's

10   policies and procedures, how significant a shortage was

11   $130 for a 30-day period?

12   A.      Um, it was -- it would be significant, something

13   we would look into, or something I would look into.

14   Q.      Do you remember discussing this -- I take it

15   this caused you concern that Mr. Allen's store had $130

16   shortage in the past 30 days?

17   A.      I -- all I can say is yes.  That's all I can

18   say.

19   Q.      I'm just trying to find out if it caused you

20   concern.  That's "yes" or "no."

21   A.      Yes.

22   Q.      Okay.  And did you discuss your concern with

23   Mr. Allen?

24   A.      If I reviewed it with him, yes.

25   Q.      Okay.  And your practice, again, would have been

**Dec. of Thompson - Exhibit 11**

1    to review it --

2    A.       Yes.

3    Q.       -- with him?

4    A.       Um-hum.

5    Q.       It being Exhibit 1?

6    A.       Yes.

7    Q.       And did Mr. Allen have any response?

8    A.       Don't remember.

9    Q.       Okay.  Now, under "payroll," it notes --

10   Exhibit 1 reads, quote, "Timecards need to be filled out

11   by employees every day worked," end quote.  What was

12   your purpose in writing that notation on Exhibit 1?

13   A.       It's -- number one, company; it was a company

14   policy, had to do it, and a state law, in case a state

15   auditor would walk in the store.  Because everything had

16   to be on there, showing lunches and stuff.

17   Q.       Were you making a note on Exhibit 1 because

18   timecards were not being filled out by employees --

19   A.       Yes.

20   Q.       -- every day?

21   A.       Um-hum.  That's what -- yes, that's what I'm

22   reading (indicating).

23   Q.       So did that cause you concern that -- well, let

24   me back up.

25            In your mind, as regional loss prevention

1    manager and based on your knowledge of Radio Shack

2    company policies and procedures, was that a significant

3    issue, that Mr. Allen was not making sure timecards were

4    being completed every day?

5    A.      Loss prevention issue?  It was a company policy,

6    so I would have to say yes, that was an issue.

7    Q.      Did that cause you concern when you learned --

8    based upon your review, your store visit -- that

9    timecards were not being filled out by employees every

10   day worked?  Did that cause you concern?

11   A.      Concern that he wasn't following policy, yes.

12   Q.      Then the notation is, "any SPIFF" -- that's

13   S-P-I-F-F -- "recorded should include a ticket # to

14   ensure validity," end quote.

15           Did you make that notation because SPIFFs were

16   not including a ticket number?

17   A.      On the timecard, you would have to have a SPIFF

18   and then right next to the ticket number, and those

19   weren't on there.

20   Q.      Can you tell me what a SPIFF is?

21   A.      They would get extra money if they sold a phone,

22   sold accessories and things like that, for the phone;

23   they would be considered a SPIFF.

24   Q.      SPIFF would mean extra compensation for the

25   employee?

**Dec. of Thompson - Exhibit 11**

1   A.      Correct.

2   Q.      So it was important that the information be

3   recorded completely and accurately?

4   A.      Correct.

5   Q.      To ensure that the employee was being paid

6   properly?

7   A.      Correct.

8   Q.      Again, did you review this as a serious concern

9   that this information was not being properly recorded?

10  A.      Yeah, I would see it as a problem with the

11  policy.

12  Q.      The next statement is, quote, "the SM" -- store

13  manager -- "must review and sign each employee's

14  timecard for accuracy prior to closing payroll," end

15  quote.  Did you observe that the store manager was not

16  reviewing and signing each employee's timecard?

17  A.      Can't remember what I saw that day.

18  Q.      Okay.

19  A.      But -- that's all I can say.  I mean, I can give

20  you a for-instance.  I don't remember what I saw this

21  day.

22  Q.      But my point is, did you make this notation on

23  Exhibit 1 because, based upon your review, you reached

24  the conclusion that the store manager was not reviewing

25  and signing each employee's timecard for accuracy?

**Dec. of Thompson - Exhibit 11**

Page 143

1    A.       It would probably be yes.  Because it's on

2    there; I put it down.

3    Q.       So why did you write it down?

4    A.       Again, I would say hypothetical -- going through

5    other things I've done, not just Frank, but bottom line

6    is it was the responsibility of the store managers to

7    fill out the timecards every time at the close of

8    payroll.  When I looked at the sheets, payroll, a lot of

9    that stuff wasn't on there, but it was on the sheets, on

10   the payroll sheets.  So on the timecards, it wasn't

11   there.  Over here it was, on the timesheets.

12   Q.       Are you guessing that happened, or do you have a

13   memory of that?

14   A.       I don't have a memory of it.

15   Q.       Okay.  All right.  Again, I'm just -- would it

16   be your practice, if you observed that each employee's

17   timecard had not been signed by the store manager, to

18   note that in a store visit report such as Exhibit 1?  In

19   other words, what I'm trying to find out is, because you

20   made a notation in here, does that indicate to you there

21   was a problem with the store manager signing each

22   employee's timecard?

23   A.       Well, yeah.

24   Q.       Okay.  That's all I'm trying to figure out.

25   A.       Right there, it says it.

**Dec. of Thompson - Exhibit 11**

1    Q.      All right.  Looking at page two of Exhibit 1,

2    about halfway down the page -- well, actually, the top

3    third, it says, "Applications On File."

4          Quote, "0 out of 7 RSAP applications did not

5    have the hard copy of the RSAP contract signed and

6    attached to the document," end quote.

7          What does RSAP stand for?

8    A.      Radio Shack -- I can't remember the rest of it.

9    Q.      Okay.  Even if you don't remember what the

10   acronym stands for, do you know what an RSAP application

11   is?

12   A.      I think it was a credit card.

13          MS. VERONESE:  Don't guess.

14          THE WITNESS:  I don't remember.

15          MS. THOMPSON:  Q.  But obviously you thought it

16   was important enough to note on Exhibit 1 that zero out

17   of seven applications did not have the hard copy

18   contract signed and attached, right?

19   A.      Correct, yes.

20   Q.      Under "General Security," next to "Stockroom,"

21   it says, quote, "Backroom door was open upon my arrival

22   to the store but the security cage was locked," end

23   quote.  I thought you indicated earlier that having the

24   back room door open was a violation of company policy?

25   A.      Correct.  But I can stop you right there.  I put

**Dec. of Thompson - Exhibit 11**

1   it in here, right?

2   Q.      Yes.

3   A.      That's just to show what I found.

4   Q.      Yes.

5   A.      There should have been a VOCP with it.

6   Q.      I'm sorry, there should have been a VOCP with

7   what?

8   A.      If I found the back door open, right, or propped

9   open when I arrived, then I would do a separate document

10  called the VOCP, violation of company policy.

11  Q.      And would you do that each and every time you

12  found a back room door open?

13  A.      Yes.

14  Q.      And you believe you did a separate document

15  called a VOCP with respect to the open back room door

16  for Mr. Allen?

17  A.      I would say I don't remember, but I would say I

18  would have done it.

19  Q.      That would be your normal policy and practice?

20  A.      Yes.  Now, there would be circumstances where I

21  would walk in, the back door would be open, the

22  stockroom door, but they're doing inventory.  And the

23  district manager says, "I'm approving this."

24  Q.      Okay.

25  A.      It means if I sent the VOCP, he wouldn't do

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 11**

1    anything with it anyway.

2    Q.      But you did not note anywhere on Exhibit 1 that

3    there was inventory --

4    A.      No.

5    Q.      -- or that the district manager had given

6    permission --

7    A.      I would have been --

8    Q.      -- for the door being open, right?

9    A.      Correct.

10          MS. THOMPSON:  Let's mark the next document as

11   Exhibit 2.

12          (DEFENDANT'S EXHIBIT NO. 2

13           WAS MARKED FOR IDENTIFICATION.)

14          (Recess taken.)

15          MS. THOMPSON:  Okay.  Back on the record.

16   Q.      Right before the break I marked as Exhibit 2 a

17   one-page document, Bates numbered Radio Shack/Allen224,

18   with a date of February 20th, 2003, to Hani Alzaghari

19   from Tom Nabozny.

20          Please take as much time as you need to read

21   Exhibit 2, and let me know when you're finished.

22          MS. VERONESE:  He's leaving.

23          (Mr. Allen left the deposition room.)

24          THE WITNESS:  Okay.

25          MS. THOMPSON:  Q.  All right.  Did you prepare

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 11**

Page 147

1    Exhibit 2?

2    A.      Yes.

3    Q.      Did you prepare Exhibit 2 in its entirety?

4    A.      Yes.

5    Q.      And did you prepare Exhibit 2 on or about

6    February 20th, 2003?

7    A.      Yes.

8    Q.      And is Exhibit 2 a violation of company policy

9    memorandum?

10   A.      Yes.

11   Q.      And did you prepare Exhibit 2 as part of your

12   duties and responsibilities as loss prevention manager?

13   A.      Yes.

14   Q.      I see that you directed -- it appears to be that

15   Exhibit 2 is directed to Hani Alzaghari DSM.  He's the

16   district sales manager, correct?

17   A.      Yes.

18   Q.      And a cc to Tom Schultz RSM?

19   A.      Um-hum.

20   Q.      Is that "yes"?

21   A.      Yes.

22   Q.      Tom Schultz was the regional sales manager at

23   the time?

24   A.      Yes.

25   Q.      And you also sent it to P. Blair, director of

PATRICIA CALLAHAN REPORTING

**Dec. of Thompson - Exhibit 11**

Page 148

1  loss prevention; is that right?

2  A.     Yes.

3  Q.     And does Exhibit 2 concern your visit to

4  Frank Allen's store on February 20th, 2003?

5  A.     This is addressing the money I found in a

6  drawer.

7         MS. THOMPSON:  Okay.  I'm sorry, could you just

8  read my question back.

9         (Record read by the reporter:

10        "Question:  And does Exhibit 2 concern your

11        visit to Frank Allen's store on February

12        20th, 2003?")

13        THE WITNESS:  Yes.

14        MS. THOMPSON:  Q.  Okay.  And are the statements

15  that are made in Exhibit 2 truthful and accurate in all

16  respects?

17  A.     Yes.

18  Q.     And what was your purpose in preparing

19  Exhibit 2?

20  A.     As it states in here, I found -- while doing the

21  visit, I found a box in a drawer, um, at which time I

22  confronted Frank with it, probably, and went over

23  everything with him.  And he explained what it was and

24  everything.  I told him it was a violation of company

25  policy, you know, and I'd have to write it up and turn

**Dec. of Thompson - Exhibit 11**

1  this over to his district manager.

2  Q.     Okay.  So is it true that keeping cash in the

3  store manager's desk was at the time a violation of

4  company policy?

5  A.     Yes.

6  Q.     And Mr. Allen, the document, Exhibit 2, states,

7  quote, "Allen stated that it was money that he would

8  keep on hand so he would not have to keep running to the

9  bank to get change," end quote.  Is that an accurate

10 statement of what Mr. Allen told you during the store

11 visit on February 20th, 2003?

12 A.     I would say yes because it's in there.  I wrote

13 it down.  So I would say yes.

14 Q.     Then the statement is made in Exhibit 2, "Allen

15 stated he did not like keeping that much money in the

16 cash drawer because he was afraid that he would be

17 robbed, so he kept the money separate from the cash

18 drawer," end quote.

19        Again, does that accurately reflect what

20 Mr. Allen told you during your store visit?

21 A.     Yes.

22 Q.     The next statement is, quote, "Allen said that

23 he would make sure that he counted the money when he did

24 the bank settlement so the cash drawer would not be

25 short," end quote.  Why did you make that notation

**Dec. of Thompson - Exhibit 11**

1   there?

2   A.      Because I probably was curious as to why it

3   wasn't showing up as a cash shortage.  So he would take

4   the money out, and then he would count that money when

5   he did his bank settlement at the end of the day.  I

6   think that's what it's called, bank settlement, at the

7   end of the day.

8   Q.      So, in other words, the money that he was

9   keeping in the store manager's desk drawer would be

10  counted at the end of each day when he did the bank

11  settlement?

12  A.      Yes.

13  Q.      And because he did that, it would not show up as

14  a shortage?

15  A.      Correct.

16  Q.      And did you tell Mr. Allen that he needs to

17  understand that this practice is strictly against

18  company policy?

19  A.      Yes.

20  Q.      Did you tell Mr. Allen that he had to follow the

21  company policy for all cash procedures?

22  A.      Yes.

23  Q.      Did you tell him all cash must be kept in a cash

24  drawer in a company-provided; drop safe?

25  A.      Yes.

**Dec. of Thompson - Exhibit 11**

1    Q.      Did you tell Mr. Allen that he had an extra

2    working cash drawer that is currently filled with odds

3    and ends?

4    A.      Yes.

5    Q.      Did you tell him that the money that was kept in

6    the manager's desk drawer should, instead, be kept in

7    this extra cash drawer so that it could be monitored by

8    him at all times?

9    A.      Yes.

10   Q.      And did you tell him this change needs to be

11   made as soon as possible?

12   A.      Yes.

13   Q.      And he would be held accountable to follow all

14   company policies at all times?

15   A.      Yes.

16   Q.      Did Mr. -- let me make sure I understand

17   something.  There was room, physical room, in the cash

18   register to keep the money that you observed was, in

19   fact, in the manager's desk in the back?

20   A.      I would say -- I have to think again, because we

21   switched over to two different drawers.  We used to have

22   this old wooden drawer with a combination on it, and it

23   was very small.  So I --

24           MS. VERONESE:  Don't guess.

25           THE WITNESS:  I don't remember.

**Dec. of Thompson - Exhibit 11**