IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

FRANK ALLEN,

    Plaintiff,

  v.

RADIOSHACK CORPORATION,

    Defendant.

No. C 11-03110 WHA

**ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

## STATEMENT

Plaintiff Frank Allen, who is African American, was employed by defendant RadioShack Corporation as an assistant manager in 1997. He was then promoted to store manager and transferred to Store 3830, where he worked for twelve years. Over the course of his employment, plaintiff earned several awards for high sales numbers. On April 27, 2010, plaintiff was terminated by Donna Ocampo, the district manager at the time. Plaintiff was 54 years old at the time of termination.

Store 3830 was considered to be a high-volume store based on sales, and was also a store with high-crime concerns, due to its location in the Tenderloin area of San Francisco. In all stores, defendant implemented and enforced "loss prevention" policies and procedures to address theft and cash control. Loss prevention was enforced in part by visits from loss-prevention managers, who visited stores to check for compliance with company policies (Peterson Decl. ¶¶ 2–3). Beginning in 2003, plaintiff received a number of unfavorable reports regarding ensuring compliance with loss-prevention policies (Alzaghari Decl. ¶¶ 4–8).

From January 2003 to February 2010, plaintiff reported directly to district manager Hani Alzaghari, who was responsible for overseeing approximately 22 stores in and around San Francisco. Alzaghari was transferred to a position as district manager in the San Jose area in

1  February 2010 (Alzaghari Decl. ¶ 1). Alzaghari in turn reported to the regional sales director,
2  Tom Schultz. In October 2009, Donna Ocampo was temporarily appointed to fill the position of
3  regional sales director following Schultz's promotion and later departure from the company.
4  Ocampo served as regional sales director from October 2009 until February 26, 2010, when she
5  became the district manager for the San Francisco area. Allen reported directly to Ocampo from
6  February 26 until his termination.

### 1. VISITS BY PATTAKOS.

Sometime in early December 2009, plaintiff's store was visited by Ocampo, then-acting regional sales director; Gregory Pattakos, in his temporary position as area vice president; and other senior managers. Alzaghari had warned the store managers in his district about the upcoming visits by senior management and had told the store managers to ensure the stores were clean and organized (Allen Dep. 47–48). During the visit, Pattakos introduced himself, looked Allen "up and down," and asked "how long have you been with RadioShack?" Pattakos' tone was "very hostile." Allen answered that he had been with the company for 13 years. Pattakos responded: "You may have a year with Radioshack" (*id.* at 58–59). Pattakos then asked whether plaintiff was in charge of running the store, to which plaintiff responded that his district manager told him how to operate the store (*id*. at 60). This conversation lasted less than a minute, after which Pattakos, Allen, and a loss-prevention manager went to the back room of the store and discussed security improvements, the disorganization of the store and back room, and rearranging the store (*id.* at 62–64). Pattakos told plaintiff he would return to the store later.

Shortly after Pattakos' visits, Alzaghari held a district meeting with all of his store managers. Ocampo was also present. At the meeting, which took place in December 2009, plaintiff recounted his experience with Pattakos, including Pattakos' statements and hostile tone (Allen Dep. 74). Other managers were "upset about what was said and how [Pattakos] was questioning . . . how long [plaintiff had] been with RadioShack" and thought Pattakos had been rude and unprofessional (*id*. at 76, 78; Alzaghari Decl. ¶ 18).

In January 2010, Pattakos returned to the Bay Area and visited several stores. Ocampo accompanied him on these visits, which included plaintiff's store. According to Ocampo, "the

1 store appearance was significantly improved from the December visit . . . and Mr. Pattakos
2 appeared pleased with the visit" (Ocampo Decl. ¶ 6; *see also* Alzaghari Decl. ¶ 21). Pattakos
3 was acting area vice president for the West region for December 2009 and January 2010. He
4 then returned to his position as vice president of operations for the Central division and no
5 longer had oversight of California stores (Pattakos Decl. ¶ 3).

### 2. LOSS PREVENTION REPORTS.

Shortly after Ocampo became district manager in the San Francisco area, she asked the regional loss-prevention manager, David Gonsolin, to visit plaintiff's store in order to review plaintiff's compliance with loss-prevention policies (Ocampo Decl. ¶ 11). Gonsolin found a number of violations in his visit on March 9, 2010, which he reported in a "violation of company policy memo" and in comments sent to Ocampo and the loss-prevention department via email (Ocampo Decl. Exhs. 3–4). Gonsolin also forwarded to Ocampo a summary of a similar inspection he had conducted in February 2009. The report was "generally positive," but noted a similar problem with unsecured laptops (*id.* ¶ 15). Based on Gonsolin's reports, Ocampo issued a "corrective action record" to plaintiff for "failure to protect company assets from internal and external theft" (*id.* at Exh. 6). The corrective action record reported issues with unsecured laptops, "missing cage counts," and several months of cash shortages. The record noted that plaintiff failed to report the cash shortages and did not have an explanation as to why they occurred. Ocampo reviewed the report with plaintiff on March 23, 2010.

### 3. OCAMPO TERMINATED PLAINTIFF.

In March 2010, Ocampo visited plaintiff's store and observed the employees as they worked (Allen Dep. 223). Ocampo then told plaintiff that he had the "wrong people in the store." Plaintiff responded that his store had three top salespeople and the best inventory in the district. Plaintiff was referring to employees "Bruce", Rosetta Holmes, and "Victoria", a Caucasian man, an African-American woman, and a Hispanic woman, respectively. Ocampo then told him "[e]ven so, it's the wrong image that [*sic*] we want" (*id.* at 223). Plaintiff claims that he considered Ocampo's remarks to be discriminatory, as four out of his five employees were either African American, Hispanic, or of Middle Eastern descent (Allen Decl. ¶ 13).

3

Ocampo returned to the store several weeks later. She told plaintiff: "if you don't get rid of those employees . . . then I will get rid of you" (Allen Dep. 230–31). Plaintiff did not terminate any employee.

On April 20, 2010, Ocampo visited the store, along with Basem Aybef, who was temporarily serving as regional sales director from April to May 21, 2010. Plaintiff was not there, as he had gone home already. Ocampo and Aybef went to the back room of the store and checked the manager's desk. Inside one of the drawers, which was open, Ocampo found coins and bills in an open pouch. According to Ocampo, keeping cash anywhere other than the cash register drawers was against company policy (Ocampo Decl. ¶ 18). During the visit, Ocampo and Aybef spoke with sales associate Rosetta Holmes. While they were talking, Holmes pulled a large bunch of cash from her pocket. She explained that she had completed several large cash transactions and that she was going to place the cash in the back room. The amount of cash was estimated to be around $1,000. Ocampo and Aybef "were both extremely concerned that a store associate would be walking around the store with any amount of cash, much less an amount that significant" (*id*. at ¶ 19). They instructed Holmes to prepare a bank deposit. Ocampo and Aybef discussed the situation, and Ocampo said that she believed plaintiff should be terminated "not only for having cash in the back, but for permitting what appeared to be a lax environment among his store employees" (*id*. at ¶ 20). Aybef agreed that termination was appropriate.

The next day, plaintiff called Ocampo regarding her visit to the store. He told Ocampo that the drawer had been locked when he left, and that it was not his fault if the drawer was unlocked when Ocampo arrived. "He further stated that he did not think he should be held accountable for what his employees did in his absence" (*id.* at ¶ 21). Plaintiff testified that he was given special permission to keep cash in the drawer of the store manager's desk in the back room by his former district manager, Alzaghari. Plaintiff did not, however, inform Ocampo that he had been given any special permission to keep cash in the desk drawer.

Sometime in the next few days, Ocampo discussed the decision to terminate plaintiff with Gonsolin, who agreed with Ocampo. On April 27, Ocampo and Gonsolin went to plaintiff's

4

store to advise him of his termination. Plaintiff became very agitated. Plaintiff remarked "thank you for freeing a slave" before walking out (Ocampo Decl. Exh. 8).

Amy Tam was transferred from another store to replace plaintiff. Tam is a 23-year-old woman of Chinese descent. Three of the five employees who had worked at the store while plaintiff was manager were fired; one was transferred. Of the original five employees, only Bruce, who was Caucasian, remained. Employees later hired to work at the store were of different races, including African American and Hispanic (Dkt Nos. 64 and 65).

Store manager Carlos Venegas sent a Facebook message to plaintiff soon after plaintiff was fired. The message stated "Amy knew about what was going to happen[.] She told me she was moving to downtown [M]arket [S]treet like a month ago. . . ." (Venegas Dep. Exh. 1). Venegas testified that Tam told him she was going to get promoted to a high-volume store in San Francisco. Tam did not tell him which store she was moving to (*id.* at 86, 106–07). After plaintiff was fired and Tam moved to plaintiff's former store, Venegas concluded that Tam must have been referring to plaintiff's store in her earlier remarks (*id.* at 107).

Plaintiff's complaint against RadioShack alleges discrimination on the basis of age and race in violation of the California Fair Employment and Housing Act ("FEHA"), retaliation, harassment and hostile work environment, wrongful termination in violation of public policy, and intentional infliction of emotional distress. Plaintiff seeks compensatory and punitive damages. Defendant filed the instant motion for summary judgment on all or part of plaintiff's claims.

## CONCLUSION

Because there are disputed issues of material facts, defendant's motion is **DENIED**.

**IT IS SO ORDERED.**

Dated: December 21, 2012.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

5